```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/22/2023
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FLOYD'S OF LEADVILLE, INC., N/K/A
VALUED, INC.,

               Plaintiff,

-against-

ALEXANDER CAPITAL, LP; NESA
MANAGEMENT, LLC; JOSEPH
ANTHONY AMATO; ROCCO GERARD
GUIDICIPIETRO; JONATHAN GAZDAK;
GREGORY F. HURLEY; HOWARD
DASILVA; RONALD BARRIE CLAPHAM;
MARK DAVID LEONARD; THIEN
TRUONG; PROVISION HOLDING, INC.;
TIMOTHY KELLY; AND THREE DDD
LLC,

               Defendants.

1:22-cv-03318-MKV

**OPINION AND ORDER
DENYING MOTION TO DISMISS**

MARY KAY VYSKOCIL, United States District Judge:

Plaintiff Floyd's of Leadville, Inc. ("FOL") bring this action asserting claims against Alexander Capital, LP ("Alexander Capital"), its partners, and associated individuals and entities (together, "Defendants"), alleging that Defendants engaged in a conspiracy to defraud FOL. Defendant Ronald Barrie Clapham ("Clapham") moves to dismiss the claims against him for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). [ECF No. 130]. For the following reasons, the Motion to Dismiss is DENIED.

## BACKGROUND[1]

FOL is a Colorado corporation, with its principal place of business in Colorado, that sells cannabidiol ("CBD") products online and at retail locations. Compl. ¶¶ 4, 20. Alexander Capital,

---

[1] This Opinion draws its facts from the Complaint [ECF No. 1] ("Compl."), the well-pleaded facts of which are taken as true and construed in the light most favorable to FOL for purposes of this Motion. *See S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010). The Court also considers the declarations and any exhibits submitted by the parties in support of or in opposition to the Motion. *See SPV OSUS Ltd. v. UBS AG*, 114 F. Supp.

a broker-dealer registered with FINRA and the SEC, is a Delaware partnership with its principal place of business in New York. Compl. ¶ 5. Clapham, the Moving Defendant, is a citizen and domiciliary of the United Kingdom. Compl. ¶ 12.

Beginning in 2017, FOL and Alexander Capital were engaged in an agreement by which Alexander Capital acted as FOL's fiduciary and financial advisor and solicited investors to provide capital for FOL, for which Alexander Capital earned a commission. Compl. ¶¶ 23, 26–28. Ultimately, Alexander Capital raised over $4 million in capital for FOL from over fifty investors, including investors based in New York. Compl. ¶ 30. The investments were issued as notes secured by FOL's assets pursuant to subscription and security agreements (the "lending documents"). Compl. ¶ 31.

FOL alleges that the lending documents were purposefully structured by Alexander Capital so that FOL would never be able to repay the notes, forcing FOL to over-leverage as part of a conspiracy to defraud FOL with the goal of seizing its assets to form a new CBD company. Compl. ¶¶ 3, 60–64, 77. FOL alleges that Alexander Capital created conflicts of interest by serving as agent to FOL's investors while also a fiduciary to FOL (as well as acting in its own interest). Compl. ¶¶ 42–59. FOL further alleges that Alexander Capital formed a side-deal with investors that decreased the likelihood that FOL would be able to renegotiate the lending documents, all while misrepresenting to FOL that it would be able to restructure the investments on commercially reasonable terms. Compl. ¶¶ 65–73. In addition, FOL alleges that as part of Alexander Capital's scheme to raid FOL, Alexander Capital and its associates siphoned money raised on behalf of FOL through a kickback scheme with another broker-dealer, "scammed" FOL by causing it to enter

---

3d 161, 167 (S.D.N.Y. 2015) ("[I]n reviewing a Rule 12(b)(2) motion, a court may consider documents beyond the pleadings in determining whether personal jurisdiction exists." (internal quotation marks omitted)), *aff'd*, 882 F.3d 333 (2d Cir. 2018).

fraudulent service contracts and loans, exposed FOL itself to fraud liability, and pressured FOL into an eventually abandoned reverse IPO.  Compl. ¶¶ 103–44.

Clapham was an investor in FOL.  [ECF No. 131 ¶ 8 ("Clapham Decl.")].  In November 2018, an entity called Speyside Holdings Limited ("Speyside"), for which Clapham signed as Director, purchased $2 million of FOL stock through a Subscription Agreement.  [ECF No. 127-1 ("Subscription Agreement")].  The Subscription Agreement and all documents related to it expressly were governed and enforced in accordance with the laws of New York.  Subscription Agreement 9 ¶ 16.  Pursuant to the Subscription Agreement, the sale of FOL stock was completed in the offices of Carmel, Milazzo & DiChiara LLP ("CMD"), a New York law firm that FOL alleges was installed by Alexander Capital as counsel to FOL, but that simultaneously advised Alexander Capital on various matters, including in connection with the lending documents.  Subscription Agreement 8 ¶ 6; Compl. ¶¶ 38–41.

Clapham joined an advisory board (the "Advisory Board") created by Alexander Capital, which purportedly was formed to advise FOL on renegotiating with its investors to improve its financial condition.  Compl. ¶ 145, 147.  FOL alleges, however, that the true purpose of the Advisory Board was to facilitate the final steps of Alexander Capital's fraud to take over FOL, including by pressuring FOL to hand over control to Alexander Capital, acquiring access to FOL's confidential information, and formalizing a secret side-deal with FOL's investors on terms favoring the investors over FOL.  Compl. ¶¶ 145, 148–52, 154.  FOL alleges that Clapham, along with the other members of the Advisory Board, "used their position to actively plot a hostile takeover of FOL and to make plans to run FOL's business after they and Alexander Capital acquired FOL's assets in litigation," and that they did so "with full knowledge of Alexander

Capital's fraud against FOL, seeking to aid and abet the culmination of that fraud and exploit it for their own personal benefit." Compl. ¶ 156.

In January 2020, Clapham traveled to New York and attended a meeting between FOL and its creditors. Clapham Decl. ¶ 10. In July 2020, Clapham created and presented to Alexander Capital and the Advisory Board an "investment deck" that proposed the formation of a new cannabis and CBD company that would sue FOL, seek to acquire its assets, and encourage FOL's investors to reassign their investments to it. Compl. ¶¶ 163–64, 166. Alexander Capital and the Advisory Board accepted and followed through on Clapham's plan, creating Redemption Holdings, Inc. ("Redemption"), a Colorado corporation with its principal place of business in New Jersey. Compl. ¶ 164. Redemption is 80% owned by a group that includes Clapham. Compl. ¶¶ 165, 169. Clapham played a role in convincing the majority of FOL's investors to reassign their rights to Redemption, on the representation that doing so was the only way the investors would recover their investments in FOL. Compl. ¶¶ 167–68.

Shortly after its formation, Redemption sued FOL in Colorado state court, alleging that it is the assignee of the lending documents and seeking to enforce those documents as assignee or agent for FOL's investors. Compl. ¶¶ 170–71. Redemption seeks a money judgment of over $6 million and control of all of FOL's assets. Compl. ¶ 171. FOL counterclaimed in Colorado state court, alleging fraud, breach of fiduciary duty, and civil conspiracy against Redemption and one of Alexander Capital's former employees and Redemption's agent, Frank DiMartini. Compl. ¶ 174. FOL attempted to join the Defendants named in this action to the Colorado action, but the

Colorado state court determined that the claims against those Defendants were not sufficiently related to the claims before it to warrant bringing them in the same action. Compl. ¶ 174.

## PROCEDURAL HISTORY

FOL initiated this action against Defendants, asserting twelve state and federal claims. Compl. ¶¶ 188–297. As against Clapham, FOL raises claims under New York state law for aiding and abetting fraud, aiding and abetting breach of fiduciary duty, intentional interference with prospective economic relations, and civil conspiracy. Compl. ¶¶ 229–36, 243–58, 290–97. Several Defendants, including Alexander Capital and its partners, filed Answers. [ECF Nos. 61, 121]. FOL voluntarily dismissed its claims against certain other Defendants following those Defendants' motions to dismiss for lack of personal jurisdiction. [ECF Nos. 78, 85, 109, 142–44]. FOL did not dismiss its claims against Clapham.

In lieu of an answer, Clapham moved to dismiss FOL's claims against him for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). [ECF No. 130]. He submitted a memorandum of law [ECF No. 115 ("Def. Mem.")] and a Declaration [ECF No. 131] in support of his Motion. FOL opposed the Motion to Dismiss [ECF No. 126 ("Pl. Mem.")] and submitted a Declaration of counsel [ECF No. 127], attached to which is a copy of the Subscription Agreement [ECF No. 127-1]. Clapham filed a reply brief in further support of his Motion. [ECF No. 135 ("Def. Reply")].

## LEGAL STANDARD

To survive a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), FOL must make a *prima facie* showing that the Court has personal jurisdiction over Clapham. *See Thomas v. Ashcroft*, 470 F.3d 491, 495 (2d Cir. 2006). Such a showing requires "legally sufficient allegations of jurisdiction," including "an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant." *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204,

5

206 (2d Cir. 2003) (internal quotation marks and ellipsis omitted); *see S. New England Tel. Co.*, 624 F.3d at 138. "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits. If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's *prima facie* showing is sufficient notwithstanding the contrary presentation by the moving party." *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993), *as amended* (May 25, 1993).

## DISCUSSION

FOL contends that Clapham is subject to specific jurisdiction in New York under New York's long-arm statute, codified in Section 302(a) of the Civil Practice Law and Rules ("C.P.L.R."). FOL argues that Clapham "transact[ed] . . . business within the state," and that he "commit[ted] a tortious act within the state," from which the allegations in the Complaint arose. N.Y. C.P.L.R. § 302(a)(1)–(2); Pl. Mem. 8. Specific jurisdiction requires that a defendant "purposefully avail[] itself of the privilege of conducting activities within the forum State." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. __, 141 S. Ct. 1017, 1024 (2021) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). In a diversity case such as this, the Court must first determine whether the law of the forum state, here, New York's long-arm statute, N.Y. C.P.L.R. § 302, would subject Clapham to personal jurisdiction. *See D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006); *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 124 (2d Cir. 2002). If New York law would permit the exercise of jurisdiction over Clapham, the Court must then evaluate whether the exercise of jurisdiction would

comport with constitutional due process requirements. *See Friedman v. Bloomberg L.P.*, 884 F.3d 83, 90 (2d Cir. 2017); *Gottdiener*, 462 F.3d at 105.

I. **New York's Long-Arm Statute Subjects Clapham to Personal Jurisdiction**

A. <u>Clapham Transacted Business in New York</u>

Section 302(a)(1) of New York's long-arm statute authorizes the exercise of personal jurisdiction over a foreign defendant who "transacts any business within the state . . . ." N.Y. C.P.L.R. § 302(a)(1). A party "transacts business" within New York when it "purposefully avails itself of the privilege of conducting activities within New York." *Ehrenfeld v. Bin Mahfouz*, 9 N.Y.3d 501, 508 (2007) (cleaned up). To establish personal jurisdiction under Section 302(a)(1), the asserted claim must "aris[e] from" the defendant's business activities within New York. N.Y. C.P.L.R. § 302(a). A claim "arises from" a transaction "when there is some articulable nexus between the business transacted and the claim sued upon, or when there is a substantial relationship between the transaction and the claim asserted." *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006) (internal quotation marks and citation omitted). A court's determination of whether a defendant transacted business within New York "is based on the totality of the circumstances." *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996). However, "Section 302(a)(1) is a 'single act statute,' and 'proof of one transaction in New York [may be] sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted.'" *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 129 (2d Cir. 2022) (quoting *Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 7 N.Y.3d 65, 71 (2006)).

Clapham engaged in several business transactions in New York that bear a substantial relationship to FOL's claims, subjecting him to personal jurisdiction under Section 302(a)(1).

First, Clapham executed a Subscription Agreement on behalf of Speyside, an entity of which he served as Director, for the purchase of $2 million in FOL stock. That contract contained a New York choice of law clause. Subscription Agreement 9 ¶ 16. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 482 (1985) (although a choice of law "provision standing alone would be insufficient to confer jurisdiction," such a provision may "reinforce[] [defendant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there"); *accord Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 23 (2d Cir. 2004); *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 367 (2d Cir. 1986). Further, the sale of FOL shares pursuant to that agreement closed at the offices of CMD, a New York law firm that Alexander Capital selected to serve as FOL's (and its own) counsel in relation to the lending documents at the center of FOL's allegations. Subscription Agreement 8 ¶ 6; Compl. ¶¶ 38–41. *See Gottdiener*, 462 F.3d at 105 (finding execution of stock trades in broker's New York offices to support personal jurisdiction under Section 302(a)(1)).

Clapham is correct that Speyside is not a defendant in this lawsuit and this lawsuit does not allege a breach of the Subscription Agreement. Def. Reply 1–2.[2] But even in his representative capacity, Clapham's assent to a New York choice of law clause as signatory of the Subscription Agreement rendered it "foreseeable to him that the clause might have application to disputes arising under that agreement that also involved him." *Firefly Equities, LLC v. Ultimate Combustion Co.*, 736 F. Supp. 2d 797, 800 (S.D.N.Y. 2010). Moreover, the relationship between Clapham's interest in FOL as established through the Subscription Agreement, and the conduct alleged in this lawsuit, centered as it is on FOL's finances and the structure of investments in FOL, is not so attenuated that "the event giving rise to the plaintiff's injury had, at best, a tangential

---

[2] Clapham's Reply Brief does not contain numbered pages. The page referred to as page "1" begins at PDF page 4.

relationship to any contacts the defendant had with New York." *Sole Resort*, 450 F.3d at 104; *see also Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 339–40 (2012) (noting that Section 302(a)(1) "is relatively permissive" and confers jurisdiction "over those claims in some way arguably connected to the transaction"). Indeed, the Subscription Agreement is itself an example of one of the lending documents FOL alleges Alexander Capital structured to FOL's detriment as part of a conspiracy to defraud FOL and acquire its assets. *See, e.g.*, Compl. ¶¶ 31, 40, 42, 51, 57, 76, 103, 158.

Clapham conducted other purposeful business activity in New York that bears "some articulable nexus" to FOL's claims against him. *Sole Resort*, 450 F.3d at 103. In January 2020, Clapham attended a business meeting in New York between FOL and its creditors at the personal request of FOL's CEO. Clapham avers that he "took no action, conducted no business and was merely a spectator at that meeting." Clapham Decl. ¶10. But at the time of the meeting, Clapham was an investor in FOL, and it is reasonable to infer that he had some interest in the subject of the meeting even if he did not attend in an official business capacity. *See* Pl. Mem. 10. In analyzing business meetings under Section 302(a)(1), "courts have found that meetings need not be 'solely for business purposes,' so long as the relevant discussions increased 'the likelihood of a more solid business relationship between the parties.'" *Aritomo v. Rhee*, No. 21-CV-4875 (RA), 2022 WL 17156554, at *6 (S.D.N.Y. Nov. 22, 2022) (quoting *CutCo*, 806 F.2d at 367). Here, Clapham admits that he and FOL's CEO had a business relationship and that he attended the meeting "as a favor to [FOL's CEO] and essentially as a result of a friendship [they] had at that time." Clapham Decl. ¶¶ 7, 10.

Finally, Clapham's membership on the Advisory Board is a New York-connected business activity that bears a substantial relationship to FOL's claims. FOL alleges that New York-based Alexander Capital put the Advisory Board in place (with the false pretense of advising FOL on

renegotiating its debt) "to execute the final stages of their plan to acquire FOL," culminating their fraud. Compl. ¶ 144–45, 147. Within his capacity on the Advisory Board, Clapham created and presented to the Advisory Board and Alexander Capital an investment deck that proposed the creation of a new company, Redemption, that would seek FOL's assets in litigation and convince FOL's investors to reassign their investments to it. Compl. ¶ 163. This plan was accepted and executed by Alexander Capital and the Advisory Board. Compl. ¶ 164. In executing the plan, Clapham liaised with FOL's investors, at least some of whom were located in New York, and successfully persuaded many of them to reassign their FOL investments to Redemption. Compl. ¶¶ 30, 167–68.

Accordingly, based on the totality of Clapham's business contacts with New York from which the claims asserted against him by FOL arise, the Court finds that FOL has made a *prima facie* showing that Clapham is subject to personal jurisdiction under Section 302(a)(1).

### B. Clapham Committed Tortious Acts in New York Through His Co-Conspirators

Section 302(a)(2) of New York's long-arm statute provides for personal jurisdiction over a defendant "who in person or through an agent commits a tortious act within the state . . . ." N.Y. C.P.L.R. § 302(a)(2). Clapham is subject to personal jurisdiction in New York under this provision by way of FOL's conspiracy allegations against him. *See* Compl. ¶¶ 290–97. Clapham does not challenge Section 302(a)(2) jurisdiction in his Motion.[3]

The Second Circuit has noted that, as interpreted by the New York Court of Appeals, Section 302(a)(2) "reaches only tortious acts performed by a defendant who was physically present

---

[3] By failing to address personal jurisdiction under Section 302(a)(2) in his opening brief, Clapham has waived any argument that he is not subject to jurisdiction under this prong of the New York long-arm statute. *See Cruz v. Zucker*, 116 F. Supp. 3d 334, 349 n.10 (S.D.N.Y. 2015) (a party waives arguments not made in their opening brief). Nonetheless, the Court addresses Section 302(a)(2) for completeness.

in New York when he performed the wrongful act." *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 28 (2d Cir. 1997) (citing *Feathers v. McLucas*, 15 N.Y.2d 443, 458, 460 (1965)). However, "New York courts have long recognized[ that] allegations of a conspiracy can satisfy [Section 302(a)(2)] and a co-conspirator can be considered an agent so that '[t]he acts of a co-conspirator may, in an appropriate case, be attributed to a defendant for the purpose of obtaining personal jurisdiction over that defendant.'" *Berkshire Bank v. Lloyds Banking Grp. plc*, No. 20-1987-CV, 2022 WL 569819, at *3 (2d Cir. Feb. 25, 2022) (quoting *Reeves v. Phillips*, 54 A.D.2d 854, 854, 388 N.Y.S.2d 294, 296 (1st Dep't 1976)), *cert. denied sub nom. Lloyds Banking Grp. plc v. The Berkshire Bank*, __ U.S. __, 143 S. Ct. 286 (2022); *see Fat Brands Inc. v. Ramjeet*, 75 F.4th 118, 126 (2d Cir. 2023) (under Section 302(a)(2), "'agent' includes not only a defendant's formal agents, but also, under certain circumstances, a defendant's co-conspirators") (cleaned up)); *see also Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 122 (2d Cir. 2021) ("a defendant can . . . avail itself of a forum through certain actions taken by a co-conspirator in the forum"), *cert. denied*, __ U.S. __, 142 S. Ct. 2852 (2022).

To establish personal jurisdiction over a co-conspirator defendant under an agency theory, "a plaintiff must allege: first, that the defendant was a part of a conspiracy involving overt acts in New York, and; second, that: (a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted at the direction or under the control, or at the request of or on behalf of the out-of-state defendant." *Fat Brands*, 75 F.4th at 126 (2d Cir. 2023) (cleaned up) (citing *Lawati v. Montague Morgan Slade Ltd.*, 102 A.D.3d 427,

11

428, 961 N.Y.S.2d 5, 7 (1st Dep't 2013) and *Berkshire Bank*, 2022 WL 569819, at *3). FOL has satisfied these requirements.

First, FOL plausibly alleges that Clapham participated in a conspiracy involving overt acts in New York. To establish a civil conspiracy under New York law, a "plaintiff[] must establish not only the corrupt agreement between two or more persons, but their intentional participation in the furtherance of the plan or purpose, and resulting damage." *Kashi v. Gratsos*, 790 F.2d 1050, 1055 (2d Cir. 1986). FOL alleges that Clapham agreed to join the Advisory Board, the creation of which was "the final stage[]" of Defendants' fraudulent scheme to acquire FOL. Compl. ¶¶ 144–45, 166. Not only did Clapham allegedly agree to this scheme, but he intentionally participated in it in furtherance of its purpose by creating the investment deck and proposing the (ultimately adopted) plan to create Redemption, and by contacting FOL's investors, some of whom were in New York, to discuss their reassignment to Redemption. Compl. ¶¶ 163–64, 167–68. Contrary to Clapham's contention, Def. Reply 4, these are particularized allegations of Clapham's participation in the conspiracy. Moreover, FOL has alleged that significant overt acts of the conspiracy took place in New York. Namely, the conspiracy was allegedly spearheaded by a New York-based investment firm, Alexander Capital. *See Schwab*, 22 F.4th at 123–24 (allegations of co-conspirators' communications to and from the forum established overt conspirational acts in the forum). *See generally* Compl.

Second, FOL's allegations that Clapham "agreed to do business with New York-based" Alexander Capital and that "he was deeply involved in the New York-based fraud" orchestrated by Alexander Capital permit the Court to infer that Clapham "was aware of the impact of his conduct in New York." *Fat Brands*, 75 F.4th at 127.

Third, the activity of Clapham's co-conspirators in New York was to his benefit. Clapham is part owner of Redemption. Compl. ¶ 165; Clapham Decl. ¶ 9. Pursuant to the plan proposed

12

by Clapham and put in place by the Advisory Board and Alexander Capital, Redemption was to be funded through the assets of FOL, which FOL alleges were fraudulently acquired through Defendants' conspiracy. Because Clapham is a stakeholder in Redemption, "[i]t follows that [he] stood to benefit financially from h[is] [New York-based] co-conspirators' efforts to further the fraud." *Fat Brands*, 75 F.4th at 127.

Finally, FOL has alleged that Clapham's New York-based co-conspirators acted at his direction or under his control, or at his request of or on his behalf. As an initial matter, this requirement "may be satisfied by an allegation that the out-of-state defendant was 'aware of the torts being committed by' co-conspirators in New York," *id.* (quoting *Berkshire Bank*, 2022 WL 569819, at *3), even if the defendant does not actually direct a co-conspirator to commit a tortious act in New York, *Berkshire Bank*, 2022 WL 569819, at *3. In any event, FOL alleges more than Clapham's mere awareness of his co-conspirators' tortious conduct in New York. Principally, FOL alleges that Clapham was the creator of the investment deck that set forth the final steps through which Defendants would complete their alleged fraud to take over FOL. Compl. ¶¶ 163, 166. Clapham presented this plan to his alleged co-conspirators, including New York-based Alexander Capital, and they "followed through on" it. Compl. ¶¶ 163–64. Based on these allegations, it is reasonable to infer that Clapham exercised some degree of influence over his co-conspirators.

Accordingly, the Court finds that FOL has made a *prima facie* showing that Clapham is subject to personal jurisdiction in New York under Section 302(a)(2), based on a co-conspirator agency theory of jurisdiction.

## II.     Personal Jurisdiction Over Clapham Comports With Due Process

"If the long-arm statute permits personal jurisdiction, the second step is to analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution."

13

*Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010).  This analysis requires both a "minimum contacts" and a "reasonableness" inquiry.  *Id.*

New York's long-arm statute does not extend to the full extent of the Due Process Clause. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60–61 (2d Cir. 2012).  The Second Circuit has noted that a case in which personal jurisdiction is permitted under New York's long-arm statute but "theoretically . . . prohibited under due process analysis" would be "rare." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013); *see Gottdiener*, 462 F.3d at 105 ("[A]pplication of N.Y. C.P.L.R. § 302(a) meets due process requirements."); *Chatwal Hotels & Resorts LLC v. Dollywood Co.*, 90 F. Supp. 3d 97, 108 (S.D.N.Y. 2015) ("Because the New York long-arm statute is more restrictive than the federal due process requirements, by virtue of satisfying the long-arm statute the minimum contacts and reasonableness requirements of due process have similarly been met.").

The Court finds both the minimum contacts and reasonableness inquiries satisfied here. As explained above, FOL alleges that Clapham conducted business in New York and participated in the tortious conduct of a conspiracy with New York-based co-conspirators, overt acts of which took place in New York.  *See, e.g.*, *Chloe*, 616 F.3d at 171 (concluding "that assertion of personal jurisdiction over [defendant] comports with due process for the same reasons that it satisfies New York's long-arm statute"); *Pearson Educ., Inc. v. Shi*, 525 F. Supp. 2d 551, 558 (S.D.N.Y. 2007) (business contacts pursuant to Section 302(a)(1) satisfied minimum contacts inquiry); *LaChapelle v. Torres*, 1 F. Supp. 3d 163, 178–79 (S.D.N.Y. 2014) (same).  As such, Clapham possesses sufficient minimum contacts with New York.

"Where a plaintiff makes the threshold showing of the minimum contacts required for the first test, a defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Bank Brussels Lambert*, 305 F.3d at 129 (internal

quotation marks omitted). Clapham has made no such case. He asserts only vague pleas of "expense and inconvenience." Clapham Decl. ¶ 12. The Court notes that Redemption is litigating against FOL in Colorado, Compl. ¶ 170, and that Clapham is a third-party defendant in that action, Clapham Decl. ¶ 10. Clapham has not persuaded the Court that the exercise of personal jurisdiction over him in New York would impose any undue burden or inconvenience when Redemption, consistent with the plan allegedly masterminded by Clapham to capture FOL's assets, Compl. ¶ 163, is litigating its own claims even further from Clapham's domicile.

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss is DENIED. The Clerk of Court is respectfully requested to terminate the motion pending at docket entry 130.

**SO ORDERED.**

Date: **September 22, 2023**  
**New York, NY**

**MARY KAY VYSKOCIL**  
**United States District Judge**