**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

FLOYD'S OF LEADVILLE, INC.,
N/K/A VALUED, INC.,

                Plaintiff,

v.                           CASE NO.: 1:22-cv-3318

ALEXANDER CAPITAL, L.P.; NESA
MANAGEMENT, LLC; JOSEPH ANTHONY AMATO;
ROCCO GERARD GUIDICIPIETRO; JONATHAN GAZDAK;
RONALD BARRIE CLAPHAM; MARK LEONARD;
PROVISION HOLDING, INC.;
TIMOTHY KELLY; AND THREE DDD LLC,

                Defendants.

**FIRST AMENDED COMPLAINT**

Plaintiff Floyd's of Leadville, Inc., n/k/a Valued, Inc. ("FOL"), as and for its complaint against Alexander Capital, L.P. ("Alexander Capital"); NESA Management, LLC; Joseph Anthony Amato; Rocco Gerard Guidicipietro; Jonathan Gazdak; ~~Gregory Hurley~~; ~~Howard DaSilva~~; Ronald Barrie Clapham; Mark Leonard; ~~Thien Truong~~; Provision Holding, Inc.; Timothy Kelly; and Three DDD LLC, alleges as follows:

**INTRODUCTION**

1.     This dispute arose because the Defendants have systematically attempted to weaken, incapacitate, and ultimately steal FOL, a fledgling CBD company with considerable long-term prospects that the conspirators have privately valued as worth more than $150 million. Consistent with their history of working together to exploit companies using a variety of unethical and deceptive strategies, these co-conspirators schemed to injure and ultimately acquire FOL using similar fraudulent and illegal methods, and they will continue to victimize and destroy other

1

companies in the future unless they are stopped.

2.      The conspirators are composed of, among others:

- A disgraced broker who was fired for misconduct;

- A suspended Financial Industry Regulatory Authority ("FINRA") member who owes millions to a former employer for illegally selling stock he did not own and hiding assets in his wife's name;

- A brokerage firm that operates as a glorified loan-shark and has apparently been placed on a FINRA watch list because over half of its agents have severe disciplinary infractions on their records;

- A former broker with a checkered past; and

- A penny-stock executive who defrauded FOL out of more than a million dollars and ripped off one of FOL's products.

3.      Together, the Defendants engaged in a series of tortious misconduct designed to defraud, devastate, and destroy FOL, with the ultimate aim of taking all of FOL's assets and using them to run a new, lucrative CBD business in FOL's place. This misconduct—running the gamut from sophisticated financial scams to simple theft—has decimated FOL and threatens to ruin its business and the lives of its employees.

## PARTIES

### FOL

4.      FOL is a Colorado corporation with its principal place of business located at 1101 Poplar Street, Leadville, CO 80461.

### Alexander Capital

5.      Alexander Capital is a Delaware partnership[1] with its principal place of business located at 17 State Street, New York, NY 10004. Alexander Capital is a broker-dealer registered

---

[1] While Alexander Capital purports to be a limited partnership, as of May 1, 2012, Alexander Capital had no general partner. Therefore, another court in this District, in *Aquino v. Alexander Capital, LP, et al.,* Case No. 1:21-cv-01355-JSR, 632 B.R. 7 (S.D.N.Y. 2021), recently held that

with the FINRA (CRD #40077) and the Securities and Exchange Commission ("SEC") (SEC #8-48957). Alexander Capital's partners are domiciled in and citizens of New York, New Jersey, Pennsylvania, Florida, and Georgia. None of Alexander Capital's partners are domiciled in or are citizens of Colorado.

### The Alexander Capital Partners

6.      NESA Management, LLC ("NESA"), is a New York limited liability company, with its principal place of business located at 17 State Street, New York, NY 10004. Until at least July 2021, NESA was a partner of Alexander Capital. All of NESA's members are adult individuals domiciled in and citizens of the State of New Jersey.

7.      Joseph Anthony Amato ("Amato") is an adult domiciled in and a citizen of the State of New Jersey. Amato has been a partner of Alexander Capital since March 2013.

8.      Rocco Gerard Guidicipietro ("Guidicipietro," and, collectively with NESA and Amato, the "Alexander Capital Partners") is an adult domiciled in and a citizen of the State of New Jersey. Guidicipietro has been a partner of Alexander Capital since April 2012. In addition to their status as direct partners, Amato and Guidicipietro are the indirect majority owners of Alexander Capital.[2]

### The Co-Conspirators

9.      Jonathan Gazdak ("Gazdak") is an adult domiciled in and a citizen of the State of New York. Gazdak is a FINRA-registered broker (CRD #5678294). Gazdak is the Managing

---

Alexander Capital "has operated since May 1, 2012, as a Delaware partnership rather than a limited partnership." *Id.* at 21. As such, the Alexander Capital Partners are liable for any tortious conduct Alexander Capital has committed.

[2] Under the Delaware Revised Uniform Partnership Act, Defendants NESA, Amato, and Guidicipietro are liable jointly and severally for all obligations of the partnership. 6 Del. Code § 15-306(a).

Director and Head of Investment Banking for Alexander Capital.

10.    Gregory Hurley ("Hurley") is an adult domiciled in and a citizen of the State of New Jersey.

11.    Howard DaSilva ("DaSilva") is an adult domiciled in and a citizen of the United Kingdom.

12.    Ronald Barrie Clapham ("Clapham") is an adult domiciled in and a citizen of the United Kingdom.

13.    Mark Leonard ("Leonard") is an adult domiciled in and a citizen of the State of California.

14.    Thien Truong ("Truong") is an adult domiciled in and a citizen of the State of California.

15.    Provision Holding, Inc. ("Provision") is a Nevada corporation with its principal place of business located at 9120 Double Diamond Parkway, Reno, NV 89521.

16.    Timothy Kelly ("Kelly") is an adult domiciled in and a citizen of the State of New York.

17.    Three DDD LLC ("Three DDD") is a defunct Texas limited liability company with its former principal place of business located at 38 Gramercy Avenue, Rye, NY 10580. Kelly is the sole member of Three DDD.

## JURISDICTION AND VENUE

18.    The Court has federal question jurisdiction over Counts III and IV of this Complaint pursuant to 15 U.S.C. § 78j(b), 15 U.S.C. § 80b-6(2), and 28 U.S.C. § 1331, and it may exercise supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(a). Further, the Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). Complete diversity exists between the parties, and the amount in controversy, exclusive of interest and costs,

involves sums in excess of $75,000.

19.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to FOL's claims occurred in this district.

## FACTS

### I.   FOL Begins Its Relationship With Alexander Capital

20.   FOL is a start-up company, formed in 2016, that sells CBD-branded products over the internet and in retail locations. While CBD products are legal in the United States, the banking industry has historically been unwilling to extend credit to companies that sell such products. Because of this, CBD companies like FOL must rely on non-traditional methods for obtaining funding. This makes CBD companies particularly vulnerable to predatory lenders and other unscrupulous actors.

21.   In the fall of 2017, FOL CEO Floyd Landis ("Landis") was introduced to Kelly. Kelly identified himself to FOL as a securities broker, claiming that he was interested in investing in a company involved in the CBD or cannabis markets and offering to help FOL raise money to expand its operations. Unbeknownst to FOL, Kelly's FINRA registration (CRD #2107818) was suspended in 2012.

22.   While Kelly repeatedly expressed interest in investing in FOL, Kelly never actually did so. Kelly did, however, introduce Landis to Kelly's "business partner" Frank DiMartini ("DiMartini") and encouraged FOL to work with DiMartini. At the time, DiMartini was employed as a FINRA-registered broker (CRD #4512897) by Alexander Capital, a New York City-based broker-dealer and investment advisor.[3]

---

[3] Unless expressly stated or the context indicates otherwise, references to "Alexander Capital" refer to both the partnership and the conduct of its agents, primarily Gazdak, DiMartini, and Kelly.

23.     Based on Kelly and DiMartini's representations, FOL believed that Alexander Capital was a reputable and experienced investment advisor that could help grow FOL. On behalf of Alexander Capital, DiMartini proposed to FOL that Alexander Capital would serve as FOL's fiduciary, financial advisor, and agent, providing expert financial advice to FOL and assisting FOL by soliciting investors to provide capital to FOL. Trusting Alexander Capital as a purported expert in the industry, FOL placed its confidence in Alexander Capital and its agents to represent FOL's best interests and act solely for FOL's benefit.

24.     DiMartini was FOL's primary contact at Alexander Capital. Additionally, Kelly represented himself to FOL as working alongside DiMartini as a broker and as agent for DiMartini and/or Alexander Capital.

25.     Although DiMartini was FOL's day-to-day liaison with Alexander Capital, Jonathan Gazdak, Alexander Capital's Managing Director and Head of Investment Banking, was the senior manager at Alexander Capital responsible for the FOL engagement.

26.     On October 20, 2017, Alexander Capital and FOL entered into an engagement agreement (the "Engagement Agreement"), which Gazdak signed on behalf of Alexander Capital. A true and accurate copy of the Engagement Agreement is attached as **Exhibit 1**. Pursuant to the terms of the Engagement Agreement, Alexander Capital became the exclusive party who could solicit investors for FOL within the scope of the engagement. FOL was thus entirely reliant on Alexander Capital to raise capital. And without a steady infusion of capital, FOL as a start-up company would quickly fold.

27.     In addition, Alexander Capital agreed to serve as FOL's "financial advisor" "in connection with" the contemplated investments. Alexander Capital agreed to provide "financial advisory services" and "to consult with and advise [FOL] with respect to the" investments. FOL

thus relied on Alexander Capital to advise FOL as to what investments to pursue. **Ex. 1 at 1**.

28.   In exchange for its placement-agent and advisory services, Alexander Capital received a 10% commission on any funds it acquired for FOL. Alexander Capital was also entitled to an additional 10% commission in the event any of the lending documents were renegotiated.

29.   Upon information and belief, Alexander Capital split this commission with DiMartini, giving 50% of the commission to DiMartini and keeping 50% for itself. This commission split gave DiMartini a personal financial incentive in the contemplated transactions.

30.   In the Engagement Agreement, FOL agreed to a private placement of up to $2,000,000 in senior secured debt, on terms "subject to mutual agreement of [FOL] and each investor." Ultimately, however, between 2017 and 2018, Alexander Capital raised $4,338.565.50 from 56 separate investors in multiple states and more than 12 different countries (the "Investors").[4] Nearly all of the communications between Alexander Capital and the Investors not residing in New York were interstate or international.

31.   Pursuant to Alexander Capital's and its agents' representations, FOL understood that the Investors had agreed to invest in FOL through promissory notes, subscription agreements, and security agreements under which the notes were secured by all of FOL's assets (collectively, the "lending documents")[5] that were all based on Alexander Capital templates. Alexander Capital supplied these documents to investors and recommended that FOL accept the investors Alexander Capital proposed. However, Alexander Capital did not provide even draft copies of the lending documents to FOL until well after the Investors had loaned money to FOL.

32.   As FOL understood the lending documents and as Alexander Capital described them

---

[4] To avoid the need to register the securities at issue, Alexander Capital was only to accept investments from accredited investors.

[5] The terms and enforceability of the lending documents are disputed.

to FOL, the notes had two-year terms, and provided that FOL would pay 12% interest per annum on the principal amount of the notes, payable on a quarterly basis. Alexander Capital represented to FOL that the notes were structured as debt with no right to convert debt to equity.

33.   FOL expressed concern that two years was a very short amount of time to repay the notes and 12% was a very high interest rate to pay for a start-up like FOL, which had substantial long-term potential but would likely be revenue-negative in its early years. Alexander Capital told FOL not to worry, that two-year debt at 12% was an industry standard, and that no investor would believe it likely that FOL would actually repay them at the end of two years. Indeed, Alexander Capital repeatedly told FOL that the notes would be renegotiated at the end of two years at commercially reasonable terms that would be acceptable to FOL.

34.   Alexander Capital further promised FOL that if FOL showed growth over those two years, FOL could restructure the notes on terms that were *better* than the terms currently in place (two years at 12%). Alexander Capital told FOL that this was how the securities industry works and that FOL should not worry about generating enough revenue in two years to pay all the principal and interest back at maturity.

35.   Alexander Capital and DiMartini made these representations to FOL and its CEO over the course of biweekly, in-person meetings in 2017 and 2018.

36.   FOL trusted and relied upon Alexander Capital's and DiMartini's representations, including but not limited to their representation that the lending documents could be renegotiated after two years. FOL would not have agreed to the lending documents but for those representations. Specifically, FOL would not have taken on debt on the above terms or in the above amount but for Alexander Capital's and DiMartini's representations.

37.   Unfortunately for FOL, its trust and confidence were misplaced. Rather than being

the industry leader it represented itself to FOL, Alexander Capital and its agents have a lengthy history of financial misconduct and wrongdoing. And true to that history but contrary to its representations to FOL and in violation of its fiduciary duties owed to FOL, Alexander Capital intended to make FOL its next victim. Specifically, Alexander Capital intended to dupe FOL into entering into agreements that would allow Alexander Capital to take over FOL in two years. The Engagement Agreement was only the first strand in Alexander Capital's web of deceit.

## II.    **Alexander Capital Introduces FOL To Legal Counsel**

38.   In late November 2017, Alexander Capital and Kelly introduced FOL to the law firm Carmel, Milazzo & DiChiara LLP ("CMD") and recommended that FOL utilize the legal services of CMD, specifically, CMD partner Peter DiChiara ("DiChiara"). But neither Alexander Capital, Kelly, CMD, nor DiChiara disclosed to FOL that CMD and DiChiara had been longstanding counsel for Alexander Capital and were actively representing Alexander Capital in several matters, including advising Alexander Capital concerning the lending documents that are the subject of this lawsuit.

39.   For example, in early November 2017, before FOL had any agreement with CMD, DiChiara emailed Gazdak a draft set of lending documents prepared for Alexander Capital to use in connection with its solicitation of investments for FOL. But when Alexander Capital recommended that FOL hire CMD, Gazdak did not disclose that CMD already represented Alexander Capital in connection with Alexander Capital's agreement with FOL.

40.   In mid-December 2017, FOL signed an engagement agreement with CMD. For reasons neither DiChiara nor CMD explained, DiChiara and CMD arranged for the engagement agreement to be backdated to October 15, 2017. FOL did not think anything of it at the time, but in hindsight, FOL believes that Alexander Capital and CMD wanted to create a false record suggesting that DiChiara and CMD were FOL's lawyers when they were drafting the lending

documents on Alexander Capital's behalf. In reality, however, CMD and DiChiara drafted the lending documents for Alexander Capital's benefit, not FOL's.

41.   FOL trusted and relied upon the legal advice of DiChiara and CMD. FOL would never have continued working with Alexander Capital had FOL known that CMD, DiChiara, and Alexander Capital were colluding to benefit Alexander Capital at FOL's expense.

### III.   Alexander Capital Creates Numerous Conflicts Of Interest

42.   Although Alexander Capital had already been retained as *FOL's* financial advisor and agent under the terms of the Engagement Agreement, under the terms of the lending documents, the Investors irrevocably appointed Alexander Capital as *their* agent to act on the Investors' behalf. As part of that appointment, the Investors assigned to Alexander Capital the exclusive right to collect on or enforce the terms of the lending documents.

43.   Through these arrangements, Alexander Capital simultaneously served as agent, fiduciary, and financial advisor for FOL, with the exclusive right to secure capital for FOL's benefit, and as agent for the Investors (who provided that capital to FOL), with the exclusive right to collect payment on or seek to enforce the terms of the investments on the Investors' behalf. At the same time, Alexander Capital benefitted financially from transactions between FOL and the Investors, and thus participated in the transactions as a party in its own right.

44.   In addition to granting Alexander Capital complete control over both investor and issuer, this created several immediate and material conflicts of interest.

45.   First, FOL and the Investors had obvious adverse interests. For example, FOL would generally want a lower interest rate on any borrowed funds, to limit the total amount FOL had to pay back on the notes. The Investors would generally want higher interest rates, to maximize their returns on their investments.

46.   Similarly, FOL would generally want longer-term loans, so that FOL could have

more time to grow and develop as a start-up company before it had to pay back the principal. The Investors would generally want shorter-term loans, so that the Investors would be paid back sooner and have less risk.

47.    At the same time, Alexander Capital had a proprietary financial interest that was adverse to *both* FOL and the Investors, because Alexander Capital received a 10% commission on the principal value of any loans that were made, at the time the money was provided to FOL and regardless of whether it was paid back, incentivizing Alexander Capital to saddle FOL with as much debt as possible regardless of FOL's ability to repay it.

48.    Further, Alexander Capital stood to receive additional compensation in the form of a second 10% commission on the principal value of the notes if they were renegotiated. This gave Alexander Capital an incentive to structure the loans in such a way that they were unlikely to be paid back at maturity, so that FOL and the Investors would have to renegotiate the investments and Alexander Capital could earn another 10% fee (indeed, DiMartini repeatedly assured FOL that the loans would be renegotiated because he and Alexander Capital wanted their 10% additional fee). Thus, advising FOL to over-leverage would benefit Alexander Capital both on the "front end" (when the original loans were made and Alexander Capital received its 10% cut) and on the "back end" (when the loans needed to be renegotiated and Alexander Capital received a second 10% cut).

49.    This kind of "structured to fail" scenario would hurt both the Investors (who would not be paid back as agreed) and FOL (who would fall deeper into debt by having to pay an additional 10% commission to Alexander Capital and be forced to renegotiate from the disadvantaged position of being unable to pay the loans in full at maturity).

50.    Thus, the interests of FOL, the Investors, and Alexander Capital were at all times adverse. Yet, Alexander Capital represented FOL, the Investors, and its own proprietary interest

11

all at the same time.

51.   This triangular relationship of perverse incentives ultimately gave all the power to Alexander Capital, as the Investors could not seek collection on or enforcement of the lending documents without Alexander Capital, and FOL could not acquire funds or renegotiate the loans without Alexander Capital. At the center of this perverse triangle was Alexander Capital and its agent DiMartini, who represented FOL, Alexander Capital, and the Investors simultaneously and adversely, as the "Agent for Everybody."

52.   A few of these conflicts among the parties (all represented by DiMartini, Gazdak, and Alexander Capital) are shown below:



53.   FOL was not contemporaneously aware of these conflicts of interest because Alexander Capital never provided FOL with copies of the lending documents that reflect these conflicts. Thus, at the time the Investors lent money to FOL, FOL had no idea that Alexander

Capital, Gazdak, and DiMartini had conflicting duties to the Investors that were contrary to FOL's best interests.

54.  If this were not bad enough, DiMartini arranged for his brother John DiMartini to become the largest Investor, purportedly issuing him a note that was more than three times the size of the next largest note. FOL later learned (well after the fact) that DiMartini had personally guaranteed the repayment of John DiMartini's note. This undisclosed guarantee created further divided loyalties and another reason why Alexander Capital did not place FOL's interests first.

55.  The three-way relationship among FOL, Alexander Capital, and the Investors was a zero-sum game, in which one party's advantage came at the other parties' expense. It was a structure in which it was impossible for Alexander Capital to behave ethically because it was always acting at the expense of at least one of the parties it represented.

56.  Alexander Capital further entrenched its control by working hard to bar FOL and the Investors from ever speaking with each other—except through Alexander Capital—including by withholding contact information for the Investors from FOL despite repeated requests. Whenever FOL brought up the idea of speaking directly with the Investors, Alexander Capital insisted that FOL was not permitted to speak with the Investors because they were Alexander Capital's "clients."

57.  The lending documents that established these inherent conflicts of interest were based on standard templates that Alexander Capital regularly uses in its business. On information and belief, Alexander Capital puts itself in a position of control over both investor and issuer as an institutional business practice and uses that position against its clients. While FOL was shocked and horrified by how Alexander Capital used its positions of power to manipulate, defraud, and injure FOL and its business partners, for Alexander Capital, the events of this dispute and the

demise of FOL were just another day in the office.

58.   DiMartini, Kelly, and DiChiara were in regular contact throughout this period, but rarely relayed their conversations to FOL. FOL later learned that CMD and DiChiara provided undisclosed legal services to Alexander Capital, Kelly, DiMartini, and others in additional transactions and dealings adverse to FOL. Although FOL placed its trust in Alexander Capital, Gazdak, and DiMartini as its financial advisors and in CMD and DiChiara as its counsel, all were secretly working together behind FOL's back to injure FOL and advance their own interests.

59.   Neither DiMartini nor Gazdak disclosed the existence of these conflicts of interest to FOL. By concealing that material information and continuing to purport to act solely in FOL's interest as its financial advisors and fiduciaries, DiMartini and Gazdak breached their fiduciary duties to FOL and engaged in deliberately illegal behavior.

**IV.**   **Alexander Capital Makes A Secret Side-Deal With The Investors**

60.   As described above, Alexander Capital through DiMartini convinced FOL that it would be in FOL's best interest to pursue notes at 12% interest with two-year terms. As Alexander Capital repeatedly promised, the notes would be renegotiated before maturity and FOL would not have to pay all the principal and interest back after just two years.

61.   For its own benefit and at FOL's expense, Alexander Capital encouraged FOL to borrow more and more money, further distressing FOL and making it more unlikely that FOL would be able to repay the notes when they became due. In its role as FOL's trusted financial advisor and agent, Alexander Capital advised FOL to borrow as much money as possible and not to worry about paying it back—as this is what start-ups do. Of course, that advice maximized Alexander Capital's commissions, to FOL's detriment.

62.   Indeed, Alexander Capital received commissions of more than $433,000 in connection with the investments, half of which went to DiMartini. And Alexander Capital and

DiMartini would have been entitled to another 10% commission if the notes had been renegotiated. Thus, to maximize their own profits, and in dereliction of their duties as FOL's agent, broker, and financial advisor, Alexander Capital and DiMartini consistently encouraged FOL to over-leverage.

63.   Because of Alexander Capital's repeated advice to borrow more and more money, FOL's debt quickly ballooned. In its October 2017 Engagement Agreement with FOL, Alexander Capital had proposed a $2 million debt placement. Less than two months later, Alexander Capital had increased that $2 million to a $3 million placement in the lending documents Alexander Capital circulated to Investors (but not to FOL). After saddling FOL with $3 million in debt, Alexander Capital increased the placement to $4 million and beyond. Even after FOL's debt secured through Alexander Capital exceeded $4.3 million, Alexander Capital kept recommending that FOL borrow even more money, and Alexander Capital would have kept incurring debt on FOL's behalf indefinitely had FOL not refused to go along with Alexander Capital's demands (as discussed below). On behalf of Alexander Capital, Gazdak signed escrow releases each time borrowed funds were released to FOL, and thus Gazdak was aware throughout the relationship of FOL's burgeoning debt and Alexander Capital's advice to FOL to continue borrowing more and more money.

64.   In hindsight, it is clear that Alexander Capital's strategy was to encourage FOL to over-leverage so that either: (1) FOL would default on the investments and Alexander Capital would attempt (as agent for the Investors) to seize control of FOL's assets; or (2) FOL would have to renegotiate the investments, and Alexander Capital would earn another 10% fee. Either outcome benefitted Alexander Capital, at FOL's expense.

65. If that were not bad enough, Alexander Capital through DiMartini made a secret side-deal (the "Secret Side-Deal") with the Investors that decreased the likelihood that FOL would be able to renegotiate the notes.

66. First, without telling FOL, Alexander Capital promised the Investors that they would be entitled to a 30% premium on the principal balance of their notes at maturity, over and above the 12% annual interest they would already be receiving.

67. As an example, if an Investor held a $1 million note, Alexander Capital promised the Investor that they would be paid back $1.3 million at maturity, in addition to the $120,000 in interest the Investor would receive each year for the two-year term. Thus, a $1 million note would create an obligation to pay back $1.54 million ($240,000 in interest and a $300,000 premium at maturity), meaning FOL would have to pay back 154% of the amount of the note. This Secret Side-Deal would more than double the nominal 12% annual interest rate, effectively imposing a 27% annual interest rate (or 54% over the two-year terms).

68. Second, and again without telling FOL, Alexander Capital told the Investors that they would be entitled to convert all or a substantial portion of their debt to equity at maturity at an absurdly low $10 million valuation of FOL. In other words, if the face value of a note were $1 million, at maturity (ignoring interest and the premium for the moment) the Investor would be entitled to receive 10% of the equity of FOL. Adding in the premium (and assuming that FOL paid the interest along the way), the $1 million note would become $1.3 million at maturity, meaning the Investor would be entitled to 13% of the equity of FOL. And if FOL was unable to pay the interest during the two-year term, then the investments would not only accrue 24% interest, but FOL would also incur default interest charges of an additional 6% per annum or 12% over the

course of the two years. In that case, the $1 million would grow to $1.66 million, convertible to 16.6% of the equity of FOL.

69.    As unlikely as it was that FOL as a start-up would be able to pay back 124% of the amounts invested in just two years (principal plus 24% total interest), the notion that FOL would be able to pay back 154% of the investments (or 166% if FOL missed any interest payment) in just two years was laughable. There was virtually no scenario under which FOL would be able to meet such an obscene obligation, as Alexander Capital, Gazdak, and DiMartini well knew.

70.    Alexander Capital, through DiMartini, negotiated the Secret Side-Deal. And Gazdak later indicated to FOL that he was contemporaneously aware of the Secret Side-Deal. But neither Gazdak nor DiMartini ever disclosed the Secret Side-Deal to FOL, instead staying silent as to the ruinous side-deal and misleading FOL by material omission while under a duty to speak as FOL's fiduciaries, financial advisors, and brokers.

71.    Further, CMD and DiChiara assisted Alexander Capital in brokering the Secret Side-Deal with the Investors by proposing changes to the initial drafts of the lending documents that created ambiguity about key terms, including the 30% premium. This language solely benefitted Alexander Capital and the Investors and was substantially detrimental to FOL.

72.    One of the many problems resulting from the Secret Side-Deal was that it made renegotiation of the lending documents impossible. Alexander Capital told FOL that the interest rate was 24% and there was no premium or conversion rights. But Alexander Capital told the Investors that the interest rate was 54% and that they could convert their debt to equity at a very low $10 million valuation of FOL. Because FOL and the Investors had inconsistent understandings of what they were purportedly agreeing to, and because the Investors' understanding of the

renegotiation "floor" (54% plus conversion rights) was unacceptable to FOL, renegotiation of the terms of the two-year investments was not possible.

73.   Alexander Capital knew this from the outset, falsely representing to FOL that the investments could be renegotiated on terms that were commercially reasonable and acceptable to FOL (even telling FOL that the renegotiated terms could be *more* favorable to FOL), while knowing that this was not true, and that the Investors would insist on terms for renegotiation that would be non-starters for FOL. It was not possible for FOL and the Investors to agree on renegotiation of the two-year investments, and Alexander Capital knew this when it advised FOL to enter into two-year notes and encouraged FOL to borrow millions of dollars on these terms.

74.   Between fall 2017 and fall 2018, with the Secret Side-Deal in place, Alexander Capital proceeded to raise more than $4.3 million in debt from the Investors. FOL expressed concern at the amount of debt, including because of FOL's understanding that the original placement would not exceed $2 million in total. Alexander Capital repeatedly assured FOL that the placement ceiling could be increased (it ultimately was), that borrowing this amount of money was not a problem, and that either FOL would pay the Investors back after Alexander Capital arranged an Initial Public Offering ("IPO") or the Investors would simply renegotiate the lending documents before maturity. Relying on and trusting Alexander Capital as FOL's agent, fiduciary, and financial advisor, FOL continued to work with Alexander Capital and incur additional debt.

75.   What FOL did not know is that it had been trapped. With a 30% premium, $4.3 million would become $5.6 million at maturity. And, with conversion rights at a $10 million valuation, $5.6 million would become up to 56% of the equity of FOL, a controlling interest (even if FOL made every single interest payment on time). As Alexander Capital knew, the likelihood that FOL as a start-up could pay back $5.6 million in two years was negligible. Thus, at the time

Alexander Capital solicited the $4.3 million in investments for FOL, Alexander Capital believed it and the Investors had (secretly) acquired control of FOL.

76.   The most insidious part of the Secret Side-Deal is that it would not matter whether it was legally enforceable. As part of the lending documents (at least as described by Alexander Capital after the fact), FOL had pledged all of its assets as collateral. In the event FOL could not pay back the notes at maturity—either on the terms promised to FOL or the terms promised to the Investors—Alexander Capital on behalf of the Investors could seek to take control over all of FOL's assets. Because Alexander Capital believed it already effectively owned a controlling interest in FOL, all it had to do was to refuse to accept FOL's renegotiation proposals, and, when FOL defaulted on the notes, Alexander Capital would take 100% of FOL via its collateral.

77.   In other words, the only thing Alexander Capital had to do to acquire control over FOL (its intent all along) was to refrain from renegotiating the notes in good faith. FOL would then default on the notes, and Alexander Capital would seek to acquire all of FOL's assets.

78.   Under these circumstances, FOL was a dead-man walking from the beginning, yet it had no idea this was the case. FOL would never have agreed to the lending documents had it known about the Secret Side-Deal, that Alexander Capital's representations that the notes could be negotiated on commercially reasonable terms were false, or that Alexander Capital had made false representations to the Investors that set expectations that could never be met in renegotiation.

79.   Although DiMartini made the Secret Side-Deal with the Investors on behalf of Alexander Capital, Gazdak, as the senior manager responsible for Alexander Capital's relationship with FOL, oversaw the flow of information between Alexander Capital, FOL, and the Investors. Specifically, Gazdak would have been privy to the communications between Alexander Capital and FOL and between Alexander Capital and the Investors, and he would have been aware of the

different representations Alexander Capital was making to each side. At the very least, Gazdak had a duty to monitor DiMartini's work and the solicitation of the investments for FOL and failed to check information that he had a duty to monitor. Accordingly, Gazdak either knew facts or had access to information suggesting that Alexander Capital's statements to FOL were not accurate because DiMartini was making materially different representations to the Investors about the terms of the investments. Indeed, Gazdak later revealed that he was aware of the Secret Side-Deal and expressed no surprise as to its terms.

**V.**     **Alexander Capital And CMD Manipulate The Lending Documents**

80.   To further confuse matters and to conceal the fact that it had made different and incompatible representations to FOL and the Investors about the nature and terms of the investments, Alexander Capital (and its agent DiMartini) and CMD (and its agent DiChiara) manipulated the manner in which the lending documents were purportedly "signed," violating their duties to FOL and exposing FOL to significant risk.

81.   There are 69 sets of lending documents at issue in this dispute. Each set of lending documents requires at least three sets of physical signatures by all the contractual counterparties: (1) on the note; (2) on the subscription agreement; and (3) on the security agreement. But FOL was never asked to and never physically signed the 69 sets of lending documents. In fact, FOL was never presented with a single complete set of lending documents to approve and sign.

82.   Instead of presenting the lending documents to FOL for its review, approval and execution, Alexander Capital somehow obtained  copies of Landis's electronic signatures and inserted those signatures into hundreds of documents without Landis's or FOL's knowledge or consent.

83.   Many software programs (like Adobe) allow pages to be "inserted" into a pdf file. For instance, a scanned pdf of a signature page can be inserted at the end of a contract, creating what

appears to be a signed document. It is not uncommon for modern commercial contracts to have language indicating that the document can be executed by the insertion of a scanned signature page in this fashion, but the lending documents FOL has seen do not contain any such language.

84.   Further, if a client's contract is going to be signed in this fashion, with an agent adding the scanned signature page to the agreement, the agent needs the client's express permission to add that scanned page and thereby (if the contract language permits it) create a binding contract. An agent may not add a scanned signature page to a contract if the client has not agreed to the terms of the contract and has not given permission for the agent to insert the client's signature. And an agent cannot add the client's signature page if the client is unaware of the document and its terms.

85.   Yet that is exactly what happened here. Alexander Capital took FOL's scanned signatures and added them to 69 different sets of lending documents, without ever running the terms by FOL or asking for FOL's consent to execute the agreements. Indeed, FOL was never once provided a full set of lending documents and asked to sign them while the loans were being procured.

86.   Instead, Alexander Capital would mockup a set of lending documents, insert FOL's signature, make some changes, insert FOL's signature, make some more changes, and insert FOL's signature again, creating multiple "signed" copies of agreements. Alexander Capital never sought or received FOL's permission to agree to any of these documents, it simply added FOL's scanned signature to whatever documents it wanted. In addition, Alexander Capital never bothered to make FOL aware of the documents FOL was purportedly signing or to obtain FOL's approval to enter into the agreements and be bound by their terms. Instead, Alexander Capital acted as if having

access to copies of Landis's electronic signatures gave it permission to bind FOL to whatever agreement Alexander Capital wanted.

87.   Ultimately, Alexander Capital took electronic copies of Landis's signatures and added them to more than 200 separate agreements, without informing FOL that it was doing so, without obtaining FOL's permission to do so, without informing FOL of the contents of those documents or providing a copy, and without obtaining FOL's consent to enter into those agreements.

88.   CMD and DiChiara assisted Alexander Capital in manipulating the lending documents. Just like Alexander Capital, CMD had no issue with adding FOL's electronic signatures to whatever document Alexander Capital wanted to send out to the Investors, and no issue with adding FOL's signature page whenever Alexander Capital wanted to change the terms of those documents. Although it was purportedly acting as FOL's counsel, at no point did CMD ask FOL for FOL's approval in entering into any of the lending documents or for any of the many changes Alexander Capital and CMD made to these documents without informing FOL of the changes or obtaining FOL's consent. Even after the fact, Alexander Capital and CMD did not ever provide FOL with fully and properly executed copies of the sets of lending documents.

89.   Further, none of the Investors received fully and properly executed copies of the lending documents. For this reason, months after they made their investments in FOL, Investors were asking Alexander Capital to provide them with fully signed, original lending documents, and Alexander Capital never did so.

90.   Because of Alexander Capital and CMD's misconduct, signed, executed, original lending documents do not exist. Further, for more than 200 alleged contracts, FOL and the Investors were never provided, never reviewed, and never agreed to the same documents with the same terms. Alexander Capital and CMD just manufactured documents after the fact and passed

them off as contracts, in violation of legal requirements and their duties to FOL.

91.   Several of the purported lending documents were signed by Gazdak on behalf of Alexander Capital. As the responsible signatory and senior manager for Alexander Capital's representation of FOL, Gazdak either knew facts or had access to information suggesting that the purported lending documents were not valid agreements to which FOL had knowingly provided consent for Alexander Capital to execute on its behalf. Specifically, Gazdak either knew facts or had access to information that FOL had not actually agreed to the lending documents Gazdak was executing on behalf of FOL. At the very least, Gazdak had a duty to monitor the execution of the investments for FOL and failed to check information that he had a duty to monitor.

92.   Indeed, discovery in the Colorado Litigation discussed below has revealed that Gazdak, DiMartini, and DiChiara coordinated closely to manipulate the lending documentation and make the fabricated contracts appear legitimate. For instance, in June 2018 (after more than 40 of the lending documents had allegedly been executed), DiChiara asked Gazdak to sign the security agreements on behalf of Alexander Capital "to insert into final documents" (meaning, to retroactively add to lending documents that purportedly had been executed months before). DiChiara also sent FOL documents to Gazdak's personal email address rather than his Alexander Capital email address. FOL was not informed of these conversations and dealings.

93.   Alexander Capital and CMD's fraudulent conduct hurt FOL in numerous ways.

94.   First, to comply with securities laws and protect FOL, the investments were to provide that any transfer of ownership would require the Investors to travel personally to FOL's offices to surrender their original notes, record the transfer, and be issued replacement notes. With no physical documents with wet signatures, it is unclear what copy of the investments documents is the original, or if *any* copy can be considered the original.

95.    Second, and relatedly, the lending documents, unlike most commercial contracts, contain no provision permitting electronic signatures or signature by counterpart. Alexander Capital's decision to ignore this fact casts further doubt upon the enforceability of the lending documents and the respective rights of the parties.

96.    Third, Alexander Capital exploited the fact that FOL did not receive properly executed copies of the lending documents by creating uncertainty about precisely what documents had been signed and the terms of those documents. In fact, Alexander Capital needed to play fast and loose with the documents (and needed CMD's help to do so) because Alexander Capital had promised FOL and the Investors different, incompatible things. With a clear set of contracts to which both FOL and the Investors had access, it would be obvious what the terms were and very difficult for Alexander Capital to represent different terms to FOL and the Investors. Thus, Alexander Capital's failure to obtain properly executed documents (assisted at all times by CMD) was not just sloppy, it was strategic. And while CMD was supposed to be protecting FOL's interests and ensuring proper execution of the lending documents with proper approvals, CMD instead secretly assisted Alexander Capital in manipulating the lending documents.

97.    Fourth, by forgoing physical documents with wet signatures, Alexander Capital made it incredibly easy and potentially untraceable for Alexander Capital to alter the lending documents after signing. To this day, it is still not clear what documents the Investors actually signed and the terms (if any) to which FOL and the Investors agreed.

98.    For example, the security agreements were supposed to contain schedules that listed FOL's assets subject to the Investors' security interest. However, at the time these documents were presented to the Investors and purportedly executed, there were no schedules. When one investor asked about the missing schedules almost a year after he had signed his lending documents, CMD

and Alexander Capital created some asset schedules, added them after-the-fact to the security agreements, and then sent them to the investor as if they had been part of the investment agreement all along. Neither CMD nor Alexander Capital: (1) informed FOL that they intended to attempt to alter the lending documents retroactively; (2) asked for FOL's consent or approval to include these schedules; nor (3) consulted with FOL as to whether the schedules contained accurate information.

99.    Upon information and belief, Alexander Capital and CMD also applied scanned signature pages supplied by the Investors to various documents that Alexander Capital changed at will. There could be (and likely are) any number of documents in existence, which each appear to have signatures from FOL and the Investors, but with different terms.

100. As astonishing as Alexander Capital and CMD's behavior was, it is not unique. Alexander Capital has a history of manipulating and fabricating documents, and FOL is not the only party who has alleged that Alexander Capital and its agents have manipulated documents in this fashion. In the action currently pending against Alexander Capital in this District, *Aquino v. Alexander Capital, LP*, *et al.*, Case No. 1:21-cv-01355-JSR, the plaintiff alleges in its April 19, 2021 amended complaint, among other things, that:

- Alexander Capital provided the plaintiff company's board of directors with a draft S-1 letter for a stock offering;

- Alexander Capital then provided the board with a draft signature page for the letter, which the board signed;

- After receiving the signature page, Alexander Capital made material changes to the S-1 letter, and pasted the signature page onto the altered document without the board's knowledge or consent.

101. Accordingly, the plaintiff in the *Aquino* matter is suing Alexander Capital for, among other things, fraud, fraudulent inducement, and breach of fiduciary duty.

102. Similar to the *Aquino* matter, it was Alexander Capital's practice throughout its relationship with FOL to make everything it did mirky and nebulous, to conceal from FOL what

it was doing and how its actions impacted FOL. Alexander Capital's manipulation of the lending documents was simply a continuation of that practice.

## VI.   Alexander Capital, CMD, Kelly, And Three DDD Begin Stealing From FOL

103. Alexander Capital and CMD's manipulation of documents and the Secret Side-Deal aside, Alexander Capital's advice that FOL should borrow millions of dollars pursuant to the lending documents Alexander Capital had drafted (two-year investments with high interest and secured by all of FOL's assets) constituted a critical and likely mortal blow to FOL. All Alexander Capital had to do was wait two years, let FOL default (as it knew FOL would), and take the company. Over the next two years, Alexander Capital and its co-conspirators proceeded to feast on their kill by systematically weakening and extracting value from FOL. Their next step was to steal from FOL by skimming money off the top of the funds the Investors lent to FOL.

104. To that end, Alexander Capital and CMD arranged for FOL to enter into an escrow agreement under which the funds Alexander Capital solicited from the Investors were temporarily held in an escrow account maintained by CMD before being distributed to FOL. With no proper purpose for doing so, Alexander Capital and CMD placed Kelly in control of the escrow account.

105. Taking into account Alexander Capital's 10% commission, FOL expected to receive 90% of the funds raised from Investors. That was true for the very first investments, but once the process was firmly in place and FOL had committed itself to multiple Investors, Alexander Capital, CMD, and Kelly began arranging for unauthorized illegal kickbacks to be paid to Three DDD (an entity owned by Kelly and serving as his alter ego) and to CMD. Because of these illegal kickbacks, FOL actually received far less than 90% of the funds. The amount of illegal kickbacks paid to Three DDD and CMD varied from investment to investment, and thus the percentage of the principal FOL received varied accordingly. Gazdak on behalf of Alexander Capital signed off on all the distributions of funds.

106.  When FOL became aware of and questioned why Three DDD was receiving a portion of the principal amount of the investments, DiChiara responded that Kelly and DiMartini were "doing business deals together" and Kelly needed to receive a commission because he was not an employee of Alexander Capital. Further, DiMartini eventually explained to FOL that Kelly had been suspended by FINRA and thus was not legally permitted to earn "commissions" on the sale of securities. Kelly varied the amount he paid Three DDD for each note, DiMartini explained, so that the payments would not legally be classified as impermissible "commissions."

107. The Engagement Agreement permitted Alexander Capital to utilize the services of other broker-dealers only if they were FINRA members, and only if FOL approved the use of such other broker-dealers in writing before Alexander Capital retained them. One of the primary reasons for this requirement was that any involvement by FOL with a bad actor (as defined under Rules 506(d)(1) and (2) of the Securities Act of 1933) could jeopardize FOL's ability to issue investments without registering them with the SEC and incurring substantial additional costs.

108. Alexander Capital never requested FOL's written permission to utilize Kelly's services, and by DiMartini's own admission (later confirmed by review of FINRA records), Kelly had been suspended by FINRA and could not be retained by Alexander Capital under the terms of the Engagement Agreement, whether or not FOL provided its prior written consent.

109.  Further, FOL never had an agreement with Kelly for broker-dealer services. However, given that Alexander Capital had the exclusive right under the Engagement Agreement to solicit investors to provide funds to FOL within the terms of its engagement, terminating FOL's relationship with Alexander Capital in protest of these illegal kickbacks would starve FOL of badly needed funds and cause it to go under. Knowing this, Alexander Capital repeatedly threatened that if FOL did not do what it wanted, Alexander Capital would cut off FOL's access to funds and FOL

would quickly fold. FOL thus had no effective recourse to combat the illegal kickbacks.

110. Kelly also transferred portions of the principal amounts of the investments to CMD, yet CMD had no entitlement to such funds under the agreement between FOL and CMD.

111. As a result of the illegal kickbacks to Kelly and CMD, FOL received significantly less than 90% of the principal value of many of the investments. For instance, for the investments with a purported closing date of February 28, 2018, FOL only received 45% of the principal, with the remaining 55% split among Alexander Capital (10%), Kelly (via Three DDD) (27%), and CMD (18%). That had the effect of further distressing FOL's balance sheet, with much of the benefit gained from money invested in FOL (which FOL had to repay in full, with interest) going to entities who had no contractual right to the funds and who provided no benefit to FOL.

112. These actions made a bleak situation even worse for FOL. For instance, for the tranche of investments for which FOL only received 45% of the principal amounts, under the Secret Side-Deal, FOL would still have to pay back 154% of the full principal amount within two years. This meant FOL would have just two years to pay back 340% of the funds it actually received. These kinds of usurious rates would make even a payday lender blush. FOL was being bled dry.

## VII.   DiMartini, Kelly, And Leonard Try To Scam FOL And Disrupt Its Business

113. In addition to simply stealing funds raised on FOL's behalf, Kelly and his associates next sought to siphon money out of FOL indirectly by scamming it.

114. To that end, Kelly and DiMartini joined with their associate Mark Leonard to form Coil Distribution LLC ("Coil"), with the intent of using Coil as a vehicle to defraud FOL. Although Coil was actually owned by Leonard, DiMartini, and Kelly, to hide DiMartini's and Kelly's involvement, and in furtherance of the plan to defraud FOL, Leonard arranged for DiMartini's and

Kelly's spouses to be listed as the members in public filings, rather than DiMartini and Kelly themselves.[6]

115. CMD helped draft the documents that created Coil, without disclosing to FOL that CMD was providing legal services to Coil or that Kelly and DiMartini were secret owners of Coil.

116. After forming Coil, Leonard introduced himself to FOL and told FOL that Coil was a longstanding distribution company that could help distribute FOL's products to thousands of stores. That was patently false: Coil was just a shell company that had no assets (not even a warehouse in which to distribute and ship FOL's products).

117. In exchange for Coil's "services," Leonard proposed that Coil receive a significant percentage of FOL's equity and a lucrative commission on all sales. CMD helped Leonard and Kelly draft the proposed distribution agreement.

118. Neither Leonard, Kelly, DiMartini, DiChiara, nor CMD ever disclosed that Coil could not distribute FOL's products, that Kelly and DiMartini were owners of Coil, or that making a deal with Coil would be making Kelly and DiMartini de facto shareholders of FOL and lining their pockets at FOL's expense.

119. FOL only discovered DiMartini's and Kelly's involvement in Coil when one of Leonard's associates inadvertently informed FOL. Ultimately, FOL called off the proposed deal and began to look for a new partner to help market FOL's products in retail locations.

120. Eventually, FOL started a relationship with Rainmaker Retail Group, LLC ("Rainmaker"). But as soon as FOL began working with Rainmaker, Leonard began harassing and

---

[6] This sort of trick was nothing new for Kelly. In 2013, Kelly was sued by a former employer for, among other things, causing the company to enter into contracts with entities that Kelly secretly owned but had put in his wife's name to disguise his involvement. Kelly's former employer ultimately secured a judgment against him in the amount of $3,164,000.

threatening Rainmaker to dissuade it from doing business with FOL. Leonard's interference culminated in a lawsuit against Rainmaker.

121. As a result of Leonard's frivolous lawsuit, Rainmaker terminated its relationship with FOL, leaving FOL without a partner to manage distribution of FOL's products and merchandising in stores. FOL was also forced to buy back more than a million dollars' worth of product, and FOL lost the ability to distribute its products on a going-forward basis through the industry's largest distributors.

## VIII.   Simultaneous With The Coil Scam, DiMartini, Kelly, and Leonard Further Scam FOL, And This Time Are Successful

122. At the same time they were trying to defraud FOL through Coil, Kelly, DiMartini, and Leonard pulled off another scam to defraud FOL. This time, the scam centered around Provision Holdings Inc. ("Provision"), a corporate entity controlled by Leonard and used by him and DiMartini in other fraudulent schemes.

123. In 2018, Leonard, as President and CEO of Provision, met with FOL and told FOL that Provision badly needed funds as a bridge loan to facilitate a $3 million investment in Provision by Coinstar (a company that operates grocery and convenience store kiosks that sort and count loose change and convert it to paper money for a fee). Leonard told FOL that the loan was very low-risk, because Coinstar's $3 million investment was assured and would soon occur. Upon information and belief, that representation was false, because Provision had no agreement with Coinstar. The claimed Coinstar investment never occurred.

124. Nonetheless, Leonard promised that if FOL were willing to loan $200,000 to Provision under a two-year promissory note, Provision would provide substantial advertising services to FOL at the deeply discounted price of $100,000. This seemed like a good deal to FOL, and FOL entered into a contract with Provision. A true and accurate copy of that contract is

attached as **Exhibit 2**. Just before execution of the agreement, Provision added a new exhibit to the contract, providing Alexander Capital with warrants for 3 million shares of Provision at the exercise price of $0.02 per share. FOL did not understand why Alexander Capital would receive a benefit from a deal between FOL and Provision for advertising services.

125. Much later, FOL learned that CMD secretly negotiated terms of the agreement with Provision, without informing FOL that CMD was working with Provision directly and involved in the deal. Provision, DiChiara, Leonard, and Kelly secretly worked together on the terms and documentation of the Provision deal without FOL's knowledge and consent. For instance, on August 24, 2018, Curt Thornton, the founder and former CEO of Provision sent an email to DiChiara, Kelly, and Leonard, which Thornton addressed to "Team." Neither CMD nor DiChiara ever shared these emails with FOL (FOL first received them, years after the fact, in discovery in the Colorado Litigation).

126. FOL also learned later that in January 2017, long before Leonard approached FOL about a potential deal with Provision, both CMD and Kelly had filed UCC-1 statements indicating that they were secured creditors of Provision. Neither CMD nor Kelly informed FOL that Provision was not credit-worthy, that Provision was already indebted to CMD and Kelly before FOL ever considered loaning money to Provision, or that CMD and Kelly would be repaid their debts as senior secured creditors before FOL could expect to be repaid as an unsecured creditor. CMD and Kelly's interests were adverse to FOL's throughout its dealings with Provision, and neither CMD nor Kelly ever informed FOL of these adverse interests.

127. FOL knew none of this at the time, and it finalized the deal with Provision. Of the $300,000 FOL paid to Provision (in the form of a $200,000 loan and $100,000 paid for discounted advertising services), FOL later learned that Provision paid DiMartini and Alexander Capital an

immediate and secret cash kickback of $50,000. FOL had never agreed that DiMartini would be entitled to any compensation as part of the deal, and this kickback was concealed by Provision, with FOL learning of its existence only well after the fact.

128. Further, on information and belief, instead of using the funds as a bridge loan to facilitate the purported Coinstar investment as represented to FOL, Leonard gave the remaining $250,000 to Kelly, purportedly to buy Kelly's stock in FOL. But *Kelly did not own any stock in FOL*. Instead, Kelly sold to Leonard FOL stock that Kelly did not own and kept the money for himself.[7] Leonard then subsequently re-sold half of those "shares" to others for $540,000.

129. FOL has since learned that CMD and Alexander Capital advised Leonard in connection with this fraudulent sale and assisted Leonard in completing it. DiChiara advised DiMartini and others that the "Common Stock issued to Mark Leonard is legitimate" and opined that Leonard's fraudulent resale "is a valid agreement and I will issue a stock certificate upon confirmation of receipt of funds." Neither CMD nor DiChiara shared these legal opinions with FOL, or informed FOL that CMD had been advising Alexander Capital and Leonard on these transactions. On information and belief, Alexander Capital and CMD received commissions on Leonard's fraudulent sale, and Gazdak on behalf of Alexander Capital signed off on payment of the commissions.

130. When the time came for Leonard to receive and sign paperwork to reflect his purchase (and later resale) of the phantom FOL stock, FOL initially refused to sign any document indicating any stock ownership by Leonard. But DiMartini then threatened to liquidate FOL if FOL would

---

[7] This too was an old trick for Kelly. In the same lawsuit referenced above, Kelly's former employer accused him of selling shares in the company that Kelly did not own, pocketing the money from duped investors and never producing any stock certificates. As noted above, the former employer secured a $3,164,000 judgment against Kelly due to his misconduct.

not sign the FOL stock over to Leonard, and with no other viable choice and at the barrel of a gun, FOL gave in. However, as part of FOL's deal-under-duress, Kelly agreed to transfer the $250,000 Kelly had received to FOL. Later, Kelly reneged and refused to do so.

131. Although FOL's loan to Provision is long since due, Provision has not paid back any of the $200,000 principal or interest due and has not provided any advertising services to FOL, despite multiple written and verbal requests by FOL.

132. In all material respects, Provision stole from FOL and gave the money to Alexander Capital and DiMartini (in the form of a $50,000 kickback), Kelly (in the form of the $250,000 Leonard paid to Kelly), Leonard (who ultimately received stock in FOL, and a further $540,000 when Leonard resold half of that stock for cash via DiMartini), and, on information and belief, Alexander Capital and CMD (who received commissions on the FOL stock sale). Ultimately, more than $1 million of value was extracted from FOL, with FOL receiving no benefit in return.

## IX.   Kelly, DiMartini, Gazdak, And Alexander Capital Purposefully Expose FOL To Fraud Liability

133. Not content with his fraudulent sale to Leonard of FOL stock he did not own, Kelly decided to start cold-calling customers who had bought FOL products, offering to sell them FOL stock—again, stock that Kelly did not own. In one instance, Kelly tried to sell $4 million of FOL stock he did not own. Thankfully, FOL became aware of and undid that sale before it was finalized, but FOL was not always so lucky, and Kelly made at least some phantom stock sales.

134. These sales were problematic for FOL even beyond the obviously fraudulent nature of Kelly's acts. To comply with securities laws and SEC regulations, FOL could neither solicit purchases of its stock nor sell to parties who were not accredited investors. Kelly ignored this, putting FOL at risk. Kelly ended up duping at least two FOL customers, one of whom is a veteran, into paying money for bogus stock Kelly did not own and never provided to the buyers.

135. Unbeknownst to FOL, Alexander Capital and DiMartini also arranged for non-accredited investor John Burgess to sign two different sets of lending documents. After FOL's relationship with Alexander Capital later began to unravel, Burgess informed FOL that he was on disability and caring for two severely ill grandchildren. Burgess told FOL that DiMartini had solicited and convinced Burgess to borrow money he could not afford to invest in FOL, and Burgess claimed that he badly needed money to cover medical bills and to pay back a loan.

136. When this became known, Alexander Capital and Gazdak demanded that FOL immediately pay Burgess back the money he had invested. FOL did so. Now, FOL faces a lawsuit in Colorado alleging, among other things, that FOL and its officers breached the lending documents and committed fraud by making a payment only to Burgess and not to all investors equally. Thus, Alexander Capital and DiMartini's wrongdoing in soliciting Burgess (who should never have been involved in an investment like this), and Alexander Capital and Gazdak's demand that FOL rectify their wrongdoing, have exposed FOL to liability for fraud.

**X.  DiMartini, Kelly, and Alexander Capital Try A Reverse IPO Scam, Then Abruptly Cut Off FOL's Funding When FOL Refuses To Cooperate**

137. Beyond stealing FOL's funds and its stock and defrauding FOL, Alexander Capital and its co-conspirators also attempted to swindle FOL out of additional stock through the mechanism of a reverse IPO (also called a reverse takeover).

138. In a reverse IPO, the shareholders of a privately held company (like FOL) exchange their privately held shares for shares in a public company, thus become the controlling owners of the public company. The public company then merges with and acquires the private company. Through this mechanism, a privately held company becomes a publicly traded company without having to go through an expensive and time-consuming initial public offering.

139. Because FOL was contemplating investing in the cannabis industry, Alexander

34

Capital and its agents Kelly and DiMartini proposed that FOL execute a reverse IPO with a company traded on the Canadian Securities Exchange, as cannabis is legal everywhere in Canada.

140. Kelly, DiMartini, and Alexander Capital arranged for FOL to work with a Canadian financial advisory firm, Baron Global Financial Canada Ltd. ("Baron Capital"), which suggested a specific company, Zander Capital Ltd. ("Zander"), as the vehicle for FOL's reverse IPO.

141. FOL, however, gradually became skeptical of the deal. First, it is customary in the reverse IPO market for the public company and the financial advisor to receive compensation in the form of approximately 5–7% of the equity of the company that survives the reverse IPO (the public company, which now owns the assets of the private company). Baron Global and Zander demanded 14.7%. Second, due diligence revealed that Zander was not actually a publicly traded company, so FOL would still need to incur the expense and delay of an IPO after the transaction was completed. Third, FOL discovered during negotiations that about 7% of the company's stock after the transaction would be owned by an unknown third party. Further investigation revealed that the 7% was to go to a company Kelly owned, a fact Kelly concealed from FOL.

142. Around the same time, FOL discovered that Kelly had been suspended by FINRA. Kelly had portrayed himself as a licensed broker and financial securities expert in the reverse-IPO process, and the fact that Kelly never disclosed his FINRA suspension was a huge shock to FOL and a serious breach of FOL's trust and confidence. FOL's relationship with Kelly quickly began to deteriorate, and FOL terminated the reverse-IPO plan.

143. In retaliation for FOL's refusal to go along with the reverse-IPO, Alexander Capital and DiMartini slowed their fund-raising efforts on behalf of FOL to a trickle and then stopping them entirely. FOL was already struggling financially as a result of Alexander Capital's diversion of large portions of the principal amounts of the investments, and the moratorium on new

investments only exacerbated those struggles.

144. After Alexander Capital cut off funding, FOL limped along until late 2019. At this point, the Provision loan became due. FOL had planned on using the $200,000 (plus interest) received from Provision to make the quarterly interest payments then due to the Investors. Provision's failure to make any payment left FOL with a sudden and unanticipated lack of funds. At this point, Alexander Capital and its co-conspirators began to execute the final stages of their plan to acquire FOL.

**XI.     Alexander Capital Forms An "Advisory Board" And Hurley, Clapham, And DaSilva Join The Conspiracy**

145. Having over-leveraged and systematically weakened FOL, Alexander Capital began the process of acquiring FOL by creating an "Advisory Board." Alexander Capital placed Gazdak, DiMartini, and DiMartini's friends and associates on the "Advisory Board": Gregory Hurley, Barrie Clapham, and Howard DaSilva. Upon information and belief, Hurley and Clapham have partnered with DiMartini on prior financial deals involving questionable conduct, including at least one instance of "pump-and-dump" securities fraud. Hurley and DaSilva were both FOL Investors.

146. Alexander Capital and Gazdak also placed DiMartini on the FOL "Advisory Board." Yet shortly before doing so, Alexander Capital fired DiMartini for gross misconduct (at which point Gazdak became the day-to-day contact for Alexander Capital in its dealings with FOL). Alexander Capital never explained how an employee who was not fit to work for Alexander Capital (and who had interests that were obviously adverse to FOL's as the guarantor of the largest FOL note) would be qualified and appropriate to advise FOL.

147. The ostensible purpose of the "Advisory Board" was to advise FOL on how to improve its financial condition (*i.e.*, to "solve" the problem Alexander Capital created). FOL believed that the "Advisory Board" would help FOL renegotiate with the Investors, as Alexander

Capital had previously promised FOL. And because FOL had no direct lines of communication with the Investors, it believed it still had to rely on Alexander Capital and its "Advisory Board" in order to renegotiate the lending documents.

148. But the "Advisory Board" never provided FOL with any helpful advice, and its real purpose was to pressure FOL to turn over majority control of the company and to give the parties who would ultimately run FOL after Alexander Capital acquired it access to FOL's confidential information and time to learn the details of FOL's business so they could run the business efficiently after they assumed control. Betraying their intent to misuse the confidential information that Alexander Capital forced FOL to provide to the "Advisory Board," the members of the "Advisory Board" refused to sign non-disclosure agreements.

149. In one instance of the misuse of that information, DiMartini learned proprietary and confidential information concerning a new FOL topical cream made from CBD, including the name and address of the cream's manufacturer. DiMartini promptly and without authorization shared this proprietary and confidential information with Leonard, who sought to use that information to develop an identical rival product to compete with FOL's product. Leonard went so far as to register a trademark for the product, and he tried but failed to induce FOL's manufacturer to replicate the cream for Leonard under false pretenses.

150. That sort of misconduct was only the tip of the iceberg. Even more troublingly, the "Advisory Board" members frequently had secret conversations with Gazdak and Alexander Capital about their plans to gain control of FOL. In these conversations, Gazdak and Alexander Capital abandoned all pretense of acting on FOL's behalf and actively plotted with the others to exploit Alexander Capital's fraud to take over FOL.

151. The "Advisory Board" quickly became a forum for DiMartini, Gazdak, Alexander

Capital, and the others to demand that FOL turn over majority control of the company and formalize the Secret Side-Deal. FOL was shocked by the negotiating demands made by the "Advisory Board" and Alexander Capital on behalf of the Investors: a 30% premium on the principal amount of the debt and the right to convert debt to equity at a $10 million valuation of FOL—in other words, the precise terms of the Secret Side-Deal.

152. When FOL protested that such terms were patently ridiculous, Alexander Capital and its co-conspirators held firm, representing to FOL that the Investors would never agree to anything less (while at the same time barring FOL from speaking directly with the Investors). Indeed, every proposal Alexander Capital and the "Advisory Board" made involved turning over majority control of FOL (*i.e.*, Alexander Capital's goal all along).

153. From FOL's perspective, the demands made and positions taken by the "Advisory Board" were nonsensical. In 2018, FOL had annual revenues of around $2.7 million, and Alexander Capital valued the company at $50 million when it sold FOL stock that year to Canadian investors. By 2020, FOL had more than doubled its annual revenues, despite Alexander Capital's wrongdoing and the worldwide COVID-19 pandemic, and it was likely worth far more than Alexander Capital's $50 million valuation in 2018. Giving away up to half of FOL's equity at a $10 million valuation was absurd.

154. By any reasonable measure, FOL was worth more as a going concern than its value in liquidation. Negotiating an arrangement under which FOL paid off the Investors over time from revenue generated through its ongoing operations was the only sensible outcome, and Alexander Capital had promised FOL repeatedly as its financial advisor while raising the funds that this kind of a "no-brainer" deal would be easily made. But the "Advisory Board" never even put such a deal on the table. It soon became clear that the "Advisory Board" had no interest in making the Investors

whole and helping FOL survive. Instead, the "Advisory Board" wanted FOL for themselves.

155. Worse, on information and belief, the "Advisory Board" never even conveyed the substance of its negotiations with FOL to the majority of the Investors.

156. Indeed, while purportedly acting as FOL's agent to advise and help FOL come to a new agreement with the Investors, the "Advisory Board" members—specifically, Gazdak, DiMartini, Hurley, DaSilva, and Clapham—used their position to actively plot a hostile takeover of FOL and to make plans to run FOL's business after they and Alexander Capital acquired FOL's assets in litigation. Upon information and belief, each did so with full knowledge of Alexander Capital's fraud against FOL, seeking to aid and abet the culmination of that fraud and exploit it for their own personal benefit. Specifically, each knew that Alexander Capital had promised the Investors terms different than those represented to FOL. Gazdak likewise knew of the Secret Side-Deal and sought to exploit it against FOL.

157. In fact, both DiMartini and Hurley suggested that the documents the Investors had signed actually memorialized the terms of the Secret Side-Deal, and that FOL had already committed itself to a 30% maturity premium and granted the Investors conversion rights at a $10 million valuation. DiMartini and Hurley did so in an effort to intimidate FOL into believing that it had already lost because the contracts had handed majority control of FOL over to the Investors after the two-year notes matured. Indeed, Hurley told FOL that "the big problem" for FOL was the massive uncertainty over the actual terms of the lending documents: "whether it's the conversion or this 30% [premium]." Yet when FOL tried to learn more about the Secret Side-Deal, Gazdak told FOL not to worry about it because it "didn't matter."

158. In June of 2020, FOL's communications with the "Advisory Board" revealed (and then confirmed) the Secret Side-Deal that Alexander Capital had reached with the Investors. When

FOL learned what Alexander Capital had promised to the Investors in the Secret Side-Deal, it became clear that no fair and reasonable deal brokered by Alexander Capital or the "Advisory Board" was going to be made between FOL and the Investors. It also became clear to FOL in June 2020 that Alexander Capital had committed fraud against FOL in connection with issuance of the lending documents.

159. At this point, FOL asked Alexander Capital to provide contact information for the Investors, so that FOL could speak and negotiate directly with them. Recognizing the threat that direct communication between FOL and the Investors would pose, Hurley advised Alexander Capital not to give FOL contact information for the Investors. Clapham too expressed concern that FOL would come to reasonable terms with some of the Investors in a "divide and conquer" strategy, undermining Alexander Capital's plan to take over FOL.

160. Despite this obstruction, FOL moved to cut out the middleman and initiate direct negotiations with the Investors. In early July 2020, FOL reached out to all the Investors it could identify and told them that it was working tirelessly to improve its bottom line and pay off the Investors and would begin resuming loan payments on July 15. Hurley, DaSilva, and John DiMartini were the only Investors who took FOL up on its offer and accepted loan payments from FOL. Despite taking FOL's money, Hurley, DaSilva, and DiMartini later alleged in the Colorado Litigation that FOL's payments to them constituted breaches of the lending documents because they were not paid to all Investors equally.

161. Upon information and belief, despite the fact that Hurley, DaSilva, and John DiMartini personally accepted FOL's offer, the "Advisory Board" instructed the other Investors not to accept any payment from FOL, not to respond to FOL's offer, and not to negotiate with FOL.

162. While Hurley, DaSilva, and DiMartini benefitted from FOL's offer, the "Advisory Board" and Alexander Capital recognized that FOL's direct communications with the Investors, and most importantly, FOL's offer and resumption of payments to the Investors, would undermine the "Advisory Board's" representations to the Investors that FOL had no plan to repay them. In response to this threat to their plans, Alexander Capital and the "Advisory Board" accelerated the final steps of the plan to take over FOL.

## XII.   Alexander Capital And Its Co-Conspirators Implement The Plan To Acquire FOL

163. In early July 2020, Clapham created an investment deck and circulated it to DaSilva, Hurley, DiMartini, and Alexander Capital. The deck proposed that a new company be formed with new management and that the new managers would sue FOL, seek to acquire FOL's assets, and encourage the Investors to assign their investments to the new company. Clapham proposed that Thien Truong, a Provision Board Member and associate of Leonard's, serve as the CEO of the new company.

164. Alexander Capital and the "Advisory Board" followed through on Clapham's plan, creating Redemption Holdings, Inc. ("Redemption"). Redemption is a Colorado corporation with its principal place of business at Hurley's home address in New Jersey. Redemption was formed as a special-purpose vehicle designed to acquire FOL's assets and use them to operate a CBD business. Per Clapham's plan, Truong was named as Redemption's CEO. Upon information and belief, Truong joined Redemption with full knowledge of Alexander Capital's fraud against FOL, seeking to aid and abet the culmination of that fraud and exploit it for his own personal benefit.

165. Redemption is 80% owned by a group including Clapham, Hurley, DaSilva (all members of the "Advisory Board"), Leonard, and Truong. DiMartini is Redemption's agent.

166. Redemption's express purpose is to "operate a cannabis business, including, without limitation, a CBD business, utilizing [FOL's] collateral." Redemption represents the end-game for

Alexander Capital and the "Advisory Board," the vehicle by which they intended to execute the final stages of their plan to acquire FOL.

167. Immediately upon forming Redemption, Clapham, Leonard, Hurley, and DiMartini went on an all-out blitz to convince the Investors to assign their rights in the investments to Redemption. The standard pitch they made was along the following lines:

- Telling the Investors that FOL had no plan to pay them back (not true);

- Telling the Investors that assigning the Investments to Redemption was the only way that the Investors would be paid back (not true);

- Telling the Investors that if they did not immediately assign their Investments to Redemption, the Investors' ability to be repaid would be further reduced (not true);

- Telling the Investors that assigning their Investments to Redemption was the best option to recover all principal and interest owed (not true);

- Telling the Investors that they would have to pursue their claims individually unless they assigned them to Redemption (Redemption has since taken a contrary position);

- Telling the Investors that they would be entitled to the terms of the Secret Side-Deal if they assigned their investments to Redemption; and

- Misleadingly suggesting that DiMartini was still associated with Alexander Capital and failing to tell the Investors that DiMartini had been fired by Alexander Capital.

168. Based on these misrepresentations and material omissions, Clapham, Hurley, DaSilva, Leonard, and DiMartini convinced all but a few of the Investors to assign their investments to Redemption.

169. Redemption is structured so that while the Investors hold a pro-rata portion of 20% of Redemption's equity, Clapham, Hurley, DaSilva, Leonard, and Truong hold nearly 80%. So, if Redemption were to succeed in acquiring FOL's assets and using the assets as intended to run a CBD business in FOL's place, Alexander Capital's "Advisory Board" and the other co-conspirators will secure 80% of the ultimate value of that business. In August 2020, DaSilva

privately valued FOL at $150 million, meaning the conspirators' 80% share (if they were to acquire FOL) would be worth more than $110 million.

## XIII.    Redemption Sues FOL

170. Eleven days after it was organized, Redemption sued FOL in the District Court, City and County of Denver, State of Colorado, in the action captioned *Redemption Holdings, Inc. v. Floyd's of Leadville, Inc.*, pending as Case No. 2020-CV-032866 (the "Colorado Litigation"). DiMartini is a third-party defendant in that action.

171. In the Colorado Litigation, Redemption alleges that it is the assignee of the lending documents discussed above and that it is entitled to enforce those documents as assignee or agent for the Investors. Redemption seeks a money judgment pursuant to the lending documents in excess of $6 million and control of all of FOL's assets.

172. Additionally, Redemption has accused FOL of fraud in connection with "FOL's" representations concerning certain assets listed on the after-the-fact schedules created by Alexander Capital and CMD and appended to the Investors' purported security agreements. The schedules that CMD and Alexander Capital created after the fact suggested that FOL was the 100% owner of certain assets owned by other entities with whom FOL had dealings, and included fake assets in which FOL had no actual or potential ownership interest. FOL was not the 100% owner of these assets at the time the security agreements were proposed to the Investors or at the time CMD and Alexander Capital created the schedules. But because CMD and Alexander Capital added these false asset schedules after the fact to the security agreements, Redemption has claimed fraud by FOL relating to those assets.

173. Indeed, the conspirators' claims of fraud with respect to FOL's purported collateral are both manufactured and circular. The conspirators:

- Created (via CMD and Alexander Capital) a fabricated list of FOL assets and inserted the list retroactively into the security agreements;

- Circulated that fabricated list to their co-conspirator Hurley (who is an Investor);

- Created a new company (Redemption, with Hurley as its CEO) and arranged for Alexander Capital to appoint Redemption as the successor agent on the lending documents; and then

- Claimed (via Redemption and Hurley) that FOL had defrauded the Investors by misrepresenting FOL's assets and business dealings and fraudulently transferring assets that (in fact) FOL had never owned.

In other words, the conspirators fabricated an asset list, circulated it amongst themselves, and then argued that FOL had defrauded them by providing an inaccurate and misleading asset list.

174. FOL has counterclaimed in the Colorado Litigation, alleging fraud, fraudulent inducement, breach of fiduciary duty, and civil conspiracy against Redemption and DiMartini. FOL also tried to join the conspirators here to the Colorado Litigation, but the Colorado court determined that the claims against those other parties (*i.e.*, the Defendants named here) are not sufficiently related to the claims at issue in the Colorado Litigation to warrant bringing both sets of claims in the same action. Accordingly, FOL brings this action to pursue these claims in this separate lawsuit.

## XIV.  **This Case Repeats The Defendants' History of Misconduct**

175. While the acts perpetrated against FOL are shocking and hard to believe, they are hardly unprecedented. Many of the Defendants have an extensive history of engaging in the same types of misconduct that they perpetrated against FOL. Simply put, they have done this before, and if they are not held accountable, they will do it again.

### A.  **Alexander Capital**

176. Alexander Capital is part of a small group of firms who serve as a revolving door for unscrupulous agents that no one else in the industry would hire. A sampling of (by no means all)

regulatory actions against Alexander Capital and its agents confirms its history of misconduct, including:

- SEC Case No. 3-18561: SEC consent order based on Alexander Capital's failure to monitor representatives and prevent fraud and a "lax compliance environment" where representatives were not reasonably monitored or disciplined and representatives engaged in material misrepresentations, unsuitable trades, churning, and unauthorized transactions, leading to fines, interest, and disgorgement penalties of nearly $1.5 million;

- SEC Case No. 3-19160: SEC consent order based on concealment of material information, material misrepresentation, churning, unauthorized trades, and unsuitable trade recommendations by an Alexander Capital broker, who was permanently barred from participating in penny-stock offerings;

- Montana State Auditor, Commissioner of Securities and Insurance Case #SEC-2016-106: allegations of excessive trading, churning, and unauthorized sales of securities by Alexander Capital and five employees, resulting in Alexander Capital paying a $206,339 penalty;

- FINRA Docket #14-02186: allegations of unauthorized purchases and sales of securities by Alexander Capital broker, resulting in Alexander Capital paying a $112,500 settlement;

- FINRA Case #2014039351101: Alexander Capital consented to $80,000 FINRA fine based on failure to implement anti-money laundering program that would detect violations of federal securities laws despite regulatory red flags and investigations;

- FINRA Case #2016047616401: Alexander Capital consented to $45,000 FINRA fine based on filing and maintaining inaccurate books and records in violation of the federal securities laws and FINRA net capital violations;

- Arkansas Securities Commission Case No. S-19-0060: Alexander Capital engaged in unregistered broker-dealer activities and agreed to pay $15,000 fine; and

- FINRA Docket #17-00044: allegations of fraud, breach of fiduciary duty, and false and misleading statements by Alexander Capital broker, resulting in Alexander Capital paying a $11,000 settlement.

177. Alexander Capital was also part of a massive $165 million fraudulent securities scheme that involved more than 50 publicly traded companies and spawned numerous SEC actions, including *SEC v. Knox*, Case No. 1:18-CV-12058-RGS (D. Mass.); *SEC v. Tobin*, Case No. 1:18-CV-12541 (D. Mass.); and *SEC v. DiChiara*, Case No. 1:20-CV-11645 (D. Mass.). This

nine-figure fraud centered around a pump-and-dump scam involving the use of a reverse IPO, the same device that Alexander Capital tried to use to defraud FOL.

178.  In that case, Alexander Capital facilitated the sale of the stock of one of the companies at the center of the scheme. Significantly, the SEC alleged in these actions that several law firms directly participated in the fraudulent schemes and the cover-up, including DiChiara, who, according to the SEC, manipulated stock certificates and created false documents in furtherance of the illegal pump-and-dump scam.

### B.  Frank DiMartini

179.  DiMartini bounced between various unscrupulous broker-dealer firms before ultimately being fired for misconduct that even Alexander Capital could not tolerate. Two of DiMartini's previous employers have been expelled from FINRA. Since Alexander Capital fired him, DiMartini has not gained employment with any FINRA-registered brokerage firm.

180.  DiMartini is no stranger to fraudulent scams. Upon information and belief, DiMartini has participated in other fraudulent financial schemes, including "pump-and-dump" securities fraud. Hurley and DiMartini have been friends since childhood, and Hurley told FOL that he had done "10 other deals" with DiMartini. DiMartini, Clapham, Hurley, and many of their business partners have been participating in questionable deals together for years.

### C.  Timothy Kelly

181.  In 2013, Kelly's former employer, Stratex Oil & Gas Holdings, Inc. ("Stratex") sued Kelly in the action *Stratex Oil & Gas Holdings, Inc. v. Kelly*, Case No. 67528/2013, in the New York Supreme Court. Stratex asserted that Kelly sold shares of Stratex that Kelly did not own, pocketing the money from duped investors and never producing any stock certificates. Stratex also alleged that Kelly had arranged for Stratex to enter into lopsided lease agreements with an entity that Kelly had represented to be an arms-length third party, but was actually Kelly himself, who

put the lease in his wife's name to disguise his involvement. Stratex ultimately secured a judgment against Kelly in the amount of $3,164,000.

182. Further, a 2012 FINRA complaint brought against Kelly and his employer accused Kelly of breaching his fiduciary duties; misrepresentations, omissions, and using manipulative devices in violation of federal and state securities laws; fraud; conversion; recklessness; breach of contract; and churning. FINRA issued a $89,250 judgment against Kelly, which he failed to pay, leading to his suspension from FINRA.

### D.   Peter DiChiara

183.  In September 2020, DiChiara was charged by the SEC with manipulating and illegally selling the stock of a publicly traded company as part of a massive pump-and-dump scheme. *See SEC v. DiChiara*, Case No. 1:20-CV-11645 (D. Mass.). The scheme involved the use of a reverse IPO, a device that the Defendants attempted to use here. The scheme also involved allegations that DiChiara manipulated securities documents and manufactured fake documents. DiChiara settled with the SEC, paid a penalty, and consented to a five-year ban on association with penny stocks.

### E.   Greg Hurley

184.  Hurley held senior management positions at various Wall Street firms before criminal charges and a deferred prosecution agreement made Hurley unemployable amongst respectable firms. With few other options, Hurley applied his years of experience and knowledge of securities and markets to work with the Defendants here on various stock manipulations and financial scams, many perpetrated with his childhood friend DiMartini.

*          *          *

185. The common thread amongst these unscrupulous individuals is manipulation and a willingness to break any rule to make a profit. Indeed, every key act of misconduct in which the

Defendants engaged here to FOL's detriment is conduct in which they have previously engaged, in many cases leading to fines, payments, settlements, or civil judgments.

186. Indeed, the key acts of wrongdoing here each parallel misconduct in which the Defendants have previously engaged, including: structuring relationships with divided loyalties and inherent conflicts of interest; attempting to perpetrate a "pump and dump" scam through taking an entity public and other stock manipulation; serving as a trusted financial advisor and agent while making reckless and disastrous recommendations that benefit only the agent; skimming money off the top in the form of illegal payments; unauthorized stock sales and sales of stock the seller did not own; concealing self-dealing transactions by putting assets in a spouse's name; defrauding clients and fraudulently inducing contracts; and manipulating and altering contract documents.

187. Simply put, the Defendants have done this before, and unless they are stopped, they will do it again.

### COUNT I: FRAUD
### (AGAINST ALEXANDER CAPITAL, GAZDAK, AND
### THE ALEXANDER CAPITAL PARTNERS)

188. FOL incorporates the allegations set forth above.

189. To induce FOL to work with the Investors, Alexander Capital, through its agents, made affirmative material misrepresentations of fact to FOL, including but not limited to the misrepresentations explained above, representing to FOL that:

- Alexander Capital was FOL's fiduciary and would act exclusively in FOL's interest;
- Alexander Capital's financial advice was solely for the benefit of FOL and no other party;
- FOL did not have to worry about generating enough revenue within two years to pay the Investors back;
- The lending documents would be renegotiated prior to maturity on commercially reasonable terms that would be acceptable to FOL;
- None of the Investors believed that FOL would actually repay the principal on their investments after two years;

- It was common for start-ups to borrow as much money as FOL did;

- Two-year investments and 12% interest were industry-standard for investments in start-ups;

- Alexander Capital would be responsible for handling all the lending documents and securing proper signatures;

- The key terms that had been explained and provided to FOL (no 30% premium, no conversion rights) were the terms to which the Investors had agreed;

- Alexander Capital had appropriately advised the Investors of FOL's business plans;

- All of the lending documents were appropriately executed;

- FOL was not permitted to contact the Investors directly;

- Alexander Capital had informed the Investors of the terms FOL was offering to renegotiate the lending documents, and all information material to those terms;

- FOL had an obligation to pay commissions to Kelly;

- The entity proposed for a reverse-IPO was an appropriate entity that would be capable of participating in a reverse-IPO; and

- The above is how the securities industry works.

190. At the time these affirmative material misrepresentations were made, Alexander Capital and its agents knew the representations were false or were recklessly indifferent to whether the representations were false.

191. Further, to induce FOL to enter into the lending documents, Alexander Capital and its agents, including Gazdak, while under a duty to speak as FOL's agent, omitted disclosing material facts, including, among other things, the omissions detailed above and omitting to tell FOL that:

- Alexander Capital had told Investors that they would be entitled to a 30% premium payment at maturity of the lending documents;

- Alexander Capital had told Investors that they would be entitled to convert half or all of their debt to equity at a $10 million or $20 million valuation of FOL;

- The Investors expected to receive a 30% premium payment at maturity of the investments;

- The Investors expected to be able to convert all or some portion of their debt to equity at a low valuation of FOL;

- Alexander Capital had taken FOL's electronic signature and pasted it onto numerous

versions of lending documents, including adding FOL's signature whenever the documents changed without seeking FOL's approval or consent;

- Alexander Capital had provided outdated marketing literature to the Investors, without FOL's knowledge or consent;

- Alexander Capital had made inaccurate representations about FOL's business plans to the Investors;

- The Investors had not been kept up to date as to FOL's current business plans (despite FOL's bi-weekly meetings with DiMartini to apprise Alexander Capital of FOL's operations);

- Alexander Capital and the "Advisory Board" told the Investors to refuse FOL's offer to resume interest payments and not to communicate or deal with FOL;

- CMD and DiChiara were providing legal services and serving as counsel to Alexander Capital, Coil, Provision, Kelly, DiMartini, and Leonard during their purported representation of FOL;

- The matters on which CMD and DiChiara were providing legal services to Alexander Capital, Coil, Provision, Kelly, DiMartini, and Leonard were related to the subject matter of CMD and DiChiara's representation of FOL and involved interests adverse to FOL's interests;

- DiMartini had personally guaranteed performance of his brother's note;

- DiMartini was an owner of Coil;

- DiMartini and Alexander Capital stood to and did receive a $50,000 kick-back payment in connection with FOL's coerced $300,000 deal with Provision;

- Kelly stood to obtain 7% of the outstanding stock after the reverse-IPO;

- Kelly had been suspended by FINRA;

- Kelly had no legal right, contractual or otherwise, to receive a portion of the principal of investments made to FOL;

- Alexander Capital had not disclosed to the Investors the $3 million debt ceiling provided under many of the early notes, nor received the Investors' permission to raise that ceiling; and

- The lending documents were not properly executed.

192. Alexander Capital and its agents, including Gazdak, made these misrepresentations and omissions with the intent to induce FOL's reliance.

193. In agreeing to work with the Investors, Alexander Capital, and CMD, FOL relied on these misrepresentations and omissions of material fact.

194. FOL's reliance was justified.

195. As a result of being fraudulently induced to borrow and lend money and as otherwise described above, FOL has suffered damages and is entitled to, among other things, rescission of the purported lending documents.

196. Alexander Capital and Gazdak acted maliciously, and FOL is entitled to punitive damages, in an amount to be determined at trial.

197. The Alexander Capital Partners are jointly and severally liable for Alexander Capital's wrongdoing.

**COUNT II: FRAUD**
**(AGAINST PROVISION)**

198. FOL incorporates the allegations set forth above.

199. To induce FOL to provide it with $300,000, Provision made affirmative material misrepresentations of fact to FOL, including but not limited to the misrepresentations explained above, and telling FOL that:

- The claimed $3 million investment from Coinstar was assured and imminent, despite knowing that the Coinstar deal was neither imminent nor certain;

- Provision would be providing deeply discounted advertising services to FOL, despite having no intention of providing those services; and

- Provision would pay back the $200,000 loan to FOL promptly upon the imminent and certain closing of Provision's deal with Coinstar, despite having no intention of paying back the loan and knowing the Coinstar deal was neither imminent nor certain.

200. At the time Provision made these affirmative material misrepresentations, Provision and its agents knew the representations were false or were recklessly indifferent to whether the representations were false.

201. Provision made these misrepresentations with the intent to induce FOL to rely on them.

202. In agreeing to work with Provision, FOL relied on these misrepresentations.

203. FOL's reliance was justified.

204. As a result of being fraudulently induced to contract with Provision, FOL has suffered damages and is entitled to, among other things, rescission of that contract.

205. Provision acted maliciously, and FOL is entitled to punitive damages, in an amount to be determined at trial.

### COUNT III: SECURITIES FRAUD
### (AGAINST ALEXANDER CAPITAL, GAZDAK, AND
### THE ALEXANDER CAPITAL PARTNERS)

206. FOL incorporates the allegations set forth above.

207. By virtue of the conduct described above, Alexander Capital and Gazdak, directly or indirectly, by the use of the means or instrumentalities of interstate commerce, or the facilities of a national securities exchange, and/or the mails: (a) employed devices, schemes and/or artifices to defraud; (b) made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon other persons in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5.

208. The instruments issued by FOL identified above were "securities" within the meaning of § 3(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78(c)(1), and thus FOL's issuance of those instruments to investors based on Alexander Capital and Gazdak's misrepresentations and omissions constituted a purchase or sale of "securities" subject to the provisions of the Securities Exchange Act of 1934. The lending documents expressly refer to the instruments as "a 'restricted security' under applicable federal securities laws" and as "securities" and "investments" made "for investment purposes."

209. In acting as FOL's financial advisor and fiduciary in connection with those

instruments, Alexander Capital and Gazdak had a duty to disclose, but failed to disclose, the true facts concerning the securities that were issued by FOL and thus made statements that were untrue or that omitted material facts necessary in order to make the statements not misleading in light of the circumstances.

210. To induce FOL to issue the securities, Alexander Capital, through its agents, made affirmative material misrepresentations of fact to FOL, including but not limited to the misrepresentations explained above, representing to FOL that:

- Alexander Capital was FOL's fiduciary and would act exclusively in FOL's interest;
- Alexander Capital's financial advice was solely for the benefit of FOL and no other party;
- FOL did not have to worry about generating enough revenue within two years to pay the Investors back;
- The lending documents would be renegotiated prior to maturity on commercially reasonable terms that would be acceptable to FOL;
- None of the Investors believed that FOL would actually repay the principal on their investments after two years;
- It was common for start-ups to borrow as much money as FOL did;
- Two-year investments and 12% interest were industry-standard for investments in start-ups;
- Alexander Capital would be responsible for handling all the lending documents and securing proper signatures;
- The terms that had been explained and provided to FOL (no 30% premium, no conversion rights) were the terms to which the Investors had agreed;
- Alexander Capital had appropriately advised the Investors of FOL's business plans;
- All of the lending documents were appropriately executed;
- FOL was not permitted to contact the Investors directly;
- Alexander Capital had informed the Investors of the terms FOL was offering to renegotiate the lending documents, and all information material to those terms;
- FOL had an obligation to pay commissions to Kelly; and
- The above is how the securities industry works.

211. At the time these affirmative material misrepresentations were made, Alexander

Capital and its agents knew the representations were false or were recklessly indifferent to whether the representations were false.

212. Further, to induce FOL to issue the securities, Alexander Capital and its agents, including Gazdak, while under a duty to speak as FOL's agent, omitted disclosing material facts, including, among other things, the omissions detailed above and omitting to tell FOL that:

- Alexander Capital had told Investors that they would be entitled to a 30% premium payment at maturity of the lending documents;

- Alexander Capital had told Investors that they would be entitled to convert half or all of their debt to equity at a $10 million or $20 million valuation of FOL;

- The Investors expected to receive a 30% premium payment at maturity of the investments;

- The Investors expected to be able to convert all or some portion of their debt to equity at a low valuation of FOL;

- Alexander Capital had taken FOL's electronic signatures and pasted them onto numerous versions of lending documents, including adding FOL's signature whenever the documents changed without seeking FOL's approval or consent;

- Alexander Capital had provided outdated marketing literature to the Investors, without FOL's knowledge or consent;

- Alexander Capital had made inaccurate representations about FOL's business plans to the Investors;

- The Investors had not been kept up to date as to FOL's current business plans (despite FOL's bi-weekly meetings with DiMartini to apprise Alexander Capital of FOL's operations);

- CMD and DiChiara were providing legal services and serving as counsel to Alexander Capital, Coil, Provision, Kelly, DiMartini, and Leonard during their purported representation of FOL;

- The matters on which CMD and DiChiara were providing legal services to Alexander Capital, Coil, Provision, Kelly, DiMartini, and Leonard were related to the subject matter of CMD and DiChiara's representation of FOL and involved interests adverse to FOL's interests;

- DiMartini had personally guaranteed performance of his brother's note;

- Kelly had been suspended by FINRA;

- Kelly had no legal right, contractual or otherwise, to receive a portion of the principal of investments made to FOL;

- Alexander Capital had not disclosed to the Investors the $3 million debt ceiling

provided under many of the early notes, nor received the Investors' permission to raise that ceiling; and

- The lending documents were not properly executed.

213. By the conduct described above, Alexander Capital and Gazdak engaged in a practice and course of conduct disregarding FOL's investment objectives, inducing FOL to take on more debt than it could afford to pay back; taking actions purportedly on behalf of FOL without FOL's knowledge, consent, instruction, or authorization; acting without authority and in derogation of their obligations to FOL; and breaching their fiduciary duties and obligations of good faith and fair dealing.

214. Alexander Capital and Gazdak acted with scienter by knowingly and recklessly making the misrepresentations and omissions described above. Alexander Capital's scienter is based on the scienter of its agents, including DiMartini and Gazdak.

215. FOL reasonably relied upon the misrepresentations and omissions of material facts Alexander Capital and Gazdak made with respect to FOL's solicitation of funds and as to the specific securities issued by FOL, and the subject transactions would not have occurred but for Alexander Capital's and Gazdak's representations and omissions.

216. As a proximate result of Alexander Capital's and Gazdak's material misrepresentations and omissions, FOL suffered damages in connection with the sale of the securities at issue in this litigation. Specifically, as a result of Alexander Capital's and Gazdak's misconduct, FOL issued securities on unfavorable terms and in amounts it would not have otherwise agreed to, causing it to become over-leveraged, owe grossly increased interest amounts, and face the loss of its business due to its inability to repay the debt with which Alexander Capital saddled it. FOL also suffered additional damages in an amount to be determined at trial.

217. Plaintiff was not aware of any facts constituting the violations of Section 10(b) and

Rule 10b-5 alleged herein until June 2020 at the earliest, when FOL was able to confirm existence of the Secret Side-Deal. FOL commenced this suit within two years of the date it became aware of the facts constituting the violations alleged herein and within five years of the date FOL issued the securities. As a result, the claims alleged in this Count were brought within the applicable statute of limitations.

218. The Alexander Capital Partners are jointly and severally liable for Alexander Capital's wrongdoing.

### COUNT IV: VIOLATION OF THE INVESTMENT ADVISERS ACT
### (AGAINST ALEXANDER CAPITAL AND THE ALEXANDER CAPITAL PARTNERS)

219. FOL incorporates the allegations set forth above.

220. Pursuant to the Engagement Agreement, Alexander Capital and its agents served as investment advisor to FOL and received special compensation from FOL for performing investment advisory services for FOL.

221. Specifically, the Engagement Agreement provided that Alexander Capital agreed to serve "as exclusive placement agent and financial advisor to [FOL]." Alexander Capital expressly agreed to act as FOL's "financial advisor in connection with" the "private placement of up to $2,000,000 (the 'Placement') in senior secured debt (the 'Securities')" and to provide "financial advisory services." FOL retained Alexander Capital "to consult with and advise [FOL] with respect to the Placement and anything incidental thereto." In exchange, Alexander Capital received special compensation in the form of a commission for successful investments and its advice to FOL in connection with those investments. In sum, Alexander Capital was advising FOL as to the advisability of issuing certain securities, thus meeting the definition of an investment advisor.

222. In the course of its engagement with FOL, Alexander Capital engaged in fraudulent, deceitful, and manipulative conduct, as described above, and including numerous fraudulent

misrepresentations and material omissions and wrongfully conspiring to acquire FOL, among other things.

223. Specifically, Alexander Capital, through its agents, made affirmative material misrepresentations of fact to FOL, including but not limited to the misrepresentations explained above, representing to FOL that:

- Alexander Capital was FOL's fiduciary and would act exclusively in FOL's interest;
- Alexander Capital's financial advice was solely for the benefit of FOL and no other party;
- FOL did not have to worry about generating enough revenue within two years to pay the Investors back;
- The lending documents would be renegotiated prior to maturity on commercially reasonable terms that would be acceptable to FOL;
- None of the Investors believed that FOL would actually repay the principal on their investments after two years;
- It was common for start-ups to borrow as much money as FOL did;
- Two-year investments and 12% interest were industry-standard for investments in start-ups;
- Alexander Capital would be responsible for handling all the lending documents and securing proper signatures;
- The terms that had been explained and provided to FOL (no 30% premium, no conversion rights) were the terms to which the Investors had agreed;
- Alexander Capital had appropriately advised the Investors of FOL's business plans;
- All of the lending documents were appropriately executed;
- FOL was not permitted to contact the Investors directly;
- Alexander Capital had informed the Investors of the terms FOL was offering to renegotiate the lending documents, and all information material to those terms;
- FOL had an obligation to pay commissions to Kelly;
- The entity proposed for a reverse-IPO was an appropriate entity that would be capable of participating in a reverse-IPO; and
- The above is how the securities industry works.

224. At the time these affirmative material misrepresentations were made, Alexander Capital and its agents knew the representations were false or were recklessly indifferent to whether

the representations were false.

225. Further, Alexander Capital and its agents, while under a duty to speak as FOL's investment adviser, omitted disclosing material facts, including, among other things, the omissions detailed above and omitting to tell FOL that:

- Alexander Capital had told Investors that they would be entitled to a 30% premium payment at maturity of the lending documents;

- Alexander Capital had told Investors that they would be entitled to convert half or all of their debt to equity at a $10 million or $20 million valuation of FOL;

- The Investors expected to receive a 30% premium payment at maturity of the investments;

- The Investors expected to be able to convert all or some portion of their debt to equity at a low valuation of FOL;

- Alexander Capital had taken FOL's electronic signatures and pasted them onto numerous versions of lending documents, including adding FOL's signature whenever the documents changed without seeking FOL's approval or consent;

- Alexander Capital had provided outdated marketing literature to the Investors, without FOL's knowledge or consent;

- Alexander Capital had made inaccurate representations about FOL's business plans to the Investors;

- The Investors had not been kept up to date as to FOL's current business plans (despite FOL's weekly meetings with DiMartini to apprise Alexander Capital of FOL's operations);

- Alexander Capital and the "Advisory Board" told the Investors to refuse FOL's offer to resume interest payments and not to communicate or deal with FOL;

- CMD and DiChiara were providing legal services and serving as counsel to Alexander Capital, Coil, Provision, Kelly, DiMartini, and Leonard during their purported representation of FOL;

- The matters on which CMD and DiChiara were providing legal services to Alexander Capital, Coil, Provision, Kelly, DiMartini, and Leonard were related to the subject matter of CMD and DiChiara's representation of FOL and involved interests adverse to FOL's interests;

- DiMartini had personally guaranteed performance of his brother's note;

- DiMartini was an owner of Coil;

- DiMartini stood to and did receive a $50,000 kick-back payment in connection with FOL's coerced $300,000 deal with Provision;

- Kelly stood to obtain 7% of the outstanding stock after the reverse-IPO;

- Kelly had been suspended by FINRA;

- Kelly had no legal right, contractual or otherwise, to receive a portion of the principal of investments made to FOL;

- Alexander Capital had not disclosed to the Investors the $3 million debt ceiling provided under many of the early notes, nor received the Investors' permission to raise that ceiling; and

- The lending documents were not properly executed.

226. By the conduct described above, Alexander Capital and Gazdak engaged in a practice and course of conduct disregarding FOL's investment objectives, inducing FOL to take on more debt than it could afford to pay back; taking actions purportedly on behalf of FOL without FOL's knowledge, consent, instruction or authorization; acting without authority and in derogation of their obligations to FOL; and breaching their fiduciary duties and obligations of good faith and fair dealing.

227. Alexander Capital's fraudulent, deceitful, and manipulative conduct was in violation of Section 206 of the Investment Advisers Act, 15 U.S.C. § 80b-6. By virtue of Alexander Capital's misconduct and its violation of the Investment Advisers Act, FOL is entitled under Section 215 of the Investment Advisers Act, 15 U.S.C. § 80b-15, to rescind the Engagement Agreement and recover all amounts paid to FOL under the Engagement Agreement and all costs incurred by FOL in compelling Alexander Capital to comply with the Act.

228. The Alexander Capital Partners are jointly and severally liable for Alexander Capital's wrongdoing.

**COUNT V: AIDING AND ABETTING FRAUD**
**(AGAINST  CLAPHAM, LEONARD,**
**KELLY, AND THREE DDD)**

229. FOL incorporates the allegations set forth above.

230. Alexander Capital, Gazdak, and Provision defrauded FOL as described above,

including but not limited to fraudulently inducing FOL to work with the Investors.

231. Thereafter, Alexander Capital, Gazdak, and Provision continued to defraud FOL pursuant to the fraudulent scheme alleged herein.

232. Hurley, Clapham, DaSilva, Leonard, Truong, Kelly, and Three DDD knew about the fraudulent scheme.

233. Hurley, Clapham, DaSilva, Leonard, and Truong knowingly and substantially assisted the fraud by, among other things, the assistance detailed above, as well as by:

- Agreeing to participate in the fraud by serving as the managers and vehicle to run a rival CBD company after Redemption had wrongfully acquired FOL's assets;

- Agreeing to form and join the group of Redemption insiders that stand to gain 80% of the lifetime value of FOL, which they themselves secretly valued at more than $150 million on the eve of the Colorado Litigation;

- Recruiting and compensating a sales team to run the rival CBD company after Redemption had wrongfully acquired FOL's assets;

- Accepting confidential and proprietary FOL information gathered while serving on the Advisory Board and using it to injure FOL, while knowing that the information was provided under obligations to keep that information confidential;

- Agreeing to serve as agent for the Investors in furtherance of the plan wrongfully to acquire FOL's operating business and assets;

- Agreeing to serve as assignee under the lending documents and to pursue the wrongful acquisition of FOL's assets in this role;

- Making false and misleading statements to the Investors to solicit them to assign their lending documents to Redemption; and

- Agreeing to fund and litigate the lawsuit against FOL wrongfully to acquire FOL's assets.

234. Kelly and Three DDD knowingly and substantially assisted the fraud by, among other things, the assistance detailed above, as well as by:

- Stealing from FOL and assisting others in stealing from FOL;

- Providing false and misleading information to the Investors and other FOL business partners;

- Encouraging FOL to work with Alexander Capital, DiMartini, CMD, and DiChiara, while knowing that Alexander Capital, DiMartini, CMD, and DiChiara were acting on

behalf of interests adverse to FOL;

- Forming Coil, hiding Kelly's ownership in Coil, and attempting to defraud FOL into entering into an agreement with Coil that would have secretly enriched Kelly and Three DDD at FOL's expense;

- Concealing Kelly's status as a secured creditor of Provision;

- Selling stock Kelly did not own to Leonard, thereby cutting Leonard into the deal;

- Selling phantom FOL stock to an unknown number of additional investors; and

- Encouraging FOL to work with Alexander Capital and the Investors and to engage in business dealings that enriched Kelly and Three DDD and hurt FOL.

235. As a result of Hurley, Clapham, DaSilva, Leonard, Truong, Kelly, and Three DDD's substantial assistance, FOL has suffered damages.

236. Hurley, Clapham, DaSilva, Leonard, Truong, Kelly, and Three DDD acted maliciously, and FOL is entitled to punitive damages, in an amount to be determined at trial.

## COUNT VI: BREACH OF FIDUCIARY DUTY
## (AGAINST ALEXANDER CAPITAL, GAZDAK, AND
## THE ALEXANDER CAPITAL PARTNERS)

237. FOL incorporates the allegations set forth above.

238. As FOL's trusted financial advisor, fiduciary, and broker, Alexander Capital (and thus its agents, including Gazdak and DiMartini) owed fiduciary duties to FOL.

239. Alexander Capital and Gazdak breached their fiduciary duties to FOL by virtue of, among other things, the breaches described above and by:

- Fabricating the lending documents, applying FOL's signatures to documents without FOL's knowledge and consent, and falsely representing that FOL had agreed to terms they never shared with FOL;

- Acting simultaneously on behalf of FOL and parties adverse to FOL (*e.g.*, the Investors, its own proprietary interests and those of its agents, Coil, Provision) without disclosing all the material facts of its adverse roles and without treating FOL entirely fairly, in violation of its duty of loyalty;

- Having an undisclosed financial interest in the Investors (via DiMartini's personal guarantee of his brother's loan, the largest loan to FOL by far) and acting to promote its own financial interests at FOL's expense;

- Withholding material information about the lending documents and FOL's dealings with counterparties while under a duty to speak;

- Stealing from FOL and providing significant amounts of the principal FOL borrowed to their associates, friends, and agents;

- Disclosing confidential and proprietary information about FOL, its operations, and its products to third parties, including disclosing to Leonard details about a new FOL product, of which Leonard obtained a sample under false pretenses and then trademarked and sought to sell to compete with FOL's product;

- Providing the Investors with false and misleading information about FOL's operations and intentions;

- Providing FOL with false information about what Alexander Capital had told the Investors and what the Investors had told Alexander Capital;

- Failing to provide information about FOL's efforts to renegotiate the lending documents to the Investors as FOL requested;

- Inducing FOL to borrow millions of dollars while knowing this would lead to a default and an attempt to acquire all of FOL's assets;

- Making some or all of the allegedly fraudulent statements to the Investors that are the subject of the Colorado Litigation and exposing FOL to liability;

- Providing some or all of the allegedly false or misleading documents to the Investors that are the subject of the Colorado Litigation and exposing FOL to liability;

- Behaving at minimum in a manner that was grossly negligent and in their duties of care; and

- Acting in bad faith.

240. As a result of Alexander Capital and Gazdak's breaches of fiduciary duty, FOL has suffered damages.

241. Alexander Capital and Gazdak acted maliciously, and FOL is entitled to punitive damages, in an amount to be determined at trial.

242. The Alexander Capital Partners are jointly and severally liable for Alexander Capital's wrongdoing.

## COUNT VII: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (AGAINST CLAPHAM, LEONARD, KELLY, AND THREE DDD)

243. FOL incorporates the allegations set forth above.

244. Alexander Capital and Gazdak owed fiduciary duties to FOL.

245. Alexander Capital and Gazdak breached those duties, as described above.

246. Hurley, Clapham, DaSilva, Leonard, Truong, Kelly, and Three DDD knew about Alexander Capital and Gazdak's breach of those duties.

247. Hurley, Clapham, DaSilva, Leonard, Truong, and Leonard knowingly and substantially assisted the breach of those duties by virtue of, among other things, the conduct described above and by:

- Agreeing to participate in Alexander Capital's breaches by serving as the managers and vehicle to run a rival CBD company after Redemption had wrongfully acquired FOL's assets;

- Agreeing to form and join the group of Redemption insiders that stand to gain more than $110 million as 80% owners of Redemption;

- Recruiting and compensating a sales team to run the rival CBD company after Redemption had wrongfully acquired FOL's assets;

- Accepting and using confidential and proprietary FOL information against FOL and to injure FOL, while knowing that the information was provided to them under obligations to keep that information confidential;

- Agreeing to serve as the purported agent for the Investors in furtherance of the plan wrongfully to acquire FOL's assets;

- Agreeing to serve as the purported assignee under the lending documents and to pursue the wrongful acquisition of FOL's assets in this role;

- Making false and misleading statements to the Investors to solicit them to assign their lending documents to Redemption; and

- Agreeing to fund and litigate the Colorado lawsuit against FOL wrongfully to acquire FOL's assets.

248. Kelly and Three DDD knowingly and substantially assisted the breach of those duties by virtue of, among other things, the conduct described above and by:

- Stealing from FOL and assisting others in stealing from FOL;

- Providing false and misleading information to the Investors and other FOL business partners;

- Proposing, encouraging, and arranging for FOL to make efforts to enter into a reverse-IPO that would have hurt FOL and enriched Kelly and Three DDD at FOL's expense;

- Forming Coil, hiding Kelly's and DiMartini's ownership in Coil, and attempting to defraud FOL into entering into an agreement with Coil that would have secretly enriched Kelly and DiMartini at FOL's expense;

- Concealing Kelly's status as a secured creditor of Provision;

- Selling stock Kelly did not own to Leonard, thereby cutting Leonard into the deal;

- Selling phantom FOL stock to other parties; and

- Encouraging FOL to work with Alexander Capital and the Investors and to engage in business dealings that enriched Kelly and Three DDD and hurt FOL.

249.  As a result of Hurley, Clapham, DaSilva, Leonard, Truong, Kelly, and Three DDD's knowing and substantial assistance, FOL has suffered damages.

250.  Hurley, Clapham, DaSilva, Leonard, Truong, Kelly, and Three DDD acted maliciously, and FOL is entitled to punitive damages, in an amount to be determined at trial.

## COUNT VIII: INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS (AGAINST CLAPHAM AND LEONARD)

251.  FOL incorporates the allegations set forth above.

252.  FOL had an opportunity to enter into prospective business relationships with the Investors in the form of renegotiated lending documents.

253.  Hurley, DaSilva, Clapham, Truong, and Leonard knew about and interfered with the prospective contractual relationships between FOL and the Investors by virtue of, among other things, the wrongful means alleged above and by:

- Responding to FOL's first attempt to negotiate with the Investors by forming Redemption and engaging in an all-out blitz of pressure tactics, misleading statements, and lies to encourage the Investors to end their relationship with FOL and form a new relationship with Redemption;

- Falsely telling the Investors that FOL had no plan to pay them back;

- Falsely telling the Investors that they had valid, accurate, original lending documents;

- Falsely telling the Investors that they were entitled to the terms of the Secret Side-Deal;

- Falsely telling the Investors that assigning the investments to Redemption was the only way that the Investors would be paid back;

- Falsely telling the Investors that their ability to be repaid would be further reduced if

they did not immediately assign their investments to Redemption;

- Falsely telling the Investors that assigning their investments to Redemption was the best option to recover all principal and interest owed;

- Falsely telling the Investors that they would have to pursue their claims individually unless they assigned their investments to Redemption;

- Misleadingly suggesting that DiMartini was still associated with Alexander Capital and failing to tell the Investors that DiMartini had been fired by Alexander Capital;

- Falsely representing that FOL and its management had engaged in fraud; and

- Stirring up vexatious litigation against FOL and its officers

254. Hurley, DaSilva, Clapham, Truong, and Leonard's interference, including through the conduct of their actual and apparent agents, was intentional and undertaken for the purpose of harming FOL.

255. Hurley, DaSilva, Clapham, Truong, and Leonard's interference was wrongful and undertaken by wrongful means.

256. Because of Hurley, DaSilva, Clapham, Truong, and Leonard's interference, FOL was prevented from renegotiating the lending documents and entering new contractual business relationships with the Investors. Specifically, the wrongful interference denied FOL an opportunity to renegotiate the investments on terms that were mutually acceptable to FOL and the Investors.

257. Because of Hurley, DaSilva, Clapham, Truong, and Leonard's interference, FOL was prevented from entering into transactions to refinance the Notes with third parties.

258. As a proximate result of Hurley, DaSilva, Clapham, Truong, and Leonard's interference, FOL has suffered damages.

259. Hurley, DaSilva, Clapham, Truong, and Leonard acted maliciously, and FOL is entitled to punitive damages, in an amount to be determined at trial.

## COUNT IX: CONVERSION
### (AGAINST ALEXANDER CAPITAL, KELLY, LEONARD, AND
### THE ALEXANDER CAPITAL PARTNERS)

260. FOL incorporates the allegations set forth above.

261. Alexander Capital, Kelly, and Three DDD took significant amounts of the investment money FOL received and distributed it to themselves and their agents, without FOL's permission and knowing that they and their agents had no right to receive the money.

262. By taking money that belonged to FOL, Alexander Capital, Kelly, and Three DDD exercised unauthorized dominion or ownership over personal property belonging to FOL.

263. Additionally, despite Kelly not owning any stock in FOL, Alexander Capital and Kelly purported to issue FOL stock to Leonard in exchange for $250,000. Because Kelly "issued" FOL stock to Leonard, the $250,000 received from Leonard belonged to FOL, not to Kelly.

264. Alexander Capital coerced FOL, after the fact, to go along with the false issuance based on the threat that otherwise Alexander Capital would immediately cut off funding and FOL would fold. As part of these coercion tactics, Kelly agreed to transfer the $250,000 he had received from Leonard to FOL, but then Kelly reneged and refused to do so.

265. By keeping the $250,000 that belonged to FOL, Kelly exercised unauthorized dominion or ownership over personal property belonging to FOL.

266. Leonard purportedly re-sold FOL stock after Kelly "issued" it to him, but he did not own that FOL stock and did not pay FOL any funds in exchange for the stock he purported to sell.

267. By selling FOL stock that Leonard did not own, Leonard exercised unauthorized dominion or ownership over personal property belonging to FOL.

268. As a result of the conduct described above, FOL has suffered damages.

269. Alexander Capital, Kelly, Three DDD, and Leonard acted maliciously, and FOL is entitled to punitive damages, in an amount to be determined at trial.

270. The Alexander Capital Partners are jointly and severally liable for Alexander Capital's wrongdoing.

## COUNT X: BREACH OF CONTRACT
## (AGAINST ALEXANDER CAPITAL AND THE ALEXANDER CAPITAL PARTNERS)

271. FOL incorporates the allegations set forth above.

272. FOL and Alexander Capital entered into the Engagement Agreement, which constitutes a valid and binding contract under New York law.

273. FOL performed its obligations under the Engagement Agreement or was excused from such performance.

274. Under the terms of the Engagement Agreement, Alexander Capital agreed to indemnify and hold FOL and its officers, directors, employees, agents, and controlling persons harmless against any and all loss, charge, claim, damage, expense, and liability whatsoever, including but not limited to all attorney fees and expenses, arising out of, based upon, or in connection with any untrue statement or alleged untrue statement of a material fact made by Alexander Capital or any omission or alleged omission of Alexander Capital to state a material fact required to be stated therein to make other statements Alexander Capital made not misleading. Alexander Capital further agreed to reimburse FOL and its officers, directors, employees, agents, and controlling persons for all expenses (including reasonable fees and expenses of legal counsel) as they are incurred in connection with the investigation of, preparation for, or defense of any pending or threatened claim related to or arising from such misstatement.

275. Alexander Capital, including through its agents Gazdak and DiMartini, made numerous material untrue statements, omitted material facts while under a duty to speak, and failed to make statements required to make other statements not misleading, including but not limited to the conduct described above. As a result of Alexander Capital's misrepresentations and material

omissions, FOL has been subjected to claims in the Colorado Litigation described above and has incurred expenses, including attorney fees, in connection with those claims and in pursuing this litigation.

276. Under the Engagement Agreement, Alexander Capital is required to reimburse FOL for all expenses, including reasonable fees and expenses of legal counsel, as they are incurred in connection with investigating, preparing for, or defending claims related to or arising from Alexander Capital's misstatements. Alexander Capital has refused to do so in breach of its obligations under the Engagement Agreement.

277. In addition, under the Engagement Agreement, Alexander Capital was engaged to act as financial advisor to FOL.

278. As set forth herein, Alexander Capital breached its obligations as financial advisor by providing grossly negligent financial advice and financial advice for its own benefit and not for FOL's. Alexander Capital's breaches rose to the level of willful misconduct.

279. Under the Engagement Agreement, Alexander Capital was required to offer and sell securities of FOL in connection with the Placement only to "qualified institutional buyers", as such term is defined in Rule 144A under the Securities Act of 1933 and "accredited investors", as such term is defined in Rule 501(a) of Regulation D.

280. Alexander Capital breached its obligations under the Engagement Agreement by offering to sell and selling securities to persons or entities who were neither a "qualified institutional buyer" nor an "accredited investor".

281. Under the Standard Terms and Conditions of the Engagement Agreement, Alexander Capital agreed to keep all information obtained from FOL strictly confidential, and only disclose

such information to permitted individuals and use its best efforts to ensure that all such persons will keep such information strictly confidential.

282. Alexander Capital breached its obligations under the Engagement Agreement by failing to keep all information obtained from the Company strictly confidential, disclosing information beyond the permitted individuals, and failing to use its best efforts to ensure that all such persons will keep such information strictly confidential.

283. Alexander Capital represented and warranted to and covenanted with FOL that it will conduct the Placement in accordance with all applicable rules and regulations of FINRA and all applicable laws, including federal and state securities laws.

284. Alexander Capital breached its representations, warranties, and covenants with FOL by, among other things, (a) violating FINRA Rule 2020 ("No member shall effect any transaction in, or induce the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance."); (b) violating FINRA Rule 2040(a) ("No member or associated person shall, directly or indirectly, pay any compensation, fees, concessions, discounts, commissions or other allowances to: (1) any person that is not registered as a broker-dealer under Section 15(a) of the Exchange Act but, by reason of receipt of any such payments and the activities related thereto, is required to be so registered under applicable federal securities laws and SEA rules and regulations; or (2) any appropriately registered associated person unless such payment complies with all applicable federal securities laws, FINRA rules and SEA rules and regulations."); (c) violating FINRA Rule 5123 (requiring members selling non-public offering to submit either (i) "a copy of any private placement memorandum, term sheet or other offering document, and any retail communication (as defined in Rule 2210) that promotes or recommends the private placement, including any materially amended versions thereof, used in connection with such sale

within 15 calendar days of the date of first sale; or (ii) notify FINRA that no such offering documents or retail communications were used. Members must provide FINRA with the required documents, retail communications, or notification and related information, if known, by filing an electronic form in the manner prescribed by FINRA."); (d) violating the content standards for member communications in the sale of securities contained in FINRA Rule 2210);  and (e) violating Section 206 of the Advisers Act"), 15 U.S.C. § 80b-r6(1), (2), and (3) (generally prohibiting fraud, deceit, and manipulation);

285.  Alexander Capital further breached its obligations under the Engagement Agreement by acts to be proven at trial.

286.  By virtue of Alexander Capital's breaches of the Engagement Agreement, FOL has suffered damages, in an amount to be determined at trial.

287.  The Alexander Capital Partners are jointly and severally liable for Alexander Capital's breaches of the Engagement Agreement.

## COUNT XI: BREACH OF CONTRACT
### (AGAINST PROVISION)

288.  FOL incorporates the allegations set forth above.

289.  FOL entered into a valid and binding written contract with Provision.

290.  FOL performed its obligations under that contract or was excused from such performance.

291.  Under the terms of the contract, Provision agreed to provide advertising services to FOL in the form of one daily insertion of an advertisement selected by FOL to be broadcast in certain kiosks owned or operated by Provision. The advertisement was to run daily for three years. Provision also agreed to repay FOL's $200,000 promissory note, plus 12% interest per annum, in one lump sum payment on or before the earlier of (a) September 16, 2019 and (b) the date Provision

received the purportedly pending Coinstar investment.

292. Provision breached its obligations under the contract by not providing advertising services to FOL.

293. Provision breached its obligations under the contract by not repaying the $200,000 promissory note by September 16, 2019 (the Coinstar investment never happened).

294. Provision further breached its obligations under the contract by acts to be proven at trial.

295. Under the promissory note attached to the contract, Provision is liable to FOL for all costs and expenses, including reasonable attorney fees, that FOL incurs in enforcing the note.

296. By virtue of Provision's breaches of the contract, FOL has suffered damages, in an amount to be determined at trial.

## COUNT XII: CIVIL CONSPIRACY
### (AGAINST ALL NON-DISMISSED DEFENDANTS)

297. FOL incorporates the allegations set forth above.

298. Alexander Capital and its co-conspirators acted with the common purpose of wrongfully acquiring FOL. They engaged in wrongful conduct to FOL's detriment in furtherance of their wrongful purpose. Each of the co-conspirators acted with an illegal purpose and/or used illegal means to achieve a legal purpose.

299. Alexander Capital and its co-conspirators had a meeting of the minds and/or entered into a combination or agreement, with one or more other persons, including each other, with the intent wrongfully to acquire FOL and to engage in other wrongful conduct to FOL's detriment.

300. Each co-conspirator committed one or more unlawful and/or wrongful overt acts in furtherance of that object, including but not limited to the conduct described above, involving acts of theft, misappropriation of intellectual property, fraud, extortion, and violations of the securities

and banking laws, as well as the wrongdoing and torts alleged above.

301. Alexander Capital and its co-conspirators agreed to commit these tortious acts in furtherance of their overall agreement and a common scheme.

302. As a result, FOL has suffered damages, in an amount to be determined at trial.

303. Alexander Capital and its co-conspirators acted maliciously, and FOL is entitled to punitive damages, in an amount to be determined at trial.

304. The Alexander Capital Partners are jointly and severally liable for Alexander Capital's wrongdoing.

## JURY DEMAND

FOL demands a trial by jury on all issues so triable.

## REQUEST FOR RELIEF

**WHEREFORE**, FOL requests that the Court enter judgment in its favor and against all Defendants in an amount to be proven at trial, including but not limited to:

1. Compensatory damages in an amount to be determined at trial;

2. Punitive damages in an amount to be determined at trial;

3. Attorney fees and costs;

4. The rescissory relief set forth above;

5. All pre- and post-judgment interest; and

6. Such other relief as this Court deems just and proper.

Dated this 5th day of February, 2024.

/s/ Daniel J. Vedra
Daniel J. Vedra, #43596 (CO
Admitted Pro Hac Vice
Vedra Law LLC
1444 Blake Street
Denver, CO 80202

Dan@vedralaw.com

***Attorneys for Plaintiff Floyd's of Leadville, Inc., n/k/a Valued, Inc.***