# Exhibit K

                                                                   **** ROUGH DRAFT ****

Wednesday, September 25, 2024.

THE VIDEOGRAPHER: ^ We are ^ Wear now on the record. The time is 905 mountain time on September 25, 2024. This begins the videoconference deposition of Floyd's of Leadville, Inc. Now known as Valued, Inc., corporate representative Robert Bell taken in the matter of Floyd's of Leadville, Inc. Now known as Valued, Inc. Versus Alexander Capital, L.P., et al. Case No. Is 1:22-cv-0331 8-DEH and it's filed in the United States District Court for the Southern District of New York. My name is George Ellis. I am the remote videographer. Our court reporter today is Deborah Moschitto and ^ we are ^ wear representing Esquire Deposition Solutions. Counsel, if you would, please state your name and who you represent, after which the court reporter will swear in the witness.

MR. WARD: My name is Bryan Ward.

that there would be somebody else.

Q. He started in 2017?

MR. VEDRA: Objection. Asked and answered.

A. You'd have to ask Floyd Landis his exact start date. I mean to ask every employee's start date, I mean I have a fairly good memory. That's tough. That's a tough one. Like do you know when Holly started, an exact date.

Q. Mr. Ryan was the chief financial officer during the time that Alexander Capital was raising funds for Floyd's; is that right?

MR. VEDRA: Objection, form, outside of the scope of this -- of the topics.

Q. You can answer.

A. I just answered. I don't know every employee's start date. Like that would be like me asking you do you remember the start date -- you own the law firm, give me the start date of Holly Cole. You wouldn't know that. You wouldn't know that.

**** ROUGH DRAFT ****

Q. Mr. Bell, Mr. Bell, please. The question was was Mr. Ryan the CFO of Floyd's during the time that Alexander Capital was raising funds for Floyd's?

MR. VEDRA: Objection, form, outside of the scope. He's given you the best answer he said he's prepared to give based on his deposition topics.

Q. Please answer.

A. I already answered.

Q. I'm asking --

A. You want me to answer again, I'll answer for a third time. Is that what you would like?

Q. I want you to answer that question, please.

A. So you would like me to answer it a third time?

Q. Yes, please.

A. I don't know everybody -- I don't know Chris Ryan's start date, just like I'm sure you don't know Holly Cole's and Aaron

Wright's start date.

Q. Mr. Bell, listen to my question.



**** ROUGH DRAFT ****

I'm not asking for a start date?

A. I'm a ^ grate ^ great listener, nobody listens better than me.

Q. Okay. And please stop interrupting. I'm asking you whether or not Chris Ryan was the CFO of Floyd's during the time that Alexander Capital was raising funds for Floyd's?

A. I already answered.

MR. VEDRA: Same objection, same objection. This is outside the scope. This isn't tied to any topics that he's been noticed for or prepared for. If you can point us to a topic, then we can discuss that, but this is not inside the scope of your deposition.

MR. WARD: Are you instructing him not to answer?

MR. VEDRA: I'm telling you he

can answer. He's given you the answer at least three times now and you keep asking him the same question.

MR. WARD: I got it. I'm going to ask him to answer the question, please.

**** ROUGH DRAFT ****

A. I don't know Chris Ryan's start date, just like you wouldn't know Holly Cole's or Aaron Wright's as the owner --as the owner of Holcolm + Ward. Define institution of Holcolm + Ward.

Q. Was Mr. Ryan CFO of Floyd's for more than a year?

MR. VEDRA: Objection. Same objection. Again, if you can point us to a topic in the 30(b)(6) notice that this relates to, we can discuss that, but it's outside the scope.

Q. Okay. Please answer.

A. My answer's no different. I don't know his start date. I don't know. Just like Mr. Vedra said, I don't believe I

A. Yeah. It's the one with the forged signature of Floyd Landis on it it. Frank DiMartini admits it in his conversation with Alex Merle-Huet at a dinner, brunch or something in New York. Actually, if you just

go over it and get copied, it will just copy it. It's the same exact signature that Bari Latterman sent to Pete DiChiara with Floyd's signature on it and Floyd wasn't on it. Holly Cole at one of her depositions --

Q. Mr. Bell, let me ask the questions, please, if you would please limit your responses to my questions. Is it your testimony that this is not Mr. Landis' signature?

A. Forged signature, 100 percent.

Q. Please let me finish the question -- on page 264 2?

A. Uh-hum.

Q. It is your testimony that that is not Mr. Landis' signature on page 264 2?

e-mail is being sent to Barrie Clapham and it has an L and S in there. Do you see that?

A. Chris sent this original e-mail to Barrie.

Q. Correct, and there is an L and S after Barrie's name on there. Do you see that?

A. Yeah.

**** ROUGH DRAFT ****

Q. Is that London and Scottish Investments?

A. I'm not Barrie Clapham.

Q. Do you know what London and Scottish Investments is?

A. If it has anything to do with Barrie Clapham, it's probably just another fraud scheme to rip people off.

Q. Do you know whether Barrie Clapham is the chairman and lead investor for London and Scottish Investments?

A. I mean -- I mean I don't know. Maybe Holly could pull up his LinkedIn page.

I mean I could look it up. He told us once he was like the greatest potato grower in the last thousand years or some shit, but I don't really know.

Q. I'm now showing you what I have marked as defendants' Exhibit 11 2.

A. He also told us he has a glass eye. He lost it from a tee, golfing tee. It hit him in the eye and he lost it. Frank used to tell us he would tell call him when he was drunk in the bathtub with prostitutes

in Spain, I knew that, but I don't want to tell that sad story.

Q. There is no question pending.

MR. WARD: Mr. Vedra, would you instruct your client to simply respond to the questions and not give extra commentaries, please. Do I take that as a no?

MR. VEDRA: I'm sorry, are you telling me to tell the client how to answer the question?

fraud was unwinding.

Q. I'm sorry?

A. Context matters. The extent of the fraud that Alexander Capital and their business associates, Barrie Clapham, Mark Leonard, Frank DiMartini, Tim Kelly, were doing and based on -- you know, you, even in this deposition, you were asking if he was the winner and brought up his doping. It's

**** ROUGH DRAFT ****

very similar how Holly brought up who's the child -- you know, who's the father of Alex's child. She brought that up 4 times which couldn't be more nastier. So he tried to remove himself from that fraud because of what people like you do about his cycling career, which he's apologized for, came clean on, made amends, donated money back, the money he received, back to the cycling community and he didn't want to be a part of the bad actors that are Joe Amato and Rocco and those things. So, yes, at the time and

place where this is heading, that's why that e-mail was sent.

Q. Mr. Bell, I just want to remind you again, you said yeah. That meant yes; correct, at the beginning of that?

A. How would you define it. I mean I guess we need to -- how do you define "yeah"? I mean let's look it up. I'm not an Ivy league grad like him. He couldn't define "can." I define "yeah" as an affirmative statement. How would you define it?

Q. At the beginning of this

deposition, I asked you whether you would be willing to say yes or no to give clear responses.

A. Sorry, sorry, I did not listen to your instructions. Ask the question again and I'll give you a yes and an explanation of why that a yes is.

Q. I'm not asking for an explanation.