# Exhibit I

**In the Matter Of:**

FLOYDS vs ALEXANDER CAPITAL

1:22-cv-03318-DEH

**ROBERT BELL**

*September 25, 2024*

*30B6*



800.211.DEPO (3376)
EsquireSolutions.com

```
 1                    R. Bell
 2   We had to let them go because your clients
 3   and Paul Rachmuth's clients decimated the
 4   company and you guys handed over the notes to
 5   a pedophile.  There wasn't -- we had to do
 6   some unfortunate things based on, you know,
 7   your -- the fraud that your clients
 8   committed.
 9              So, yeah, I mean people are
10   always willing to help.  We got a lot of
11   people who just, you know, some note holders,
12   are willing to help.
13        Q.    Does Floyd's archive its
14   corporate e-mails?
15        A.    What do you mean, "archive"?
16   Define that for me.
17        Q.    Store them.
18        A.    Yeah, we have -- we have
19   everything on like e-mail, and if anything
20   specific, you would have to ask Floyd Landis.
21   He -- he is the CEO.  I mean, I don't know
22   where every little document is.  That's not
23   what I hand -- you know, that's not what I
24   specifically handle.  But, yeah, I mean I'll
25   remind you tomorrow to ask him that.
```



```
 1                         R. Bell
 2         Q.       The domain name for Floyd's
 3   corporate e-mails is @floydsofleadville.com;
 4   correct?
 5         A.       Correct.
 6         Q.       E-mails sent to and from that
 7   domain run through pro hac vice now; is that
 8   right?
 9         A.       Correct.
10         Q.       And Floyd's has access to all of
11   the @floydsofleadville.com e-mail addresses?
12         A.       Correct.
13         Q.       Are Floyd's employees allowed to
14   conduct company business using e-mail
15   addresses other than those ending in
16   @floydsofleadville.com?
17         A.       Nope.
18         Q.       Is that the case since 2017?
19         A.       Well, we might not -- like right
20   in 2017, we might not have had a
21   floydsofleadville.com e-mail address.  I
22   mean, we moved to it pretty quick.  At one
23   point it was just mostly me and Floyd Landis,
24   so...
25         Q.       Since October of 2017 --
```



1                           R. Bell

2          A.      I would say --

3          Q.      Let me finish.  I haven't

4    finished the question yet.

5                  Since October of 2017, are

6    Floyd's employees allowed to conduct any

7    company business using an e-mail address

8    other than those ending in

9    @floydsofleadville.com?

10         A.      No.  I mean, they're not going to

11   do like what Frank did and use his Gmail

12   account to lie, you know, to customers

13   like -- like, you know, he did.  He didn't

14   always use his Alexander Capital e-mail

15   address.  Our employees use the

16   floydsofleadville e-mail address.

17         Q.      Floyd's employees used a service

18   called Wire, to communicate; is that right?

19         A.      At one point, yeah.

20         Q.      At what point was that?

21         A.      Probably around 2017, 2018, and

22   then after your clients decimated our company

23   and handed it over to Greg Hurley who then --

24         Q.      I'm going to strike the rest of

25   this.  You've answered the question.



                          R. Bell

1
2              Is it correct that those messages

3      on Wire were not saved by Floyd's?

4          A.     Well, define "employees."  There

5      was a lot of people.  I mean, are you saying

6      every -- every person that used Wire?  I mean

7      Wire had some --

8                 THE WITNESS:  Whoa.  Somebody

9      gave me a thumbs up.  Paul if that was you, I

10     appreciate that thumbs up.

11         Q.     I think you gave it to yourself.

12         A.     I'll give you one in Vegas on

13     Thursday night.

14         Q.     Did the company employees of --

15     did -- the company, itself, Floyd's, did not

16     save Wire messages; is that right?

17         A.     No, they were saved.

18         Q.     Okay, by the company?

19         A.     Uh-hum.

20         Q.     Other than Wire, are Floyd's

21     employees allowed to conduct Floyd's business

22     using messaging applications like WhatsApp,

23     Signal or Telegram?

24         A.     I mean, sometimes if they were

25     talking to -- I mean, yeah, because



1                        R. Bell

2    sometimes -- like if you have a -- like an

3    account, sometimes that account might only

4    want to use WhatsApp or -- so sometimes we

5    had to go their way.  You know, like we had

6    an account in Costa Rica.  They only would

7    use WhatsApp.  So an employee would have to

8    use that app.

9               And, you know, before you guys

10   decimated the company, there was a lot of --

11   a lot of accounts, right, and so they could

12   have used all different types of messaging

13   services based on what the client wanted.

14               I'm not sure if that makes sense.

15   Does that make sense?

16        Q.    And that's true -- is that true

17   from 2017 forward?

18        A.    Correct.

19        Q.    Did Floyd's have any policy about

20   monitoring any services or -- or saving any

21   of those messages?

22        A.    I believe you've already asked

23   that like four times.

24        Q.    What's the answer?

25        A.    Same as it was before.



```
 1                      R. Bell
 2       Q.     Would you please answer the
 3  question?
 4              MR. VEDRA:  Objection.  Asked and
 5  answered.
 6       Q.     You can answer.
 7              MR. VEDRA:  Objection,
 8  repetitive.
 9       A.     Can you repeat the question?
10       Q.     Did Floyd's have a policy to
11  monitor or maintain messages from other
12  messaging applications, like WhatsApp, Signal
13  or Telegram?
14              MR. VEDRA:  Objection, form.
15       A.     Yeah, we would ask our employees
16  for their communications, ask them to be
17  saved, hand over or depending on the service,
18  we could access them.
19       Q.     In searching for documents
20  responsive to the requests in this case, did
21  Floyd's search cloud storage for responsive
22  documents?
23              MR. VEDRA:  Objection,
24  foundation.
25       A.     We searched everything.
```



```
 1                         R. Bell
 2       Q.     Including cloud storage?
 3              MR. VEDRA:  Objection,
 4   foundation.
 5       A.     I just said we searched
 6   everything.
 7       Q.     Does that include cloud storage?
 8              MR. VEDRA:  Objection,
 9   foundation.
10       A.     It includes everything.
11       Q.     Please answer the question.  Does
12   this include cloud storage?
13       A.     Everything.
14       Q.     Would you please answer the
15   question.  I'm asking --
16              MR. VEDRA:  Objection.
17       Q.     You're not answering the
18   question.
19              MR. VEDRA:  I'm going to instruct
20   the witness not to answer the question
21   because you're harassing him and trying to
22   get a different answer.
23              MR. WARD:  I'm trying to ask --
24   you're instructing him not to answer who
25   Floyd's --
```



```
 1                       R. Bell
 2      A.      I answered everything.  We
 3   searched everything.
 4               MR. VEDRA:  As an initial matter,
 5   Mr. Ward, you haven't established what you
 6   even mean by cloud storage, and I don't think
 7   you have even asked whether Floyd's of
 8   Leadville has cloud storage of any kind.  So
 9   there is no foundation for your question.
10               Mr. Bell has answered the
11   question that they have searched everything.
12   He previously answered the question stating
13   that everything that Alexander Capital asked
14   for in this lawsuit was provided through the
15   attorney.
16               So if you have a specific
17   question, for example, if you want to say:
18   Do you use Dropbox as a cloud service and do
19   you maintain documents on Dropbox, perhaps
20   there would be a foundation for that.  And
21   then you could ask:  Did you search Dropbox
22   for these documents.
23               But you haven't established a
24   foundation for any of these questions.  So
25   when Mr. Bell answered everything, he's given
```



1                       R. Bell

2    you the best possible answer you could

3    receive for your question.

4               MR. WARD:  Let me alter the

5    question then and first start with:

6         Q.    Did Floyd's use any cloud storage

7    services?

8               MR. VEDRA:  Same objection.  You

9    need to tell the witness what you mean by

10   cloud storage services.

11        Q.    Do you understand the question?

12        A.    I zoned out while you two guys

13   were fighting.  It wasn't very interesting,

14   so you might want to repeat the question.

15        Q.    Did Floyd's use any cloud storage

16   services to archive any documents?

17               MR. VEDRA:  Same objection.

18        A.    You'd have to ask Floyd Landis

19   that but -- never mind.

20        Q.    Would I need to ask Floyd Landis

21   for any details about the search for

22   responsive documents in this case?

23        A.    Everything you've requested us to

24   search for has been searched for.

25               Now, again, because I've looked



```
 1                        R. Bell

 2    through 200,000 documents, I don't remember

 3    specifically everything you wrote down to

 4    search for.  There is a lot of information

 5    out there, but everything that was asked of

 6    you from -- to Floyd's of Leadville was done.

 7    It was made sure it was done.  Our lawyers

 8    asked us to double-check.  So when I say

 9    everything, that's what I mean.  The

10    specific -- me as Bob Bell doesn't -- doesn't

11    have every single document of Floyd's of

12    Leadville in his hand.

13                So I said everything.  You kept

14    asking.  I said well, then you can ask Floyd

15    Landis more particulars tomorrow.

16        Q.    Okay.  Anything beyond

17    everything, I would need to ask Floyd Landis?

18        A.    I mean everything's -- I mean

19    it's a great answer.  It's everything.  What

20    you asked for, like you asked me to prepare,

21    I looked through 200,000 documents.

22                Now, we know your clients don't

23    do that, but I spent 10 hours some days

24    preparing.  I know your clients don't do that

25    because I've been to every deposition in this
```



1                       R. Bell

2    case.  So we take it seriously.  You guys

3    didn't.

4         Q.    Mr. Bell, I'd ask you to keep to

5    the questions.

6         A.    I'm answering.  This is the

7    fullest question.  I'm answering the question

8    to the fullest of my ability.  Again, if you

9    don't like my answers, then don't ask a

10   question.

11        Q.    Did Floyd's search the phones of

12   its employees for responsive documents?

13        A.    Everything.  Everything you

14   asked, we did.  Did you ask us -- did you ask

15   us to do that?

16        Q.    We did not describe what -- there

17   was no description --

18        A.    Did you ask us to look at --

19        Q.    Mr. Bell, I'm asking the

20   questions here.

21        A.    Then pull up what you asked us to

22   look at and I'll answer each one.

23        Q.    Did Floyd's look at my phone in

24   responding --

25        A.    Your phone?



```
 1                        R. Bell

 2        Q.      Correct.

 3        A.      The clients over there have a

 4  history of pedophilia.  I don't want to look

 5  at anybody's phone.

 6        Q.      Mr. Bell, answer the question,

 7  please.

 8        A.      I did not look at your phone.

 9        Q.      Did Floyd's look at all of its

10  employees' phones in searching for responsive

11  documents?

12        A.      We looked at everything you asked

13  us to look at.

14        Q.      There was no request, one way or

15  the other, as to whether or not they were

16  going to look at the phones or not.

17              MR. VEDRA:  Objection, form.

18        Q.      I asked you to describe your

19  efforts to find documents.

20        A.      Oh, thanks for the thumbs up.

21  Was that Paul again?  Maybe that was Bryan

22  McKenna.  He could give that 480 grand back

23  plus $300,000 of court fees or whatever it

24  was.

25              We looked at everything.
```



1                    R. Bell

2    Everything, you asked, every phone, every

3    document, every e-mail.  I mean everything.

4    Unlike Jonathan Gazdak or Michelle Misiti

5    looked at nothing.

6         Q.    Did Floyd's look at the phones of

7    its past employees in responding to our

8    requests?

9         A.    Yes, everything.

10        Q.    From 2017 to the present, who

11   served as CEO of Floyd's?

12             MR. VEDRA:  Objection, found.

13        A.    Floyd Landis.

14        Q.    Was Mr. Landis --

15        A.    Floyd Andrew Landis, I believe is

16   his middle name.

17        Q.    Was Mr. Landis' e-mail address

18   Floyd@floydsofleadville.com?

19        A.    Uh-hum.

20        Q.    Did he sometimes use

21   FL@floydsofleadville.com?

22        A.    We used that when Alexander

23   Capital wouldn't give us the note holders'

24   information.  We found some so we just used a

25   separate e-mail to e-mail then, and then we



1                      R. Bell

2        A.      I don't know what this document

3    is talking about if it's a Nevada

4    corporation.  Floyd's of Leadville is a

5    Colorado corporation.

6        Q.      Okay.  This is a document that

7    Floyd's has in its possession; correct?

8        A.      It was sent to you, but it

9    doesn't mean it's accurate.  It says a Nevada

10   corporation.  This is a document thrown out

11   by Alexander Capital that sent it to us and

12   it says it's a Nevada corporation, not a

13   Colorado corporation.

14       Q.      What's your basis for saying this

15   was drafted by Alexander Capital?

16       A.      Because that's what they did.

17   All these documents were drafted.  None of

18   these documents were ever drafted by Floyd's

19   of Leadville.  What are we paying them for?

20   That's their job, is to raise money and sell

21   securities and notes and draw up

22   documentation.  That's their job.

23             I mean you have a whole rule book

24   on that job.  This says a Nevada corporation.

25   It doesn't say a Colorado corporation.



1                        R. Bell

2        Q.      Did Pete DiChiara not draft these

3    documents, to your understanding?

4        A.      Pete DiChiara is Alexander

5    Capital's -- I don't know who Alexander

6    Capital had draw up their documents.  I mean,

7    I know Pete's their lawyer.  Rocco said it

8    himself in his deposition that you see CMD

9    all the time.  But it says a Nevada

10   corporation.

11       Q.      Do you have any knowledge that

12   Pete DiChiara represented Alexander Capital

13   for the Floyd's capital raise?

14       A.      Yeah, it's in e-mails.

15       Q.      What e-mails?

16       A.      I mean you have 200,000 e-mails.

17   You're asking me to recall specific e-mails?

18   I mean, he was asked about his representation

19   and he said he had a waiver, I believe, to

20   represent both parties and no waiver was

21   ever -- was ever produced or sent.  And his

22   business -- I mean Frank DiMartini and

23   Jonathan Gazdak and Bari Latterman are

24   e-mailing Pete all the time.  And according

25   to your own rule book, somebody from Floyd's



1                        R. Bell

2    of Leadville needs to be on those e-mails and

3    never were.  He clearly represented Alexander

4    Capital throughout the whole thing.  There's

5    no waiver, there's no nothing.

6             Floyd's of Leadville is not a

7    Nevada corporation, so, I mean, I don't know

8    what to tell you.  You got sent these, these

9    documents.

10        Q.    I'm going to direct you to

11   page 20 of exhibit -- Defendants'

12   Exhibit 208.

13        A.    Hold on one second.  I just want

14   to -- I'm looking through this document.  I

15   just want to see something.  I mean if you

16   look at page 2670 --

17        Q.    Mr. Bell?

18        A.    -- you could clearly see the

19   writing here is not from anyone from Floyd's

20   of Leadville.  It looks like Frank

21   DiMartini's.  And then all the stickers --

22        Q.    Mr. Bell --

23             MR. WARD:  Mr. Vedra, I'm going

24   to ask you to direct your client to answer

25   the question and not to engage in colloquy

