UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FLOYD'S OF LEADVILLE, INC.,
N/K/A VALUED, INC.,

     Plaintiff,

vs.

ALEXANDER CAPITAL, L.P., NESA
MANAGEMENT, LLC, JOSEPH ANTHONY
AMATO, ROCCO GERARD GUIDICIPIETRO,
JONATHAN GAZDAK, RONALD BARRIE
CLAPHAM, MARK LEONARD, PROVISION
HOLDING, INC., TIMOTHY KELLY, and
THREE DDD, LLC,

     Defendants.

Case No.: 1:22-cv-03318-DEH

---

**DEFENDANTS ALEXANDER CAPITAL, L.P., NESA MANAGEMENT, LLC, JOSEPH ANTHONY AMATO, ROCCO GERARD GUIDICIPIETRO, AND JONATHAN GAZDAK'S MOTION FOR CONTEMPT AS TO NON-PARTY WITNESSES ALEXANDRA MERLE-HUET AND CHRISTOPHER RYAN**

COME NOW Defendants Alexander Capital, L.P., NESA Management, LLC, Joseph Anthony Amato, Rocco Guidicipietro, and Jonathan Gazak ("ACLP Defendants"), and move for contempt as to non-party witnesses Alexandra Merle-Huet and Christopher Ryan, showing the Court as follows.

## **INTRODUCTION**

Pursuant to subpoenas issued under Federal Rule of Civil Procedure 45, the ACLP Defendants attempted to take the depositions of non-party witnesses Alexandra Merle-Huet and Christopher Ryan. (*See* Exhibits A and B.) Alexandra Merle-Huet appeared for a deposition on September 4, 2024, and Christopher Ryan appeared for a deposition on September 6, 2024. Plaintiff's Initial Disclosures identify Alexandra Merle-Huet as Floyd's of Leadville's ("FOL's")

former Chief Operating Officer (COO) and as a witness who "possesses information among other things relating to the allegations and claims in the Complaint and the Defendants' Answers and other responses to the Complaint, FOL's business dealings, FOL's relationships and dealings with Alexander Capital and the other Defendants, FOL's dealings with the Advisory Board and Redemption, FOL's attempts to renegotiate the loans, and FOL's damages." (Exhibit C at 2.) Plaintiff's Initial Disclosures identify Christopher Ryan as Floyd's of Leadville's former Chief Financial Officer (CFO) and as a witness who "possesses information among other things relating to the allegations and claims in the Complaint and the Defendants' Answers and other responses to the Complaint, FOL's business dealings, FOL's relationships and dealings with Alexander Capital and the other Defendants, FOL's dealings with the Advisory Board and Redemption, FOL's attempts to renegotiate the loans, FOL's financial performance, and FOL's damages." (*Id.* at 3.) As officers of Floyd's of Leadville during the relevant time period, Ms. Merle-Huet and Mr. Ryan had substantial involvement in the underlying events at issue in this litigation and are therefore material witnesses with respect to Plaintiff's claims and the ACLP Defendants' defenses.

  Ms. Merle-Huet and Mr. Ryan each "sat for a deposition" — literally, but as discussed below, not in any meaningful sense. Their "testimony" was almost comical in its implausibility and flagrant obfuscation. Ms. Merle-Huet claimed ignorance in response to basic background questions about whether she is currently employed, any details of prior employment at any job, if she was formerly employed at FOL, whether she knew Floyd Landis, how she knows Floyd Landis, if she is currently married to or was previously married to Floyd Landis, what "Floyd's of Leadville" is, and whether she was ever the COO of Floyd's of Leadville. In total, she answered "unsure," "not sure," "I don't know," or "I don't recall" more than 315 times during the 2 hours and 26 minutes of questioning. Similarly, Mr. Ryan disclaimed knowledge of whether he was at FOL for more than a day, whether he was its CFO, what a CFO even is, whether he understood basic accounting

2

terminology like "revenue," "balance sheet," "default," or if he had ever seen a contract before. He answered "I don't recall," "I don't know," "I'm not sure," or "I don't understand," more than 640 times.

For the reasons set forth herein, the ACLP Defendants request that this Court find Alexandra Merle-Huet and Christopher Ryan in contempt. Specifically, with respect to Ms. Merle-Huet, ACLP Defendants move that the Court order her to reimburse ACLP Defendants for their attorney's fees and costs associated with her September 4, 2024 deposition. With respect to Mr. Ryan, ACLP Defendants move for an order requiring him to sit for a second deposition, testify completely and truthfully, reimburse ACLP Defendants for their attorney's fees and costs associated with his first deposition, and pay all costs incurred for a second deposition.[1]

## ARGUMENT AND CITATION OF AUTHORITY

On June 27, 2024, the ACLP Defendants sent deposition subpoenas for Alexandra Merle-Huet and Christopher Ryan to Plaintiff's counsel who agreed to accept service on their behalf. Plaintiff's counsel, Mr. Vedra, returned executed Waiver and Acceptance of Service of Process forms for Ms. Merle-Huet and Mr. Ryan on July 10, 2024. Alexandra Merle-Huet and Christopher Ryan appeared for their respective depositions, but they both engaged in flagrant and repeated failures to answer questions truthfully to prevent defendants from obtaining complete and accurate testimony.[2]

---

[1] Although ACLP Defendants do not view a motion for contempt and sanctions as a discovery dispute requiring a meet and confer, counsel for ACLP Defendants raised these issues with Plaintiff's counsel to avoid bringing a formal motion but that effort was unsuccessful.

[2] During the meet and confer between counsel for ACLP Defendants and counsel for Ms. Merle-Huet, Mr. Ryan, and Plaintiff to try to resolve the issues in this motion, Plaintiff's counsel attempted to deflect blame from Ms. Merle-Huet and Mr. Ryan by portraying ACLP Defendants' witnesses as having been similarly non-responsive. ACLP Defendants expect Plaintiff's counsel to employ the same strategy with the Court. This could not be more of a red herring. ACLP Defendants recognize that a deposition is not a memory contest. As is typical in a deposition — and as was the case in FOL's depositions of ACLP Defendants' witnesses — deponents will not remember certain events that occurred years ago with crystal clarity and will not recognize every document put in front of

3

### I. The Court Has the Power to Impose Civil Contempt Sanctions on Witnesses who Give Obviously False, Evasive, and Equivocal Answers to Avoid Providing Information.

A subpoena "is a legal instrument, non-compliance with which can constitute contempt of court." *Daval Steel Prods., a Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357, 1364 (2d Cir. 1991). An unjustified failure to comply with a subpoena "may be deemed a contempt of the court from which the subpoena issued." Fed. R. Civ. P. 45(g) (providing that a court "may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena"); *SonoMedica, Inc. v. Mohler*, 2009 U.S. Dist. LEXIS 65714 *9 (E.D. Va. 2009) (finding the witnesses in civil contempt pursuant to *Fed. R. Civ. P. 45* because third party witnesses who failed to tell the truth in their depositions were deemed to have failed to comply with the subpoena). Thus, Federal Rule of Civil Procedure 45(g) "grants the court the power to hold a party in contempt simply on the basis of failure to comply with a subpoena." *Hunter TBA, Inc. v. Triple V Sales*, 250 F.R.D. 116, 117 (E.D.N.Y. 2008); *PaineWebber Inc. v. Acstar Ins. Co.*, 211 F.R.D. 247, 249 (S.D.N.Y. 2002) (same).

Under Rule 45, a deponent's attendance and testimony at a deposition may be compelled by subpoena. A subpoena issued pursuant to Rule 45 expressly commands the "person to whom it is directed to do the following at a specified time and place: **attend and testify**." Fed. R. Civ. P. 45(a)(1)(A)(iii) (emphasis added). Merely showing up is not sufficient to constitute compliance with Rule 45. *See id.*; *see also SonoMedica, Inc. v. Mohler*, 2009 U.S. Dist. LEXIS 65714, at *9 n. 2 (noting that witnesses "may purge themselves of their contempt of Court not by participating, not by merely participating, but by producing everything that the subpoena required them to produce and by having testified truthfully at the depositions. Merely showing up is not going to be enough to

---

them. But even a cursory review of the testimony shows there is no comparison between the respective witnesses. The witnesses for ACLP Defendants each provided substantive testimony within the full scope of their knowledge while Ms. Merle-Huet and Mr. Ryan provided none. ACLP Defendants will provide copies of these depositions upon the Court's request.

purge anybody of contempt").

The discovery process is designed to give both parties a full and fair opportunity to obtain facts necessary to prepare for trial. *See Cine Forty-Second Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062 (2d Cir. 1979). The purpose of a deposition is to enable a party to obtain truthful and complete information about relevant topics. As the District Court in *Andrews v. Holloway* aptly explained,

> Truthfulness is demanded through the requirement that the deponent testify under oath or affirmation, Rule 30(b)(5)(A)(iv), Fed. R. Civ. P., and completeness is required through the provisions of Rule 37(a)(4), Fed. R. Civ. P., that 'an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer or respond.' In light of the purpose of depositions, 'a response containing misrepresentations . . . is as good as no response at all.'

*Andrews v. Holloway*, 256 F.R.D. 136, 140 (D.N.J. 2009); *see also* Fed. R. Civ. P. 37(a)(4) ("For purposes of [a motion for an order compelling disclosure or discovery], an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond.") Emphasizing the importance of truthful testimony, the Second Circuit has advised that "perjury goes to the very heart of the fair administration of justice. No legal system can long remain viable if lying under oath is treated as no more than a social solecism. Swearing to tell the truth is a solemn oath, the breach of which should have serious consequences." *United States v. Cornielle*, 171 F.3d 748, 753 (2d Cir. 1999); *see also Miller v. Time-Warner Communs., Inc.*, Case No. 97 Civ. 7286 (JSM), 1999 U.S. Dist. LEXIS 14512, at *8 (S.D.N.Y. Sep. 22, 1999).

Courts have long construed false assertions of an inability to answer – whether attributed to a lack of knowledge or to a lack of memory – as refusals to answer. *In re Bongiorno*, 694 F.2d 917, 922 (2d Cir. 1982) (citing cases); *In re Schulman*, 177 F. 191, 193 (2d Cir. 1910) ("The witness was being asked regarding transactions directly within his knowledge and facts which he must have known. When, therefore, he answered repeatedly 'I don't remember,' it is obvious that he was

deliberately withholding information to which the trustee was entitled. In effect his attitude was one of defiance. He did not affirmatively tell the referee that he refused to disclose the facts which would enable the trustee to follow the property, although these facts were well known to him, but his conduct produced the same result as if he had stated his purpose openly."); *Life Music, Inc. v. Broadcast Music, Inc.*, 41 F.R.D. 16, 24 (S.D.N.Y. 1966) ("An 'I don't remember' answer is, in effect, a representation that the [witness] has no present recollection and is therefore unable to testify. If that representation is false (that is, the party does in fact have a present recollection), an 'I don't remember' answer is nothing more than a refusal to answer.")

A deponent's claim of inability to remember will be treated as the equivalent of an outright refusal to testify if it is both obviously false and intentionally evasive and obstructive. *In re Weiss*, 703 F.2d at 662-63 ("Testimonial obduracy by a witness … to answer questions may take any of a number of forms. The witness may refuse categorically to answer. Or he may respond in a way that avoids providing information, as, for example, by denying memory of the events under inquiry, denying acquaintance with targets of the inquiry, or denying knowledge of facts sought to be elicited. Or he may purport to state informative facts in response to the questions while in fact testifying falsely."); *Nittolo v. Brand*, 96 F.R.D. 672, 675 (1983) (S.D.N.Y.) (concluding that party "deliberately engaged in a pattern of conduct designed to conceal facts and to prevent defendants from discovering and obtaining relevant evidence" where he gave false and evasive testimony during the course of discovery). Evidence establishing that the witness' claimed inability to remember may include extrinsic proof, such as tape recordings, documents, or photographs; or it may be found in the witness's demeanor and his answers, if the pattern and substance of those answers convinces the court that the answers are inherently incredible." *In re Bongiorno*, 694 F.2d at 922.

This Court therefore has the discretion to impose civil contempt sanctions on witnesses who give "obviously false evasive and equivocal answers in an effort to avoid providing information." *In*

*re Weiss*, 703 F.2d 653, 667 (2d Cir. 1983) (rejecting witness's argument that the court has no power to hold in contempt as a recalcitrant witness a person who does not refuse outright to answer questions but rather gives answers that the court concludes are false or evasive and concluding that the court's contempt powers "reaches refusals to answer disguised as evasive responses"); *Bongiorno*, 694 F.2d at 922. The court's exercise of its contempt powers serves a dual purpose: "first, the proper punishment of the guilty party for his disrespect to the court or its order, and the second, to compel his performance of some act or duty required of him by the court, which he refuses to perform." *In re Weiss*, 703 F.2d at 660-661 (quoting *In re Chiles*, 89 U.S. (22 Wall.) 157, 168 (1874) and *Bessette v. W.B. Conkey Co.*, 194 U.S. 324, 327 (1904)).

**II.    Ms. Merle-Huet Failed to Comply with a Lawful Subpoena by Providing Evasive and Untruthful Deposition Testimony**

Alexandra Merle-Huet was identified by Plaintiff in its Initial Disclosures as the former Chief Operating Officer (COO) of Floyd's of Leadville. (Ex. B at 2.) She is identified in documents produced in discovery in this case and on the "floydsofleadville.com" website as both its President and COO:



(Exhibit D at 4.) Ms. Merle-Huet previously provided deposition testimony on June 7, 2022, in the Colorado action filed against FOL by its noteholders in which she testified that she was married to Floyd Landis by common law in 2014 and that they had a child together. (Exhibit E at 44-45.)

Ms. Merle-Huet appeared for a deposition in this case pursuant to a subpoena for a total of 2 hours and 26 minutes on September 4, 2024. During her short stint as a witness, Ms. Merle-Huet answered "unsure," "not sure," "I don't know," or "I don't recall" more than 315 times in response to ACLP Defendants' counsel's questions. (Exhibits F and G, Volumes I and II of Deposition Transcript of Alexandra Merle-Huet.) Counsel for FOL, Daniel Vedra, represented at the beginning of the deposition that he was "appearing on behalf of the witness, Alexandra Merle-Huet." (Exhibit F, Vol I. at 5.) Ms. Merle-Huet claimed not to know or recall basic information, like when she had engaged Mr. Vedra (*id.* at 8-9), whether she was paying him to represent her (*id.* at 9), if she knows what an email looks like (*id.* at 27), whether she has any health issues that would impair her ability to recollect events and testify to them truthfully (*id.* at 28), whether she is currently taking medications (*id.* at 29), whether these medications impair her memory (*id.*), what email address she primarily uses to send electronic communications (*id.* at 41-42), or how she got the link for the remote deposition (Exhibit G, Vol. II at 8). She further professed ignorance in response to simple background questions[3] about whether she is currently employed or has a job (Exhibit F, Vol. I at 10-11), details of prior employment at any job (*id.* at 11-14), whether she knows Floyd Landis (*id.* at 28), how she knows Floyd Landis (*id.* at 30), if she is currently married to or was previously married to Floyd Landis (*id.* at 10), or whether she previously testified that she was married to Floyd Landis (*id.* at 10).

When asked "Do you know who Floyd Landis is," Ms. Merle-Huet responded, "I'm unsure."

---

[3] In her prior deposition in 2022, Merle-Huet testified that she had worked for the Federal Reserve Bank for approximately 15 years, starting in 2004, was Vice President, and explained her job duties and employment history. (Exhibit E at 10-15.)

8

(*Id.* at 28.) Several minutes later, she admitted to knowing a person by the name of Floyd Landis but did not recall how she knew him. Then this colloquy followed:

```
 9          Q.    And in what context do you know
10   him?
11          A.    I'm not sure what that means, "in
12   what context."
13          Q.    Well, when you say you know a
14   person named Floyd Landis, what is that answer
15   based on?
16          A.    Knowing him.
17          Q.    And how do you know him?
18          A.    I know him in different ways.
19          Q.    Tell me about those ways.
20          A.    I know him as a person.
21          Q.    How do you know him as a person?
22          A.    I'm not sure what you're getting
23   at.  I don't understand question.
```

(*Id.* at 30; *see also id*. at 31-33.) She eventually admitted that she had lived with Floyd Landis but was unsure how long or whether it was for more than a day. (*Id*.) Despite having previously testified that Floyd Landis, CEO of FOL, was the father of her child, she now denied any such knowledge. (*Id.* Vol. I at 33, Exhibit G, Vol II at 11.)

Just as troubling was Ms. Merle-Huet's refusal to provide testimony for the topics on which she had been identified by Plaintiff as having knowledge in its Initial Disclosures, including: "the allegations and claims in the Complaint and the Defendants' Answers and other responses to the Complaint, FOL's business dealings, FOL's relationships and dealings with Alexander Capital and the other Defendants, FOL's dealings with the Advisory Board and Redemption, FOL's attempts to renegotiate the loans, and FOL's damages." (Exhibit C at 2.) During her deposition she claimed to

9

be unsure what "Floyd's of Leadville" is (Exhibit F at 33), whether she was ever the COO of FOL (*id.* at 15), whether she had even been employed at FOL (*id.* at 13-14), denied knowledge of documents identifying her as COO (*id.* at 19-20, 23-24), and she denied knowledge of having a "floydsofleadville.com" email address even when shown emails to and from that address (*id.* at 16-17, 40-41). Even when shown a printout of the FOL website taken the day of the deposition, showing a photo of her in front of the FOL logo, she would not acknowledge having the photo made, knowledge of it being on the website or whether she had ever authorized anyone to put her photo and information on the website, and she continued to maintain that she was "unsure" whether she served as COO of FOL throughout the deposition. (Exhibit G, Vol. II at 12-13.)

Ms. Merle-Huet disputed that she sent emails from a floydsofleadville.com address because "somebody could have hacked into my email address" (apparently not recognizing that such testimony acknowledges it was her email address). (Exhibit F, Vol. I at 16-18). She testified that she could not verify any emails shown to her because "I don't know if you just typed it on a piece of paper or where it comes from." (*Id.* at 44) Here is an example of one exchange during the deposition:

```
 2      Q.    So, is it possible that you sent
 3   this e-mail that's signed Alex?
 4      A.    Maybe.  I'm not sure.
 5      Q.    So, you acknowledge that you might
 6   have sent this e-mail; is that correct?
 7      A.    No.
 8      Q.    So, what did you mean by "maybe"?
 9      A.    I said unsure.
10      Q.    When you said "maybe," are you
11   changing that answer now to unsure?
12      A.    Maybe could be unsure.  I'm not
13   sure.  So, could be maybe.  I don't know.
```

(*Id.* at 45.)

10

Ms. Merle-Huet's testimony is demonstrably false as evidenced by her prior deposition testimony in 2022[4] and documents produced by Plaintiff FOL in discovery. In addition to discussing her marital relationship with Floyd Landis, Ms. Merle-Huet testified during her prior deposition in 2022 that she had been employed at FOL from the end of September 2018 or beginning of October of 2018 to May of 2020. (Exhibit E at 69.) She further testified that her "husband, Floyd, had started the company" and she asked if she could work with him. (*Id.* at 15.) Ms. Merle-Huet also acknowledged that she was the chief operating officer of FOL, (*id.* at 20), and she explained her duties as COO, (*id.* at 27). Although she testified in her prior deposition that she knew the chief financial officer of FOL was Chris Ryan and that she had worked with him at FOL (*id.* at 35), in her deposition in this case, Ms. Merle-Huet was unsure who Chris Ryan is or whether she had met him (Exhibit F, Vol. I. at 27-28, 34). In 2022, she testified that she was familiar with Alexander Capital as the broker-dealer that helped FOL raise money and that she had interacted with past and present Alexander Capital representatives Frank DiMartini and Jonathan Gazdak (Exhibit E at 56, 58, 80), yet, in her September 2024 deposition in this case, she claimed that she was not sure if she had heard of or was familiar with Alexander Capital (Exhibit F, Vol I. at 35-37). In this case, Ms. Merle-Huet was unsure if she knew Jonathan Gazdak or had ever communicated with him. (*Id.* at 60.) She also said she was unsure if she knew Frank DiMartini, (*id.* at 34), but then admitted to having recorded conversations and meetings with him on her phone (Exhibit G, Vol. II at 44-51). In 2022, she testified that she was aware of the promissory notes for FOL's capital raise based on discussions with Floyd Landis and that FOL had received money. (Exhibit E at 64, 79.) But in 2024, she claimed that she was unsure whether FOL had raised capital in the form of promissory notes or even what a promissory note is. (Exhibit F, Vol I. at 38-39.)

---

[4] Of course, she claims that she does not remember any of her deposition testimony in 2022 in the Colorado action. (Exhibit F, Vol I. at 10-14.)

11

Disguised as evasive responses, Ms. Merle-Huet refused to answer even the most basic questions about her background, her role with Floyd's of Leadville, and her knowledge of the relevant events. The evidence clearly demonstrates that Ms. Merle-Huet's answers indicating a lack of memory were obstructive, false, and constituted a refusal to testify in contempt of the subpoena. *See In re Weiss*, 703 F.2d at 667; *Bongiorno*, 694 F.2d at 922. Ms. Merle-Huet's testimony and her purported lack of memory was "systematic" and her answers simply were not credible. *Id.*

### III. Mr. Ryan Failed to Comply with a Lawful Subpoena by Providing Evasive and Untruthful Deposition Testimony

Chris Ryan was identified by Plaintiff in its Initial Disclosures as the former Chief Financial Officer (CFO) of Floyd's of Leadville (Ex. B at 3), and he is identified in documents produced in discovery in this case as its CFO:



Mr. Ryan was identified as having knowledge of, among other things "FOL's financial performance, and FOL's damages." (*Id.*)

Unlike Ms. Merle-Huet, Mr. Ryan admitted that had been employed at Floyd's of Leadville, but not much else. Mr. Ryan answered, "I don't recall," "I don't know," "I'm not sure," or "I don't understand," more than 640 times. He claimed he could not remember any details of his employment

history:

> Q. What was your first job out of college?
> A. I don't -- I don't recall.
> Q. Do you recall any of your jobs between when you graduated college and when you began working at Floyd's?
> A. I don't recall.
> Q. Did you work any jobs between graduating college and working at Floyd's?
> A. I don't recall.
> Q. Do you recall what you did after college?
> A. Yes.
> Q. What was that?
> A. I went home.
> Q. How long did you stay at home?
> A. I don't recall.
> Q. Did you start to work at some point after that?
> A. I don't recall.

(Exhibit H, Deposition Transcript of Chris Ryan at 34.) Mr. Ryan also apparently has no memory of the details of his employment at FOL:

> Q. How long were you employed at Floyd's?
> A. I don't recall.
> Q. Was it more than a day?
> A. I don't recall.
> Q. You don't recall if it was more than a day that you were employed at Floyd's?
> A. I do not.
> …
> Q. When you were employed at Floyd's what was your job title?
> A. I don't recall.
> Q. What's your current job title?
> A. I don't recall.
> Q. When someone asks you what you do, what do you say to them?
> A. It depends.

(*Id.* at 27.) And he disclaimed knowledge of whether he was Floyd's of Leadville's CFO or what a CFO even is:

> Q. Mr. Ryan, are you familiar with the term "CFO"?
> A. Yes.
> Q. What do you understand that term to mean?
> A. I don't recall.
> Q. Have you ever heard of a "chief financial officer"?
> A. Yes.
> Q. Have you ever heard of a "chief financial officer" called a "CFO"?
> A. I don't recall.
> Q. Have you ever been a chief financial officer?

13

> A. I don't recall.
> Q. Have you ever been a CFO?
> A. I don't recall.

(*Id.* at 33.)

Although his bio for FOL stated that he had 30 years of experience as an investment banker, private equity investor, and chief financial officer, Mr. Ryan could not testify to whether he understood basic accounting terminology like "revenue," "balance sheet," "default," or if he had ever seen a contract before. (*Id.* at 63-65, 70, 72-78.) Mr. Ryan could not recall if he ever kept track of income, what a "liability" is, what a loan is, what the term "borrow" means, what a contract is, what an "investor" is, what "profit" means, or if he's seen a profit and loss statement. (*Id.* at 66-69, 72-74, 77.) With respect to basic financial tracking programs, he testified:

> Q. Have you ever created a spreadsheet?
> A. I don't recall.
> Q. Have you ever used a spreadsheet?
> A. I don't recall.
> Q. Have you ever put numbers into a spreadsheet?
> A. I don't recall.

(*Id.* at 50-51.) His recollection could not be refreshed with any documents shown to him during his deposition. (*Id.* at 113, 131-133, 135-136, 144-145, 157-190.) While Mr. Ryan repeatedly and unabashedly proclaimed his ignorance, FOL's counsel, — who was also acting as counsel for the witness during the deposition — incredulously interjected:

```
12           MR. VEDRA:  Sorry, are we
13      just asking the witness questions
14      about documents he doesn't
15      recognize?
16           MR. WRIGHT:  I am trying to
17      help refresh his recollection.
```

(*Id.* at 181.)

The pattern and substance of Mr. Ryan's deposition answers are inherently incredible. The record establishes that Mr. Ryan deliberately engaged in a pattern of conduct designed to conceal facts and to prevent ACLP Defendants from discovering and obtaining relevant evidence. Because of Ryan's recalcitrance ACLP Defendants were not able obtain testimony from FOL's only chief financial officer about how FOL's financial documents were put together, how FOL made its financial projections, how FOL's assets appeared on the books and were removed from them, how escrow breaks were tracked, what sort of record keeping was done in general, how the books were kept, and how income and expenditures were tracked.

### IV. This Court Should Exercise its Power and Discretion and Find Ms. Merle-Huet and Mr. Ryan in Contempt and Sanction their Conduct

Swearing to tell the truth is a solemn oath, the breach of which should have serious consequences." *United States v. Cornielle*, 171 F.3d 748, 753 (2d Cir. 1999). Ms. Merle-Huet and Mr. Ryan's claims of inability to remember are both obviously false and intentionally evasive and obstructive and should therefore be treated as the equivalent of an outright refusal to testify. *In re Weiss*, 703 F.2d at 662-63. This Court therefore should find Ms. Merle-Huet and Mr. Ryan in contempt and impose civil contempt sanctions for their effort to avoid providing information by giving "obviously false evasive and equivocal answers." *Id.* at 667.

Civil contempt may be accompanied by compensatory sanctions. *See N.Y. State NOW v. Terry*, 886 F.2d 1339, 1352-53 (2d Cir. 1989). The Second Circuit has explained that such sanctions "should reimburse the injured party for its actual damages" resulting from the sanctioned party's conduct. *Id.* at 1353; *see also Hutto v. Finney*, 437 U.S. 678, 691 (1978) (explaining that civil contempt may carry with it a "remedial fine" that "compensates the party who won the injunction for the effects of his opponent's noncompliance"); Fed. R. Civ. P. 37(b)(2)(A)(vii), 45(g). Such sanctions may include ordering a witness to sit for another deposition and to compensate Defendants for their costs associated with the deposition and reasonable attorney's fees. *In re Gorsoan Ltd.*, Case

No. 17-cv-5912 (RJS), 2020 U.S. Dist. LEXIS 104025, *10, *33-35 (S.D.N.Y. 2020) (Sullivan, J.).

ACLP Defendants request that this Court enter an order:

(1) finding Alexandra Merle-Huet and Christopher Ryan in contempt;

(2) requiring Alexandra Merle-Huet to reimburse ACLP Defendants for their attorney's fees and costs associated with her September 4, 2024 deposition;

(3) requiring Christopher Ryan to sit for a second deposition, testify completely and truthfully, reimburse ACLP Defendants for their attorney's fees and costs associated with his first deposition, and pay all costs incurred for a second deposition.

## **CONCLUSION**

Ms. Merle-Huet and Mr. Ryan refused to answer material questions, and gave equivocal, evasive, conspicuously unbelievable, and patently false answers in their depositions. They were evasive when they repeatedly did not remember what they should have remembered and did not know what they should have known. By their obfuscation, they actively misrepresented the truth to prevent Defendants from obtaining complete and accurate testimony. It is reasonable to infer from their conduct during the depositions that they did not seem to care if their answers were truthful or accurate. Their conduct amounts to an unjustified failure to comply with their deposition subpoenas.

This Court should therefore find Alexandra Merle-Huet and Chris Ryan in contempt and impose sanctions sufficient to compel their compliance and to remedy the harm to Defendants.

Respectfully submitted, this 14th day of October 2024.

/s/ *Bryan Ward*
Bryan Ward (*Pro Hac Vice*)
Holly Cole (*Pro Hac Vice*)
Aaron Wright (*Pro Hac Vice*)
Holcomb + Ward, LLP
3455 Peachtree Road NE
Suite 500
Atlanta, Georgia 30326
404-601-2803
Bryan.Ward@holcombward.com
Holly@holcombward.com
Aaron@holcombward.com

*Counsel for Defendants Alexander Capital LP, Joseph Amato, Rocco Guidicipietro, Jonathan Gazdak, and NESA Management, LLC*