# Exhibit E

DISTRICT COURT, CITY AND COUNTY OF DENVER
STATE OF COLORADO
Case No. 2020CV032866, Division 203

----------------------------------------------------
DEPOSITION OF -  ALEXANDRA MERLE HUET
                 June 7, 2022
----------------------------------------------------
REDEMPTION HOLDINGS, INC., a Colorado corporation,

Plaintiff,

vs.

FLOYD'S OF LEADVILLE, INC. n/k/a VALUED, INC., a
Colorado corporation, et al.,

Defendants,

and

FLOYD'S OF LEADVILLE, INC. n/k/a VALUED, INC.,

Counterclaimant Plaintiff,

v.

REDEMPTION HOLDINGS, INC.,

Counterclaim Defendant,

and

FLOYD'S OF LEADVILLE, INC. n/k/a VALUED, INC.,

Third-Party Plaintiff,

v.

FRANK J. DIMARTINI,

Third-Party Defendant.
----------------------------------------------------

```
 1   APPEARANCES:

 2        FOX ROTHSCHILD, LLP
             By Christopher J. Dawes, Esq
 3               Christopher T. Groen, Esq.
                 1225 17th Street, Suite 2200
 4               Denver, Colorado 80202
                 303-292-1200
 5                 Appearing on behalf of Plaintiff and
                   Counterclaim Defendant Redemption
 6                 Holdings, Inc.

 7        HOLLAND & HART, LLP
             By Matthew J. Smith, Esq.
 8               555 17th Street, Suite 3200
                 Denver, Colorado 80202
 9               303-295-8000
                   Appearing on behalf of Defendant Floyd's
10                 of Leadville, Inc. n/k/a Valued, Inc.,
                   Floyd A. Landis, and Alexandra Merle Huet
11                          and
          KOHNER, MANN & KAILAS, S.C.
12           By Ryan M. Billings, Esq.
                 4650 N. Port Washington Road
13               Washington Building, Second Floor
                 Milwaukee, Wisconsin 53212-1059
14               414-962-5110
                   Appearing on behalf of Defendant Floyd's
15                 of Leadville, Inc. n/k/a Valued, Inc.,
                   Floyd A. Landis, and Alexandra Merle Huet
16
          DAVIS & CERIANI, P.C.
17           By Michael P. Murray, Esq.
                 1600 Stout Street, Suite 1710
18               Denver, Colorado 80202
                 303-534-9000
19                 Appearing on behalf of Defendants
                   David J. Benlolo and Andrew M. Kaplan,
20                 Slichlolo Retail, LLC, BTE Reed, LLC,
                   BTE 2, LLC, BTE 3, LLC, and BTE 4, LLC
21
          Also Present:   Howard da Silva
22                         (Appearing telephonically)
                           David J. Benlolo
23                         Andrew M. Kaplan
                           Floyd Landis
24                         Greg Hurley

25
```

1              Pursuant to Notice and the Colorado

2    Rules of Civil Procedure, the deposition of ALEXANDRA

3    MERLE HUET, called by Plaintiff, was taken on Tuesday,

4    June 7, 2022, commencing at 8:34 a.m., at 1225 17th

5    Street, Suite 2200, Denver, Colorado 80202, before

6    Teresa L. Cardenas, Registered Professional Reporter

7    and Certified Realtime Reporter within the State of

8    Colorado.

9                    I N D E X

10   DEPOSITION OF ALEXANDRA MERLE HUET                PAGE

11   Examination by Mr. Dawes                       7, 270
     Examination by Mr. Murray                   188, 333
12

     DEPOSITION EXHIBITS:
13

     1    FOL Defendants' Answer And Crossclaims To      22
14        Benlolo And Kaplan's Crossclaims

15   2    Email to Floyd's of Leadville, Inc., from      53
          DiChiara, 10/15/17, Re: Legal Retainer -
16        Private Offering

17   3    Letter to Floyd Landis from Alexander         61
          Capital, 10/20/17
18
     4    Escrow Agreement                              63
19
     5    Subscription Agreement Floyd's Of             65
20        Leadville, Inc.

21   6    Email to tkelly@lyndencap.com from            78
          Floyd Landis, 2/7/18, Subject:  Take a
22        look at this, with attachments

23   7    Equity Exchange Agreement                     82

24   8    Floyd's of Leadville Deck entitled High       88
          Altitude Cannabis & Infused Products
25

1   9   5217 RE, LLC, Operating Agreement            103

2   10  Email to DiChiara, et al., from               108
        Floyd@floydsofleadville.com,, 12/21/18,
3       Subject:  Resolution

4   11  Email to Hurley from Merle, 3/7/19,           113
        Subject:  Floyd's of Leadville Deck,
5       with attachment

6   12  Email to Clapham, et al., from                127
        Chris@floydsofleadville.com, 3/7/19,
7       Subject: FOL Financial Information,
        with attachment
8
    13  Email to DiMartini from DiChiara,             148
9       3/11/19, Subject: RE: Floyds 12% Senior
        Secured Promissory Notes, with
10      attachments

11  14  Email to DiMartini, et al., from              151
        DiChiara, 4/5/19, Subject:  Interest,
12      with attachment

13  15  Email to Clapham from DeMartini,              154
        5/3/19, Subject: Fwd: FOL Revenues,
14      with attachments

15  16  Email to DiChiara, et al., from               159
        Chris@floydsofleadville.com, 5/6/19,
16      Subject:  Current Noteholder Chart,
        with attachment
17
    17  Termination of equity Exchange Agreement      162
18
    18  Email to Kaplan, et al., from Landis,         162
19      7/25/19, Re: OR Assets Plan

20  19  Email to Floyd Lands from Benlolo,            167
        7/25/19, Re: OR Assets Plan
21
    20  Email to Merle, et al., from Benlolo,         169
22      12/12/19, Re: Please sign Escrow
        Cancellation Agreement
23
    21  To Whom It May Concern, 12/12/19,             170
24      Re: Notification of Closure of Account

25

22  Email to Clapham from Landis, 1/20/20,        170
    Subject: Re: 4th qtr interest 2019
    Floyd's, with attached emails

23  Email to Gazdak, et al., from Merle,          175
    2/13/20, Subject:  Follow-up, with
    attachment

24  Email to Hurley, et al., from Merle,          182
    2/15/20, Subject: Re: FW: Floyds of
    Leadville 12% Senior Secured Promissory
    Notes, with attached emails

25  Email to Hurley from Merle, 2/20/20,          185
    Subject: Draft Investor Update, with
    attachments

26  Valued, Inc. Transaction Report              204

27  Floyd's Of Leadville, Inc. Wells Fargo       207
    Checking Account Statement, March 2019

28  Email to ak@tru-qual.com from                213
    ak@floydsofleadville.com, 9/13/21,
    Fw: Re: November and December Payment

29  Text Messages                                223

30  Text Messages                                238

31  Email to Benlolo from Landis,                255
    7/25/19, Subject: OR Assets Plan, with
    attached emails

32  Email to da Silva from DiMartini,            277
    3/15/19, Subject: [SPAM]Fw: FOL
    Revenues, with attachments

33  Email to Merle from Kelsey, 3/15/19,         282
    Subject: Re: Inventory Financing,
    with attachments

34  Email to Gazdak from                         288
    Chris@floydsofleadville.com, 4/5/2020,
    Subject: Re: Valued Inc. Diligence
    Materials, with attached emails

| 1 | 35 | Email to Gazdak from Gazdak, 4/20/20, Subject: Update and Calls - Floyd's of Leadville (nka Valued, Inc.), with attachments | 295 |
| 2 | | | |
| 3 | | | |
| | 36 | Email to Landis, et al., from Gazdak, 5/12/20, Subject: Advisory Board and Requests, with attached emails | 308 |
| 4 | | | |
| 5 | | | |
| | 37 | Email to da Silva, et al., from Chris@floydsofleadville.com, 5/29/20, Subject: Valued Inc. - Discussion materials, with attachments | 311 |
| 6 | | | |
| 7 | | | |
| 8 | 38 | Email to Landis, et al., from Gazdak, 6/6/20, Subject: Valued Next Steps | 323 |
| 9 | | | |
| | 39 | Floyd's of Leadville American Express Account Statement | 326 |
| 10 | | | |

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2                    ALEXANDRA MERLE HUET,

3    called as a witness on behalf of the Defendants,

4    having been first duly sworn, testified as follows:

5                         EXAMINATION

6    BY MR. DAWES:

7          Q.    Good morning.  Would you state your name

8    and address for the record, please.

9          A.    Alexandra Merle Huet, 61 Stoneyside

10   Drive, Larchmont, New York.

11         Q.    Is that your residential address?

12         A.    Yes.

13         Q.    What is your business address?

14         A.    I don't know.

15         Q.    Okay.  You don't have a business address?

16         A.    What business are you referring to?

17         Q.    Are you employed?

18         A.    Yes.

19         Q.    Okay.  Who is your employer?

20         A.    Federal Reserve Bank of New York.

21         Q.    Okay.  And do you have an office that you

22   work from?

23         A.    Well, we're remote right now.

24         Q.    Okay.  When you are not remote, where did

25   you report to physically for work?

1          A.    In New York City.

2          Q.    All right.  And whereabouts?

3          A.    In -- down in the Wall Street area.

4          Q.    All right.  So my name is Chris Dawes.  I

5     represent the plaintiff, Redemption Holdings, in this

6     case.

7          A.    Um-hum.

8          Q.    Have you had your deposition taken

9     before?

10         A.    No.

11         Q.    Okay.  I'm sure you spent some time with

12    your counsel and have gotten a sense of what a

13    deposition is.

14         A.    Um-hum.

15         Q.    It is a formal question-and-answer

16    session.  You'll be answering under oath today.  Do

17    you understand that?

18         A.    Yes.

19         Q.    If for any reason, during the course of

20    today's deposition, you don't understand what I've

21    asked you, would you go ahead and agree to let me know

22    that's the case?

23         A.    Yes.

24         Q.    All right.  If you do answer, I'll assume

25    you understood the question; is that fair?

1          A.    Yes.

2          Q.    Okay.  If for any reason you need to take

3     a break today, feel free to let me know.

4          A.    Um-hum.

5          Q.    I'm glad to entertain that request.  I

6     may want to wrap up a particular line of questioning

7     before we do that.  But let me know, okay?

8          A.    Okay.  Am I supposed to sit here or

9     there?

10         Q.    No, you're right in the spot.

11         A.    Okay.

12         Q.    You're in the right spot.

13         A.    Okay.

14         Q.    Have you been involved in any kind of

15    litigation matters before?

16         A.    No.

17         Q.    And have you ever testified in any kind

18    of proceeding --

19         A.    No.

20         Q.    -- be it arbitration, trial, anything

21    like that?

22         A.    No.

23         Q.    Okay.  The other thing I'll ask you to do

24    is to try not to talk over one another so we'll have a

25    clean transcript for our court reporter today.

```
 1          A.    Okay.

 2          Q.    So if you want to pause before answering

 3    my question, I'll try to do the same for you.

 4          A.    Okay.

 5          Q.    For how long have you been employed with

 6    the Fed?

 7          A.    Approximately a total of 6 -- 15 years.

 8          Q.    All right.  So you started around

 9    2007-ish; is that --

10          A.    2004.

11          Q.    2004?  Okay.  And what is your current

12    title with the Fed?

13          A.    I am a vice president.

14          Q.    Okay.  And for how long has that been the

15    case?

16          A.    I don't recall --

17          Q.    Okay.

18          A.    -- exactly.

19          Q.    Ballpark?

20          A.    Probably about four years, three years.

21          Q.    Okay.  And as vice president, generally

22    speaking, what are your duties and responsibilities?

23          A.    I'm chief of staff.

24          Q.    Okay.  And what does that mean?

25          A.    That means that I support the Markets
```

1    Group.

2            Q.    Okay.  In what sense?

3            A.    I help support the Markets Group head in

4    different ways.  I make sure that the leadership team

5    is doing what they are supposed to be doing and making

6    sure that things are running the way that they should.

7            Q.    So -- and how many people report to you

8    in that position?

9            A.    I don't have any direct reports at this

10   time.

11           Q.    Okay.  And you -- who do you report to?

12           A.    I report to Michelle Neal.

13           Q.    Okay.  And has that been the case for

14   your duration as a vice president?

15           A.    No.

16           Q.    Okay.  Someone else before?

17           A.    Yes.

18           Q.    Okay.  And prior to becoming vice

19   president, what other positions did you have at the

20   Fed?

21           A.    So before being a vice president, I was

22   in -- well, the vice president title underneath that.

23   So before I was promoted, I was assistant vice

24   president.

25           Q.    Okay.  And for how long roughly?

1          A.    Probably three, four to five years.

2          Q.    Okay.  And prior to that?

3          A.    And prior to that, I was an officer.

4          Q.    And what does that mean, an officer?

5  What does that entail?

6          A.    It's a title.

7          Q.    Okay.  What were your duties and

8  responsibilities as an officer of the Fed?

9          A.    So at the time, I worked in payments

10 policy.

11         Q.    Okay.  And what does that mean?

12         A.    That means that we look at payments

13 issues around the world.  And so I helped to advocate

14 certain payments views of the Federal Reserve to other

15 central banks.

16         Q.    Okay.  All right.  And was that your

17 first position with the Fed?

18         A.    No.

19         Q.    Okay.  Continuing to work our way back in

20 time, what was the next position you had at the Fed

21 before becoming an officer?

22         A.    So before becoming an officer -- well,

23 then they have -- they call it salary grades.  It has

24 numbers.  So I was Salary Grade 17.  And -- and I

25 worked at the time -- so before payments -- you're

1   asking me to dig back here.  So before payments, I

2   worked in an area that is no longer in existence

3   called the Special Investments Management Group.

4            Q.   Okay.  All right.  And was that your

5   first position at the Fed then?

6            A.   It was not.

7            Q.   Okay.  What was your first position at

8   the Fed?

9            A.   So I was hired out of grad school and

10  entered a training program in the supervision group.

11           Q.   Okay.  And what was your graduate degree

12  in?

13           A.   I have a master's in international

14  affairs.

15           Q.   From where?

16           A.   From Columbia.

17           Q.   Had you had any kind of banking

18  experience before going to work for the Fed?

19           A.   No.

20           Q.   And what year did you get that graduate

21  degree?

22           A.   2004.

23           Q.   And you have an undergraduate degree as

24  well?

25           A.   I do.

1       Q.    And that's in what?

2       A.    A bachelor's of science in language.

3       Q.    Okay.  And that was -- that degree was

4  conferred from where?

5       A.    Georgetown.

6       Q.    Okay.  All right.  Did you have work

7  experience while you were in college and grad school?

8       A.    What do you mean by "work experience"?

9       Q.    Were you employed while you were in

10  college or grad school?

11       A.    No.

12       Q.    All right.  So your -- you worked for the

13  Fed basically since you got out of school, correct?

14       A.    Out of graduate school.

15       Q.    Yes.  Did you have a gap period between

16  the time you got your undergraduate degree and you

17  went to grad school?

18       A.    Yes.

19       Q.    And did you work in that interim period?

20       A.    Yes.

21       Q.    In what capacity?

22       A.    I worked my -- in different capacities.

23  So I have had several jobs.  So my first job was at a

24  company that no longer exists called Windstar.

25       Q.    Okay.  And what did you do for Windstar?

1          A.   Sales.

2          Q.   All right.  And you had another -- you

3    had a couple of other positions, too?

4          A.   Yes.  And then I worked at the Council on

5    Foreign Relations.

6          Q.   All right.  Any other positions?

7          A.   Not that I recall.

8          Q.   Okay.  Now, you also have a position with

9    Floyd's of Leadville, correct?

10         A.   I did.

11         Q.   Okay.  When did you have the position

12   with Floyd's of Leadville?

13         A.   I became an employee of Floyd's of

14   Leadville at the end of September 2018 or beginning of

15   October of 2018.

16         Q.   Okay.  And how did that come about?

17         A.   I'm not sure what you mean.

18         Q.   How was it you became an employee of

19   Floyd's of Leadville?

20         A.   Because -- you mean -- I'm sorry.  I

21   don't -- I don't know what you mean.  Like --

22         Q.   What was the process by which you became

23   an employee?

24         A.   Well, my husband, Floyd, had started the

25   company; and I asked if I could work with him.

```
 1          Q.   Okay.  You didn't have to fill out a job
 2    application?
 3               MR. SMITH:  Objection to form.
 4          A.   No.
 5          Q.   (BY MR. DAWES)  And had you been involved
 6    in the business operation of Floyd's of Leadville --
 7    which I will refer to FOL today; is that fair?
 8          A.   Yes.
 9          Q.   And -- so were you involved in FOL's
10    operations before actually becoming an employee in the
11    fall of 2018?
12               MR. BILLINGS:  Objection to the form.
13          A.   What do you mean by "involved in the
14    operations"?
15          Q.   (BY MR. DAWES)  Did you have any
16    involvement in FOL in any way, shape or form prior to
17    fall of 2018?
18          A.   I helped Floyd and advised him on some
19    things.
20          Q.   What types of things did you advise Floyd
21    on?
22          A.   Administrative things.
23          Q.   Such as what?
24          A.   Such as how to pay people and put them on
25    the payroll.
```

```
1              Q.    Okay.  Anything else?
2              A.    I don't recall specifically.
3              Q.    When did you first begin advising Floyd
4    in that regard?
5              A.    I don't recall specifically.
6              Q.    And what were your positions -- I take it
7    you're no longer an employee of FOL?
8              A.    Correct.
9              Q.    When did that role cease?
10             A.    May of 2020.
11             Q.    Okay.  And what prompted that?
12             A.    I was requested -- I was called back to
13   the Fed.
14             Q.    All right.  Had you ceased your
15   employment with the Fed for a time?
16             A.    Yes.
17             Q.    From when to when?
18             A.    From the same time that I just stated, so
19   end of September of 2018 or October of 2018.  That's
20   when I ceased my employment.
21             Q.    Okay.  And what prompted you to cease
22   your employment?
23             A.    From where?
24             Q.    Well, where have you ceased your
25   employment from?
```

1          A.     Okay.

2                 MR. SMITH:  Objection to form, asked and

3     answered.

4          A.     Can you repeat your question?

5          Q.     (BY MR. DAWES)  Sure.  You said you

6     ceased your employment, correct?

7          A.     I was answering your question about the

8     Fed.

9          Q.     Right.  What prompted you to cease your

10    employment at the Fed?

11         A.     So are you asking me the same question as

12    before, which was why did I go to work at Floyd's of

13    Leadville?

14         Q.     No, I said -- my specific question is

15    what prompted you to cease your employment at the Fed?

16         A.     Because I got another job at Floyd's of

17    Leadville.

18         Q.     Okay.  So you notified the Fed you were

19    leaving the Fed to take the job at FOL?

20         A.     I notified the Fed that I was leaving the

21    Fed.

22         Q.     Okay.  And then at some point, you went

23    back to the Fed?

24         A.     Yes.

25         Q.     Why?

1          A.    Because they called me and offered me to

2    come back.

3          Q.    Okay.  And why did you take that job to

4    come back after you had left approximately two years

5    before?

6          A.    Because I wanted to.

7          Q.    Okay.  Was it the same position?

8          A.    Not exactly.

9          Q.    Okay.  How was it different?

10         A.    I had a different boss.

11         Q.    Okay.  Same job, different boss?

12         A.    I would not say it was the exact same

13   job.

14         Q.    Okay.  How was it different?

15         A.    Because each boss requires different

16   things to be done.  And time had passed, and so there

17   were different issues for me to be working on in

18   different projects.

19         Q.    So while you worked for Floyd -- or FOL,

20   what were your titles?

21              MR. SMITH:  Objection to form.

22              MR. BILLINGS:  Join.

23              THE DEPONENT:  What does that mean?

24              MR. BILLINGS:  You can answer.

25         Q.    (BY MR. DAWES)  You can answer.

```
 1          A.   Can you repeat the question?

 2          Q.   Sure.  What was your title at FOL?

 3               MR. SMITH:  Same objection.

 4               MR. BILLINGS:  Same objection.

 5          A.   I viewed myself as chief operating

 6     officer.

 7          Q.   (BY MR. DAWES)  Okay.  Did you have other

 8     titles?

 9          A.   At times, there -- I was written down as

10     president on some materials.

11          Q.   Okay.  Were you not the president?

12          A.   No.

13          Q.   Okay.  Who specified that you were the

14     president on certain materials?

15          A.   I don't know.

16          Q.   Okay.  Who was the president?

17          A.   There was no president, as far as I know.

18          Q.   What other titles did you hold at FOL?

19          A.   I did not hold any other titles.  We did

20     not view titles as being very important.

21          Q.   Did you have a specific job description

22     at FOL?

23          A.   Not that I am aware of.

24          Q.   Who did you report to at FOL?

25          A.   The CEO.
```

1        Q.   And was that Mr. Landis?

2        A.   That was Floyd Landis.

3        Q.   Okay.  Did you report to anyone else?

4        A.   No.

5        Q.   Did you have folks reporting to you?

6        A.   Yes.

7        Q.   Who reported to you?

8        A.   I cannot recall specifically because I

9 don't want to miss any names.  And it varied over

10 time.

11       Q.   Okay.  Tell me who you recollect

12 reporting to you?

13       A.   Okay.  I recollect Bob Bell reporting to

14 me, Jake Sitler, Heather Mackey, Julie Rodden -- and I

15 can't remember the other names.  And it also depended

16 on the time period.  So there were different times

17 where people may have left or not started yet.

18       Q.   Okay.  During your tenure with FOL, what

19 was the maximum number of employees at any given time?

20       A.   I do not recall that number.

21       Q.   Do you recall an estimate?

22       A.   No.

23       Q.   Okay.  Less than 50?

24       A.   Yes.

25       Q.   Between 25 and 50?

```
1          A.    No.

2          Q.    Less than 25?

3          A.    Yes.

4          Q.    All right.  Did you have any kind of

5    contract with FOL?

6          A.    No.

7          Q.    Okay.  You are familiar with some papers

8    filed in our case this week, I suspect.  We'll mark

9    this as Exhibit 1.

10              MR. BILLINGS:  Objection to the form.

11              (Deposition Exhibit 1 was marked.)

12         Q.    (BY MR. DAWES)  Are you familiar with

13   Exhibit 1?

14         A.    No.

15         Q.    Have you ever seen it?

16         A.    I don't think so.

17         Q.    Okay.  Why don't you take a look at the

18   second page and see if that helps at all.

19         A.    I don't -- I mean, I don't really do very

20   well with legal documents.

21         Q.    Okay.  Do you understand this is a filing

22   submitted on your behalf in our case?

23              MR. BILLINGS:  Objection to the form.

24         A.    No.

25         Q.    (BY MR. DAWES)  All right.
```

```
1           A.   I don't pay attention to the filings.
2           Q.   You've never -- this is the first you've
3    seen this document?
4           A.   Yes.
5           Q.   Well, let me ask you to take a look at
6    page 13.  And paragraph 21 there talks about FOL
7    hiring Mr. Benlolo and Mr. Kaplan.  Do you see that?
8           A.   Yes.
9           Q.   Were you aware of them being hired?
10          A.   Yes.
11          Q.   Okay.  When were they hired?
12          A.   I don't remember.
13          Q.   Okay.  In what capacity were they hired?
14          A.   To run dispensaries in Portland, Oregon.
15          Q.   Okay.  Did they have any other role?
16               MR. BILLINGS:  Objection to the form.
17               MR. SMITH:  Join.
18          A.   I don't know.
19          Q.   (BY MR. DAWES)  All right.  To the best
20   of your knowledge, their role was to run dispensaries
21   in Portland, Oregon?
22          A.   Yes.
23          Q.   All right.  Whose dispensaries?
24               MR. BILLINGS:  Objection to the form.
25               MR. SMITH:  Join.
```

```
 1            A.   I don't understand the question.

 2            Q.   (BY MR. DAWES)  Which dispensaries were

 3    they hired by FOL to run?

 4            A.   I don't know the names of the

 5    dispensaries.

 6            Q.   Do you know the locations?

 7            A.   No, not specifically.

 8            Q.   How many were there?

 9            A.   I don't know.

10            Q.   Have you ever had discussions with

11    Mr. Benlolo or Mr. Kaplan about running those

12    dispensaries?

13            A.   No.

14            Q.   Okay.  At no time?

15            A.   Well, what do you mean by discussions on

16    running the dispensaries?

17            Q.   What do you understand discussions to be?

18                 MR. SMITH:  Objection to form.

19                 MR. BILLINGS:  Join.

20            A.   A con -- that's why I'm asking, because

21    it is a very broad term.

22            Q.   It is very broad.

23            A.   Yeah.

24            Q.   It is very broad.  Any kind of

25    communication, I would say.  A phone call, a text
```

1  message, a meeting, communication, discussion in the

2  broadest regard.

3         A.    But about what specifically?

4         Q.    Running dispensaries in Oregon.

5         A.    Very early on, we talked about what needs

6  to be done to run a dispensary.

7         Q.    And who is "we"?

8         A.    Mostly me and Mr. Kaplan.

9         Q.    Okay.  And tell me about those

10 discussions.

11               MR. SMITH:  Objection to form.

12               MR. BILLINGS:  Join.

13        A.    They have expertise in running cannabis

14 dispensaries, which is a very specific skill set that

15 I do not have.

16        Q.    (BY MR. DAWES)  Okay.  How did you first

17 meet Mr. Benlolo or Mr. Kaplan?

18        A.    I don't remember.

19        Q.    Do you remember when you first met them?

20        A.    No.

21        Q.    Do you remember where?

22        A.    No.

23        Q.    All right.  Who actually decided to hire

24 Mr. Benlolo and Mr. Kaplan?

25               MR. BILLINGS:  Objection to the form.

1              MR. SMITH:  Join.

2         A.    Not me, and I don't know who

3    specifically.

4         Q.    (BY MR. DAWES)  Okay.  Is it correct they

5    received salaries from FOL?

6         A.    They did.

7         Q.    And did they receive W2s each year they

8    were employees?

9         A.    I don't know that.

10        Q.    Who would know that?

11        A.    They would.

12        Q.    Okay.  I thought you were responsible for

13   overseeing some of the payroll operations for FOL.

14   Did I misunderstand that?

15             MR. SMITH:  Objection to form.

16             MR. BILLINGS:  Join.

17        A.    I was, but I don't remember exactly what

18   tax form was sent or filed for them.

19        Q.    (BY MR. DAWES)  Okay.  And so how

20   frequently would you have interaction with Mr. Benlolo

21   or Mr. Kaplan while you were COO of FOL?

22        A.    Not very frequently.

23        Q.    Okay.  Who had the primary interaction

24   with them from the FOL side?

25             MR. BILLINGS:  Objection to the form.

1                MR. SMITH:  Join.

2        A.   I think that they interacted mostly with

3    Floyd.

4        Q.   (BY MR. DAWES)  Okay.  When you were COO

5    for FOL, did you have any other positions or jobs?

6        A.   So as COO, I managed parts of the

7    company.

8        Q.   Okay.  And what does that mean?

9        A.   I focused on the more administrative

10    aspects of the company, such as human resource issues,

11    operations, for example, inventory, procurement, and

12    marketing.

13        Q.   Okay.  So you had a wide array of duties

14    and responsibilities with FOL; is that fair?

15                MR. BILLINGS:  Object to the form.

16        A.   I'm not sure what you mean by "wide."

17        Q.   (BY MR. DAWES)  How would you

18    characterize the breadth of your duties and

19    responsibilities at FOL?

20                MR. SMITH:  Object to form, asked and

21    answered.

22                MR. BILLINGS:  Join.

23        A.   That depends on what one would consider

24    is a wide array of duties in running a company.  It

25    could be -- it could vary.

1          Q.   (BY MR. DAWES)  Right.  And my question

2    is how would you characterize the breadth of your

3    duties and responsibilities?

4               MR. SMITH:  Objection to form.

5               MR. BILLINGS:  Join.

6          A.   I don't know.

7          Q.   (BY MR. DAWES)  It is true that you have

8    met with Mr. Benlolo and Mr. Kaplan in Oregon,

9    correct?

10         A.   Yes.

11         Q.   On how many occasions?

12         A.   I don't know.

13         Q.   More than one?

14         A.   Yes.

15         Q.   More than a half dozen?

16         A.   Oh, I don't know.

17         Q.   Are you familiar with a meeting taking

18   place at a restaurant in Bend, Oregon, with them and

19   yourself and Mr. Landis?

20         A.   When?

21         Q.   How about in mid-July 2019?

22         A.   I don't recall being in Bend, Oregon, in

23   July of 2019.

24         Q.   Okay.  All right.  Do you recall meeting

25   with them in a restaurant in Bend, Oregon, ever?

1          A.    Yes.

2          Q.    Okay.  When was that, to the best of your

3    recollection?

4          A.    I believe it was at the end of May in

5    2019.

6          Q.    Okay.  And why does that date stick in

7    your mind?

8          A.    I don't know.

9          Q.    Did you maintain any kind of notes or

10   anything from those meetings?

11         A.    No.

12         Q.    Any kind of records reflecting your

13   travel to that meeting?

14         A.    It was just one meeting; and, no, I don't

15   know if there's any records.  I have not looked.

16         Q.    Okay.  And what do you recollect from

17   that lunch meeting in Bend, Oregon, with them?

18         A.    Not a lot.  I just remember that Floyd

19   had raised and David and Andrew had raised changing

20   the nature of the original transaction that we had

21   with them.

22         Q.    Okay.  And what do you remember

23   specifically about that issue being raised at that

24   meeting?

25         A.    That's all that I recall.

1          Q.   You know it was raised, but you don't

2    recollect any particulars?

3          A.   Correct.

4          Q.   Are you familiar with what the original

5    transaction was?

6          A.   Not specifically.

7          Q.   Okay.  How about generally?

8          A.   I know that there's an agreement -- there

9    was an agreement.

10          Q.   Okay.  What did you understand that

11    agreement to provide for?

12          A.   I don't recall.

13          Q.   Have you ever reviewed that agreement?

14          A.   No.

15          Q.   Have you ever seen that agreement?

16          A.   Yes.

17          Q.   Okay.  But you've never -- you've seen it

18    but never read it?

19          A.   Yes.

20          Q.   How do you know anything about that

21    agreement?

22               MR. SMITH:  Objection to form.

23               MR. BILLINGS:  Join.

24          A.   Because Floyd has told me about it.

25          Q.   (BY MR. DAWES)  Okay.  Has anyone else?

```
 1          A.    No.

 2          Q.    Okay.  Have you yourself had any

 3    discussions with Mr. Kaplan or Benlolo about that

 4    original transaction?

 5          A.    No.

 6          Q.    Was there discussion at that meeting in

 7    Bend, Oregon, about terminating the transaction?

 8          A.    I don't recall specifically.

 9          Q.    Do you remember generally?

10          A.    No.

11          Q.    Okay.  All right.  Do you recall

12    Mr. Benlolo or Mr. Kaplan proposing that FOL enter

13    into a new agreement with them?

14          A.    I remember that they talked about

15    changing the original terms.

16          Q.    Okay.  Do you recall how so?

17          A.    No.

18          Q.    Okay.  How would you describe the

19    relationship at -- at that meeting in Bend, Oregon?

20    What was the relationship between FOL, on the one

21    hand, and Mr. Benlolo and Mr. Kaplan on the other?

22                MR. BILLINGS:  Objection to the form.

23          A.    What --

24                MR. SMITH:  Join.

25          A.    -- do you mean by "relationship"?
```

1          MR. SMITH:  Alex, give us a moment to
2    object.
3          THE DEPONENT:  Okay.  Sorry.
4          MR. SMITH:  No, just give us a couple
5    seconds --
6          THE DEPONENT:  So do I still answer if
7    you object?
8          MR. SMITH:  Yes.
9          THE DEPONENT:  Okay.
10         Q.   (BY MR. DAWES)  So let me ask it this
11   way:  Was there a relationship between Mr. Benlolo and
12   Kaplan at the meeting in Bend, Oregon?
13         A.   Well, if we had a meeting together, then
14   that, to me, constitutes as a relationship.
15         Q.   Okay.  And what would you describe --
16   were they employees at the time?
17         A.   I don't recall.
18         Q.   Do you know when they ceased being
19   employees or if they ceased being employees?
20         A.   I do not recall when they ceased to be
21   employees.
22         Q.   Do you know what the circumstances were
23   of their cessation of being employees of FOL?
24         A.   No.
25         Q.   Did they resign?

1          A.   I don't know.

2          Q.   Were they fired?

3          A.   I don't know.

4          Q.   Okay.  Do you know who was involved in

5     the termination -- or the cessation of their

6     employment from FOL?

7          A.   No.

8          Q.   Okay.  All right.  Are you aware that

9     money had been paid by FOL under an Equity Exchange

10    Agreement by summer of 2019?

11               MR. SMITH:  Objection to form.

12               MR. BILLINGS:  Join.

13         A.   I'm sorry.  The money went where?

14         Q.   (BY MR. DAWES)  Are you familiar with any

15    financial transactions between FOL and Mr. Kaplan and

16    Mr. Benlolo or entities with which they are

17    affiliated?

18         A.   Yes.

19         Q.   Okay.  Can you describe for me what those

20    financial transactions are?

21         A.   No.

22         Q.   You have no idea what they are?

23         A.   Well, that's a very broad question; and

24    I'm not sure what you're asking specifically.

25         Q.   Okay.  I'm asking you in the broadest

1    term.  You have told me you're aware of certain

2    financial transactions between FOL, on one hand, and

3    Mr. Kaplan, Mr. Benlolo, and entities with which they

4    are affiliated, correct?

5         A.   Yes.

6         Q.   All right.  What do you know about any of

7    those financial transactions?

8         A.   Just that money from FOL went to either

9    -- and I'm not sure who, but the individuals you

10   mentioned or their entities.

11        Q.   How much money?

12        A.   I don't know.

13        Q.   When?

14        A.   I don't know.

15        Q.   For what purpose?

16        A.   I don't know specifically.

17        Q.   For what purpose generally?

18        A.   Or generally, I do not know.

19        Q.   Okay.  Did you have any involvement with

20   respect to any of those transactions while you were

21   the COO of FOL?

22             MR. SMITH:  Objection.

23             MR. BILLINGS:  Objection.  Sorry.

24             MR. SMITH:  Sorry.  Join.

25        A.   No, the COO typically doesn't deal with

1    financial transactions.

2            Q.    (BY MR. DAWES)  Okay.  How about the

3    reporting of financial transactions?  Did you have any

4    involvement or participation in that regard?

5                  MR. BILLINGS:  Objection to the form.

6                  MR. SMITH:  Join.

7            A.    No.

8            Q.    (BY MR. DAWES)  Okay.  Who would have?

9            A.    Typically in a company, a CFO has

10   responsibilities for financials.

11           Q.    Okay.  And who was the CFO?

12           A.    Chris Ryan.

13           Q.    Okay.  And he reported to Mr. Landis?

14           A.    Yes.

15           Q.    Did you work with Mr. Ryan?

16           A.    A little bit.

17           Q.    Okay.  Did you interact with him

18   routinely?

19           A.    What do you mean by "routinely"?

20           Q.    What do you understand the word

21   "routinely" to mean?

22                  MR. SMITH:  Objection to form.

23                  MR. BILLINGS:  Join.

24           A.    I don't know, that's why I'm asking you.

25           Q.    (BY MR. DAWES)  Well, how frequently did

1    you interact with Mr. Ryan?

2          A.    I do not recall specifically how many

3    times I interacted with him.

4          Q.    When you were working for FOL as COO,

5    from where did you do that?

6          A.    Do you mean physically?

7          Q.    I do.

8          A.    It would depend.

9          Q.    Tell me all of the places you worked for

10   -- physically from for FOL.

11         A.    Okay.  So I'm not going to be able to

12   recall every location --

13         Q.    Okay.

14         A.    -- because we traveled a lot.

15         Q.    Okay.

16         A.    And went to a lot of different events

17   around the country.

18         Q.    Okay.

19         A.    So I just want to be very specific and

20   truthful.  So I worked from home mostly.

21         Q.    Okay.

22         A.    But when we traveled, I would work

23   wherever it was that we were traveling.

24         Q.    Okay.  So either from home or if you were

25   on the road wherever you were, correct?

1         A.    Yes.

2         Q.    When there were meetings between the FOL

3    executive team, did those happen at your house or

4    where?

5              MR. SMITH:  Objection to form.

6              MR. BILLINGS:  Join.

7         A.    Who do you mean by the FOL executive

8    team?

9         Q.   (BY MR. DAWES)  Well, who would you

10   describe as the FOL executive team?

11        A.    I guess Floyd.

12        Q.    Um-hum.

13        A.    And I don't know who else that would

14   constitute -- again, we didn't put a lot of emphasis

15   on titles or hierarchy.

16        Q.    So you don't know who the executive team

17   was for Floyd?

18             MR. BILLINGS:  Objection to form.

19             MR. SMITH:  Join.

20        A.    It -- I don't know -- that could vary.

21   It could be broad.  It could be specific.  I'm not

22   sure who you're referring to specifically.

23        Q.   (BY MR. DAWES)  You were part of the

24   executive team, were you not?

25             MR. BILLINGS:  Objection to form.

1          A.    I don't know if the company would

2     consider a COO as part of the executive team.

3     Typically, they would.

4          Q.    (BY MR. DAWES)  And Chris Ryan was part

5     of the executive team, correct?

6               MR. BILLINGS:  Objection to the form.

7               MR. SMITH:  Join.

8          A.    Again, companies typically view a CFO as

9     part of the executive team.

10         Q.    (BY MR. DAWES)  Is Scott Thompson also a

11    part of the executive team?

12              MR. BILLINGS:  Object to the form.

13         A.    I don't know.

14         Q.    (BY MR. DAWES)  How about Bob Bell, is he

15    part of the executive team?

16              MR. BILLINGS:  Object to the form.

17              MR. SMITH:  Join.

18         A.    It depends on what you mean by "executive

19    team."

20         Q.    (BY MR. DAWES)  When FOL uses the term

21    "executive team," what does that mean?

22              MR. BILLINGS:  Objection to form.

23              MR. SMITH:  Join.

24         A.    We didn't really use that term when we

25    were meeting in person.

1           Q.   (BY MR. DAWES)  You know that you were

2    part of the executive team as part of the FOL,

3    correct?

4                MR. BILLINGS:  Object to the form.

5                MR. SMITH:  Join.

6           A.   I'm not sure.

7           Q.   (BY MR. DAWES)  So when the executive

8    team -- for the purposes of this discussion, let's

9    assume for the moment that FOL holds out the folks I

10   just mentioned, Mr. Ryan, Mr. Bell, yourself,

11   Mr. Landis, as the executive team -- where would those

12   meetings take place?

13               MR. BILLINGS:  Object to the form.

14               MR. SMITH:  Join.

15          A.   I don't recall specific meetings with

16   them over the course of the time I was employed there.

17          Q.   (BY MR. DAWES)  Okay.  Do you recollect

18   any meetings with them?

19          A.   I remember meeting with them.  I don't

20   recall specific meetings.

21          Q.   Okay.  And when you met with them, where

22   was that?

23          A.   I don't recall.

24          Q.   Okay.  Are you familiar with a

25   Mr. Worthington?

1        A.    Yes.

2        Q.    And who is he?

3        A.    He's a friend of Floyd's.

4        Q.    Have you ever met with him?

5        A.    I have met Roger.

6        Q.    Have you ever met with him in Oregon?

7        A.    Yes.

8        Q.    Okay.  In what circumstance?

9        A.    There was a -- an event in Oregon, and I

10   stayed at his house.

11        Q.    Okay.  Do you remember when that was?

12        A.    It was around the same time that we had

13   the meeting in Bend that we discussed earlier.

14        Q.    Okay.  All right.  Did you have an

15   understanding, coming away from that trip to Oregon

16   where that lunch meeting took place, that the --

17   Mr. Benlolo and Mr. Kaplan would be repaid for certain

18   investments in a pool of assets?  Do you recollect

19   anything along those lines?

20        A.    I don't know.

21              MR. BILLINGS:  Object to the form.

22   Sorry.  Just a second so we don't talk over each

23   other.

24              THE DEPONENT:  Sorry.  Do I say it again?

25        Q.    (BY MR. DAWES)  All right.  Do you

1    recollect any discussions about the ultimate sale of
2    assets by the Oregon entities with which Mr. Benlolo
3    and Mr. Kaplan were affiliated?
4         A.   No.
5         Q.   Okay.  Do you remember anything about
6    splitting funds on a 50/50 basis?  Do you remember
7    that discussion coming up at any time in Oregon?
8         A.   No.
9         Q.   Were you involved in any communications
10   following that trip to Bend, Oregon, memorializing a
11   new arrangement with Mr. Benlolo, Mr. Kaplan, and
12   entities with which they are affiliated?
13        A.   I do not recall.
14        Q.   Do you recall Mr. Landis memorializing
15   any kind of written agreement with Mr. Benlolo and
16   Mr. Kaplan?
17        A.   I do not recall.
18        Q.   Okay.  In terms of your preparation for
19   your testimony today, I understand -- I'm sure you met
20   with your counsel, and I'm not interested in what
21   those discussions were; but can you describe for me
22   generally what you did to prepare for your testimony?
23        A.   What did I discuss with them?
24        Q.   No.  That's exactly what I said I'm not
25   interested in.

1          A.   Okay.

2          Q.   I'm asking what did you do to prepare for

3    your testimony today?

4          A.   We went through what a deposition is

5    like.

6          Q.   Okay.  And, again, I'm not interested in

7    what you spoke with your counsel about.

8          A.   Um-hum.

9          Q.   I'm just generally interested in what you

10   did.

11         A.   Um-hum.

12         Q.   You met with your counsel?

13         A.   Yes.

14         Q.   Did you meet with anyone else?

15         A.   No.

16         Q.   Did you meet with Mr. Kaplan -- or

17   Mr. Landis?

18         A.   He was with us.

19         Q.   Okay.  Did you meet with any other folks

20   from FOL?

21              MR. SMITH:  In preparation for the

22   deposition.

23         A.   No.

24         Q.   (BY MR. DAWES)  How much time did you

25   spend getting ready for your testimony?

1      A.    I don't recall exactly how many hours

2  we --

3      Q.    Best estimate.

4      A.    Five --

5      Q.    Okay.

6      A.    -- -ish.

7      Q.    All right.  Did you go back and refresh

8  on emails, agreements, anything like that?

9      A.    Some.

10     Q.    Any that you recollect in particular?

11     A.    No.

12     Q.    Okay.  Are you familiar with some of the

13  promissory notes that are in controversy in this case?

14     A.    I know of promissory notes.

15     Q.    And they are often referred to as the

16  senior 12 percent notes.  Have you heard them referred

17  to that way?

18          MR. SMITH:  Objection to form.

19     A.    No.

20     Q.    (BY MR. DAWES)  How have you heard them

21  referred to?

22     A.    The promissory notes.

23     Q.    And do you recollect how many there are?

24     A.    No.

25     Q.    Do you have an estimate?

1       A.   No.

2       Q.   Could be two, it could be 500.  You don't

3   know, right?

4       A.   I don't know.

5       Q.   Okay.  So as you sit here now, you have

6   no knowledge or familiarity with any kind of 50/50

7   agreement involving FOL, Mr. Kaplan, or Mr. Benlolo;

8   is that right?

9            MR. BILLINGS:  Object to the form.

10           MR. SMITH:  Join.

11      A.   I have no personal knowledge.

12      Q.   (BY MR. DAWES)  Do you have any knowledge

13  that's other than personal, hearsay knowledge or

14  something other than direct personal knowledge?

15           MR. SMITH:  Objection, form.  And I'll

16  just advise you, Alex, to not reveal any

17  communications you have had with Floyd.

18      A.   No.

19           MR. BILLINGS:  Join.

20           MR. DAWES:  And on what basis is that?

21           MR. SMITH:  Spousal communications.

22      Q.   (BY MR. DAWES)  You are married to

23  Mr. Landis?

24      A.   He -- yes.

25      Q.   When did you become married to

1    Mr. Landis?

2         A.    When we had a child together.

3         Q.    What day was that?

4         A.    August 14th of 2014.

5         Q.    From what state is your marital license

6    issued?

7         A.    I don't know.

8         Q.    Okay.  Where did you get married?

9         A.    I don't know.  It's through, I think,

10   common-law marriage.

11        Q.    Okay.  So you're not actually -- you

12   claim to have a common-law marriage; is that correct?

13             MR. SMITH:  Objection to form.

14             MR. BILLINGS:  Join.

15        A.    I think so.

16        Q.    (BY MR. DAWES)  Okay.  You do not have a

17   marriage license, then, correct?

18        A.    Correct.

19        Q.    And what is the duration of your

20   common-law marriage?

21        A.    I don't know.

22        Q.    Okay.  You don't know when it started?

23        A.    Oh, it started in 2014.

24        Q.    Okay.  And did it ever end or cease, or

25   was it suspended at any time?

1          A.   No.

2          Q.   Okay.  Have you lived with Mr. Landis

3    continuously since 2014?

4          A.   Yes, although what do you mean by "live

5    with"?  Does that --

6          Q.   Do you have the same residential address

7    as Mr. Landis?

8          A.   No.

9          Q.   Okay.  Where do you live again?

10         A.   So I live at the same place I stated

11   earlier, 61 Stoneyside Drive in Larchmont.

12         Q.   Okay.  And where does Mr. Landis reside?

13         A.   So Mr. Landis, his official -- actually,

14   I don't know because -- I don't know.  I think he's --

15   he's domiciled in Colorado.  I don't know what the

16   exact address is, but he -- but we live together.

17         Q.   Okay.  Now you're confusing me.

18         A.   It's confusing.

19         Q.   You live in Larchmont, New York, correct?

20         A.   Correct.

21         Q.   Mr. Landis does not live in Larchmont,

22   New York, correct?

23         A.   His official residence is in Colorado,

24   but he, most of the time, travels and is with us at

25   home.

1          Q.   Where is -- where is Mr. Landis' official

2    residence in Colorado?

3          A.   I do not know that.

4          Q.   Okay.  Do you know what county it's in?

5          A.   No.

6          Q.   Do you know what city it's in?

7          A.   No.

8          Q.   Do you know which quadrant of the state

9    his official address is in?

10          A.   No.

11          Q.   Have you ever been to his residence in

12    Colorado?

13          A.   I don't -- no.

14          Q.   You don't know or no?

15          A.   I do not know what his address is, so I

16    don't know if I've been there.

17          Q.   You don't know if you've been to his

18    residence in Colorado?

19          A.   I don't know his address, so I don't

20    think so.

21          Q.   If he -- for instance, if he lived in

22    this office, you would have been there?

23          A.   But how would I know if that's his

24    residence if I don't know his address.

25          Q.   All right.  Is it something he keeps

1    secret from you?

2                  MR. BILLINGS:  Object to the form.

3                  MR. SMITH:  Join.

4         A.   No, we just don't really talk about his

5    administrative paperwork.

6         Q.   (BY MR. DAWES)  His residential address

7    you consider to be administrative paperwork?

8                  MR. SMITH:  Objection to form.

9                  MR. BILLINGS:  Join.

10        A.   Yes, as long as he's with me.

11        Q.   (BY MR. DAWES)  Okay.  Well, how many

12   nights in the last year have you and he slept under

13   the same roof?

14        A.   I do not know that.

15        Q.   More than ten?

16        A.   Yes.

17        Q.   More than 300?

18        A.   I don't know.

19        Q.   Can you be any more specific than that?

20        A.   No.

21        Q.   All right.  But to be certain, he does

22   not live in Larchmont, New York, where you live,

23   correct?

24                  MR. BILLINGS:  Object to the form.

25                  MR. SMITH:  Join.

```
1          A.   His official residence is not in
2    Larchmont, New York.
3          Q.   (BY MR. DAWES)  Okay.  And when you say
4    "official residence," what is an official residence?
5               MR. BILLINGS:  Object to the form.
6               MR. SMITH:  Join.
7          A.   I see it as where you register yourself.
8          Q.   (BY MR. DAWES)  Register with who?
9          A.   A state.
10         Q.   Are you registered with a state?
11         A.   Yes.
12         Q.   How so?
13         A.   My license.
14         Q.   Okay.  You have a New York state license?
15         A.   I do.
16         Q.   Mr. Landis has a state of Colorado
17    license?
18         A.   Yes.
19         Q.   And for how long has that been the case?
20         A.   I don't know.
21         Q.   More than ten years?
22         A.   I don't know.
23         Q.   When was the last time you and Mr. Landis
24    lived under the same roof together?
25               MR. BILLINGS:  Object to the form.
```

1          MR. SMITH:  Join.

2          A.   I -- I really don't know what you're

3     asking.  Can you clarify that?

4          Q.   (BY MR. DAWES)  Well, we'll use your

5     concept of official residence.  When was the last time

6     you and Mr. Landis shared the same official residence?

7          A.   I don't know.

8          Q.   Have you ever?

9          A.   I don't know.

10         Q.   Okay.  All right.  When you file your tax

11    returns, do you do so jointly?

12         A.   No.

13         Q.   Have you ever?

14         A.   Have I ever what?

15         Q.   Filed a joint tax return with Mr. Landis.

16         A.   No.

17         Q.   Have you filed any kind of papers with

18    any government agency where you have decreed Mr. -- or

19    declared Mr. Landis to be your legal spouse?

20         MR. BILLINGS:  Object to the form.

21         MR. SMITH:  Join.

22         A.   No.

23         Q.   (BY MR. DAWES)  The 50/50 agreement that

24    you said that you have a very general knowledge of,

25    what is the current status of that agreement?

1       A.   I do not know.

2       Q.   All right.  And you haven't looked into

3   that at all?

4       A.   No.

5       Q.   Are you familiar with the Carmel Milazzo

6   DiChiara law firm?

7       A.   Yes.

8       Q.   And how do you have familiarity with that

9   entity?

10      A.   Because Floyd's of Leadville used to work

11  with that entity.

12      Q.   Okay.  And from when to when?

13      A.   I don't know.

14      Q.   Okay.  Did you have interaction with --

15  that's a law firm, right?

16      A.   Yes.

17      Q.   And did you have interaction with the

18  lawyers in that law firm?

19      A.   I was at meetings when one of the lawyers

20  was there.

21      Q.   Okay.  Which lawyer?

22      A.   Pete DiChiara.

23      Q.   All right.  And that's -- is that the

24  pronunciation?  I've heard it pronounced many, many

25  different ways.

```
1          A.   I'm not sure.
2          Q.   All right.  And what was the purpose of
3   that meeting?
4          A.   What meeting?
5          Q.   You said you were at a meeting with
6   Mr. DiChiara.
7          A.   I believe I said I was at some
8   meetings --
9          Q.   Okay.  What's your --
10         A.   -- where --
11         Q.   -- best estimate?  How many?
12         A.   -- Mr. DiChiara was at.  Best estimate of
13  what?
14         Q.   Meetings, number.
15         A.   Oh.  I don't know.
16         Q.   Any estimate?
17         A.   No.
18         Q.   Could be more than ten?
19         A.   I don't know.
20         Q.   All right.  And where were the meetings?
21         A.   At the firm's office.
22         Q.   Okay.  Were they anywhere else ever?
23         A.   Not that I recall.
24         Q.   All right.  And what did you understand
25  the law firm's role to be vis-a-vis FOL?
```

1           A.   I don't know.

2           Q.   Do you know what their scope of

3    engagement was?

4           A.   No.

5           Q.   Did you have any idea what they were

6    being asked to do for FOL?

7           A.   No.

8           Q.   All right.  Why were you at those

9    meetings?

10          A.   Sometimes I traveled with Floyd and was

11   with him.

12          Q.   Are you able to -- as you sit here now,

13   are you able to recollect anything specifically about

14   any of those meetings?

15          A.   No.

16          Q.   Just the fact that they happened, and you

17   were there for some of them?

18          A.   Yes.

19          Q.   All right.  No recollection beyond that?

20          A.   Correct.

21          Q.   Okay.

22               (Deposition Exhibit 2 was marked.)

23          Q.   This -- have you ever seen what I've

24   marked here as Exhibit 2?

25          A.   I don't recall.

1          Q.   And this would have been -- this is

2    October 15, 2017.  This would have been the -- before

3    the time you formally became the COO; is that true?

4               MR. BILLINGS:  Object to the form.

5          A.   I was not employed at Floyd's of

6    Leadville in October of 2017.

7          Q.   (BY MR. DAWES)  All right.  Whatever work

8    you were doing for FOL at that time was in an advisory

9    capacity, correct?

10              MR. SMITH:  Object to the form.

11              MR. BILLINGS:  Join.

12         A.   I was helping Floyd on some matters as an

13   adviser.

14         Q.   (BY MR. DAWES)  Right.  And do you know

15   when that started?

16         A.   No.

17         Q.   Was it from inception of the company?

18         A.   I don't recall.

19         Q.   Were you involved in the formation of the

20   company, FOL?

21         A.   Well, what do you mean "involved in the

22   formation"?

23         Q.   What don't you understand about that?

24         A.   Is it -- is it a specific legal term

25   where I helped to found and sign foundation bylaws,

1    for example, or setting up the C corp of the company,

2    or was it in an advisory capacity helping him think

3    through some ideas?

4          Q.   In the broadest terms, what involvement

5    did you have in FOL being formed and coming to

6    fruition?

7                MR. BILLINGS:  Object to the form.

8                MR. SMITH:  Join.

9          A.   Very little.

10         Q.   (BY MR. DAWES)  What little was your

11   involvement, though?

12         A.   Hearing about the company and how Floyd

13   was building it up and what he was doing.

14         Q.   When you were serving in a consulting or

15   advisory role, were you compensated for some of your

16   time and effort?

17         A.   No.

18         Q.   Do you know for how long the CMD -- we'll

19   call it the CMD law firm, Mr. DiChiara's law firm --

20   how long that relationship spanned with FOL?

21         A.   No.

22         Q.   You don't know when it started, and you

23   don't know when it ended?

24         A.   No.

25         Q.   Do you know if it exists today?

```
1          A.   I --
2               MR. BILLINGS:  Object to the form.
3          A.   I do not know.
4          Q.   (BY MR. DAWES)  You're familiar with
5    Alexander Capital?
6          A.   Yes.
7          Q.   And how is that?
8          A.   How is it --
9          Q.   How is it that you are familiar with
10   Alexander Capital?
11         A.   I know them because we did some work with
12   them.
13         Q.   Okay.  And when you say "we" --
14         A.   The firm, FOL, did some work with
15   Alexander Capital.
16         Q.   What do you understand Alexander Capital
17   to be?
18         A.   Alexander Capital is a broker/dealer, I
19   think.
20         Q.   Okay.  Did you interact with the folks
21   from Alexander Capital yourself?
22         A.   Sometimes.
23         Q.   Okay.  And who would that have been?
24         A.   Frank DiMartini and sometimes Jonathan
25   Gasdak.
```

1          Q.    Okay.  Anybody else?

2          A.    Not that I recall.

3          Q.    Okay.  And what was the purpose of your

4     interaction with them?

5          A.    I do not remember.

6          Q.    Okay.  Do you recollect what you were

7     talking to them about?

8          A.    No.

9          Q.    Okay.  As you sit here today, can you

10    recollect any particular discussions or communications

11    you had with the folks from Alexander Capital?

12         A.    No, not -- not specifically.

13         Q.    Okay.  And how about generally?  What's

14    your best recollection of any of those communications?

15         A.    Sometimes I would talk to Frank about

16    some of the issues at hand or setting up meetings, for

17    example.

18         Q.    Okay.  Can you recollect anything more

19    specific than that?

20         A.    No.

21         Q.    When you say talking about some of the

22    issues at hand, what were the issues at hand?

23              MR. BILLINGS:  Object to the form.

24              MR. SMITH:  Join.

25         A.    Frank would ask me questions about, for

1    example, sending a check to a noteholder.

2         Q.   (BY MR. DAWES)  Okay.  Do you recall

3    anything more specific than that?

4         A.   Not specifically.

5         Q.   And how about -- you said there were also

6    -- so in terms of your communications with

7    Mr. DiMartini, you can't recollect anything further

8    beyond what you've described; is that fair?

9              MR. BILLINGS:  Objection -- sorry.

10             MR. SMITH:  Objection, form.

11             MR. BILLINGS:  Join.

12        A.   Not specifically.

13        Q.   (BY MR. DAWES)  And how about -- you said

14   there were communications with Mr. Gazdak?

15        A.   Yes.

16        Q.   What do you recollect about those

17   discussions?

18        A.   I interacted mostly with Mr. Gazdak in

19   meetings -- in a meeting at Alexander Capital's

20   offices and during the spring of 2020 when I was

21   helping coordinate calls on the advisory board.

22        Q.   Okay.  So there was -- there was -- you

23   said -- you have a specific recollection of a meeting

24   at Alexander Capital's office?

25        A.   There was a meeting --

```
1            Q.   Okay.

2            A.   -- at their office.

3            Q.   How many meetings did you attend at their

4   office?

5            A.   I don't recall.

6            Q.   More than one?

7            A.   I don't know.

8            Q.   But you know there was at least one?

9            A.   Yes.

10           Q.   And what do you -- and who was at the one

11  meeting that you recollect?

12           A.   I do not recall.

13           Q.   Okay.  What was said at the one meeting

14  that you're recollecting?

15           A.   I do not recall.

16           Q.   Okay.  Do you know when that meeting was?

17           A.   No.

18           Q.   Do you know how long it lasted?

19           A.   No.

20           Q.   Do you know how many people were in the

21  meeting?

22           A.   No.

23           Q.   Do you know who attended the meeting on

24  behalf of FOL?

25           A.   I don't recall.
```

1          Q.   All right.  Do you know who attended the

2     meeting on behalf of Alexander Capital?

3          A.   No.

4          Q.   All right.  You just know that there was

5     a meeting?

6          A.   Yes.

7          Q.   All right.  And then you also indicated

8     there was some -- there were some discussions or

9     communications in spring of 2020 as you were trying to

10    line up calls or conferences with the advisory board;

11    is that right?

12         A.   Yes.

13         Q.   Okay.  What do you recollect about those

14    communications?

15         A.   I don't recall.

16         Q.   Do you recall who you were having those

17    discussions with?

18         A.   I just recall that they called themselves

19    the advisory board.

20         Q.   And who was the advisory board?

21         A.   I don't recall specifically.

22         Q.   Do you recall generally who the advisory

23    board was?

24         A.   No.

25         Q.   Do you know how many members of the -- or

1    board -- board directors, or whatever, in terms of the

2    number of constituents of the advisory board?

3            A.    No.

4                  MR. BILLINGS:   Objection to the form.

5                  THE DEPONENT:   Sorry.

6            Q.    (BY MR. DAWES)   Are you able to identify

7    any person that was part of the advisory board?

8            A.    I believe Greg Hurley --

9            Q.    Okay.

10           A.    -- was there.

11           Q.    Okay.   Anybody else?

12           A.    I don't recall.

13           Q.    Okay.   So the only one you remember is

14   Greg Hurley.   All right.   Beyond what you've described

15   for me here in the last couple of minutes, do you

16   recall any other specific discussions or

17   communications with Alexander Capital at any time?

18           A.    No, I do not.

19                 (Deposition Exhibit 3 was marked.)

20           Q.    So I've handed you what we've marked as

21   Exhibit 3.   And this is an engagement letter with

22   Alexander Capital.   Do you recognize it?

23           A.    No.

24           Q.    Okay.   Have you ever seen it?

25           A.    No.

1          Q.   Okay.  Do you recognize on -- I guess

2    there are Bates labeled -- I guess it's page 4 of the

3    letter.  Do you recognize the Landis signature there?

4          A.   I don't know.

5          Q.   Do you know what his signature looks

6    like?

7          A.   It varies.

8          Q.   Okay.  You've seen it a lot, and you've

9    seen it vary; is that right?

10         A.   I've seen different versions of it.

11         Q.   Okay.  What -- how would you describe the

12   different versions?

13              MR. SMITH:  Objection to form.

14              MR. BILLINGS:  Join.

15         A.   Mine changes as well.

16         Q.   (BY MR. DAWES)  Okay.

17         A.   Not -- yeah.

18         Q.   Are you able to describe how Mr. -- are

19   you able to describe the differences in the different

20   versions of Mr. Landis' signature that you just

21   described?

22              MR. SMITH:  Objection, form.

23              MR. BILLINGS:  Join.

24         A.   No.

25         Q.   (BY MR. DAWES)  All right.  And I take it

1   you did not have any involvement in connection with

2   the preparation of Exhibit 3?

3           A.   I did not.

4           Q.   All right.  And you weren't -- you were

5   not, to your recollection, involved in negotiating its

6   terms?

7           A.   I was not.

8           Q.   Okay.  All right.  And what did you

9   understand the -- the -- the goals of FOL to be in

10  engaging Alexander Capital?

11          A.   I do not know.

12          Q.   Okay.  Are you familiar with an escrow

13  arrangement being established between FOL, the CMD

14  firm, and Alexander Capital?

15          A.   No.

16          Q.   Have you ever heard of that before?

17          A.   Have I heard of what?

18          Q.   An escrow agreement between those

19  entities.

20          A.   Not an escrow agreement.

21          Q.   Okay.  All right.  So you've never seen

22  an escrow agreement --

23          A.   No.

24          Q.   -- between them?

25               (Deposition Exhibit 4 was marked.)

1          Q.   So when -- is it fair, then, that you've

2    not seen Exhibit 4 before?

3          A.   I have not.

4          Q.   And if you look at -- in the bottom

5    right-hand corner, there are what are called Bates

6    labels.  Do you see those numbers?

7          A.   Yes.

8          Q.   All right.  And if you go to 115, do you

9    recognize that as Mr. Landis' signature?

10               MR. SMITH:  Object to form.

11               MR. BILLINGS:  Join.

12         A.   I don't know.

13         Q.   (BY MR. DAWES)  The -- we talked about

14   promissory notes earlier.  Have you seen some of the

15   promissory notes from FOL as maker?

16         A.   I don't know.

17         Q.   You don't know if you've seen them before

18   or not?

19         A.   No.

20         Q.   Okay.  How do you know about the

21   existence of these promissory notes?

22         A.   Because Floyd told me about them.

23         Q.   Okay.  How so?

24               MR. SMITH:  Objection to form.

25               MR. BILLINGS:  Join.

1          A.    That there were promissory notes.

2          Q.    (BY MR. DAWES)  Okay.  Was there -- was

3     there anything beyond just the fact that there were

4     promissory notes?

5          A.    Not that I recall.

6          Q.    Okay.  Number of notes, magnitude -- size

7     of the notes, anything like that?

8          A.    No.

9                (Deposition Exhibit 5 was marked.)

10         Q.    So I've handed you Exhibit 5, which is a

11    Subscription Agreement and related documents that have

12    been disclosed confidentially in this case.  This

13    particular agreement is with Howard da Silva.  Do you

14    recognize that name at all?

15         A.    I do.

16         Q.    And how do you recognize that name?

17         A.    He, I believe, was a noteholder.

18         Q.    Okay.  And how do you have that belief?

19         A.    Because Floyd told me about Howard.

20         Q.    Okay.  And what did he tell you about

21    Howard?

22         A.    I don't recall.

23         Q.    All right.  Have you had any

24    communications with Howard da Silva?

25         A.    I was on calls with Howard da Silva.

1           Q.   Okay.

2           A.   And he was on the advisory board.

3           Q.   Okay.

4           A.   Yeah.

5           Q.   So now you remember Mr. da Silva and

6    Mr. Hurley were on the advisory board?

7           A.   Yes.

8           Q.   Does that stimulate any further

9    recollection for you now?

10               MR. SMITH:  Object to form.

11               MR. BILLINGS:  Join.

12          A.   No.

13          Q.   (BY MR. DAWES)  So as you sit here now,

14   you can't remember any other member of the advisory

15   board other than those two gentlemen, correct?

16          A.   I don't remember.

17          Q.   Okay.  All right.  So in terms of -- so

18   what specifically did Mr. Landis tell you about

19   Mr. da Silva?

20          A.   I don't recall.

21          Q.   Okay.  And you said you were on calls

22   with Mr. da Silva; is that right?

23          A.   Yes.

24          Q.   All right.  Do you recollect anything in

25   particular about any of those calls?

```
1           A.   No, I do not.
2           Q.   Do you recollect anything generally about
3    those calls other than the fact that some of them
4    happened?
5           A.   I do not.
6           Q.   Do you know when those calls took place?
7           A.   I do not.
8           Q.   Do you know who participated on those
9    calls?
10          A.   I do not.
11          Q.   Looking at Exhibit 5, have you seen this
12   before?
13          A.   I don't recall.
14          Q.   Have you seen other documents of a
15   similar nature that have a similar look and feel?
16               MR. BILLINGS:  Object to form.
17               MR. SMITH:  Join.
18          A.   I don't recall.
19          Q.   (BY MR. DAWES)  And if you look at Bates
20   label 3591, that has Mr. Landis' signature.  Do you
21   see that?
22               MR. BILLINGS:  Objection to form.
23          A.   I see some scribble on the piece of
24   paper.
25          Q.   (BY MR. DAWES)  Do you see where
```

1    Mr. Landis' name shows up on that page?

2         A.   I see the typed "Floyd Landis."

3         Q.   Yeah.  And then there's a signature above

4    that, correct?

5         A.   I cannot say whether it's a signature.

6         Q.   Okay.  You're not sure?

7         A.   I'm -- I don't know.

8         Q.   Has Mr. Landis told you he's never signed

9    any promissory notes before?

10             MR. SMITH:  Objection to form.

11             MR. BILLINGS:  Join.

12        A.   I don't know.

13        Q.   (BY MR. DAWES)  Has he ever suggested

14   that he didn't sign promissory notes in connection

15   with FOL?

16             MR. SMITH:  Objection to form.

17             MR. BILLINGS:  Join.

18        A.   I don't know.

19        Q.   (BY MR. DAWES)  Has he told you that he

20   signed promissory notes on behalf of FOL?

21             MR. SMITH:  Objection to form.

22             MR. BILLINGS:  Join.

23        A.   I don't know.

24        Q.   (BY MR. DAWES)  Is there anything that is

25   impairing or impacting your ability to recollect as

1    you sit here today?

2           A.    What do you mean?

3           Q.    Is there any kind of medication you're

4    on, any -- anything that would impair your ability to

5    recollect past events?

6           A.    Not that I believe.  I did not work at

7    the company when these were pulled together.

8           Q.    Okay.  When were these pulled together?

9           A.    I don't know.

10          Q.    Okay.  When were you at the company?

11                MR. BILLINGS:  Object to the form.

12          A.    So I was employed at the company from the

13   end of September 2018 or beginning of October of 2018

14   to May of 2020.

15          Q.    (BY MR. DAWES)  When you left in May of

16   2020, was there any kind of formal notice?

17          A.    Not that I recall.

18          Q.    Okay.  Did you just tell Floyd, I'm

19   taking a job at the Fed, and you'll have to find

20   somebody else?

21                MR. SMITH:  Objection to form.

22                MR. BILLINGS:  Join.

23          A.    I accepted another position at the Fed.

24          Q.    (BY MR. DAWES)  Okay.  And how did you

25   tell FOL you were leaving?

1           A.   I told the staff and Floyd that I would

2     be taking another job.

3           Q.   Okay.  And that was in May of 2020?

4           A.   That was in May of 2020.

5           Q.   Okay.

6                MR. DAWES:  Well, we've been going for a

7     little bit.  I'm going to suggest we take our first

8     break for maybe, say, ten minutes; maybe pick up at a

9     quarter of 10.

10               MR. SMITH:  Okay.

11               (Recess taken, 9:37 a.m. to 9:54 a.m.)

12               MR. SMITH:  Chris, real quick.  I had

13    asked a question of you and Michael about how we're

14    splitting up time today.  Did you guys come to an

15    agreement on that?

16               MR. DAWES:  Yeah.  I think I'll probably

17    go three-ish hours, Michael will go about two-ish, and

18    then I'll go another hour or so.

19               MR. SMITH:  Okay.

20               MR. DAWES:  We'll see how that plays out,

21    but that's the big picture.

22               Are you ready to go?

23               THE DEPONENT:  Yes.

24          Q.   (BY MR. DAWES)  Okay.  So one thing you

25    mentioned earlier this morning is you had some

1    discussion with Mr. DiMartini about a check.  Do you

2    recall that?

3         A.   I remember saying that as an example of

4    some of the things that I would talk to Frank

5    DiMartini about was whether or not I would send a

6    check to an investor --

7         Q.   Okay.

8         A.   -- or noteholder.

9         Q.   And did you do that from time to time?

10        A.   I did it one time.

11        Q.   And you had some conversation with

12   Mr. DiMartini about that?

13        A.   Yes.

14        Q.   Who got the check?

15        A.   I don't remember.

16        Q.   Okay.  Having had a -- a chance to

17   reflect since this morning, any further recollection

18   of any discussions with Mr. DiMartini?

19             MR. SMITH:  Objection to form.

20             MR. BILLINGS:  Join.

21        A.   Not that I can recall as I sit here

22   today.

23        Q.   (BY MR. DAWES)  Okay.  I understand that

24   there may have been other conversations that were

25   recorded from time to time.  Do you have any

1   familiarity with that?

2          A.   Which conversations?

3          Q.   Are you familiar with any conversations

4   being recorded related to the business affairs of FOL?

5          A.   Yes.

6          Q.   Okay.  And under what circumstances?

7          A.   Can you clarify that?

8          Q.   Sure.  When were the recordings of

9   conversations made?

10         A.   I --

11              MR. BILLINGS:  Object to the form.

12              MR. SMITH:  Join.

13         A.   I don't recall specifically today.

14         Q.   (BY MR. DAWES)  Do you remember

15   generally?

16         A.   Generally about what?

17         Q.   Recorded conversations.

18         A.   Yes, I do.

19         Q.   All right.  You recorded conversations?

20         A.   I recorded some conversations.

21         Q.   And when you say "some," how many

22   conversations are we talking about?

23         A.   I don't know the exact number or the

24   dates.

25         Q.   Do you have an estimate?

1          A.    Two.

2          Q.    Two?   Okay.   And when you say you don't

3    know the exact dates, do you know the years in which

4    you recorded conversations?

5          A.    Either at the end of 2019 or maybe

6    beginning of 2020.

7          Q.    (BY MR. DAWES)   Okay.   And were these

8    in-person communications or were these phone calls

9    that were recorded?

10          A.    In person.

11          Q.    And who were the participants?

12          A.    Okay.   So one conversation I recorded was

13    me and Frank DiMartini.

14          Q.    Okay.   Anybody else?

15          A.    Not that I recall.

16          Q.    Okay.   And are you able to be any more

17    specific in terms of the -- the location or date of

18    that recording?

19          A.    I don't remember the exact date, but I

20    remember that we had a late breakfast at the -- it was

21    in New York City.

22          Q.    Okay.   And do you have any recollection

23    of that discussion?

24          A.    I don't recall the details of the

25    discussion.

1          Q.    Okay.  And did you record it on your cell

2    phone, or how did you record it?

3          A.    I recorded the conversation on my cell

4    phone.

5          Q.    Okay.  And why did you record the

6    conversation?

7          A.    Because I wanted to get on the record

8    what Frank was saying and that he would follow through

9    and do what he said he might do.

10          Q.    Okay.  And do you have any recollection

11    of what he was saying and what he would follow through

12    about or not?

13          A.    No.

14          Q.    All right.  So as you sit here, you have

15    no idea what was really said; is that fair?

16                MR. SMITH:  Objection to form.

17                MR. BILLINGS:  Join.

18          A.    Today, as I sit here, I don't recall

19    specifically what was said during that conversation.

20          Q.    (BY MR. DAWES)  What is your very best

21    recollection of what was said during that

22    conversation?

23          A.    I don't remember.

24          Q.    Okay.  All right.  And you said there was

25    another call -- another communication that you

```
 1   recorded?

 2         A.   Yes.

 3         Q.   When was that?

 4         A.   I don't recall the specific date.

 5         Q.   Okay.  Do you recall the year?

 6         A.   I believe the meeting was in early 2020.

 7         Q.   Okay.  And where was the meeting?

 8         A.   At Alexander Capital's offices.

 9         Q.   Okay.  And who was in attendance at the

10   meeting?

11         A.   I do not recall today exactly who was at

12   the meeting.

13         Q.   Who do you generally recall being at the

14   meeting?

15         A.   I was.

16         Q.   Okay.

17         A.   And Frank DiMartini was.

18         Q.   Okay.

19         A.   And Jonathan Gazdak.

20         Q.   Okay.

21         A.   And I don't -- I don't want to confuse

22   the meetings, so I don't recall specifically.

23         Q.   Okay.  And do you recollect anything

24   about that -- what was said at that meeting?

25         A.   No, not today.
```

1          Q.   And why -- you still have the recording,

2    correct?

3          A.   Yes.

4          Q.   And why did you record that meeting?

5          A.   Because I wanted to get on the record

6    what the people in the meeting were saying and that

7    they would actually do what they said they were going

8    to do.

9          Q.   Okay.  All right.  And as you sit here

10   now, you don't have a recollection of any of that,

11   correct?

12         A.   I don't remember the specifics.

13         Q.   Okay.  And are you able to describe what

14   was said in that meeting beyond what you just stated?

15         A.   No, not right now.

16         Q.   So there are two recordings.  Are there

17   any other recordings you made related to any aspect of

18   the business affairs of FOL?

19              MR. SMITH:  Objection to form.

20              MR. BILLINGS:  Join.

21         A.   There may have been.  I don't remember.

22         Q.   (BY MR. DAWES)  Do you still have any

23   other recordings?

24         A.   If I made another recording, then I would

25   still have it.

1          Q.   Okay.  Has that been provided to your

2   counsel in this case?

3          A.   Yes.

4          Q.   Okay.  All recordings you have have been

5   provided to your counsel, correct?

6          A.   Yes.

7          Q.   Okay.  Do you -- is it a practice of

8   yours to record conversations generally?

9               MR. SMITH:  Objection, form.

10              MR. BILLINGS:  Join.

11         A.   Generally, no, I do not record

12  conversations unless there's an issue and I'm worried

13  about something.

14         Q.   (BY MR. DAWES)  Okay.  So have you

15  recorded any other conversations other than the two

16  you've mentioned this morning?

17              MR. BILLINGS:  Objection to the form.

18              MR. SMITH:  Join.

19         A.   Sorry.  I did not recall.

20         Q.   (BY MR. DAWES)  Have you recorded any --

21  outside of matters concerning FOL, you've already told

22  me you've recorded two.  You don't remember any

23  others, correct?

24              MR. SMITH:  Objection to form.

25              MR. BILLINGS:  Join.

1          A.    Correct.

2          Q.    (BY MR. DAWES)  Do you have other

3   recordings aside from FOL of conversations you have

4   recorded on other matters?

5                MR. BILLINGS:  Objection to the form.

6                MR. SMITH:  Join.

7          A.    I do not recall today.

8          Q.    (BY MR. DAWES)  Okay.

9                (Deposition Exhibit 6 was marked.)

10         Q.    All right.  So if you would take a moment

11   to take a look at Exhibit 6.  Have you seen this

12   document before?

13         A.    No, I have not.

14         Q.    All right.  Have you seen a document that

15   has this look and feel before?

16         A.    Not that I --

17                MR. SMITH:  Objection to form.

18                MR. BILLINGS:  Join.

19         A.    Not that I am aware of.

20         Q.    (BY MR. DAWES)  Have you ever seen --

21   there are a number of escrow summaries like what are

22   attached as Exhibit 6 that have been disclosed in this

23   case.  Is it your testimony you have never seen a

24   document like this?

25                MR. BILLINGS:  Object to the form.

1          A.   It is my testimony I do not recall seeing

2     a document like this.

3          Q.   (BY MR. DAWES)  Okay.  Ever?

4          A.   I do not recall whether I've seen a

5     document like this as I sit here today.

6          Q.   Are you familiar with -- you are familiar

7     with the fact that there were promissory notes,

8     correct, and there was money advanced to FOL in

9     connection with those promissory notes?

10              MR. SMITH:  Objection to form.

11              MR. BILLINGS:  Join.

12         A.   I'm aware that there were promissory

13    notes.

14         Q.   (BY MR. DAWES)  Okay.  And you were aware

15    that proceeds were received by FOL in connection with

16    those notes, correct?

17         A.   I'm aware that FOL received money.

18         Q.   Okay.  When did FOL receive money?

19         A.   I --

20              MR. BILLINGS:  Object to the form.

21         A.   I cannot recall specifically when money

22    was received by FOL.

23         Q.   (BY MR. DAWES)  And what was Alexander

24    Capital's role in connection with FOL's receipt of

25    money or funds?

1                    MR. BILLINGS:  Object to the form.

2                    MR. SMITH:  Join.

3          A.   What do you mean by "what was Alexander

4     Capital's role"?

5          Q.   (BY MR. DAWES)  Well, what was their --

6     do you know what the word role means, r-o-l-e?

7                    MR. SMITH:  Objection to form.

8                    MR. BILLINGS:  Join.

9          A.   So it's a broad word.  So do you mean

10    what they were doing with the money or --

11         Q.   (BY MR. DAWES)  Alexander Capital was

12    hired by FOL to raise debt; is that correct?

13                   MR. BILLINGS:  Object to the form.

14                   MR. SMITH:  Object to the form.

15         A.   I was not an employee at the time when

16    Alexander Capital was hired.

17         Q.   (BY MR. DAWES)  Describe for me what

18    Alexander Capital's role or purpose was vis-a-vis FOL

19    from your perspective as the COO.

20                   MR. SMITH:  Objection to form, asked and

21    answered.  She's already told you, Chris.

22                   MR. BILLINGS:  Join.

23                   THE DEPONENT:  Do I have to answer that?

24                   MR. BILLINGS:  Yeah.

25         A.   So my understanding was that Alexander

1  Capital was supposed to raise money for FOL.

2       Q.   (BY MR. DAWES)  And it did, correct?

3       A.   Yes, it did.

4       Q.   What was the process or how was that

5  money actually received by FOL?

6            MR. BILLINGS:  Object to the form.

7            MR. SMITH:  Join.

8       A.   As you sit here today, I cannot answer

9  that.  I don't know.

10      Q.   (BY MR. DAWES)  Okay.  And you know how

11  there was money that was provided by noteholders,

12  correct?

13      A.   There was money provided by noteholders,

14  yes.

15      Q.   Okay.  And I'm trying to understand what

16  was the mechanism or process by which that money

17  flowed from the noteholders and ultimately got to FOL.

18  Okay?

19      A.   Okay.

20      Q.   So can you describe that process for me?

21      A.   No, I cannot specifically describe that

22  process.  Typically money is wired these days.

23      Q.   Okay.  What is your understanding in

24  terms of how money flowed from noteholders ultimately

25  to FOL?

```
1                MR. BILLINGS:  Object to the form, asked
2     and answered multiple times.
3                MR. SMITH:  Join.
4          A.   I -- okay.  I do not know because I did
5     not deal with the money.
6          Q.   (BY MR. DAWES)  Okay.
7          A.   So as you sit here today, I cannot answer
8     that question.  I don't know.
9          Q.   And that's -- you've never looked into
10    that, correct?
11         A.   I don't recall looking into that
12    specifically.
13               (Deposition Exhibit 7 was marked.)
14         Q.   Are you generally familiar with
15    Exhibit 7?
16         A.   No, I am not generally familiar with
17    Exhibit 7.
18         Q.   Have you ever seen Exhibit 7 before?
19         A.   I have not read through Exhibit 7 before.
20         Q.   Okay.  Have you seen it before?
21         A.   I do not recall if I have even seen it
22    before.
23         Q.   You've heard of its existence, though; is
24    that fair?
25         A.   I have heard of its existence.
```

1          Q.   All right.  And we talked about it a
2     little bit earlier.  What is your understanding of the
3     Equity Exchange Agreement?
4               MR. SMITH:  Objection, form.
5               MR. BILLINGS:  Join.
6          A.   I do not know specifically.  I was not an
7     employee at the time when this was done.
8          Q.   (BY MR. DAWES)  Okay.  Did the issue of
9     the Equity Exchange Agreement ever come up at any
10    point in time while you were the COO of FOL?
11         A.   In what capacity would it have come up?
12         Q.   In any.
13         A.   I don't recall specifically --
14         Q.   Okay.
15         A.   -- as I sit here today.
16         Q.   Do you remember generally?
17         A.   No, I do not remember generally.
18         Q.   Okay.  I take it you don't know who
19    prepared this document?
20         A.   I do not.
21         Q.   All right.  Have you discussed this
22    agreement, Exhibit 7, with other representatives of
23    FOL, be it the executive team, Mr. Landis, anybody
24    else?
25         A.   I do not recall discussing this document

1   with anyone.

2           Q.    If you look at page 17 --

3           A.    Okay.

4           Q.    -- do you recognize Mr. Landis' signature

5   there?

6           A.    I cannot say that that is Mr. Landis'

7   signature.

8           Q.    Okay.  All right.  And have you ever had

9   a discussion with Mr. Landis about Exhibit 7 at any

10  time?

11                MR. SMITH:  Objection to form.

12                MR. BILLINGS:  Join.

13          A.    I don't recall discussing this agreement

14  with Floyd at any time.

15          Q.    (BY MR. DAWES)  And do you recall

16  discussing it with Mr. Benlolo or Mr. Kaplan at any

17  time?

18          A.    No, I do not recall discussing this

19  agreement specifically with them.

20          Q.    Okay.  The -- this agreement refers to

21  certain companies on the first page in the recitals.

22  Do you see that?

23          A.    I do see that.

24          Q.    All right.

25          A.    Well, are they companies or are they

1    individuals?

2         Q.   Well, I'm looking at the first Whereas

3    clause that talks about -- there's the defined term

4    Companies.  Do you see that?

5         A.   Under Definitions?

6         Q.   Under Recitals, the first Whereas clause.

7         A.   Oh.  Oh, okay.  So on page 2?

8         Q.   No, on the first page.

9         A.   Okay.  Recitals.  Okay.  Yeah.

10        Q.   Are you familiar with a company called

11   BTE 2, LLC?

12        A.   I've heard of it.  I don't really know

13   anything about it.

14        Q.   Okay.  You have no idea what its business

15   is, where it's located, who owns it, anything like

16   that, correct?

17        A.   I don't remember, correct.

18        Q.   All right.

19        A.   I don't -- I don't really know.

20        Q.   Does the same hold true for BTE Reed,

21   LLC?

22        A.   Yes.

23        Q.   Does the same hold true with respect to

24   Slichlolo Broadway Retail, LLC?

25        A.   Yes.  I don't recall what these companies

1    are specifically.  I -- looks like they are in Oregon.

2         Q.    Okay.  Are you familiar -- there are a

3    couple of other names on this page.  There's a Shawn

4    Kuruvilla.  Are you familiar with Mr. Kuruvilla?  And

5    I'm probably butchering his name, but . . .

6         A.    I do not know who that is.

7         Q.    How about Craig Adelman?

8         A.    I do not know who that is.

9         Q.    And Michael Conroy?

10        A.    I don't know who that is either.

11        Q.    All right.  And to your knowledge, you've

12   never met any of those folks?

13        A.    To my knowledge or recollection, I have

14   never met them.

15        Q.    As you sit here today now, do you have

16   any recollection of any communications you have had

17   with any person regarding this Exhibit 7, the Equity

18   Exchange Agreement?

19             MR. SMITH:  Objection, form.

20             MR. BILLINGS:  Join.

21        A.    This agreement was done before I was an

22   employee of Floyd's of Leadville, and I was not

23   involved with its creation or -- so that is correct.

24        Q.    (BY MR. DAWES)  Well, I want to -- you

25   know, I could have a conversation with somebody about

1    this document today, and it had nothing to do with

2    forming it, right?

3        A.    Right.

4        Q.    So I want to make sure we're on the same

5    page.  Do you have any recollection, as you sit here

6    now, of any discussions with any person regarding the

7    Equity Exchange Agreement?

8              MR. SMITH:  Objection to form.

9        A.    No.

10             MR. BILLINGS:  Join.

11             THE DEPONENT:  Sorry.  Too fast.

12       A.    No, I do not recall today having a

13   discussion on this document.

14       Q.    (BY MR. DAWES)  At any time, correct?

15       A.    That I recall --

16       Q.    All right.

17       A.    -- at any time.

18       Q.    All right.  Did you -- from really the

19   start of your role as a consultant or adviser for FOL

20   up until now, did you keep any kind of notes,

21   calendar, journal, anything like that related to any

22   of the business affairs of FOL?

23             MR. BILLINGS:  Objection to the form.

24             MR. SMITH:  Join.

25       A.    Not that I recall.

1          Q.   (BY MR. DAWES)  Is it your practice to

2    keep that kind of document?

3          A.   What kind of document?

4          Q.   Well, any kind of notes, calendar,

5    journal, anything like that.

6               MR. SMITH:  Objection to form.

7               MR. BILLINGS:  Join.

8          A.   I don't typically take notes.

9               (Deposition Exhibit 8 was marked.)

10         Q.   (BY MR. DAWES)  Are you familiar with

11   Exhibit 8?

12         A.   Somewhat.

13         Q.   Okay.  And how is it you're familiar with

14   it?

15         A.   I have seen it once, but I did not create

16   it.

17         Q.   Okay.  Who created it?

18         A.   I don't know.

19         Q.   And when did you see it?

20         A.   Yesterday.

21         Q.   Okay.  Is that the first time you have

22   ever seen it?

23         A.   Yes.

24         Q.   Okay.

25         A.   As far as I can remember, yes.

1          Q.    Okay.  All right.  Let's take a look at

2    the second page, which is Redemption 00976.

3          A.    76 or --

4          Q.    Oh, it's 78.  Excuse me.

5          A.    8.  Okay.

6          Q.    So it starts with About Floyd's of

7    Leadville, and it talks about "Seeking funding to

8    purchase a greenhouse complex in Palisade, Colorado,

9    licensed to cultivate marijuana."

10              Are you familiar with that -- that

11   effort?

12         A.    No, I am not.

13         Q.    Okay.  You don't know anything about it?

14         A.    I do not.

15         Q.    Okay.  Is yesterday the first you had

16   ever heard anything about that when you looked at this

17   document?

18         A.    When Floyd started the company, he had

19   mentioned Palisade; but I was never involved directly

20   with anything relating to that -- to Palisade.

21         Q.    Did FOL seek funding to purchase a

22   greenhouse complex in Palisade?

23         A.    I do not know.

24         Q.    Have you ever asked?

25         A.    I have not asked, as far as I can recall.

1          Q.   Do you know who was involved in seeking

2     that funding?

3          A.   I do not.

4               MR. SMITH:  Objection to form.

5               MR. BILLINGS:  Join.

6               THE DEPONENT:  Sorry.

7          A.   I do not know.

8          Q.   (BY MR. DAWES)  And is it true that FOL

9     received a dispensary license in Palisade?

10         A.   I do not know.

11         Q.   So you don't know when that was received?

12         A.   No, I don't know.

13         Q.   Because you don't know if one was

14    received or not?

15         A.   That is correct, I don't know if they

16    received one.

17         Q.   All right.  And the third bullet point

18    there talks about being under contract to purchase an

19    existing marijuana dispensary in Leadville, Colorado.

20    Do you know when that contract was entered into?

21         A.   I do not.

22         Q.   Do you know when it was closed?

23              MR. SMITH:  Objection, form.

24              MR. BILLINGS:  Join.

25         A.   I do not.

1          Q.    (BY MR. DAWES)  Do you know what the
2    existing marijuana dispensary was?
3          A.    What -- sorry.  Say that again.
4          Q.    Yeah.  Do you know what the existing
5    marijuana dispensary was that's referenced in that
6    bullet point?
7          A.    No, I can't talk to what they meant in
8    that bullet.
9          Q.    Are you familiar with a contract to
10   purchase a marijuana dispensary in Leadville?
11         A.    I'm not familiar with a contract to
12   purchase a dispensary.
13         Q.    Are you familiar with such an
14   acquisition?
15         A.    There is a dispensary in Leadville.
16         Q.    Okay.  And when was that acquired?
17               MR. BILLINGS:  Objection to form.
18         A.    I do not know when it was acquired.
19         Q.    (BY MR. DAWES)  All right.  If we look at
20   the next page, this identifies the management team.
21   And I know you were not comfortable with that term.
22   You understand that Floyd's held out, among others,
23   you as part of the management team, correct?
24               MR. BILLINGS:  Objection to the form.
25         A.    So, no, I don't know why I was added on

1    there.  I had nothing to do with making this deck, and

2    so I don't know who put me on there.

3         Q.   (BY MR. DAWES)  Okay.  All right.  And

4    you don't know who prepared this document for FOL,

5    correct?

6         A.   That is correct.  I do not know.

7         Q.   All right.  And do you know why it was

8    prepared?

9              MR. SMITH:  Objection, form.

10             MR. BILLINGS:  Join.

11        A.   No, I do not.

12        Q.   (BY MR. DAWES)  Okay.  Is the information

13   on 979 under the Management Team, is it accurate to

14   your knowledge?

15             MR. BILLINGS:  Objection to the form.

16             MR. SMITH:  Join.

17        A.   Which information are you asking about?

18        Q.   (BY MR. DAWES)  All of it.  What is

19   inaccurate on this page of 979?

20             MR. SMITH:  Objection to form.

21             MR. BILLINGS:  Join.

22        A.   I would not characterize myself as being

23   part of the management team at the time.

24        Q.   (BY MR. DAWES)  When you say, "at the

25   time," what was the time?

1          A.   I don't know.  Does it have a date on the
2    deck?
3          Q.   Well, you have said you would not
4    characterize yourself as part of the management team
5    at the time.  And I'm trying to understand what time
6    you were referring to in your testimony.
7          A.   I -- because I had nothing to do with
8    this deck.  And I had not seen it, and I don't know
9    who created it.  I am guessing that this was a very
10   early deck that was created.
11         Q.   So one thing, too, that I -- you are
12   giving sworn testimony under oath.
13         A.   Yes.
14         Q.   And I'm not asking you to guess, and I'm
15   sure counsel doesn't want you to guess.
16         A.   Okay.
17         Q.   If I was asking for a reasonable
18   guesstimate, I would ask for that; but please don't
19   guess.
20              MR. SMITH:  Objection to form.  We'll
21   take care of that aspect of it, Chris, thanks.
22         A.   So what is it that you want me to not
23   guess on?
24         Q.   (BY MR. DAWES)  I don't want you to guess
25   anything in any part of sworn testimony.

1          MR. SMITH:  As your counsel, Alex, you

2   just answer the questions to the best of your ability.

3          THE DEPONENT:  Okay.

4      Q.   (BY MR. DAWES)  So when was Exhibit 8

5   prepared?

6      A.   I do not know.

7      Q.   And your testimony is you don't know who

8   prepared it?

9      A.   I do not know who prepared this.

10      Q.   All right.  Do you know who this was

11   provided to?

12      A.   I do not know who this was provided to.

13      Q.   Do you know that this was provided to

14   noteholders?

15          MR. SMITH:  Objection to form.

16          MR. BILLINGS:  Join.

17      A.   No, I do not know.

18      Q.   (BY MR. DAWES)  All right.  The folks

19   identified as members of the management team on

20   page 979 --

21      A.   Um-hum.

22      Q.   -- other than yourself, are the remaining

23   folks on that page still with FOL?

24      A.   I do not know because I don't -- I'm not

25   an employee of Floyd's of Leadville anymore.

1          Q.   Do you ever discuss the business affairs

2     of FOL with Mr. Landis?

3               MR. SMITH:  Objection to form.

4               MR. BILLINGS:  Join.

5          A.   Sometimes we do still talk about the

6     affairs.

7               Q.   (BY MR. DAWES)  Is Mr. Landis still with

8     FOL?

9          A.   Yes.

10         Q.   Okay.  How about Mr. Thompson?

11         A.   I don't know.

12         Q.   Mr. Ryan?

13         A.   I don't know.

14         Q.   Mr. Browne?

15         A.   I do not know.

16         Q.   And Mr. Zabriskie?

17         A.   And I don't know either.

18         Q.   Okay.  Let me ask you to take a look at

19    Redemption 981, which has projected financials.  Are

20    you familiar with these projected financials?

21         A.   No, I am not familiar with them.

22         Q.   Okay.  And there is discussion of the

23    greenhouse grow facility in Palisade there on this

24    page as well, correct?

25         A.   That's correct, it's on the page.

1          Q.   Right.  And your sworn testimony is you

2    don't know anything about it?

3               MR. SMITH:  Object.

4          Q.   (BY MR. DAWES)  Nor have you ever,

5    correct?

6               MR. SMITH:  Object.

7               MR. BILLINGS:  Join.

8          A.   What's "it"?

9          Q.   (BY MR. DAWES)  The greenhouse grow

10   facility in Palisade, Colorado.

11         A.   I do not know anything about the

12   greenhouse grow facility in Palisade, Colorado, as I

13   sit here today.

14         Q.   Okay.  Now, this -- this document talks

15   about the fact that there is -- the Palisade,

16   Colorado, property is currently under contract with

17   FOL.  Do you see that, the second bullet point?

18         A.   I see it.

19         Q.   And I take it you don't know when it was

20   placed under contract?

21         A.   I do not know, no.

22         Q.   Or with whom, correct?

23         A.   Correct.

24         Q.   Okay.  And you don't know if there was a

25   broker involved?

1          A.   I do not know that.

2          Q.   All right.  And you don't know who the --

3     who prepared the projected financials, correct?

4          A.   I -- that is correct, I do not know.

5          Q.   And if we look at the total projected

6     financials, the current is at 1.52 million, the

7     projection out to 2020 was 28.22 million, correct?

8          A.   That's what it says on the page.

9          Q.   Okay.  How did those projections align

10    with FOL's performance while you were COO?

11               MR. BILLINGS:  Objection to the form.

12               MR. SMITH:  Join.

13         A.   I don't know.

14         Q.   (BY MR. DAWES)  And why don't you know?

15               MR. SMITH:  Objection to the form.

16               MR. BILLINGS:  Join.

17         A.   I don't understand why we would compare

18    these financials to FOL, and I -- first of all.  And

19    then I don't understand or know what the numbers are

20    at FOL.

21         Q.   (BY MR. DAWES)  You don't know what the

22    numbers were while you were at COO?

23         A.   I do not recall the numbers specifically,

24    no.

25         Q.   All right.  So you're not in a position

1   to comment on how the actual numbers align with what

2   we see on this particular exhibit in the projected

3   financials, correct?

4              MR. SMITH:  Object to form.

5        A.    Correct.

6              MR. BILLINGS:  Join.

7        A.    Sorry.  I'm absolutely not in a position.

8   I don't know who put these numbers together.  I cannot

9   talk to them, and I don't know who put the deck

10  together; so I cannot talk to these numbers in any

11  way.

12       Q.    (BY MR. DAWES)  You would agree that it's

13  important for FOL to share accurate information,

14  correct?

15             MR. SMITH:  Objection, form.

16             MR. BILLINGS:  Join.

17       A.    Yes.

18       Q.    (BY MR. DAWES)  When information is being

19  provided to noteholders, for example, it's important

20  that that information be true and correct, right?

21             MR. SMITH:  Objection to form.

22             MR. BILLINGS:  Join.

23       A.    Any information provided should be

24  correct.

25       Q.    (BY MR. DAWES)  And it's important to

1    make sure it is correct, right?

2              MR. SMITH:  Objection to form.

3              MR. BILLINGS:  Join.

4         A.   So are you talking about financials or --

5         Q.   (BY MR. DAWES)  I'm talking -- sure, yes.

6         A.   -- projections?  Or which ones?

7         Q.   Let's talk financials first off.

8         A.   So financials should be accurate.

9         Q.   Statements of assets, correct?

10             MR. SMITH:  Objection to form.

11             MR. BILLINGS:  Join.

12        Q.   (BY MR. DAWES)  Those should be accurate?

13        A.   Well, what statement of assets?

14        Q.   Any statement of assets.

15             MR. SMITH:  Objection to the form.

16             MR. BILLINGS:  Join.

17        A.   They should -- a statement of assets

18   should be accurate.

19        Q.   (BY MR. DAWES)  And complete?

20             MR. BILLINGS:  Objection to form.

21        A.   I don't know what that means.

22        Q.   (BY MR. DAWES)  You don't know what

23   "complete" means?

24        A.   Generally speaking, yeah, statements of

25   assets should be accurate and complete.

1                 MR. SMITH:  Objection to form.

2                 MR. BILLINGS:  Join.

3        Q.  (BY MR. DAWES)  That is not an

4  earth-shattering revelation, right?

5        A.  It is --

6                 MR. BILLINGS:  Objection to form.

7                 MR. SMITH:  Join.

8        A.  Not that I am aware of.

9        Q.  (BY MR. DAWES)  Okay.  All right.  And

10  when FOL is reporting on financial affairs of FOL to

11  noteholders, it's important that the information be

12  true, correct, and complete, correct?

13                MR. BILLINGS:  Objection to the form.

14                MR. SMITH:  Join.

15       A.  I'm not sure why I'm speaking to what FOL

16  is doing or not doing.

17       Q.  (BY MR. DAWES)  Can you answer the

18  question?

19       A.  Okay.  So can you repeat the question?

20       Q.  I can.  It's important -- when FOL is

21  reporting on financial affairs of FOL to noteholders,

22  it's important that the information be true, correct,

23  and complete, correct?

24                MR. BILLINGS:  Objection to the form.

25                MR. SMITH:  Join.

1          A.    It is important that any company report

2    financials accurately.

3          Q.    (BY MR. DAWES)  Including FOL, right?

4          A.    Including any company.

5          Q.    Now, this document, if we look -- I think

6    you told me you didn't know what the timing was on

7    this document, correct?

8          A.    I do not know the specific date of this

9    document.

10         Q.    Right.  Would you -- there are references

11   on, for example, Redemption 981 where the -- it looks

12   like the projections are in 2018, 2019, and '20,

13   correct?

14         A.    According to the slide, that's what it

15   seems that it's saying.

16         Q.    Right.  And it goes on to talk about the

17   2017 Colorado cannabis industry in that first bullet

18   point, correct?

19         A.    Yes.

20         Q.    All right.  Does that suggest to you that

21   this document was prepared sometime in 2017?

22         MR. SMITH:  Do you want her to guess now?

23         A.    Can you repeat the question?

24         Q.    (BY MR. DAWES)  Yes.  Does that suggest

25   this document was prepared sometime in 2017?

```
 1                    MR. SMITH:  Objection, form.

 2                    MR. BILLINGS:  Join.

 3          A.    Well, based on the sentence "2017

 4   Colorado cannabis industry is valued at 1.4 billion,"

 5   that just tells me that that's what the Colorado

 6   cannabis industry was valued at in 2017.

 7          Q.    (BY MR. DAWES)  How about Redemption 985?

 8          A.    Okay.

 9          Q.    This -- it talks about an Investment

10   Sought.  Do you see that?

11          A.    Yes.

12          Q.    And when is the Investment Sought -- it's

13   being sought in connection with Q4 2017, correct?

14          A.    From what it says on the slide.

15          Q.    Does that suggest to you this slide was

16   prepared sometime prior to the fourth quarter of 2017?

17                    MR. SMITH:  ^Objection to the form.

18                    MR. BILLINGS:  Objection to the form.

19                    MR. SMITH:  Join.

20          A.    I cannot speak to that.  I don't know.

21          Q.    (BY MR. DAWES)  No idea as you sit here

22   now, right?

23          A.    I do not know who made this deck or why

24   or what it's trying to say.  I cannot speak to that.

25          Q.    All right.  And do you know if this was
```

```
1    prepared sometime after 2017, can you explain the
2    passage seeking 3.6 million in financing by Q4 2017?
3              MR. SMITH:  Objection to form.
4              MR. BILLINGS:  Join.
5         A.   No, I cannot speak to that.
6         Q.   (BY MR. DAWES)  Okay.
7              (Deposition Exhibit 9 was marked.)
8         Q.   Are you familiar with 5217 RE LLC?
9              MR. BILLINGS:  Objection to the form.
10        A.   I don't remember right now what it is.
11        Q.   (BY MR. DAWES)  Okay.  All right.  So as
12   you scroll back, let's see if we can stipulate some
13   recollection.  If you look at the very last page --
14        A.   Okay.
15        Q.   -- there's an Exhibit B.
16        A.   Um-hum.
17        Q.   Do you see that?
18        A.   Um-hum.
19        Q.   And do you see your name there?
20        A.   Yes.
21        Q.   All right.  Does that stipulate some
22   recollection for you as to what 5217 RE, LLC, is?
23        A.   Yes.
24        Q.   All right.  What is it?
25              MR. BILLINGS:  Objection to the form.
```

1       A.   I'm not sure what specifically 5217 RE,

2  LLC, is other than an LLC.

3       Q.   (BY MR. DAWES)  Okay.  Do you know what

4  its business is?

5       A.   I'm not sure specifically what its

6  business is.

7       Q.   Do you know where it's located?

8       A.   In Oregon, I think.

9       Q.   When was the first you ever heard of

10  5217 RE, LLC?

11       A.   I cannot recall that.

12       Q.   Okay.  How was it you became a member in

13  5217 RE, LLC?

14            MR. BILLINGS:  Objection to the form.

15       A.   I invested in a real estate deal.

16       Q.   (BY MR. DAWES)  Okay.  And how was that

17  real estate deal presented to you?

18       A.   I understood the real estate deal to be

19  that I would invest money in it.

20       Q.   Okay.  So my question was how was the

21  real estate deal presented to you?

22       A.   That I would invest money in the real

23  estate deal.

24       Q.   Who presented the deal to you?

25       A.   I don't recall specifically.

1          Q.   Okay.  Do you recall generally?

2          A.   Generally, I believe it was Andrew

3     Kaplan.

4          Q.   Okay.  And what was the -- what did he

5     tell you in that regard?

6          A.   I don't remember specifically.

7          Q.   Okay.  And the $127,500, that's what you

8     invested in this entity?

9          A.   I'm not sure exactly of the amount; but

10    if that's what it was because it says it on the

11    document; but I don't recall specifically --

12         Q.   Okay.

13         A.   -- the amount.

14         Q.   And where did that come from?

15         A.   That was personal money.

16         Q.   That you held in your personal bank

17    account?

18         A.   Correct.

19         Q.   All right.  And had -- it did not come

20    from FOL, correct?

21         A.   No, it did not.

22         Q.   Okay.  And as you sit here now, you don't

23    know what the actual amount was?

24              MR. SMITH:  Objection to form.

25              MR. BILLINGS:  Join.

```
1           A.   I don't remember specifically the amount.
2           Q.   (BY MR. DAWES)  Okay.  All right.  And
3    have you been involved in any of the business affairs
4    of 5217 RE, LLC?
5           A.   Have not.
6           Q.   Where was the real estate?
7           A.   As far as I can remember, the real estate
8    was in Oregon.
9           Q.   Can you be any more specific than that?
10          A.   No, I don't remember exactly.
11          Q.   Do you remember what type of real estate
12   it was?
13          A.   No.
14          Q.   Was it involved in a dispensary business?
15          A.   I -- I don't recall.
16          Q.   Was it residential, commercial,
17   warehouse, any recollection?
18               MR. SMITH:  Objection, form.
19               MR. BILLINGS:  Join.
20          Q.   (BY MR. DAWES)  Tell me about the due
21   diligence you did before you made the investment in
22   5217 RE, LLC.
23          A.   I -- I don't recall today.
24          Q.   Did you do any due diligence?
25          A.   I do not recall today.
```

1          Q.   What's the current status of your

2     investment in 5217 RE, LLC?

3               MR. BILLINGS:  Objection to the form.

4               MR. SMITH:  Join.

5          A.   What do you mean by the current status?

6          Q.   (BY MR. DAWES)  Are you still a member?

7          A.   Yes, I believe I am.

8          Q.   And have you received any distributions

9     of any sort out of 5217 RE, LLC?

10         A.   Yes, they send periodic checks.

11         Q.   And who is the manager of the entity?

12         A.   I do not recall.

13         Q.   All right.  When you say "they send

14    periodic checks," who is that?

15         A.   I don't know specific -- I don't know.

16         Q.   And to whose attention do the checks go?

17         A.   To me.

18         Q.   All right.  And as you sit here now, you

19    don't know what -- what the investment actually was,

20    correct?

21              MR. SMITH:  Objection, form.

22              MR. BILLINGS:  Join.

23         Q.   (BY MR. DAWES)  Other than some piece of

24    real estate in Oregon?

25              MR. SMITH:  Objection to form.

1              MR. BILLINGS:  Join.

2         A.   It's an investment in real estate in

3   Oregon.

4         Q.   (BY MR. DAWES)  Okay.  All right.

5              (Deposition Exhibit 10 was marked.)

6         Q.   Are you familiar with Exhibit 10?

7         A.   I -- I don't specifically remember this

8   email.

9         Q.   Okay.  Do you recognize it as an email

10  from Mr. Landis?

11        A.   Yes.

12        Q.   To a number of folks, including yourself,

13  correct?

14        A.   Correct.

15        Q.   All right.  And this is at the end of

16  2018, correct?

17        A.   Well, the email says 12/21/2018.

18        Q.   Okay.  Do you have any reason to doubt

19  that date?

20        A.   No.

21        Q.   Okay.  So there's -- in the second

22  paragraph, there's a -- the second sentence says,

23  "Alex and I had to sell 3 percent of our founders

24  shares to Sunny."

25             Do you see that?

```
1          A.   No, where is it?  Oh, I --

2          Q.   The second paragraph.

3          A.   The third line?

4          Q.   Correct.

5          A.   Okay.

6          Q.   Correct.  So do you know who Sunny is?

7          A.   I remember Sunny as being someone who

8    claimed to be in the convenience store industry in

9    New York City.

10         Q.   Okay.  Does Sunny have a last name?

11         A.   I don't know.

12         Q.   Okay.  Is that -- is Sunny's first name

13   really Sunny or is that a nickname?

14         A.   I don't know.

15         Q.   Okay.  All right.  And Mr. Landis is

16   talking about your -- your founders shares.  Do you

17   see that?

18         A.   I see that.

19         Q.   Okay.  What founders shares did you have

20   in FOL?

21              MR. BILLINGS:  Objection to the form.

22              MR. SMITH:  Join.

23         A.   I -- I don't recall --

24         Q.   (BY MR. DAWES)  Did you have --

25         A.   -- today.
```

1          Q.   -- have founders shares in FOL?

2          A.   I do not recall today.  I don't know.

3          Q.   Have you ever had an ownership interest

4     in FOL?

5          A.   I don't know.

6          Q.   Do you have an interest in FOL right now?

7          A.   I don't know for sure.

8          Q.   Have you ever sold or transferred an

9     interest in FOL?

10         A.   I do not recall that.

11         Q.   Have you ever seen founders shares?

12         A.   I don't think so.

13         Q.   What is a founder share?

14              MR. SMITH:  Objection, form.

15              MR. BILLINGS:  Join.

16         A.   I'm not sure.

17         Q.   (BY MR. DAWES)  Have you ever held a

18    founder share of anything in your life?

19              MR. BILLINGS:  Objection to the form.

20         A.   I'm not sure.

21         Q.   (BY MR. DAWES)  And, again, as you sit

22    here now, you don't know if you have ever had any

23    ownership interest in FOL, correct?

24              MR. SMITH:  Objection, form, asked and

25    answered.

```
 1              MR. BILLINGS:  Join.

 2         A.   That is correct, I don't know.

 3         Q.   (BY MR. DAWES)  Okay.  Did you have any

 4    discussions with anybody about Exhibit 10?

 5         A.   Not that I recall.

 6         Q.   Okay.  And reading Exhibit 10 doesn't

 7    stimulate any further recollection on the issue,

 8    correct?

 9         A.   On what issue?

10         Q.   Its contents.

11         A.   Well, it's a lot of contents.  I'm not

12    sure which one you're referring to.

13         Q.   Well, let's focus in on the founders

14    shares.

15         A.   Okay.

16         Q.   Does that stimulate any recollection for

17    you?

18         A.   No, it does not.  I don't remember --

19         Q.   Okay.

20         A.   -- sitting here today.

21         Q.   Are you familiar with an entity known as

22    Valued Operations, LLC?

23         A.   I don't recall.

24         Q.   Okay.  Have you ever heard of it?

25         A.   I don't recall if I have.
```

1          Q.   Are you familiar with any business

2    operations of FOL or any of the Oregon entities we've

3    talked about today in Colton, Oregon?

4          A.   Are you -- can you repeat the question?

5          Q.   Sure.  Are you familiar with any business

6    operations of FOL or any of the Oregon entities we've

7    talked about today in Colton, Oregon?

8               MR. BILLINGS:  Objection to the form.

9          A.   I -- I do not recall.  I don't know where

10   Colton, Oregon, is.

11         Q.   (BY MR. DAWES)  Have you ever heard of

12   Colton, Oregon, before today?

13         A.   I have not.

14         Q.   Are you familiar with Valued Operations,

15   LLC?

16              MR. SMITH:  Object.

17         Q.   (BY MR. DAWES)  Have you ever heard of

18   that?

19              MR. SMITH:  Objection to form.

20         A.   I don't recall.

21         Q.   (BY MR. DAWES)  Are you familiar with a

22   property located on South Green Mountain Road in

23   Oregon?  Does that ring a bell for you at all?

24         A.   I do not recall that address.

25         Q.   Have you ever heard of an entity known as

1    GMC, LLC?

2           A.    That does not ring a bell.

3           Q.    During your tenure as either a consultant

4    or COO of FOL, did you have any dealings with the

5    Oregon Liquor Control Commission?

6           A.    Not that I recall, no.

7           Q.    Were you ever consulted about matters

8    involving the Oregon Liquor Control Commission by

9    anybody?

10          A.    Not that I recall.  I was not.

11                (Deposition Exhibit 11 was marked.)

12          Q.    Do you recognize Exhibit 11 as an email

13   from yourself to Mr. Hurley forwarding a Floyd's of

14   Leadville deck?

15          A.    I can see, yes, that it's an email from

16   me to Greg Hurley.

17          Q.    And it includes a deck for FOL?

18          A.    Yes, correct.

19          Q.    All right.  All right.  And you state,

20   "Greg, Frank gave me your email to send you the PDF of

21   our deck.  Thank you for your consideration."

22                Do you recall any discussions with

23   Mr. DiMartini regarding this deck or the fact that you

24   were going to be sending it to Mr. Hurley?

25          A.    The only thing I recall is that Frank

1    asked me to send a deck to Greg Hurley.

2        Q.   Okay.  And you did?

3        A.   Per the email you're showing me in

4    Exhibit 11, I did.

5        Q.   Okay.  Do you have any independent

6    recollection of doing that?

7        A.   I don't really remember sending it.

8        Q.   Okay.  All right.  And where did you get

9    the deck?

10       A.   I do not remember where I got the deck.

11       Q.   Okay.  Do you recognize the deck?

12       A.   I do recognize the deck.

13       Q.   Okay.  And were you involved in

14   preparation of this deck?

15       A.   I had input in preparing the deck.

16       Q.   Who else had input in preparing the deck?

17       A.   I don't remember specifically.  There

18   were different people involved.

19       Q.   Other than yourself, can you identify any

20   -- any specific person?

21       A.   The only thing I remember was that we had

22   a marketing firm helping us put the deck together.

23       Q.   Okay.  What about Mr. Ryan?

24       A.   I don't recall.

25       Q.   What about Mr. Landis?

1          A.    I don't recall.

2          Q.    All right.  Again, it's important for all

3     of this information in this deck to be true and

4     correct, correct?

5                MR. SMITH:  Objection to form.

6                MR. BILLINGS:  Join.

7          A.    Yes, the information should be accurate.

8          Q.    (BY MR. DAWES)  All right.  And did you

9     understand why Mr. Hurley wanted to see the deck?

10         A.    No, I don't remember why.

11         Q.    Why does a company like FOL put together

12    a deck?

13               MR. BILLINGS:  Objection to the form.

14               MR. SMITH:  Join.

15         A.    I don't know why.  There are a lot of

16    different reasons.

17         Q.    (BY MR. DAWES)  What are -- what are the

18    different reasons companies like FOL put together a

19    deck?

20         A.    I can provide some examples.  One example

21    would be for marketing purposes.

22         Q.    Um-hum.

23         A.    To get new customers.

24         Q.    Um-hum.  Can you think of any other

25    reasons?

1           A.    Not right now.

2           Q.    Okay.  Was -- was Mr. Hurley a potential

3     customer of FOL?

4           A.    I don't recall what his role was at the

5     time in 2019.

6           Q.    Okay.

7           A.    March 7th, 2019.

8           Q.    If -- if you look at 9 -- Redemption

9     934 --

10          A.    Okay.

11          Q.    -- that's the consolidated 2018 CBD

12    results.

13          A.    Yes.

14          Q.    And as COO -- former COO of FOL, can you

15    tell me what is depicted here on that page?

16              MR. SMITH:  Objection to form.

17              MR. BILLINGS:  Join.

18          A.    I cannot speculate as to what the chart

19    was supposed to mean because I did not put together

20    this chart.

21          Q.    (BY MR. DAWES)  Okay.  Is it true for you

22    to understand the chart you have to have been the one

23    to prepare it?

24              MR. SMITH:  Objection, form.

25              MR. BILLINGS:  Join.

1          A.   I don't -- I don't understand your
2    question.
3          Q.   (BY MR. DAWES)  You said you don't
4    understand it because you didn't prepare it --
5          A.   No.
6          Q.   -- true?
7          A.   No, I said I cannot speculate on what
8    this chart was supposed to mean.
9          Q.   What does it mean?
10              MR. BILLINGS:  Objection to the form.
11              MR. SMITH:  Join.
12         A.   Well, the title says 2018 CBD Growth.
13         Q.   (BY MR. DAWES)  Um-hum.  Okay.  And it's
14   important for this information to be accurate,
15   correct?
16              MR. SMITH:  Objection, form.
17              MR. BILLINGS:  Join.
18         A.   I presume, yes, the information should be
19   accurate.
20         Q.   (BY MR. DAWES)  And if we look at the
21   next page, Redemption 935 --
22         A.   Yeah.
23         Q.   -- the same thing, correct?
24         A.   The same thing what?
25         Q.   It also is important for it to be

1    accurate and complete, correct?

2              MR. SMITH:  Objection, form.

3              MR. BILLINGS:  Join.

4         A.   The information should be accurate and

5    complete.

6         Q.   (BY MR. DAWES)  Okay.  All right.  And if

7    we look at Redemption 938 --

8         A.   Although I'd like to point out on this

9    slide, it says, "Projected."  So projected numbers

10   should be accurate and complete, but they are

11   projections.

12        Q.   Okay.

13        A.   Which one am I looking at?

14        Q.   938.

15        A.   938.  Okay.

16        Q.   All right.  And this is under Steady

17   Revenue and Growth, right?

18        A.   Yes.

19        Q.   All right.  And this indicates there are

20   currently monthly revenues of about 625,000, correct?

21        A.   That's what the first bullet says.

22        Q.   Is that true?

23             MR. SMITH:  Objection, form.

24             MR. BILLINGS:  Join.

25        A.   I do not know.

1        Q.   (BY MR. DAWES)  All right.  This also
2   identifies three dispensaries in Portland, Oregon?
3             MR. BILLINGS:  Objection, misstates the
4   document.
5             MR. SMITH:  Join.
6        A.   It says three in Portland, Oregon, and
7   one in Leadville, Colorado.
8        Q.   (BY MR. DAWES)  Where is the one in
9   Leadville, Colorado?
10       A.   In Leadville, Colorado.
11       Q.   Do you know specifically where it is?
12       A.   No.
13       Q.   Have you been to Leadville?
14       A.   I have been to Leadville.
15       Q.   Okay.  All right.  But you're not certain
16  where the dispensary is in Leadville?
17       A.   I don't recall the address of the
18  Leadville dispensary.
19       Q.   Okay.  And where are the three
20  dispensaries in Portland, Oregon?  Where are they
21  located?
22       A.   I don't know specifically the addresses
23  of Portland, Oregon, dispensaries.
24       Q.   Do you know the names?
25       A.   I know that there were, at one point,

1    three dispensaries with the brand name Floyd's Fine

2    Cannabis.

3              Q.    And where were they?

4              A.    I don't know the addresses specifically.

5              Q.    And those were owned by FOL, correct?

6                    MR. SMITH:  Objection to the form.

7                    MR. BILLINGS:  Objection to the form.

8                    MR. MURRAY:  Objection to the form.

9              Q.    (BY MR. DAWES)  Is that the -- what are

10   the three Portland Oregon dispensaries identified in

11   Exhibit 11?

12                   MR. BILLINGS:  Objection to the form.

13                   MR. SMITH:  Join.

14             A.    I don't know.

15             Q.    (BY MR. DAWES)  Did you ever ask?

16             A.    About this specifically, the deck?  This

17   line in the deck?

18             Q.    Sure.  Let's start there, sure.

19             A.    I don't recall specifically asking about

20   this line.

21             Q.    Did you ever ask about the three Portland

22   dispensaries at any time?

23             A.    I do not recall, as I sit here today,

24   whether I asked about that.

25             Q.    And as you sit here now, you don't know

1    which three dispensaries are being referenced in this

2    bullet point, correct?

3          A.    I cannot say what those three Portland

4    dispensaries are referring to specifically in this

5    deck.

6          Q.    Can you refer to what they are generally?

7          A.    I'm not sure.

8          Q.    Okay.  All right.  This goes on to talk

9    about cultivation, "The first successful crop in

10   Colorado in an outdoor growth."  Do you see that?

11         A.    I do see that.

12         Q.    All right.  Where in Colorado?

13         A.    I do not know.

14         Q.    Do you know the name of the outdoor grow?

15         A.    No, I do not.

16         Q.    Do you know the town?

17         A.    No, I do not.

18         Q.    The county?

19         A.    No.

20         Q.    It goes on to state that FOL recently

21   bought a 6-acre cultivation in Oregon.  Where was that

22   6-acre cultivation in Oregon located?

23                MR. SMITH:  Objection to form.

24                MR. BILLINGS:  Join.

25         A.    I do not know the location.

1        Q.  (BY MR. DAWES)  Do you know the county?

2        A.  No, I do not know the county.

3        Q.  Do you know what the 6-acre cultivation

4  is called?

5        A.  No, I do not.

6        Q.  Do you know -- it says it was recently

7  bought.  Do you know specifically when it was bought?

8        A.  No, it does not have a date on it.  I

9  don't know.

10       Q.  Do you know who handled that purchase

11  transaction?

12       A.  I know that it was not me.

13       Q.  Okay.  Do you know who it was?

14       A.  No, I do not recall.

15       Q.  All right.  Do you know what the purchase

16  price was?

17       A.  No --

18       Q.  Do you know --

19       A.  -- I do not.

20       Q.  -- what the terms were?

21       A.  I do not recall the purchase price, and I

22  do not recall or know what the terms were.

23       Q.  Have you seen purchase agreement

24  documentation?

25       A.  I don't recall if I saw purchase

1    documentation.  And I'm not sure what it's referring

2    to specifically, so I can't say.

3            Q.   Do you know what the current status of

4    the six-acre cultivation in Oregon is?

5            A.   I do not recall.

6            Q.   Are you able to tell me what its

7    operations were for any period during which you were

8    COO of FOL?

9            A.   I cannot recall.

10           Q.   Okay.  Do you know what income was

11   generated from the six-acre cultivation purchased in

12   Oregon?

13           A.   No, I cannot -- I do not know today or

14   recall what that number would be.

15           Q.   Have you ever discussed the 6-acre

16   cultivation with anybody?

17           A.   Not that I recall.

18           Q.   Okay.  So if we look at Redemption 947,

19   here we have FOL in the deck that you sent to

20   Mr. Hurley identifying the executive team, correct?

21           A.   It says The Executive Team on this slide.

22           Q.   All right.  And, again, it's important

23   for this information to be true and accurate, right?

24                MR. SMITH:  Objection, form.

25                MR. BILLINGS:  Join.

1      A.   I would say that it's important for
2  information to be accurate on materials.
3      Q.   (BY MR. DAWES)  Right.  So who is the
4  first member of the executive team?
5      A.   It says Floyd Landis.
6      Q.   And the second member?
7      A.   It says Alexander Merle.
8      Q.   And it identifies you as president and
9  COO, correct?
10     A.   It does.
11     Q.   And you are -- I think from your
12 statement right at the beginning this morning, that's
13 false, you were never the president, correct?
14               MR. SMITH:  Objection to form.
15               MR. BILLINGS:  Objection to form.
16     A.   I was chief operating officer.
17     Q.   (BY MR. DAWES)  Okay.  Is it a false
18 statement to hold you out as having been the president
19 of FOL?
20               MR. SMITH:  Objection to form.
21               MR. BILLINGS:  Objection to form.
22     A.   I cannot say whether that was false.
23     Q.   (BY MR. DAWES)  It was never -- you were
24 never the president, correct, of FOL?
25     A.   I never thought of myself as president of

```
1    FOL.

2           Q.   Were you ever the president of FOL?

3                MR. BILLINGS:  Objection to the form.

4           A.   I never thought of myself as president of

5    FOL.

6           Q.   (BY MR. DAWES)  I'm not interested in

7    what you thought.  I'm asking were you ever the

8    president of FOL?

9                MR. BILLINGS:  Objection to form.

10               MR. SMITH:  Objection to form.

11          A.   I think it is important I never viewed

12   myself as president of FOL.

13          Q.   (BY MR. DAWES)  Did others?

14          A.   I can't speak for others.  I don't know.

15          Q.   Was this an accurate depiction of the

16   executive team, to describe you as the president and

17   chief operating officer of FOL?

18               MR. SMITH:  Objection, form.

19               MR. BILLINGS:  Join.

20          A.   I don't know why it says president and

21   chief operating officer.  I don't know who wrote that.

22   I don't know why it's there.

23          Q.   (BY MR. DAWES)  Is the rest of the

24   information set out in the -- on page 948 about your

25   background all true and accurate?
```

1         A.    Let me confirm and read it.  Yes, it is

2    accurate.

3         Q.    And the rest of the folks on the

4    executive team were Mr. Ryan, Mr. Thompson, and

5    Mr. Bell, correct?

6         A.    That's what it says in the deck.

7         Q.    Okay.  And are you -- is that not true?

8              MR. SMITH:  Objection, form.

9              MR. BILLINGS:  Join.

10        A.    What's not true?

11        Q.    (BY MR. DAWES)  Those are the members of

12   the executive team, are they not?

13             MR. BILLINGS:  Objection to the form.

14             MR. SMITH:  Join.

15        A.    They were considered sometimes members of

16   the executive team.  And that's what it says in the

17   deck.

18        Q.    (BY MR. DAWES)  Right.  And what is in

19   the deck is accurate about that, correct?

20        A.    Yes, the deck is accurate about that.

21        Q.    Now, if you need more information about

22   this deck, who would be the right person to contact?

23        A.    I'm not sure.

24        Q.    Okay.  Would it be Alex Merle, president

25   and COO?

1          A.    I'm not sure who you're referring would

2    need to call the person.

3          Q.    Well, the very last page of this document

4    says, "For more information, contact Alex Merle,

5    president and COO," correct?

6          A.    That's what it says on the deck, yeah.

7          Q.    And FOL is inviting questions to be

8    fielded by you as president and COO there, correct?

9                MR. SMITH:  Objection to form.

10               MR. BILLINGS:  Join.

11         A.    That's what it says for more information,

12   contact me.

13         Q.    (BY MR. DAWES)  Right.  President and

14   COO?

15         A.    That's what it says on the deck.

16         Q.    Right.  Did you ever tell anyone that any

17   of the information in Exhibit 11 was inaccurate or

18   can't be relied on?

19               MR. SMITH:  Objection to form.

20               MR. BILLINGS:  Join.

21         A.    I cannot recall what I may or may not

22   have said about the deck to anyone.

23         Q.    (BY MR. DAWES)  Okay.

24               (Deposition Exhibit 12 was marked.)

25         Q.    All right.  So if we look at Exhibit 12,

1    this is an email from Mr. Ryan to a couple of

2    different folks, including Barrie Clapham, yourself,

3    and Floyd Landis, correct?

4         A.   Yes, that's what the email says.

5         Q.   All right.  And it includes several

6    attachments in the nature of FOL financial

7    information, correct?

8         A.   That's what it says.

9         Q.   All right.  And it goes on to say,

10   "Barrie, I hope you have been well.  Alex asked that I

11   send you the following materials."

12             Do you see that?

13        A.   I see that.

14        Q.   Do you have any reason to doubt that you

15   told Mr. Ryan to do that?

16        A.   I -- I don't know.

17        Q.   All right.  And Mr. Clapham.  Who is

18   Barrie Clapham?

19        A.   Barrie Clapham was an equity investor in

20   FOL.

21        Q.   Okay.  Is he somebody you had interaction

22   with?

23        A.   A little.

24        Q.   Do you recollect any particulars of your

25   interaction with Mr. Clapham?

```
1              A.    I do not recall.

2              Q.    You don't recall anything you told him;

3    you don't recall anything he told you, is that fair?

4              A.    I do not remember conversations --

5    specific conversations with Mr. Clapham.

6              Q.    Okay.  And you recall that there were

7    some conversations; you just don't recall what any of

8    them were, correct?

9              A.    I recall some conversations.

10             Q.    But don't remember any of the content,

11   correct?

12             A.    And I don't remember specifically the

13   content, no.

14             Q.    Do you remember generally the content?

15             A.    Generally speaking, no, I don't remember

16   the content either.

17             Q.    Okay.  Do you recollect why you were

18   asking Mr. Ryan to forward these materials?

19             A.    I do not --

20             Q.    All right.

21             A.    -- remember.

22             Q.    All right.  Are you familiar with the

23   types of documents that are described on -- in this

24   email?

25             A.    No, I am not.  I don't remember them.
```

1          Q.   As COO, did you deal with things like

2    proformas?

3          A.   I did not as COO.

4          Q.   As COO, did you deal with things like

5    P and Ls and balance sheets?

6          A.   I did not as COO.

7          Q.   As COO, you did not really have any

8    involvement with any financial reporting issues; is

9    that true?

10         A.   That is correct.  As I stated before, I

11   did not deal with financials and numbers.

12         Q.   Okay.  Now, if we look at the first few

13   pages from 20007 on, that's another deck there, right?

14         A.   I'm sorry.  20007?

15         Q.   So it would be the second page.

16         A.   Okay.

17         Q.   Do you recognize the deck?

18         A.   It looks like the last one we just looked

19   at.

20         Q.   Do you think it's identical?

21              MR. SMITH:  Objection, form.

22              MR. BILLINGS:  Join.

23         A.   I do not -- I do not know.

24         Q.   (BY MR. DAWES)  Okay.  And then if we go

25   to 20042 --

```
 1              A.    20042.  Okay.
 2              Q.    And on the top, Floyd's of Leadville CBD
 3     Consolidated.  Do you see that?
 4              A.    I see that.
 5              Q.    What are we looking at on this page?
 6              A.    It looks like numbers in an Excel
 7     spreadsheet.
 8              Q.    And what would you describe this document
 9     as?
10              A.    I don't know because I didn't put it
11     together.
12              Q.    Okay.  So because you didn't put it
13     together, you don't know what it says, correct?
14                    MR. BILLINGS:  Objection to the form.
15                    MR. SMITH:  Join.
16              A.    Other than what it says on it, no.
17              Q.    (BY MR. DAWES)  Okay.  All right.  It --
18     it goes on and identifies dispensaries there about
19     halfway down on the left-hand column.  Do you see
20     that?
21              A.    I do.
22              Q.    Okay.  What are the dispensaries?
23              A.    I don't know.  I didn't put the deck
24     together, so I don't feel comfortable on opining what
25     was meant by dispensaries.
```

1        Q.    What dispensaries has FOL owned from

2    inception, if you know?

3              MR. BILLINGS:  Object to form.

4              MR. SMITH:  Join.

5        A.    I don't know.

6        Q.    (BY MR. DAWES)  You were the COO of the

7    company.  You don't know what dispensaries FOL owned,

8    correct?

9              MR. SMITH:  Objection, form.

10             MR. BILLINGS:  Join.

11        A.    I do not recall specifically, no, I don't

12    remember.

13        Q.    (BY MR. DAWES)  Tell me each and every

14    dispensary you were aware of as COO that FOL owned.

15             MR. BILLINGS:  Objection to form.

16             MR. SMITH:  Join.

17        A.    I do not recall.  I don't -- I don't know

18    right now.

19        Q.    (BY MR. DAWES)  Did you ever know what

20    dispensaries FOL owned?

21             MR. BILLINGS:  Objection to the form.

22             MR. SMITH:  Join.

23        A.    I don't know.

24        Q.    (BY MR. DAWES)  Did FOL ever own a

25    dispensary?

1          MR. BILLINGS:  Objection to the form.

2          MR. SMITH:  Join.

3      A.  I don't know or recall.

4      Q.  (BY MR. DAWES)  If you go back two pages,

5  there is a -- a P and L.

6      A.  Can you confirm the -- the number on the

7  bottom?

8      Q.  You may be going backwards, not forward.

9      A.  Okay.

10      Q.  So if you go forward, there's no Bates

11  label on it.  If you hand it to me, I'm glad to get

12  you to that page.  Keep going.

13      A.  Is it 40?

14      Q.  No.  Keep going.  No.  Wrong direction.

15      A.  Okay.

16      Q.  There you go.

17      A.  Okay.

18      Q.  All right.  So do you see -- are you

19  looking at the page that has the P and L -- profit and

20  loss by month for January through December 2018?

21      A.  Yes.

22      Q.  Okay.  All right.  And you were the COO

23  for the company for a majority of that year, correct?

24      A.  No.  I joined as an employee of FOL in

25  late September of 2018.

1          Q.   Late September, okay.

2          A.   Or early October of 2018.

3          Q.   All right.  So if we go over to -- do you

4     know what a profit-and-loss statement is?

5          A.   I do.

6          Q.   All right.  You didn't prepare this, but

7     you know what it is, right?

8          A.   I did not prepare this.

9          Q.   You know what it is, though, right?

10         A.   I know what a profit-and-loss statement

11    is, yes.

12         Q.   And you know how to read and interpret a

13    P and L, correct?

14              MR. SMITH:  Objection, form.

15              MR. BILLINGS:  Join.

16         A.   I'm not sure I can say that with --

17    fully.  I don't know.

18         Q.   (BY MR. DAWES)  That is not a skill that

19    you have needed in connection with any of your

20    positions with the Fed, correct?

21         A.   Reading a company's P and L statement is

22    definitely not connected with duties at the Fed.

23         Q.   All right.  If we go -- if you flip over

24    to the next page, which is the --

25         A.   The end of it?

1          Q.    -- second part of the P and L.  That's
2     exactly right.

3          A.    Okay.

4          Q.    There are -- there's a column of Other
5     Expenses.  Do you see that?

6          A.    Um-hum, I do.

7          Q.    All right.  And then it talks about
8     different commissions.  Do you see that?

9          A.    I do.

10          Q.    All right.  Those three commission line
11     items, are you familiar with what those were for?

12          A.    No, I am not.

13          Q.    All right.  But those -- you recognize
14     those as transactions that were booked by FOL,
15     correct?

16               MR. BILLINGS:  Objection to the form.

17               MR. SMITH:  Join.

18          A.    I can't say that for certain.  It's just
19     -- this is a printout of the P and L.

20          Q.    (BY MR. DAWES)  Right.

21          A.    I don't know exactly where it came from
22     or who prepared it or what it was prepared for.

23          Q.    Well, who prepared the financial
24     reporting documents for FOL?

25          A.    I -- I -- depends for which documents.

1          Q.   How about --

2          A.   I don't know for sure.

3          Q.   Who prepared P and Ls for FOL?

4          A.   Usually it was the CFO.

5          Q.   Okay.  All right.  So back to those

6    commissions.  Do you know anything about what those

7    commissions are or were?

8          A.   I do not know.

9          Q.   Okay.  You don't know who they were

10   payable to, what they were for, when they were paid,

11   when they were booked?

12         A.   I don't know.

13         Q.   All right.  There's also a line item for

14   Interest Paid.  To whom did FOL pay interest to?

15         A.   Where do you see -- oh, interest paid.  I

16   don't know.

17         Q.   Okay.  Did FOL pay interest to some of

18   the noteholders from time to time?

19         A.   Yes.

20         Q.   Okay.  When -- when would FOL pay

21   interest to the noteholders?  These are the 12 percent

22   noteholders we were talking about before.

23              MR. SMITH:  Objection to form.

24              MR. BILLINGS:  Join.

25         A.   I don't remember the specifics.

1         Q.   (BY MR. DAWES)  Do you know how many

2  times that happened?

3              MR. SMITH:  Objection, form.

4              MR. BILLINGS:  Join.

5         A.   No, I do not.

6         Q.   (BY MR. DAWES)  Do you know who decided

7  who would authorize those payments?

8              MR. SMITH:  Objection to form.

9              MR. BILLINGS:  Join.

10        A.   I don't recall.

11        Q.   (BY MR. DAWES)  And then if you go to the

12 next page, which is the balance sheet, are you

13 familiar with what a balance sheet is?

14        A.   I am.

15        Q.   Okay.  There -- in the Assets section,

16 there's a section called Other Assets.  Do you see

17 that?

18        A.   Yes, I do.

19        Q.   All right.  And there's

20 1.852 million-and-change and other assets.  Do you see

21 that?

22        A.   I see that.

23        Q.   What were the other assets, do you know,

24 as the COO?

25        A.   I do not know what Other Assets included.

1       Q.   Okay.  Is this -- do you know how to read

2    a balance sheet?

3       A.   I can read the numbers associated with

4    line items.

5       Q.   Okay.  Okay.  But do you feel like you

6    know how to read and interpret a balance sheet?

7       A.   My skill set is not in reading financial

8    statements.

9       Q.   Do you review -- as COO, did you rely on

10   financial reporting from time to time in carrying out

11   your duties?

12              MR. SMITH:  Objection, form.

13              MR. BILLINGS:  Join.

14       A.   I cannot recall.

15       Q.   (BY MR. DAWES)  All right.  The -- under

16   Liabilities and Shareholders' Equity, where is it --

17   okay.  There is a -- there's a line item for Notes

18   Payable - 12% Senior Notes.  Do you see that?

19       A.   Under Long-Term Liabilities?

20       Q.   Right.

21       A.   Yes, I see it.

22       Q.   And that's 4.433 million-and-change,

23   correct?

24       A.   That's what it says.

25       Q.   And that's the 12% Senior Notes that

1   we've been talking about today?

2            MR. SMITH:  Objection to form.

3            MR. BILLINGS:  Objection to form.

4       A.   I can't say for certain.

5       Q.   (BY MR. DAWES)  Well, what is it?

6       A.   I don't know.

7       Q.   Notes Payable - Founder, do you know what

8   that is?

9       A.   I do not know what that is.

10      Q.   Do you have any reason to doubt that the

11  Notes Payable - 12% Senior Notes are the notes that

12  are being sought to be enforced in this case?

13           MR. BILLINGS:  Objection to the form.

14           MR. SMITH:  Join.

15      A.   Since I don't know what they are, I can't

16  say that I -- I know.

17      Q.   (BY MR. DAWES)  Okay.  All right.  Now,

18  let's see if we can shed some light on the other

19  assets.  If you go two pages back.

20      A.   Back?

21      Q.   Why don't you hand it to me, and I'll

22  help you.  You're tending to go forward.  Okay?

23           MR. BILLINGS:  Give us a second to get to

24  that page.

25           MR. DAWES:  The page you should be at

1  should say Floyd's Summary of Other Assets.

2            MR. BILLINGS:  Give me a second.

3            MR. DAWES:  I can help you out, Ryan.

4            MR. BILLINGS:  Please do.  Thank you.

5            MR. DAWES:  You bet.

6       Q.   (BY MR. DAWES)  All right.  So the

7  Summary of Other Assets, Base Camp, LLC, Loan, do you

8  know what that is?

9       A.   I do not.

10      Q.   All right.  As the COO of FOL, were you

11 familiar with the Portland dispensaries valued at

12 1.029 million-and-change?

13      A.   I can't say specifically what this is for

14 because I didn't put this document together.

15      Q.   All right.  As COO, did you ever know

16 that FOL had an interest in Portland dispensaries of

17 any sort?

18            MR. MURRAY:  Object to form.

19      A.   We had a financial interest in some

20 Portland dispensaries.

21      Q.   (BY MR. DAWES)  And what was the nature

22 of that interest?

23      A.   I don't know specifically, but what do

24 you mean by "nature"?

25      Q.   What do you understand the word "nature"

1   to be?

2           MR. SMITH:  Objection to form.

3           MR. BILLINGS:  Join.

4       A.   I just want to make sure I'm answering

5   the question --

6       Q.   (BY MR. DAWES)  Sure.

7       A.   -- correctly.  So we had a financial

8   interest.

9       Q.   Okay.  How would you describe the

10  interest?

11      A.   We -- the company had put some money

12  towards eventually purchasing dispensaries.

13      Q.   And how would you describe the interest?

14          MR. SMITH:  Objection to the form, asked

15  and answered.

16          MR. BILLINGS:  Join.

17      A.   The interest is we had put some money

18  towards eventually purchasing and closing on the

19  dispensaries.

20      Q.   (BY MR. DAWES)  Okay.  All right.  So if

21  you go back two more pages to the balance sheet.

22          MR. SMITH:  Go back to the balance sheet?

23  Is that what you said?

24      Q.   (BY MR. DAWES)  If you go back two more

25  pages to the balance sheet, there's a balance sheet as

1    of January 31, 2019.

2         A.   Okay.

3         Q.   And the top item is Business Checking,

4    7458.  Do you see that line item?

5         A.   No.

6              MR. HURLEY:  You mean go forward.

7         Q.   (BY MR. DAWES)  Okay.  Let's go forward,

8    then, two pages.  It should be a balance sheet as of

9    January 31, 2019.

10        A.   Okay.

11        Q.   And just so we're on the same page, is

12   the first line item there Business Checking 7458?

13        A.   Yes.

14        Q.   Okay.  All right.  And then if we go down

15   under Other Assets down to the bottom --

16        A.   Okay.

17        Q.   -- all right, we see some of the same

18   line items we saw earlier.  One is the Portland

19   dispensaries at 1.029 million-and-change.  Is it fair

20   you don't know where that number came from?

21        A.    I don't feel comfortable opining on a

22   number that's from a balance sheet that I don't know

23   where it came from or who put it together, so I can't

24   say for sure.

25        Q.   You don't know where that number came

```
 1   from; is that true?
 2          A.   I did not put together this document.
 3          Q.   You don't know what that number came
 4   from; is that true?
 5          A.   Because I didn't put this document
 6   together, I cannot say for sure where this number came
 7   from.
 8          Q.   There is a line item called Attempted
 9   Farm Acquisition.
10          A.   Um-hum.
11          Q.   What is the attempted farm acquisition?
12          A.   I don't know.
13          Q.   And as COO, you never knew what a farm
14   acquisition even was, correct?
15               MR. SMITH:  Objection to form.
16               MR. BILLINGS:  Join.
17          A.   In general, what a farm acquisition is?
18          Q.   (BY MR. DAWES)  Sure.  Why don't you tell
19   -- let's start there.
20          A.   So I understand what a farm acquisition
21   could mean.
22          Q.   Did FOL ever attempt to acquire a farm?
23          A.   I believe that it did.
24          Q.   Where?
25          A.   In Oregon.
```

1          Q.    Okay.  And what happened with the farm
2    acquisition in Oregon?
3          A.    I don't know what happened in the end.
4          Q.    What was your involvement in that?
5          A.    Or I don't recall what happened.  I did
6    not -- I was not involved in that.
7          Q.    Okay.  So you don't know what happened?
8          A.    I do not remember what happened.
9          Q.    Okay.  Is it a question -- did you know
10   what happened at one time and have since forgotten, or
11   you never knew?
12         A.    I just don't know the details of what
13   happened at the end in the farm.
14         Q.    Generally, what happened to it?
15              MR. SMITH:  Objection to form, asked and
16   answered.
17              MR. BILLINGS:  Join.
18         A.    Again, I don't know.  I didn't work on it
19   specifically, but I believe it fell through.
20         Q.    (BY MR. DAWES)  Okay.  The -- if you go
21   over to the next page of the balance sheet --
22         A.    Okay.
23         Q.    -- there are long-term -- the bottom
24   page, just so we're on the same page, total
25   liabilities is 5.382 million.  Are you on the same

1    page?

2           A.    Can you repeat that?

3           Q.    Yes.  At the bottom of the balance sheet,

4    Total Liabilities and Equity of 5.382 million?

5           A.    Okay.

6           Q.    And then there is a reference -- up under

7    Long-Term Requirements, there's reference Notes

8    Payable, Alexander Capital.  Do you see that?

9           A.    I do see that.

10          Q.    And that's -- that 4.338 million number,

11   that's the same number we saw on those 12 percent

12   notes a few moments ago, correct?

13          A.    I would have to double-check.  Where was

14   that number?  Are you referring to the notes payable a

15   few pages back?

16          Q.    That's exactly right.

17          A.    Okay.  Well, that number was for

18   $4,433,571.

19          Q.    Okay.

20          A.    Okay.

21          Q.    And let's go forward as well to --

22   there's a document that starts 12% Senior Secured

23   Promissory Notes.

24          A.    Okay.

25          Q.    Are you familiar with this schedule?

```
1              A.    No, I am not.

2              Q.    Okay.  And this goes on to itemize notes

3     1 through 71 totaling 4.433 million-and-change.  Do

4     you see that?

5              A.    Yes, I see that.

6              Q.    And these are -- and, again, this is part

7     of the records you asked the CFO to forward to

8     Mr. Clapham, correct?

9                    MR. SMITH:  Objection to form.

10                   MR. BILLINGS:  Join.

11             A.    Well, if this was part of the attachment

12    in the exhibit -- so just to make sure I'm precise, it

13    was an attachment in the exhibit where I sent -- where

14    Chris sent that email?

15             Q.    (BY MR. DAWES)  Well, you tell me.  If

16    you look at the first page --

17             A.    Yep.

18             Q.    -- do you see No. 3, "Excel Spreadsheet"?

19    So there's 1, 2, 3 --

20             A.    Was it the March -- which -- which --

21    which -- it doesn't say.  Which one is it?

22             Q.    So if you look at the text where it says,

23    "Excel Spreadsheet," the last bullet point under 3

24    says, "12% Senior Secured Promissory Notes."

25                   Do you see that?
```

1          A.    Yeah, yeah, I see that.  Okay.  And that

2    was also in the attachments line?  I just want to make

3    sure we're very precise about the documents we're

4    talking about because I don't feel comfortable

5    otherwise.  So "12% Senior Secured Promissory Notes:

6    Terms + Amount raised."

7               You're saying that the document I'm

8    looking at here is that document?

9          Q.    This is the document I have, yes.

10         A.    Okay.  But how do I know for sure that it

11   was attached to this email?  How do I confirm that?

12         Q.    Are you doubting that this document was

13   prepared and transmitted by Mr. Ryan?

14              MR. SMITH:  Objection, form.

15              MR. BILLINGS:  Join.

16         A.    I'm doubting that the pieces of paper

17   that you have handed me were not part of this email.

18   I just want to confirm it, okay?  So I just want to

19   know that you're -- I just want to be precise.  You're

20   asking me a very precise question.  Because I don't

21   know what this document is.

22         Q.    (BY MR. DAWES)  Do you have reason to

23   dispute that Mr. Ryan prepared the document called the

24   12% Senior Secured Promissory Notes that we're looking

25   at here?

1          MR. SMITH:  Objection, form.

2          MR. BILLINGS:  Join.

3     A.   No, I do not.

4     Q.   (BY MR. DAWES)  Okay.  All right.  And do

5  you actually have an independent recollection of your

6  request to Mr. Ryan to transmit these materials?

7     A.   I do not have a recollection.

8          MR. BILLINGS:  Chris, we've been going

9  for more than an hour.  If we're switching topics,

10  would now be a good time for a break?

11          MR. DAWES:  I am glad to accommodate that

12  request.

13          MR. BILLINGS:  Thank you.

14          (Recess taken, 11:11 a.m. to 11:32 a.m.)

15          (Deposition Exhibit 13 was marked.)

16     Q.   (BY MR. DAWES)  All right.  Are you

17  familiar with Exhibit 13?

18     A.   Well, let me just read through it.  So

19  it's an email from Pete DiChiara to Frank DiMartini.

20     Q.   All right.  And you've seen this email

21  recently, have you not?

22     A.   I have seen it yesterday.

23     Q.   Okay.  All right.  And was yesterday the

24  first you had seen it since March of 2019?

25     A.   I had not seen it.  When it was sent to

1    me, it was not opened.

2            Q.   Okay.  Did you go back and verify that it

3    was not opened?

4            A.   I did.

5            Q.   When did you do that?

6            A.   I did that in the spring of 2020 when

7    Mr. Hurley had raised it.

8            Q.   Okay.  And when had -- and in what format

9    had Mr. Hurley raised it?

10           A.   During some form of the advisory board

11   discussions.

12           Q.   And this email from Mr. DiChiara, he was

13   FOL's counsel back at the time in March of 2019,

14   correct?

15                MR. BILLINGS:  Objection to the form.

16                MR. SMITH:  Join.

17           A.   I don't know for sure.

18           Q.   (BY MR. DAWES)  He was FOL's counsel,

19   correct?

20                MR. BILLINGS:  Objection to the form.

21                MR. SMITH:  Join.

22           A.   At what time period?

23           Q.   (BY MR. DAWES)  Was he ever FOL's

24   counsel?

25           A.   I believe that he was -- well, he was

1    counsel for FOL at some point in time.

2          Q.    Okay.  And you don't know when, though,

3    is that what you want to say?

4          A.    I don't remember exactly when.

5          Q.    Okay.  All right.  As you sit here now,

6    do you have any reason to dispute that he was FOL's

7    counsel as of March 11, 2019?

8                MR. BILLINGS:  Object to the form.

9          A.    I just can't confirm exactly if he was

10   counsel, but I think so.

11         Q.    (BY MR. DAWES)  Okay.  So you -- this

12   email was brought to your attention by Mr. Hurley

13   sometime in the spring of 2020.  Do you recollect any

14   of your discussion with Mr. Hurley about that?

15         A.    Just that he raised it.

16         Q.    Okay.  And did you have any response?

17         A.    That I didn't know what he was referring

18   to.

19         Q.    Okay.  And you went back and you

20   confirmed you had received this email, but your

21   testimony today is you hadn't opened it as of spring

22   of 2020; is that right?

23         A.    That is correct.  That I was copied on

24   it, and I had not seen it and did not open it and had

25   nothing to do with the email.

1          Q.   All right.  Did you ever discuss this

2     email with Mr. DiChiara?

3          A.   I don't recall.

4          Q.   How about did you ever discuss it with

5     DiMartini?

6          A.   No, I do not recall ever discussing it

7     with Mr. DiMartini.

8          Q.   Other than this coming up in a discussion

9     with Mr. Hurley, did you ever discuss Exhibit 13 with

10    anybody?

11         A.   What's Exhibit 13?  Oh, the --

12         Q.   This document.

13         A.   The email?  Not that I recall.

14         Q.   Okay.  And I'm not inquiring about your

15    discussions with counsel in the last week.

16         A.   Okay.

17         Q.   Put those aside.  But aside from

18    discussions with Mr. Hurley, you don't recall

19    discussing this Deposition Exhibit 13 with anybody

20    ever, correct?

21         A.   That is correct.

22              (Deposition Exhibit 14 was marked.)

23         Q.   Do you recognize Exhibit 14 as an email

24    from Mr. DiChiara to you and Mr. DiMartini concerning

25    interest?

1          A.   Yes.  It looks like it's an email from

2    Pete to Frank DiMartini, Floyd, and myself.

3          Q.   Okay.  And do you recollect what the

4    circumstances were regarding getting this email?

5          A.   I do not.

6          Q.   As you sit here now, do you have a sense

7    of why this email was being provided?

8          A.   As I sit here now, I do not know why the

9    email was provided.

10         Q.   So is this sentence from Mr. DiChiara,

11   "If the payment due is for fourth quarter calendar use

12   the attached spreadsheet" -- does that give you any

13   insights as to why this email was being sent?

14         A.   No.

15              MR. SMITH:  Form.

16         A.   No.

17         Q.   (BY MR. DAWES)  All right.

18         A.   Because I don't know what the attached

19   spreadsheet says.

20         Q.   Well, let's take a look at it.

21         A.   Okay.

22         Q.   Do you recognize the attached

23   spreadsheet?

24         A.   I don't remember the attached

25   spreadsheet, no.

1        Q.   You don't -- you have no reason to

2  dispute that you got the attached spreadsheet?

3        A.   It was emailed to me.

4        Q.   All right.  And do you recognize this as

5  the senior 12 percent notes we've been talking about?

6              MR. BILLINGS:  Objection to the form.

7              MR. SMITH:  Join.

8        A.   I can't confirm for sure.

9        Q.   (BY MR. DAWES)  Well, what -- what do you

10  think this attachment is, Ms. Huet?

11             MR. SMITH:  Objection to form.

12             MR. BILLINGS:  Join.

13        A.   Well, it says that it's fourth quarter

14  interest.

15        Q.   (BY MR. DAWES)  What do you suppose that

16  interest is for?

17             MR. SMITH:  Objection, form.

18             MR. BILLINGS:  Join.

19        A.   I would say that the interest is for

20  certain noteholders.

21        Q.   (BY MR. DAWES) Right.  All right.  And,

22  again, when you got this email, you were the COO of

23  FOL, right?

24        A.   Okay.  So the email was sent April 5th,

25  2019.  And at the time, I was chief operating officer.

1          Q.   Right.

2          A.   Again, focusing on operations, not

3    financials.

4          Q.   Right.  Okay.  Who was responsible for

5    making sure FOL made interest payments on the

6    promissory notes?

7          A.   I don't recall.

8          Q.   Okay.  All right.  Do you recollect any

9    discussions regarding Exhibit 14 with anybody?

10         A.   No, I do not.

11         Q.   Okay.  Do you know if the interest

12   payments were made for the fourth quarter?

13         A.   I can't say for sure.

14         Q.   Okay.

15         A.   I don't know.

16         Q.   As you sit here now, do you know what

17   interest payments were made to the senior 12 percent

18   noteholders?

19         A.   I do not know.  I would have to look.  I

20   don't know.

21         Q.   You know that certain interest payments

22   were made, but you don't know which; is that fair?

23         A.   Yes.

24              (Deposition Exhibit 15 was marked.)

25         Q.   Do you recognize Exhibit 15 as an email

1    from you to Mr. DiMartini and, in turn, an email from

2    Mr. DiMartini to Mr. Clapham?

3         A.   So it looks like I forwarded an email to

4    Frank DiMartini.

5         Q.   Um-hum.

6         A.   And then Frank forwarded it to Barrie.

7         Q.   Right.  And the subject is "FOL

8    Revenues," correct?

9         A.   Correct.

10        Q.   And then if you look at the ensuing

11   pages -- which is reporting on FOL revenues, correct?

12        A.   Yes.

13        Q.   All right.  Do you have any reason to

14   dispute that's what you were forwarding on to

15   Mr. DiMartini?

16        A.   I -- it doesn't -- I mean, to be just

17   very clear, it doesn't say what attachments I

18   forwarded to Frank; so I can't confirm for sure that

19   he then didn't re-add them from somewhere and send

20   them to Barrie.  So, no, I cannot confirm that.

21        Q.   When you look at Redemption 19432 --

22        A.   19 --

23        Q.   So the second page of this document.

24        A.   19432.  Okay.

25        Q.   So this is the way it's produced.  This

1   is half of a statement that's Floyd's revenue by week.

2   If you look at the third page, that seems to be the

3   second portion of that document.  Do you see that?

4           A.   What do you mean by "the second portion"?

5           Q.   Okay.  So if you look at the 19432, do

6   you see that's weekly reporting of revenue?

7           A.   It -- yes, it appears to be Floyd's

8   Revenue By Week, as it says on the top left.

9           Q.   Right.  And that continues over on the

10  top of the next page, right?

11          A.   Let me check.  Yes, it appears to.

12          Q.   Okay.  And this is for the period in

13  which you were COO of FOL, correct?

14          A.   I, at the time, was chief operating

15  officer of FOL.

16          Q.   Right.  And the dispute -- you don't --

17  the line item for all of the dispensary revenue

18  reporting per week, you don't know what those

19  dispensaries are or where they are located or how many

20  there are, correct?

21               MR. SMITH:  Objection, form.

22               MR. BILLINGS:  Join.

23          A.   I did not put this document together, so

24  I can't attest to what the author --

25          Q.   (BY MR. DAWES)  Okay.

1           A.    -- was referring to specifically.

2           Q.    Right.  So between the period of

3    January 2019 through April 28, 2019, what dispensaries

4    did FOL own and operate?

5                 MR. SMITH:  Objection, form.

6                 MR. BILLINGS:  Join.

7           A.    I don't know that FOL owned any

8    dispensaries.

9           Q.    (BY MR. DAWES)  Do you know if FOL

10   operated any dispensaries in that time frame?

11          A.    In what time frame?

12          Q.    The time frame of January 2019 through

13   April 2019.

14          A.    I don't know for sure if FOL operated --

15   owned -- wait.  What was your question?  Sorry.  Can

16   you repeat it?

17          Q.    Sure.  Do you know if FOL operated any

18   dispensaries in that time frame, being January 2019

19   through April 2019?

20          A.    I can't recall specifically because the

21   dates --

22          Q.    As COO, did you ever deal with

23   dispensaries in any way, shape or form owned or

24   operated by FOL?

25                MR. BILLINGS:  Objection to the form.

1                    MR. SMITH:  Join.

2          A.   As I mentioned earlier in my testimony,

3    early on, I would sometimes talk to Andrew Kaplan

4    about how he runs dispensaries.

5          Q.   (BY MR. DAWES)  Did you ever talk about

6    how FOL would run or own a dispensary?

7          A.   I do not recall.

8          Q.   And that's because you don't know if FOL

9    ever owned or operated a dispensary, correct?

10                    MR. SMITH:  Objection to form.

11                    MR. BILLINGS:  Join.

12          A.   I can't recall during this time frame

13    whether FOL owned or operated a dispensary.

14          Q.   (BY MR. DAWES)  Did FOL own or operate a

15    dispensary at any time period?

16          A.   I don't know for sure.

17          Q.   Okay.  Are you able to -- are you able --

18    do you have any information to suggest that FOL owned

19    or operated a dispensary at any time?

20                    MR. BILLINGS:  Object to the form.

21                    MR. SMITH:  Join.

22          A.   As I mentioned earlier, we had a

23    financial interest in dispensaries.

24          Q.   (BY MR. DAWES)  In Oregon?

25          A.   In Oregon.

```
1                    (Deposition Exhibit 16 was marked.)

2          Q.   Do you recognize Exhibit 16 as an email

3     from FOL's CFO to Mr. DiChiara, Mr. DiMartini, and

4     yourself?

5          A.   Yes.

6          Q.   All right.  And this is -- the message

7     is, "Please send me a copy of the current noteholder

8     chart.  Attached is my latest copy."

9               Do you see that?

10         A.   Yes.

11         Q.   All right.  And when you got this email

12    back in May of 2019, did you discuss it with anyone?

13         A.   Not that I recall.

14         Q.   All right.  Do you recognize the current

15    noteholder chart described by Mr. Ryan?

16         A.   I don't -- I don't remember seeing it.

17         Q.   And as COO back in May of 2019, does this

18    noteholder chart mean anything to you whatsoever?

19              MR. BILLINGS:  Objection to the form.

20              MR. SMITH:  Join.

21         A.   What do you mean by it means anything to

22    me whatsoever?

23         Q.   (BY MR. DAWES)  What does it mean to you?

24              MR. SMITH:  Objection to form.

25              MR. BILLINGS:  Join.
```

1          A.   I don't know.

2          Q.   (BY MR. DAWES)  Do you know what it is?

3          A.   I'm not sure exactly.

4          Q.   Do you know what it's about?

5          A.   I didn't put it together, so I don't know

6     for sure.

7          Q.   Okay.  So when you look at the -- there

8     are note numbers there.  Do you see that in the

9     column?

10         A.   Yes.

11         Q.   Okay.  And you don't know what the note

12    numbers are, right?

13         A.   No, I can't say for sure.

14         Q.   You don't know what the closing date is,

15    right?

16         A.   It's a closing date.

17         Q.   And do you know what -- it was a closing

18    date of what?

19         A.   No, I do not.

20         Q.   And where it says Subscriber, you have no

21    idea what that is, right?

22         A.   I -- I can't say for sure that I know

23    what it was meant to mean.

24         Q.   Right.  And where it says Amount

25    Received, you have no idea what that is, right?

1                    MR. BILLINGS:  Objection to the form.

2                    MR. SMITH:  Join.

3         A.    I'm assuming it was an amount -- that

4    that was the amount received by the subscriber.

5         Q.    (BY MR. DAWES)  You think that's the

6    amount received by the subscriber?

7         A.    Based on what the document says because

8    the column says Amount Received.

9         Q.    You don't think that's the amount

10   received by FOL?

11                   MR. SMITH:  Objection to form.

12                   MR. BILLINGS:  Join.

13        A.    I don't know.

14        Q.    (BY MR. DAWES)  And when Mr. Ryan is

15   describing current noteholder chart, you have no idea

16   what he's even talking about, right --

17                   MR. SMITH:  Objection to form.

18                   MR. BILLINGS:  Objection to form.

19        Q.    (BY MR. DAWES)  -- as the COO of FOL?

20                   MR. SMITH:  Objection, form,

21   argumentative.

22                   MR. BILLINGS:  Join.

23        A.    I would assume he's talking about current

24   noteholders.

25        Q.    (BY MR. DAWES)  Okay.  You mean holders

1  of notes from FOL?

2      A.  Probably.

3      Q.  Okay.  What else might it be?

4          MR. SMITH:  Objection to form.

5          MR. BILLINGS:  Join.

6      A.  I do not know.

7      Q.  (BY MR. DAWES)  Okay.  I think you told

8  me earlier, when I was asking you about the Equity

9  Exchange Agreement, you were not familiar with any

10  kind of termination agreement concerning it; is that

11  right?

12      A.  I was not involved in negotiations or

13  anything relating to termination agreements.

14      Q.  Have you ever seen a termination

15  agreement related to the Equity Exchange Agreement?

16      A.  I do not recall that.

17          (Deposition Exhibit 17 was marked.)

18      Q.  So Exhibit 17, I take it you've never

19  seen, am I right?

20      A.  Correct.  I have never seen this.

21      Q.  And you had no involvement in it?

22      A.  I don't recall that I did.

23      Q.  Okay.

24          (Deposition Exhibit 18 was marked.)

25      Q.  You've seen Exhibit 18 before, correct?

```
1          A.   I'm sorry.  I've seen Exhibit 18 before?

2          Q.   That was the question, yes.

3          A.   I was copied on the email.

4          Q.   Okay.  Have you seen it in the course of

5   the last seven days?

6          A.   I saw it yesterday.

7          Q.   Sure.  And you would have seen it on or

8   around July 25, 2019; is that correct?

9          A.   I don't recall seeing it.  I was copied

10  on it.

11         Q.   All right.  Did you ever go back in your

12  email to see if you had opened it?

13         A.   I did not for this.

14         Q.   All right.  And do you recall receiving

15  this email at all?

16         A.   I do not recall receiving it.

17         Q.   Do you recall discussing the content of

18  this email with anybody?

19         A.   I do not recall discussing the contents

20  of this, no, I don't remember.

21         Q.   Okay.  Okay.  And to your knowledge, you

22  have never discussed this with Floyd Landis?

23              MR. SMITH:  Objection, form.

24              MR. BILLINGS:  Join.

25         A.   I don't -- I don't know.
```

1          Q.    (BY MR. DAWES)   There is a statement from

2    Mr. Landis that "FOL had a purchase agreement for

3    three Portland dispensaries that has been terminated."

4                You don't know if that's true or not; is

5    that right?

6          A.    Well, Floyd wrote that; so I can't speak

7    to that or not, no.

8          Q.    You don't know if that's true or not?

9          A.    I can't say for sure.

10         Q.    And you don't know anything about it,

11   right?

12         A.    What's "it"?

13         Q.    A purchase agreement for three Portland

14   dispensaries that has been terminated.

15         A.    No, I don't remember the specifics around

16   it.

17         Q.    Okay.  And then there is -- the next dash

18   talks about -- it says, "A new agreement, yet to be

19   documented, will be created to show distribution of

20   funds upon sale of the Oregon assets (which now

21   includes a farm and fourth dispensary)."

22                What is the farm?

23         A.    I'm not sure specifically what Floyd was

24   referring to in that email.

25         Q.    Okay.  You don't know what the farm is,

1    correct?

2              MR. SMITH:  Objection, form.

3              MR. BILLINGS:  Join.

4         A.   I don't know specifically what "the farm"

5    was referring to.

6         Q.   (BY MR. DAWES)  Are you familiar with any

7    farm in Oregon?

8              MR. SMITH:  Objection to form, asked and

9    answered.

10             MR. BILLINGS:  Join.

11        A.   As I mentioned earlier, there was --

12   there were discussions about a farm in Oregon between

13   people, but I wasn't part of that.

14        Q.   (BY MR. DAWES)  You cannot be any more

15   specific than that; is that fair?

16        A.   I don't remember specifics around it.

17        Q.   Okay.  And fourth dispensary, what is the

18   fourth dispensary?

19        A.   I'm not sure.

20        Q.   Do you know anything about a fourth

21   dispensary?

22        A.   I remember that Mr. Kaplan and Benlolo

23   had opened up a fourth dispensary and that it should

24   have also been called -- and I think it was called

25   Floyd's Fine Cannabis.

1          Q.    Okay.  Do you know anything further about

2    the fourth dispensary in terms of location?

3          A.    No, I don't know exactly -- I don't know

4    where it was located.

5          Q.    Do you have any other detail beyond what

6    you just testified to?

7          A.    Not that I can -- sorry.  Not that I can

8    recall today.

9          Q.    Okay.  And I asked you earlier about a

10   50/50 arrangement that you seemed to not have a

11   recollection of.

12                MR. SMITH:  Objection to form.

13                MR. BILLINGS:  Join.

14         Q.    (BY MR. DAWES)  There is a passage that

15   says, "The remaining funds from the sale will be split

16   between Floyd's of Leadville and your side 5/50."

17                Do you see that?

18         A.    I do see that.

19         Q.    Does that stimulate any recollection of

20   the subject matter?

21         A.    Well, I believe that Floyd and Andrew and

22   David had agreed to split a sale 50/50.

23         Q.    Okay.  And is that something you have

24   direct personal knowledge of?

25         A.    Not specifically.  I didn't negotiate

1    that deal.

2            Q.    Okay.  How do you know about that?

3            A.    That I recall.  Because Floyd would

4    discuss it, and I heard about it.

5            Q.    You heard about it from who?

6                  MR. SMITH:  Independent of this email?

7    Is that --

8            Q.    (BY MR. DAWES)  You heard about it from

9    who?

10           A.    I don't remember.

11           Q.    Okay.  Did you discuss this email with

12   anybody at any time?

13                 MR. SMITH:  Objection, form.

14                 MR. BILLINGS:  Join.

15           A.    Not that I remember.

16                 (Deposition Exhibit 19 was marked.)

17           Q.    (BY MR. DAWES)  Do you recognize

18   Exhibit 19?

19           A.    It says it's an email from David Benlolo

20   to Floyd, and it copies Andrew and me.

21           Q.    You've read this in the last week, right?

22           A.    Probably.  I don't -- yes.  I don't

23   remember specifically if they pulled up this email for

24   me.

25           Q.    Okay.  All right.  Do you have any

1    independent recollection of this email?

2         A.    I remember it was sent.

3         Q.    Okay.  And do you remember it being sent

4    back in July of 2019?  Do you remember anything else

5    about it from back in that time frame?

6         A.    No, I do not.

7         Q.    Did you discuss it with any of the other

8    folks on this email?

9         A.    Not that I recall.

10        Q.    Okay.

11              MR. BILLINGS:  I'm just going to put an

12   objection on the record that it seems to be missing an

13   attachment.

14        Q.    (BY MR. DAWES)  Did you discuss any --

15   did you discuss Exhibit 19 with anybody at any time?

16        A.    I don't recall.

17        Q.    Are you familiar with Valued 19860 RE,

18   LLC?

19        A.    No, I am not.

20        Q.    Never heard of it?

21        A.    I don't remember hearing of it.

22        Q.    Okay.  Do you know if you've ever been an

23   authorized signer for that entity?

24        A.    I don't know.  I don't remember.

25        Q.    All right.  Do you know what Valued 19860

1  RE, LLC -- what its business is?

2        A.   No, I don't -- I don't know what that is

3  right now.

4        Q.   Do you know who its members and managers

5  are?

6        A.   No, I do not.

7        Q.   Do you remember receiving monies or funds

8  from or on behalf of Valued 19860 RE, LLC?

9        A.   Me personally receiving funds?

10       Q.   Um-hum, yes.

11       A.   I don't remember.

12            (Deposition Exhibit 20 was marked.)

13            MR. BILLINGS:  And just for the record,

14  it also seems to be missing an attachment.

15       Q.   (BY MR. DAWES)  Do you recognize

16  Exhibit 20?

17       A.   It's an email from David Benlolo to me,

18  Floyd, and Andrew.

19       Q.   Okay.  Does this stimulate any

20  recollection of what that company is?

21            MR. SMITH:  Objection, form.

22       A.   I think it's the -- I think it's the --

23  this farm that we were supposed to purchase -- that we

24  were supposed to purchase.

25       Q.   (BY MR. DAWES)  Okay.  And do you recall

1   signing an Escrow Cancellation Agreement?

2           A.    I do not recall doing that.

3           Q.    Okay.  Do you recall discussions with any

4   of the other parties on this email regarding the

5   Escrow Cancellation Agreement?

6           A.    I don't remember.

7                 (Deposition Exhibit 21 was marked.)

8           Q.    I've handed you Exhibit 21.  It's dated

9   12/12/19.  There are a couple of signatures on that

10  page.  Do you recognize either of them?

11          A.    I can't say for sure.

12          Q.    Do you have any idea whose signatures

13  they are?

14                MR. SMITH:  Objection, form.

15                MR. BILLINGS:  Join.

16          A.    I can't say for sure.

17          Q.    (BY MR. DAWES)  You can say none of them

18  are yours; is that right?

19          A.    It does not look -- neither one looks

20  like my signature.

21          Q.    All right.  You did not sign this

22  document for Valued 19860 RE, LLC, correct?

23          A.    I don't know for sure, and I do not

24  remember signing this.

25                (Deposition Exhibit 22 was marked.)

1    Q.    This is a series of emails.  Do you
2  recognize yourself as being one of the cc recipients?
3    A.    I was copied on this email.
4    Q.    Okay.  And any recollection of any
5  discussions or communications with other folks
6  regarding the content of Exhibit 22?
7    A.    Okay.  Well, I need to go through it
8  because I don't know exactly what the content is.
9    Q.    Sure.  Well, let me ask you this, too:
10  In the January 2020 time frame, what was going on
11  between FOL and the various noteholders?
12    A.    I can't say for sure what was going on.
13    Q.    Okay.  Do you have any recollection what
14  was going on back in early 2020 in terms of FOL's
15  dealings with the noteholders?
16    A.    FOL was trying to renegotiate terms of
17  certain notes.
18    Q.    Okay.  Had those notes all matured at
19  that point in time as of January of 2020?
20          MR. SMITH:  Objection, form.
21    A.    I do not --
22          MR. BILLINGS:  Join.
23    A.    Sorry.  I do not know that.
24    Q.    (BY MR. DAWES)  You don't know when the
25  notes matured; is that correct?

1          A.   Correct.

2          Q.   All right.  And as we sit here, if you

3    look at the bottom of 15719, there's a sentence from

4    Mr. Clapham.  And you had mentioned him earlier today.

5    It says, "As shareholder all I can ask you is to try

6    to settle with them given that the notes are due and

7    payable."

8               Do you see that?

9          A.   Okay.  Yes.

10         Q.   Okay.  As you sit here today, do you have

11   any factual basis to dispute Mr. Clapham's statement

12   in that January 20, 2020, email?

13              MR. SMITH:  Objection to form.

14              MR. BILLINGS:  Join.

15         A.   I can't conjecture about what exactly he

16   was trying to say.

17         Q.   (BY MR. DAWES)  That's not what I asked

18   you.

19         A.   Okay.

20         Q.   I said do you have any factual basis to

21   dispute Mr. Clapham's statements that the notes were

22   due and payable?

23              MR. SMITH:  Objection to form.

24              MR. BILLINGS:  Join.

25         A.   I cannot say that.  I don't know.

1          Q.   (BY MR. DAWES)  Okay.  You don't know one

2    way or the other?

3          A.   One way or the other what?  Specifically?

4          Q.   Whether the notes were due and payable as

5    of January 20th, 2020.

6               MR. SMITH:  Objection, form.

7               MR. BILLINGS:  Join.

8          A.   I do not know specifically the dates of

9    each note and when it was due, no.

10         Q.   (BY MR. DAWES)  Do you know how many

11   notes there were?

12         A.   No, I don't recall.

13         Q.   Okay.  Are you able to provide an

14   estimate of how many notes there were?

15              MR. SMITH:  Objection to form.

16              MR. BILLINGS:  Join.

17         A.   I think you threw out an estimate

18   earlier.  I can't remember what that was.

19         Q.   (BY MR. DAWES)  Well, let me just ask

20   you --

21         A.   Yeah.

22         Q.   -- were there more than five notes?

23         A.   There were.

24         Q.   Were there less than 100 notes?

25         A.   I believe so.

1          Q.   Can you be any more specific than that?

2          A.   I don't feel comfortable not knowing the

3     exact number.

4          Q.   Okay.  So you are comfortable somewhere

5     between 5 and 100 notes existed, right?

6               MR. SMITH:  Objection, form.

7               MR. BILLINGS:  Right.

8          A.   Yes.

9          Q.   (BY MR. DAWES)  And you're not

10    comfortable being any more specific than that,

11    correct?

12         A.   I don't want to say a wrong number.

13         Q.   All right.  And you're not able to

14    provide any more reasoned estimate than between 5 and

15    100, right?

16              MR. BILLINGS:  Objection to form.

17              MR. SMITH:  Join.

18         A.   I don't want to get the number wrong.

19         Q.   (BY MR. DAWES)  Have you -- we talked

20    about Mr. DiChiara earlier.  It's been suggested along

21    the way that he was an attorney for Alexander Capital.

22    Do you know anything about that?

23              MR. BILLINGS:  Objection to the form.

24              MR. SMITH:  Join.

25         A.   I -- I don't know specifically about

1    that, no.

2          Q.   (BY MR. DAWES)  Do you know generally

3    about that?

4          A.   Generally, I cannot speak to that.

5          Q.   Okay.  You just don't know, right?

6          A.   I just don't know.

7          Q.   Were you -- do you have a recollection of

8    being involved in communications between Mr. Landis

9    and Mr. Hurley back in January of 2020 in terms of

10   what was going to happen in terms of payment of the

11   various notes?

12              MR. BILLINGS:  Objection to the form.

13              MR. SMITH:  Join.

14         A.   No, I don't remember.

15              (Deposition Exhibit 23 was marked.)

16         Q.   (BY MR. DAWES)  You are familiar with

17   Exhibit 23, correct?

18         A.   Yep.  It's an email from me to -- yeah,

19   to various people.

20         Q.   And you have seen this one in the last

21   week, right?

22              MR. SMITH:  Objection to form.

23         A.   Yes.

24         Q.   (BY MR. DAWES)  All right.  So this was

25   an email you sent to Mr. Gazdak and Mr. DiMartini, and

1    then you copied in Mr. Bell and Mr. Ryan at FOL along

2    with Mr. Clapham, correct?

3         A.   Yes.

4         Q.   All right.  And you attached two

5    documents, a set of bullets/talking points for Frank

6    to use, and then a list of FOL assets, correct?

7         A.   Yes.

8         Q.   All right.  And do you know why were you

9    forwarding the bullets/talking points to

10   Mr. DiMartini?

11        A.   Well, I don't believe I was forwarding

12   them.  I was emailing them, and he had asked me to

13   send him that.

14        Q.   This says, "Attached are two documents we

15   discussed providing you during our meeting last week."

16        A.   Um-hum.

17        Q.   Right?

18        A.   Um-hum.

19        Q.   All right.  "One is a set of

20   bullets/talking points for Frank to use."

21        A.   Um-hum.

22        Q.   Okay.  And you see the bullet -- bullets,

23   the talking points for Frank DiMartini?

24        A.   Um-hum, I do.

25        Q.   That's from FOL, correct?

1           A.    That's from FOL.

2           Q.    Right.  And who prepared that on behalf

3   of FOL?

4           A.    I can't remember exactly.

5           Q.    Okay.  You participated in part, correct?

6           A.    Yes, I had input in it.

7           Q.    All right.  As did the CFO?

8                 MR. SMITH:  Objection to form.

9           A.    I don't recall.

10          Q.    (BY MR. DAWES)  Okay.  How about

11  Mr. Bell?  He also had input, did he not?

12          A.    I don't recall.

13          Q.    Okay.  And this was for Frank to use in

14  discussions with noteholders, correct?

15          A.    I don't recall.

16          Q.    Okay.  Well, what -- what was the use you

17  intended Frank to make of these?

18          A.    I don't remember specifically, but it was

19  to make sure he had talking points about the company.

20          Q.    All right.  Talking points to share with

21  who?

22          A.    I don't know.  I don't remember.

23          Q.    Okay.  You would not dispute these were

24  talking points for Mr. DiMartini to share with

25  noteholders, correct?

```
 1                    MR. SMITH:  Objection to form.

 2                    MR. BILLINGS:  Join.

 3           A.    I cannot say that for sure.

 4           Q.    (BY MR. DAWES)  You just don't know why

 5    you were sending these documents as you sit here now?

 6                    MR. SMITH:  That's not -- objection.

 7           Q.    (BY MR. DAWES)  Correct?

 8                    MR. BILLINGS:  Join.

 9           A.    As I sit here today, I do not remember

10    why we put those talking points together.

11           Q.    (BY MR. DAWES)  Now, the second

12    paragraph, you're looking for some kind of

13    confirmation about restructuring terms, correct?

14           A.    Correct.

15           Q.    That's with the senior 12 percent notes,

16    correct?

17           A.    Yes.

18           Q.    Okay.  All right.

19           A.    I believe so.

20           Q.    All right.  And so you're sending the

21    talking points and the list of FOL assets in

22    connection with the idea of a restructuring, correct?

23                    MR. SMITH:  Objection, form.

24                    MR. BILLINGS:  Join.

25           A.    I don't know for sure.  It says, "Please
```

1    confirm in an email the restructuring terms we've
2    tentatively agreed to last week."
3            So I wanted to make sure that -- to get
4    in writing what -- the restructuring terms we had
5    agreed to.
6        Q.   (BY MR. DAWES)  All right.  And that was
7    in the same meeting where you said you would be
8    forwarding the two documents, correct?
9        A.   What meeting did I say I was forwarding
10   the two documents?
11       Q.   Go ahead and why don't you read into the
12   record that first sentence starting with "Attached."
13       A.   Okay.  "Attached are two documents we
14   discussed providing during our meeting last week."
15       Q.   And we -- we talked about the bullet
16   points.  If you look at the next page, FOL 9795, we
17   have the Valued, Inc., Asset List, at 2/5/2020,
18   correct?
19       A.   Yes.
20       Q.   And this is what you provided to
21   Mr. DiMartini, correct?
22       A.   Yes.
23       Q.   All right.  And the purpose was to give
24   him an itemization of what the assets were of FOL at
25   the time, correct?

1           A.    Correct.

2           Q.    Okay.  And that's what this is, correct?

3           A.    That's what it is.

4           Q.    All right.  So here, we have -- and you

5    participated in preparing this, and Mr. Ryan did too;

6    is that right?

7           A.    I cannot recall.

8           Q.    Okay.  You know you did.  You're

9    uncertain who else did, correct?

10          A.    I provided input on it, and I don't

11   remember exactly who else did.

12          Q.    All right.  So the top asset is four

13   Portland retail marijuana dispensaries.  And it sets

14   forth a book value and an estimated fair market value,

15   correct?

16          A.    Correct.

17          Q.    All right.  And these were assets of FOL,

18   correct?

19          A.    According to the document and the notes,

20   it says, "Agreement is to retain $2 million of the

21   original 2.5 million purchase price.  Actively looking

22   to sell, in which case FOL to be returned 2 million

23   plus 50 percent of the sale gains."

24          Q.    Okay.  And this asset list is true and

25   correct, right?

```
1          A.    As far as I know, it is.

2          Q.    You --

3          A.    But --

4          Q.    -- helped prepare it, right?

5                MR. SMITH:  Objection to form.

6                MR. BILLINGS:  Join.

7                MR. SMITH:  Asked and answered.

8          A.    I had in input in preparing it.

9          Q.    (BY MR. DAWES)  And you don't know who

10   else at FOL had input, correct?

11               MR. SMITH:  Same objection.

12               MR. BILLINGS:  Join.

13         A.    I don't remember specifically who else

14   helped me put it together.

15         Q.    (BY MR. DAWES)  And the entirety of this

16   is true and correct to the best of your knowledge and

17   belief, correct?

18               MR. SMITH:  Objection, form.

19               MR. BILLINGS:  Join.

20         A.    I'd like a little more time to read the

21   specifics to be 100 percent sure.  Sometimes people

22   make mistakes in putting together documents, but as

23   far as I know -- let me look through it -- it is -- it

24   seems correct.

25         Q.    (BY MR. DAWES)  Do you know if you vetted
```

1    this with Mr. Landis?

2          A.    I do not remember.

3                (Deposition Exhibit 24 was marked.)

4          Q.    I may have given you one too many.

5                MR. BILLINGS:  Yes.  It got stuck.

6          Q.    (BY MR. DAWES)  All right.  So

7    Exhibit 24, I'd like to draw your attention to, in

8    particular, your email on the top to Mr. Hurley and to

9    Bob Bell at FOL.  Do you see that?

10         A.    I do.

11         Q.    Okay.  All right.  And this is in

12   response to some prior emails from Mr. Hurley,

13   correct?

14         A.    I'd have to check.  Hold on.  Yeah, an

15   email from Greg to Gazdak and DiMartini.

16         Q.    Um-hum.

17         A.    At least the one from February 14th.  I

18   can't say for sure the February 15th, but it's just

19   from Greg Hurley.

20         Q.    Okay.  And the subject is the FOL

21   12 percent senior secured promissory notes, right?

22         A.    Yes.

23         Q.    Okay.  And you're emailing in

24   February 15, 2020, and you're talking about in the

25   opening -- or second paragraph discussions at the

1   meeting last week, right?

2           A.   That's what it says.

3           Q.   All right.  And then you go on to state,

4   "I then sent three emails this week to Jonathan and

5   Frank with the information we agreed to provide during

6   the meeting."

7                Do you see that?

8           A.   I do see that.

9           Q.   Does that include the talking points and

10  the itemization of assets we just looked at?

11          A.   I don't know.

12          Q.   Okay.  Do you have any reason to doubt

13  that that's the case?

14          A.   I'd have to see it.

15          Q.   We just looked at it.

16          A.   So is that -- am I referring to that

17  email?

18          Q.   That's the question I just asked you.

19          A.   Well, I don't know.

20          Q.   Okay.  You also go on to state that, "We

21  are also cleaning up the year end financials and will

22  send a balance sheet" -- what's I/S?

23          A.   I think it's income statement.

24          Q.   -- "income statement shortly."  Who is

25  the "we"?

1          A.    FOL.

2          Q.    Okay.  Anyone in particular?

3          A.    I don't know.

4          Q.    Okay.  Then you go -- you go on to state,

5     "I can assure you we are working 24/7 to continue

6     growing the business and provide all and any

7     information requested.  We pulled together a business

8     update/talking points" -- again, I presume that would

9     be the talking points you sent to Mr. DiMartini?

10         A.    Presumably.

11         Q.    -- "financial information and greater

12    detail on assets which were part of the Security

13    Agreement of your notes," correct?

14         A.    That's what it says.

15         Q.    All right.  And are we talking about the

16    assets list we just looked at that you had sent to

17    DiMartini?

18               MR. SMITH:  Objection to form.

19         A.    I -- I don't know.

20         Q.    (BY MR. DAWES)  So the Exhibit 23

21    preceded this email by two days, correct?

22         A.    Okay.  So 23 is -- yeah, February 13th,

23    and this is February 15th, so correct.

24         Q.    Is that fair to construe that Exhibit 24

25    is talking about the same bullet points and asset

1    detail that you're forwarding in this February 13th

2    email, Exhibit 23?

3                    MR. SMITH:  Objection to form.

4                    MR. BILLINGS:  Join.

5            A.    I can't say for sure.  Probably.

6                    (Deposition Exhibit 25 was marked.)

7            Q.    (BY MR. DAWES)  Do you recognize

8    Exhibit 25 as an email from yourself to Mr. Hurley?

9            A.    Yes.

10           Q.    And attaching some financial documents

11   and an investor update, correct?

12           A.    Yes.

13           Q.    All right.  And you're telling him you

14   wanted to send an update to investors, correct?

15           A.    I'm telling him that as he suggested, we

16   would like -- we, FOL, would like to send an update to

17   investors.

18           Q.    Okay.  All right.  And then you forward

19   the financial records, correct?

20           A.    Yes.

21           Q.    All right.  And if we look at Redemption

22   34674, there's a balance sheet that you forwarded for

23   FOL, correct?

24           A.    I'd like to double-check that that was in

25   there.  So it looks like it was attached to the email.

1          Q.    Um-hum.  And that picks up the 12 percent

2    senior notes and the balance sheet, correct?

3          A.    Well, on the balance sheet, it says under

4    Long Term Liabilities - 12% Senior Notes.

5          Q.    Correct.  And then it picks up interest

6    on the next page on those 12 percent notes at

7    565,000-and-change, correct?

8          A.    Where do you see that?

9          Q.    So under Interest Expense, third of the

10   way down, 12% Notes, $565,820, right?

11         A.    Yes, that's what it says.

12         Q.    And then if you go back to the first page

13   of the balance sheet, there are other assets

14   identified at 2.557 million?

15         A.    Yes.

16         Q.    Do you know what those other assets are?

17         A.    I do not.

18         Q.    Okay.  The -- if you look at Redemption

19   34676, who prepared this?

20         A.    I do not remember.

21         Q.    Did you participate in its preparation?

22         A.    Probably, but I don't remember

23   specifically.

24         Q.    Okay.  And what is -- what is the purpose

25   -- what are you trying to accomplish here in this

1   document, the draft 2/19/20?

2   MR. SMITH:  Objection, form.

3   MR. BILLINGS:  Join.

4   A.   I would have to read it all through to

5   know exactly what I was -- not I, we, whoever put the

6   documents together, was trying to accomplish.

7   Q.   (BY MR. DAWES)  Okay.  Do you have any

8   independent recollection of doing any of this at the

9   time?

10   A.   I don't remember.  It was a long time

11   ago.

12   Q.   Okay.  All right.  And then if we look at

13   Redemption 34678, this sets out FOL's summary of a

14   financing update, correct?

15   A.   It says Financing Update.

16   Q.   All right.  And it goes on to talk about

17   the 12 percent notes that we've been talking about,

18   right?

19   A.   Yes.

20   Q.   All right.  And it indicates that the

21   notes matured at various dates between December of

22   2019 and October 2020, right?

23   A.   That's what it says.

24   Q.   All right.  And it goes on to say, "FOL

25   is currently engaged in discussions" for the purposes

1    of amending those notes, correct?

2               MR. SMITH:  Objection to form.

3               MR. BILLINGS:  Join.

4      A.   It says, "FOL is currently engaged in

5    discussions with Alexander Capital, as Agent, to the

6    12 percent noteholders, to amend the terms of the

7    12 Percent notes" -- that's what it says.

8               MR. DAWES:  We're probably at a pretty

9    good point to take our lunch break.

10              MR. SMITH:  Okay.

11              (Recess taken, 12:20 p.m. to 1:30 p.m.)

12                     EXAMINATION

13    BY MR. MURRAY:

14      Q.   Ms. Huet, my name is Michael Murray.  We

15    have not met yet, but I represent Andrew Kaplan, David

16    Benlolo, and the various entities that you have

17    probably seen on any of the pleadings:  Sichlolo, BTE

18    Reed, BTE 2, BTE 3, and BTE 4.

19               You obviously covered a lot of ground

20    with Mr. Dawes this morning on a lot of topics that I

21    would have asked about as well, so I will do my best

22    not to duplicate; but I do just have some matters to

23    get additional clarification on.

24               And as with Mr. Dawes, we'll try not to

25    speak over each other.  And if you have any questions

1    about, you know, lack of clarity on my questions,

2    please let me know, and I'll try to rephrase it for

3    you.

4                So we spoke -- or you were speaking with

5    Mr. Dawes quite a bit this morning about what -- I

6    understand you were the COO, but you weren't involved

7    in the financials or -- or many of the financial

8    interactions that FOL was involved in; is that fair to

9    say?

10           A.    Correct.  I focused more on operational

11   issues.

12           Q.    Sure.  Can you tell me what -- when you

13   say "operational issues," what did you do on a daily

14   basis what you were COO of FOL?

15           A.    So I managed some of the staff.  I made

16   sure that we were paying our sales taxes, that

17   everybody was on the payroll.  We hired ADP.  I made

18   sure that we -- you know, I worked a lot in marketing,

19   marketing emails, for example, setting up events.  We

20   did a lot of events, so working with the various event

21   companies, like Lifetime, making sure those were

22   staffed properly.  I worked on inventory issues, that

23   kind of thing.

24           Q.    And did you -- we've -- we've -- this

25   morning, you were discussing with Mr. Dawes these

1   Portland dispensaries.

2          A.   Um-hum.

3          Q.   Did you do any of the work that you just

4   described in connection with these Portland

5   dispensaries?

6          A.   I did not run anything relating to the

7   Portland dispensaries.

8          Q.   Were you compensated by FOL for your role

9   as COO?

10         A.   Yes.

11         Q.   Do you know what your financial

12  compensation was?

13         A.   I don't recall exactly what it was.

14         Q.   Was it salary-based?

15         A.   It was a salary.

16         Q.   Okay.  Benefits as well?

17         A.   Yes.

18         Q.   Okay.  So I understand that you started

19  at FOL late September, early October of 2018; is that

20  correct?

21         A.   Yes.

22         Q.   And we previously looked at an Equity

23  Exchange Agreement.  It was one of the many exhibits

24  that I believe was introduced.  It's Exhibit 7.  You

25  have that sitting in front of you.

1          A.   Okay.

2          Q.   And I don't need you to read it in any

3    detail.  I understand that -- well, let me back up.

4    You can see the very first line, the Equity Exchange

5    Agreement is made and entered into as of June 11th,

6    2018.  Do you see that just at the very top?

7          A.   Yes, at the top.

8          Q.   So that would have been before you began

9    working at FOL; is that correct?

10         A.   Yes.

11         Q.   And I believe you testified that you were

12   not involved in the negotiation of the Equity Exchange

13   Agreement at all.

14         A.   Not that I recall.

15         Q.   And you -- I believe you testified that

16   you actually have not ever reviewed the equity

17   exchange agreement; is that correct?

18         A.   I don't remember reading through it,

19   correct.

20         Q.   So you don't even have a general idea of

21   what it is about?

22              MR. SMITH:  Objection, form.

23              MR. BILLINGS:  Join.

24         A.   No, not specifically.  Definitely having

25   nothing to do with it, I don't feel comfortable

1  recalling details about it.

2       Q.   (BY MR. MURRAY)  Yeah, absolutely.  And I

3  believe you testified earlier that you have had --

4  after you started at FOL as a COO, you would have had

5  some communications with Mr. Kaplan; is that correct?

6       A.   Yes.

7       Q.   How frequently would you communicate with

8  Mr. Kaplan?

9       A.   That's very hard for me to recall exactly

10  how frequently.  It was several years ago.

11       Q.   Sure.  Ballpark, was it once a week?

12       A.   I can't say for sure.

13       Q.   Okay.  Was it -- was it fairly regular,

14  though?  Let me back up.  So what -- you've talked to

15  him probably more than five times in your life?

16       A.   That's probably right, yeah.

17       Q.   More than ten times?

18       A.   Again, I feel uncomfortable --

19       Q.   Sure.

20       A.   -- giving a specific number under oath

21  when I can't -- I don't know how many times that was.

22       Q.   Yeah.  I was just trying to get a sense

23  of generally, but it's fine.  Do you recall generally

24  or specifically what you would talk to Mr. Kaplan

25  about when you did talk to him?

1          A.   So generally -- I don't remember specific

2     conversations by any means, but I -- I do remember in

3     the beginning that Andrew spent some time explaining

4     how the marijuana industry works and functions and how

5     one might run a dispensary, like what -- you know,

6     what that entails because it's a very specific skill

7     set.  And so he sort of was tutoring me in that

8     area --

9          Q.   Sure.

10         A.   -- in a way.

11         Q.   And why -- why were you asking him about

12    how to manage a dispensary?

13         A.   So one, I found it interesting.  And,

14    two, I knew that -- that there -- there was a

15    financial interest in the dispensaries.

16         Q.   You mentioned the financial interest in

17    the dispensaries this morning.  To be clear, are you

18    referring to the Portland, Oregon, dispensaries?

19         A.   So when I say "financial interests," yes,

20    I'm referring to dispensaries in Portland.

21         Q.   And I apologize if I'm being redundant,

22    but can you tell me what your understanding of those

23    financial interests was?

24              MR. SMITH:  Objection, form.

25              MR. BILLINGS:  Join.

1     A.   I don't know a lot of the specifics, but

2  I know that Floyd's of Leadville or I believe Floyd's

3  of Leadville was making payments towards acquiring and

4  closing on purchasing dispensaries in Portland.

5     Q.   (BY MR. MURRAY)  Do you know if they --

6  if Floyd -- FOL -- I'm sorry -- if FOL ever closed on

7  the purchase of those entities in Portland?

8     A.   I believe that it did not close --

9     Q.   Do you know why it did --

10     A.   -- a purchase.

11     Q.   Oh, sorry.

12     A.   I don't know specifically why it didn't

13  close.

14     Q.   If you can take a look at Exhibit 1,

15  which is the FOL Defendants' Answer And Crossclaims To

16  Benlolo And Kaplan Crossclaims.

17     A.   Okay.

18     Q.   And I know you looked at this earlier.

19  My understanding is you testified that you have not

20  reviewed this before today; is that correct?

21     A.   That is correct.

22     Q.   And -- let me see.  So you have not

23  reviewed any -- well, let me back up.  Do you see

24  pages 1 -- I'm sorry -- page 2 at the bottom through

25  the top of page 11?

1        A.    I have not read through it, no.

2        Q.    Okay.  So you didn't review any of this

3  before it was filed?

4        A.    I did not.

5        Q.    Okay.  And so starting at page 11, these

6  are what are called Crossclaims.  You can see it

7  written there in the middle of the page.

8        A.    Okay.

9        Q.    And I understand that you haven't

10  reviewed it.  I'll just represent that FOL has

11  asserted Crossclaims against my clients, so that's

12  what that refers to.

13        A.    Okay.

14        Q.    If you can take a look at page --

15  paragraph 14 on page 12.

16        A.    Okay.  I just need to read it.

17        Q.    Sure.

18        A.    Okay.

19        Q.    And I understand that you started at FOL

20  in late September or early October.

21        A.    Um-hum.

22        Q.    So I take it, based on your testimony,

23  that you were not at FOL when Benlolo and Kaplan

24  approached FOL; is that correct?

25              MR. SMITH:  Objection, form.

1                    MR. BILLINGS:   Join.

2            A.    So I don't know when this was in 2018;

3    but I do not recall meeting with Benlolo and Kaplan,

4    that's correct, about this specifically.

5            Q.    (BY MR. MURRAY)   Do you have any

6    understanding of whether Benlolo and Kaplan approached

7    FOL?

8            A.    It says that they did here, so I would

9    assume that's accurate.

10           Q.    But you don't have any other

11   independent --

12           A.    I don't have direct personal knowledge of

13   whether or not . . .

14           Q.    If you look at paragraph 18 -- and I'll

15   just read it for the record as well, "Eventually, FOL

16   agreed to purchase the Original dispensaries, and on

17   June 11, 2018, FOL and the Original Dispensary Owners

18   entered into an equity exchange agreement to govern

19   the transaction (the 'Equity Exchange Agreement').

20   (FOL Enterprises Ltd. was also a party to the

21   agreement, but that entity is now defunct and has

22   assigned its interests to FOL).   A true and correct

23   copy of the Equity Exchange Agreement is attached

24   hereto as Exhibit A."

25                    And, again, I understand that you didn't

1    review any of these before it was filed; but you can

2    see here this is referring to the Equity Exchange

3    Agreement we just looked at, right?

4            A.   It appears so.

5            Q.   Can you tell me what FOL Enterprises,

6    Ltd., is?

7            A.   I don't know what that is.

8            Q.   So you have no idea if it has any

9    relation to FOL?

10           A.   I -- no, I don't know.  I wasn't -- I

11   don't know what it is or when it was created or who

12   created it.

13           Q.   Okay.

14           A.   And I was not an employee of the company

15   in June of 2018.

16           Q.   So you have no knowledge of that entity

17   now being defunct?

18           A.   I do not.

19           Q.   And you have no idea of when it went

20   defunct?

21           A.   No.

22           Q.   If you could look back at the exhibit

23   that is the Equity Exchange Agreement.  I think it was

24   Exhibit 7.  Are you there?

25           A.   I'm there.

1          Q.    Okay.  So under Definitions, the first

2    definition that's on page 1 there --

3          A.    Um-hum.

4          Q.    "Floyd's of Leadville's, Inc., a Colorado

5    corporation having place of business at 1101 Popular,"

6    is defined as the "Purchaser."  Do you see that?

7          A.    I see that in the document.

8          Q.    And right below it says, "FOL

9    Enterprises, Ltd., a Canadian corporation, having its

10   principal place of business at," blank, and then it's

11   in parentheses "FOLE."  Do you see that?

12         A.    I do see that.

13         Q.    So if you turn to the second page, the

14   very first recital on the second page.

15         A.    Yeah.

16         Q.    At the top, "Whereas, Purchaser is a

17   subsidiary of FOLE and sells products containing

18   cannabinoids in compliance with Colorado law."  And

19   right after that, it reads, "Whereas, within a year of

20   the Effective Date of this Agreement, FOLE intends to

21   undergo a sale, in a firm commitment underwritten of

22   common stock of FOLE," as defined as the "Initial

23   Public Offering."  Do you see that?

24         A.    I do.

25         Q.    So I understand you just testified that

1    you don't know what FOLE was?

2          A.    Correct.

3          Q.    Did you have any general understanding of

4    whether an entity related to FOLE was trying to go

5    public at or around this time?

6                MR. SMITH:  Objection, form.

7                MR. BILLINGS:  Join.

8          A.    What is "this time"?

9          Q.    (BY MR. MURRAY)  June 11, 2018.

10         A.    No, I was not working there at that time;

11   so I do not know.

12         Q.    At any point that you were working at

13   FOL, were you aware of either FOL or an entity related

14   to FOL trying to go public?

15         A.    I remember that at some point we -- well,

16   the company, FOL, thought about trying to go public.

17   Again, I don't know what FOLE is, so I don't -- I

18   can't speak to that entity.

19         Q.    (BY MR. MURRAY)  Sure.  So is it your

20   understanding that FOL was the company that was trying

21   to go public?

22         A.    Yes.

23               MR. SMITH:  Object.

24               THE DEPONENT:  Sorry.

25               MR. SMITH:  That's all right.

1      Q.    (BY MR. MURRAY)  Do you know if it ended
2   up going public?

3      A.    It did not.

4      Q.    Do you know why it didn't?

5      A.    I don't know why.

6      Q.    Are you aware of any issues involving an
7   audit that would impact the company being able to go
8   public?

9      A.    The only thing that I can think of right
10  now is just marijuana inventory would probably be a
11  problem going public.

12     Q.    Why?

13     A.    Because it's federally illegal in the
14  United States.

15     Q.    Was FOL -- I understand your testimony is
16  that you understood FOL was looking into going public.
17  Was it looking into going public on an American -- one
18  of the America-traded exchanges?

19     A.    I believe it was looking to go public in
20  Canada.

21     Q.    And so by looking to go public, because
22  it was potentially involved with something that was
23  illegal at the federal level, it would impact its
24  ability to go public; is that your understanding?

25               MR. BILLINGS:  Objection to the form.

1                MR. SMITH:  Join.

2          A.   You asked me what could impede possibly

3     an IPO, and I think that could be an issue that one

4     would have to work around.

5          Q.   (BY MR. MURRAY)  And you're speaking in

6     generalities, not specific to FOL going public, right?

7          A.    I'm speaking in generalities, and FOL

8     itself would not be able to go public on the U.S.

9     stock exchange.

10         Q.   Right, but I -- I guess what I'm asking

11    is you don't have any specific knowledge with respect

12    to FOL or one of its affiliated companies trying to go

13    public.  You are speaking generally about a company

14    that would try to go public that was involved in the

15    marijuana industry?

16         A.   Yes, that's what I understood your

17    question to mean.

18         Q.   Okay.  You don't have any specific

19    knowledge regarding FOL going public or why they

20    ultimately did not go public?

21                MR. SMITH:  Objection to form.

22                MR. BILLINGS:  Join.

23         A.   I just said that I thought that, yes, FOL

24    did try to go public at one point.

25         Q.   (BY MR. MURRAY)  I understand.  But do

1  you have any specific understanding as why it did not

2  go public?

3       A.   No, I do not.

4       Q.   And so when we were discussing the audit

5  issue, that's just one possible issue you can imagine?

6       A.   Hemp could also be an issue or barrier to

7  going public in the U.S.

8       Q.   Sure.  But you're not aware that that was

9  the specific reason why FOL did not go public?

10      A.   No.  I don't recall exactly specific

11  reasons why.

12      Q.   Again, I understand that you were not

13  involved in the negotiation of the Equity Exchange

14  Agreement.

15      A.   Um-hum.

16      Q.   Do you have any idea whether FOL was

17  represented by counsel in connection with that

18  agreement?

19      A.   I don't know.

20      Q.   Earlier this morning, I believe you guys

21  talked about Roger Worthington.

22      A.   Um-hum.

23      Q.   And I believe you testified that you know

24  him, right?

25      A.   Um-hum.

1          Q.   Who is he?

2          A.   He's a friend of Floyd's and an investor

3     in Floyd's of Leadville.

4          Q.   Is he an attorney?

5          A.   I believe he is.

6          Q.   Do you have any idea whether he was

7     representing FOL in connection with the Equity

8     Exchange Agreement?

9          A.   I do not know.

10          Q.   Because you don't know whether FOL was

11     represented by an attorney?

12          A.   Correct.

13          Q.   So earlier when we were talking about the

14     financial interests that FOL had in these -- these

15     Oregon entities --

16          A.   Um-hum.

17          Q.   -- I believe you testified that it was

18     your understanding FOL was making payments to the

19     owners of the entities to ultimately buy them.

20               MR. SMITH:   Objection, form.

21               MR. BILLINGS:   Join.

22          A.   I don't know if the payments were being

23     made to the owners of the entities.  I don't know

24     exactly -- I can't say right now who the payments were

25     made to, so -- but -- but generally speaking, yes, FOL

1    made payments to eventually purchase dispensaries in

2    Oregon.

3                    (Deposition Exhibit 26 was marked.)

4            Q.    I just handed to you what's been marked

5    as Exhibit 26.  Have you ever seen this before?

6            A.    I don't think I have.  I'm not sure.

7            Q.    Okay.  Do you see on the bottom right --

8    you guys were talking about Bates numbers earlier

9    today.  Do you remember that discussion?

10           A.    Yes.

11           Q.    So when I refer to this document or any

12   other document I give you, that's -- I'll mostly be

13   referring to it by the Bates.  So that Bates says

14   FOL 15936.  Do you see that?

15           A.    Yes.

16           Q.    And I'll represent to you that means it

17   was produced by FOL in this litigation.  And it's

18   really small, and I apologize.  I wish I would have

19   printed it out on bigger paper.  But you can see the

20   column under Date, it lists a series of dates,

21   Transaction, and then the Memo/Description in the

22   middle.

23                    If you review that, you can see there's a

24   number of payments.  The first one is to Scott Lurie.

25   I guess the first one is a withdrawal made in a branch

1    store.  And then going below that, you can see Scott

2    Lurie, Andrew Kaplan, and down the road.  Do you see

3    that?

4         A.   I do.

5         Q.   And then under Account, it says,

6    "Portland dispensaries."  Do you see that?

7         A.   Yep.

8         Q.   So does -- and, again, you don't recall

9    ever having seen this before?

10        A.   Well, I don't know what this -- what is

11   this from?

12        Q.   Well, it was produced by FOL.

13        A.   Right.  But is it -- is it from

14   QuickBooks?  Is it from Excel?  Is it an email?

15   What's the context?  There's nothing -- I just don't

16   really know exactly what the context is around it.

17        Q.   Sure.  It was produced by FOL in this

18   litigation.

19        A.   Okay.

20        Q.   When you're saying it was attached to an

21   email, this is how we received it.  I can represent to

22   you that --

23        A.   Okay.

24        Q.   I'll represent to you that it's the

25   payments that were made by FOL under the -- what we're

1    referring to as the Equity Exchange Agreement.

2         A.    Okay.

3         Q.    I believe you testified earlier speaking

4    with Mr. Dawes that you weren't involved in the

5    financial transactions with FOL at a high level; is

6    that correct?

7              MR. SMITH:  Objection, form.

8              MR. BILLINGS:  Join.

9         A.    I was not involved or made any decisions

10   on financial matters.

11        Q.   (BY MR. MURRAY)  And I believe you

12   testified earlier that you were not aware of the

13   mechanism in which we've been referring to the

14   noteholders and the notes.

15        A.    Um-hum.

16        Q.    You didn't have any idea how -- what the

17   mechanism was for how the money transferred from the

18   noteholders to FOL; is that correct?

19        A.    The mechanic -- oh, yes, I remember

20   Mr. Dawes was asking me how the money was sent.  I

21   can't say for sure.

22        Q.    All right.  And so do you have any idea

23   -- well, let me back up.  Do you know what the source

24   of the payments FOL -- that FOL used to make -- make

25   these payments under the Equity Exchange Agreement?

1          MR. BILLINGS:  Objection to the form.

2          MR. SMITH:  Join.

3      A.   No, I can't tell where this money came

4  from.

5      Q.   (BY MR. MURRAY)  So if you look under

6  Split -- do you see that?

7      A.   Yes.

8      Q.   And it says, "Business Checking," in

9  parentheses "(7458)."

10     A.   Um-hum.

11     Q.   Do you understand what "7458" refers to?

12     A.   No.  I don't know.  Checking account

13 numbers.  I can't confirm what checking account is --

14 or if it's even -- well, it is a checking account.

15     Q.   Sure.

16          (Deposition Exhibit 27 was marked.)

17     Q.   Do you have Exhibit 27 sitting in front

18 of you?

19     A.   I do.

20     Q.   So do you see this is -- this is

21 Wells Fargo Business Choice Checking at the top.  It

22 says Floyd's of Leadville, Inc., on the left side

23 there.  Do you see that?

24     A.   Yep, I see that.

25     Q.   And then if you see -- so kind of the

1    bottom right corner, it says account number.  I won't

2    read it all out, but the last four is 7458.  Do you

3    see that?

4            A.    Yes.

5            Q.    And so if you see -- going back to

6    Exhibit 26, you can see that --

7            A.    It matches.

8            Q.    Yeah, it matches.

9            A.    Yeah, that looks like that's the checking

10   account it came from.

11           Q.    That's all I was --

12           A.    Okay.

13           Q.    So would that indicate to you under

14   Exhibit 26 that for each of those payments made that

15   lists 7458 -- does that indicate that they would have

16   come out of this checking account --

17                 MR. SMITH:  Objection to form.

18           Q.    (BY MR. MURRAY)  -- listed on Exhibit 27?

19                 MR. SMITH:  Objection to form.

20                 MR. BILLINGS:  Join.

21           A.    So what I can see from the transaction

22   report is it looks like one, two, three, four, five,

23   six, seven payments came out of this Wells Fargo

24   account.

25           Q.    (BY MR. MURRAY)  The last one you were

1    referring to was a different one?

2        A.   Well, I'm assuming we can find out -- I'm

3    sure we can find a match for it, but I have not

4    looked.

5        Q.   Yeah, I'll represent that Exhibit 27 is

6    just one month.

7        A.   Okay.

8        Q.   It's just March 2019.  So it's not going

9    to list --

10       A.   Okay.  But I just want to be clear that I

11   don't have personal knowledge.  I didn't push any

12   buttons, I didn't -- I don't have personal knowledge

13   of these amounts.  I didn't even have access to the

14   Wells Fargo account, so I cannot say for sure that I

15   saw that happening.  But based on the documents you're

16   showing me, I can confirm that that looks like what it

17   is.

18       Q.   Sure.  And I'll just say let's assume,

19   just for the purposes of this question, each of these

20   payments were made as represented here on the dates

21   and the amounts and to the people it lists, okay?

22       A.   Okay.

23       Q.   Assuming that to be true, do you have any

24   idea -- so let me back up.  Each of those payments --

25   and further assume that each of those payments were

1    made by FOL to the people listed.

2         A.    Um-hum.

3         Q.    Do you have any idea where FOL got the

4    money to make those payments?

5              MR. BILLINGS:  Objection to the form.

6              MR. SMITH:  Join.

7         A.    I don't know.

8         Q.    (BY MR. MURRAY)  So you have no idea

9    whether the funds came from the noteholders as opposed

10   to anybody else?

11        A.    No.

12        Q.    Would anybody at FOL know that

13   information?

14        A.    Possibly, but I don't know for sure.

15        Q.    Who would it be?  If somebody knew, who

16   would it be?

17        A.    Floyd.

18             MR. SMITH:  Objection to the form.

19             MR. BILLINGS:  Join.

20        A.    Sorry.  I'm too fast.  I believe Floyd

21   would know maybe, but I can't say for sure he would

22   know.  But you can ask him.

23        Q.    (BY MR. MURRAY)  So from the accounting

24   standpoint into the flow of funds into and out of FOL,

25   Floyd would be the best person to ask about that?

```
1          A.    Yes.

2          Q.    Would anybody else?

3          A.    I don't know.

4          Q.    I know we looked at the executive team

5    earlier.  Was there a CFO?

6          A.    There was.

7          Q.    Who was that?

8          A.    Chris Ryan.

9          Q.    Who would be involved in that, in the

10   flow of funds?

11               MR. SMITH:  Objection to form.

12               MR. BILLINGS:  Join.

13         A.    I don't know.

14         Q.    (BY MR. MURRAY)  So if -- like under

15   Exhibit 26, if, say, for example, there was a -- a

16   wire out of checking account ending 7458 in the amount

17   of $300,000 to Andrew Kaplan --

18         A.    Um-hum.

19         Q.    -- who at FOL would have the authority to

20   execute that wire?

21               MR. BILLINGS:  Objection to the form.

22               MR. SMITH:  Join.

23         A.    So to the best of my knowledge, Floyd

24   did.  Floyd had access to the account, and I -- that's

25   -- I think that's it.
```

1           Q.   (BY MR. MURRAY)  Nobody else at --

2           A.   I don't know.

3           Q.   Sure.

4           A.   I don't know.

5           Q.   As far as you know, was there -- did FOL

6    have some kind of an authorization process in place

7    where if a wire transaction was in excess of a certain

8    amount, more than one person had to authorize it?

9           A.   I don't know.

10          Q.   As far as you know, Floyd would have

11   unlimited access with respect to executing wires into

12   and out of FOL's bank accounts?

13               MR. BILLINGS:  Objection to the form.

14               MR. SMITH:  Join.

15          A.   I mean, that's making a pretty negative

16   assumption there.  And I don't -- I don't know.  I

17   mean, I'm not sure why -- I don't know.

18          Q.   (BY MR. MURRAY)  You just don't know one

19   way or the other whether Floyd had that authority or

20   not?

21          A.   I -- no, I don't know whether Floyd had a

22   senior authority or where that authority would come

23   from or exactly what authority he had, no.  He --

24          Q.   And so, again, I know that you hadn't

25   previously seen Exhibit 26, but just to clarify --

1           A.    Um-hum.

2           Q.    -- you were not involved in making any of

3     these payments identified on Exhibit 26?

4                 MR. SMITH:  Objection, form, asked and

5     answered.

6                 MR. BILLINGS:  Join.

7           A.    Not that I recall.

8           Q.    (BY MR. MURRAY)  And you wouldn't know

9     the reason for any of the specific amounts reflected

10    in Exhibit 26; is that correct?

11          A.    No, I definitely do not know that; that

12    is correct.

13                (Deposition Exhibit 28 was marked.)

14          Q.    Do you see what's been marked as

15    Exhibit 28 there in front of you?

16          A.    Yes.

17          Q.    Do you see it's a -- and I'll represent

18    -- I know that you are not on this email.

19          A.    Um-hum.

20          Q.    So I assume you've not previously seen

21    this email.

22          A.    I have not.

23          Q.    Okay.  So if you look at the Bates label

24    BENKAP-00274 -- 2074, do you see that?

25          A.    Yes.

```
1              Q.   And see it's an email on December 5th,
2    2018, from Tim at Floyd's of Leadville.  Do you see
3    that?
4              A.   Yes.
5              Q.   Do you know who Tim is?
6              A.   Yes.
7              Q.   What's his last name?
8              A.   Kelly.
9              Q.   And what was his role?  Do you know?
10             A.   I don't know.  Floyd mostly dealt with
11   him.
12             Q.   He was not part of the management team?
13                  MR. SMITH:  Objection, form.
14                  MR. BILLINGS:  Join.
15             A.   No, not that I am aware of.
16             Q.   (BY MR. MURRAY)  Do you have a general
17   idea of what he did there?  Was he involved in sales?
18   Marketing?
19             A.   I don't know.
20             Q.   No idea?  Okay.  If you can see, it says
21   -- that email says, "David, Good to speak with you
22   today.  To clarify, we will doing a break this week
23   and get you caught up on your monthly installment.  We
24   have been stymied a bit because we closed the $32mm
25   round and had to do new docs for the $50mm round which
```

1    took longer than anticipated.  I apologize for the

2    delay.  Please reach out to me at any time, Tim."

3                  Do you see that?

4         A.    I see that.

5         Q.    Do you have -- again, I understand you're

6    not on this email.  Do you have any idea what Tim

7    would be meaning by the $32-million round and the

8    $50-million round?

9         A.    I do not.

10        Q.    Do you know if FOL was ever trying to

11   raise money in those amounts?

12        A.    I don't -- I don't recall an amount.  I

13   don't know.

14        Q.    You don't recall if FOL was ever trying

15   to raise money in those amounts?

16        A.    In those amounts?  That's very specific.

17   I don't know.

18        Q.    Do you know if FOL -- aside from the

19   notes that we've discussed this morning, was FOL

20   trying to raise funds from other sources aside from

21   the notes around this time?

22        A.    I believe so.

23        Q.    Tell me what you know about that.

24        A.    About what?

25        Q.    FOL's efforts to raise funds around that

1    time.

2           A.   Well, I -- oh, around that time?

3           Q.   December of 2022.

4           A.   That I -- that is too specific of a time

5    period for me to nail down what was being raised at

6    that time.

7           Q.   How about at any time?  Aside from the

8    notes from late December 2018 when you were there

9    until the time you left, tell me about all fundraising

10   efforts by FOL.

11               MR. BILLINGS:  Object to form.

12               MR. SMITH:  Join.

13          A.   So over the course of some time, Floyd

14   was trying to raise money from other investors.

15          Q.   (BY MR. MURRAY)  And when you say "over

16   the course of some time," do you have any idea what

17   time frame that was?

18               MR. SMITH:  Form.

19               MR. BILLINGS:  Join.

20          A.   I don't recall specifically the time

21   frame.

22          Q.   (BY MR. MURRAY)  Safe to say between

23   December 2018 and when you left?

24          A.   Exactly.  When I was there and an

25   employee, yeah.

1    Q.   And, again, you left in --

2    A.   May of 2020.

3    Q.   Do you know who Floyd was trying to raise

4  money from?

5    A.   I don't remember.

6    Q.   And let me back up.  I believe your

7  testimony was that Floyd was trying to raise money.

8  Did you -- did you intentionally mean Floyd as opposed

9  to FOL?

10   A.   Floyd on behalf of FOL.

11   Q.   Was he raising any money on behalf of

12  anybody else in addition to FOL or any other entities

13  in addition to FOL?

14   A.   Not that I am aware of.

15   Q.   Do you know why he was trying to raise

16  money?

17   A.   Because as a start-up, FOL needed a lot

18  of funds to grow quickly; and that takes money.

19   Q.   Do you know who he was trying to raise it

20  from?

21   A.   No.

22        MR. BILLINGS:  Objection to the form.

23  Sorry.

24        MR. SMITH:  Join.

25   A.   I'll say it again.  No, I don't recall.

1          Q.   (BY MR. MURRAY)  Do you have any idea how

2     much he was trying to raise?

3          A.   No.

4          Q.   In that email we just looked at,

5     Exhibit 28, it represents a $32-million round and a

6     $50-million round.  Do you have any idea if the amount

7     Floyd was trying to raise was in that neighborhood?

8               MR. BILLINGS:  Objection to the form.

9               MR. SMITH:  Join.

10         A.   No, I don't.  But, again, that's a very

11    high number to be raising that for a small company.

12    But I don't know.  I would be surprised.

13         Q.   (BY MR. MURRAY)  Do you know if he

14    ultimately raised $32 million?

15         A.   He did not, no.

16         Q.   Do you know if he ultimately raised

17    $50 million?

18         A.   He did not.

19         Q.   Do you know how much he raised in these

20    fundraising efforts?  And, again, we're talking about

21    separate from the notes.

22              MR. BILLINGS:  Objection to the form.

23              MR. SMITH:  Join.

24         A.   No, I don't recall specific amounts.

25         Q.   (BY MR. MURRAY)  And do you have any idea

1   what the funds would have been used for?

2            MR. BILLINGS:  Objection to the form.

3            MR. SMITH:  Join.

4        A.   Again, in a start-up, you need money --

5   one, a company typically needs money -- and FOL was no

6   different -- to mainly purchase inventory and

7   packaging and branding, that kind of thing.

8        Q.   (BY MR. MURRAY)  And I believe you

9   testified you don't know how much he ultimately

10  raised; is that correct?

11       A.   Correct.

12       Q.   Do you know if he raised anything?

13       A.   I believe he raised some money, um-hum.

14       Q.   And do you know if it was in the form of

15  equity?

16       A.   I don't know.

17       Q.   Do you know a Jonathan Farber?

18       A.   I do.

19       Q.   Who is he?

20       A.   He's a friend of Floyd's and -- yeah, I

21  believe he might be an investor.

22       Q.   An investor in --

23       A.   In Floyd's of Leadville.

24       Q.   So when we were just talking about the

25  equity -- I'm sorry.  Let me back up.  When we were

1    just discussing the fundraising that Floyd was out

2    engaged in, was it equity in FOL?

3        A.   I don't know specifically what he

4    invested in.  That was not -- I did not deal with

5    Jonathan on any fundraising.

6        Q.   Do you know if Jonathan -- I believe you

7    just testified you think he might be an investor in

8    FOL.

9        A.   I do think so, yeah.

10       Q.   So he -- so he holds equity in FOL?

11            MR. SMITH:  Objection to form.

12            MR. BILLINGS:  Join.

13       A.   I believe so.

14       Q.   (BY MR. MURRAY)  Do you know how many

15   equity holders there are in FOL?

16            MR. SMITH:  Objection, form.

17            MR. BILLINGS:  Join.

18       A.   No, I do not.

19       Q.   (BY MR. MURRAY)  Ballpark, any idea?

20       A.   No.

21       Q.   More than 20?

22       A.   I don't know.

23       Q.   No idea?  Okay.  Do you know who Jeremy

24   Fand is?

25       A.   I do.

1          Q.   Who is he?

2          A.   He's a friend of Floyd's, and he gave

3   money to FOL, invest -- but I can't remember in what

4   form.

5          Q.   Do you know how much money he gave to

6   FOL?

7          A.   I don't recall specifically.

8          Q.   Does $500,000 sound about right?

9          A.   I don't know for sure.

10         Q.   Do you know who Joan Speigel is?

11         A.   That is Jeremy's sister.

12         Q.   Do you know if she gave money to FOL?

13         A.   I don't know for sure if she gave money

14  to FOL.

15         Q.   Do you know approximately when Jeremy

16  gave money to FOL?

17         A.   No, I don't remember.

18         Q.   Do you know what FOL used Jeremy's money

19  for?

20         A.   No, I do not.  Also, just to be clear, I

21  don't know if Jeremy himself gave money to the

22  company.  I just want to be very precise.  Or if a

23  trust that he's involved with gave money to the

24  company, so I just wanted to be precise about that.

25         Q.   I could probably eliminate a bunch of the

1    questions if we just get a broader idea, which we've

2    already been discussing.  Would you agree with me that

3    you don't have any specific knowledge with respect to

4    the source of funds used by FOL to make any payments

5    under the Equity Exchange Agreement?

6            A.    That is correct.

7            Q.    And you don't have any knowledge

8    regarding the source of funds that came into FOL and

9    then went out of FOL?  You didn't have any involvement

10   in the financial transactions with FOL; is that

11   correct?

12           A.    No.

13                 MR. BILLINGS:  Objection to the form.

14                 THE DEPONENT:  Sorry.

15                 MR. SMITH:  Join.

16           A.    As far as I can recall, that is correct.

17           Q.    (BY MR. MURRAY)  Did you have the

18   authority -- we were previously discussing the

19   authority to make wire transactions, for example, with

20   FOL.  Did you have that authority?

21                 MR. BILLINGS:  Objection to the form.

22                 MR. SMITH:  Join.

23           A.    I'm not sure.  I -- I don't know if I

24   ever made a wire.  And if I did, it was a small

25   amount.  You know, it was to vendors and manufacturers

1   and smaller amounts.

2                (Deposition Exhibit 29 was marked.)

3        Q.   Do you see Exhibit 29 sitting there in

4   front of you?

5        A.   Um-hum.

6        Q.   Do you have it?  And, again, you're not

7   on this.  You can see it's a text message.  I believe

8   it looks like it's from Floyd.  Do you see that?  It

9   says "Floyd" at the top?

10       A.   Um-hum.

11       Q.   It says, "Floyd, Hey dude just sit tight

12  on the check for one more day and we should be good."

13               Do you see below that he's forwarding a

14  text exchange between himself and Jeremy?

15       A.   Um-hum.

16       Q.   It says, "I'm not sure if FOL will be a

17  partner yet or if we can do it under FOL.  I'm still

18  getting some counsel on how to do that, but it

19  benefits FOL, who will be able to acquire the

20  marijuana assets.  While the other capital focuses on

21  real estate."  Do you see that?

22       A.   I mean, it's very difficult to read; but,

23  yes.

24       Q.   It is not a great picture, I acknowledge

25  that.  Do you have any idea -- well, let me back up.

1   Do you know if Jeremy in this text exchange is Jeremy

2   Fand that we just discussed?

3          A.   I cannot confirm that.  I don't --

4          Q.   When Fand says, "It benefits FOL who will

5   be able to bring" -- or "who will be able to acquire

6   the marijuana assets," do you know what assets he's

7   referring to?

8          A.   I don't feel comfortable speaking for

9   Floyd in what he meant in a text to someone else that

10  I was not on.

11         Q.   And when you say you don't feel

12  comfortable --

13         A.   I don't know.

14         Q.   -- you don't know?  What were the assets

15  FOL -- the marijuana assets that FOL was acquiring

16  around this time, April 8th, 2019?

17              MR. BILLINGS:  Objection to the form.

18              MR. SMITH:  Join.

19         A.   I -- I'm not sure.

20         Q.   (BY MR. MURRAY)  Do you know if it was

21  acquiring any marijuana assets at that time?

22              MR. BILLINGS:  Objection to the form.

23         A.   I'm not sure.  I don't know.

24         Q.   (BY MR. MURRAY)  And when this text says,

25  "It benefits FOL who will be able to acquire the

1  marijuana assets while the other capital focuses on

2  real estate," do you have any idea what he means by

3  "other capital"?

4          A.  No, I do not.

5          Q.  Do you have any idea what he's referring

6  to with respect to the real estate?

7          A.  No, I do not.

8          Q.  Do you know if around this time,

9  April 8th, 2019, FOL was acquiring real estate?

10         A.  I don't recall.

11         Q.  I believe you discussed the farm earlier

12 this afternoon -- or this morning with Mr. Dawes.  Do

13 you remember that?  Do you have any idea if this real

14 estate would be in reference to that?

15         A.  I don't know.

16         Q.  So we've already discussed that you're

17 not familiar with the payments that FOL made under the

18 Equity Exchange Agreement, correct?

19         A.  Correct.

20         Q.  So is it fair to say you were not aware

21 whether FOL made those payments on a timely basis as

22 required under the Equity Exchange Agreement?

23         A.  No, I don't know.

24         Q.  So when we were talking about FOL having

25 a financial interest in the Oregon entities and you

1    testified that you understood FOL was making some

2    payments to eventually acquire the Oregon entities --

3          A.    Um-hum.

4          Q.    -- do you know what -- from a -- well,

5    let me back up.  To acquire an entity like a

6    dispensary, do you know what is required at the state

7    level for a transfer of the entity?

8                MR. BILLINGS:  Objection to the form.

9                MR. SMITH:  Join.

10         A.    No, I do not.

11         Q.    (BY MR. MURRAY)  Do you know if there's

12   any requirements in terms of transferring the specific

13   license between -- for example, the sale of a

14   dispensary.  If there's a sale, are you aware of any

15   state or local law requirements with respect to

16   transferring the license between the seller and the

17   buyer?

18               MR. BILLINGS:  Objection to form.

19               MR. SMITH:  Join.

20         A.    I don't know.

21         Q.    (BY MR. MURRAY)  If you can go back to

22   Exhibit 1, which is the Crossclaims.  If you look at

23   paragraph 20 -- I'm looking at the crossclaim

24   paragraphs.  This is page 14.

25         A.    Okay.  I'm on page 14.

1        Q.   So paragraph 23 at the top says, "In

2  anticipation of the completion of the transaction and

3  the resulting transfer of ownership, FOL and the

4  Original Dispensary Owners submitted paperwork to the

5  Oregon Liquor and Cannabis Commission ('OLCC'), which

6  must approve all ownership transfers for Oregon

7  cannabis dispensaries."

8        Do you see that?

9        A.   I see that.

10       Q.   Do you have any idea whether FOL and the

11  original dispensary owners submitted the required

12  paperwork to the OLCC?

13       A.   I don't know.

14       Q.   Do you know generally whether any

15  paperwork was submitted by FOL to the OLCC?

16       A.   I -- no, I don't know.

17       Q.   Do you have any idea whether a license, a

18  marijuana license, was ever transferred to FOL from a

19  -- a Portland, Oregon, dispensary license was ever

20  transferred to FOL?

21       A.   No, I don't know.

22       Q.   You don't know one way or the other?

23       A.   I don't.

24       Q.   And you're not -- I believe you testified

25  that you wouldn't -- you don't know what would be

1    required to effect that transfer of a license?

2        A.    No, I don't.

3        Q.    If you look at paragraph 21 of that

4    Crossclaims -- it's on the prior page -- it reads,

5    "Additionally, FOL hired Benlolo and Kaplan to manage

6    its cannabis assets.  FOL placed its trust in Benlolo

7    and Kaplan to manage those assets, and Benlolo and

8    Kaplan exercised virtually unfettered oversight over

9    those assets for the next several years.  In exchange,

10   Benlolo and Kaplan received $100,000 salaries from FOL

11   as well as health insurance."

12             Do you see that?

13       A.    I do.

14       Q.    When it says, "FOL hired Benlolo and

15   Kaplan," I believe you testified earlier -- were

16   Benlolo and Kaplan employees of FOL?

17       A.    At one point, they were.  Well, if you

18   consider being an employee making a salary, yes.

19       Q.    Do you know whether they were -- I

20   believe you testified that you didn't know whether

21   their salary was paid via 1099 or W2.

22       A.    I don't recall the specifics of their

23   tax.

24       Q.    And in this paragraph where it says, "FOL

25   placed its trust in Benlolo and Kaplan" -- well, let

1  me back up.  When it says, "FOL hired Benlolo and

2  Kaplan to manage its cannabis assets," do you know

3  what assets that is referring to?

4          A.    Not specifically, no.

5          Q.    How about generally?

6          A.    I knew you would ask that.

7          Q.    We're very predictable.

8          A.    No, I'm not sure exact -- I'm not sure

9  what that's referring to.

10         Q.    Do you know if FOL had any cannabis

11  assets at around the time they hired Benlolo and

12  Kaplan?

13         A.    I'm not sure.

14         Q.    Do you know if FOL had any cannabis

15  assets at any point during the time you were employed

16  by FOL?

17         A.    So I believe that FOL had a dispensary in

18  Leadville, Colorado.

19         Q.    FOL owned that dispensary?

20         A.    Technically, the license is under Floyd's

21  name because, at the time, if I remember correctly,

22  the Colorado marijuana regulator -- I forgot what it's

23  called -- didn't -- required it to be an individual

24  that owned a marijuana license, so it was under

25  Floyd's name.

1    Q.   Did it have -- did FOL have any other

2    marijuana assets at that time?

3         A.   I'm not sure.

4         Q.   So looking at paragraph 21 where it says,

5    "FOL hired Benlolo and Kaplan to manage its cannabis

6    assets," is it your understanding that Benlolo and

7    Kaplan managed the Leadville dispensary that you just

8    referenced?

9              MR. SMITH:  Objection to form.

10             MR. BILLINGS:  Join.

11        A.   They helped with some things on the

12   dispensary.

13        Q.   (BY MR. MURRAY)  Would you say that

14   Benlolo and Kaplan exercised virtually unfettered

15   oversight over the Leadville dispensary?

16        A.   I don't know.  I can't say.

17        Q.   Were there any other managers of the

18   Leadville dispensary?

19             MR. SMITH:  Objection to form.

20             MR. BILLINGS:  Join.

21        A.   Scott Thompson worked at the dispensary.

22        Q.   (BY MR. MURRAY)  In what capacity?

23        A.   I don't remember exactly what capacity.

24        Q.   Was it like a management-like role?

25             MR. BILLINGS:  Objection to the form.

```
 1                MR. SMITH:  Join.
 2         A.   I'm not sure what you mean by
 3   "management-type role."
 4         Q.   (BY MR. MURRAY)  Was he there every day?
 5         A.   I can't say for sure if he was there
 6   every day.
 7         Q.   Did he have any employees reporting to
 8   him?
 9         A.   I don't know.
10         Q.   Did he set schedules for the employees?
11         A.   I don't know.
12         Q.   You don't know what he did there?
13         A.   I don't know exactly what he did at the
14   dispensary.
15         Q.   Do you know if Mr. Benlolo and Mr. Kaplan
16   were there every day?
17         A.   No, I do not know that.
18         Q.   Do you know if they were there on a
19   fairly regular basis?
20         A.   I believe in the beginning, they helped
21   Scott.  And they were there frequently, but I'm not
22   sure exactly how frequently or what that means in
23   terms of visits.
24         Q.   And what -- what gives you that
25   understanding about how frequent they were there?  I
```

1    believe you just testified at the beginning they were

2    there.  Were you present at the Leadville dispensary?

3              MR. SMITH:  Objection, form.

4              MR. BILLINGS:  Join.

5         A.   Not much because I live in New York.

6         Q.   (BY MR. MURRAY)  So what's the basis for

7    your testimony that you understand that Mr. Benlolo

8    and Kaplan were there fairly regularly at the

9    beginning?

10             A.   Because as I referred to earlier, Andrew

11   and I would work on understanding how a dispensary

12   works.  And so I went to the Leadville dispensary at

13   least once that I can recall with Andrew to have him

14   show me how it works.

15             Q.   (BY MR. MURRAY)  So conversations with

16   Mr. Kaplan is what --

17             MR. SMITH:  Objection, form.

18             Q.   (BY MR. MURRAY)  -- primarily gave you

19   the basis of understanding of them being there on a

20   fairly regular basis at the beginning?

21             MR. SMITH:  Objection to form.

22             MR. BILLINGS:  Join.

23             A.   I don't recall specifically.

24             Q.   (BY MR. MURRAY)  So in that same

25   paragraph we just looked at and discussed on FOL's

1    cannabis assets, we discussed financial interests that

2    FOL had in those Oregon dispensaries.  And I believe

3    you testified that that sale never closed; is that

4    correct?

5         A.   That's correct.

6         Q.   So in this paragraph where it's referring

7    to Benlolo and Kaplan managing FOL's cannabis assets,

8    would you consider those Oregon dispensaries FOL's

9    cannabis assets?

10             MR. SMITH:  Objection, form.

11             MR. BILLINGS:  Join.

12        A.   I'm not sure I understand the question.

13   The term asset can be very broad, so I'm not sure what

14   you're asking.

15        Q.   (BY MR. MURRAY)  I understand asset can

16   be broad, but were they FOL's assets as opposed to

17   someone else's assets?

18             MR. BILLINGS:  Objection to form.

19        Q.   (BY MR. MURRAY)  Did FOL own them?

20             MR. BILLINGS:  Objection to the form.

21             MR. SMITH:  Join.

22        A.   I don't know what assets we're referring

23   to, so I can't say whether or not FOL owned them.

24        Q.   (BY MR. MURRAY)  So we've been talking

25   about Portland, Oregon, dispensaries.

1           A.    Okay.

2           Q.    Did FOL ever own these Portland, Oregon,

3    dispensaries?

4                 MR. BILLINGS:  Objection to the form.

5                 MR. SMITH:  Join.

6           A.    I don't believe that it did.

7           Q.    (BY MR. MURRAY)  Because the sale never

8    closed?

9           A.    Correct.

10          Q.    So there's -- you were discussing earlier

11   with Mr. Dawes the notes that were raised or the issue

12   by FOL and various collateral or assets that were

13   pledged in connection with those notes.  Do you

14   remember that?

15          A.    Are you -- can you be more specific?

16          Q.    Just the general topic of testimony?

17          A.    Yes.

18          Q.    So do you understand that the notes --

19   there are notes that exist that FOL issued to various

20   noteholders?

21                MR. BILLINGS:  Objection to the form.

22                MR. SMITH:  Join.

23          A.    I understand that there were notes, yes.

24          Q.    (BY MR. MURRAY)  Do you understand that

25   those notes were secured by collateral?

```
1            A.   I don't know.

2                 MR. BILLINGS:  Objection to the form.

3            Q.   (BY MR. MURRAY)  You don't know one way

4    or the other whether they were secured?

5            A.   I wasn't involved in the creation of the

6    notes.

7            Q.   So is it fair to say that you don't know

8    what, if any, the collateral for the notes are?

9            A.   I don't know or recall the specifics of

10   the agreements regarding the notes.

11           Q.   Not speaking specifically about those

12   notes, just the concept of secured notes in general,

13   if they are secure, that means there is collateral

14   securing them; is that fair to say?

15                MR. SMITH:  Object to form.

16                MR. BILLINGS:  Join.

17           A.   I don't know; but in general, that's my

18   understanding of the term securing is that there's

19   collateral against some assets.

20           Q.   (BY MR. MURRAY)  And I'm just talking

21   generally.  I'm not talking about the FOL notes, just

22   a general concept.

23           A.   Okay.

24           Q.   And so if somebody is going to borrow

25   money under a secured note and post collateral for it,
```

1    would you agree that they would have to own the

2    collateral in order to post it -- own the assets in

3    order to post it as collateral for those notes?

4            MR. BILLINGS:  Objection to the form.

5            MR. SMITH:  Join.

6        A.   I don't really feel comfortable

7    speculating on what may or not be in a made-up

8    scenario.

9        Q.   (BY MR. MURRAY)  Can you post something

10   as collateral for a loan if you don't own it?

11           MR. BILLINGS:  Objection to the form.

12           MR. SMITH:  Join.

13       A.   Can you post something as collateral for

14   a loan if you don't know it -- I --

15       Q.   (BY MR. MURRAY)  If you don't --

16       A.   I don't know.  That's -- I don't know.

17   Again, context, it's a made-up example.  I don't know.

18       Q.   So if you were going to go borrow money

19   for a bank and they asked you to pledge assets for

20   collateral for it, do you think you would be able to

21   pledge my house as collateral for that loan?

22           MR. SMITH:  Objection to form.

23           MR. BILLINGS:  Join.

24       A.   In that example, I don't think that would

25   be possible.

1          Q.   (BY MR. MURRAY)  Because you don't own my

2    house?

3               MR. SMITH:  Objection to form.

4               MR. BILLINGS:  Join.

5          A.   Because I don't own your house.

6               MR. SMITH:  Yet.

7               MR. MURRAY:  It's a matter of time.

8          Q.   (BY MR. MURRAY)  Unless, of course, I

9    gave you permission to pledge my house; is that fair?

10              MR. SMITH:  Objection to form.

11              MR. BILLINGS:  Yeah, join.

12         A.   No, again, I don't -- that depends on the

13   agreements we have and --

14         Q.   (BY MR. MURRAY)  Did you ever have any

15   discussions with Mr. Kaplan or Benlolo about FOL

16   pledging the Oregon dispensaries as collateral for the

17   notes?

18         A.   No, I do not recall having any such

19   conversation with them.

20         Q.   Any written communication with them?

21         A.   Not that I can recall.

22         Q.   No communication of any kind with

23   Mr. Benlolo or Mr. Kaplan regarding FOL pledging the

24   Oregon dispensaries as collateral for the notes?

25              MR. BILLINGS:  Objection to the form.

1          A.    Not that I can remember today, no.  I --
2                MR. BILLINGS:  We've been going about an
3    hour.  If you're going to switch topics, it may be a
4    good time for a break.
5                MR. MURRAY:  Sure.  I'm bouncing around
6    in no coherent form, so every question is a new topic.
7                (Recess taken, 2:29 p.m. to 2:43 p.m.)
8                (Deposition Exhibit 30 was marked.)
9          Q.    (BY MR. MURRAY)  Okay.  Exhibit 30.  Do
10    you see that is a text exchange?  You're not on it, so
11    I wouldn't expect you to have seen this before.
12                You see Floyd is writing -- this is a
13    text between Floyd and Andrew Kaplan.  Floyd, at the
14    top right, "Hey dude I'll write up an email update for
15    the above.  In the mean time I need a few things for
16    Roger.  Can I get the EIN numbers for the three
17    Portland dispensaries?  He's going to finance the
18    farm.  And we can go to him a bit later about the
19    hotel."
20                And you can see AK, which is Andrew
21    Kaplan's response, "K great - just for clarity use of
22    EINs is not to pledge the shops for anything, right?"
23                And then actually if you look on the next
24    page, it's easier to read.  Floyd responds, "Correct.
25    I'm trying to help him to understand the structure and

1    I've made it clear we don't own them yet.  He's ok

2    with the farm real estate as collateral."

3              So a few questions on this.  Do you know

4    here if Floyd is referring to Roger Worthington?

5         A.   I -- I can't say for sure.

6         Q.   Do you know if Roger Worthington was

7    involved in financing the farm?

8         A.   I believe he was.

9         Q.   What was his role in financing the farm?

10        A.   I believe that he put in some money for

11   the farm.

12        Q.   Did he -- and I believe you testified

13   earlier the farm did not -- FOL did not end up closing

14   on the purchase of the farm; is that correct?

15        A.   That's correct.

16        Q.   And do you know why FOL did not end up

17   closing on the purchase of the farm?

18        A.   No, I do not.

19        Q.   You don't know one way or the other?

20        A.   I don't recall.

21        Q.   Do you know if there were any compliance

22   violations by the seller of the farm that caused a

23   delay in the closing?

24              MR. BILLINGS:  Objection to the form.

25              MR. SMITH:  Join.

```
1              A.   I don't know.

2              Q.   (BY MR. MURRAY)  You haven't heard that

3    one way or the other?

4              A.   I don't remember hearing that.

5              Q.   And then we see on that exhibit I just

6    read, Floyd says, "Correct.  I'm trying to help him"

7    -- well, let me back up.

8                   Andrew says, "K great - just for clarity

9    use of EINs is not to pledge for anything, right?"

10   And Floyd responds, "Correct.  I'm trying to help him

11   understand the structure and I've made it clear that

12   we don't own them yet."

13                  Do you understand this to be Floyd saying

14   not pledging the dispensaries as collateral for

15   anything?

16                  MR. BILLINGS:  Objection to the form.

17                  MR. SMITH:  Join.

18             A.   I can't speak to what Floyd meant in his

19   text to Andrew.

20             Q.   (BY MR. MURRAY)  Do you know if Floyd or

21   FOL ever did pledge the Oregon entities, these

22   Portland, Oregon, dispensaries, as collateral for

23   anything?

24                  MR. BILLINGS:  Objection to the form.

25                  MR. SMITH:  Join.
```

1          A.    I don't recall.

2          Q.    (BY MR. MURRAY)  But we discussed earlier

3    that FOL never closed on the purchase of these three

4    dispensaries, right?

5          A.    Correct.

6          Q.    And if it never closed on purchase, then

7    it never owned them, correct?

8                MR. BILLINGS:  Objection to the form.

9                MR. SMITH:  Join.

10         A.    Right.  Right.  And as I said, it was a

11   financial interest in the dispensaries.

12         Q.    (BY MR. MURRAY)  A financial interest --

13   you believe you testified that they were making

14   payment -- FOL was making payments toward acquiring

15   the dispensaries, right?

16         A.    Yes.

17         Q.    But FOL never closed on the purchase of

18   those dispensaries, correct?

19         A.    Correct.

20         Q.    So would you agree that FOL never owned

21   those dispensaries?

22               MR. BILLINGS:  Objection to the form.

23               MR. SMITH:  Join.

24         A.    Not that I remember or not that I know.

25         Q.    (BY MR. MURRAY)  So if you can go back to

1    Exhibit 13 that you guys looked at earlier today.

2                    THE DEPONENT:  Is it okay if I just grab

3    a tissue?

4                    MR. MURRAY:  Sure.

5                    THE DEPONENT:  Oh, thank you.

6                    MR. BILLINGS:  Two boxes' worth.

7                    THE DEPONENT:  Okay.  Which exhibit?

8                    MR. MURRAY:  13.

9                    THE DEPONENT:  Sorry.  I'm getting my

10   exhibits all messed up.  Okay.  Exhibit 13?

11                   MR. MURRAY:  Yeah.

12                   THE DEPONENT:  Okay.

13            Q.   (BY MR. MURRAY)  This was the email you

14   guys discussed, you and Mr. Dawes earlier today, from

15   Mr. -- I think we've been pronouncing it different

16   ways.  I was going to say DiChiara.  Is it hard CH?

17                   MR. LANDIS:  Good enough.

18            A.   I don't know.

19            Q.   (BY MR. MURRAY)  It's between

20   Mr. DiChiara and Mr. DiMartini, and you're copied on

21   it.  And earlier you guys looked at Schedule A, which

22   would be third page in, Bates ending 1882.

23            A.   Um-hum.

24            Q.   And this is Schedule A.  Do you

25   understand what -- what this Schedule A is intended to

1    represent?

2         A.    No, I do not.  I did not put it together.

3         Q.    Do you know if it's intended to represent

4    FOL's assets?

5         A.    No, I do not because I had nothing to do

6    with that schedule.

7         Q.    And this is at -- in March of 11/20/2019.

8    Assuming -- and I understand you don't know, but

9    assuming Schedule A is intended to represent FOL's

10   assets, you can see on Schedule A, Item 2 is BTE Reed,

11   LLC; Item 3 is BET 2, LLC; Item 4 is the Slichlolo

12   Broadway.  Do you see that?

13                MR. BILLINGS:  Objection to the form.

14        Q.    (BY MR. MURRAY)  And I'll represent that

15   those are the names of the Portland, Oregon, entities

16   that we've been discussing here today.

17        A.    Okay.

18        Q.    If Schedule A is intended to represent

19   FOL's assets and it is representing that it owns these

20   three Portland, Oregon, entities, do you consider that

21   an accurate representation at this time on March 11 of

22   2019?

23                MR. BILLINGS:  Objection to the form.

24                MR. SMITH:  Join.

25        A.    I don't know what this was supposed to

1   represent.

2        Q.   (BY MR. MURRAY)  I understand.  But

3   assuming that it's intended to represent what FOL owns

4   as of March 11, 2019, do you think it is accurate to

5   say that as of March 11, 2019, FOL owned these three

6   Portland, Oregon, dispensaries?

7        A.   No.

8             MR. BILLINGS:  Objection to the form.

9             MR. SMITH:  Join.

10            THE DEPONENT:  Sorry.

11            MR. BILLINGS:  That's all right.

12       A.   No, it would not be accurate.

13       Q.   (BY MR. MURRAY)  Earlier this morning,

14  you discussed the -- well, we have been discussing the

15  Equity Exchange Agreement today and this morning.  And

16  then you discussed earlier this morning the

17  termination agreement with Mr. Dawes.  Do you remember

18  that?

19       A.   I think so.

20       Q.   And I believe it was your testimony that

21  you were not involved in the negotiation of the

22  termination agreement; is that correct?

23       A.   Yes.

24       Q.   And you have not seen -- did we introduce

25  the termination agreement as an exhibit?

1           MR. DAWES:  I believe so.

2           MR. MURRAY:  I guess we'll just get it

3    out to confirm.

4           Q.   (BY MR. MURRAY)  Oh, we did.  I'm sorry.

5    Exhibit 17, if you could just pull it up quickly.

6           A.   Okay.

7           Q.   Exhibit 17, do you have that?

8           A.   Yeah.

9           Q.   Do you see at the top it says Termination

10   of Equity Exchange Agreement?

11          A.   Yes.

12          Q.   I believe you testified this morning that

13   you had not seen this prior to today; is that

14   accurate?

15          A.   That's accurate.

16          Q.   You were not involved in the negotiation

17   of this agreement?

18          A.   Not that I recall.

19          Q.   Do you know what this -- anything about

20   what this agreement purports to say?

21          A.   I don't know the specifics, and I have

22   not read it.

23          Q.   Do you know the generalities?

24          A.   Not -- no.

25          Q.   Okay.  Do you know if -- you can see -- I

1    mean, having never -- I understand you hadn't

2    previously reviewed it, but you can see it looks like

3    it's a formal legal document.  Would you agree with

4    that?

5              MR. SMITH:  Objection to form.

6              MR. BILLINGS:  Join.

7        Q.   (BY MR. MURRAY)  Do you have any idea if

8    FOL was represented by legal counsel in connection

9    with this?

10        A.   I don't know.

11        Q.   If you can pull up Exhibit 18 and 19 from

12    earlier today.  And if you recall, you -- you

13    discussed with Mr. Dawes this is -- Mr. Dawes

14    referenced a 50/50 deal.  Do you remember that

15    testimony and line of questions, I should say?  Just

16    generally speaking, do you remember?

17        A.   Yes, about the email saying that.

18        Q.   And I understand your testimony was you

19    don't recall receiving this back on July 25th, 2019;

20    is that correct?

21        A.   I don't remember.

22        Q.   Okay.  Do you recall any discussions you

23    had with Floyd about this email?

24        A.   No, I don't recall.

25        Q.   And when I say "this email," I should

1    probably clarify either of the emails, the email

2    chain.  You don't have any recollection one way or the

3    other?

4         A.   It was a long time ago, and I don't

5    remember.

6         Q.   And if you can -- if you can keep that in

7    front of you, but if you can also pull up Exhibit 23.

8         A.   Okay.

9         Q.   And this is the email from February 13th,

10   2020, that you discussed this morning with Mr. Dawes.

11   Do you remember that?

12        A.   Yes, I do.

13        Q.   And then if you look at page Bates 9795,

14   which is the second page --

15        A.   Okay.

16        Q.   -- it lists Valued, Inc. Assets as of

17   February 25th, 2020.  Do you see that?

18        A.   I do.

19        Q.   The very first one, the asset is "4

20   Portland Retail Marijuana dispensaries."  And then

21   under Notes, it says, "Agreement is to retain

22   $2 million of the original $2.5 million purchase

23   price.  Actively looking to sell, in which case FOL to

24   be returned $2 million plus 50% of the sale gains (we

25   believe they have an $8 million value)."

1                    Do you see that?

2          A.    I do.

3          Q.    When it says, "Agreement is to retain,"

4    what does the "agreement" reference?

5                    MR. SMITH:  Objection to form.

6                    MR. BILLINGS:  Join.

7          A.    I can't say for sure.

8          Q.    (BY MR. MURRAY)  Do you know if there

9    ever was a written agreement reflecting these terms at

10   the top of page 9795?

11                   MR. BILLINGS:  Objection to form.

12                   MR. SMITH:  Join.

13         A.    I can't say for sure what agreement that

14   is referring to.

15         Q.    (BY MR. MURRAY)  Well, looking back at

16   Exhibits 18 and 19, the email chain regarding the

17   50/50 split --

18         A.    Okay.

19         Q.    -- do you know if this agreement on page

20   -- or in Exhibit 23 is in reference to that 50/50

21   split?

22                   MR. SMITH:  Objection to form.

23                   MR. BILLINGS:  Join.

24         A.    Again, it's hard for me to confirm what

25   was meant by that word "agreement."

1          Q.   (BY MR. MURRAY)  Are you -- do you know

2    if there is an agreement for a 50/50 split of the

3    proceeds of the sale of these entities?

4               MR. BILLINGS:  Objection to the form.

5               MR. SMITH:  Join.

6          A.   I don't recall.

7          Q.   (BY MR. MURRAY)  You don't know one way

8    or the other whether there is an agreement?

9          A.   I don't recall.

10         Q.   Have you ever seen a written agreement

11   reflecting those terms?

12              MR. BILLINGS:  Objection to the form.

13              MR. SMITH:  Join.

14         A.   Not that I remember.

15         Q.   (BY MR. MURRAY)  Do you know if one

16   exists?

17         A.   I can't recall specifically if an

18   agreement exists.

19         Q.   As far as you know, you've never seen an

20   agreement to that effect?

21              MR. BILLINGS:  Objection to the form.

22              MR. SMITH:  Join.

23         A.   I can't recall.

24         Q.   (BY MR. MURRAY)  So in Exhibit 23, which

25   I understand was sent to a number of folks at the top

1    you discussed earlier, I believe it was sent -- and

2    correct me if I'm wrong, but I believe it was sent in

3    connection with discussions with the noteholders or

4    representatives of the noteholders, and it was

5    discussing the assets of FOL at the time.  Is that

6    accurate?

7                    MR. BILLINGS:  Objection to the form.

8                    MR. SMITH:  Join.

9            A.    Are you referring to the email on

10   Exhibit 23?

11           Q.    (BY MR. MURRAY)  Yeah.

12           A.    Okay.  And I think -- as I said earlier,

13   I can't say for sure what it was for.

14           Q.    Sure.

15           A.    It says, "Attached are two documents we

16   discussed providing you during our meeting last week."

17           Q.    Understood.  And when -- if you look at

18   the bottom -- I'm looking at page 2, 9795, Bates

19   ending 9795.  I'm sorry.

20           A.    Okay.

21           Q.    Do you see the total of the assets at the

22   bottom line?

23           A.    I do.

24           Q.    It says total book value is 6.8,

25   estimated fair market value 12.3 million to

1    14.5 million.  Do you see that?

2         A.    Um-hum, I do.

3         Q.    And do you see, going back to the top

4    line, the estimated fair market value of the four

5    Portland retail marijuana dispensaries is 4 to

6    6 million?  Do you see that?

7         A.    I do.

8         Q.    So that's -- the estimated fair market

9    value is approximately between a third and half of the

10   total value listed on this page 9795.  Does that look

11   about right?

12        A.    I guess so.

13        Q.    So it's a fairly -- is it fair to say

14   it's a fairly substantial portion of the total assets

15   listed on this page 9795?

16             MR. SMITH:  Objection to form.

17             MR. BILLINGS:  Join.

18        A.    It's -- it's the second-highest number on

19   the sheet.

20        Q.    (BY MR. MURRAY)  Sure.  So did anybody

21   ever ask you -- when I say "anybody," I'm referring to

22   the noteholders, representatives of the noteholders,

23   representatives of Redemption, Alexander Capital, any

24   representatives of them -- did anybody ever ask you to

25   see this agreement to retain the $2 million of the

1  original $2 1/2 million purchase price actively

2  looking to sell in which case FOL to be returned

3  2 million plus 50 percent of the sale gains?  Did

4  anybody ever ask to see that agreement?

5           MR. BILLINGS:  Object to the form.

6           MR. SMITH:  Join.

7      A.   I don't -- I don't recall.

8      Q.   (BY MR. MURRAY)  On this list, it says

9  that that agreement was estimated fair market value of

10  4 to 6 million.  Do you see that?

11     A.   That's what it says.

12     Q.   It's a fairly sizable amount of money;

13  would you agree with that?

14     A.   I suppose.

15     Q.   Do you think it's important to have a

16  written agreement reflecting the terms of a 4 to

17  $6 million deal?

18           MR. SMITH:  Objection, form.

19           MR. BILLINGS:  Join.

20     A.   It's hard for me opine on that

21  hypothetical.  I don't -- I don't know.

22     Q.   (BY MR. MURRAY)  Well, let's say

23  hypothetically there is no written agreement

24  reflecting those terms.  Would that concern you?

25           MR. SMITH:  Objection to form.

1                    MR. BILLINGS:  Join.

2          A.   I don't know.  I'm -- I wasn't in a

3    position -- I'm not really in a position to say

4    whether or not I would be concerned in a hypothetical

5    situation.

6          Q.   (BY MR. MURRAY)  If you were involved in

7    the negotiations and discussion of this 50/50 deal,

8    we've been calling it -- and I know that you weren't,

9    but if you were, would you have recommended putting

10   that agreement into a signed written contract?

11                   MR. BILLINGS:  Objection to the form.

12                   MR. SMITH:  Join.

13         A.   I don't know.

14         Q.   (BY MR. MURRAY)  You don't -- you don't

15   know whether you would have recommended that?

16                   MR. SMITH:  Objection to form.

17                   MR. BILLINGS:  Join.

18         A.   I don't because an agreement can have

19   different definitions.

20         Q.   (BY MR. MURRAY)  And when I say

21   "agreement," I'm talking about a signed written

22   agreement like the Equity Exchange Agreement, for

23   example.  I know that you haven't reviewed it, but

24   it's -- I'm talking about a formal legal contract.

25         A.    I believe that there's many examples of

1  verbal agreements, handshakes.  Emails could

2  potentially be considered an agreement.  So that's why

3  I can't answer that because it depends on the deal and

4  who the parties are, and so I don't know exactly what

5  I would do in that situation.

6          Q.   (BY MR. MURRAY)  And with respect to the

7  50/50 deal, is it your understanding that it was a

8  verbal agreement?

9          A.   I don't know.

10         Q.   Is it your understanding that it was a

11  handshake agreement?

12         A.   I don't know.

13         Q.   Was it your understanding that it was in

14  -- contained within these emails?

15         A.   It looks like this email in Exhibit 19

16  that we've been over today could constitute an

17  agreement.

18         Q.   What makes you say that?

19         A.   Actually, I don't know if it's exhibit --

20  one of these emails, 18 or 19.

21         Q.   Well, why don't we look at a different

22  version of it that has all of them in one.

23              MR. BILLINGS:  There's some highlighting

24  on mine.

25              MR. DAWES:  Mine, too.

1               MR. MURRAY:  Those aren't my highlights,

2   so it may be a printer issue.

3               MR. BILLINGS:  Okay.

4               (Deposition Exhibit 31 was marked.)

5         Q.   (BY MR. MURRAY)  Okay.  Exhibit 31, you

6   can see -- if you turn to the back page -- I thought

7   these would have been payments.  Anyway, if you look

8   at the back page, do you see that it says July 25th,

9   2019, at 10:08 a.m.?  Do you see that?

10        A.   I do.

11        Q.   And then if you look at Exhibit 18, you

12  can see it's the same email, July 25th, 2018.  Do you

13  see that?

14        A.   Yep.

15        Q.   And then Exhibit 19 is from David

16  Benlolo, July 25th at 1:39.  And then if you look at

17  the first page of Exhibit 31, it's the same email.

18        A.   Yep.

19        Q.   Okay.  I just wanted you to see that

20  we're talking about the same email chain.

21        A.   Okay.

22        Q.   So earlier I believe you just testified

23  that this could constitute an agreement; is that

24  correct?

25        A.   Well, you asked me what types of

1   agreements that there could be.  And I said it's

2   possible an email could constitute as an agreement.

3           Q.   And then I understood that you testified

4   this -- you said Exhibit -- correct me if I'm wrong,

5   Exhibits 18 and 19 looks like it could constitute an

6   agreement.  Is that what you testified?

7                MR. SMITH:  Objection, form.

8                MR. BILLINGS:  Join.

9           A.   I mean, it could.

10          Q.   (BY MR. MURRAY)  Do you know if this --

11          A.   I think.  But I don't know specifically.

12   I'm not a lawyer.

13          Q.   Have you reviewed this -- these emails

14   before today?

15               MR. SMITH:  Objection to form, asked and

16   answered many times.

17          A.   Not that I recall.

18          Q.   (BY MR. MURRAY)  And you don't recall

19   reading this back on July 25th, 2019?

20          A.   I do not.

21          Q.   If this is an agreement, do you know what

22   the terms of this agreement are?

23          A.   I do not.

24               MR. BILLINGS:  Was this produced in

25   native?  Is that why it doesn't have a Bates?

1           MR. MURRAY:  I'm wondering why we don't

2  have a Bates.  We have so many iterations of this

3  document, but I will make sure.

4           MR. BILLINGS:  Okay.

5      Q.  (BY MR. MURRAY)  And I just want to --

6  we've been -- this 50/50 agreement is a fairly

7  substantial part of the case.  I don't mean to belabor

8  the point, but I'm just trying to understand if

9  there's a 50/50 agreement, where it exists and in what

10  form.  And your testimony, correct me if I'm wrong, is

11  you're not aware of any formal written agreement

12  reflecting the terms of that 50/50 agreement; is that

13  accurate?

14           MR. BILLINGS:  Objection to form.

15           MR. SMITH:  Join.

16      A.  I don't remember.

17      Q.  (BY MR. MURRAY)  You don't know one way

18  or the other?

19      A.  I don't know one way or the other.

20      Q.  Do you recall any other -- and I -- my

21  understanding of your testimony is you don't recall

22  receiving these emails on July 25th, 2019; is that

23  correct?

24      A.  I was copied on them.

25      Q.  But I believe you testified earlier you

AB Litigation Services

1   don't have any specific recollection of reviewing

2   these back then or reviewing them any time since then.

3           A.    That is correct.

4           Q.    Do you have any recollection of any other

5   email correspondence regarding this 50/50 arrangement?

6           A.    No, I don't -- I don't recall.

7           Q.    Do you have any recollection of any other

8   discussions with anybody about the 50/50 arrangement?

9           A.    No.

10          Q.    So you are not aware of any other

11  document I should be looking at to determine whether a

12  50/50 agreement exists?

13              MR. SMITH:  Objection, form.

14              MR. BILLINGS:  Join.

15          A.    Not that I am aware of.

16          Q.    (BY MR. MURRAY)  And, again, we talked

17  about the Equity Exchange Agreement, and I know you

18  didn't review it.  And we talked about the Termination

19  Agreement, and I know you didn't review that.  We

20  looked at this morning an operating agreement for one

21  of your -- an entity that I believe you had invested

22  in.  Do you recall that?

23          A.    No, I don't.

24          Q.    And that was Exhibit 9.  It's the

25  operating agreement of 5217 RE, LLC.  Do you recall

1    that?

2        A.   I do.

3        Q.   I don't have any specific questions on

4    it.  And so we've looked at the Equity Exchange

5    Agreement, we've looked at the Termination Agreement,

6    we've looked at, for example, the Operating Agreement.

7    These are all legal documents, legal contracts,

8    correct?  And would you agree that they look like a

9    legal contract drafted by counsel?

10       A.   They do.

11       MR. BILLINGS:  Objection to form.  Sorry.

12    I was a little late.

13       A.   They do.

14       Q.  (BY MR. MURRAY)  And as far as you know,

15    there is no written agreement drafted by counsel

16    reflecting the 50/50 deal; is that correct?

17       MR. SMITH:  Objection to form.

18       MR. BILLINGS:  Join.

19       A.   As far as I'm aware, I'm not aware.

20       Q.  (BY MR. MURRAY)  Do you find it odd

21    there's no written contract to reflect the terms of

22    that 50/50 agreement?

23       MR. BILLINGS:  Objection to form.

24       MR. SMITH:  Join.

25       A.   I haven't thought about it.

1          Q.   (BY MR. MURRAY)   When FOL entered into

2    the Equity Exchange Agreement, there's a written

3    document.   And then they drafted a Termination

4    Agreement.   Do you find it odd that they didn't draft

5    a formal legal document reflecting the 50/50

6    arrangement?

7               MR. BILLINGS:   Objection to the form.

8               MR. SMITH:   Join.

9          A.   I don't know.

10          Q.   (BY MR. MURRAY)   Have you ever asked

11    Floyd whether that document exists?

12               MR. SMITH:   Objection to form.

13               MR. BILLINGS:   Join.

14          A.   I don't recall.

15          Q.   (BY MR. MURRAY)   If you could pull up

16    Exhibit 1 again real quick.   Look at -- and I'm on the

17    Crossclaims, page 24.   Looking under -- it's Count

18    VIII, Breach of Contract.   Do you see that there on

19    24?

20          A.   Yes.

21          Q.   And I -- I understand that you didn't

22    review this before it was filed, and I also understand

23    these claims are not brought on your behalf.   So if

24    you can see, paragraph 102 reads, "FOL, Benlolo, and

25    Kaplan entered into the 50/50 Agreement, which

1    constitutes a valid and binding agreement under

2    Colorado law."

3                I take it based on your testimony you

4    don't know what the basis of that allegation is?

5         A.   I don't know.

6         Q.   Okay.  "Under the 50/50 Agreement,

7    Benlolo and Kaplan have the obligation to provide FOL

8    a share of the proceeds from any sale of the Oregon

9    dispensaries."

10               Do you know what the actual basis for

11   that allegation is?

12        A.   I don't know.

13        Q.   "Benlolo and Kaplan have represented to

14   FOL that there is a ready, willing, and able buyer for

15   at least the Original dispensaries."

16               Have Benlolo and Kaplan ever represented

17   that to you?

18        A.   They represented that to our lawyers.

19        Q.   And paragraph 105 at the top of page 35

20   says, "Despite this, Benlolo and Kaplan have refused

21   to complete the sale and provide FOL its share of the

22   sale proceeds unless FOL agrees to reduce the amount

23   FOL is contractually entitled to receive from the

24   sale, release the Oregon dispensaries from all claims,

25   and permit FOL's share of funds to be transferred to a

1    third party other than FOL."

2            Do you see that?

3        A.   I see that.

4        Q.   Do you have any idea what the basis is

5    for the allegation that Benlolo and Kaplan have

6    refused to complete the sale?

7        A.   I don't know.  I didn't write that.

8        Q.   Do you personally -- aside from what's

9    written here, do you have any idea what the basis of

10   that would be?

11       A.   No, I do not.

12       Q.   Do you believe that Benlolo and Kaplan

13   have refused to complete the sale?

14       A.   I don't know.

15       Q.   And if the -- as we've been discussing

16   with the 50/50 agreement, assuming it's an agreement,

17   the deal is that upon the sale of the entities, FOL is

18   to be paid some percentage of something; is that

19   accurate?

20       A.   I don't know.  I would have to be

21   familiar with the specific term.

22       Q.   Let's assume that the -- if the deal

23   exists, it's upon the sale of the entities, FOL is to

24   be paid something as a general matter.  If the

25   entities have not been sold, is it your understanding

1  that Benlolo and Kaplan owe FOL anything from that

2  agreement?

3          MR. BILLINGS:  Objection to the form.

4          MR. SMITH:  Join.

5      A.  I don't know.

6      Q.  (BY MR. MURRAY)  You have no idea what

7  the 50/50 agreement is?

8          MR. SMITH:  Objection to form.

9          MR. BILLINGS:  Join.

10     A.   I can't speak to the 50/50 agreement.

11     Q.  (BY MR. MURRAY)  If an agreement -- so

12  set aside the 50/50 agreement.  If there's a

13  hypothetical agreement where I say I'm going to pay

14  you something as soon as I sell this thing over here,

15  if I have not sold this thing over here, would you

16  agree that I don't owe you anything?

17          MR. BILLINGS:  Objection to the form.

18          MR. SMITH:  Objection.

19     A.   No, that would depend on the deal we had.

20     Q.  (BY MR. MURRAY)  Those are the only

21  terms, the terms I just defined.

22          MR. SMITH:  Objection.

23     A.   So repeat the terms.

24     Q.  (BY MR. MURRAY)  I only owe you

25  something, some amount of money upon the sale of an

1    item.  And if that item is not sold -- there are no

2    other terms.  If the item is not sold, then would you

3    agree that I would not owe you the money that I said I

4    would pay you as soon as that item is sold?

5              MR. BILLINGS:  Objection to the form.

6              MR. SMITH:  Join.

7         A.   Well, I would never agree to that because

8    then you would be disincentivized to sell it.

9         Q.   (BY MR. MURRAY)  Assuming that you gave

10   it to me for free, is that where you're going with

11   that?

12             MR. BILLINGS:  Objection.

13             MR. MURRAY:  We can strike all of these

14   hypotheticals.

15        A.   Okay.  Thank you.

16        Q.   (BY MR. MURRAY)  I just want to make sure

17   I'm getting your understanding and all of the

18   knowledge that you have regarding anything.  And I

19   know it's redundant for me to ask you questions and

20   the answer is you don't know, but I need to understand

21   what you do know and what you don't know.  So that's

22   the reason for this exercise.  So I apologize.

23             MR. MURRAY:  So maybe we can take, like,

24   two minutes.  I have to revise everything --

25             MR. DAWES:  Sure.

1           MR. MURRAY:  -- just to make sure I'm all

2    done.

3           MR. DAWES:  We can take five minutes.

4           MR. MURRAY:  I'm sure I'm either done or

5    just about done, so . . .

6           (Recess taken, 3:14 p.m. to 3:21 p.m.)

7       Q.   (BY MR. MURRAY)  Just a few more

8    questions from me.  I believe earlier today with

9    Mr. Dawes, you discussed a meeting in Bend, Oregon,

10   with Mr. Benlolo and Kaplan.  Do you remember that?

11      A.   Um-hum.

12      Q.   And I believe you testified it was in May

13   of 2019.

14      A.   Yes, around that time.

15      Q.   And who else was there?

16      A.   I don't recall exactly, but I know Andrew

17   and David and Floyd.

18      Q.   And do you -- what -- I know that you

19   already discussed it, so I apologize, but what -- what

20   details do you recall about what was discussed?

21          MR. SMITH:  Objection to form.

22          MR. BILLINGS:  Join.

23      A.   I don't remember much other than Floyd,

24   Andrew, and David talking about changing the terms of

25   the original deal.

1    Q.   (BY MR. MURRAY)  The original deal being?

2         MR. SMITH:  Is that a question?

3         MR. MURRAY:  Yeah.

4         MR. SMITH:  Objection to form.

5    Q.   (BY MR. MURRAY)  What was the original

6    deal they were speaking about?

7    A.   The original deal of the original

8    purchase of the dispensaries.

9    Q.   And do you remember any details about how

10   they were changing that deal?

11   A.   I do not.

12   Q.   And you believe you testified that you

13   didn't take any notes of that meeting?

14   A.   I did not.

15   Q.   Have you had any communications with

16   Mr. Benlolo and Mr. Kaplan since this lawsuit was

17   filed?

18   A.   I don't recall that I have.  Since --

19   which lawsuit?  There's several.

20   Q.   Fortunately, we are only for now -- knock

21   on wood -- involved in one.  This lawsuit that we're

22   here -- I don't have the -- well, I guess if you read

23   the case number, it wouldn't make any difference

24   anyway.  This lawsuit that we're here for in Colorado

25   State court, which was filed in -- forgive me.  We

1    came in midway through.  I think it was October of

2    2020.

3              MR. DAWES:  I would say august.

4              MR. MURRAY:  August 2020.

5         Q.   (BY MR. MURRAY)  Have you had any

6    discussions with my clients, Mr. Benlolo and

7    Mr. Kaplan, since August of 2020?

8         A.   I believe I may have been present for a

9    call --

10        Q.   Do you remember --

11        A.   -- with them.

12        Q.   -- what was discussed?

13        A.   No, I do not.

14        Q.   You don't have any -- any recollection

15   one way or the other?

16        A.   No.

17        Q.   Do you remember Mr. Floyd -- Mr. Floyd --

18   Mr. Landis being on that call?

19        A.   I believe he was.

20        Q.   Do you recall him saying or apologizing

21   to my clients for getting them involved in this

22   lawsuit?

23        A.   I do not remember that.

24        Q.   Do you recall Mr. Landis telling my

25   clients he would pay their legal fees incurred in

1    connection with this lawsuit?

2         A.   No, I do not recall that.

3         Q.   Do you have -- you said you don't recall

4    one way or the other?

5         A.   I do not recall Floyd saying that to

6    them.

7         Q.   What do you recall Floyd saying to them?

8         A.   I don't recall much of -- I don't recall

9    what he said.

10        Q.   You have no idea what he did say,

11   correct?

12        A.   I don't know what Floyd said.  I don't

13   remember what Floyd said.

14        Q.   So he may have told my clients he would

15   pay their legal fees incurred in connection with this

16   litigation?

17             MR. SMITH:  Objection, form.

18             MR. BILLINGS:  Join.

19        A.   That would seem weird to me, but I don't

20   remember him saying that.

21        Q.   (BY MR. MURRAY)  Why would that seem

22   weird to you?

23        A.   I don't know why anyone would offer to

24   pay legal fees for someone else.

25        Q.   Did you ever have any communications with

1    Mr. Benlolo or Mr. Kaplan regarding the notes that FOL

2    issued to -- that we've been discussing today at any

3    point in time?

4              MR. BILLINGS:  Objection to the form.

5         A.   Can you ask that again?

6         Q.   (BY MR. MURRAY)  Do you recall having any

7    discussions with Mr. Benlolo or Mr. Kaplan about the

8    notes that FOL issued that we were -- that we've been

9    discussing today?

10             MR. BILLINGS:  Objection to form.

11             MR. SMITH:  Join.

12        A.   No, I don't remember.

13        Q.   (BY MR. MURRAY)  Any communication of any

14   kind regarding those notes?

15        A.   I do not recall.

16        Q.   Did you -- you don't -- so you don't

17   recall ever talking to my clients about the existence

18   of the notes?

19        A.   I do not remember discussing that with

20   them.

21        Q.   And you don't recall ever telling my

22   clients that the dispensaries had been posted as

23   collateral for those notes?

24        A.   No, I do not remember that.

25        Q.   Did you -- I'm not suggesting you did

1  tell them that.  Did you ever tell my clients that the

2  collateral or the dispensaries had been posted as

3  collateral for the notes?

4          A.   I don't recall ever saying that to them.

5              MR. MURRAY:  All right.  That's it.

6  Mr. Dawes, it's all you.

7              MR. DAWES:  All right.

8                       EXAMINATION

9  BY MR. DAWES:

10         Q.   So, Ms. Huet, could I ask you to take a

11  look at Exhibit 23 one more time.

12         A.   Okay.

13         Q.   Sec.  So if I could ask you to take a

14  look at that second page, that's the asset list as of

15  2/5/2020.

16         A.   Okay.

17         Q.   And I realize you've been asked a series

18  of questions about this document, but to your

19  knowledge and belief, is the content of FOL 9795, this

20  page, true, complete, and accurate?

21             MR. SMITH:  Objection to form.  It's been

22  asked many, many times.

23             MR. BILLINGS:  Join.

24         A.   So as I testified earlier, I can't say

25  for sure who prepared this.  And it seems to be

1    accurate.

2           Q.   (BY MR. DAWES)   There is a passage in the

3    -- where it talks about the "4 Portland Retail

4    Marijuana dispensaries."

5           A.   Yep.

6           Q.   As you see under the Notes section, in

7    the parenthetical, it says, "We believe they have an

8    $8 million value."  Do you see that?

9           A.   I do.

10          Q.   And "we" is FOL; is that correct?

11               MR. SMITH:  Objection, form.

12               MR. BILLINGS:  Join.

13          A.   I'm not sure.

14          Q.   (BY MR. DAWES)  Well, who is "we"?  In

15   this Valued, Inc. Asset List, who is that referring

16   to?

17               MR. BILLINGS:  Objection to the form.

18               MR. SMITH:  Join.

19          A.   I'm not sure.

20          Q.   (BY MR. DAWES)  The $8 million value

21   figure there, how was that derived?

22          A.   I don't know.

23          Q.   Now, this is a list as of February 5,

24   2020, correct?

25          A.   That's what the document says.

1          Q.    Prepared by FOL or Valued, Inc., as it's
2    also called, correct?

3          A.    I can't say for sure, but probably.

4          Q.    Okay.  All right.  Now, the -- the date
5    of February 5, 2020, does that tie to a meeting that
6    took place with FOL representatives, some of the
7    noteholders, and some of the folks from Alexander
8    Capital?

9          A.    I can't say for sure because the email
10   just says, "During our meeting last week."  So I'm not
11   sure exactly what meeting that was.

12         Q.    All right.  Do you recall there being a
13   meeting the week prior to February 13, 2020?

14         A.    I recall there being a meeting around
15   February 2020 at the offices of Alexander Capital.

16         Q.    All right.  And February 5th would be the
17   week before, right?

18         A.    Yes.

19         Q.    Was there more than one meeting that took
20   place for that group in February of 2020?

21         A.    Not that I am aware of.

22         Q.    Okay.  All right.  And do you recollect
23   why the asset list was pegged to February 5, 2020?

24         A.    I do not.

25         Q.    Do you recall that issue coming up, this

1  50/50 arrangement that's -- or commented upon in the

2  notes in that February 2020 meeting with the

3  noteholders and Alexander Capital representatives?

4        A.   I do not recall.

5        Q.   Okay.  The -- in terms of your defense in

6  this case, are you party to any kind of

7  indemnification agreement where someone is picking up

8  or paying your defense costs in the case?

9             MR. SMITH:  Objection to form.

10 Relevancy.

11            MR. BILLINGS:  Join.

12       A.   I don't -- I don't know.

13       Q.   (BY MR. DAWES)  Okay.  You're not aware

14 of any indemnity agreement you are party to, correct?

15            MR. SMITH:  Same objection.

16            MR. BILLINGS:  Join.

17       A.   I don't know.

18       Q.   (BY MR. DAWES)  Are you paying your own

19 legal fees?

20            MR. SMITH:  Objection to form.

21       A.   I'm not sure.

22       Q.   (BY MR. DAWES)  You don't know if you are

23 paying your own legal fees?

24            MR. SMITH:  Objection to form.

25            MR. BILLINGS:  Join.

1           A.   For what?

2           Q.   (BY MR. DAWES)  For your defense in this

3    lawsuit.

4                MR. SMITH:  Objection, form.

5                MR. BILLINGS:  Join.

6           A.   I'm not sure.

7           Q.   (BY MR. DAWES)  Have you written any

8    checks for your defense costs?

9           A.   I don't think I have.

10          Q.   Okay.  Have you made any payments of any

11   sort for your defense costs?

12          A.   I don't remember.

13          Q.   Do you know if FOL is paying your defense

14   costs in this case?

15               MR. SMITH:  Objection, form.

16               MR. BILLINGS:  Join.

17          A.   I'm not sure.

18          Q.   (BY MR. DAWES)  Is Mr. Landis?

19          A.   I don't know.

20          Q.   Someone is paying your defense costs.

21   You don't know who, correct?

22               MR. SMITH:  Objection, form.

23               MR. BILLINGS:  Join.

24          A.   I'm not sure.

25          Q.   (BY MR. DAWES)  Okay.  You're not paying

1   your defense costs, though, correct?

2        A.   I just answered that and said I didn't

3   know.

4        Q.   How would you know if you were paying

5   your defense costs?  Is that something you would know?

6             MR. SMITH:  Objection to form.

7             MR. BILLINGS:  Join.

8             MR. SMITH:  It's been asked many, many

9   times.

10        A.   I don't know.

11        Q.   (BY MR. DAWES)  Okay.  Do you pay a

12   mortgage?

13             MR. SMITH:  Objection to form.

14             MR. BILLINGS:  Join.

15        A.   I pay a mortgage.

16        Q.   (BY MR. DAWES)  How do you know?

17             MR. SMITH:  Same objection.

18             MR. BILLINGS:  Join.

19        A.   Because I pay a mortgage to the bank.

20        Q.   (BY MR. DAWES)  Right.  You send out a

21   wire or you make an electronic transfer or you write a

22   check, right?

23             MR. SMITH:  Objection to form, relevancy.

24             MR. BILLINGS:  Join.

25        A.   One of the above.

1            Q.   (BY MR. DAWES)  All right.  Have you done

2      any of those things in connection with your defense in

3      this lawsuit?

4            MR. SMITH:  Objection to form.  It's been

5      asked and answered.

6            A.   I don't know.

7            MR. BILLINGS:  Join.

8            Q.   (BY MR. DAWES)  How do you not know if

9      you are paying for your defense or not?

10           MR. SMITH:  Chris, you can ask it a

11     hundred different ways.  She said she doesn't know.

12     Objection, form, asked and answered.  You can answer

13     it one more time.

14           MR. BILLINGS:  Join.

15           A.   I don't know.

16           Q.   (BY MR. DAWES)  The one way we would know

17     is to subpoena all of your bank records, correct?

18           MR. BILLINGS:  Objection to form.

19           MR. SMITH:  Join.

20           A.   I don't understand what you're asking me

21     or why.  I really don't.

22           Q.   (BY MR. DAWES)  I'm asking you the

23     questions.  You're telling me you don't know.  What

24     I'm suggesting is perhaps we need to subpoena your

25     bank records.  We'll take that up later.

1          MR. SMITH:  You can do that, and we'll

2    handle it.

3          Q.   (BY MR. DAWES)  Have you received any

4    distributions from FOL since your separation as an

5    employee?

6          A.   Not that I can recall.

7               (Deposition Exhibit 32 was marked.)

8          Q.   Do you recognize Exhibit 32 as an email

9    from yourself to Mr. DiMartini and copying in FOL's

10   CFO?

11         A.   That's what it says.

12         Q.   Okay.  And you are attaching some

13   documents for Mr. DiMartini, correct?

14         A.   So the email that I sent to Frank, as far

15   as I can tell, it didn't have attachments.

16         Q.   Okay.

17         A.   But --

18         Q.   What is the -- would you go ahead and

19   read the first sentence in your email to

20   Mr. DiMartini.

21         A.   "As discussed, attached are two documents

22   that further break down our revenues."

23         Q.   Okay.  Is it your testimony that you

24   didn't actually provide those documents to

25   Mr. DiMartini?

1     A.   No, it is my testimony that you asked me

2   -- these were the attachments that were attached to

3   the email, and I said I couldn't tell.  If you look at

4   the email, it doesn't say attachments.  The one that

5   does is the one from Frank to Howard da Silva copying

6   Tim Maynard.

7     Q.   So do you have any reason to dispute that

8   the attached pages labeled 34212 and 213 were the

9   attachments to your email to Mr. DiMartini?

10        MR. BILLINGS:  Objection to the form.

11        MR. SMITH:  Join.

12     A.   I just want to be very precise that I

13   know exactly what documents were attached to emails.

14   And so unless I can see it here, you know, I -- I

15   don't know -- I can't tell if Frank attached them or

16   if I attached them, but I don't have reason to think

17   that these were not the ones.

18     Q.   (BY MR. DAWES)  Okay.  All right.  So you

19   go on and you summarize some important business

20   highlights for FOL, correct?

21        MR. SMITH:  Objection, form.

22        MR. BILLINGS:  Join.

23     A.   Let me -- where?  In the email?  I'll

24   have to read it.  Okay.

25     Q.   (BY MR. DAWES)  Okay.  Do you want to

1    answer my question now?

2         A.   What was your question?

3         Q.   So you go on to summarize some important

4    business highlights for FOL, correct?

5         A.   It appears so in the email.

6         Q.   All right.  And you're doing so as the

7    COO of FOL, correct?

8              MR. BILLINGS:  Objection to form.

9              MR. SMITH:  Join.

10        A.   At the time, I was employed as the COO.

11        Q.   (BY MR. DAWES)  Right.  Okay.  And one of

12   the statements you make in the -- the last

13   paragraph -- or, I guess, really it's the

14   second-to-last paragraph is talking about the

15   "Marijuana side, our revenues have also grown very

16   fast," right?

17        A.   That's what it says.

18        Q.   And then you go on to expressly state,

19   "We have four dispensaries:  Three in Portland,

20   Oregon, and one in Leadville, Colorado," correct?

21        A.   That's what it says.

22        Q.   You go on and say, "Sales have more than

23   doubled and margins have improved since we rebranded

24   the stores 'Floyd's Fine Cannabis' in June of 2018,"

25   correct?

```
1          A.   That's correct.

2          Q.   These are all true-and-accurate

3     statements to Mr. DiMartini, correct?

4               MR. BILLINGS:  Objection to the form.

5          A.   Yes, as far as I know.

6          Q.   (BY MR. DAWES)  You weren't lying to

7     Mr. DiMartini in this email, were you?

8               MR. SMITH:  Objection to form.

9               MR. BILLINGS:  Join.

10         A.   No, because -- no, because we were

11    anticipating the close of the dispensaries.

12         Q.   (BY MR. DAWES)  All right.  And that's

13    why you state, "We have four dispensaries:  Three in

14    Portland, Oregon, and one in Leadville, Colorado,"

15    correct?

16         A.   Yes, it was --

17         Q.   You have them presently, correct?

18              MR. SMITH:  Objection to form.

19         Q.   That's what that says?

20              MR. BILLINGS:  Join.

21         A.   What that meant was we have a financial

22    interest in the dispensaries, and we're about to close

23    and own them.

24         Q.   (BY MR. DAWES)  Where are those words?

25         A.   I don't see them.
```

1          Q.   Okay.  All right.  We can -- we can all

2     read what it says.  You also talk about finalizing

3     plans to acquire an Oregon growing facility, correct?

4          A.   That's what it says.

5          Q.   Is that the farm that you were talking

6     about?

7          A.   I don't know.

8          Q.   What were you talking about in terms of

9     acquiring an Oregon growing facility?

10          A.   I don't recall.

11          Q.   Where was the Oregon growing facility for

12     which plans were being made to acquire?

13          A.   I don't recall.

14          Q.   Who told you that FOL was finalizing

15     plans to acquire an Oregon growing facility?

16               MR. SMITH:  Objection to the form.

17               MR. BILLINGS:  Join.

18          A.   I don't recall.

19          Q.   (BY MR. DAWES)  Okay.  Then how did you

20     know to make this statement to Mr. DiMartini in this

21     email?

22          A.   I don't remember where I got it from, so

23     I don't know.

24          Q.   Did anyone at FOL tell you to write this

25     email to Mr. DiMartini?

1      A.   I do not recall.

2           (Deposition Exhibit 33 was marked.)

3      Q.   Now, 33 is another email from you to

4  Mr. DiMartini, same date, March 15, 2019, correct?

5      A.   The second one in the chain, yes, that's

6  correct.

7      Q.   Okay.  All right.  And you're giving him

8  a rundown on some of the financial parameters of FOL,

9  correct?

10          MR. SMITH:  Objection, form.

11          MR. BILLINGS:  Join.

12     A.   Well, let me read it.  Okay.  Yes.

13     Q.   (BY MR. DAWES)  Okay.  And on the second

14  page, which is FOL 8087, you go on to state -- in the

15  second paragraph, you say, "We have had to invest all

16  of our working capital in inventory."

17          Do you see that?

18     A.   I do.

19     Q.   Where did FOL maintain its inventory?

20          MR. BILLINGS:  Objection to the form.

21     A.   What time period?

22     Q.   (BY MR. DAWES)  Well, let's start in

23  March of 2019.

24     A.   I don't -- we changed shippers, and I

25  don't remember when.  So I just want to be very

1    precise.  Our --

2           Q.    Okay.  So in March of 2019, where did FOL

3    maintain its inventory?

4           A.    So in March of 2019, I believe that it

5    was at -- it was in Memphis, Tennessee, at our

6    shippers.

7           Q.    Okay.  And what's the ship -- what is the

8    shippers -- or who is the shippers?  Who are the

9    shippers?

10          A.    I don't remember their name.

11          Q.    All right.  And before March of 2019,

12   where did FOL maintain its inventory?

13          A.    That was our first shipper.

14          Q.    Okay.  And where after the Memphis

15   shippers did FOL maintain its inventory?

16          A.    We changed shippers at some point, and

17   then it was stored in Colorado.

18          Q.    Can you be more specific than "Colorado"?

19          A.    No, sorry, Utah.

20          Q.    Okay.

21          A.    So I'm not sure exactly where it is in

22   Utah.

23          Q.    Okay.  And is that -- to your knowledge,

24   does that remain the case?

25          A.    To my knowledge, it does.

1          Q.   Okay.  All right.  Now, you go on to

2    state in the third paragraph on that second page, "I

3    am attaching documents that may assist to understand

4    our situation."

5               And then when you say -- when you're

6    talking about "our situation," what was "our

7    situation," that being the FOL situation that you're

8    referring to, in March of 2019?

9               MR. SMITH:  Objection, form.

10              MR. BILLINGS:  Join.

11         A.   I don't know.

12         Q.   (BY MR. DAWES)  And you're also passing

13   along to Mr. DiMartini your most-recent balance sheet

14   and your most-recent income statement, correct?

15         A.   That's what it says.

16         Q.   Okay.  And you went -- when you say

17   "our," that's FOL, right?

18         A.   I would think so.

19         Q.   Okay.  And then behind, we -- behind that

20   document, we actually see -- at FOL 8088, we see the

21   balance sheet, correct?

22         A.   Correct.

23         Q.   And we also see the P and L at FOL 8090,

24   correct?

25         A.   Yes.

1          Q.   Okay.  Do you recall any discussion you

2     had with Mr. DiMartini around this time regarding the

3     information you had provided and/or this email?

4          A.   No, I don't -- I don't recall.

5          Q.   So in terms of the communications that

6     were going on between FOL and Alexander Capital in the

7     spring of 2020, can you describe for me generally what

8     those discussions concerned?

9          A.   Between specifically Alexander Capital

10    and FOL?

11         Q.   Sure.

12         A.   Or who -- can you be more specific on who

13    you're referring to?

14         Q.   Let's start there very big picture.

15         A.   So the -- we were -- FOL and Alexander

16    Capital -- we thought we were trying to restructure

17    notes.

18         Q.   Okay.  And so there were discussions

19    about reviewing those notes because they were maturing

20    and they were in default, correct?

21              MR. BILLINGS:  Objection to form.

22              MR. SMITH:  Join.

23         A.   I don't know if they were in default.

24         Q.   (BY MR. DAWES)  Okay.  Have you ever made

25    a determination as to whether any of the senior

1    12 percent notes were in default?

2              MR. BILLINGS:  Objection to the form.

3              MR. SMITH:  Join.

4         A.   I personally have not, no.

5         Q.   (BY MR. DAWES)  Do you know how many of

6    those notes are in default now?

7              MR. BILLINGS:  Objection to the form.

8              MR. SMITH:  Join.

9         A.   I do not know.

10        Q.   (BY MR. DAWES)  Do you know if any of

11   those notes are not yet matured as we sit here today?

12             MR. SMITH:  Objection to form.

13             MR. BILLINGS:  Join.

14        A.   I don't know.  Sorry.  No, I don't know.

15        Q.   (BY MR. DAWES)  Do you recollect that the

16   terms of those notes were two-year notes?

17        A.   I do not -- I was not involved with the

18   creation of the notes.

19        Q.   Do you recall there being requests for

20   information from Alexander Capital folks vis-a-vis the

21   Oregon assets we've been talking about today?

22        A.   I don't recall specifically.  Do you --

23   who do you mean "from Alexander Capital folks"?

24        Q.   How about Jonathan Gazdak, for example?

25        A.   I don't recall -- I don't recall specific

1    requests.

2         Q.   What about requests involving a Shawn

3    Weadock?

4         A.   I do not remember Shawn Weadock's

5    requests.

6         Q.   As you sit here now, you have zero

7    recollection of Alexander Capital making inquiry of

8    FOL's interest and ownership of assets in Oregon,

9    correct?

10             MR. SMITH:  Objection to form.

11             MR. BILLINGS:  Join.

12        A.   I would not be able to pull up specific

13   examples of them asking for -- for that.  That was a

14   long time ago.  And I'd have to go back and look at

15   documents and emails.

16        Q.   (BY MR. DAWES)  Okay.  So from the

17   standpoint of your independent recollection, as you

18   sit here now, please describe for me each and every

19   communication you had with Alexander Capital

20   representatives regarding FOL's interest in assets in

21   Oregon.

22             MR. BILLINGS:  Objection to the form.

23             MR. SMITH:  Join.

24        A.   So that's what I'm saying.  In my

25   personal capacity today, I cannot recall specific and

1   every request that they asked for.

2          Q.   (BY MR. DAWES)  And you can't recall a

3   single one as you sit here now, correct?

4          A.   Correct.

5          Q.   All right.  You have no independent

6   recollection of any of that happening, correct?

7          A.   Correct.

8               MR. SMITH:  Objection, form.

9               MR. BILLINGS:  Join.

10         Q.   (BY MR. DAWES)  Let's see if we can

11  stimulate some recollection.

12              (Deposition Exhibit 34 was marked.)

13         Q.   All right.  Do you recognize Exhibit 34

14  at all?

15         A.   From what it says, it's an email from

16  Chris to Jonathan Gazdak --

17         Q.   Right.

18         A.   -- and others.

19         Q.   And do you see who the cc's are?

20         A.   So it's me, Floyd, and Shawn Weadock.

21         Q.   Okay.  All right.  And so the top couple

22  emails talk about trying to set up a meeting in early

23  April 2020, correct?

24         A.   Well, let me look through the whole chain

25  first.

1          Q.   Sure.

2          A.   Okay.  I've read through it.  Can you

3     please repeat your question?

4          Q.   Sure.  Let me -- let me take you back

5     further.  And take a look at FOL 11260.

6          A.   Okay.

7          Q.   And so the email on the bottom is from

8     FOL's CFO to a number of different folks, including

9     folks at Alexander Capital, forwarding a series of

10    financial information cataloged as 1 through 10 on the

11    next page, correct?

12         A.   Yeah, it's Chris telling Jonathan and

13    Shawn that he's attached the following information,

14    and it's a list of documents.

15         Q.   Right.  Right.  And the CFO was

16    authorized to share that information, correct?

17              MR. BILLINGS:  Objection to the form.

18         A.   I can't recall specifically.

19         Q.   (BY MR. DAWES)  Okay.  And then if we

20    look at -- over on FOL 11259, there's an email that

21    starts about halfway down from Mr. Gazdak.  And,

22    again, March 31, 2020.  "Team, See below for some

23    basic questions."  Do you see that?

24         A.   I do.

25         Q.   All right.  And then when you go down, he

1 asks about a series of different topics, 1 through 5

2 there, right?

3      A.  He does.

4      Q.  Okay.  And then if we go back over to

5 11258, that is your response to that information,

6 correct?

7      A.  It appears, yeah.

8      Q.  And, again, you're not misrepresenting

9 these to Mr. Gazdak?

10          MR. SMITH:  Objection to form.

11          MR. BILLINGS:  Join.

12      A.  I certainly have no intention of

13 misrepresenting.

14      Q.  (BY MR. DAWES)  Just so we're clear, your

15 responses on this page, that's what's in red, correct?

16      A.  I believe so.

17      Q.  Okay.  And so you respond to each one of

18 the -- the points that had been raised by Mr. Gazdak,

19 correct?

20      A.  Correct.

21      Q.  All right.  And as you noted, true,

22 correct, and complete to the best of your knowledge in

23 each instance, correct?

24          MR. SMITH:  Objection, form.

25          MR. BILLINGS:  Join.

1          A.    To the best of my knowledge, I tried to
2    be accurate.
3          Q.    (BY MR. DAWES)  Okay.  And regarding the
4    -- the signed Oregon dispensary note, you state you
5    followed up with Floyd, Andrew, and David to get this
6    final agreement, correct?
7          A.    That's what it says.
8          Q.    Okay.  Do you recollect doing that?
9          A.    I do not.
10         Q.    Okay.  And then there is a -- No. 2,
11   asked about the "Signed agreement on the 50 percent
12   split.  (grow and 4th dispensary)."
13               That goes back to the 50/50 concept you
14   testified about earlier today, correct?
15         A.    I think so.
16         Q.    And when you say -- you go on to state,
17   "We know that this email is legally enforceable."
18               Are you alluding to the emails back and
19   forth between Mr. Landis and Messrs. Benlolo and
20   Kaplan regarding that 50/50 arrangement?
21         A.    I probably was.
22         Q.    Okay.  Then you go in paragraph 3 -- the
23   question is, "Why doesn't the $2 million note show up
24   as an asset to the company?"  And you state, "It is
25   under the 'Other Assets' for approximately

1    2.1 million," correct?

2          A.    That's what it says.

3          Q.    Okay.  And did you get that information

4    from FOL's CFO?

5          A.    I do not know where I got that

6    information.

7          Q.    You would not have provided this

8    information without fact-checking it, correct?

9                MR. SMITH:  Objection, form.

10               MR. BILLINGS:  Join.

11         A.    I would have worked with the team to come

12   up with the information --

13         Q.    (BY MR. DAWES)  Okay.

14         A.    -- and provided input.

15         Q.    Right.  And when we say "Team" -- or when

16   you say "Team," you mean the executive team at FOL?

17               MR. SMITH:  Objection to form.

18               MR. BILLINGS:  Join.

19         A.    I mean Floyd and Chris.

20         Q.    (BY MR. DAWES)  Okay.  Anybody else?

21         A.    Not that I can think of right now.

22         Q.    Okay.  Do you recollect any discussions

23   with the folks at Alexander Capital or with the team

24   at FOL following Exhibit 34 after your -- your

25   response to Mr. Gazdak?

1                    MR. BILLINGS:  Objection to the form.

2          A.   I -- I don't remember.

3          Q.   (BY MR. DAWES)  Okay.  And when we look

4     at the first page of this exhibit, this is talking

5     about setting up a meeting, right?

6          A.   Yep.

7          Q.   Okay.  Do you know if, in fact, that

8     happened?

9          A.   I'd have to go back and confirm.  I don't

10    know.

11         Q.   And when you say "go back and confirm,"

12    how would you go about confirming that?

13         A.   I would have to look at my materials that

14    are available.

15         Q.   Okay.  What kind of materials would help

16    you on that?

17         A.   Probably emails would be the first place

18    I would start.

19         Q.   Okay.  Or maybe calendar?  Outlook or

20    something like that?

21                   MR. SMITH:  Objection to form.

22                   MR. BILLINGS:  Join.

23         A.   Possibly.

24         Q.   (BY MR. DAWES)  Okay.  Do you recollect

25    whether this meeting, in fact, happened at all?  Do

1  you have any independent recollection one way or the

2  other?

3      A.   I can't say for sure.

4      Q.   All right.  And judging from that answer,

5  I assume you have no independent recollection of what

6  would have been said at this meeting you're not sure

7  happened?

8      A.   That is correct.

9      Q.   Okay.  Did FOL have shareholder meetings

10  from time to time from its formation?

11      A.   I don't know.  I can't -- I don't know.

12      Q.   All right.  And I think I asked you this

13  before when we were talking about founders shares, and

14  you -- I think you told me you didn't know what they

15  were, and you didn't know if you had any.  Am I right?

16      A.   Correct.

17      Q.   All right.  And were you ever a

18  shareholder in any way, shape, or form of FOL?

19      A.   I don't know.

20      Q.   Okay.  And you're not aware of any -- are

21  you aware of any formalities by FOL in terms of having

22  shareholder meetings or meetings with officers and

23  directors of FOL at any time?

24          MR. BILLINGS:  Objection to the form.

25          MR. SMITH:  Join.

1           A.    I don't recall.

2           Q.    (BY MR. DAWES)  Okay.

3                 (Deposition Exhibit 35 was marked.)

4           Q.    So this is an email of April 20, 2020, on

5     top.  Below is another email.  This appears to be

6     between Alexander Capital folks.  Do you see that?

7           A.    I see that.

8           Q.    All right.  So if you go over to

9     Redemption 34025, there is a Corporate Noteholder

10    Update.  Do you see that?

11          A.    Yes.

12          Q.    All right.  Are you familiar with that

13    document?

14          A.    I did not put together this document.

15          Q.    Okay.  Have you seen it before?

16          A.    I may have.

17          Q.    All right.  Have you seen it in the last

18    few days as you got ready for your deposition?

19          A.    That's probably where I saw it.

20          Q.    Okay.  All right.  And do you know who

21    all was involved in preparing it?

22          A.    I do not recall.

23          Q.    Okay.  All right.  Now, this is -- this

24    purports to be a noteholder update.  So this is an

25    update for the senior 12 percent noteholders; is that

```
 1   fair?
 2          A.   I did not write this email.  I cannot
 3   attest to that.
 4          Q.   Okay.  What do you think -- do you see
 5   what the title of the document is?
 6          A.   The title says Valued Noteholder
 7   Presentation.
 8          Q.   All right.  And if you look at Redemption
 9   34025 --
10          A.   Okay.
11          Q.   -- what does that document say?
12          A.   It says Valued, Inc.  Corporate
13   Noteholder Update.
14          Q.   All right.  Are you familiar with the
15   concept of a noteholder update?
16               MR. SMITH:  Objection, form.
17               MR. BILLINGS:  Join.
18          A.   There's many forms of that, so I can't
19   speak to this one in particular.
20          Q.   (BY MR. DAWES)  All right.  All right.
21   Do you understand this document purports to update
22   noteholders?
23               MR. SMITH:  Objection to form.
24               MR. BILLINGS:  Join.
25          A.   Again, I did not put this together; so I
```

1    cannot speak to the intent of what the document is.  I

2    cannot speak to something I did not put together.

3             Q.   (BY MR. DAWES)  Look at 34027.  It's a

4    company overview.

5             A.   Okay.

6             Q.   The last bullet point there says, "Valued

7    employees 20 people around the U.S. who work

8    remotely."

9                  You were with the CFO back in April of

10   2020, right?

11            A.   No, I was never the CFO.

12            Q.   COO?

13            A.   In April of 2020?

14            Q.   Right.

15            A.   I still was.

16            Q.   And you handled HR?

17            A.   Matters, yes.

18            Q.   Is that right that Valued employed 20

19   people around the U.S. at that time?

20            A.   It sounds about right.

21            Q.   Okay.  And then if you look at the next

22   page, 34028, this provides a Company Overview.  And if

23   you take a look at the second bullet point --

24            A.   Okay.

25            Q.   -- this -- this ties in with the 50/50

1    agreement you've been talking about today, correct?

2         A.   I didn't write this, so I can't say to

3    what it's referring to.  I don't feel comfortable.

4    That's not my deck.

5         Q.   I understand you didn't write it.

6         A.   Okay.

7         Q.   We all read books, and we didn't write

8    the books, right?  You can read these words and

9    understand them, correct?

10            MR. SMITH:  Objection, form.

11            MR. BILLINGS:  Join.

12         A.   I can make assumptions and a guess.  But,

13    again, I can't say for sure what this is about.

14         Q.   (BY MR. DAWES)  Well, why don't you read

15    that second bullet point into the record just so we

16    have a clear delineation of what it says.

17         A.   Okay.  So the bullet says, "A 2.3 million

18    note on 4 Oregon dispensaries, 'Floyd's Fine Cannabis'

19    plus a 50 percent economic interest in the sale price

20    of the dispensaries, after Valued's note is paid

21    back."

22         Q.   What don't you understand about that

23    bullet point?

24            MR. SMITH:  Objection, form.

25            MR. BILLINGS:  Join.

1          A.    I never said I didn't understand it.

2          Q.    (BY MR. DAWES)  You understand it?

3          A.    I understand the bullet.

4          Q.    All right.  And so if we go on to the

5    next page, the 2019 highlights, is it correct that the

6    revenues -- 2019 revenues for FOL had more than

7    tripled from 2018?

8          A.    I don't know.

9          Q.    Well, take a look at that first bullet

10   point.

11         A.    Okay.

12         Q.    Okay?

13         A.    Okay.

14         Q.    And do you want to answer my question

15   again?

16         A.    I cannot confirm.  I didn't write this

17   deck, so I cannot attest.

18         Q.    Forget about writing the deck.

19         A.    The veracity of this deck --

20         Q.    Forget about writing the deck.  I'm

21   asking you a question -- and let me ask it this way:

22   Had, in fact, FOL's revenues grown from 2.7 million in

23   2018 to 7.9 million in 2019?

24         A.    I don't know.  I don't recall.  I don't

25   have the information in front of me to be able to

1   verify that.

2          Q.   So you don't know if the information in

3   this noteholder update is accurate or not?

4                MR. SMITH:  Objection to form.

5                MR. BILLINGS:  Join.

6          A.   I did not write the deck.  I don't know

7   what it was intended for.

8          Q.   (BY MR. DAWES)  When you say you don't

9   know what it was intended for, you know it's a

10  corporate noteholder update, do you not?

11               MR. SMITH:  Objection to form.

12               MR. BILLINGS:  Join.

13               MR. SMITH:  Asked and answered.

14         A.   Again, I don't know what Jonathan Gazdak

15  wanted to do with this deck.

16         Q.   (BY MR. DAWES)  Well, what do you suppose

17  gets done with a corporate noteholder update?  Do you

18  think it's to update the noteholders?

19         A.   Presumably.

20               MR. SMITH:  Objection to form,

21  argumentative.

22         Q.   Yes, I would agree.  I would agree.

23               MR. BILLINGS:  Join.

24         Q.   (BY MR. DAWES)  I don't agree that's a

25  reach at all, do you?

1              MR. SMITH:  Object to the form.

2              MR. BILLINGS:  Join.

3         A.   I don't know.

4         Q.   (BY MR. DAWES)  Let me next ask you to

5    take a look at 34036.  So this is under Marijuana

6    Recreational Dispensaries.  Do you see that?

7         A.   I do.

8         Q.   And the second bullet point -- I know you

9    didn't write this, but go ahead and read that to

10   yourself, if you would, for a moment.

11        A.   Okay.

12        Q.   Again, I know you didn't write it, but

13   you can read it.  Is there anything inaccurate that

14   you see in that second bullet point that starts with

15   "In June 2018"?

16             MR. SMITH:  Objection to form.

17             MR. BILLINGS:  Join.

18        A.    I am not familiar with the terms of the

19   agreements, so I don't feel comfortable saying that

20   this is 100 percent accurate, especially if I didn't

21   write it.

22        Q.   (BY MR. DAWES)  Okay.  Is it true it's

23   impossible for you to evaluate if something is correct

24   or not unless you wrote it?

25             MR. BILLINGS:  Objection to the form,

1 argumentative.

2 MR. SMITH: Join.

3 A. I would feel a lot more comfortable if I

4 knew who wrote this deck.

5 Q. (BY MR. DAWES) And I understand that.

6 We all want to be comfortable, and I want you to be

7 comfortable. But what I'm asking is is the

8 information in this second bullet point, to your

9 knowledge, accurate or not?

10 A. I can't --

11 Q. I know you didn't write it.

12 A. Right.

13 MR. SMITH: Objection to form.

14 Q. (BY MR. DAWES) Is it accurate, as far as

15 you know?

16 A. I cannot --

17 MR. BILLINGS: Objection to form.

18 THE DEPONENT: Sorry.

19 MR. SMITH: Asked and answered. Hold on.

20 Just because you don't like the answer -- I understand

21 you're not getting the answer that you think you want.

22 MR. DAWES: That's enough on the

23 coaching, okay?

24 MR. SMITH: I'm not coaching. I am just

25 saying that we're all here pulling our hair out

1  because you've answered the question many, many times.

2  And she's given you an question, but you just don't

3  like it.  So you've got however many more minutes you

4  got, so --

5          Q.  (BY MR. DAWES)  So bottom line, you don't

6  know if it's true or not?

7              MR. BILLINGS:  Objection to form.

8              MR. SMITH:  Join.

9          A.  I cannot confirm these numbers.

10         Q.  (BY MR. DAWES)  Now, the third bullet

11 point talks about revenues doubling at the three

12 stores in Portland.  Do you see that?

13         A.  I see that.

14         Q.  You have no idea if that's true or not,

15 correct?

16             MR. SMITH:  Objection, form.

17             MR. BILLINGS:  Join.

18         A.  I cannot confirm the revenues at three

19 stores in Portland.

20         Q.  (BY MR. DAWES)  Okay.

21         A.  No.

22         Q.  Now, FOL was able to provide that and put

23 it in the Corporate Noteholder Update, though,

24 correct?

25             MR. BILLINGS:  Objection to the form,

1    lack of foundation.

2              MR. SMITH:  Join.

3         A.   I don't understand your question.

4         Q.   (BY MR. DAWES)  The information in that

5    third bullet point is contained in the Corporate

6    Noteholder Update that we're looking at, correct?

7         A.   Yes.

8         Q.   All right.  You did not fact-check any of

9    it, correct?

10        A.   I --

11             MR. SMITH:  Objection to form.

12             MR. BILLINGS:  Join.

13        A.   I don't recall.

14        Q.   (BY MR. DAWES)  Okay.  Did -- did you

15   fact-check some of this, some of the content of

16   Exhibit 3 --

17             THE COURT REPORTER:  5.

18        Q.   (BY MR. DAWES)  -- 5?

19             MR. SMITH:  Objection to form, lack of

20   foundation.  She's not even on the email, but you can

21   answer.

22        A.   I do not recall.

23        Q.   (BY MR. DAWES)  So if we take a look at

24   34039, this includes a Noteholder Status, correct?

25        A.   Correct.

1        Q.   Okay.  Do you have any reason to dispute

2  the first bullet point that says, "All noteholders

3  have not been paid interest for the fourth quarter of

4  2019, nor the first quarter of 2020, $257,614 in

5  total"?

6              MR. SMITH:  Objection to form.

7              MR. BILLINGS:  Join.

8        A.   I cannot confirm that bullet.

9        Q.  (BY MR. DAWES)  Nor can you deny it?

10            MR. SMITH:  Objection, form.

11            MR. BILLINGS:  Join.

12       A.   I just don't know.

13       Q.  (BY MR. DAWES)  Okay.  Do you have any

14  basis to dispute the statement that "As of March 31,

15  2020, $1,083,507 in Principal of the Notes was in

16  default"?

17            MR. BILLINGS:  Objection to the form.

18            MR. SMITH:  Join.

19       A.   I cannot confirm that.

20       Q.  (BY MR. DAWES)  You cannot deny it,

21  correct?

22            MR. SMITH:  Same objection.

23            MR. BILLINGS:  Join.

24       A.   I -- I just don't know.

25       Q.  (BY MR. DAWES)  As -- and you were the

1    COO when this was done, correct?

2         A.   What was the date of the deck again?

3         Q.   April of 2020.

4         A.   Yes.

5         Q.   Okay.  All right.  The third bullet

6    point, do you -- you cannot deny that "Valued," or

7    FOL, "doesn't have available cash to pay off the

8    Interest, Principal on Notes that are currently in

9    default, nor those nearing maturity," correct?

10             MR. BILLINGS:  Objection to the form.

11             MR. SMITH:  Join.

12        A.   I don't know.

13        Q.   (BY MR. DAWES)  You are unable to deny

14   that as you sit here right now, correct?

15        A.   I do not know whether Valued had had

16   available cash to pay off the interest, principal on

17   notes that are currently in default nor those nearing

18   maturity.

19        Q.   Okay.  Is it true that FOL's management

20   team wanted to discuss options to amend or extend the

21   outstanding notes?

22             MR. SMITH:  Objection, form.

23             MR. BILLINGS:  Join.

24        A.   As I've said, FOL's team did -- was

25   trying to restructure the notes.

1          Q.   (BY MR. DAWES)  Okay.

2               MR. DAWES:  Well, I think we're getting

3    toward the end of our time.  Why don't we take a quick

4    ten minutes, and then we'll get this buttoned up.

5               (Recess taken, 4:06 p.m. to 4:16 p.m.)

6          Q.   (BY MR. DAWES)  So the -- you've

7    mentioned this advisory board a couple of times today,

8    and I know you've identified some of its constituents

9    as best you can recollect.  Do you remember when it

10   was formed exactly?

11         A.   No, I do not.

12         Q.   All right.  And do you remember what the

13   -- what its purpose was?

14         A.   Not specifically why.  No, I don't know.

15         Q.   Okay.  How much interaction did you have

16   with the -- with this board at any given time from its

17   inception until its demise?

18         A.   I tried to help coordinate calls and

19   provide documents as we saw in the emails.

20         Q.   Okay.  Was that most of what your

21   interaction was then?

22         A.   From what I remember.

23              THE DEPONENT:  Who is on the phone?

24              MR. DAWES:  That's Mr. da Silva, I

25   believe.

1          MR. MURRAY:  Who is on the phone?

2          MR. DAWES:  Howard da Silva.

3          THE DEPONENT:  Is there anyone else

4   that's been listening that we were not aware of?

5          MR. DAWES:  Not that I am aware.

6          THE DEPONENT:  Okay.  I thought you guys

7   had asked at the beginning -- okay.

8          MR. DAWES:  No, we disclosed Mr. da Silva

9   from inception.

10          Q.   (BY MR. DAWES)  And speaking of

11   Mr. da Silva -- I know his name has come up a couple

12   of times today.  Having gone through all of these

13   exhibits and all, does that stimulate any further

14   recollection of any interaction you have had with him

15   at any time?

16          A.   Not that I remember.

17          (Deposition Exhibit 36 was marked.)

18          Q.   Have you seen Exhibit 36 before?

19          A.   Well, I'm copied -- or I'm sent --

20   Jonathan Gazdak sent me the email.

21          Q.   Right.  Yeah.  And do you -- does this

22   tie in with kind of with what you were recollecting

23   from that time period in terms of who was doing what

24   and what the activities or interaction were between

25   FOL and this advisory board?

1                    MR. SMITH:  Objection, form.

2                    MR. BILLINGS:  Join.

3           A.   Well, let me read it.

4           Q.   (BY MR. DAWES)  Sure.

5           A.   I'm not sure what it says.

6           Q.   Sure.

7           A.   Okay.  Yes, I generally recall that these

8    were the guys involved.

9           Q.   Okay.  Do you -- anyone else come to

10   mind?

11          A.   No.

12          Q.   Okay.  So this -- the email from

13   Mr. Gazdak talks about setting up, like, a biweekly

14   Zoom conference in that second paragraph.  Did that

15   ever happen?

16          A.   I can't say for sure if it was biweekly.

17   I don't know.

18          Q.   How many times do you think FOL actually

19   sat down and met with this advisory board, be it by

20   Zoom or in person or by phone?

21          A.   I don't know.

22          Q.   Any estimate?

23          A.   No.

24          Q.   There are some specific requests for

25   information made of the financial nature there at the

1  bottom of the first page.  Do you see that?

2      A.   I do.

3      Q.   And to the best of your knowledge, was

4  that information provided to Mr. Gazdak or the

5  advisory board?

6      A.   I can't say for sure.

7      Q.   Okay.  Did you provide any of that after

8  this email?

9      A.   I don't know.

10      Q.   The fifth bullet point under Financial

11  talks about PPP and EIDL loan information.  Did FOL

12  actually have a PPP or EIDL loan?

13      A.   Yes, it did.

14      Q.   And for how much was that?

15      A.   I don't remember.

16      Q.   Has that -- was it PPP or EIDL?

17      A.   There was one of each.

18      Q.   Okay.  And was the PPP forgiven?

19      A.   I don't know.

20      Q.   Okay.  And do you know the outcome of --

21  whether the EIDL loan remains outstanding?  Has it

22  been paid?  Do you have any idea?

23      A.   No.

24      Q.   The -- one of the things that was

25  requested was a diagram of the organizational

1    structure of the company.  Do you see that, that

2    second-to-last bullet point on that page?

3           A.   Um-hum.

4           Q.   Do you know if that ever happened?

5           A.   I don't --

6           Q.   Did that ever get put together?

7           A.   No, I don't know.

8           Q.   And then there were inquiries under

9    Valued Structure at the top of the second page.  There

10   are three bullet points there.  Do you know if that

11   information was assembled by FOL and provided?

12          A.   I'm not sure.

13          Q.   Is it safe to say you didn't have any

14   role in that if that did happen?

15          MR. SMITH:  Objection to form.

16          MR. BILLINGS:  Join.

17          A.   I can't say for sure what I sent or

18   didn't send.  I don't know.

19          Q.   (BY MR. DAWES)  Okay.

20          (Deposition Exhibit 37 was marked.)

21          Q.   I'll let you take a moment to take a look

22   at Exhibit 37.

23          A.   Okay.

24          Q.   So just looking at the first page, we're

25   now -- this is at the end of May of 2020.  There's an

1    email from FOL's CFO to a host of different folks,

2    including yourself, correct?

3            A.    Correct.

4            Q.    All right.  And it looks like he's

5    sending a bunch of this information that he has

6    cataloged in advance of a call that was going to

7    happen that day, correct?

8            A.    It appears from the document, so that's

9    right.

10            Q.    So it looks like he's itemized six pieces

11    of information there, and then he goes on to talk

12    about "Additions to Tresorit data room not included in

13    this email."

14                 So talking about the Tresorit -- I don't

15    know if I'm pronouncing that right -- data room, what

16    was that exactly?

17            A.    That was a cloud storage.

18            Q.    Okay.  And was that something set up to

19    transmit information to the advisory board or did that

20    have some other independent purpose?

21            A.    I believe it was created to provide the

22    documents requested by the advisory board.

23            Q.    Okay.  And were you involved in terms of

24    putting together that information as you recall?

25            A.    I don't recall.

1          Q.   Okay.  All right.  And Items 1 through 6
2   is kind of -- we've seen some of this information
3   provided previously on behalf of FOL, correct?
4               MR. SMITH:  Objection, form.
5               MR. BILLINGS:  Join.
6          A.   I'm not sure where we've seen it.
7          Q.   (BY MR. DAWES)  We've looked at some of
8   the P and Ls today, for example.
9          A.   We have looked at P and Ls.  I'm not sure
10  it's the same ones.
11         Q.   No, I'm just saying that this type of
12  information has been previously provided by FOL to the
13  Alexander Capital folks and/or noteholders, correct?
14              MR. BILLINGS:  Objection to form.
15              MR. SMITH:  Join.
16         A.   No, I do not know what was provided to
17  the noteholders.
18         Q.   (BY MR. DAWES)  So on this email, do you
19  know if Howard da Silva was a noteholder?
20         A.   I believe he was.
21         Q.   And how about Greg Hurley, do you know if
22  he was a noteholder?
23         A.   I believe he was.
24         Q.   All right.  And do you know if the P and
25  Ls and balance sheets had been previously provided by

1    FOL to either of those gentlemen?

2          A.   I --

3               MR. SMITH:  Objection, form.

4               MR. BILLINGS:  Join.

5          A.   I don't recall.

6          Q.   (BY MR. DAWES)  All right.  So when we

7    look at the -- the next page, one of the things is you

8    have -- well, before we go to the next page, I guess,

9    No. 2 says, "Greg Hurley Q and A response."  Do you

10   see that?

11         A.   No.

12         Q.   All right.  So take a look at the first

13   page.

14         A.   Um-hum.

15         Q.   And just over halfway up that page, No.

16   2, "Greg Hurley, Q and A response."

17         A.   Yes, I see that.

18         Q.   Okay.  And then if you look to the second

19   page, there is -- in the top half of that page, there

20   is an email that appears to be written by Mr. Hurley.

21   And interlineated in the middle of the email is some

22   red text.  Do you see that?

23         A.   I do.

24         Q.   Okay.  Did you understand this was

25   information being relayed on behalf of FOL to

1    Mr. Hurley in response to questions he had asked?

2               MR. SMITH:  Objection to form.

3               MR. BILLINGS:  Join.

4          A.   I can't recall, but it looks like, from

5     the email that I'm looking at, that someone is

6     responding to Greg's questions.

7          Q.   (BY MR. DAWES)  Right.  And do you know

8     who that is?

9               MR. SMITH:  Objection to form.

10              MR. BILLINGS:  Join.

11         A.   It's hard to tell if this is a separate

12    document that was stapled here or if it's part of the

13    email.  I don't -- there's no title on it.  It's just

14    -- so I'm not sure.

15              MR. BILLINGS:  And just for the record,

16    there appears to be a missing Bates between the first

17    and second page.

18              MR. DAWES:  Yeah.

19         Q.   (BY MR. DAWES)  Okay.  So you don't know

20    who prepared the red -- the red text material?

21         A.   There's no way for me to know.  I don't

22    know.

23         Q.   Okay.  So do you understand that the red

24    is a response from FOL albeit you don't know

25    specifically who wrote it?

1           MR. SMITH:  Objection, form.

2           MR. BILLINGS:  Join.

3      A.   Well, I don't know who wrote it, I can't

4  confirm that it was from FOL.

5      Q.   (BY MR. DAWES)  Well, there are many

6  references to "we," for example, on that first red

7  text section.  Do you see that?

8      A.   I see it twice.

9      Q.   Um-hum.  Does that help you figure out

10 whether that came from FOL or not?

11          MR. SMITH:  Objection, form.

12          MR. BILLINGS:  Join.

13     A.   I -- I -- no, I can't confirm.

14     Q.   (BY MR. DAWES)  Okay.

15     A.   I don't know.

16     Q.   It's a mystery.  Let's look at Redemption

17 799.

18     A.   Well, again, especially if the Bates

19 stamp is missing, there's no 797.  So this could have

20 been inserted from anywhere, so I don't know.

21     Q.   So if you look at 799, the red text --

22     A.   Okay.

23     Q.   -- it is true, as you sit here today, you

24 have no earthly idea who wrote the red text; is that

25 true?

1              MR. BILLINGS:  Objection to form.

2         A.   I don't know how I can confirm and verify

3    who wrote the red text.

4         Q.   (BY MR. DAWES)  You have no idea as you

5    sit here?

6         A.   I do not know.

7         Q.   Okay.  It certainly seems to be written

8    on behalf of Valued, correct?

9              MR. SMITH:  Objection to form.

10             MR. BILLINGS:  Join.

11        Q.   (BY MR. DAWES)  FOL?

12        A.   I don't know.

13        Q.   You just don't know?  Okay.  That's fine.

14   Then when we look at Redemption 800, there is

15   discussion or response to question 2.  Again, you have

16   no idea who wrote that, right?

17        A.   I cannot confirm.  I don't know where

18   this document is from.

19        Q.   And you don't know whether this was

20   something FOL provided, correct?

21        A.   I can't confirm that.

22        Q.   And you don't know if it's the Q and A

23   response that Mr. -- that the CFO identified on the

24   first page, right?

25        A.   I have no way of confirming that.

1          Q.   It could be anything?  Okay.  Now,

2     there's a statement that says, "There is" -- I'm back

3     on 800 in the very middle of the page.  "There is no,

4     and never was any, ownership in any Colorado grow

5     business."

6               I know you didn't write this, and I know

7     your sworn testimony today under oath is you don't

8     know who did write it, but my question is is that a

9     true statement?

10              MR. BILLINGS:  Objection to the form.

11              MR. SMITH:  Join.

12         A.   I am not aware that FOL owned a Colorado

13    grow business.

14         Q.   (BY MR. DAWES)  Okay.  At any time,

15    correct?

16         A.   Correct, I'm not aware of that.

17         Q.   And notwithstanding what information may

18    have been relayed on that to others, correct?

19         A.   I don't understand the question.

20         Q.   Okay.  Have you seen information in some

21    of the decks, if you recall, that talk about a

22    Colorado grow that had been established by FOL?  Do

23    you recall that?

24              MR. SMITH:  Objection to the form.

25              MR. BILLINGS:  Objection to the form.

1        A.   I do not recall any decks with Floyd's of
2   Leadville owning a Colorado grow.
3        Q.   (BY MR. DAWES)  If you look at the
4   Redemption 802, once again, the red text, you have no
5   idea who wrote that, right?
6        A.   I can't -- there's no way for me to know.
7        Q.   Now, the question in No. 5 is, "How is
8   our debt serviced by the dispensaries?"  That could
9   have been answered by anybody, right?  You don't think
10  that was a question to FOL?
11            MR. SMITH:  Objection to form.
12       A.   Again, I don't know where this document
13  came from.
14       Q.   (BY MR. DAWES)  Okay.
15       A.   And who wrote it.
16       Q.   Okay.  And you cannot speak to the
17  truthfulness of any of this, correct?
18            MR. SMITH:  Objection, form.
19            MR. BILLINGS:  Join.
20       A.   To any of what?
21       Q.   (BY MR. DAWES)  Anything in red, can you
22  vouch for the truthfulness of what is set forth
23  therein?
24            MR. SMITH:  Objection to form.
25            MR. BILLINGS:  Join.

1          A.   I cannot vouch for anything that I didn't

2     write or know for sure that I wrote.

3          Q.   (BY MR. DAWES)  Okay.  There is a section

4     at the bottom of 802 called Current Debt.  Do you see

5     that?

6          A.   Yes.

7          Q.   Do you want to take a look at that for a

8     moment?

9          A.   Um-hum.

10          Q.   Okay.  Do you have any information

11     related to whether any of this is bona fide debt of

12     FOL?

13               MR. SMITH:  Objection to form.

14               MR. BILLINGS:  Join.

15          A.   What does "bona fide" mean?

16          Q.   (BY MR. DAWES)  Legitimate.

17               MR. SMITH:  Same objection.

18               MR. BILLINGS:  Join.

19          A.   I don't know.

20          Q.   (BY MR. DAWES)  You don't know if any of

21     this is legitimate debt, correct?

22               MR. SMITH:  Objection.

23          A.   I don't know.

24          Q.   (BY MR. DAWES)  So on 803, at the top, it

25     says, "See loan" -- or in the middle -- excuse me --

1   below the table, it says "See loan document in data

2   room."

3                  That's a data room established by FOL, as

4   I understand it?

5                  MR. SMITH:  Objection to form.

6                  MR. BILLINGS:  Join.

7        A.   So, again, I'm not sure exactly what data

8   room they are talking about; but it's probably

9   Tresorit data room, would be my guess.

10       Q.   (BY MR. DAWES)  Okay.  The remainder of

11  the information we see in red text on page 803, you

12  cannot speak to or vouch for the factual content of

13  it, correct?

14       A.   Are you asking me for -- about specific

15  sections or --

16       Q.   The remaining passages in red or four

17  sections below the table in red, can you speak to or

18  vouch for the factual accuracy of any of that

19  information?

20                 MR. SMITH:  Objection, form.

21                 MR. BILLINGS:  Join.

22       A.   I -- probably not, no.

23       Q.   (BY MR. DAWES)  Do you recollect any

24  discussions with the recipients of this email,

25  Exhibit 37, regarding its contents?

1          A.    No, I do not.

2          Q.    Do you recall fielding any questions

3    following the transmission of this Exhibit 37?

4          A.    I do not recall conversations -- specific

5    conversations where we talked about this.

6          Q.    And having gone through this Q and A

7    response, does that stimulate any further recollection

8    regarding a meeting that happened around May 29, 2020?

9          A.    Well, as we've established, there were

10   many meetings.  And so I don't know which one --

11         Q.    Oh, I --

12         A.    -- that could have been.

13         Q.    I apologize.  I did not know we had

14   established there were many meetings.  How many

15   meetings were there?

16              MR. SMITH:  Objection, form.

17              MR. BILLINGS:  Join.

18         A.    I don't know; but from Jonathan Gazdak's

19   email, he said meetings were established twice weekly.

20         Q.    (BY MR. DAWES)  I thought you told me you

21   didn't know if that happened or not.

22         A.    I can't say for sure.

23         Q.    How many meetings were there?

24         A.    I don't know.

25         Q.    Were there more than ten?

1        A.    I don't know.

2              MR. SMITH:  Objection.

3        Q.    (BY MR. DAWES)  Were there more than one?

4        A.    Probably.

5        Q.    More than five?

6        A.    I don't know.

7        Q.    Okay.  Can you be any more specific

8    between one and five?

9        A.    No, I cannot.

10             MR. BILLINGS:  And just for the record, I

11   believe this exhibit is missing a number of

12   attachments.

13             THE DEPONENT:  So -- yeah.

14             (Deposition Exhibit 38 was marked.)

15       Q.    (BY MR. DAWES)  So my first question is

16   do you recognize Exhibit 38?

17       A.    Well, it was an email from Jonathan

18   Gazdak to Floyd, me, and Chris.

19       Q.    Do you have any recollection of having

20   received this email?

21       A.    Not specifically.

22       Q.    Okay.  Do you recollect any discussions

23   internally at FOL or otherwise with the folks on this

24   email?

25             A.    Are you asking if we discussed this email

1  with Floyd, Alex, and Chris?

2          Q.    Sure.  Let's start there.

3          A.    I don't remember --

4          Q.    All right.

5          A.    -- if we did.

6          Q.    Did you discuss it with any of the folks

7  in the cc section of this email?

8          A.    I don't recall that we did.

9          Q.    Okay.  All right.  Do you recall if FOL

10 had any response to this email?

11         A.    No, I don't recall that.

12         Q.    Okay.  All right.  This -- if you look at

13 the second and third pages, it lays out kind of nine

14 steps.  Do you see that?

15         A.    Well, no, I have to count them.  I mean,

16 hold on.

17         Q.    Sure.  Well, if you look, they are

18 numbered 1 through 9.  That might help.

19         A.    Okay.

20         Q.    Okay.  Do you recollect any discussion

21 about any of these nine steps?

22         A.    I believe there were discussions -- well,

23 not really.  I -- not really.  I don't know what was

24 discussed about them.

25         Q.    Okay.  The PPP loan you were talking

1  about before, do you -- you don't recollect what those

2  proceeds were utilized for?

3           MR. SMITH:  Objection, form.

4       A.   I don't recall what the proceeds were

5  utilized for, but I do know that they would have been

6  utilized for what the PPP specifically requested they

7  be utilized for.  And the government made it very

8  clear that there was only certain things that they

9  could be utilized for.

10      Q.   (BY MR. DAWES)  Okay.  Were you on the --

11 were you quarterbacking that effort in terms of

12 obtaining the PPP loan?

13      A.   What do you mean by "quarterbacking"?

14      Q.   What do you understand the term

15 "quarterbacking" to mean?

16      A.   I don't really do sports, so I don't

17 know.

18      Q.   How about coordinating?

19      A.   I was helping to coordinate.

20      Q.   Who else was?

21      A.   I don't recall.

22      Q.   Do you know how FOL went about valuing

23 its inventory?

24           MR. BILLINGS:  Objection to the form.

25      A.   No, I don't know exactly how it would do

1    that.

2            Q.    (BY MR. DAWES)   Who handled valuation of

3    FOL's inventory?

4            A.    I -- it would have been a joint effort

5    between some of the team members and -- yeah.

6            Q.    And what team members?

7            A.    Likely at some point, it would have been

8    me and Chris and the bookkeeper; but that could change

9    depending on what inventory item we're referring to.

10           Q.    Okay.

11                 (Deposition Exhibit 39 was marked.)

12           Q.    Do you recognize this as an Am Ex

13   statement?

14           A.    Yes, I do.

15           Q.    And you had a corporate card for FOL,

16   correct?

17           A.    Well, we had an American Express card

18   that I personally guaranteed for business purposes.

19                 MR. DAWES:   Can I take two minutes just

20   to see Mr. Hurley out, and I'll come back and finish

21   up?

22                 MR. SMITH:   Sure.

23                 (Recess taken, 4:40 p.m. to 4:42 p.m.)

24           Q.    (BY MR. DAWES)   So going back, were there

25   any kind of limits you had in terms of what you could

1    utilize the FOL card for?

2              MR. SMITH:  Objection to form.

3              MR. BILLINGS:  Join.

4         A.   I don't -- what do you mean by any limits

5    to what we could use the FOL card for?

6         Q.   (BY MR. DAWES)  What don't you understand

7    about that question?

8              MR. SMITH:  Objection.

9         A.   What do you mean --

10             THE DEPONENT:  Sorry.

11             MR. SMITH:  Go ahead.

12        A.   Monetary limits or what -- if you can

13   just clarify.

14        Q.   (BY MR. DAWES)  Let's start with monetary

15   limits, and then you tell me any other limits.

16        A.   Okay.  Well, I believe there probably was

17   a ceiling on the card, a financial -- I don't know

18   exactly what it was; but, you know, we couldn't spend

19   a million dollars on it, for example.

20        Q.   So you could not spend a million dollars

21   on it, correct?

22        A.   It was limited.

23        Q.   Were there any other limitations beyond

24   not spending a million dollars?

25        A.   These were meant for corporate expenses.

1          Q.    Um-hum.   Personal expenses would be

2    improper, correct?

3                MR. SMITH:  Objection, form.

4                MR. BILLINGS:  Join.

5          A.    Personal expenses were paid back.

6          Q.    (BY MR. DAWES)  So you were authorized to

7    make personal expenditures on the credit card provided

8    you pay them back, correct?

9                MR. SMITH:  Objection, form.

10               MR. BILLINGS:  Join.

11         A.    I'm not sure if I was authorized.   I

12   don't know.

13         Q.    (BY MR. DAWES)  Who instructed you in

14   terms of what you could or could not use the FOL Am Ex

15   card for?

16         A.    Well, I think common sense and Floyd

17   would look through it.

18         Q.    Did you ever reimburse personal expenses?

19         A.    I did.

20         Q.    All right.  And by writing a check?

21         A.    No.

22         Q.    How did you do that?

23         A.    By reducing the amount of a loan that I

24   gave to FOL.

25         Q.    Okay.  When did you give a loan to FOL?

1        A.   I can't recall exactly, but I believe

2  it's in the discovery documents.

3        Q.   Okay.  And how much was the loan?

4        A.   Approximately a hundred thousand dollars.

5        Q.   And how did you fund the loan?

6        A.   With my own personal money in my savings.

7        Q.   By check, wire, EFT, or how?

8        A.   Again, it's in the discovery documents,

9  so you can go look there because I don't know --

10  remember exactly.

11        Q.   Well, I'm asking you.  You're under oath.

12        A.   Um-hum.

13        Q.   And your answer is you don't know,

14  correct?

15        MR. SMITH:  Objection to form.  She knows

16  she's under oath.

17        A.   My answer is I don't recall, and I don't

18  want to get the answer wrong.

19        Q.   (BY MR. DAWES)  Okay.  All right.  And so

20  you would utilize the Am Ex card for personal expenses

21  and then reduce your loan to FOL accordingly; is that

22  what you're telling me?

23        MR. SMITH:  Objection, form.

24        MR. BILLINGS:  Join.

25        A.   No.

1          Q.   (BY MR. DAWES)  Okay.

2          A.   I --

3          Q.   Explain it for me.  I'm sometimes slow on

4     the uptake.

5          A.   That's funny.  So at times, it would

6     be -- for example, we were traveling, and it was the

7     only card I would have; so I would have to use it.  Or

8     another example would be we traveled a lot.  We put

9     our heart and soul into building this company, and we

10    spent a lot of time on the road.  And husband and wife

11    are both working, so we were stuck running our

12    children, when we were traveling, to go to events, for

13    example, in Leadville, Colorado.  So at times, it was

14    easier to buy four tickets instead of doing two

15    separate transactions.  And if there was any personal

16    involvement, then I paid it back to the company.

17         Q.   Okay.  What I was trying to understand is

18    the logistics because you talked about a promissory

19    note or a loan you made to the company.  And you were

20    talking about that coming into play vis-a-vis personal

21    expenditures you made on the corporate credit card.

22    That's what I heard.  I'm trying to understand the

23    relationship between those two.

24         A.   The relationship between --

25              MR. SMITH:  Objection.

1           A.    -- what?

2           Q.    (BY MR. DAWES)  So if you had, for

3    example, $25,000 of personal expenses in August of

4    2019 on the credit card for FOL --

5           A.    I would never have that amount of

6    personal expenses on the corporate card.

7           Q.    Okay.  Let's assume you did.  What number

8    -- you pick a number.  Tell me the number you're more

9    comfortable with.

10           MR. BILLINGS:  Objection.

11           MR. SMITH:  Join.

12           A.    I prefer $100.

13           Q.    (BY MR. DAWES)  $100.  You had a

14    hundred-dollar expense on the FOL credit card.  How

15    did you go about repaying that?

16           A.    So if I had what I deemed to be a

17    personal expense for $100, then if I had made a loan

18    for $200, for example, then my loan of what the

19    company owed me would then be $100 less.

20           Q.    And where would we find that

21    reconciliation?

22           A.    I don't know for sure.  I'd have to go

23    back and look.

24           Q.    Okay.  You personally would have made

25    sure that reconciliation happened, though, correct?

1              MR. SMITH:  Objection, form.

2              MR. BILLINGS:  Join.

3         A.   I would make sure that the reconciliation

4    happened.

5         Q.   (BY MR. DAWES)  While you were COO of

6    FOL, did FOL have an accountant?

7         A.   FOL had a bookkeeper.

8         Q.   Okay.  And who was the bookkeeper?

9         A.   At what time period?

10        Q.   All bookkeepers from beginning to end as

11   best you know.

12        A.   We had several bookkeepers.

13        Q.   Okay.  What were the names of the

14   bookkeepers?

15        A.   Kelsie.  I'm forgetting her last name.

16   Heather.  And then -- yeah, and then we had another

17   one.

18        Q.   Okay.  And were these internal

19   bookkeepers or external bookkeepers?

20        A.   They were internal.

21        Q.   Okay.  Were there any external

22   accountants or bookkeepers at FOL at any time?

23        A.   Not that I recall.

24        Q.   Is there a tax accountant that's used by

25   FOL?

1          A.   I believe so.

2          Q.   Do you know who that is?

3          A.   I don't remember the name.

4          Q.   Are you aware of whether FOL has filed

5    tax returns each year from inception?

6          A.   I can't -- I'm not -- I don't know.

7               MR. DAWES:  Michael, if you have some

8    follow-up.

9               MR. MURRAY:  I just have one question.

10                        EXAMINATION

11   BY MR. MURRAY:

12         Q.   Do you mind pulling up Exhibit 34 again?

13         A.   Okay.

14         Q.   If you can turn to page 2, Bates ending

15   258.

16         A.   Okay.

17         Q.   And under paragraph 2 -- you went through

18   this with Mr. Dawes -- it says, "Sign Agreement on the

19   50 percent split (grow and 4th dispensary)."

20              Then in red -- which I believe reflects

21   the response to Mr. Hurley; is that correct?

22         A.   Yes.

23         Q.   So in red, it says --

24              MR. SMITH:  To Mr. Gazdak.

25              MR. MURRAY:  I'm sorry, Mr. Gazdak.  I

1    apologize.

2            Q.   (BY MR. MURRAY)  But it was -- the idea

3    of what's in red was coming from FOL; is that correct?

4    Whether you wrote it, or somebody else, that was FOL's

5    response?

6            MR. SMITH:  Objection to form.

7            A.   It -- it's hard for me to confirm.

8            Q.   (BY MR. MURRAY)  Okay.  Well, in any

9    event, "We cannot afford legal fees for drawing-up a

10   legal agreement."  In parentheses, "(Not trying to be

11   difficult; we know that this email is legally

12   enforceable and we already owe Pete over $40,000 in

13   legal fees)."

14           And I apologize, I don't recall, was it

15   your testimony that you wrote what is in red?  You can

16   see the email is coming from you, but I don't

17   recall --

18           A.   Yeah.  It looks like it is, but I don't

19   -- yes, it looks like it is.  I don't know for sure.

20   That's the other one that had more issues, yeah.

21           Q.   And you testified throughout the

22   deposition today that you're not aware of what the

23   terms of the 50/50 deal are; is that correct?

24           MR. SMITH:  Objection to form.

25           A.   That is correct.

1        Q.    (BY MR. MURRAY)  So if you are not aware

2    of what the terms are, what is your basis here for

3    writing, "We know that this email is legally

4    enforceable"?

5            MR. SMITH:  Objection to form.  If it

6    requires you to disclose attorney-client information,

7    then I instruct you not to answer.  Otherwise, you can

8    answer if it's your own personal knowledge.

9            MR. BILLINGS:  I give you the same

10   instruction.

11       A.    Okay.  Yeah, I don't know.

12       Q.    (BY MR. MURRAY)  Did you -- did a lawyer

13   advise you -- and I don't want to know any

14   communications that a lawyer might have had -- did FOL

15   seek consultation with a lawyer regarding that 50/50

16   email?

17           MR. BILLINGS:  Objection, vague as to

18   time.

19       A.    I can't recall.

20       Q.    (BY MR. MURRAY)  Did FOL seek legal

21   counsel with respect to the 50/50 agreement as of

22   April 25, 2020?

23       A.    I don't know.

24       Q.    Do you have any understanding of whether

25   that email is legally enforceable?

```
1              A.    I personally do not.  I don't know.

2              Q.    Do you know if it's an attorney -- aside

3     from an attorney, who else would have told you this

4     information if it's written in red regarding the email

5     being legally enforceable?

6              A.    I don't recall.  There were a few of us

7     that would have put together answers to these

8     questions, so I don't -- I don't know.

9              Q.    And you don't recall specifically who

10    provided you with the information in this answer,

11    No. 2, where it says, "We know that this email is

12    legally enforceable"?

13             A.    No, I do not.

14             Q.    And you have no basis -- your testimony

15    is you have no basis for knowing one way or the other

16    whether that email is legally enforceable?

17                   MR. SMITH:  Objection to form.

18                   MR. BILLINGS:  Join.

19             A.    I can't -- I'm not a lawyer, and I don't

20    know -- I can't say whether or not the email is

21    legally enforceable.

22             Q.    (BY MR. MURRAY)  So just to clarify, when

23    we read this, "We know this email is legally

24    enforceable," that is not your personal position?

25                   MR. SMITH:  Objection to form.
```

1                    MR. BILLINGS:  Join.

2          A.   I can't say that right now, because I

3   can't -- I don't know.

4          Q.   (BY MR. MURRAY)  And you don't know who

5   -- who would have provided you this information for

6   this answer?

7                    MR. SMITH:  Objection to form, asked and

8   answered.

9                    MR. BILLINGS:  Join.

10         A.   Well, again, as I've mentioned, there

11  were -- there was Floyd and Chris involved and I, and

12  we would have worked together to provide documents and

13  answers.

14         Q.   (BY MR. MURRAY)  And that first sentence

15  there where it says, "We cannot afford legal fees for

16  drawing-up a new agreement," is that consistent with

17  your understanding that a new agreement was never

18  drafted?

19                   MR. BILLINGS:  Objection to the form.

20         A.   I'm not sure.  I can't confirm if there

21  was or wasn't a new agreement.

22         Q.   (BY MR. MURRAY)  Do you have any

23  recollection of ever seeing a new agreement?

24         A.   I do not.

25                   MR. MURRAY:  Okay.  That's all I got.

1    Thank you.

2                MR. SMITH:   Thank you, gentlemen.

3                MR. BILLINGS:   To make one statement on

4    the record with respect to Exhibit 39, we didn't

5    produce this; so we didn't have an opportunity to

6    place a confidentiality designation on it, and we are

7    designating it as confidential, "we" being FOL.

8                (The deposition concluded at 4:54 p.m.,

9    June 7, 2022.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                I, ALEXANDRA MERLE HUET, do hereby

2    certify that I have read the foregoing transcript and

3    that the same and accompanying amendment sheets, if

4    any, constitute a true and complete record of my

5    testimony.

6

7

8                      _____

                        Signature of Deponent

9

                        (  ) No amendments

10                    (  ) Amendments attached

11

12          Acknowledged before me this _____

13    day of _____, 2022.

14

    Notary Public:  _____

15

    My Commission Expires:  _____

16

    Seal:

17

18

19

20

21

22

23

24

25

```
 1    STATE OF COLORADO      )

 2                           )ss.    REPORTER'S CERTIFICATE

 3    COUNTY OF DENVER       )

 4         I, Teresa L. Cardenas, do hereby certify that I

 5    am a Registered Professional Reporter and Certified

 6    Realtime Reporter within the State of Colorado; that

 7    previous to the commencement of the examination, the

 8    deponent was duly sworn to testify to the truth.

 9         I further certify that this deposition was taken

10    in shorthand by me at the time and place herein set

11    forth, that it was thereafter reduced to typewritten

12    form, and that the foregoing constitutes a true and

13    correct transcript.

14         I further certify that I am not related to,

15    employed by, nor of counsel for any of the parties or

16    attorneys herein, nor otherwise interested in the

17    result of the within action.

18              In witness whereof, I have affixed my

19    signature this 16th of June, 2022.

20              My commission expires May 24, 2023.

21

22              _____

23              Teresa L. Cardenas, RPR, CRR

24

25
```

1    AB LITIGATION SERVICES
     216 - 16th Street, Suite 600
2    Denver, Colorado  80202

3    June 16, 2022

4    MATTHEW J. SMITH, ESQ.
     Holland & Hart, LLP
5    555 17th Street, Suite 3200
     Denver, Colorado 80202
6
     Re      Deposition of ALEXANDRA MERLE HUET
7            Redemption Holdings, Inc. v.
             Floyd's of Leadville, Inc.
8            Case No. 2020CV032866

9    The aforementioned deposition is ready for reading
     and signing.  Please attend to this matter by
10   following BOTH of the items indicated below:

11   _____ Call 303-296-0017 and arrange with us to read
            and sign the deposition in our office
12
     _XXX_ Have the deponent read your copy and sign
13          the signature page and amendment sheets,
            if applicable; the signature page is attached
14
     _____ Read the enclosed copy of the deposition
15          and sign the signature page and amendment
            sheets, if applicable; the signature page
16          is attached

17   _XXX_ WITHIN 35 DAYS OF THE DATE OF THIS LETTER

18   _____ By _____ due to a trial date of _____

19   Please be sure the original signature page and
     amendment sheets, if any, are SIGNED BEFORE A NOTARY
20   PUBLIC and returned to AB Litigation Services for
     filing with the original deposition.  A copy of these
21   changes should also be forwarded to counsel of record.
     Thank you.
22
     AB LITIGATION SERVICES
23
     cc:  All Counsel
24

25

```
 1   AB LITIGATION SERVICES
     216 - 16th Street, Suite 600
 2   Denver, Colorado  80202

 3

 4

 5               ALEXANDRA MERLE HUET
                   June 7, 2022
 6           Redemption Holdings, Inc. v.
             Floyd's of Leadville, Inc.
 7             Case No. 2020CV032866

 8
     The original deposition was filed with
 9
     Christopher J. Dawes, Esq., on approximately
10
     the 16th of June, 2022.
11
     _____ Signature waived
12
     _____ Signature not requested
13
     _____ Unsigned; signed signature page and amendment
14         sheets, if any, to be filed at trial

15   _XXX_ Unsigned; original amendment sheets and/or
           signature pages should be forwarded to
16         AB Litigation Services, to be filed in the
           envelope attached to the sealed original

17

18
     Thank you.
19
     AB LITIGATION SERVICES
20
     cc:  All Counsel
21

22

23

24

25
```

```
              --- AMENDMENT SHEET ---

        Deposition of ALEXANDRA MERLE HUET
                  June 7, 2022
            Redemption Holdings, Inc. v.
             Floyd's of Leadville, Inc.
              Case No. 2020CV032866
```

The deponent wishes to make the following changes in the testimony as originally given:

Page     Line               Should Read                Reason

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

Signature of Deponent: _____

Acknowledged before me this _____ day of

_____, 2022.

(seal)        Notary's signature _____

              My commission expires  _____

## Exhibits

**EXHIBIT 1**  22:9,11, 13 194:14 226:22 260:16

**EXHIBIT 2**  53:22,24

**EXHIBIT 3**  61:19,21 63:2 304:16

**EXHIBIT 10**  108:5,6 111:4,6

**EXHIBIT 11**  113:11, 12 114:4 120:11 127:17

**EXHIBIT 12**  127:24, 25

**EXHIBIT 13**  148:15, 17 151:9,11,19 242:1,10

**EXHIBIT 14**  151:22, 23 154:9

**EXHIBIT 15**  154:24, 25

**EXHIBIT 16**  159:1,2

**EXHIBIT 17**  162:17, 18 245:5,7

**EXHIBIT 18**  162:24, 25 163:1 246:11 255:11

**EXHIBIT 19**  167:16, 18 168:15 254:15 255:15

**EXHIBIT 20**  169:12, 16

**EXHIBIT 21**  170:7,8

**EXHIBIT 22**  170:25 171:6

**EXHIBIT 23**  175:15, 17 184:20 185:2 247:7 248:20 249:24 250:10 270:11

**EXHIBIT 24**  182:3,7 184:24

**EXHIBIT 25**  185:6,8

**EXHIBIT 26**  204:3,5 208:6,14 211:15

212:25 213:3,10

**EXHIBIT 27**  207:16, 17 208:18 209:5

**EXHIBIT 28**  213:13, 15 218:5

**EXHIBIT 29**  223:2,3

**EXHIBIT 30**  238:8,9

**EXHIBIT 31**  255:4,5, 17

**EXHIBIT 32**  277:7,8

**EXHIBIT 33**  282:2

**EXHIBIT 34**  288:12, 13 292:24 333:12

**EXHIBIT 35**  295:3

**EXHIBIT 36**  308:17, 18

## $

**$1,083,507**  305:15

**$100**  331:12,13,17, 19

**$100,000**  228:10

**$127,500**  105:7

**$2**  180:20 247:22,24 251:25 252:1 291:23

**$2.5**  247:22

**$200**  331:18

**$25,000**  331:3

**$257,614**  305:4

**$300,000**  211:17

**$32**  218:14

**$32-million**  215:7 218:5

**$32mm**  214:24

**$4,433,571**  145:18

**$40,000**  334:12

**$50**  218:17

**$50-million**  215:8 218:6

**$500,000**  221:8

**$50mm**  214:25

**$565,820**  186:10

**$6**  252:17

**$8**  247:25 271:8,20

## (

**(7458)**  207:9

## -

**-ish**  43:6

## 0

**00976**  89:2

## 1

**1**  22:9,11,13 146:3,19 194:14,24 198:2 226:22 260:16 289:10 290:1 313:1 324:18

**1.029**  140:12 142:19

**1.4**  102:4

**1.52**  97:6

**1.852**  137:20

**1/2**  252:1

**10**  70:9 108:5,6 111:4,6 289:10

**100**  173:24 174:5,15 181:21 301:20

**102**  260:24

**105**  261:19

**1099**  228:21

**10:08**  255:9

**11**  113:11,12 114:4 120:11 127:17 150:7 194:25 195:5 196:17 199:9 243:21 244:4,5

**11/20/2019**  243:7

**1101**  198:5

**11258**  290:5

**11259**  289:20

**11260**  289:5

**115**  64:8

**11:11**  148:14

**11:32**  148:14

**11th**  191:5

**12**  43:16 127:24,25 136:21 145:11 153:5 154:17 178:15 182:21 186:1,6 187:17 188:6,7 195:15 286:1 295:25

**12%**  138:18,25 139:11 145:22 146:24 147:5,24 186:4,10

**12.3**  250:25

**12/12/19**  170:9

**12/21/2018**  108:17

**12:20**  188:11

**13**  23:6 148:15,17 151:9,11,19 242:1,8, 10 272:13

**13th**  184:22 185:1 247:9

**14**  151:22,23 154:9 195:15 226:24,25

**14.5**  251:1

**14th**  45:4 182:17

**15**  10:7 54:2 154:24, 25 182:24 282:4

**15719**  172:3

**15936**  204:14

**15th**  182:18 184:23

**16**  159:1,2

**17**  12:24 84:2 162:17, 18 245:5,7

**18**  162:24,25 163:1 196:14 246:11 248:16 254:20 255:11 256:5

**1882** 242:22

**19** 155:22 167:16,18 168:15 246:11 248:16 254:15,20 255:15 256:5

**19432** 155:21,24 156:5

**19860** 168:17,25 169:8 170:22

**1:30** 188:11

**1:39** 255:16

---
**2**

**2** 53:22,24 85:7,11 146:19 180:22 188:18 194:24 243:10,11 250:18 252:3 291:10 314:9, 16 317:15 333:14,17 336:11

**2.1** 292:1

**2.3** 298:17

**2.5** 180:21

**2.557** 186:14

**2.7** 299:22

**2/19/20** 187:1

**2/5/2020** 179:17 270:15

**20** 101:12 169:12,16 172:12 220:21 226:23 295:4 297:7, 18

**20007** 130:13,14

**2004** 10:10,11 13:22

**20042** 130:25 131:1

**2007-ish** 10:9

**2014** 45:4,23 46:3

**2017** 54:2,6 101:17, 21,25 102:3,6,13,16 103:1,2

**2018** 15:14,15 16:11, 17 17:19 69:13 101:12 108:16 116:11 117:12

133:20,25 134:2 190:19 191:6 196:2, 17 197:15 199:9 214:2 216:8,23 255:12 279:24 299:7, 23 301:15

**2019** 28:21,23 29:5 33:10 73:5 101:12 116:5,7 142:1,9 148:24 149:13 150:7 153:25 157:3,12,13, 18,19 159:12,17 163:8 168:4 187:22 209:8 224:16 225:9 243:22 244:4,5 246:19 255:9 256:19 257:22 265:13 282:4, 23 283:2,4,11 284:8 299:5,6,23 305:4 331:4

**2020** 17:10 58:20 60:9 69:14,16 70:3,4 73:6 75:6 97:7 149:6 150:13,22 171:10,14, 19 172:12 173:5 175:9 182:24 187:22 217:2 247:10,17 267:2,4,7 271:24 272:5,13,15,20,23 273:2 285:7 288:23 289:22 295:4 297:10, 13 305:4,15 306:3 311:25 322:8 335:22

**2022** 216:3 338:9

**2074** 213:24

**20th** 173:5

**21** 23:6 170:7,8 228:3 230:4

**213** 278:8

**22** 170:25 171:6

**23** 175:15,17 184:20, 22 185:2 227:1 247:7 248:20 249:24 250:10 270:11

**24** 182:3,7 184:24 260:17,19

**24/7** 184:5

**25** 21:25 22:2 163:8 185:6,8 335:22

**258** 333:15

**25th** 246:19 247:17 255:8,12,16 256:19 257:22

**26** 204:3,5 208:6,14 211:15 212:25 213:3, 10

**27** 207:16,17 208:18 209:5

**28** 157:3 213:13,15 218:5

**28.22** 97:7

**29** 223:2,3 322:8

**2:29** 238:7

**2:43** 238:7

---
**3**

**3** 61:19,21 63:2 108:23 146:18,19,23 188:18 243:11 291:22 304:16

**3.6** 103:2

**30** 238:8,9

**300** 48:17

**31** 142:1,9 255:4,5,17 289:22 305:14

**32** 277:7,8

**33** 282:2,3

**34** 288:12,13 292:24 333:12

**34025** 295:9 296:9

**34027** 297:3

**34028** 297:22

**34036** 301:5

**34039** 304:24

**34212** 278:8

**34674** 185:22

**34676** 186:19

**34678** 187:13

**35** 261:19 295:3

**3591** 67:20

**36** 308:17,18

**37** 311:20,22 321:25 322:3

**38** 323:14,16

**39** 326:11 338:4

**3:14** 265:6

**3:21** 265:6

---
**4**

**4** 62:2 63:25 64:2 188:18 243:11 247:19 251:5 252:10, 16 271:3 298:18

**4.338** 145:10

**4.433** 138:22 146:3

**40** 133:13

**4:06** 307:5

**4:16** 307:5

**4:40** 326:23

**4:42** 326:23

**4:54** 338:8

**4th** 291:12 333:19

---
**5**

**5** 65:9,10 67:11 174:5,14 271:23 272:5,23 290:1 304:17,18 319:7

**5.382** 144:25 145:4

**5/50** 166:16

**50** 21:23,25 180:23 252:3 291:11 298:19 333:19

**50%** 247:24

**50/50** 41:6 44:6 50:23 166:10,22 246:14 248:17,20 249:2 253:7 254:7 257:6,9,12 258:5,8, 12 259:16,22 260:5, 25 261:6 262:16

263:7,10,12 273:1
291:13,20 297:25
334:23 335:15,21

**500** 44:2

**5217** 103:8,22 104:1,
10,13 106:4,22
107:2,9 258:25

**565,000-and-
change** 186:7

**5th** 153:24 214:1
272:16

---

**6**

**6** 10:7 78:9,11,22
251:6 252:10 313:1

**6-acre** 121:21,22
122:3 123:15

**6.8** 250:24

**61** 7:9 46:11

**625,000** 118:20

---

**7**

**7** 82:13,15,17,18,19
83:22 84:9 86:17
190:24 197:24 338:9

**7.9** 299:23

**71** 146:3

**7458** 142:4,12
207:11 208:2,15
211:16

**76** 89:3

**78** 89:4

**797** 316:19

**799** 316:17,21

**7th** 116:7

---

**8**

**8** 88:9,11 89:5 94:4

**800** 317:14 318:3

**802** 319:4 320:4

**803** 320:24 321:11

**8087** 282:14

**8088** 284:20

**8090** 284:23

**8th** 224:16 225:9

---

**9**

**9** 103:7 116:8 258:24
324:18

**934** 116:9

**935** 117:21

**938** 118:7,14,15

**947** 123:18

**948** 125:24

**979** 92:13,19 94:20

**9795** 179:16 247:13
248:10 250:18,19
251:10,15 270:19

**981** 95:19 101:11

**985** 102:7

**9:37** 70:11

**9:54** 70:11

---

**A**

**a.m.** 70:11 148:14
255:9

**ability** 68:25 69:4
94:2 200:24

**absolutely** 98:7
192:2

**accepted** 69:23

**access** 209:13
211:24 212:11

**accommodate**
148:11

**accomplish** 186:25
187:6

**account** 105:17
205:5 207:12,13,14
208:1,10,16,24
209:14 211:16,24

**accountant** 332:6,
24

**accountants** 332:22

**accounting** 210:23

**accounts** 212:12

**accuracy** 321:18

**accurate** 92:13
98:13 99:8,12,18,25
115:7 117:14,19
118:1,4,10 123:23
124:2 125:15,25
126:2,19,20 196:9
243:21 244:4,12
245:14,15 250:6
257:13 262:19
270:20 271:1 291:2
300:3 301:20 302:9,
14

**accurately** 101:2

**acknowledge**
223:24

**acquire** 143:22
223:19 224:5,25
226:2,5 281:3,12,15

**acquired** 91:16,18

**acquiring** 194:3
224:15,21 225:9
241:14 281:9

**acquisition** 91:14
143:9,11,14,17,20
144:2

**actively** 180:21
247:23 252:1

**activities** 308:24

**actual** 98:1 105:23
261:10

**added** 91:25

**addition** 217:12,13

**additional** 188:23

**Additionally** 228:5

**Additions** 312:12

**address** 7:8,11,13,
15 46:6,16 47:9,15,
19,24 48:6 112:24
119:17

**addresses** 119:22
120:4

**Adelman** 86:7

**administrative**
16:22 27:9 48:5,7

**ADP** 189:17

**advance** 312:6

**advanced** 79:8

**advise** 16:20 44:16
335:13

**advised** 16:18

**adviser** 54:13 87:19

**advising** 17:3

**advisory** 54:8 55:2,
15 58:21 60:10,19,
20,22 61:2,7 66:2,6,
14 149:10 307:7
308:25 309:19 310:5
312:19,22

**advocate** 12:13

**affairs** 13:14 72:4
76:18 87:22 95:1,6
100:10,21 106:3

**affiliated** 33:17 34:4
41:3,12 201:12

**afford** 334:9 337:15

**afternoon** 225:12

**agency** 50:18

**Agent** 188:5

**agree** 8:21 98:12
222:2 236:1 241:20
246:3 252:13 259:8
263:16 264:3,7
300:22,24

**agreed** 166:22
179:2,5 183:5 196:16

**agreement** 30:8,9,
11,13,15,21 31:13
33:10 41:15 44:7
50:23,25 63:18,20,22
65:11,13 70:15 83:3,
9,22 84:13,19,20
86:18,21 87:7 122:23
162:9,10,15 164:2,
13,18 170:1,5 180:20
184:13 190:23 191:5,

---

13,17 196:18,21,23
197:3,23 198:20
202:14,18 203:8
206:1,25 222:5
225:18,22 244:15,17,
22,25 245:10,17,20
247:21 248:3,4,9,13,
19,25 249:2,8,10,18,
20 251:25 252:4,9,
16,23 253:10,18,21,
22 254:2,8,11,17
255:23 256:2,6,21,22
257:6,9,11,12
258:12,17,19,20,25
259:5,6,15,22 260:2,
4,25 261:1,6 262:16
263:2,7,10,11,12,13
273:7,14 291:6,11
298:1 333:18 334:10
335:21 337:16,17,21,
23

**Agreement'** 196:19

**agreements** 43:8
162:13 235:10
237:13 254:1 256:1
301:19

**agrees** 261:22

**ahead** 8:21 179:11
277:18 301:9 327:11

**AK** 238:20

**albeit** 315:24

**Alex** 32:1 44:16 94:1
108:23 126:24 127:4
128:10 324:1

**Alexander** 56:5,10,
15,16,18,21 57:11
58:19,24 60:2 61:17,
22 63:10,14 75:8
79:23 80:3,11,16,18,
25 124:7 145:8
174:21 188:5 251:23
272:7,15 273:3
285:6,9,15 286:20,23
287:7,19 289:9
292:23 295:6 313:13

**Alexandra** 7:2,9

**align** 97:9 98:1

**allegation** 261:4,11
262:5

**alluding** 291:18

**amend** 188:6 306:20

**amending** 188:1

**America-traded**
200:18

**American** 200:17
326:17

**amount** 105:9,13,23
106:1 147:6 160:24
161:3,4,6,8,9 211:16
212:8 215:12 218:6
222:25 252:12
261:22 263:25
328:23 331:5

**amounts** 209:13,21
213:9 215:11,15,16
218:24 223:1

**and/or** 285:3 313:13

**Andrew** 29:19 105:2
158:3 166:21 167:20
169:18 188:15 193:3
205:2 211:17 232:10,
13 238:13,20 240:8,
19 265:16,24 291:5

**answering** 8:16
10:2 18:7 141:4

**answers** 336:7
337:13

**anticipated** 215:1

**anticipating** 280:11

**anticipation** 227:2

**anymore** 94:25

**apologize** 193:21
204:18 215:1 264:22
265:19 322:13 334:1,
14

**apologizing** 267:20

**appears** 156:7,11
197:4 279:5 290:7
295:5 312:8 314:20
315:16

**application** 16:2

**approached** 195:24
196:6

**approve** 227:6

**approximately** 10:7
19:4 221:15 251:9
291:25 329:4

**April** 153:24 157:3,
13,19 224:16 225:9
288:23 295:4 297:9,
13 306:3 335:22

**arbitration** 9:20

**area** 8:3 13:2 193:8

**argumentative**
161:21 300:21 302:1

**arrangement** 41:11
63:13 166:10 258:5,8
260:6 273:1 291:20

**array** 27:13,24

**asks** 290:1

**aspect** 76:17 93:21

**aspects** 27:10

**assembled** 311:11

**asserted** 195:11

**asset** 179:17 180:12,
24 184:25 233:13,15
247:19 270:14
271:15 272:23
291:24

**assets** 40:18 41:2
99:9,13,14,17,25
137:15,16,20,23,25
139:19 140:1,7
142:15 164:20 176:6
178:21 179:24
180:17 183:10
184:12,16 186:13,16
223:20 224:6,14,15,
21 225:1 228:6,7,9
229:2,3,11,15 230:2,
6 233:1,7,9,16,17,22
234:12 235:19 236:2,
19 243:4,10,19
247:16 250:5,21
251:14 286:21 287:8,
20 291:25

**assigned** 196:22

**assist** 284:3

**assistant** 11:23

**assume** 8:24 39:9
161:23 196:9 209:18,

25 213:20 262:22
294:5 331:7

**assuming** 161:3
209:2,23 243:8,9
244:3 262:16 264:9

**assumption** 212:16

**assumptions**
298:12

**assure** 184:5

**attached** 78:22
147:11 152:12,18,22,
24 153:2 159:8
176:4,14 179:12,13
185:25 196:23
205:20 250:15
277:21 278:2,8,13,
15,16 289:13

**attaching** 185:10
277:12 284:3

**attachment** 146:11,
13 153:10 168:13
169:14

**attachments** 128:6
147:2 155:17 277:15
278:2,4,9 323:12

**attempt** 143:22

**attempted** 143:8,11

**attend** 59:3

**attendance** 75:9

**attended** 59:23 60:1

**attention** 23:1
107:16 150:12 182:7

**attest** 156:24 296:3
299:17

**attorney** 174:21
203:4,11 336:2,3

**attorney-client**
335:6

**audit** 200:7 202:4

**august** 45:4 267:3,4,
7 331:3

**author** 156:24

**authority** 211:19
212:19,22,23 222:18,
19,20

**authorization** 212:6

**authorize** 137:7
212:8

**authorized** 168:23
289:16 328:6,11

**aware** 20:23 23:9
33:8 34:1 78:19
79:12,14,17 100:8
132:14 199:13 200:6
202:8 206:12 214:15
217:14 225:20
226:14 257:11
258:10,15 259:19
272:21 273:13
294:20,21 308:4,5
318:12,16 333:4
334:22 335:1

**B**

**bachelor's** 14:2

**back** 12:19 13:1
17:12 18:23 19:2,4
43:7 103:12 133:4
136:5 139:19,20
141:21,22,24 145:15
149:2,13 150:19
159:12,17 163:11
168:4,5 171:14 175:9
186:12 191:3 192:14
194:23 197:22
206:23 208:5 209:24
217:6 219:25 223:25
226:5,21 229:1 240:7
241:25 246:19
248:15 251:3 255:6,8
256:19 258:2 287:14
289:4 290:4 291:13,
18 293:9,11 297:9
298:21 318:2 326:20,
24 328:5,8 330:16
331:23

**background** 125:25

**backwards** 133:8

**balance** 130:5
137:12,13 138:2,6
141:21,22,25 142:8,
22 144:21 145:3
183:22 185:22 186:2,
3,13 284:13,21
313:25

**Ballpark** 10:19
192:11 220:19

**bank** 7:20 105:16
212:12 236:19
275:19 276:17,25

**banking** 13:17

**banks** 12:15

**Barrie** 128:2,10,18,
19 155:6,20

**barrier** 202:6

**Base** 140:7

**based** 102:3 161:7
195:22 209:15 261:3

**basic** 289:23

**basically** 14:13

**basis** 41:6 44:20
172:11,20 189:14
225:21 231:19 232:6,
19,20 261:4,10
262:4,9 305:14 335:2
336:14,15

**Bates** 62:2 64:5
67:19 133:10 204:8,
13 213:23 242:22
247:13 250:18
256:25 257:2 315:16
316:18 333:14

**began** 191:8

**begin** 17:3

**beginning** 15:14
69:13 73:6 124:12
193:3 231:20 232:1,
9,20 308:7 332:10

**behalf** 7:3 22:22
59:24 60:2 68:20
169:8 177:2 217:10,
11 260:23 313:3
314:25 317:8

**belabor** 257:7

**belief** 65:18 181:17
270:19

**bell** 21:13 38:14
39:10 112:23 113:2
126:5 176:1 177:11
182:9

**Bend** 28:18,22,25

29:17 31:7,19 32:12
40:13 41:10 265:9

**benefits** 190:16
223:19 224:4,25

**BENKAP-00274**
213:24

**Benlolo** 23:7 24:11
25:17,24 26:20 28:8
31:3,12,21 32:11
33:16 34:3 40:17
41:2,11,15 44:7
84:16 165:22 167:19
169:17 188:16
194:16 195:23 196:3,
6 228:5,6,7,10,14,16,
25 229:1,11 230:5,6,
14 231:15 232:7
233:7 237:15,23
255:16 260:24 261:7,
13,16,20 262:5,12
263:1 265:10 266:16
267:6 269:1,7 291:19

**bet** 140:5 243:11

**big** 70:21 285:14

**bigger** 204:19

**BILLINGS** 16:12
19:22,24 20:4 22:10,
23 23:16,24 24:19
25:12,25 26:16,25
27:15,22 28:5 30:23
31:22 33:12 34:23
35:5,23 37:6,18,25
38:6,12,16,22 39:4,
13 40:21 44:9,19
45:14 48:2,9,24 49:5,
25 50:20 54:4,11
55:7 56:2 57:23 58:9,
11 61:4 62:14,23
64:11,25 66:11
67:16,22 68:11,17,22
69:11,22 71:20 72:11
74:17 76:20 77:10,
17,25 78:5,18,25
79:11,20 80:1,8,13,
22,24 81:6 82:1 83:5
84:12 86:20 87:10,23
88:7 90:5,24 91:17,
24 92:10,15,21 94:16
95:4 96:7 97:11,16
98:6,16,22 99:3,11,
16,20 100:2,6,13,24
102:2,18 103:4,9,25

104:14 105:25
106:19 107:3,22
108:1 109:21 110:15,
19 111:1 112:8
115:6,13 116:17,25
117:10,17 118:3,24
119:3 120:7,12
121:24 123:25
124:15,21 125:3,9,19
126:9,13 127:10,20
130:22 131:14 132:3,
10,15,21 133:1
134:15 135:16
136:24 137:4,9
138:13 139:3,13,23
140:2,4 141:3,16
143:16 144:17
146:10 147:15 148:2,
8,13 149:15,20 150:8
153:6,12,18 156:22
157:6,25 158:11,20
159:19,25 161:1,12,
18,22 162:5 163:24
165:3,10 166:13
167:14 168:11
169:13 170:15
171:22 172:14,24
173:7,16 174:7,16,23
175:12 178:2,8,24
181:6,12,19 182:5
185:4 187:3 188:3
191:23 193:25 196:1
199:7 200:25 201:22
203:21 206:8 207:1
208:20 210:5,19
211:12,21 212:13
213:6 214:14 216:11,
19 217:22 218:8,22
219:2 220:12,17
222:13,21 224:17,22
226:8,18 230:10,20,
25 232:4,22 233:11,
18,20 234:4,21
235:2,16 236:4,11,23
237:4,11,25 238:2
239:24 240:16,24
241:8,22 242:6
243:13,23 244:8,11
246:6 248:6,11,23
249:4,12,21 250:7
251:17 252:5,19
253:1,11,17 254:23
255:3 256:8,24
257:4,14 258:14
259:11,18,23 260:7,
13 263:3,9,17 264:5,

12 265:22 268:18
269:4,10 270:23
271:12,17 273:11,16,
25 274:5,16,23
275:7,14,18,24
276:7,14,18 278:10,
22 279:8 280:4,9,20
281:17 282:11,20
284:10 285:21 286:2,
7,13 287:11,22 288:9
289:17 290:11,25
292:10,18 293:1,22
294:24 296:17,24
298:11,25 300:5,12,
23 301:2,17,25
302:17 303:7,17,25
304:12 305:7,11,17,
23 306:10,23 309:2
311:16 313:5,14
314:4 315:3,10,15
316:2,12 317:1,10
318:10,25 319:19,25
320:14,18 321:6,21
322:17 323:10
325:24 327:3 328:4,
10 329:24 331:10
332:2 335:9,17
336:18 337:1,9,19
338:3

**billion** 102:4

**binding** 261:1

**bit** 35:16 70:7 83:2
189:5 214:24 238:18

**biweekly** 309:13,16

**blank** 198:10

**board** 58:21 60:10,
19,20,23 61:1,2,7
66:2,6,15 149:10
307:7,16 308:25
309:19 310:5 312:19,
22

**Bob** 21:13 38:14
182:9

**bona** 320:11,15

**book** 180:14 250:24

**booked** 135:14
136:11

**bookkeeper** 326:8
332:7,8

**bookkeepers**
332:10,12,14,19,22

**books** 298:7,8

**borrow** 235:24
236:18

**boss** 19:10,11,15

**bottom** 64:4 133:7
142:15 144:23 145:3
172:3 194:24 204:7
208:1 250:18,22
289:7 303:5 310:1
320:4

**bought** 121:21 122:7

**bouncing** 238:5

**boxes'** 242:6

**branch** 204:25

**brand** 120:1

**branding** 219:7

**Breach** 260:18

**breadth** 27:18 28:2

**break** 9:3 70:8
148:10 188:9 214:22
238:4 277:22

**breakfast** 73:20

**bring** 224:5

**broad** 24:21,22,24
33:23 37:21 80:9
233:13,16

**broader** 222:1

**broadest** 25:2 33:25
55:4

**Broadway** 85:24
243:12

**broker** 96:25

**broker/dealer** 56:18

**brought** 150:12
260:23

**Browne** 95:14

**BTE** 85:11,20
188:17,18 243:10

**building** 55:13 330:9

**bullet** 90:17 91:6,8

96:17 101:17 118:21
121:2 146:23 176:22
179:15 184:25 297:6,
23 298:15,17,23
299:3,9 301:8,14
302:8 303:10 304:5
305:2,8 306:5 310:10
311:2,10

**bullets** 176:22

**bullets/talking**
176:5,9,20

**bunch** 221:25 312:5

**business** 7:13,15,16
16:6 72:4 76:18
85:14 87:22 95:1
104:4,6 106:3,14
112:1,5 142:3,12
169:1 184:6,7 198:5,
10 207:8,21 278:19
279:4 318:5,13
326:18

**butchering** 86:5

**buttoned** 307:4

**buttons** 209:12

**buy** 203:19 330:14

**buyer** 226:17 261:14

**bylaws** 54:25

─────

**C**

**calendar** 87:21 88:4
152:11 293:19

**call** 12:23 24:25
55:19 74:25 127:2
267:9,18 312:6

**called** 7:3 13:3 14:24
17:12 19:1 60:18
64:5 85:10 122:4
137:16 143:8 147:23
165:24 195:6 229:23
272:2 320:4

**calling** 253:8

**calls** 58:21 60:10
65:25 66:21,25 67:3,
6,9 73:8 307:18

**Camp** 140:7

**Canada** 200:20

**Canadian** 198:9

**Cancellation** 170:1,
5

**cannabinoids**
198:18

**cannabis** 25:13
101:17 102:4,6 120:2
165:25 227:5,7 228:6
229:2,10,14 230:5
233:1,7,9 279:24
298:18

**capacities** 14:22

**capacity** 14:21
23:13 54:9 55:2
83:11 230:22,23
287:25

**capital** 56:5,10,15,
16,18,21 57:11 60:2
61:17,22 63:10,14
80:11,16 81:1 145:8
174:21 188:5 223:20
225:1,3 251:23
272:8,15 273:3
282:16 285:6,9,16
286:20,23 287:7,19
289:9 292:23 295:6
313:13

**Capital's** 58:19,24
75:8 79:24 80:4,18

**card** 326:15,17
327:1,5,17 328:7,15
329:20 330:7,21
331:4,6,14

**care** 93:21

**Carmel** 51:5

**carrying** 138:10

**case** 8:6,22 10:15
11:13 22:8,22 43:13
49:19 65:12 77:2
78:23 139:12 180:22
183:13 247:23 252:2
257:7 266:23 273:6,8
274:14 283:24

**cash** 306:7,16

**cataloged** 289:10
312:6

**caught** 214:23

**caused** 239:22

**CBD** 116:11 117:12 131:2

**cc's** 288:19

**cease** 17:9,21 18:9, 15 45:24

**ceased** 17:14,20,24 18:6 32:18,19,20

**ceiling** 327:17

**cell** 74:1,3

**central** 12:15

**CEO** 20:25

**cessation** 32:23 33:5

**CFO** 35:9,11 38:8 136:4 146:7 159:3 177:7 211:5 277:10 289:8,15 292:4 297:9,11 312:1 317:23

**CH** 242:16

**chain** 247:2 248:16 255:20 282:5 288:24

**chance** 71:16

**change** 326:8

**changed** 282:24 283:16

**changing** 29:19 31:15 265:24 266:10

**characterize** 27:18 28:2 92:22 93:4

**chart** 116:18,20,22 117:8 159:8,15,18 161:15

**check** 58:1 71:1,6,14 156:11 182:14 223:12 275:22 328:20 329:7

**checking** 142:3,12 207:8,12,13,14,21 208:9,16 211:16

**checks** 107:10,14,16 274:8

**chief** 10:23 20:5 124:16 125:17,21 153:25 156:14

**child** 45:2

**children** 330:12

**Choice** 207:21

**Chris** 8:4 35:12 38:4 70:12 80:21 93:21 146:14 148:8 211:8 276:10 288:16 289:12 292:19 323:18 324:1 326:8 337:11

**circumstance** 40:8

**circumstances** 32:22 72:6 152:4

**city** 8:1 47:6 73:21 109:9

**claim** 45:12

**claimed** 109:8

**claims** 260:23 261:24

**Clapham** 128:2,17, 18,19,25 129:5 146:8 155:2 172:4 176:2

**Clapham's** 172:11, 21

**clarification** 188:23

**clarify** 50:3 72:7 212:25 214:22 247:1 327:13 336:22

**clarity** 189:1 238:21 240:8

**clause** 85:3,6

**clean** 9:25

**cleaning** 183:21

**clear** 155:17 193:17 209:10 221:20 239:1 240:11 290:14 298:16 325:8

**clients** 195:11 267:6,21,25 268:14 269:17,22 270:1

**close** 194:8,13 280:11,22

**closed** 90:22 194:6 214:24 233:3 234:8 241:3,6,17

**closing** 141:18 160:14,16,17 194:4 239:13,17,23

**cloud** 312:17

**CMD** 55:18,19 63:13

**coaching** 302:23,24

**coherent** 238:6

**collateral** 234:12,25 235:8,13,19,25 236:2,3,10,13,20,21 237:16,24 239:2 240:14,22 269:23 270:2,3

**college** 14:7,10

**Colorado** 46:15,23 47:2,12,18 49:16 89:8 90:19 96:10,12, 16 101:17 102:4,5 119:7,9,10 121:10,12 198:4,18 229:18,22 261:2 266:24 279:20 280:14 283:17,18 318:4,12,22 319:2 330:13

**Colton** 112:3,7,10, 12

**Columbia** 13:16

**column** 131:19 135:4 160:9 161:8 204:20

**comfortable** 91:21 131:24 142:21 147:4 174:2,4,10 191:25 224:8,12 236:6 298:3 301:19 302:3,6,7 331:9

**comment** 98:1

**commented** 273:1

**commercial** 106:16

**commission** 113:5, 8 135:10 227:5

**commissions** 135:8 136:6,7

**commitment** 198:21

**common** 198:22 328:16

**common-law** 45:10, 12,20

**communicate** 192:7

**communication** 24:25 25:1 74:25 237:20,22 269:13 287:19

**communications** 41:9 44:17,21 57:10, 14 58:6,14 60:9,14 61:17 65:24 73:8 86:16 171:5 175:8 192:5 266:15 268:25 285:5 335:14

**companies** 38:8 84:21,25 85:4,25 115:18 189:21 201:12

**company** 14:24 15:25 27:7,10,24 35:9 38:1 54:17,20 55:1,12 69:7,10,12 85:10 89:18 101:1,4 115:11 132:7 133:23 141:11 169:20 177:19 197:14 199:16,20 200:7 201:13 218:11 219:5 221:22,24 291:24 297:4,22 311:1 330:9,16,19 331:19

**company's** 134:21

**compare** 97:17

**compensated** 55:15 190:8

**compensation** 190:12

**complete** 99:19,23, 25 100:12,23 118:1, 5,10 261:21 262:6,13 270:20 290:22

**completion** 227:2

**complex** 89:8,22

**compliance** 198:18 239:21

**con** 24:20

**concept** 50:5 235:12,22 291:13 296:15

**concern** 252:24

**concerned** 253:4 285:8

**concluded** 338:8

**conference** 309:14

**conferences** 60:10

**conferred** 14:4

**confidential** 338:7

**confidentiality** 338:6

**confidentially** 65:12

**confirm** 126:1 133:6 147:11,18 150:9 153:8 155:18,20 179:1 207:13 209:16 224:3 245:3 248:24 293:9,11 299:16 303:9,18 305:8,19 316:4,13 317:2,17,21 334:7 337:20

**confirmation** 178:13

**confirmed** 150:20

**confirming** 293:12 317:25

**confuse** 75:21

**confusing** 46:17,18

**conjecture** 172:15

**connected** 134:22

**connection** 63:1 68:14 79:9,15,24 102:13 134:19 178:22 190:4 202:17 203:7 234:13 246:8 250:3 268:1,15 276:2

**Conroy** 86:9

**consideration**

113:21

**considered** 126:15 254:2

**consistent** 337:16

**consolidated** 116:11 131:3

**constituents** 61:2 307:8

**constitute** 37:14 254:16 255:23 256:2,5

**constitutes** 32:14 261:1

**construe** 184:24

**consultant** 87:19 113:3

**consultation** 335:15

**consulted** 113:7

**consulting** 55:14

**contact** 126:22 127:4,12

**contained** 254:14 304:5

**content** 129:10,13, 14,16 163:17 171:6,8 270:19 304:15 321:12

**contents** 111:10,11 163:19 321:25

**context** 205:15,16 236:17

**continue** 184:5

**continues** 156:9

**Continuing** 12:19

**continuously** 46:3

**contract** 22:5 90:18, 20 91:9,11 96:16,20 253:10,24 259:9,21 260:18

**contracts** 259:7

**contractually** 261:23

**Control** 113:5,8

**controversy** 43:13

**convenience** 109:8

**conversation** 71:11 73:12 74:3,6,19,22 86:25 237:19

**conversations** 71:24 72:2,3,9,17,19, 20,22 73:4 77:8,12, 15 78:3 129:4,5,7,9 193:2 232:15 322:4,5

**COO** 26:21 27:4,6 34:21,25 36:4 38:2 54:3 80:19 83:10 97:10,22 113:4 116:14 123:8 124:9 126:25 127:5,8,14 130:1,3,4,6,7 132:6, 14 133:22 137:24 138:9 140:10,15 143:13 153:22 156:13 157:22 159:17 161:19 189:6, 14 190:9 192:4 279:7,10 297:12 306:1 332:5

**coordinate** 58:21 307:18 325:19

**coordinating** 325:18

**copied** 150:23 163:3,9 171:3 176:1 242:20 257:24 308:19

**copies** 167:20

**copy** 159:7,8 196:23

**copying** 277:9 278:5

**corner** 64:5 208:1

**corp** 55:1

**corporate** 295:9 296:12 300:10,17 303:23 304:5 326:15 327:25 330:21 331:6

**corporation** 198:5,9

**correct** 14:13 15:9 17:8 18:6 26:4 28:9 30:3 34:4 36:25 38:5 39:3 45:12,17,18

46:19,20,22 48:23 53:20 54:9 66:15 68:4 76:2,11 77:5,23 78:1 79:8,16 80:12 81:2,12 82:10 85:16, 17 86:23 87:14 90:15 91:23 92:5,6 95:24, 25 96:5,22,23 97:3,4, 7 98:3,5,14,20,24 99:1,9 100:12,22,23 101:7,13,18 102:13 105:18,20 107:20 108:13,14,16 109:4,6 110:23 111:2,8 113:18 115:4 117:15, 23 118:1,20 120:5 121:2 123:20 124:9, 13,24 126:5,19 127:5,8 128:3,7 129:8,11 130:10 131:13 132:8 133:23 134:13,20 135:15 138:23 143:14 145:12 146:8 149:14, 19 150:23 151:20,21 155:8,9,11 156:13,20 158:9 162:20,25 163:8 165:1 170:22 171:25 172:1 174:11 175:17 176:2,6,25 177:5,14,25 178:7, 13,14,16,22 179:8, 18,21,25 180:1,2,9, 15,16,18,25 181:10, 16,17,24 182:13 184:13,21,23 185:11, 14,19,23 186:2,5,7 187:14 188:1 189:10 190:20 191:9,17,19 192:5 194:20,21 195:24 196:4,22 199:2 203:12 206:6, 18 213:10,12 219:10, 11 222:6,11,16 225:18,19 233:4,5 234:9 238:24 239:14, 15 240:6,10 241:5,7, 18,19 244:22 246:20 250:2 255:24 256:4 257:10,23 258:3 259:8,16 268:11 271:10,24 272:2 273:14 274:21 275:1 276:17 277:13 278:20 279:4,7,20,25 280:1,3,15,17 281:3

282:4,6,9 284:14,21,
22,24 285:20 287:9
288:3,4,6,7,23
289:11,16 290:6,15,
19,20,22,23 291:6,14
292:1,8 294:8,16
298:1,9 299:5 301:23
303:15,24 304:6,9,
24,25 305:21 306:1,
9,14 312:2,3,7 313:3,
13 317:8,20 318:15,
16,18 319:17 320:21
321:13 326:16
327:21 328:2,8
329:14 331:25
333:21 334:3,23,25

**correctly** 141:7
229:21

**correspondence**
258:5

**costs** 273:8 274:8,
11,14,20 275:1,5

**Council** 15:4

**counsel** 8:12 41:20
42:7,12 77:2,5 93:15
94:1 149:13,18,24
150:1,7,10 151:15
202:17 223:18 246:8
259:9,15 335:21

**count** 260:17 324:15

**country** 36:17

**county** 47:4 121:18
122:1,2

**couple** 15:3 32:4
61:15 86:3 128:1
170:9 288:21 307:7
308:11

**court** 9:25 266:25
304:17

**covered** 188:19

**Craig** 86:7

**create** 88:15

**created** 88:17 93:9,
10 164:19 197:11,12
312:21

**creation** 86:23 235:5
286:18

**credit** 328:7 330:21
331:4,14

**crop** 121:9

**crossclaim** 226:23

**Crossclaims**
194:15,16 195:6,11
226:22 228:4 260:17

**cultivate** 89:9

**cultivation** 121:9,
21,22 122:3 123:4,
11,16

**current** 10:11 50:25
97:6 107:1,5 123:3
159:7,14 161:15,23
320:4

**customer** 116:3

**customers** 115:23

---

**D**

**da** 65:13,24,25 66:5,
19,22 278:5 307:24
308:2,8,11 313:19

**daily** 189:13

**dash** 164:17

**data** 312:12,15
321:1,3,7,9

**date** 29:6 73:17,19
75:4 93:1 101:8
108:19 122:8 160:14,
16,18 198:20 204:20
272:4 282:4 306:2

**dated** 170:8

**dates** 72:24 73:3
157:21 173:8 187:21
204:20 209:20

**David** 29:19 166:22
167:19 169:17
188:15 214:21
255:15 265:17,24
291:5

**Dawes** 7:6 8:4 16:5,
15 18:5 19:25 20:7
22:12,25 23:19 24:2
25:16 26:4,19 27:4,
17 28:1,7 30:25
32:10 33:14 35:2,8,

25 37:9,23 38:4,10,
14,20 39:1,7,17
40:25 42:24 43:20
44:12,20,22 45:16
48:6,11 49:3,8 50:4,
23 54:7,14 55:10
56:4 58:2,13 61:6
62:16,25 64:13 65:2
66:13 67:19,25
68:13,19,24 69:15,24
70:6,16,20,24 71:23
72:14 73:7 74:20
76:22 77:14,20 78:2,
8,20 79:3,14,23 80:5,
11,17 81:2,10 82:6
83:8 84:15 86:24
87:14 88:1,10 90:8
91:1,19 92:3,12,18,
24 93:24 94:4,18
95:7 96:4,9 97:14,21
98:12,18,25 99:5,12,
19,22 100:3,9,17
101:3,24 102:7,21
103:6,11 104:3,16
106:2,20 107:6,23
108:4 109:24 110:17,
21 111:3 112:11,17,
21 115:8,17 116:21
117:3,13,20 118:6
119:1,8 120:9,15
122:1 124:3,17,23
125:6,13,23 126:11,
18 127:13,23 130:24
131:17 132:6,13,19,
24 133:4 134:18
135:20 137:1,6,11
138:15 139:5,17,25
140:3,5,6,21 141:6,
20,24 142:7 143:18
144:20 146:15
147:22 148:4,11,16
149:18,23 150:11
152:17 153:9,15,21
156:25 157:9 158:5,
14,24 159:23 160:2
161:5,14,19,25 162:7
164:1 165:6,14
166:14 167:8,17
168:14 169:15,25
170:17 171:24
172:17 173:1,10,19
174:9,19 175:2,16,24
177:10 178:4,7,11
179:6 181:9,15,25
182:6 184:20 185:7
187:7 188:8,20,24

189:5,25 206:4,20
225:12 234:11
242:14 244:17 245:1
246:13 247:10
254:25 264:25 265:3,
9 267:3 270:6,7,9
271:2,14,20 273:13,
18,22 274:2,7,18,25
275:11,16,20 276:1,
8,16,22 277:3
278:18,25 279:11
280:6,12,24 281:19
282:13,22 284:12
285:24 286:5,10,15
287:16 288:2,10
289:19 290:14 291:3
292:13,20 293:3,24
295:2 296:20 297:3
298:14 299:2 300:8,
16,24 301:4,22
302:5,14,22 303:5,
10,20 304:4,14,18,23
305:9,13,20,25
306:13 307:1,2,6,24
308:2,5,8,10 309:4
311:19 313:7,18
314:6 315:7,18,19
316:5,14 317:4,11
318:14 319:3,14,21
320:3,16,20,24
321:10,23 322:20
323:3,15 325:10
326:2,19,24 327:6,14
328:6,13 329:19
330:1 331:2,13 332:5
333:7,18

**day** 45:3 223:12
231:4,6,16 312:7

**days** 81:22 163:5
184:21 295:18

**deal** 34:25 82:5
104:15,17,18,21,23,
24 130:1,4,11 157:22
167:1 220:4 246:14
252:17 253:7 254:3,7
259:16 262:17,22
263:19 265:25 266:1,
6,7,10 334:23

**dealings** 113:4
171:15

**dealt** 214:10

**debt** 80:12 319:8
320:4,11,21

**December** 133:20 187:21 214:1 216:3, 8,23

**decided** 25:23 137:6

**decisions** 206:9

**deck** 92:1 93:2,8,10 98:9 102:23 113:14, 17,21,23 114:1,9,10, 11,12,14,15,16,22 115:3,9,12,19 120:16,17 121:5 123:19 126:6,17,19, 20,22 127:6,15,22 130:13,17 131:23 298:4 299:17,18,19, 20 300:6,15 302:4 306:2

**decks** 318:21 319:1

**declared** 50:19

**decreed** 50:18

**deemed** 331:16

**default** 285:20,23 286:1,6 305:16 306:9,17

**Defendants** 7:3

**Defendants'** 194:15

**defense** 273:5,8 274:2,8,11,13,20 275:1,5 276:2,9

**defined** 85:3 198:6, 22 263:21

**definition** 198:2

**definitions** 85:5 198:1 253:19

**defunct** 196:21 197:17,20

**degree** 13:11,21,23 14:3,16

**delay** 215:2 239:23

**delineation** 298:16

**demise** 307:17

**deny** 305:9,20 306:6, 13

**depend** 36:8 263:19

**depended** 21:15

**depending** 326:9

**depends** 27:23 38:18 135:25 237:12 254:3

**depicted** 116:15

**depiction** 125:15

**DEPONENT** 19:23 32:3,6,9 40:24 61:5 70:23 80:23 87:11 90:6 94:3 199:24 222:14 242:2,5,7,9, 12 244:10 302:18 307:23 308:3,6 323:13 327:10

**deposition** 8:8,13, 20 22:11 42:4,22 53:22 61:19 63:25 65:9 78:9 82:13 88:9 103:7 108:5 113:11 127:24 148:15 151:19,22 154:24 159:1 162:17,24 167:16 169:12 170:7, 25 175:15 182:3 185:6 204:3 207:16 213:13 223:2 238:8 255:4 277:7 282:2 288:12 295:3,18 308:17 311:20 323:14 326:11 334:22 338:8

**derived** 271:21

**describe** 31:18 32:15 33:19 37:10 41:21 62:11,18,19 76:13 80:17 81:20,21 125:16 131:8 141:9, 13 285:7 287:18

**describing** 161:15

**description** 20:21

**designating** 338:7

**designation** 338:6

**detail** 166:5 184:12 185:1 191:3

**details** 73:24 144:12 192:1 265:20 266:9

**determination**

**determine** 258:11

**diagram** 310:25

**Dichiara** 51:6,22 52:6,12 148:19 149:12 151:2,24 152:10 159:3 174:20 242:16,20

**Dichiara's** 55:19

**difference** 266:23

**differences** 62:19

**difficult** 223:22 334:11

**dig** 13:1

**diligence** 106:21,24

**Dimartini** 56:24 58:7 71:1,5,12,18 73:13 75:17 113:23 148:19 151:5,7,24 152:2 155:1,2,4,15 159:3 176:10,23 177:24 179:21 182:15 184:9,17 242:20 277:9,13,20, 25 278:9 280:3,7 281:20,25 282:4 284:13 285:2

**direct** 11:9 44:14 166:24 196:12

**direction** 133:14

**directly** 89:19

**directors** 61:1 294:23

**disclose** 335:6

**disclosed** 65:12 78:22 308:8

**discovery** 329:2,8

**discuss** 41:23 95:1 151:1,4,9 159:12 167:4,11 168:7,14,15 306:20 324:6

**discussed** 40:13 83:21 123:15 163:22 176:15 179:14 215:19 224:2 225:11, 16 232:25 233:1

**285:25**

241:2 242:14 244:14, 16 246:13 247:10 250:1,16 265:9,19,20 267:12 277:21 323:25 324:24

**discussing** 83:25 84:13,16,18 151:6,19 163:17,19 189:25 202:4 220:1 222:2,18 234:10 243:16 244:14 250:5 262:15 269:2,9,19

**discussion** 25:1 31:6 39:8 41:7 71:1 73:23,25 84:9 87:13 95:22 150:14 151:8 204:9 253:7 285:1 317:15 324:20

**discussions** 24:10, 15,17 25:10 31:3 41:1,21 57:10 58:17 60:8,17 61:16 71:18 87:6 111:4 113:22 149:11 151:15,18 154:9 165:12 170:3 171:5 177:14 182:25 187:25 188:5 237:15 246:22 250:3 258:8 267:6 269:7 285:8,18 292:22 321:24 323:22 324:22

**disincentivized** 264:8

**dispensaries** 23:14, 20,23 24:2,5,12,16 25:4,14 119:2,20,23 120:1,10,22 121:1,4 131:18,22,25 132:1, 7,20 140:11,16,20 141:12,19 142:19 156:19 157:3,8,10, 18,23 158:4,23 164:3,14 180:13 190:1,5,7 193:15,17, 18,20 194:4 196:16 204:1 205:6 227:7 233:2,8,25 234:3 237:16,24 238:17 240:14,22 241:4,11, 15,18,21 244:6 247:20 251:5 261:9, 15,24 266:8 269:22 270:2 271:4 279:19

280:11,13,22 298:18,
20 301:6 319:8

**dispensary** 25:6
90:9,19 91:2,5,10,12,
15 106:14 119:16,18
132:14,25 156:17
158:6,9,13,15,19
164:21 165:17,18,21,
23 166:2 193:5,12
196:17 226:6,14
227:4,11,19 229:17,
19 230:7,12,15,18,21
231:14 232:2,11,12
291:4,12 333:19

**dispute** 147:23
150:6 153:2 155:14
156:16 172:11,21
177:23 278:7 305:1,
14

**distribution** 164:19

**distributions** 107:8
277:4

**docs** 214:25

**document** 23:3
78:12,14,24 79:2,5
83:19,25 87:1,13
88:2,3 89:17 92:4
96:14 101:5,7,9,21,
25 105:11 119:4
127:3 131:8 140:14
143:2,5 145:22
147:7,8,9,12,21,23
151:12 155:23 156:3,
23 161:7 170:22
180:19 187:1 198:7
204:11,12 246:3
257:3 258:11 260:3,
5,11 270:18 271:25
284:20 295:13,14
296:5,11,21 297:1
312:8 315:12 317:18
319:12 321:1

**documentation**
122:24 123:1

**documented**
164:19

**documents** 22:20
65:11 67:14 129:23
135:24,25 147:3
176:5,14 178:5
179:8,10,13 181:22

185:10 187:6 209:15
250:15 259:7 277:13,
21,24 278:13 284:3
287:15 289:14
307:19 312:22 329:2,
8 337:12

**dollars** 327:19,20,24
329:4

**domiciled** 46:15

**double-check**
145:13 185:24

**doubled** 279:23

**doubling** 303:11

**doubt** 108:18 128:14
139:10 183:12

**doubting** 147:12,16

**dozen** 28:15

**draft** 187:1 260:4

**drafted** 259:9,15
260:3 337:18

**draw** 182:7

**drawing-up** 334:9
337:16

**Drive** 7:10 46:11

**dude** 223:11 238:14

**due** 106:20,24
152:11 172:6,22
173:4,9

**duly** 7:4

**duplicate** 188:22

**duration** 11:14
45:19

**duties** 10:22 12:7
27:13,18,24 28:3
134:22 138:11

─────────

**E**

─────────

**earlier** 40:13 46:11
64:14 70:25 83:2
142:18 158:2,22
162:8 165:11 166:9
172:4 173:18 174:20
192:3 194:18 202:20
203:13 204:8 206:3,

12 211:5 225:11
228:15 232:10
234:10 239:13 241:2
242:1,14,21 244:13,
16 246:12 250:1,12
255:22 257:25 265:8
270:24 291:14

**early** 25:5 75:6 93:10
134:2 158:3 171:14
190:19 195:20
288:22

**earth-shattering**
100:4

**earthly** 316:24

**easier** 238:24 330:14

**economic** 298:19

**effect** 228:1 249:20

**Effective** 198:20

**effort** 55:16 89:11
325:11 326:4

**efforts** 215:25
216:10 218:20

**EFT** 329:7

**EIDL** 310:11,12,16,
21

**EIN** 238:16

**EINS** 238:22 240:9

**electronic** 275:21

**eliminate** 221:25

**else's** 233:17

**email** 108:8,9,17
113:12,15,20 114:3
128:1,4 129:24
146:14 147:11,17
148:19,20 149:12
150:12,20,25 151:2,
13,23 152:1,4,7,9,13
153:22,24 154:25
155:1,3 159:2,11
163:3,12,15,18
164:24 167:6,11,19,
23 168:1,8 169:17
170:4 171:3 172:12
175:18,25 179:1
182:8,15 183:17
184:21 185:2,8,25
205:14,21 213:18,21

214:1,21 215:6 218:4
238:14 242:13
246:17,23,25 247:1,9
248:16 250:9 254:15
255:12,17,20 256:2
258:5 272:9 277:8,
14,19 278:3,4,9,23
279:5 280:7 281:21,
25 282:3 285:3
288:15 289:7,20
291:17 295:4,5 296:2
304:20 308:20
309:12 310:8 312:1,
13 313:18 314:20,21
315:5,13 321:24
322:19 323:17,20,24,
25 324:7,10 334:11,
16 335:3,16,25
336:4,11,16,20,23

**emailed** 153:3

**emailing** 176:12
182:23

**emails** 43:8 171:1
182:12 183:4 189:19
247:1 254:1,14,20
256:13 257:22
278:13 287:15
288:22 291:18
293:17 307:19

**emphasis** 37:14

**employed** 7:17 10:5
14:9 39:16 54:5
69:12 229:15 279:10
297:18

**employee** 15:13,18,
23 16:10 17:7 80:15
83:7 86:22 94:25
133:24 197:14
216:25 228:18 277:5

**employees** 21:19
26:8 32:16,19,21,23
228:16 231:7,10
297:7

**employer** 7:19

**employment** 17:15,
20,22,25 18:6,10,15
33:6

**end** 15:14 17:19 29:4
45:24 69:13 73:5
108:15 134:25 144:3,
13 183:21 239:13,16

307:3 311:25 332:10

**ended** 55:23 200:1

**ending** 211:16
242:22 250:19
333:14

**enforceable** 291:17
334:12 335:4,25
336:5,12,16,21,24

**enforced** 139:12

**engaged** 187:25
188:4 220:2

**engagement** 53:3
61:21

**engaging** 63:10

**ensuing** 155:10

**entail** 12:5

**entails** 193:6

**enter** 31:12

**entered** 13:10 90:20
191:5 196:18 260:1,
25

**Enterprises** 196:20
197:5 198:9

**entertain** 9:5

**entirety** 181:15

**entities** 33:16 34:3,
10 41:2,12 63:19
112:2,6 188:16 194:7
203:15,19,23 217:12
225:25 226:2 240:21
243:15,20 249:3
262:17,23,25

**entitled** 261:23

**entity** 51:9,11 105:8
107:11 111:21
112:25 168:23
196:21 197:16 199:4,
13,18 226:5,7 258:21

**equity** 33:9 83:3,9
86:17 87:7 128:19
138:16 145:4 162:8,
15 190:22 191:4,12,
16 196:18,19,23
197:2,23 202:13
203:7 206:1,25
219:15,25 220:2,10,

15 222:5 225:18,22
244:15 245:10
253:22 258:17 259:4
260:2

**escrow** 63:12,18,20,
22 78:21 170:1,5

**established** 63:13
318:22 321:3 322:9,
14,19

**estate** 104:15,17,18,
21,23 106:6,7,11
107:24 108:2 223:21
225:2,6,9,14 239:2

**estimate** 21:21 43:3,
25 52:11,12,16 72:25
173:14,17 174:14
309:22

**estimated** 180:14
250:25 251:4,8 252:9

**evaluate** 301:23

**event** 40:9 189:20
334:9

**events** 36:16 69:5
189:19,20 330:12

**eventually** 141:12,
18 196:15 204:1
226:2

**exact** 19:12 46:16
72:23 73:3,19 174:3
229:8

**EXAMINATION** 7:5
188:12 270:8 333:10

**examples** 115:20
253:25 287:13

**Excel** 131:6 146:18,
23 205:14

**excess** 212:7

**exchange** 33:9 83:3,
9 86:18 87:7 162:9,
15 190:23 191:4,12,
17 196:18,19,23
197:2,23 201:9
202:13 203:8 206:1,
25 222:5 223:14
224:1 225:18,22
228:9 238:10 244:15
245:10 253:22
258:17 259:4 260:2

**exchanges** 200:18

**excuse** 89:4 320:25

**execute** 211:20

**executing** 212:11

**executive** 37:3,7,10,
16,24 38:2,5,9,11,15,
18,21 39:2,7,11
83:23 123:20,21
124:4 125:16 126:4,
12,16 211:4 292:16

**exercise** 264:22

**exercised** 228:8
230:14

**exhibit** 22:9,11,13
53:22,24 61:19,21
63:2,25 64:2 65:9,10
67:11 78:9,11,22
82:13,15,17,18,19
83:22 84:9 86:17
88:9,17,15 108:5,6
111:4,6 113:11,12
114:4 120:11 127:17,
24,25 146:12,13
148:15,17 151:9,11,
19,22,23 154:9,24,25
159:1,2 162:17,18,
24,25 163:1 167:16,
18 168:15 169:12,16
170:7,8,25 171:6
175:15,17 182:3,7
184:20,24 185:2,6,8
190:24 194:14
196:24 197:22,24
204:3,5 207:16,17
208:6,14,18 209:5
211:15 212:25 213:3,
10,13,15 218:5
223:2,3 226:22
238:8,9 240:5 242:1,
7,10 244:25 245:5,7
246:11 247:7 248:20
249:24 250:10
254:15,19 255:4,5,
11,15,17 256:4
258:24 260:16
270:11 277:7,8 282:2
288:12,13 292:24
293:4 295:3 304:16
308:17,18 311:20,22
321:25 322:3 323:11,
14,16 326:11 333:12

338:4

**exhibits** 190:23
242:10 248:16 256:5
308:13

**exist** 234:19

**existed** 174:5

**existence** 13:2
64:21 82:23,25
269:17

**existing** 90:19 91:2,
4

**exists** 14:24 55:25
249:16,18 257:9
258:12 260:11
262:23

**expect** 238:11

**expenditures** 328:7
330:21

**expense** 186:9
331:14,17

**expenses** 135:5
327:25 328:1,5,18
329:20 331:3,6

**experience** 13:18
14:7,8

**expertise** 25:13

**explain** 103:1 330:3

**explaining** 193:3

**Express** 326:17

**expressly** 279:18

**extend** 306:20

**external** 332:19,21

---

**F**

**facility** 95:23 96:10,
12 281:3,9,11,15

**fact** 53:16 65:3 67:3
79:7 96:15 113:23
293:7,25 299:22

**fact-check** 304:8,15

**fact-checking**
292:8

**factual** 172:11,20 321:12,18

**fair** 8:25 16:7 27:14 58:8 64:1 74:15 82:24 129:3 142:19 154:22 165:15 180:14 184:24 189:8 225:20 235:7,14 237:9 250:25 251:4, 8,13 252:9 296:1

**fairly** 192:13 231:19 232:8,20 251:13,14 252:12 257:6

**fall** 16:11,17

**false** 124:13,17,22

**familiar** 22:7,12 28:17 30:4 33:14 39:24 43:12 51:5 56:4,9 63:12 72:3 79:6 82:14,16 85:10 86:2,4 88:10,13 89:10 91:9,11,13 95:20,21 103:8 108:6 111:21 112:1,5,14,21 129:22 135:11 137:13 140:11 145:25 148:17 162:9 165:6 168:17 175:16 225:17 262:21 295:12 296:14 301:18

**familiarity** 44:6 51:8 72:1

**Fand** 220:24 224:2,4

**Farber** 219:17

**Fargo** 207:21 208:23 209:14

**farm** 143:9,11,13,17, 20,22 144:1,13 164:21,22,25 165:4, 7,12 169:23 225:11 238:18 239:2,7,9,11, 13,14,17,22 281:5

**fast** 87:11 210:20 279:16

**February** 182:17,18, 24 184:22,23 185:1 247:9,17 271:23 272:5,13,15,16,20,23 273:2

**Fed** 10:6,12 11:20 12:8,17,20 13:5,8,18 14:13 17:13,15 18:8, 10,15,18,19,20,21,23 69:19,23 134:20,22

**federal** 7:20 12:14 200:23

**federally** 200:13

**feel** 9:3 67:15 78:15 131:24 138:5 142:21 147:4 174:2 191:25 192:18 224:8,11 236:6 298:3 301:19 302:3

**fees** 267:25 268:15, 24 273:19,23 334:9, 13 337:15

**fell** 144:19

**fide** 320:11,15

**fielded** 127:8

**fielding** 322:2

**figure** 271:21 316:9

**file** 50:10

**filed** 22:8 26:18 50:15,17 195:3 197:1 260:22 266:17,25 333:4

**filing** 22:21

**filings** 23:1

**fill** 16:1

**final** 291:6

**finalizing** 281:2,14

**finance** 238:17

**financial** 33:15,20 34:2,7 35:1,3 100:10, 21 128:6 130:8 135:23 138:7,10 140:19 141:7 158:23 184:11 185:10,19 189:7 190:11 193:15, 16,19,23 203:14 206:5,10 222:10 225:25 233:1 241:11, 12 280:21 282:8 289:10 309:25 310:10 327:17

**financials** 35:10 95:19,20 97:3,6,18 98:3 99:4,7,8 101:2 130:11 154:3 183:21 189:7

**financing** 103:2 187:14,15 239:7,9

**find** 69:19 209:2,3 259:20 260:4 331:20

**fine** 120:1 165:25 192:23 279:24 298:18 317:13

**finish** 326:20

**fired** 33:2

**firm** 51:6,15,18 55:19 56:14 63:14 114:22 198:21

**firm's** 52:21,25

**flip** 134:23

**flow** 210:24 211:10

**flowed** 81:17,24

**Floyd** 15:24 16:18, 20 17:3 19:19 21:2 27:3 29:18 30:24 37:11,17 44:17 53:10 54:12 55:12 64:22 65:19 68:2 69:18 70:1 84:14 89:18 124:5 128:3 152:2 163:22 164:6,23 166:21 167:3,20 169:18 194:6 210:17, 20,25 211:23,24 212:10,19,21 214:10 216:13 217:3,7,8,10 218:7 220:1 223:8,9, 11 224:9 238:12,13, 24 239:4 240:6,10, 13,18,20 246:23 260:11 265:17,23 267:17 268:5,7,12,13 288:20 291:5 292:19 323:18 324:1 328:16 337:11

**Floyd's** 15:9,12,13, 19 16:6 18:12,16 40:3 51:10 54:5 86:22 89:6 91:22 94:25 113:13 120:1 131:2 140:1 156:1,7

165:25 166:16 194:2 198:4 203:2,3 207:22 214:2 219:20,23 221:2 229:20,25 279:24 298:18 319:1

**focus** 111:13

**focused** 27:9 189:10

**focuses** 223:20 225:1

**focusing** 154:2

**FOL** 16:7,16 17:7 18:19 19:19 20:2,18, 22,24 21:18 22:5 23:6 24:3 26:5,13,21, 24 27:5,14,19 31:12, 20 32:23 33:6,9,15 34:2,8,21 36:4,10 37:2,7,10 38:20 39:2, 9 42:20 44:7 52:25 53:6 54:8,20 55:5,20 56:14 59:24 63:9,13 64:15 68:15,20 69:25 72:4 76:18 77:21 78:3 79:8,15,17,18, 22 80:12,18 81:1,5, 17,25 83:10,23 87:19,22 89:21 90:8 92:4 94:23 95:2,8 96:17 97:18,20 98:13 100:10,15,20,21 101:3 105:20 109:20 110:1,4,6,9,23 112:2, 6 113:4,17 115:11,18 116:3,14 120:5 121:20 123:8,19 124:19,24 125:1,2,5, 8,12,17 127:7 128:6, 20 132:1,7,14,20,24 133:24 135:14,24 136:3,14,17,20 140:10,16 143:22 150:1 153:23 154:5 155:7,11 156:13,15 157:4,7,9,14,17,24 158:6,8,13,14,18 161:10,19 162:1 164:2 171:11,16 176:1,6,25 177:1,3 178:21 179:16,24 180:17,22 181:10 182:9,20 184:1 185:16,23 187:24 188:4 189:8,14

190:8,19 191:9 192:4 194:6,15 195:10,19, 23,24 196:7,15,17, 20,22 197:5,9 198:8 199:13,14,16,20 200:15,16 201:6,7, 12,19,23 202:9,16 203:7,10,14,18,25 204:14,17 205:12,17, 25 206:5,18,24 210:1,3,12,24 211:19 212:5 215:10,14,18, 19 216:10 217:9,10, 12,13,17 219:5 220:2,8,10,15 221:3, 6,12,14,16,18 222:4, 8,9,10,20 223:16,17, 19 224:4,15,25 225:9,17,21,24 226:1 227:3,10,15,18,20 228:5,6,10,14,16,24 229:1,10,14,16,17,19 230:1,5 233:2,19,23 234:2,12,19 235:21 237:15,23 239:13,16 240:21 241:3,14,17, 20 244:3,5 246:8 247:23 250:5 252:2 260:1,24 261:7,14, 21,22,23 262:1,17,23 263:1 269:1,8 270:19 271:10 272:1,6 274:13 277:4 278:20 279:4,7 281:14,24 282:8,14,19 283:2, 12,15 284:7,17,20,23 285:6,10,15 289:5,20 292:16,24 294:9,18, 21,23 299:6 303:22 306:7 308:25 309:18 310:11 311:11 313:3, 12 314:1,25 315:24 316:4,10 317:11,20 318:12,22 319:10 320:12 321:3 323:23 324:9 325:22 326:15 327:1,5 328:14,24,25 329:21 331:4,14 332:6,7,22,25 333:4 334:3 335:14,20 338:7

**FOL's** 16:9 79:24 97:10 149:13,18,23 150:6 159:3 171:14 187:13 212:12 215:25 232:25 233:7,

8,16 243:4,9,19 261:25 277:9 287:8, 20 289:8 292:4 299:22 306:19,24 312:1 326:3 334:4

**FOLE** 198:11,17,20, 22 199:1,4,17

**folks** 21:5 39:9 42:19 56:20 57:11 86:12 94:18,23 108:12 126:3 128:2 168:8 171:5 249:25 272:7 286:20,23 289:8,9 292:23 295:6 312:1 313:13 323:23 324:6

**follow** 74:8,11

**follow-up** 333:8

**Foreign** 15:5

**Forget** 299:18,20

**forgetting** 332:15

**forgive** 266:25

**forgiven** 310:18

**forgot** 229:22

**forgotten** 144:10

**form** 16:3,12,16 18:2 19:21 22:10,23 23:16,24 24:18 25:11,25 26:15,18,25 27:15,20 28:4 30:22 31:22 33:11 35:5,22 37:5,18,25 38:6,12, 16,22 39:4,13 40:21 43:18 44:9,15 45:13 48:2,8,24 49:5,25 50:20 54:4,10 55:7 56:2 57:23 58:10 61:4 62:13,22 64:10, 24 66:10 67:16,22 68:10,16,21 69:11,21 71:19 72:11 74:16 76:19 77:9,17,24 78:5,17,25 79:10,20 80:1,7,13,14,20 81:6 82:1 83:4 84:11 86:19 87:8,23 88:6 90:4,23 91:17,24 92:9,15,20 93:20 94:15 95:3 97:11,15 98:4,15,21 99:2,10, 15,20 100:1,6,13,24

102:1,17,18 103:3,9, 25 104:14 105:24 106:18 107:3,21,25 109:21 110:14,19,24 112:8,19 115:5,13 116:16,24 117:10,16 118:2,23 120:6,7,8, 12 121:23 123:24 124:14,15,20,21 125:3,9,10,18 126:8, 13 127:9,19 130:21 131:14 132:3,9,15,21 133:1 134:14 135:16 136:23 137:3,8 138:12 139:2,3,13 140:18 141:2,14 143:15 144:15 146:9 147:14 148:1 149:10, 15,20 150:8 152:15 153:6,11,17 156:21 157:5,23,25 158:10, 20 159:19,24 161:1, 11,17,18,20 162:4 163:23 165:2,8 166:12 167:13 169:21 170:14 171:20 172:13,23 173:6,15 174:6,16,23 175:12,22 177:8 178:1,23 181:5,18 184:18 185:3 187:2 188:2 191:22 193:24 195:25 199:6 200:25 201:21 203:20 206:7 207:1 208:17,19 210:5,18 211:11,21 212:13 213:4 214:13 216:11,18 217:22 218:8,22 219:2,14 220:11,16 221:4 222:13,21 224:17,22 226:8,18 230:9,19,25 232:3,17,21 233:10, 18,20 234:4,21 235:2,15 236:4,11,22 237:3,10,25 238:6 239:24 240:16,24 241:8,22 243:13,23 244:8 246:5 248:5, 11,22 249:4,12,21 250:7 251:16 252:5, 18,25 253:11,16 256:7,15 257:10,14 258:13 259:11,17,23 260:7,12 263:3,8,17 264:5 265:21 266:4

268:17 269:4,10 270:21 271:11,17 273:9,20,24 274:4, 15,22 275:6,13,23 276:4,12,18 278:10, 21 279:8 280:4,8,18 281:16 282:10,20 284:9 285:21 286:2, 7,12 287:10,22 288:8 289:17 290:10,24 292:9,17 293:1,21 294:18,24 296:16,23 298:10,24 300:4,11, 20 301:1,16,25 302:13,17 303:7,16, 25 304:11,19 305:6, 10,17 306:10,22 309:1 311:15 313:4, 14 314:3 315:2,9 316:1,11 317:1,9 318:10,24,25 319:11, 18,24 320:13 321:5, 20 322:16 325:3,24 327:2 328:3,9 329:15,23 332:1 334:6,24 335:5 336:17,25 337:7,19

**formal** 8:15 69:16 246:3 253:24 257:11 260:5

**formalities** 294:21

**formally** 54:3

**format** 149:8

**formation** 54:19,22 294:10

**formed** 55:5 307:10

**forming** 87:2

**forms** 296:18

**Fortunately** 266:20

**forward** 129:18 133:8,10 139:22 142:6,7 145:21 146:7 185:18

**forwarded** 155:3,6, 18 185:22

**forwarding** 113:13 155:14 176:9,11 179:8,9 185:1 223:13 289:9

**found** 54:25 193:13

**foundation** 54:25 304:1,20

**founder** 110:13,18 139:7

**founders** 108:23 109:16,19 110:1,11 111:13 294:13

**fourth** 102:16 152:11 153:13 154:12 164:21 165:17,18,20, 23 166:2 305:3

**frame** 157:10,11,12, 18 158:12 168:5 171:10 216:17,21

**Frank** 56:24 57:15, 25 71:4 73:13 74:8 75:17 113:20,25 148:19 152:2 155:4, 6,18 176:5,20,23 177:13,17 183:5 277:14 278:5,15

**free** 9:3 264:10

**frequent** 231:25

**frequently** 26:20,22 35:25 192:7,10 231:21,22

**friend** 40:3 203:2 219:20 221:2

**front** 190:25 207:17 213:15 223:4 247:7 299:25

**fruition** 55:6

**fully** 134:17

**functions** 193:4

**fund** 329:5

**funding** 89:7,21 90:2

**fundraising** 216:9 218:20 220:1,5

**funds** 41:6 79:25 164:20 166:15 169:7, 9 210:9,24 211:10 215:20,25 217:18 219:1 222:4,8 261:25

**funny** 330:5

## G

**gains** 180:23 247:24 252:3

**gap** 14:15

**Gasdak** 56:25

**gave** 113:20 221:2,5, 12,13,16,21,23 232:18 237:9 264:9 328:24

**Gazdak** 58:14,18 75:19 175:25 182:15 286:24 288:16 289:21 290:9,18 292:25 300:14 308:20 309:13 310:4 323:18 333:24,25

**Gazdak's** 322:18

**general** 50:24 143:17 191:20 199:3 214:16 234:16 235:12,17,22 262:24

**generalities** 201:6,7 245:23

**generally** 10:21 30:7 31:9 34:17,18 41:22 42:9 57:13 60:22 67:2 72:15,16 75:13 77:8,11 82:14,16 83:16,17 99:24 105:1,2 121:6 129:14,15 144:14 175:2,4 192:23 193:1 201:13 203:25 227:14 229:5 235:21 246:16 285:7 309:7

**generated** 123:11

**gentlemen** 66:15 314:1 338:2

**Georgetown** 14:5

**give** 32:1,4 139:23 140:2 152:12 179:23 204:12 328:25 335:9

**giving** 93:12 192:20 282:7

**glad** 9:5 133:11 148:11

**GMC** 113:1

**goals** 63:9

**good** 7:7 148:10 188:9 214:21 223:12 238:4 242:17

**govern** 196:18

**government** 50:18 325:7

**grab** 242:2

**grad** 13:9 14:7,10,17

**Grade** 12:24

**grades** 12:23

**graduate** 13:11,20 14:14

**great** 223:24 238:21 240:8

**greater** 184:11

**Green** 112:22

**greenhouse** 89:8, 22 95:23 96:9,12

**Greg** 61:8,14 113:16, 20 114:1 182:15,19 313:21 314:9,16

**Greg's** 315:6

**ground** 188:19

**group** 11:1,3 13:3,10 272:20

**grow** 95:23 96:9,12 121:14 217:18 291:12 318:4,13,22 319:2 333:19

**growing** 184:6 281:3,9,11,15

**grown** 279:15 299:22

**growth** 117:12 118:17 121:10

**guaranteed** 326:18

**guess** 37:11 62:1,2 93:14,15,19,23,24 101:22 201:10 204:25 245:2 251:12 266:22 279:13 298:12 314:8 321:9

**guessing** 93:9

**guesstimate** 93:18

**guys** 70:14 202:20 204:8 242:1,14,21 308:6 309:8

## H

**hair** 302:25

**half** 28:15 156:1 251:9 314:19

**halfway** 131:19 289:21 314:15

**hand** 31:21 34:2 57:16,22 133:11 139:21

**handed** 61:20 65:10 147:17 170:8 204:4

**handle** 277:2

**handled** 122:10 297:16 326:2

**handshake** 254:11

**handshakes** 254:1

**happen** 37:3 175:10 309:15 311:14 312:7

**happened** 53:16 67:4 137:2 144:1,3,5, 7,8,10,13,14 293:8, 25 294:7 311:4 322:8,21 331:25 332:4

**happening** 209:15 288:6

**hard** 192:9 242:16 248:24 252:20 315:11 334:7

**head** 11:3

**health** 228:11

**heard** 43:16,20 51:24 63:16,17 82:23,25 85:12 89:16 104:9 111:24 112:11, 17,25 167:4,5,8 168:20 240:2 330:22

**hearing** 55:12 168:21 240:4

**hearsay** 44:13

**heart** 330:9

**Heather** 21:14 332:16

**held** 91:22 105:16 110:17

**helped** 12:13 16:18 54:25 181:4,14 230:11 231:20

**helping** 54:12 55:2 58:21 114:22 325:19

**helps** 22:18

**Hemp** 202:6

**hereto** 196:24

**Hey** 223:11 238:14

**hierarchy** 37:15

**high** 206:5 218:11

**highlighting** 254:23

**highlights** 255:1 278:20 279:4 299:5

**hire** 25:23

**hired** 13:9 23:9,11, 13 24:3 80:12,16 189:17 228:5,14 229:1,11 230:5

**hiring** 23:7

**hold** 20:18,19 85:20, 23 124:18 182:14 302:19 324:16

**holders** 161:25 220:15

**Holdings** 8:5

**holds** 39:9 220:10

**home** 36:20,24 46:25

**hope** 128:10

**host** 312:1

**hotel** 238:19

**hour** 70:18 148:9 238:3

**hours** 43:1 70:17

**house** 37:3 40:10 236:21 237:2,5,9

**Howard** 65:13,19, 21,24,25 278:5 308:2 313:19

**HR** 297:16

**Huet** 7:2,9 153:10 188:14 270:10

**human** 27:10

**hundred** 276:11 329:4

**hundred-dollar** 331:14

**Hurley** 61:8,14 66:6 113:13,16,24 114:1 115:9 116:2 123:20 142:6 149:7,9 150:12,14 151:9,18 175:9 182:8,12,19 185:8 313:21 314:9, 16,20 315:1 326:20 333:21

**husband** 15:24 330:10

**hypothetical** 252:21 253:4 263:13

**hypothetically** 252:23

**hypotheticals** 264:14

---

**I**

**I/s** 183:22

**idea** 33:22 53:5 74:15 85:14 102:21 160:21,25 161:15 170:12 178:22 191:20 197:8,19 202:16 203:6 206:16, 22 209:24 210:3,8 214:17,20 215:6 216:16 218:1,6,25 220:19,23 222:1 223:25 225:2,5,13 227:10,17 246:7 262:4,9 263:6 268:10 303:14 310:22 316:24 317:4,16

319:5 334:2

**ideas** 55:3

**identical** 130:20

**identified** 94:19 120:10 186:14 213:3 307:8 317:23

**identifies** 91:20 119:2 124:8 131:18

**identify** 61:6 114:19

**identifying** 123:20

**illegal** 200:13,23

**imagine** 202:5

**impact** 200:7,23

**impacting** 68:25

**impair** 69:4

**impairing** 68:25

**impede** 201:2

**important** 20:20 98:13,19,25 100:11, 20,22 101:1 115:2 117:14,25 123:22 124:1 125:11 252:15 278:19 279:3

**impossible** 301:23

**improper** 328:2

**improved** 279:23

**in-person** 73:8

**inaccurate** 92:19 127:17 301:13

**inception** 54:17 132:2 307:17 308:9 333:5

**include** 183:9

**included** 137:25 312:12

**includes** 113:17 128:5 164:21 304:24

**including** 101:3,4 108:12 128:2 289:8 312:2

**income** 123:10 183:23,24 284:14

**incurred** 267:25 268:15

**indemnification** 273:7

**indemnity** 273:14

**independent** 114:5 148:5 167:6 168:1 187:8 196:11 287:17 288:5 294:1,5 312:20

**individual** 229:23

**individuals** 34:9 85:1

**industry** 101:17 102:4,6 109:8 193:4 201:15

**information** 92:12, 17 98:13,18,20,23 100:11,22 115:3,7 117:14,18 118:4 123:23 124:2 125:24 126:21 127:4,11,17 128:7 158:18 183:5 184:7,11 210:13 285:3 286:20 289:10, 13,16 290:5 292:3,6, 8,12 299:25 300:2 302:8 304:4 309:25 310:4,11 311:11 312:5,11,19,24 313:2,12 314:25 318:17,20 320:10 321:11,19 335:6 336:4,10 337:5

**Initial** 198:22

**input** 114:15,16 177:6,11 180:10 181:8,10 292:14

**inquiries** 311:8

**inquiring** 151:14

**inquiry** 287:7

**inserted** 316:20

**insights** 152:13

**installment** 214:23

**instance** 47:21 290:23

**instruct** 335:7

**instructed** 328:13

**instruction** 335:10

**insurance** 228:11

**intended** 177:17 242:25 243:3,9,18 244:3 300:7,9

**intends** 198:20

**intent** 297:1

**intention** 290:12

**intentionally** 217:8

**interact** 35:17 36:1 56:20

**interacted** 27:2 36:3 58:18

**interaction** 26:20,23 51:14,17 57:4 128:21,25 307:15,21 308:14,24

**interactions** 189:8

**interest** 110:3,6,9,23 136:14,15,17,21 140:16,19,22 141:8, 10,13,17 151:25 153:14,16,19 154:5, 11,17,21 158:23 186:5,9 193:15,16 225:25 241:11,12 280:22 287:8,20 298:19 305:3 306:8, 16

**interested** 41:20,25 42:6,9 125:6

**interesting** 193:13

**interests** 193:19,23 196:22 203:14 233:1

**interim** 14:19

**interlineated** 314:21

**internal** 332:18,20

**internally** 323:23

**international** 13:13

**interpret** 134:12 138:6

**introduce** 244:24

**introduced** 190:24

**inventory** 27:11 189:22 200:10 219:6 282:16,19 283:3,12, 15 325:23 326:3,9

**invest** 104:19,22 221:3 282:15

**invested** 104:15 105:8 220:4 258:21

**investment** 102:9, 12 106:21 107:2,19 108:2

**investments** 13:3 40:18

**investor** 71:6 128:19 185:11 203:2 219:21, 22 220:7

**investors** 185:14,17 216:14

**inviting** 127:7

**involved** 9:14 16:5, 9,13 33:4 41:9 54:19, 21 63:5 86:23 89:19 90:1 96:25 106:3,14 114:13,18 144:6 162:12 175:8 189:6,8 191:12 200:22 201:14 202:13 206:4, 9 211:9 213:2 214:17 221:23 235:5 239:7 244:21 245:16 253:6 266:21 267:21 286:17 295:21 309:8 312:23 337:11

**involvement** 16:16 34:19 35:4 55:4,11 63:1 130:8 144:4 162:21 222:9 330:16

**involving** 44:7 113:8 200:6 287:2

**IPO** 201:3

**issue** 29:23 77:12 83:8 111:7,9 201:3 202:5,6 234:11 255:2 272:25

**issued** 45:6 234:19 269:2,8

**issues** 12:13 19:17

27:10 57:16,22 130:8 189:11,13,22 200:6 334:20

**item** 136:13 138:17 142:3,4,12 143:8 156:17 243:10,11 264:1,2,4 326:9

**itemization** 179:24 183:10

**itemize** 146:2

**itemized** 312:10

**items** 135:11 138:4 142:18 313:1

**iterations** 257:2

---

**J**

**Jake** 21:14

**January** 133:20 142:1,9 157:3,12,18 171:10,19 172:12 173:5 175:9

**Jeremy** 220:23 221:15,21 223:14 224:1

**Jeremy's** 221:11,18

**Joan** 221:10

**job** 14:23 16:1 18:16, 19 19:3,11,13 20:21 69:19 70:2

**jobs** 14:23 27:5

**join** 19:22 23:17,25 24:19 25:12 26:1,16 27:1,22 28:5 30:23 31:24 33:12 34:24 35:6,23 37:6,19 38:7, 17,23 39:5,14 44:10, 19 45:14 48:3,9,25 49:6 50:1,21 54:11 55:8 57:24 58:11 62:14,23 64:11,25 66:11 67:17 68:11, 17,22 69:22 71:20 72:12 74:17 76:20 77:10,18,25 78:6,18 79:11 80:2,8,22 81:7 82:3 83:5 84:12 86:20 87:10,24 88:7

90:5,24 92:10,16,21 94:16 95:4 96:7 97:12,16 98:6,16,22 99:3,11,16 100:2,7, 14,25 102:2,19 103:4 105:25 106:19 107:4, 22 108:1 109:22 110:15 111:1 115:6, 14 116:17,25 117:11, 17 118:3,24 119:5 120:13 121:24 123:25 125:19 126:9, 14 127:10,20 130:22 131:15 132:4,10,16, 22 133:2 134:15 135:17 136:24 137:4, 9 138:13 139:14 141:3,16 143:16 144:17 146:10 147:15 148:2 149:16, 21 153:7,12,18 156:22 157:6 158:1, 11,21 159:20,25 161:2,12,22 162:5 163:24 165:3,10 166:13 167:14 170:15 171:22 172:14,24 173:7,16 174:17,24 175:13 178:2,8,24 181:6,12, 19 185:4 187:3 188:3 191:23 193:25 196:1 199:7 201:1,22 203:21 206:8 207:2 208:20 210:6,19 211:12,22 212:14 213:6 214:14 216:12, 19 217:24 218:9,23 219:3 220:12,17 222:15,22 224:18 226:9,19 230:10,20 231:1 232:4,22 233:11,21 234:5,23 235:16 236:5,12,23 237:4,11 239:25 240:17,25 241:9,23 243:24 244:9 246:6 248:6,12,23 249:5, 13,22 250:8 251:17 252:6,19 253:1,12,17 256:8 257:15 258:14 259:18,24 260:8,13 263:4,9 264:6 265:22 268:18 269:11 270:23 271:12,18 273:11,16,25 274:5,

16,23 275:7,14,18,24
276:7,14,19 278:11,
22 279:9 280:9,20
281:17 282:11
284:10 285:22 286:3,
8,13 287:11,23 288:9
290:11,25 292:10,18
293:22 294:25
296:17,24 298:11,25
300:5,12,23 301:2,17
302:2 303:8,17
304:2,12 305:7,11,
18,23 306:11,23
309:2 311:16 313:5,
15 314:4 315:3,10
316:2,12 317:10
318:11 319:19,25
320:14,18 321:6,21
322:17 327:3 328:4,
10 329:24 331:11
332:2 336:18 337:1,9

**joined** 133:24

**joint** 50:15 326:4

**jointly** 50:11

**Jonathan** 56:24
75:19 183:4 219:17
220:5,6 286:24
288:16 289:12
300:14 308:20
322:18 323:17

**journal** 87:21 88:5

**judging** 294:4

**Julie** 21:14

**July** 28:23 163:8
168:4 246:19 255:8,
12,16 256:19 257:22

**June** 191:5 196:17
197:15 199:9 279:24
301:15 338:9

————————

**K**

**Kaplan** 23:7 24:11
25:8,17,24 26:21
28:8 31:3,12,21
32:12 33:15 34:3
40:17 41:3,11,16
42:16 44:7 84:16
105:3 158:3 165:22
188:15 192:5,8,24
194:16 195:23 196:3,

6 205:2 211:17
228:5,7,8,10,15,16,
25 229:2,12 230:5,7,
14 231:15 232:8,16
233:7 237:15,23
238:13 260:25 261:7,
13,16,20 262:5,12
263:1 265:10 266:16
267:7 269:1,7 291:20

**Kaplan's** 238:21

**Kelly** 214:8

**Kelsie** 332:15

**kind** 9:14,17 13:17
22:4 24:24 29:9,12
41:15 44:6 50:17
69:3,16 87:20 88:2,3,
4 162:10 178:12
189:23 207:25 212:6
219:7 237:22 269:14
273:6 293:15 308:22
313:2 324:13 326:25

**knew** 143:13 144:11
193:14 210:15 229:6
302:4

**knock** 266:20

**knowing** 174:2
336:15

**knowledge** 23:20
44:6,11,12,13,14
50:24 86:11,13 92:14
163:21 166:24
181:16 196:12
197:16 201:11,19
209:11,12 211:23
222:3,7 264:18
270:19 283:23,25
290:22 291:1 302:9
310:3 335:8

**Kuruvilla** 86:4

————————

**L**

**label** 67:20 133:11
213:23

**labeled** 62:2 278:8

**labels** 64:6

**lack** 189:1 304:1,19

**Landis** 21:1,2 28:19

35:13 39:11 41:14
42:17 44:23 45:1
46:2,7,12,13,21
49:16,23 50:6,15,19
62:3 66:18 68:2,8
83:23 84:9 95:2,7
108:10 109:15
114:25 124:5 128:3
163:22 164:2 175:8
182:1 242:17 267:18,
24 274:18 291:19

**Landis'** 47:1 62:20
64:9 67:20 68:1 84:4,
6

**language** 14:2

**Larchmont** 7:10
46:11,19,21 48:22
49:2

**lasted** 59:18

**late** 73:20 133:25
134:1 190:19 195:20
216:8 259:12

**latest** 159:8

**law** 51:6,15,18 52:25
55:19 198:18 226:15
261:2

**lawsuit** 266:16,19,
21,24 267:22 268:1
274:3 276:3

**lawyer** 51:21 256:12
335:12,14,15 336:19

**lawyers** 51:18,19
261:18

**lays** 324:13

**leadership** 11:4

**Leadville** 15:9,12,
14,19 16:6 18:13,17
51:10 54:6 86:22
89:7 90:19 91:10,15
94:25 113:14 119:7,
9,10,13,14,16,18
131:2 166:16 194:2,3
203:3 207:22 214:2
219:23 229:18 230:7,
15,18 232:2,12
279:20 280:14 319:2
330:13

**Leadville's** 198:4

**leaving** 18:19,20
69:25

**left** 19:4 21:17 69:15
156:8 207:22 216:9,
23 217:1

**left-hand** 131:19

**legal** 22:20 50:19
54:24 246:3,8 253:24
259:7,9 260:5 267:25
268:15,24 273:19,23
334:9,10,13 335:20
337:15

**legally** 291:17
334:11 335:3,25
336:5,12,16,21,23

**legitimate** 320:16,
21

**letter** 61:21 62:3

**level** 200:23 206:5
226:7

**liabilities** 138:16,19
144:25 145:4 186:4

**license** 45:5,17
49:13,14,17 90:9
226:13,16 227:17,18,
19 228:1 229:20,24

**licensed** 89:9

**life** 110:18 192:15

**Lifetime** 189:21

**light** 139:18

**limitations** 327:23

**limited** 327:22

**limits** 326:25 327:4,
12,15

**lines** 40:19

**Liquor** 113:5,8 227:5

**list** 176:6 178:21
179:17 180:24
184:16 209:9 252:8
270:14 271:15,23
272:23 289:14

**listed** 208:18 210:1
251:10,15

**listening** 308:4

**lists** 204:20 208:15 209:21 247:16

**litigation** 9:15 204:17 205:18 268:16

**live** 46:4,9,10,16,19, 21 48:22 232:5

**lived** 46:2 47:21 49:24

**LLC** 85:11,21,24 103:8,22 104:2,10,13 106:4,22 107:2,9 111:22 112:15 113:1 140:7 168:18 169:1,8 170:22 243:11 258:25

**loan** 140:7 236:10, 14,21 310:11,12,21 320:25 321:1 324:25 325:12 328:23,25 329:3,5,21 330:19 331:17,18

**local** 226:15

**located** 85:15 104:7 112:22 119:21 121:22 156:19 166:4

**location** 36:12 73:17 121:25 166:2

**locations** 24:6

**logistics** 330:18

**long** 10:5,14 11:25 48:10 49:19 55:18,20 59:18 186:4 187:10 247:4 287:14

**long-term** 138:19 144:23 145:7

**longer** 13:2 14:24 17:7 215:1

**looked** 29:15 51:2 82:9 89:16 130:18 183:10,15 184:16 190:22 194:18 197:3 209:4 211:4 218:4 232:25 242:1,21 258:20 259:4,5,6 313:7,9

**loss** 133:20

**lot** 29:18 36:14,16 37:14 62:8 111:11 115:15 188:19,20 189:18,20 194:1 217:17 302:3 330:8, 10

**Ls** 130:5 136:3 313:8,9,25

**lunch** 29:17 40:16 188:9

**Lurie** 204:24 205:2

**lying** 280:6

---

**M**

**Mackey** 21:14

**made** 72:9 76:17,24 102:23 106:21 154:5, 12,17,22 189:15,17 191:5 203:23,25 204:1,25 205:25 206:9 208:14 209:20 210:1 222:24 225:17, 21 239:1 240:11 274:10 281:12 285:24 309:25 325:7 330:19,21 331:17,24

**made-up** 236:7,17

**magnitude** 65:6

**maintain** 29:9 282:19 283:3,12,15

**majority** 133:23

**make** 11:4 87:4 99:1 141:4 146:12 147:2 177:17,19 179:3 181:22 206:24 210:4 222:4,19 257:3 264:16 265:1 266:23 275:21 279:12 281:20 298:12 328:7 332:3 338:3

**maker** 64:15

**makes** 254:18

**making** 11:5 92:1 154:5 189:21 194:3 203:18 212:15 213:2 226:1 228:18 241:13, 14 287:7

**manage** 193:12 228:5,7 229:2 230:5

**managed** 27:6 189:15 230:7

**management** 13:3 91:20,23 92:13,23 93:4 94:19 214:12 306:19

**management-like** 230:24

**management-type** 231:3

**manager** 107:11

**managers** 169:4 230:17

**managing** 233:7

**manufacturers** 222:25

**March** 116:7 146:20 148:24 149:13 150:7 209:8 243:7,21 244:4,5 282:4,23 283:2,4,11 284:8 289:22 305:14

**margins** 279:23

**marijuana** 89:9 90:19 91:2,5,10 180:13 193:4 200:10 201:15 223:20 224:6, 15,21 225:1 227:18 229:22,24 230:2 247:20 251:5 271:4 279:15 301:5

**marital** 45:5

**mark** 22:8

**marked** 22:11 53:22, 24 61:19,20 63:25 65:9 78:9 82:13 88:9 103:7 108:5 113:11 127:24 148:15 151:22 154:24 159:1 162:17,24 167:16 169:12 170:7,25 175:15 182:3 185:6 204:3,4 207:16 213:13,14 223:2 238:8 255:4 277:7 282:2 288:12 295:3 308:17 311:20

323:14 326:11

**market** 180:14 250:25 251:4,8 252:9

**marketing** 27:12 114:22 115:21 189:18,19 214:18

**Markets** 10:25 11:3

**marriage** 45:10,12, 17,20

**married** 44:22,25 45:8

**master's** 13:13

**match** 209:3

**matches** 208:7,8

**material** 315:20

**materials** 20:10,14 124:2 128:11 129:18 148:6 293:13,15

**matter** 166:20 237:7 262:24

**matters** 9:15 54:12 77:21 78:4 113:7 188:22 206:10 297:17

**matured** 171:18,25 187:21 286:11

**maturing** 285:19

**maturity** 306:9,18

**maximum** 21:19

**Maynard** 278:6

**meaning** 215:7

**means** 10:25 12:12 80:6 99:21,23 159:21 193:2 204:16 225:2 231:22 235:13

**meant** 91:7 131:25 160:23 224:9 240:18 248:25 280:21 327:25

**mechanic** 206:19

**mechanism** 81:16 206:13,17

**medication** 69:3

**meet** 25:17 42:14,16, 19

**meeting** 25:1 28:17, 24 29:13,14,17,24 31:6,19 32:12,13 38:25 39:19 40:13,16 52:3,4,5 58:19,23,25 59:11,13,16,21,23 60:2,5 75:6,7,10,12, 14,24 76:4,6,14 176:15 179:7,9,14 183:1,6 196:3 250:16 265:9 266:13 272:5, 10,11,13,14,19 273:2 288:22 293:5,25 294:6 322:8

**meetings** 29:10 37:2 39:12,15,18,20 51:19 52:8,14,20 53:9,14 57:16 58:19 59:3 75:22 294:9,22 322:10,14,15,19,23

**member** 66:14 104:12 107:6 124:4,6

**members** 60:25 94:19 126:11,15 169:4 326:5,6

**Memo/description** 204:21

**memorializing** 41:10,14

**Memphis** 283:5,14

**mentioned** 34:10 39:10 70:25 77:16 89:19 158:2,22 165:11 172:4 193:16 307:7 337:10

**Merle** 7:2,9 124:7 126:24 127:4

**message** 25:1 159:6 223:7

**messed** 242:10

**Messrs** 291:19

**met** 25:19 28:8 39:21 40:4,5,6 41:19 42:12 86:12,14 188:15 309:19

**Michael** 70:13,17 86:9 188:14 333:7

**Michelle** 11:12

**mid-july** 28:21

**middle** 195:7 204:22 314:21 318:3 320:25

**midway** 267:1

**Milazzo** 51:5

**million** 97:6,7 103:2 144:25 145:4,10 180:20,21,22 186:14 218:14,17 247:22,24, 25 250:25 251:1,6,25 252:1,3,10,17 271:8, 20 291:23 292:1 298:17 299:22,23 327:19,20,24

**million-and-change** 137:20 138:22 140:12 142:19 146:3

**mind** 29:7 309:10 333:12

**mine** 62:15 254:24, 25

**minutes** 61:15 70:8 264:24 265:3 303:3 307:4 326:19

**misrepresenting** 290:8,13

**missing** 168:12 169:14 315:16 316:19 323:11

**misstates** 119:3

**mistakes** 181:22

**misunderstand** 26:14

**moment** 32:1 39:9 78:10 301:10 311:21 320:8

**moments** 145:12

**monetary** 327:12,14

**money** 33:9,13 34:8, 11 79:8,17,18,21,25 80:10 81:1,5,11,13, 16,22,24 82:5 104:19,22 105:15 141:11,17 206:17,20 207:3 210:4 215:11, 15 216:14 217:4,7,

11,16,18 219:4,5,13 221:3,5,12,13,16,18, 21,23 235:25 236:18 239:10 252:12 263:25 264:3 329:6

**monies** 169:7

**month** 133:20 209:6

**monthly** 118:20 214:23

**morning** 7:7 70:25 71:17 77:16 124:12 188:20 189:5,25 193:17 202:20 215:19 225:12 244:13,15,16 245:12 247:10 258:20

**mortgage** 275:12, 15,19

**most-recent** 284:13,14

**Mountain** 112:22

**multiple** 82:2

**Murray** 120:8 140:18 188:13,14 192:2 194:5 196:5 199:9,19 200:1 201:5,25 206:11 207:5 208:18, 25 210:8,23 211:14 212:1,18 213:8 214:16 216:15,22 218:1,13,25 219:8 220:14,19 222:17 224:20,24 226:11,21 230:13,22 231:4 232:6,15,18,24 233:15,19,24 234:7, 24 235:3,20 236:9,15 237:1,7,8,14 238:5,9 240:2,20 241:2,12,25 242:4,8,11,13,19 243:14 244:2,13 245:2,4 246:7 248:8, 15 249:1,7,15,24 250:11 251:20 252:8, 22 253:6,14,20 254:6 255:1,5 256:10,18 257:1,5,17 258:16 259:14,20 260:1,10, 15 263:6,11,20,24 264:9,13,16,23 265:1,4,7 266:1,3,5

267:4,5 268:21 269:6,13 270:5 308:1 333:9,11,25 334:2,8 335:1,12,20 336:22 337:4,14,22,25

**mystery** 316:16

---

**N**

**nail** 216:5

**names** 21:9,15 24:4 86:3 119:24 243:15 332:13

**native** 256:25

**nature** 29:20 67:15 128:6 140:21,24,25 309:25

**Neal** 11:12

**nearing** 306:9,17

**needed** 134:19 217:17

**negative** 212:15

**negotiate** 166:25

**negotiating** 63:5

**negotiation** 191:12 202:13 244:21 245:16

**negotiations** 162:12 253:7

**neighborhood** 218:7

**nickname** 109:13

**nights** 48:12

**note** 160:8,11 173:9 235:25 291:4,23 298:18,20 330:19

**noted** 290:21

**noteholder** 58:1 65:17 71:8 159:7,15, 18 161:15 295:9,24 296:6,13,15 300:3, 10,17 303:23 304:6, 24 313:19,22

**noteholders** 81:11, 13,17,24 94:14 98:19

100:11,21 136:18,21,
22 153:20 154:18
161:24 171:11,15
177:14,25 188:6
206:14,18 210:9
234:20 250:3,4
251:22 272:7 273:3
295:25 296:22
300:18 305:2 313:13,
17

**notes** 29:9 43:13,14,
16,22 64:14,15,21
65:1,4,6,7 68:9,14,20
79:7,9,13,16 87:20
88:4,8 138:17,18,25
139:7,11 145:7,12,
14,23 146:2,24
147:5,24 153:5 154:6
162:1 171:17,18,25
172:6,21 173:4,11,
14,22,24 174:5
175:11 178:15
180:19 182:21
184:13 186:2,4,6,10
187:17,21 188:1,7
206:14 215:19,21
216:8 218:21 234:11,
13,18,19,23,25
235:6,8,10,12,21
236:3 237:17,24
247:21 266:13 269:1,
8,14,18,23 270:3
271:6 273:2 285:17,
19 286:1,6,11,16,18
305:15 306:8,17,21,
25

**notice** 69:16

**notified** 18:18,20

**notwithstanding**
318:17

**number** 21:19,20
52:14 61:2 65:6
72:23 78:21 108:12
123:14 133:6 142:20,
22,25 143:3,6
145:10,11,14,17
174:3,12,18 192:20
204:24 208:1 218:11
249:25 251:18
266:23 289:8 323:11
331:7,8

**numbered** 324:18

**numbers** 12:24 64:6
97:19,22,23 98:1,8,
10 118:9 130:11
131:6 138:3 160:8,12
204:8 207:13 238:16
303:9

---

## O

**oath** 8:16 93:12
192:20 318:7 329:11,
16

**object** 27:15,20
32:2,7 38:12,16 39:4,
13 40:21 44:9 48:2,
24 49:5,25 50:20
54:4,10 55:7 56:2
57:23 64:10 66:10
67:16 69:11 72:11
78:25 79:20 80:1,13,
14 81:6 82:1 96:3,6
98:4 112:16 132:3
140:18 150:8 158:20
199:23 216:11
235:15 252:5 301:1

**objection** 16:3,12
18:2 19:21 20:3,4
22:10,23 23:16,24
24:18 25:11,25
26:15,25 28:4 30:22
31:22 33:11 34:22,23
35:5,22 37:5,18,25
38:6,22 43:18 44:15
45:13 48:8 58:9,10
61:4 62:13,22 64:24
67:22 68:10,16,21
69:21 71:19 74:16
76:19 77:9,17,24
78:5,17 79:10 80:7,
20 83:4 84:11 86:19
87:8,23 88:6 90:4,23
91:17,24 92:9,15,20
93:20 94:15 95:3
97:11,15 98:15,21
99:2,10,15,20 100:1,
6,13,24 102:1,17,18
103:3,9,25 104:14
105:24 106:18 107:3,
21,25 109:21 110:14,
19,24 112:8,19
115:5,13 116:16,24
117:10,16 118:2,23
119:3 120:6,7,8,12
121:23 123:24

124:14,15,20,21
125:3,9,10,18 126:8,
13 127:9,19 130:21
131:14 132:9,15,21
133:1 134:14 135:16
136:23 137:3,8
138:12 139:2,3,13
141:2,14 143:15
144:15 146:9 147:14
148:1 149:15,20
153:6,11,17 156:21
157:5,25 158:10
159:19,24 161:1,11,
17,18,20 162:4
163:23 165:2,8
166:12 167:13
168:12 169:21
170:14 171:20
172:13,23 173:6,15
174:6,16,23 175:12,
22 177:8 178:1,6,23
181:5,11,18 184:18
185:3 187:2 188:2
191:22 193:24
195:25 199:6 200:25
201:21 203:20 206:7
207:1 208:17,19
210:5,18 211:11,21
212:13 213:4 214:13
217:22 218:8,22
219:2 220:11,16
222:13,21 224:17,22
226:8,18 230:9,19,25
232:3,17,21 233:10,
18,20 234:4,21 235:2
236:4,11,22 237:3,
10,25 239:24 240:16,
24 241:8,22 243:13,
23 244:8 246:5
248:5,11,22 249:4,
12,21 250:7 251:16
252:18,25 253:11,16
256:7,15 257:14
258:13 259:11,17,23
260:7,12 263:3,8,17,
18,22 264:5,12
265:21 266:4 268:17
269:4,10 270:21
271:11,17 273:9,15,
20,24 274:4,15,22
275:6,13,17,23
276:4,12,18 278:10,
21 279:8 280:4,8,18
281:16 282:10,20
284:9 285:21 286:2,
7,12 287:10,22 288:8

289:17 290:10,24
292:9,17 293:1,21
294:24 296:16,23
298:10,24 300:4,11,
20 301:16,25 302:13,
17 303:7,16,25
304:11,19 305:6,10,
17,22 306:10,22
309:1 311:15 313:4,
14 314:3 315:2,9
316:1,11 317:1,9
318:10,24,25 319:11,
18,24 320:13,17,22
321:5,20 322:16
323:2 325:3,24
327:2,8 328:3,9
329:15,23 330:25
331:10 332:1 334:6,
24 335:5,17 336:17,
25 337:7,19

**obligation** 261:7

**obtaining** 325:12

**occasions** 28:11

**October** 15:15 17:19
54:2,6 69:13 134:2
187:22 190:19
195:20 267:1

**odd** 259:20 260:4

**offer** 268:23

**offered** 19:1

**Offering** 198:23

**office** 7:21 47:22
52:21 58:24 59:2,4

**officer** 12:3,4,8,21,
22 20:6 124:16
125:17,21 153:25
156:15

**officers** 294:22

**offices** 58:20 75:8
272:15

**official** 46:13,23
47:1,9 49:1,4 50:5,6

**OLCC** 227:12,15

**OLCC'** 227:5

**open** 150:24

**opened** 149:1,3
150:21 163:12

165:23

**opening** 182:25

**operate** 157:4
158:14

**operated** 157:10,14,
17,24 158:9,13,19

**operating** 20:5
124:16 125:17,21
153:25 156:14
258:20,25 259:6

**operation** 16:6

**operational** 189:10,
13

**operations** 16:10,14
26:13 27:11 111:22
112:2,6,14 123:7
154:2

**opine** 252:20

**opining** 131:24
142:21

**opportunity** 338:5

**opposed** 210:9
217:8 233:16

**options** 306:20

**order** 236:2,3

**Oregon** 23:14,21
25:4 28:8,18,22,25
29:17 31:7,19 32:12
40:6,9,15 41:2,7,10
86:1 104:8 106:8
107:24 108:3 112:2,
3,6,7,10,12,23 113:5,
8 119:2,6,20,23
120:10 121:21,22
123:4,12 143:25
144:2 158:24,25
164:20 165:7,12
193:18 203:15 204:2
225:25 226:2 227:5,
6,19 233:2,8,25
234:2 237:16,24
240:21,22 243:15,20
244:6 261:8,24 265:9
279:20 280:14 281:3,
9,11,15 286:21
287:8,21 291:4
298:18

**organizational**

310:25

**original** 29:20 30:4
31:4,15 180:21
196:16,17 227:4,11
247:22 252:1 261:15
265:25 266:1,5,7

**outcome** 310:20

**outdoor** 121:10,14

**Outlook** 293:19

**outstanding** 306:21
310:21

**overseeing** 26:13

**oversight** 228:8
230:15

**overview** 297:4,22

**owe** 263:1,16,24
264:3 334:12

**owed** 331:19

**owned** 120:5 132:1,
7,14,20 157:7,15,23
158:9,13,18 229:19,
24 233:23 241:7,20
244:5 318:12

**owners** 196:17
203:19,23 227:4,11

**ownership** 110:3,23
227:3,6 287:8 318:4

**owning** 319:2

**owns** 85:15 243:19
244:3

---

**P**

---

**p.m.** 188:11 238:7
265:6 307:5 326:23
338:8

**packaging** 219:7

**pages** 130:13 133:4
139:19 141:21,25
142:8 145:15 155:11
194:24 278:8 324:13

**paid** 33:9 136:10,14,
15 228:21 262:18,24
298:20 305:3 310:22
328:5 330:16

**Palisade** 89:8,19,20,
22 90:9 95:23 96:10,
12,15

**paper** 67:24 147:16
204:19

**papers** 22:7 50:17

**paperwork** 48:5,7
227:4,12,15

**paragraph** 23:6
108:22 109:2 178:12
182:25 195:15
196:14 226:23 227:1
228:3,24 230:4
232:25 233:6 260:24
261:19 279:13,14
282:15 284:2 291:22
309:14 333:17

**paragraphs** 226:24

**parameters** 282:8

**parentheses** 198:11
207:9 334:10

**parenthetical** 271:7

**part** 37:23 38:2,4,9,
11,15 39:2 61:7
91:23 92:23 93:4,25
135:1 146:6,11
147:17 165:13 177:5
184:12 214:12 257:7
315:12

**participants** 73:11

**participate** 186:21

**participated** 67:8
177:5 180:5

**participation** 35:4

**particulars** 30:2
128:24

**parties** 170:4 254:4

**partner** 223:17

**parts** 27:6

**party** 196:20 262:1
273:6,14

**passage** 103:2
166:14 271:2

**passages** 321:16

**passed** 19:16

**passing** 284:12

**past** 69:5

**pause** 10:2

**pay** 16:24 23:1
136:14,17,20 263:13
264:4 267:25 268:15,
24 275:11,15,19
306:7,16 328:8

**payable** 136:10
138:18 139:7,11
145:8,14 172:7,22
173:4

**paying** 189:16
273:8,18,23 274:13,
20,25 275:4 276:9

**payment** 152:11
175:10 241:14

**payments** 12:9,12,
14,25 13:1 137:7
154:5,12,17,21 194:3
203:18,22,24 204:1,
24 205:25 206:24,25
208:14,23 209:20,24,
25 210:4 213:3 222:4
225:17,21 226:2
241:14 255:7 274:10

**payroll** 16:25 26:13
189:17

**PDF** 113:20

**pegged** 272:23

**people** 11:7 16:24
21:17 59:20 76:6
114:18 165:13
175:19 181:21
209:21 210:1 297:7,
19

**percent** 43:16
108:23 136:21
145:11 153:5 154:17
178:15 180:23
181:21 182:21 186:1,
6 187:17 188:6,7
252:3 286:1 291:11
295:25 298:19
301:20 333:19

**percentage** 262:18

**performance** 97:10

**period** 14:15,19

21:16 123:7 149:22
156:12 157:2 158:15
216:5 282:21 308:23
332:9

**periodic** 107:10,14

**permission** 237:9

**permit** 261:25

**person** 38:25 61:7
73:10 86:17 87:6
114:20 126:22 127:2
210:25 212:8 309:20

**personal** 44:11,13,
14 105:15,16 166:24
196:12 209:11,12
287:25 328:1,5,7,18
329:6,20 330:15,20
331:3,6,17 335:8
336:24

**personally** 169:9
262:8 286:4 326:18
331:24 336:1

**perspective** 80:19

**Pete** 51:22 148:19
152:2 334:12

**phone** 24:25 73:8
74:2,4 307:23 308:1
309:20

**physically** 7:25
36:6,10

**pick** 70:8 331:8

**picking** 273:7

**picks** 186:1,5

**picture** 70:21 223:24
285:14

**piece** 67:23 107:23

**pieces** 147:16
312:10

**place** 28:18 39:12
40:16 46:10 67:6
198:5,10 212:6
272:6,20 293:17
338:6

**places** 36:9

**plaintiff** 8:5

**plans** 281:3,12,15

**play** 330:20

**plays** 70:20

**pleadings** 188:17

**pledge** 236:19,21
237:9 238:22 240:9,
21

**pledged** 234:13

**pledging** 237:16,23
240:14

**point** 18:22 83:10
90:17 91:6 96:17
101:18 118:8 119:25
121:2 146:23 150:1
171:19 188:9 199:12,
15 201:24 228:17
229:15 257:8 269:3
283:16 297:6,23
298:15,23 299:10
301:8,14 302:8
303:11 304:5 305:2
306:6 310:10 311:2
326:7

**points** 176:5,9,20,23
177:19,20,24 178:10,
21 179:16 183:9
184:8,9,25 290:18
311:10

**policy** 12:10

**pool** 40:18

**Popular** 198:5

**portion** 156:3,4
251:14

**Portland** 23:14,21
119:2,6,20,23
120:10,21 121:3
140:11,16,20 142:18
164:3,13 180:13
190:1,4,7 193:18,20
194:4,7 205:6 227:19
233:25 234:2 238:17
240:22 243:15,20
244:6 247:20 251:5
271:3 279:19 280:14
303:12,19

**position** 11:8 12:17,
20 13:5,7 15:8,11
19:7 69:23 97:25
98:7 253:3 336:24

**positions** 11:19
15:3,6 17:6 27:5
134:20

**possibly** 201:2
210:14 293:23

**post** 235:25 236:2,3,
9,13

**posted** 269:22 270:2

**potential** 116:2

**potentially** 200:22
254:2

**PPP** 310:11,12,16,18
324:25 325:6,12

**practice** 77:7 88:1

**preceded** 184:21

**precise** 146:12
147:3,19,20 221:22,
24 278:12 283:1

**predictable** 229:7

**prefer** 331:12

**preparation** 41:18
42:21 63:2 114:14
186:21

**prepare** 41:22 42:2
116:23 117:4 134:6,8
181:4

**prepared** 83:19
92:4,8 94:5,8,9 97:3
101:21,25 102:16
103:1 135:22,23
136:3 147:13,23
177:2 186:19 270:25
272:1 315:20

**preparing** 114:15,16
180:5 181:8 295:21

**present** 232:2 267:8

**Presentation** 296:7

**presented** 104:17,
21,24

**presently** 280:17

**president** 10:13,21
11:14,19,21,22,24
20:10,11,14,16,17
124:8,13,18,24,25
125:2,4,8,12,16,20
126:24 127:5,8,13

**presume** 117:18
184:8

**pretty** 188:8 212:15

**previously** 190:22
212:25 213:20
222:18 246:2 313:3,
12,25

**price** 122:16,21
180:21 247:23 252:1
298:19

**primarily** 232:18

**primary** 26:23

**principal** 198:10
305:15 306:8,16

**printed** 204:19

**printer** 255:2

**printout** 135:19

**prior** 11:18 12:2,3
16:16 102:16 182:12
228:4 245:13 272:13

**problem** 200:11

**proceeding** 9:18

**proceeds** 79:15
249:3 261:8,22
325:2,4

**process** 15:22 81:4,
16,20,22 212:6

**procurement** 27:11

**produce** 338:5

**produced** 155:25
204:17 205:12,17
256:24

**products** 198:17

**profit** 133:19

**profit-and-loss**
134:4,10

**proformas** 130:2

**program** 13:10

**projected** 95:19,20
97:3,5 98:2 118:9

**projection** 97:7

**projections** 97:9
99:6 101:12 118:11

projects 19:18

promissory 43:13,
14,22 64:14,15,21
65:1,4 68:9,14,20
79:7,9,12 145:23
146:24 147:5,24
154:6 182:21 330:18

promoted 11:23

prompted 17:11,21
18:9,15

pronounced 51:24

pronouncing
242:15 312:15

pronunciation
51:24

properly 189:22

property 96:16
112:22

proposing 31:12

provide 30:11
115:20 173:13
174:14 183:5 184:6
261:7,21 277:24
303:22 307:19 310:7
312:21 337:12

provided 77:1,5
81:11,13 94:11,12,13
98:19,23 152:7,9
179:20 180:10 285:3
292:7,14 310:4
311:11 313:3,12,16,
25 317:20 328:7
336:10 337:5

providing 176:15
179:14 250:16

public 198:23 199:5,
14,16,21 200:2,8,11,
16,17,19,21,24
201:6,8,13,14,19,20,
24 202:2,7,9

pull 245:5 246:11
247:7 260:15 287:12

pulled 69:7,8 167:23
184:7

pulling 302:25
333:12

purchase 89:8,21

90:18 91:10,12
122:10,15,21,23,25
164:2,13 169:23,24
180:21 194:7,10
196:16 204:1 219:6
239:14,17 241:3,6,17
247:22 252:1 266:8

purchased 123:11

Purchaser 198:6,16

purchasing 141:12,
18 194:4

purports 245:20
295:24 296:21

purpose 34:15,17
52:2 57:3 80:18
179:23 186:24
307:13 312:20

purposes 39:8
115:21 187:25
209:19 326:18

push 209:11

put 16:24 37:14 92:2
98:8,9 114:22
115:11,18 116:19
131:10,12,23 140:14
141:11,17 142:23
143:2,5 151:17
156:23 160:5 168:11
178:10 181:14 187:5
239:10 243:2 295:14
296:25 297:2 303:22
311:6 330:8 336:7

putting 181:22 253:9
312:24

---

Q

Q4 102:13 103:2

quadrant 47:8

quarter 70:9 102:16
152:11 153:13
154:12 305:3,4

quarterbacking
325:11,13,15

question 8:25 10:3
18:4,7,11,14 20:1
24:1 28:1 33:23
70:13 82:8 100:18,19

101:23 104:20 112:4
117:2 141:5 144:9
147:20 157:15 163:2
183:18 201:17
209:19 233:12 238:6
266:2 279:1,2 289:3
291:23 299:14,21
303:1,2 304:3 317:15
318:8,19 319:7,10
323:15 327:7 333:9

question-and-
answer 8:15

questioning 9:6

questions 57:25
94:2 127:7 188:25
189:1 222:1 239:3
246:15 259:3 264:19
265:8 270:18 276:23
289:23 315:1,6 322:2
336:8

quick 70:12 260:16
307:3

Quickbooks 205:14

quickly 217:18
245:5

---

R

r-o-l-e 80:6

raise 80:12 81:1
215:11,15,20,25
216:14 217:3,7,15,19
218:2,7

raised 29:19,23 30:1
147:6 149:7,9 150:15
216:5 218:14,16,19
219:10,12,13 234:11
290:18

raising 217:11
218:11

re-add 155:19

reach 215:2 300:25

read 30:18 82:19
126:1 134:12 138:1,
3,6 148:18 167:21
179:11 181:20 187:4
191:2 195:1,16
196:15 208:2 223:22
238:24 240:6 245:22

266:22 277:19
278:24 281:2 282:12
289:2 298:7,8,14
301:9,13 309:3
336:23

reading 111:6
134:21 138:7 191:18
256:19

reads 198:19 228:4
260:24

ready 42:25 70:22
261:14 295:18

real 70:12 104:15,17,
18,21,22 106:6,7,11
107:24 108:2 223:21
225:2,6,9,13 239:2
260:16

realize 270:17

reason 8:19 9:2
108:18 128:14
139:10 147:22 150:6
153:1 155:13 183:12
202:9 213:9 264:22
278:7,16 305:1

reasonable 93:17

reasoned 174:14

reasons 115:16,18,
25 202:11

rebranded 279:23

recall 10:16 15:7
17:2,5 21:8,20,21
28:22,24 29:25 30:12
31:8,11,16 32:17,20
36:2,12 39:15,20,23
41:13,14,17 43:1
52:23 53:25 54:18
57:2 58:2 59:5,12,15,
25 60:15,16,18,21,22
61:12,16 65:5,22
66:20 67:13,18 69:17
71:2,21 72:13 73:15,
24 74:18 75:4,5,11,
13,22 77:19 78:7
79:1,4,21 82:11,21
83:13,25 84:13,15,18
85:25 87:12,15,25
89:25 97:23 104:11,
25 105:1,11 106:15,
23,25 107:12 109:23
110:2,10 111:5,23,25

112:9,20,24 113:6,
10,22,25 114:24
115:1 116:4 119:17
120:19,23 122:14,21,
22,25 123:5,9,14,17
127:21 129:1,2,3,6,7,
9 132:11,17 133:3
137:10 138:14 144:5
151:3,6,13,18 154:7
157:20 158:7,12
159:13 162:16,22
163:9,14,16,17,19
166:8 167:3 168:9,16
169:25 170:2,3
173:12 177:9,12,15
180:7 190:13 191:14
192:9,23 196:3
202:10 205:8 213:7
215:12,14 216:20
217:25 218:24 221:7
222:16 225:10
228:22 232:13,23
235:9 237:18,21
239:20 241:1 245:18
246:12,19,22,24
249:6,9,17,23 252:7
256:17,18 257:20,21
258:6,22,25 260:14
265:16,20 266:18
267:20,24 268:2,3,5,
7,8 269:6,15,17,21
270:4 272:12,14,25
273:4 277:6 281:10,
13,18 282:1 285:1,4
286:19,22,25 287:25
288:2 289:18 295:1,
22 299:24 304:13,22
309:7 312:24,25
314:5 315:4 318:21,
23 319:1 322:2,4
324:8,9,11 325:4,21
329:1,17 332:23
334:14,17 335:19
336:6,9

**recalling** 192:1

**receipt** 79:24

**receive** 26:7 79:18
261:23

**received** 26:5 79:15,
17,22 81:5 90:9,11,
14,16 107:8 150:20
160:25 161:4,6,8,10
205:21 228:10 277:3
323:20

**receiving** 163:14,16
169:7,9 246:19
257:22

**recently** 121:20
122:6 148:21

**recess** 70:11 148:14
188:11 238:7 265:6
307:5 326:23

**recipients** 171:2
321:24

**recital** 198:14

**recitals** 84:21 85:6,9

**recognize** 61:22
62:1,3 64:9 65:14,16
84:4 108:9 113:12
114:11,12 130:17
135:13 151:23
152:22 153:4 154:25
159:2,14 167:17
169:15 170:10 171:2
185:7 277:8 288:13
323:16 326:12

**recollect** 21:11,13
29:16 30:2 39:17
40:18 41:1 43:10,23
53:13 57:6,10,18
58:7,16 59:11 60:13
66:24 67:2 68:25
69:5 75:23 128:24
129:17 150:13 152:3
154:8 272:22 286:15
291:8 292:22 293:24
307:9 321:23 323:22
324:20 325:1

**recollecting** 59:14
308:22

**recollection** 29:3
53:19 57:14 58:23
63:5 66:9 71:17
73:22 74:10,21 76:10
86:13,16 87:5
103:13,22 106:17
111:7,16 114:6
148:5,7 166:11,19
168:1 169:20 171:4,
13 175:7 187:8 247:2
258:1,4,7 267:14
287:7,17 288:6,11
294:1,5 308:14 322:7
323:19 337:23

**recommended**
253:9,15

**reconciliation**
331:21,25 332:3

**record** 7:8 74:1,2,5,7
76:4,5 77:8,11
168:12 169:13
179:12 196:15
298:15 315:15
323:10 338:4

**recorded** 71:25
72:4,17,19,20 73:4,9,
12 74:3 75:1 77:15,
20,22 78:4

**recording** 73:18
76:1,24

**recordings** 72:8
76:16,17,23 77:4
78:3

**records** 29:12,15
146:7 185:19 276:17,
25

**Recreational** 301:6

**red** 290:15 314:22
315:20,23 316:6,21,
24 317:3 319:4,21
321:11,16,17 333:20,
23 334:3,15 336:4

**Redemption** 8:5
89:2 95:19 101:11
102:7 116:8 117:21
118:7 123:18 155:21
185:21 186:18
187:13 251:23 295:9
296:8 316:16 317:14
319:4

**reduce** 261:22
329:21

**reducing** 328:23

**redundant** 193:21
264:19

**Reed** 85:20 188:18
243:10

**refer** 16:7 121:6
204:11

**reference** 145:6,7
225:14 248:4,20

**referenced** 91:5
121:1 230:8 246:14

**references** 101:10
316:6

**referred** 43:15,16,21
232:10

**referring** 7:16 37:22
93:6 111:12 121:4
123:1 127:1 145:14
150:17 157:1 164:24
165:5 183:16 193:18,
20 197:2 204:13
206:1,13 209:1 224:7
225:5 229:3,9 233:6,
22 239:4 248:14
250:9 251:21 271:15
284:8 285:13 298:3
326:9

**refers** 84:20 195:12
207:11

**reflect** 71:17 259:21

**reflected** 213:9

**reflecting** 29:12
248:9 249:11 252:16,
24 257:12 259:16
260:5

**reflects** 333:20

**refresh** 43:7

**refused** 261:20
262:6,13

**regard** 17:4 25:2
35:4 105:5

**register** 49:7,8

**registered** 49:10

**regular** 192:13
231:19 232:20

**regularly** 232:8

**regulator** 229:22

**reimburse** 328:18

**related** 65:11 72:4
76:17 87:21 162:15
199:4,13 320:11

**relating** 89:20
162:13 190:6

**relation** 197:9

Relations 15:5

relationship 31:19, 20,25 32:11,14 55:20 330:23,24

relayed 314:25 318:18

release 261:24

relevancy 273:10 275:23

relied 127:18

rely 138:9

remain 283:24

remainder 321:10

remaining 94:22 166:15 321:16

remains 310:21

remember 21:15 23:12 25:18,19,21 26:17 29:18,22 31:9, 14 39:19 40:11 41:5, 6 57:5 61:13 66:5,14, 16 71:3,15 72:14 73:19,20 74:23 76:12,21 77:22 83:16,17 85:17 88:25 103:10 105:6 106:1, 7,10,11 108:7 109:7 111:18 114:7,10,17, 21 115:10 129:4,10, 12,14,15,21,25 132:12 136:25 144:8 150:4 152:24 159:16 163:20 164:15 165:16,22 167:10,15, 23 168:2,3,4,21,24 169:7,11 170:6,24 173:18 175:14 177:4, 18,22 178:9 180:11 181:13 182:2 186:20, 22 187:10 191:18 193:1,2 199:15 204:9 206:19 217:5 221:3, 17 225:13 229:21 230:23 234:14 238:1 240:4 241:24 244:17 246:14,16,21 247:5, 11 249:14 257:16 265:10,23 266:9 267:10,17,23 268:13, 20 269:12,19,24

274:12 281:22 282:25 283:10 287:4 293:2 307:9,12,22 308:16 310:15 324:3 329:10 333:3

remote 7:23,24

remotely 297:8

renegotiate 171:16

repaid 40:17

repaying 331:15

repeat 18:4 20:1 100:19 101:23 112:4 145:2 157:16 263:23 289:3

rephrase 189:2

report 7:25 11:7,11, 12 20:24 21:3 101:1 208:22

reported 21:7 35:13

reporter 9:25 304:17

reporting 21:5,12,13 35:3 100:10,21 130:8 135:24 138:10 155:11 156:6,18 231:7

reports 11:9

represent 8:5 188:15 195:10 204:16 205:21,24 209:5 213:17 243:1, 3,9,14,18 244:1,3

representation 243:21

representatives 83:22 250:4 251:22, 23,24 272:6 273:3 287:20

represented 202:17 203:11 209:20 246:8 261:13,16,18

representing 203:7 243:19

represents 218:5

request 9:5 148:6,12 288:1

requested 17:12 184:7 310:25 312:22 325:6

requests 286:19 287:1,2,5 309:24

required 225:22 226:6 227:11 228:1 229:23

requirements 145:7 226:12,15

requires 19:15 335:6

Reserve 7:20 12:14

reside 46:12

residence 46:23 47:2,11,18,24 49:1,4 50:5,6

residential 7:11 46:6 48:6 106:16

resign 32:25

resource 27:10

respect 34:20 85:23 201:11 212:11 222:3 225:6 226:15 254:6 335:21 338:4

respond 290:17

responding 315:6

responds 238:24 240:10

response 150:16 182:12 238:21 290:5 292:25 314:9,16 315:1,24 317:15,23 322:7 324:10 333:21 334:5

responses 290:15

responsibilities 10:22 12:8 27:14,19 28:3 35:10

responsible 26:12 154:4

rest 125:23 126:3

restaurant 28:18,25

restructure 285:16 306:25

restructuring 178:13,22 179:1,4

resulting 227:3

results 116:12

retail 85:24 180:13 247:20 251:5 271:3

retain 180:20 247:21 248:3 251:25

return 50:15

returned 180:22 247:24 252:2

returns 50:11 333:5

reveal 44:16

revelation 100:4

revenue 118:17 156:1,6,8,17

revenues 118:20 155:8,11 277:22 279:15 299:6,22 303:11,18

review 138:9 195:2 197:1 204:23 258:18, 19 260:22

reviewed 30:13 191:16 194:20,23 195:10 246:2 253:23 256:13

reviewing 258:1,2 285:19

revise 264:24

right-hand 64:5

ring 112:23 113:2

road 36:25 112:22 205:2 330:10

Rodden 21:14

Roger 40:5 202:21 238:16 239:4,6

role 17:9 23:15,20 52:25 55:15 79:24 80:4,6,18 87:19 116:4 190:8 214:9 230:24 231:3 239:9 311:14

roof 48:13 49:24

**room** 312:12,15 321:2,3,8,9

**roughly** 11:25

**round** 214:25 215:7, 8 218:5,6

**routinely** 35:18,19, 21

**run** 23:14,20 24:3 25:6 158:6 190:6 193:5

**rundown** 282:8

**running** 11:6 24:11, 16 25:4,13 27:24 330:11

**runs** 158:4

**Ryan** 35:12,15 36:1 38:4 39:10 95:12 114:23 126:4 128:1, 15 129:18 140:3 147:13,23 148:6 159:15 161:14 176:1 180:5 211:8

**S**

**safe** 216:22 311:13

**salaries** 26:5 228:10

**salary** 12:23,24 190:15 228:18,21

**salary-based** 190:14

**sale** 41:1 164:20 166:15,22 180:23 198:21 226:13,14 233:3 234:7 247:24 249:3 252:3 261:8, 21,22,24 262:6,13, 17,23 263:25 298:19

**sales** 15:1 189:16 214:17 279:22

**sat** 309:19

**savings** 329:6

**scenario** 236:8

**schedule** 145:25 242:21,24,25 243:6, 9,10,18

**schedules** 231:10

**school** 13:9 14:7,10, 13,14,17

**science** 14:2

**scope** 53:2

**Scott** 38:10 204:24 205:1 230:21 231:21

**scribble** 67:23

**scroll** 103:12

**Sec** 270:13

**second-highest** 251:18

**second-to-last** 279:14 311:2

**seconds** 32:5

**secret** 48:1

**section** 137:15,16 271:6 316:7 320:3 324:7

**sections** 321:15,17

**secure** 235:13

**secured** 145:22 146:24 147:5,24 182:21 234:25 235:4, 12,25

**securing** 235:14,18

**Security** 184:12

**seek** 89:21 335:15, 20

**seeking** 89:7 90:1 103:2

**sell** 108:23 180:22 247:23 252:2 263:14 264:8

**seller** 226:16 239:22

**sells** 198:17

**send** 71:5 107:10,13 113:20 114:1 128:11 155:19 159:7 176:13 183:22 185:14,16 275:20 311:18

**sending** 58:1 113:24 114:7 178:5,20 312:5

**senior** 43:16 138:18, 25 139:11 145:22 146:24 147:5,24 153:5 154:17 178:15 182:21 186:2,4 212:22 285:25 295:25

**sense** 8:12 11:2 152:6 192:22 328:16

**sentence** 102:3 108:22 152:10 172:3 179:12 277:19 337:14

**separate** 218:21 315:11 330:15

**separation** 277:4

**September** 15:14 17:19 69:13 133:25 134:1 190:19 195:20

**series** 171:1 204:20 270:17 289:9 290:1

**serviced** 319:8

**serving** 55:14

**session** 8:16

**set** 25:14 125:24 138:7 176:5,19 193:7 231:10 263:12 288:22 312:18 319:22

**sets** 180:13 187:13

**setting** 55:1 57:16 189:19 293:5 309:13

**settle** 172:6

**shape** 16:16 157:23 294:18

**share** 98:13 110:13, 18 177:20,24 261:8, 21,25 289:16

**shared** 50:6

**shareholder** 172:5 294:9,18,22

**Shareholders'** 138:16

**shares** 108:24 109:16,19 110:1,11 111:14 294:13

**Shawn** 86:3 287:2,4 288:20 289:13

**shed** 139:18

**sheet** 137:12,13 138:2,6 141:21,22,25 142:8,22 144:21 145:3 183:22 185:22 186:2,3,13 251:19 284:13,21

**sheets** 130:5 313:25

**ship** 283:7

**shipper** 283:13

**shippers** 282:24 283:6,8,9,15,16

**shops** 238:22

**shortly** 183:24

**show** 164:19 232:14 291:23

**showing** 114:3 209:16

**shows** 68:1

**Sichlolo** 188:17

**side** 26:24 166:16 207:22 279:15

**sign** 54:25 68:14 170:21 333:18

**signature** 62:3,5,20 64:9 67:20 68:3,5 84:4,7 170:20

**signatures** 170:9,12

**signed** 68:8,20 253:10,21 291:4,11

**signer** 168:23

**signing** 170:1,24

**Silva** 65:13,24,25 66:5,19,22 278:5 307:24 308:2,8,11 313:19

**similar** 67:15

**single** 288:3

**sister** 221:11

**sit** 9:8 44:5 53:12 57:9 66:13 69:1

71:21 74:14,18 76:9
79:5 81:8 82:7 83:15
86:15 87:5 96:13
102:21 105:22
107:18 110:21
120:23,25 150:5
152:6,8 154:16
172:2,10 178:5,9
223:11 286:11 287:6,
18 288:3 306:14
316:23 317:5

**Sitler** 21:14

**sitting** 111:20
190:25 207:17 223:3

**situation** 253:5
254:5 284:4,6,7

**six-acre** 123:4,11

**sizable** 252:12

**size** 65:6

**skill** 25:14 134:18
138:7 193:6

**slept** 48:12

**Slichlolo** 85:24
243:11

**slide** 101:14 102:14,
15 118:9 123:21

**slow** 330:3

**small** 204:18 218:11
222:24

**smaller** 223:1

**SMITH** 16:3 18:2
19:21 20:3 23:17,25
24:18 25:11 26:1,15
27:1,20 28:4 30:22
31:24 32:1,4,8 33:11
34:22,24 35:6,22
37:5,19 38:7,17,23
39:5,14 42:21 43:18
44:10,15,21 45:13
48:3,8,25 49:6 50:1,
21 54:10 55:8 57:24
58:10 62:13,22
64:10,24 66:10 67:17
68:10,16,21 69:21
70:10,12,19 71:19
72:12 74:16 76:19
77:9,18,24 78:6,17
79:10 80:2,7,14,20
81:7 82:3 83:4 84:11

86:19 87:8,24 88:6
90:4,23 92:9,16,20
93:20 94:1,15 95:3
96:3,6 97:12,15 98:4,
15,21 99:2,10,15
100:1,7,14,25 101:22
102:1,17,19 103:3
105:24 106:18 107:4,
21,25 109:22 110:14,
24 112:16,19 115:5,
14 116:16,24 117:11,
16 118:2,23 119:5
120:6,13 121:23
123:24 124:14,20
125:10,18 126:8,14
127:9,19 130:21
131:15 132:4,9,16,22
133:2 134:14 135:17
136:23 137:3,8
138:12 139:2,14
141:2,14,22 143:15
144:15 146:9 147:14
148:1 149:16,21
152:15 153:7,11,17
156:21 157:5 158:1,
10,21 159:20,24
161:2,11,17,20 162:4
163:23 165:2,8
166:12 167:6,13
169:21 170:14
171:20 172:13,23
173:6,15 174:6,17,24
175:13,22 177:8
178:1,6,23 181:5,7,
11,18 184:18 185:3
187:2 188:2,10
191:22 193:24
195:25 199:6,23,25
201:1,21 203:20
206:7 207:2 208:17,
19 210:6,18 211:11,
22 212:14 213:4
214:13 216:12,18
217:24 218:9,23
219:3 220:11,16
222:15,22 224:18
226:9,19 230:9,19
231:1 232:3,17,21
233:10,21 234:5,22
235:15 236:5,12,22
237:3,6,10 239:25
240:17,25 241:9,23
243:24 244:9 246:5
248:5,12,22 249:5,
13,22 250:8 251:16
252:6,18,25 253:12,

16 256:7,15 257:15
258:13 259:17,24
260:8,12 263:4,8,18,
22 264:6 265:21
266:2,4 268:17
269:11 270:21
271:11,18 273:9,15,
20,24 274:4,15,22
275:6,8,13,17,23
276:4,10,19 277:1
278:11,21 279:9
280:8,18 281:16
282:10 284:9 285:22
286:3,8,12 287:10,23
288:8 290:10,24
292:9,17 293:21
294:25 296:16,23
298:10,24 300:4,11,
13,20 301:1,16
302:2,13,19,24
303:8,16 304:2,11,19
305:6,10,18,22
306:11,22 309:1
311:15 313:4,15
314:3 315:2,9 316:1,
11 317:9 318:11,24
319:11,18,24 320:13,
17,22 321:5,20
322:16 323:2 325:3
326:22 327:2,8,11
328:3,9 329:15,23
330:25 331:11 332:1
333:24 334:6,24
335:5 336:17,25
337:7 338:2

**sold** 110:8 262:25
263:15 264:1,2,4

**sort** 107:9 140:17
193:7 274:11

**sought** 102:10,12,13
139:12

**soul** 330:9

**sound** 221:8

**sounds** 297:20

**source** 206:23
222:4,8

**sources** 215:20

**South** 112:22

**spanned** 55:20

**speak** 102:20,24

103:5 125:14 164:6
175:4 188:25 199:18
214:21 240:18
263:10 296:19 297:1,
2 319:16 321:12,17

**speaking** 10:22
99:24 100:15 129:15
189:4 201:5,7,13
203:25 206:3 224:8
235:11 246:16 266:6
308:10

**Special** 13:3

**specific** 18:14 20:21
25:14 36:19 37:21
39:15,20 48:19 54:24
57:19 58:3,23 61:16
73:17 75:4 101:8
106:9 107:15 114:20
129:5 165:15 174:1,
10 192:20 193:1,6
201:6,11,18 202:1,9,
10 213:9 215:16
216:4 218:24 222:3
226:12 234:15 258:1
259:3 262:21 283:18
285:12 286:25
287:12,25 309:24
321:14 322:4 323:7

**specifically** 17:2,5
21:8 24:7 25:3 26:3
29:23 30:6 31:8
33:24 34:16 36:2
37:22 53:13 57:12
58:4,12 60:21 66:18
72:13 74:19 75:22
79:21 81:21 82:12
83:6,13 84:19 86:1
97:23 104:1,5,25
105:6,11 106:1 108:7
114:17 119:11,22
120:4,16,19 121:4
122:7 123:2 129:12
132:11 140:13,23
144:19 157:1,20
164:23 165:4 166:25
167:23 173:3,8
174:25 177:18
181:13 186:23
191:24 192:24
194:12 196:4 216:20
220:3 221:7 229:4
232:23 235:11
249:17 256:11 285:9
286:22 289:18

**307**:14 **315**:25
**323**:21 **325**:6 **336**:9

**specifics** 76:12
136:25 164:15
165:16 181:21 194:1
228:22 235:9 245:21

**speculate** 116:18
117:7

**speculating** 236:7

**Speigel** 221:10

**spend** 42:25 327:18,
20

**spending** 327:24

**spent** 8:11 193:3
330:10

**split** 166:15,22 207:6
248:17,21 249:2
291:12 333:19

**splitting** 41:6 70:14

**spoke** 42:7 189:4

**sports** 325:16

**spot** 9:10,12

**Spousal** 44:21

**spouse** 50:19

**spreadsheet** 131:7
146:18,23 152:12,19,
23,25 153:2

**spring** 58:20 60:9
149:6 150:13,21
285:7

**staff** 10:23 70:1
189:15

**staffed** 189:22

**stamp** 316:19

**standpoint** 210:24
287:17

**stapled** 315:12

**start** 87:19 120:18
143:19 282:22
285:14 293:18 324:2
327:14

**start-up** 217:17
219:4

**started** 10:8 15:24
21:17 45:22,23 54:15
55:22 89:18 190:18
192:4 195:19

**starting** 179:12
195:5

**starts** 89:6 145:22
289:21 301:14

**state** 7:7 45:5 47:8
49:9,10,14,16 113:19
121:20 183:3,20
184:4 226:6,15
266:25 279:18
280:13 282:14 284:2
291:4,16,24

**stated** 17:18 46:10
76:14 130:10

**statement** 99:13,14,
17 124:12,18 134:4,
10,21 156:1 164:1
172:11 183:23,24
281:20 284:14
305:14 318:2,9
326:13 338:3

**statements** 99:9,24
138:8 172:21 279:12
280:3

**States** 200:14

**status** 50:25 107:1,5
123:3 304:24

**stayed** 40:10

**Steady** 118:16

**steps** 324:14,21

**stick** 29:6

**stimulate** 66:8
111:7,16 166:19
169:19 288:11
308:13 322:7

**stipulate** 103:12,21

**stock** 198:22 201:9

**Stoneyside** 7:9
46:11

**storage** 312:17

**store** 109:8 205:1

**stored** 283:17

**stores** 279:24
303:12,19

**Street** 8:3

**strike** 264:13

**structure** 238:25
240:11 311:1,9

**stuck** 182:5 330:11

**stymied** 214:24

**subject** 155:7
166:20 182:20

**submitted** 22:22
227:4,11,15

**subpoena** 276:17,
24

**subscriber** 160:20
161:4,6

**Subscription** 65:11

**subsidiary** 198:17

**substantial** 251:14
257:7

**successful** 121:9

**suggest** 70:7
101:20,24 102:15
158:18

**suggested** 68:13
174:20 185:15

**suggesting** 269:25
276:24

**summaries** 78:21

**summarize** 278:19
279:3

**summary** 140:1,7
187:13

**summer** 33:10

**Sunny** 108:24 109:6,
7,10,13

**Sunny's** 109:12

**supervision** 13:10

**support** 10:25 11:3

**suppose** 153:15
252:14 300:16

**supposed** 9:8 11:5

81:1 116:19 117:8
169:23,24 243:25

**surprised** 218:12

**suspect** 22:8

**suspended** 45:25

**switch** 238:3

**switching** 148:9

**sworn** 7:4 93:12,25
96:1 318:7

———————

**T**

**table** 321:1,17

**takes** 217:18

**taking** 28:17 69:19
70:2

**talk** 9:24 40:22 48:4
57:15 71:4 91:7 95:5
98:9,10 99:7 101:16
121:8 158:3,5 187:16
192:24,25 281:2
288:22 312:11
318:21

**talked** 25:5 31:14
64:13 83:1 112:3,7
174:19 179:15
192:14 202:21
258:16,18 322:5
330:18

**talking** 57:7,21
72:22 99:4,5 109:16
136:22 139:1 147:4
153:5 161:16,23
176:23 177:19,20,24
178:10,21 182:24
183:9 184:9,15,25
187:17 203:13 204:8
218:20 219:24
225:24 233:24
235:20,21 253:21,24
255:20 265:24
269:17 279:14 281:5,
8 284:6 286:21 293:4
294:13 298:1 312:14
321:8 324:25 330:20

**talks** 23:6 85:3 89:7
90:18 96:14 102:9
135:7 164:18 271:3
303:11 309:13

310:11

**tax** 26:18 50:10,15
228:23 332:24 333:5

**taxes** 189:16

**team** 11:4 37:3,8,10,
16,24 38:2,5,9,11,15,
19,21 39:2,8,11
83:23 91:20,23
92:13,23 93:4 94:19
123:20,21 124:4
125:16 126:4,12,16
211:4 214:12 289:22
292:11,15,16,23
306:20,24 326:5,6

**Technically** 229:20

**telling** 185:13,15
267:24 269:21
276:23 289:12
329:22

**tells** 102:5

**ten** 48:15 49:21
52:18 70:8 192:17
307:4 322:25

**tending** 139:22

**Tennessee** 283:5

**tentatively** 179:2

**tenure** 21:18 113:3

**term** 24:21 34:1
38:20,24 54:24 85:3
91:21 186:4 233:13
235:18 262:21
325:14

**terminated** 164:3,14

**terminating** 31:7

**termination** 33:5
162:10,13,14 244:17,
22,25 245:9 258:18
259:5 260:3

**terms** 31:15 41:18
55:4 58:6 61:1 63:6
66:17 73:17 81:24
122:20,22 147:6
166:2 171:14,16
175:9,10 178:13
179:1,4 188:6 226:12
231:23 248:9 249:11
252:16,24 256:22
257:12 259:21

263:21,23 264:2
265:24 273:5 281:8
285:5 286:16 294:21
301:18 308:23
312:23 325:11
326:25 328:14
334:23 335:2

**testified** 7:4 9:17
166:6 191:11,15
192:3 194:19 198:25
202:23 203:17 206:3,
12 219:9 220:7 226:1
227:24 228:15,20
232:1 233:3 239:12
241:13 245:12
255:22 256:3,6
257:25 265:12
266:12 270:24
291:14 334:21

**testimony** 41:19,22
42:3,25 78:23 79:1
93:6,12,25 94:7 96:1
150:21 158:2 195:22
200:15 217:7 232:7
234:16 244:20
246:15,18 257:10,21
261:3 277:23 278:1
318:7 334:15 336:14

**text** 24:25 146:22
223:7,14 224:1,9,24
238:10,13 240:19
314:22 315:20 316:7,
21,24 317:3 319:4
321:11

**thing** 9:23 70:24
93:11 113:25 114:21
117:23,24 189:23
200:9 219:7 263:14,
15

**things** 11:6 16:19,
20,22 19:16 71:4
130:1,4 230:11
238:15 276:2 310:24
314:7 325:8

**Thompson** 38:10
95:10 126:4 230:21

**thought** 26:12
124:25 125:4,7
199:16 201:23 255:6
259:25 285:16 308:6
322:20

**thousand** 329:4

**three-ish** 70:17

**threw** 173:17

**tickets** 330:14

**tie** 272:5 308:22

**ties** 297:25

**tight** 223:11

**Tim** 214:2,5 215:2,6
278:6

**time** 8:11 11:10 12:9,
20,25 14:16 17:15,18
19:16 21:10,16,19
24:14 32:16 39:16
40:12 41:7 42:24
45:25 46:24 49:23
50:5 54:3,8 55:16
61:17 70:14 71:9,10,
25 80:15 83:7,10
84:10,14,17 87:14,17
88:21 92:23,25 93:5
116:5 120:22 136:18
138:10 144:10
148:10 149:13,22
150:1 153:25 156:14
157:10,11,12,18
158:12,15,19 167:12
168:5,15 171:10,19
179:25 181:20 187:9,
10 193:3 199:5,8,10
215:2,21 216:1,2,4,6,
7,9,13,16,17,20
224:16,21 225:8
229:11,15,21 230:2
237:7 238:4,15
243:21 247:4 250:5
258:2 265:14 269:3
270:11 276:13
279:10 282:21 285:2
287:14 294:10,23
297:19 307:3,16
308:15,23 318:14
330:10 332:9,22
335:18

**timely** 225:21

**times** 20:9 21:16
36:3 82:2 137:2
192:15,17,21 256:16
270:22 275:9 303:1
307:7 308:12 309:18
330:5,13

**timing** 101:6

**tissue** 242:3

**title** 10:12 11:22 12:6
20:2 117:12 296:5,6
315:13

**titles** 19:20 20:8,18,
19,20 37:15

**today** 8:16 9:3,25
16:7 41:19 42:3
55:25 57:9 69:1
70:14 71:22 72:13
74:18 75:11,25 78:7
79:5 81:8 82:7 83:15
86:15 87:1,12 96:13
106:23,25 109:25
110:2 111:20 112:3,
7,12 120:23 123:13
139:1 150:21 166:8
172:4,10 178:9
194:20 204:9 214:22
238:1 242:1,14
243:16 244:15
245:13 246:12
254:16 256:14 265:8
269:2,9 286:11,21
287:25 291:14 298:1
307:7 308:12 313:8
316:23 318:7 334:22

**today's** 8:20

**told** 30:24 34:1 64:22
65:19 68:8,19 70:1
77:21 80:21 101:6
128:15 129:2,3 162:7
268:14 281:14
294:14 322:20 336:3

**top** 131:2 142:3
156:8,10 180:12
182:8 191:6,7 194:25
198:16 207:21 223:9
227:1 238:14 245:9
248:10 249:25 251:3
261:19 288:21 295:5
311:9 314:19 320:24

**topic** 234:16 238:6

**topics** 148:9 188:20
238:3 290:1

**total** 10:7 97:5
144:24 145:4 250:21,
24 251:10,14 305:5

**totaling** 146:3

**town** 121:16

**training** 13:10

**transaction** 29:20 30:5 31:4,7 122:11 196:19 204:21 208:21 212:7 227:2

**transactions** 33:15, 20 34:2,7,20 35:1,3 135:14 206:5 222:10, 19 330:15

**transcript** 9:25

**transfer** 226:7 227:3 228:1 275:21

**transferred** 110:8 206:17 227:18,20 261:25

**transferring** 226:12, 16

**transfers** 227:6

**transmission** 322:3

**transmit** 148:6 312:19

**transmitted** 147:13

**travel** 29:13

**traveled** 36:14,22 53:10 330:8

**traveling** 36:23 330:6,12

**travels** 46:24

**Tresorit** 312:12,14 321:9

**trial** 9:20

**trip** 40:15 41:10

**tripled** 299:7

**true** 28:7 54:3 85:20, 23 90:8 98:20 100:12,22 115:3 116:21 117:6 118:22 123:23 125:25 126:7, 10 130:9 143:1,4 164:4,8 180:24 181:16 196:22 209:23 270:20 290:21 301:22 303:6, 14 306:19 316:23,25 318:9

**true-and-accurate** 280:2

**trust** 221:23 228:6, 25

**truthful** 36:20

**truthfulness** 319:17,22

**turn** 155:1 198:13 255:6 333:14

**tutoring** 193:7

**two-ish** 70:17

**two-year** 286:16

**type** 106:11 313:11

**typed** 68:2

**types** 16:20 129:23 255:25

**typically** 34:25 35:9 38:3,8 81:22 88:8 219:5

**U**

**U.S.** 201:8 202:7 297:7,19

**ultimate** 41:1

**ultimately** 81:17,24 201:20 203:19 218:14,16 219:9

**um-hum** 8:7,14 9:4 37:12 42:8,11 94:21 103:16,18 115:22,24 117:13 135:6 143:10 155:5 169:10 176:16, 18,21,24 182:16 186:1 190:2 195:21 198:3 202:15,22,25 203:16 206:15 207:10 210:2 211:18 213:1,19 219:13 223:5,10,15 226:3 242:23 251:2 265:11 311:3 314:14 316:9 320:9 328:1 329:12

**unable** 306:13

**uncertain** 180:9

**uncomfortable**

192:18

**undergo** 198:21

**undergraduate** 13:23 14:16

**underneath** 11:22

**understand** 8:17,20 22:21 24:1,17 30:10 35:20 41:19 52:24 54:23 56:16 63:9 71:23 81:15 91:22 93:5 97:17,19 115:9 116:22 117:1,4 140:25 143:20 189:6 190:18 191:3 195:9, 19 196:25 198:25 200:15 201:25 202:12 207:11 215:5 232:7 233:12,15 234:18,23,24 238:25 240:11,13 242:25 243:8 244:2 246:1,18 249:25 257:8 260:21, 22 264:20 276:20 284:3 296:21 298:5, 9,22 299:1,2,3 302:5, 20 304:3 314:24 315:23 318:19 321:4 325:14 327:6 330:17, 22

**understanding** 40:15 80:25 81:23 83:2 193:22 194:19 196:6 199:3,20 200:24 202:1 203:18 230:6 231:25 232:11, 19 235:18 254:7,10, 13 257:21 262:25 264:17 335:24 337:17

**understood** 8:25 104:18 200:16 201:16 226:1 250:17 256:3

**underwritten** 198:21

**unfettered** 228:8 230:14

**United** 200:14

**unlimited** 212:11

**update** 185:11,14,16

187:14,15 238:14 295:10,24,25 296:13, 15,21 300:3,10,17,18 303:23 304:6

**update/talking** 184:8

**uptake** 330:4

**Utah** 283:19,22

**utilize** 327:1 329:20

**utilized** 325:2,5,6,7, 9

**V**

**vague** 335:17

**valid** 261:1

**valuation** 326:2

**valued** 102:4,6 111:22 112:14 140:11 168:17,25 169:8 170:22 179:17 247:16 271:15 272:1 296:6,12 297:6,18 306:6,15 311:9 317:8

**Valued's** 298:20

**valuing** 325:22

**varied** 21:9

**varies** 62:7

**vary** 27:25 37:20 62:9

**vendors** 222:25

**veracity** 299:19

**verbal** 254:1,8

**verify** 149:2 300:1 317:2

**version** 254:22

**versions** 62:10,12, 20

**vetted** 181:25

**vice** 10:13,21 11:14, 18,21,22,23

**view** 20:20 38:8

**viewed** 20:5 125:11

views 12:14

VIII 260:18

violations 239:22

virtually 228:8
230:14

vis-a-vis 52:25
80:18 286:20 330:20

visits 231:23

vouch 319:22 320:1
321:12,18

---

**W**

W2 228:21

W2s 26:7

wait 157:15

Wall 8:3

wanted 19:6 74:7
76:5 115:9 179:3
185:14 221:24
255:19 300:15
306:20

warehouse 106:17

ways 11:4 51:25
242:16 276:11

Weadock 287:3
288:20

Weadock's 287:4

week 22:8 151:15
156:1,8,18 167:21
175:21 176:15 179:2,
14 183:1,4 192:11
214:22 250:16
272:10,13,17

weekly 156:6 322:19

weird 268:19,22

Wells 207:21 208:23
209:14

whatsoever 159:18,
22

whereabouts 8:2

wide 27:13,16,24

wife 330:10

Windstar 14:24,25

wire 211:16,20 212:7
222:19,24 275:21
329:7

wired 81:22

wires 212:11

withdrawal 204:25

wondering 257:1

wood 266:21

word 35:20 80:6,9
140:25 248:25

words 280:24 298:8

work 7:22,25 12:19
13:18 14:6,8,19
15:25 18:12 35:15
36:22 51:10 54:7
56:11,14 69:6 144:18
190:3 201:4 232:11
297:7

worked 12:9,25 13:2
14:12,22 15:4 19:19
36:9,20 189:18,22
230:21 292:11
337:12

working 19:17 36:4
184:5 189:20 191:9
199:10,12 282:16
330:11

works 193:4 232:12,
14

world 12:13

worried 77:12

worth 242:6

Worthington 39:25
202:21 239:4,6

wrap 9:6

write 238:14 262:7
275:21 281:24 296:2
298:2,5,7 299:16
300:6 301:9,12,21
302:11 318:6,8 320:2

writing 179:4 238:12
299:18,20 328:20
335:3

written 20:9 41:15
195:7 237:20 248:9

249:10 252:16,23
253:10,21 257:11
259:15,21 260:2
262:9 274:7 314:20
317:7 336:4

wrong 133:14
174:12,18 250:2
256:4 257:10 329:18

wrote 125:21 164:6
301:24 302:4 315:25
316:3,24 317:3,16
319:5,15 320:2
334:4,15

---

**Y**

year 13:20 26:7
48:12 75:5 133:23
183:21 198:19 333:5

years 10:7,20 12:1
19:4 49:21 73:3
192:10 228:9

yesterday 88:20
89:15 148:22,23
163:6

York 7:10,20 8:1
46:19,22 48:22 49:2,
14 73:21 109:9 232:5

---

**Z**

Zabriskie 95:16

Zoom 309:14,20