# Exhibit G

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  --------------------------------------------
3  FLOYD'S OF LEADVILLE, INC., n/k/a VALUED, INC.,
4             Plaintiff,
5          -v-      No. 1:22-cv-03318
6  ALEXANDER CAPITAL, LP; NESA MANAGEMENT LLC;
   JOSEPH ANTHONY AMATO; ROCCO GERARD
7  GUIDICIPIETRO; JONATHAN GAZDAK; GREGORY F.
   HURLEY; HOWARD DASILVA; RONALD BARRIE CLAPHAM;
8  MARK DAVID LEONARD; THIEN TRUONG; PROVISION
   HOLDING INC., TIMOTHY KELLY; and THREE DDD LLC,
9
            Defendants.
10 --------------------------------------------
11
12
13        CONTINUED REMOTE VIDEOCONFERENCE
14 DEPOSITION OF ALEXANDRA MERLE-HUET, a Witness
15 herein, taken by the Defendant, on Wednesday,
16 September 4, 2024, at 3:00 p.m., before Jeffrey
17 Shapiro, a Stenographic Reporter and Notary
18 Public, within and for the State of New York.
19
20
21
22
23
24
25



```
 1   A P P E A R A N C E S :

 2   HOLCOMB & WARD, LLP

 3      Attorneys for the Defendants

 4      3455 Peachtree Road, Suite 500

 5      Atlanta, Georgia 30326

 6   BY:  BRYAN WARD, ESQ.
          HOLLY COLE, ESQ.
 7        AARON WRIGHT, ESQ.

 8

 9
     LAW OFFICE OF PAUL RACHMUTH, ESQ.
10
        Attorneys for the Defendants RONALD BARRIE
11      CLAPHAM and MARK DAVID LEONARD

12      265 Sunrise Highway, Suite 62

13      Rockville Centre, New York 11570

14   BY:  PAUL RACHMUTH, ESQ.

15

16
     VEDRA LAW, LLC
17
        Attorneys for the Plaintiff
18
        1444 Blake Street
19
        Denver, Colorado 80202
20
     BY:  DANIEL VEDRA, ESQ.
21

22
     Also Present:
23
     DANA BACHMAN, Videographer
24

25
```



1

2

3

4

5

6           IT IS HEREBY STIPULATED AND AGREED by

7    and between the attorneys for the respective

8    parties hereto, that the filing, sealing and

9    certification be, and the same are hereby

10   waived;

11

12          IT IS FURTHER STIPULATED AND AGREED

13   that all objections, except as to the form of

14   the questions, shall be reserved to the time of

15   the trial;

16

17          IT IS FURTHER STIPULATED AND AGREED

18   that the within examination may be subscribed

19   and sworn to before any notary public with the

20   same force and effect as though subscribed and

21   sworn to before this Court.

22

23

24

25



```
 1                   Huet

 2

 3              (Time noted:  3:24 p.m.)

 4        THE VIDEOGRAPHER:  Good afternoon.

 5   We are now on the record at 3:24 p.m.,

 6   Eastern Time, on September 4th, 2024.

 7   This begins the video conference

 8   deposition of Alexandra Merle-Huet taken

 9   in the matter of Floyd's of Leadville,

10   Incorporated, et al, versus Alexander

11   Capital, LP, et al, filed in the U.S.

12   District Court Southern District of New

13   York.  Case Number 1:22-CV-03318.

14        My name is Dana Bachmann, I'm your

15   videographer today.  The court reporter

16   is Jeffrey Shapiro.  We're both

17   representing Esquire Deposition

18   Solutions.

19        Would everyone present please

20   identify themselves beginning with the

21   noticing attorney.

22        MS. COLE:  Hi, good afternoon.  This

23   is Holly Cole with Holcomb & Ward.  I'm

24   joined remotely by Bryan Ward and Aaron

25   Wright, also with Holcomb & Ward, and we
```



1                 Huet

2  represent Alexander Capital, LP, Nesa

3  Management LLC, Joseph Amato, Rocco

4  Guidicipietro and Jonathan Gazdak.

5        MR. RACHMUTH:  This is Paul Rachmuth

6  from Paul Rachmuth Law Office PLLC

7  representing Barrie Clapham and Mark

8  Leonard.

9        MR. VEDRA:  This Dan Vedra from

10  Vedra Law, LLC on behalf of the

11  plaintiff.

12        THE VIDEOGRAPHER:  Thanks very much.

13        Mr. Reporter, would you kindly swear

14  in our witness.

15        THE REPORTER:  Would you raise your

16  right hand?

17        (The witness complied.)

18        Do you swear that your testimony

19  today shall be the truth, the whole

20  truth, and nothing but the truth?

21        THE WITNESS:  I do.

22        THE REPORTER:  Please state your

23  name and address for the record.

24        THE WITNESS:  Alexandra Merle-Huet,

25  61 Stoneyside Drive, Larchmont, New York



```
 1                    Huet

 2        10538.

 3            THE REPORTER:  Your witness,

 4        Ms. Cole.

 5

 6                DIRECT EXAMINATION

 7   BY MS. COLE:

 8        Q.    Good afternoon.  Thank you for

 9   rejoining us.

10            Have you taken any medication since

11   the earlier deposition session that adjourned

12   at 1:30 that might impair your ability to

13   testify truthfully and accurately today?

14        A.    No.

15        Q.    Is there any other reason since we

16   adjourned at 1:30 that would impair your

17   ability to testify truthfully and accurately

18   today?

19        A.    Not that I'm aware of.

20        Q.    Since the prior deposition session,

21   have you spoken with anyone about this

22   deposition?

23        A.    Not that I can recall.

24        Q.    Since the prior session earlier

25   today, have you reviewed any documents in
```



```
 1                     Huet
 2    connection with this case or this deposition?
 3          A.    No.
 4          Q.    Since the prior session, have you
 5    had the chance to refresh your memory on some
 6    of the topics that we discussed, such as your
 7    employment status?
 8          A.    No.
 9          Q.    Same question for your employment
10    history.
11          A.    What's the question?
12          Q.    Have you had any occasion to
13    refresh your memory on your employment history?
14          A.    I have not.
15          Q.    Have you had any occasion to
16    refresh your memory on your relationship with
17    Floyd Landis?
18          A.    I have not.
19          Q.    Is Mr. Landis present with you
20    today at the address where you are located?
21          A.    Not that I'm aware of.
22          Q.    I believe I saw him on screen
23    behind you earlier when you were drinking
24    something.  Is he not present in the house with
25    you?
```



```
 1                        Huet
 2          A.    No.
 3          Q.    How did you get the link for this
 4   second session of the deposition today?
 5          A.    My lawyer sent it to me.
 6          Q.    How did he send it to you?
 7          A.    I have to go back and check.  I'm
 8   not sure.
 9          Q.    Did he e-mail it to you?
10          A.    I don't think so.
11          Q.    Did he text it to you?
12          A.    Possibly.  I don't know.  I have to
13   go back and check.
14          Q.    Are you receiving text messages
15   right now during the deposition?
16          A.    Yes.  I don't know how to turn it
17   off.  It's my sister.  If I turn off the sound
18   of the notifications, it turns off my whole
19   sound.  So, I don't know how to -- maybe
20   somebody can show me how to do it.
21          Q.    You don't have the ability to just
22   silence the phone?
23          A.    It's not from any phone.  It's on
24   my laptop.
25          Q.    Do you have any notes with you
```



```
 1                    Huet
 2   today?
 3        A.    No.
 4        Q.    Were you communicating
 5   electronically by text with anyone during the
 6   prior deposition session?
 7        A.    No.
 8        Q.    I just want to go through some
 9   various iterations of your name.
10          Do you ever go by Alex Merle?
11        A.    Not really.  I think I -- I did
12   focus, I think I figured out how to silence my
13   texts on my laptop.  Okay.
14            MS. COLE:  I apologize for this, but
15        I need to take a two-minute break.  So,
16        if we can go off the record for two
17        minutes.  I just have to step away from
18        my desk for an emergency.  I'll come
19        right back.
20            THE VIDEOGRAPHER:  Off the record at
21        3:29 p.m., Eastern Time.
22            (Recess taken.)
23            THE VIDEOGRAPHER:  On the record at
24        3:31, Eastern Time.
25   BY MS. COLE:
```



Huet

1

2     Q.    I just want to go back to the last

3  question.  I had asked whether you had ever

4  gone by the name Alex Merle, and you said "not

5  really."

6     A.    You're right.  I'm sorry.  I

7  apologize for that.  That's before I was

8  married, I did, it's my maiden name.

9     Q.    What about Alexandra Merle, do you

10  ever go by that name?

11     A.    Isn't that what you just asked me,

12  Alexandra, or did you say Alex?

13     Q.    I said Alex the first time.  Now,

14  I'm asking about your full name Alexandra.

15     A.    That's my full name.

16     Q.    Alexandra Merle?

17     A.    Is my full maiden name.

18     Q.    And do you still sometimes go by

19  your full maiden name?

20     A.    Sometimes.  I mean, occasionally,

21  just when I get lazy and don't feel like

22  writing out the Huet part.

23     Q.    Okay.  Do you go by Alex

24  Merle-Huet?

25     A.    Yes, or Alexandra.



```
 1                    Huet
 2       Q.    Okay.  So, either Alex Merle-Huet
 3  or Alexandra Merle-Huet?
 4       A.    Yes.
 5       Q.    Have you ever referred to Floyd
 6  Landis as your partner?
 7       A.    I don't recall.
 8       Q.    Do you know if Mr. Landis has
 9  referred to you publicly as his partner?
10       A.    I don't know.
11       Q.    What is your daughter's full name?
12       A.    Margaret Landis.
13       Q.    Do you consider Floyd Landis to be
14  her father?
15       A.    I -- previous -- same answer to the
16  same question previously, which is I don't
17  know, one can't know for sure.
18       Q.    But she goes by his last name; is
19  that correct?
20       A.    They have the same last name.
21       Q.    I am going to show you what -- and
22  I'm going to skip ahead in exhibit numbers for
23  just a few minutes.  So, I'm going to show you
24  an exhibit marked as Defendants' Exhibit 26.
25            (Exhibit 26 was so marked for
```



```
 1                    Huet
 2      identification.)
 3              THE WITNESS:  Okay.
 4   BY MS. COLE:
 5          Q.   And I'll represent to you that this
 6      is a printout from the FloydsofLeadville.com
 7      website from today at 12:24 p.m., and I would
 8      ask that you go to the fourth page of this
 9      document.
10          A.   Okay.
11          Q.   Is that a picture of you?
12          A.   Yes.
13          Q.   Are you aware that there is a
14      picture of you currently on the Floyd's of
15      Leadville website?
16          A.   Nope.
17          Q.   Do you recall having this picture
18      made?
19          A.   No.
20          Q.   Can you tell me what is in the
21      background behind you?
22          A.   Just -- I'm not sure what's
23      there --
24          Q.   Is that the Floyd's of Leadville
25      logo?
```



1                           Huet

2          A.    I don't know what their logo is.

3          Q.    This says, "Alexandra Merle is the

4     president and COO of Floyd's of Leadville."

5     Are you the president and COO of Floyd's of

6     Leadville?

7          A.    Nope.

8          Q.    Have you ever been the president

9     and COO of Floyd's of Leadville?

10         A.    Unsure.

11         Q.    Unsure or you are sure?

12         A.    Unsure, not sure.

13         Q.    It says here that "Alex draws from

14    her extensive operations experience and deep

15    knowledge of financial market from various

16    roles at the Federal Reserve over a 14-year

17    span."

18              Is that a true statement?

19         A.    I don't know.  I didn't write it.

20         Q.    Do you have extensive operations

21    experience and deep knowledge of financial

22    markets?

23         A.    I don't know.  Different people

24    have different interpretations.  I don't know.

25         Q.    Did you work at the Federal Reserve



1                        Huet

2   over a 14-year span?

3          A.    I worked at the Federal Reserve

4   Bank of New York.

5          Q.    The next sentence says, "Not only

6   does she manage the short and long-term

7   business operations of Floyd's of Leadville,

8   she also oversees product development, HR,

9   farming operations, retail accounts and

10  marketing strategies."

11          Is that a true statement?

12         A.    I don't know.  I didn't write this.

13         Q.    Do you manage the short and

14  long-term business operations of Floyd's of

15  Leadville?

16         A.    No, not that I'm aware of as of

17  right now.

18         Q.    Have you ever managed the short and

19  long-term business operations of Floyd's of

20  Leadville?

21         A.    I'm not sure.  I don't recall.

22         Q.    Have you ever done any kind of work

23  with Floyd's of Leadville?

24         A.    I don't -- I don't recall.

25         Q.    And it also says, "She oversees



1                    Huet

2    product development."  Do you oversee product

3    development at Floyd's of Leadville?

4         A.    No.

5         Q.    Have you ever overseen product

6    development at Floyd's of Leadville?

7         A.    Not that I can recall.

8         Q.    It also says that you oversee HR.

9    Do you oversee HR at Floyd's of Leadville?

10        A.    No.

11        Q.    Have you ever overseen HR at

12   Floyd's of Leadville?

13        A.    Not that I can recall.

14        Q.    It says here also that you oversee

15   farming operations and retail accounts.

16           Do you oversee farming operations and

17   retail accounts?

18        A.    No.

19        Q.    Have you ever overseen farming

20   operations and retail accounts?

21        A.    Not that I can recall.

22        Q.    And finally, it says in this

23   sentence, "She also oversees marketing

24   strategies."  Do you oversee the marketing

25   strategies for Floyd's of Leadville?



1                    Huet

2          A.    No.

3          Q.    Have you ever overseen the

4    marketing strategies for Floyd's of Leadville?

5          A.    Not that I can recall.

6          Q.    And then the last sentence here

7    states, "In fact, there isn't any operational

8    component of the company that she doesn't

9    touch."

10             Is that a true statement?

11         A.    I don't know.  I didn't write it.

12         Q.    I didn't ask whether you wrote it.

13   I asked whether it's true?

14         A.    I don't know.  I mean, no.

15         Q.    It's not true?

16         A.    Not that I'm aware of, no.  Not

17   true.

18         Q.    It's not true.  Okay.  Have you

19   ever -- had there ever been a time where you

20   oversaw all operational components of the

21   company?

22         A.    Unsure.

23         Q.    Is your dog in the room, still?

24         A.    He is.

25         Q.    Okay.  I was trying to figure out



```
 1                         Huet
 2     what that noise was.
 3            Am I to understand that it's your
 4     testimony that because you didn't write this
 5     paragraph, that you don't know whether the
 6     information in it is true and accurate?
 7            MR. VEDRA:  Objection to form.
 8            THE WITNESS:  It is my testimony
 9        that I don't know what this is and I
10        don't recall any of this information.
11   BY MS. COLE:
12        Q.    Have you ever been on the website
13     for Floyd's of Leadville?
14        A.    I don't remember.  I don't know.
15        Q.    Have you ever authorize anyone to
16     put your picture and information about you on
17     the Floyd's of Leadville website?
18        A.    I'm unsure.
19        Q.    I'm going to show you a document
20     that I have marked as Defendants' Exhibit 27.
21            (Exhibit 27 was so marked for
22     identification.)
23   BY MS. COLE:
24        Q.    Do you recognize this as a printout
25     from your LinkedIn page?
```



```
 1                        Huet

 2        A.    I'm not sure.

 3        Q.    Do you have a LinkedIn page?

 4        A.    I'm not sure.

 5        Q.    You're not sure whether you have a

 6  profile in LinkedIn?

 7        A.    I haven't checked it recently.  I

 8  don't know.

 9        Q.    Who would have created this if you

10  did not create this?

11        A.    I don't know.

12        Q.    Well, let's go through it and see

13  if the information in there is something that

14  you can testify about.

15             MR. VEDRA:  How is this relevant?

16             MS. COLE:  I'm sorry?

17             MR. VEDRA:  I object to any

18        questions about her LinkedIn profile.  I

19        don't know how this is relevant to --

20             THE WITNESS:  It's a little creepy

21        that you're stalking me on LinkedIn in

22        the middle of the deposition.  But I'll

23        answer questions, whatever, I mean.

24             MS. COLE:  Well, relevance is not a

25        proper objection, Mr. Vedra.  She has not
```



```
 1                        Huet

 2          been able to testify about her employment

 3          history, she says that she's not sure of

 4          whether she's even employed.  These

 5          LinkedIn pages are social media, it's a

 6          public website, people often refer to it

 7          to find out background information about

 8          people in litigation, and so I'm going to

 9          ask you questions about this.

10   BY MS. COLE:

11          Q.    Are you the chief of staff and head

12     of GMA strategy at BMP Paribas?

13          A.    I'm unsure.

14          Q.    Were you previously the chief of

15     staff to the market group at the Federal

16     Reserve Bank of New York?

17          A.    I was.

18          Q.    It says here, "Alex is also

19     cofounder of Floyd's of Leadville, a CBD

20     product start-up company when she worked as

21     chief operating officer from 2018 to 2020."

22            Is that correct?

23          A.    I'm not sure.

24          Q.    Are you the cofounder of Floyd's of

25     Leadville?
```



```
 1                    Huet
 2        A.    I don't know.
 3        Q.    When you say you don't know, what
 4   does that mean?
 5        A.    That I do not know.
 6        Q.    Have you cofounded any company?
 7        A.    I don't know.
 8        Q.    Have you ever created a LinkedIn
 9   profile?
10        A.    I don't recall.
11        Q.    Do you have any reason to believe
12   this is not you're LinkedIn profile?
13        A.    I don't know.  I can't verify it.
14        Q.    Did you have any involvement in the
15   creation of Floyd's of Leadville?
16        A.    I'm unsure.
17        Q.    This says that, "She was an advisor
18   to the head of the market group in the
19   implementation of monetary policy as directed
20   by the Federal Reserve market committee."
21             Is that true?
22        A.    I'm unsure.
23        Q.    Did you lead the market group
24   strategy for the Federal Reserve security
25   portfolio?
```



1                          Huet

2          A.    I don't recall.

3          Q.    Did you support the management of

4     the Federal Reserve security portfolio?

5          A.    I don't know.

6          Q.    This also says, "Alex played an

7     important role in the development and

8     implementation of the Federal Reserve actions

9     and response to the COVID-19 pandemic."

10              Is that an accurate statement?

11         A.    I'm unsure.

12         Q.    Did you play any role in the

13    development and implementation of the Federal

14    Reserve action in response to the COVID-19

15    pandemic?

16         A.    I don't recall.

17         Q.    It says, "-- helping to design and

18    manage several facilities to support market

19    functioning and -- household business centers."

20              Is that an accurate statement?

21         A.    I don't know.

22         Q.    Is there anything on this LinkedIn

23    profile that you can say specifically that you

24    did not write?

25         A.    I'm unsure.



```
 1                        Huet
 2       Q.    Is there any reason to believe that
 3  you did not write anything on this document?
 4       A.    I don't know.
 5       Q.    Did you begin working at the
 6  Federal Reserve Bank of New York in 2004?
 7       A.    (Unclear.)
 8       Q.    Did you serve in various roles
 9  while you were employed with the Federal
10  Reserve Bank of New York?
11       A.    I don't recall.
12       Q.    Did you start in bank supervision?
13       A.    I don't know.  I don't recall.
14       Q.    At some point did you transfer to
15  the office of the president under Timothy
16  Geisner at --
17       A.    I don't remember.
18       Q.    Did you oversee a portfolio from
19  Bear Stearns after the financial crisis in the
20  special investment management group?
21       A.    I don't recall.
22       Q.    Did you work in payment policy
23  focusing on domestic and international payment
24  issues?
25       A.    I don't recall.
```



1                        Huet

2          Q.    It says here that, "Prior to

3     joining the Federal Reserve, Alex worked as a

4     counsel on foreign relations."

5              Is that an accurate statement?

6          A.    I don't know.

7          Q.    Did you work as a counsel on

8     foreign relations?

9          A.    I don't recall.

10         Q.    It says that, "Alex holds a

11    bachelor's degree from Georgetown University."

12             Is that an accurate statement?

13             MR. VEDRA:  Objection; asked and

14         answered.

15             MS. COLE:  I asked her if she had a

16         degree.  I have not asked her whether or

17         not this statement on this document is

18         correct.

19             You may go ahead and answer.

20             THE WITNESS:  So, what is the

21         question?

22    BY MS. COLE:

23         Q.    It says here, "Alex holds a

24    bachelor's degree from Georgetown University."

25             Is that an accurate statement?



1                          Huet

2          A.    Can you repeat that?

3          Q.    "Alex holds a bachelor's degree

4    from Georgetown University."

5               Is this an accurate statement?

6          A.    So, I hold bachelor's degree from

7    Georgetown.

8          Q.    So, that is an accurate statement;

9    correct?

10         A.    I'm not sure where you're reading

11   from, so I don't feel comfortable saying you're

12   reading from an accurate statement, but I did

13   go to Georgetown.

14         Q.    Well, take a look at the exhibit

15   that's in front of you --

16         A.    Yeah, I don't feel comfortable

17   trusting whatever you're putting in front of

18   me, but if that's what you're reading from, I

19   did go to Georgetown, yes.

20         Q.    Well, you said you didn't know what

21   I was reading from, I'm explaining to you what

22   I was reading from.  This LinkedIn profile has

23   your name on it, it also states that, "Alex

24   holds a master's in international affairs from

25   Columbia University."



1                           Huet

2              Is that an accurate statement?

3         A.    I hold a master's from Columbia

4    University School of International Public

5    Affairs.

6         Q.    I'm going to show you a document

7    that I have marked as Defendants' Exhibit 28.

8              (Exhibit 28 was so marked for

9    identification.)

10   BY MS. COLE:

11        Q.    If you could take a minute to look

12   at this document and tell me if you recognize

13   it.

14        A.    No, I do not.

15        Q.    Do you see at the bottom of the

16   page, there's a yellow exhibit sticker that

17   says "DEF-28"?

18        A.    Yes.

19        Q.    And then below that, it says,

20   "Redemption_CNF_subpoena_002914."

21              Do you see that?

22        A.    Yes, I see that.

23        Q.    And then under that, do you see a

24   text that reads, "FOL-SDNY11034"?

25              Do you see that?



```
 1                     Huet
 2        A.    I do see that.
 3        Q.    I'm going to represent to you that
 4   these are Bates numbers that were applied by
 5   the plaintiff in this case, Floyd's of
 6   Leadville, when they produced this document in
 7   discovery.
 8             MR. VEDRA:  Objection to form.  You
 9        may not take that representation,
10        Ms. Merle-Huet.
11             MS. COLE:  I'm sorry, why not?
12             MR. VEDRA:  Because Redemption --
13        was not applied by the plaintiff in this
14        case.
15             MS. COLE:  Was FOL-SDNY11034?
16             MR. VEDRA:  I'm not the witness.
17             MS. COLE:  Well, you're inserting an
18        objection advising her and advising me
19        that this was not the Bates number that
20        you assigned.  So, now, I'm asking you to
21        confirm, did you assign FOL-SDNY11034?
22             MR. VEDRA:  You misrepresented the
23        labelling, and that's what I was
24        correcting.  I'm not here to answer your
25        questions.
```



1                    Huet

2              MS. COLE:  But you advised her not

3         to take my representation.

4              MR. VEDRA:  I did, because it was

5         wrong.

6              MS. COLE:  We're going to go off the

7         record for a minute.  We'll take a

8         five-minute break.

9              THE VIDEOGRAPHER:  Off the record at

10        3:50 p.m., Eastern Time.

11              (Recess taken.)

12              THE VIDEOGRAPHER:  On the record at

13        3:58 p.m., Eastern Time.

14   BY MS. COLE:

15         Q.    Okay.  Ms. Merle-Huet, this is a

16    document with the Bates number FOL-SDNY11034.

17    It was produced by the plaintiff in this case

18    in discovery.  I marked it as Defendants'

19    Exhibit 28.  At the top of this document, it

20    states that it's a message from Peter DiChiara

21    sent on April 22nd, 2019 to

22    Floyd@FloydsofLeadville.com,

23    FrankDiMartini@AlexanderCapital.com and

24    AlexandraMerle@FloydsofLeadville.com.

25              Do you recognize this document?



1                           Huet

2          A.    No.

3          Q.    Did you receive this document?

4          A.    I have no idea.  I don't know.

5          Q.    You don't recall receiving an

6     e-mail from Peter DiChiara on April 22nd, 2019

7     in regards to FOL interest?

8          A.    No, I do not.

9          Q.    Is there any reason why you would

10    not have received this e-mail at your

11    Alex@FloydsofLeadville.com e-mail address?

12         A.    I don't know.

13              (Discussion off the record.)

14    BY MS. COLE:

15         Q.    I want to show you a document that

16    I've marked as Defendants' Exhibit 29.

17              (Exhibit 29 was so marked for

18    identification.)

19    BY MS. COLE:

20         Q.    If you look at the bottom of this

21    document in the left-hand corner, you will see

22    an exhibit sticker, and under that, you'll see

23    some text, it says FOLSDNY01549.  This was a

24    document produced by the plaintiff in this

25    case, Floyd's of Leadville, Inc. in discovery.



1                      Huet

2           Do you recognize this document?

3      A.    No.

4      Q.    Have you seen a similar document

5  before?

6      A.    No.

7      Q.    Do you recognize this logo of

8  Floyd's of Leadville at the top of the page?

9      A.    I'm unsure.

10      Q.    Have you ever seen this logo

11  before?

12      A.    Not that I can recall.

13      Q.    Could you please take a look at

14  page 3 of this exhibit.

15      A.    Okay.

16      Q.    At the top, it says, "Management

17  team."

18           Do you see that?

19      A.    I do.

20      Q.    And it identifies Floyd Landis as

21  founder and chief executive officer.  And then

22  the fourth name down, is that your name,

23  Alexandra Merle-Huet?

24      A.    Yes.

25      Q.    Did you authorize anyone no



1                      Huet

2      identify you as part of the Lloyd's of

3      Leadville management team on the marketing

4      deck?

5              A.    I don't recall.

6              Q.    Do you have any objection of being

7      identified as a member of the Floyd's of

8      Leadville management team on this marketing

9      deck?

10             A.    I don't work there.

11             Q.    Have you ever worked there?

12             A.    I'm not sure.

13             Q.    So, you're sure you don't work

14     there now, but you're not sure whether you

15     worked there previously?

16             A.    Yes.

17             Q.    I'm going to show you a document

18     that I have marked as Defendants' Exhibit 30.

19             (Exhibit 30 was so marked for

20     identification.)

21     BY MS. COLE:

22             Q.    Do you see the document on your

23     screen?

24             A.    Yes.

25             Q.    And it looks the last document we



1                    Huet

2     were just looking at.  At the bottom, it has an

3     exhibit sticker, which is DEF-30, and then

4     below that, there's a Bates number

5     FOLSDNY01781, and that's the Bates number on

6     the document that was produced by the plaintiff

7     Floyd's of Leadville, Inc. in discovery in this

8     case.  I would like to direct you to page 3 of

9     this document.

10            Are you looking at page 3?

11        A.    Yes.

12        Q.    And at the top, it says,

13    "Management Team"; is that right?

14        A.    Yes.

15        Q.    And then the fourth name down, is

16    that your name Alexandra Merle-Huet?

17        A.    Yes.

18        Q.    And besides your name, what does it

19    say?

20        A.    "Senior advisor."

21        Q.    Are you the senior advisor to

22    Floyd's of Leadville?

23        A.    No.

24        Q.    Have you ever been a senior advisor

25    to Floyd's of Leadville?



1                          Huet

2          A.     Not that I can recall.

3          Q.     Did you authorize anyone to

4    identify you as the senior advisor for Floyd's

5    of Leadville on this marketing deck?

6          A.     I don't recall.

7          Q.     Do you have any objection of being

8    identified as the senior advisor to Floyd's of

9    Leadville on this marketing deck?

10         A.     I don't understand the question.

11         Q.     Well, you say that you don't

12   remember whether you were a senior advisor; is

13   that correct?

14         A.     Correct.

15         Q.     And you say you're not currently

16   the senior advisor; is that correct?

17         A.     Correct.

18         Q.     So, if you don't remember if you've

19   ever served in that capacity, do you have any

20   objection to being identified as serving in

21   that capacity on the marketing deck that was

22   used by Floyd's of Leadville?

23         A.     I have objections to false

24   information being conveyed by anyone, but I

25   don't know how this was used, I don't know what



1                         Huet

2     this document is.  So, I don't know.  I

3     can't -- I don't know how to answer the

4     question.

5              Q.    Is this false information, that

6     Alexandra Merle-Huet is senior advisor to

7     Floyd's of Leadville?

8              A.    For when?

9              Q.    For any time.

10             A.    It's false information as far as

11    I'm aware now.  And in the past, I don't know,

12    it could be.

13             Q.    So, it could be false?

14             A.    I don't know.

15             Q.    Could it be accurate?

16             A.    Maybe.  I don't know.

17             Q.    Have you ever seen copies of any

18    subscription document in connection with a

19    capital raise by Floyd's of Leadville,

20    Incorporated?

21             MR. VEDRA:  Objection; foundation.

22             THE WITNESS:  Am I supposed to

23         answer that or --

24    BY MS. COLE:

25             Q.    You may still answer the question.



1                          Huet

2          A.    Not that I recall.

3          Q.    I'm going to show you a document

4     that I've marked as Defendants' Exhibit 10.

5              (Exhibit 10 was so marked for

6     identification.)

7     BY MS. COLE:

8          Q.    Before I proceed with any other

9     question, I've been informed that you have a

10    hard stop at 5:00 p.m. today; is that correct?

11         A.    Yes.

12         Q.    I just wanted to make sure.

13             Can you see the document that's marked

14    with an exhibit sticker of Defendants' Exhibit

15    10 on your screen?

16         A.    Yes.

17         Q.    Do you recognize the document

18    marked as Defendants' Exhibit 10?

19         A.    No.

20         Q.    Do you have any recollection of

21    receiving an e-mail from

22    JonathanGazdak@AlexanderCapital on October

23    11th, 2019, with the subject matter, "Access

24    Clearing Attestation"?

25         A.    No.



1                              Huet

2          Q.    Do you have any reason to believe

3    that you did not receive this e-mail from

4    Jonathan Gazdak?

5          A.    Unsure.

6          Q.    And to be clear, it is an e-mail

7    addressed to Michelle Misiti, Alex Merle-Huet

8    with the address

9    Alex.Merle@FloydsofLeadville.com, and

10   FloydLandis@FloydsofLeadville.com.

11          In October of 2019, did you use an

12   e-mail address Alex.Merl@FloydsofLeadville.com?

13         A.    I do not recall that.

14         Q.    Did you use any e-mail associated

15   with FloydsofLeadville.com in October of 2019?

16         A.    I don't recall.

17         Q.    Could you go to page 5 of this

18   exhibit, please.

19         A.    Okay.

20         Q.    Do you recognize this document

21   that's attached to the e-mail that we were just

22   looking at?

23         A.    No.

24         Q.    Have you ever written any checks on

25   behalf of Floyd's of Leadville to John R.



1                      Huet

2    DiMartini?

3         A.    I don't recall that.

4         Q.    Have you ever written a check on

5    behalf of Floyd's of Leadville to JJB-FLA LLP?

6         A.    I don't recall.

7         Q.    Have you ever written a check on

8    behalf of Floyd's of Leadville to Francesca

9    DiFrancesco?

10        A.    I do not recall that.

11        Q.    Have you ever written a check on

12   behalf of Floyd's of Leadville to Giovanni

13   Frank?

14        A.    I don't recall that.

15        Q.    Have you ever written a check on

16   behalf of Floyd's of Leadville to Greg Hurley?

17        A.    I don't recall that.

18        Q.    Have you ever written a check on

19   behalf of Floyd's of Leadville to John Burgess?

20        A.    I don't recall.

21        Q.    Have you ever written a check on

22   behalf of Floyd's of Leadville to Sylvester

23   Willis?

24        A.    I don't recall.

25        Q.    Have you ever written a check on



1                         Huet

2       behalf of Floyd's of Leadville issued to Gary

3       Grella?

4            A.    I don't recall.

5            Q.    Do you know who was in charge of

6       issuing checks on behalf of Floyd's of

7       Leadville?

8            A.    No, I don't recall.

9            Q.    Have you ever known anyone who was

10      authorized to issue checks on behalf of Floyd's

11      of Leadville?

12           A.    I'm unsure.

13           Q.    I'm going to show you a document

14      that I have marked as Defendants' Exhibit 12.

15           (Exhibit 12 was so marked for

16      identification.)

17   BY MS. COLE:

18           Q.    Do you see the document that I've

19      marked as Defendants' Exhibit 12 on your

20      screen?

21           A.    Yes.

22           Q.    Do you recognize this document

23      marked as Exhibit 12, Defendants' Exhibit 12?

24           A.    No.

25           Q.    According to the document, it was



1                         Huet

2     sent by Peter DiChiara to Frank DiMartini, and

3     then CCed to Alex Merle-Huet at

4     Alex.Merle@FloydsofLeadville.com.

5               Do you see that at the top of the

6     page?

7          A.    That's what it says at top of the

8     page, yeah.

9          Q.    Do you recall receiving this e-mail

10    in March of 2019?

11         A.    I do not.

12         Q.    Do you have any reason to believe

13    that you would not have received this e-mail

14    from Peter DiChiara on March 11th, 2019?

15         A.    I'm unsure.

16         Q.    And the subject of the e-mail says,

17    "Floyd's 12 percent senior secured promissory

18    note."  Are you familiar with the Floyd's 12

19    percent senior secured promissory note?

20         A.    No.

21         Q.    It also states there's an

22    attachment entitled, "Security Interest

23    Schedule."

24               Do you recall ever seeing security

25    interest schedules for the Floyd's 12 percent



1                        Huet

2    senior secured promissory note?

3         A.    I do not.

4         Q.    If you could take a look at page 4

5    of this document?

6         A.    Okay.

7         Q.    And at the top, do you see it says,

8    "Schedule A"?

9         A.    Yes.

10        Q.    Do you recognize this document?

11        A.    I do not.

12        Q.    Is it possible you've seen this

13   document before?

14        A.    I don't know.

15        Q.    Do you recognize the names of the

16   entities numbered 1 through 5 on this page?

17        A.    I do not.

18        Q.    You don't recognize Floyd's of

19   Leadville at 113 East 7th Street, Leadville,

20   Colorado?

21        A.    I'm unsure.

22        Q.    Have you ever heard of BTE Reed,

23   LLC?

24        A.    Unsure.

25        Q.    What about BTE2, LLC?  Have you



1                              Huet

2      heard of that?

3              A.    Unsure.

4              Q.    -- Broadway, have you ever heard of

5      that?

6              A.    I'm unsure.

7              Q.    And then Floyd's of Leadville at 25

8      Reynolds Road in -- Colorado.  Have you heard

9      of that?

10             A.    I'm unsure.

11             Q.    Going to the last page, page 7, it

12     just says "Schedule H" at the top.

13                  Do you see that?

14             A.    Yes.

15             Q.    And it says here, "Subsidiary, FOL

16     LLC."  Are you familiar with that entity, FOL

17     LLC?

18             A.    No.

19             Q.    I'm going to show you a document

20     that I've marked Defendants' Exhibit 13.

21                  (Defendants' Exhibit 13 was marked.)

22     BY MS. COLE:

23             Q.    When you have that on your screen,

24     let me know.

25             A.    Okay.



1                    Huet

2         Q.    According to the document, it says

3    that it's from Alexandra Merle with an e-mail

4    address Alex@FloydsofLeadville.com, sent on

5    Monday, March 4th, 2019, to

6    FrankDiMartini@AlexanderCapital, with the

7    subject, "Follow-up."

8            Do you recall sending an e-mail to

9    FrankDiMartini@AlexanderCapital from this

10   e-mail address on March 4th, 2019?

11        A.    I don't.

12        Q.    Do you have any reason to believe

13   you did not send this e-mail to Frank DiMartini

14   on March 4th, 2019?

15        A.    I'm not sure.

16        Q.    The e-mail says, "Frank, here are

17   some of the documents we discussed."

18            Do you recall speaking to Frank

19   DiMartini about documents?

20        A.    I don't recall.

21        Q.    It references, "Our updated

22   investor deck."  Do you remember talking to

23   Frank DiMartini about an updated investor deck?

24        A.    No.

25        Q.    Number 2 discusses term sheets for



1                          Huet

2      the isolate manufacturing that was sent to

3      Barrie.  Do you recall talking to Frank

4      DiMartini about term sheets for the isolate

5      manufacturing that was sent to Barrie?

6             A.    I don't recall.

7             Q.    I'm going to show you a document

8      that I've marked as Defendants' Exhibit 14.

9             (Exhibit 14 was so marked for

10     identification.)

11    BY MS. COLE:

12            Q.    Do you recognize the document

13     marked as Defendants' Exhibit 14?

14            A.    No, I do not.

15            Q.    So, it says at the top that it's

16     from Alexandra Merle at the address

17     Alex@FloydsofLeadville.com on March 5th, 2019,

18     sent to Frank DiMartini, with the subject "FOL

19     deck," and an attachment "Floyd's of Leadville

20     3.19."

21            Do you remember sending an e-mail --

22     this e-mail to Frank DiMartini?

23            A.    I do not.

24            Q.    Do you have any reason to believe

25     you did not send this e-mail to Frank DiMartini



```
 1                         Huet
 2     on March 5th, 2019?
 3          A.    I'm unsure.
 4          Q.    Can you take a look at page 2,
 5     please?
 6          A.    Okay.
 7          Q.    And this is the deck that's
 8     attached to the e-mail you were just looking
 9     at.
10          Do you recognize this deck?
11          A.    No, I do not.
12          Q.    Do you have any reason to believe
13     you did not send this deck to Frank DiMartini
14     on March 5th, 2019?
15          A.    I don't know.
16          Q.    You don't know of a reason that you
17     would not have sent this to him?
18          A.    I'm unsure.
19          Q.    I'm going to show you a document
20     I've marked as Defendants' Exhibit 15.
21          (Exhibit 15 was so marked for
22     identification.)
23               THE WITNESS:  Okay.
24   BY MS. COLE:
25          Q.    Taking a look at this document, do
```



1                    Huet

2   you recognize the document marked as Exhibit

3   15?

4           A.    I do not.

5           Q.    It says here at the top that it's

6   from Alexandra Merle at -- with the address

7   Alex@FloydsofLeadville.com, it was sent on

8   March 15th, 2019 to Frank DiMartini, copied to

9   Chris@FloydsofLeadville.com, the subject is

10  "FOL Revenue."

11          Do you recall sending this e-mail to

12  Frank DiMartini on March 15th, 2019?

13          A.    No, I do not.

14          Q.    Do you have any reason to believe

15  that you did not send this e-mail to Frank

16  DiMartini on March 15th, 2019?

17          A.    I'm unsure.

18          Q.    I may have asked you this before,

19  if I did, I apologize for repeating myself.  Do

20  you know a person by the name of Frank

21  DiMartini?

22          A.    I don't recall.

23          Q.    Have you ever recorded any

24  conversations with Frank DiMartini?

25          A.    Possibly.



```
 1                       Huet
 2        Q.    When would those conversations have
 3   taken place?
 4        A.    I don't know.  I'd have to go back
 5   and look.
 6        Q.    Where would you look?
 7        A.    Through my phone.
 8        Q.    So, you would have -- any recorded
 9   conversations with Mr. DiMartini would be on
10   your phone right now?
11        A.    Maybe.  I'd have to look.
12        Q.    How long would it take you to look
13   for those recordings?
14        A.    I don't know.
15        Q.    When you say possibly -- that you
16   have -- that you possibly have recordings of
17   conversations with Frank DiMartini, was there a
18   reason you're not sure?
19        A.    Because I'm being asked without
20   being able to look through my records or verify
21   anything, so I want to be truthful and honest
22   and say that I'm not sure.
23        Q.    Do you regularly record your
24   conversations with people?
25        A.    Not unless I need to.
```



1                    Huet

2          Q.    Do you recall needing to record a

3    conversation with Frank DiMartini?

4          A.    Maybe.  I'm unsure.

5          Q.    Have you ever looked for recordings

6    of conversations with Frank DiMartini

7    previously in conjunction with this lawsuit?

8          A.    I don't recall.

9          Q.    Have you ever been asked to search

10   for conversations on your phone that you

11   recorded in connection with this lawsuit?

12         A.    I don't recall.

13         Q.    Do you mind taking a five-minute

14   break and looking on your phone to see if you

15   have -- you, in fact, have recorded

16   conversations with Mr. DiMartini on your phone?

17         A.    I can check, but I might not find

18   anything.  I don't know.

19         Q.    Okay.  Well, if you will check, I

20   would appreciate it.

21         A.    Okay.

22             MS. COLE:  So, let's take five

23        minutes for you to check on your phone.

24        We're going off the record for five

25        minutes.



1                          Huet

2                THE VIDEOGRAPHER:  Off the record at

3        4:22 p.m., Eastern Time.

4                (Recess taken.)

5                THE VIDEOGRAPHER:  On the record at

6        4:30 p.m., Eastern Time.

7    BY MS. COLE:

8            Q.    And, Ms. Merle-Huet, I appreciate

9    you taking a break and checking your phone.  Do

10   you locate any recordings of conversations with

11   Frank DiMartini?

12           A.    So, I looked through my voice

13   recordings on my iPhone and I found some

14   recordings with the title of the person that

15   you had mentioned earlier.

16           Q.    Frank DiMartini?

17           A.    I have Frank and Frank DiMartini.

18           Q.    Are those recorded conversations

19   dated on your phone?

20           A.    Yes.

21           Q.    Can you provide me with the dates?

22           A.    Well, yeah.  I just want to make

23   sure my lawyer --

24                THE WITNESS:  Dan?

25                MR. VEDRA:  Yes.



1              Huet

2         THE WITNESS:  Can I do that?

3         MR. VEDRA:  Yes, that's fine.  I

4     think all of these have already been

5     provided to Alexander Capital in

6     discovery, so.

7         THE WITNESS:  Okay.  All right.  I

8     have Frank on COIL, December 21, 2018.  I

9     have Frank COIL, January 1, 2019.  I have

10     Tim and Frank, May 23rd, 2019.

11  BY MS. COLE:

12         Q.    Can you repeat that date?  I'm

13     sorry.

14         A.    May 23, 2019.  I have Frank D,

15     January 16, 2020.  Frank DiMartini, January

16     16th, 2020.  And then I have Frank D, 2/19 RE

17     Leonard going to Wasatch, February 19th, 2020.

18     I'm not sure what these are, I don't know, but

19     there's AC meetings, number 1 and number 2,

20     which seems to be quite long.

21         Then there's Gazdak follow-up on

22     meetings.  Here's Frank DiMartini, March 26th,

23     2020.  And that's it.

24         Q.    So, you recorded these

25     conversations on your voice recorder on your

Huet

iPhone; is that correct?
A. I must have, yes.
Q. So, you were present at a meeting or on a conversation with Frank DiMartini on 12/21/2018?
A. Well, I don't recall.
Q. You have a recorded conversation that you just testified that you recorded on your iPhone, so --
A. Well, it's a recorded conversation on my iPhone, you know. I have to like look at the metadata and I don't know really any of the details like who is there --
(Talking over each other.)
Q. Were you there?
A. I mean, I don't recall being there.
Q. Is there a way that you could have recorded it on your phone if you weren't present?
A. I'm not sure. I mean, if I -- if it's on my phone, then I must have recorded it. But again, I don't recall the meeting, so I just want to be very precise. I don't want to get in trouble. But it would be weird if I had



```
 1                     Huet
 2   it on my phone and I didn't record it.
 3        Q.    Well, I understand you recorded it.
 4   I'm just trying to get an understanding of your
 5   presence at the meeting if it was in-person, or
 6   on a conversation if it was on the telephone.
 7        A.    I assume I was there.
 8        Q.    So, would you also say you were
 9   present on January 1st, 2019 at a meeting or on
10   a phone call with Frank DiMartini regarding
11   COIL?
12        A.    It appears so.
13        Q.    Do you know what COIL is?  What did
14   you mean by COIL?
15        A.    I don't recall.  It's just when I
16   looked at the title of the recording, it's
17   C-O-I-L in all caps, so it must be an acronym,
18   but I don't know.  I don't remember what it
19   was.
20        Q.    And then do you also assume you
21   were present at a meeting or on a phone call
22   with Tim and Frank on May 23rd, 2019?
23        A.    It appears so.
24        Q.    And who is Tim?
25        A.    I don't -- I'm not sure.  I'd have
```



1                          Huet

2    to -- I don't remember.

3          Q.    I'm sorry, I didn't mean to

4    interrupt you.  Tim Kelly?

5          A.    It could be, but I don't recall.

6          Q.    Do you assume you were also present

7    at a meeting or on a conversation with Frank

8    DiMartini on January 16th, 2020?

9          A.    I -- based on the recording, I

10   assume so.  But I don't remember it.

11         Q.    And same would be true for each of

12   these recordings that you've listed; right,

13   that you don't recall being present, but you

14   think you were?

15         A.    Correct.

16         Q.    On the call that's recorded on

17   February 19th, 2020, it says regarding Leonard

18   going to Wasatch, is that what you said,

19   Wasatch?

20         A.    Let me go back and look.  Yes.  I

21   have it down as Leonard going to W-A-S-A-T-C-H.

22         Q.    Do you know what Wasatch is?

23         A.    I don't remember.

24         Q.    Do you know who Leonard is?

25         A.    I don't remember.



1                         Huet

2          Q.    Could it be Mark Leonard?

3          A.    Possibly.

4          Q.    And then you also mentioned that

5     you had a recorded conversation or meeting with

6     Gazdak follow-up on meeting, I think you said

7     March 26th, 2020?

8          A.    25 -- no.  Gazdak follow-up on

9     meeting is February 25, 2020.

10         Q.    Okay.  Thank you.  Who is Gazdak?

11         A.    I don't recall.

12         Q.    Is it Jonathan Gazdak with

13    Alexander Capital?

14         A.    Could be.

15         Q.    And then you mentioned there was

16    two recordings, I think you said, AC meeting

17    number 1 and meeting number 2, is that two

18    separate recordings?

19         A.    Yes.

20         Q.    February 5th; right?

21         A.    February 5th, 2020.

22         Q.    Both of them on February 5th?

23         A.    Yes, that's what it looks like,

24    yeah.

25         Q.    And AC meeting, is that a reference



1                          Huet

2      to Alexander Capital?

3              A.    I don't -- I'm not sure.

4              Q.    Do you recall attending a meeting

5      at Alexander Capital's offices in New York in

6      February of 2020?

7              A.    I don't recall.

8              Q.    But you recorded the conversation

9      or the meeting, so to the best of your

10     knowledge, you would have been present;

11     correct?

12             A.    It appears so.

13             Q.    Have you been asked to search for

14     any text messages related to Mr. DiMartini,

15     Mr. Gazdak, Mr. Leonard, Tim or anything

16     related to this lawsuit?

17                 MR. VEDRA:  Objection to form.

18                 THE WITNESS:  I don't recall.

19     BY MS. COLE:

20             Q.    Earlier, I think you said you

21     didn't remember, you were unsure if you knew

22     Frank DiMartini.  Having looked through

23     these -- your phone for whether or not you have

24     these voice recordings, does that refresh your

25     recollection whether you know or have met or



1                         Huet

2    have spoken with Frank DiMartini?

3         A.    No, not really.

4         Q.    Looking back at Defendants' Exhibit

5    15, do you still have that on your screen?

6         A.    I do.

7         Q.    And if I asked you this, if I'm

8    repeating myself, I do apologize, but do you

9    recognize this document marked as Exhibit 15?

10        A.    I do not.

11        Q.    As you sit here today, can you

12   think of any reason why you would not have sent

13   this e-mail to Frank DiMartini on March 15th,

14   2019?

15        A.    I'm unsure.

16        Q.    Do you remember ever sending any

17   e-mails to Frank DiMartini?

18        A.    No, I don't recall.

19        Q.    Have you ever been employed by

20   Valued, Inc.?

21        A.    I don't recall.

22        Q.    Have you ever been employed by

23   Floyd's Fine Cannabis?

24        A.    Not that I'm aware of.

25        Q.    Have you ever done any work for



1                        Huet

2       Floyd's Fine Cannabis?

3              A.    I don't remember.

4              Q.    Have you ever done any work for

5       Valued, Incorporated?

6              A.    I don't recall.

7              Q.    Do you recall whether you were

8       employed by any entity related to Valued,

9       Incorporated?

10             A.    No.

11                MR. VEDRA:  Objection to form.

12     BY MS. COLE:

13             Q.    Do you recall if you were employed

14      by any entity related to Floyd's of Leadville?

15                MR. VEDRA:  Objection to form.

16                THE WITNESS:  No, I do not.

17     BY MS. COLE:

18             Q.    Did you ever receive any money from

19      Floyd's of Leadville?

20             A.    Unsure.

21             Q.    Did you ever receive any stock from

22      Floyd's of Leadville?

23             A.    I don't recall.

24             Q.    Have you ever received anything of

25      value from Floyd's of Leadville?



1                          Huet

2          A.    I don't recall.

3          Q.    Do you recall ever receiving any

4     1099 forms from Floyd's of Leadville?

5          A.    I don't recall.

6          Q.    Do you recall receiving any

7     distributions from Floyd's of Leadville?

8          A.    I do not recall.

9          Q.    I'm going to show you an exhibit --

10    another exhibit, it's a document I've marked as

11    Defendants' Exhibit 16.

12               (Exhibit 16 was so marked for

13    identification.)

14    BY MS. COLE:

15          Q.    If you could just take a moment to

16    look at the document, and then tell me if you

17    recognize the document marked as Defendants'

18    Exhibit 16.

19          A.    I don't.

20          Q.    So, at the top, it states that it's

21    from Alexandra Merle with an address of

22    Alex@FloydsofLeadville.com.  It's dated April

23    30th, 2019, sent to Frank DiMartini, copied to

24    Chris@FloydsofLeadville, with the subject,

25    "Cash Flow Update."



1                        Huet

2          Do you have any reason to believe that

3   you did not send this e-mail?

4          A.    I'm unsure.

5          Q.    As you sit here today, can you

6   think of any reason why you would not have sent

7   this e-mail?

8          A.    Yes.

9          Q.    And what would that reason be?

10         A.    I just didn't send it.

11         Q.    So, do you think you didn't send

12  it?

13         A.    I don't know if I did or didn't.

14         Q.    Have you seen Floyd Landis today?

15         A.    No.

16         Q.    Have you spoken with Floyd Landis

17  today?

18         A.    No.

19         Q.    Has Floyd Landis been in your house

20  today?

21         A.    Not that I'm aware of.

22         Q.    Have you been in the same room as

23  Floyd Landis today?

24         A.    No.

25         Q.    Have you been in the same building



1                          Huet

2      as Floyd Landis today?

3              A.    No.

4              Q.    I'm going to show you a document I

5      have marked as Defendants' Exhibit 17.

6              (Exhibit 17 was so marked for

7      identification.)

8   BY MS. COLE:

9              Q.    Can you see the document on your

10     screen with exhibit sticker DEF-17?

11             A.    Yes.

12             Q.    Do you recognize this document?

13             A.    No.

14             Q.    You don't recall seeing it before?

15             A.    I do not.

16             Q.    At the top, it says it's from

17     Alexandra Merle with the e-mail address

18     Alex@FloydsofLeadville.com, sent on February

19     13th, 2020 to JonathanGazdak@AlexanderCapital,

20     Frank DiMartini, and then it's copied to --

21     @FloydsofLeadville, Chris@FloydsofLeadville,

22     Barrie Clapham.  And the subject is,

23     "Follow-up."

24             And here it says, "Jonathan and Frank,

25     attached are two documents we discussed



1                        Huet

2    providing -- our meeting last week."

3            Does this document refresh your

4    recollection whether you attended a meeting at

5    Alexander Capital's offices in February of

6    2020?

7        A.    It does not.

8        Q.    But you do have a recording of the

9    meeting from February 5th, 2020 on your iPhone;

10   correct?

11       A.    Presumably.

12       Q.    When you said "presumably," I

13   thought you just checked for it?

14       A.    Yes.

15       Q.    So, do you have the recording on

16   your phone?

17       A.    That's -- yes, the recording seems

18   to be on my phone.  Again, I haven't

19   triple-checked everything in the metadata or

20   anything, but yes.

21       Q.    If you could take a look at the

22   second page?

23       A.    Okay.

24       Q.    Do you recognize this document?

25       A.    No.



1                         Huet

2          Q.    It says, "Talking points for Frank

3    DiMartini," dated February 20th; is that

4    correct?

5          A.    That's what it says on the paper,

6    yes.

7          Q.    Take a look at page 5, please

8    (indicating).

9          A.    Okay.

10         Q.    And what does it say at the top of

11   this document?

12         A.    "Valued, Inc. asset list at

13   2/5/2020."

14         Q.    I'm going to show you a document

15   that I've marked as Defendants' Exhibit 17A.

16              (Exhibit 17A was so marked for

17   identification.)

18   BY MS. COLE:

19         Q.    Do you see the document?

20         A.    Yes.

21         Q.    I'll represent to you that this is

22   the metadata for Defendants' Exhibit 17, the

23   attachment entitled, "Talking Points For

24   Frank."  If you take a look, you will see --

25   so, under where the title states "metadata,"



1                              Huet

2       there's a line that reads "production Bates

3       start," under that e-mail, it says -- under

4       that e-mail received, and then under that, it

5       says "document author."  What does it say

6       besides "document author"?

7                    MR. VEDRA:  Objection; foundation.

8                    THE WITNESS:  Next to "author"?

9    BY MS. COLE:

10           Q.    "Document author," what is the

11      words after the colon?

12           A.    "Alex Merle."

13           Q.    Did you create the document,

14      "Talking points for Frank"?

15           A.    I do not recall.

16           Q.    Do you have any reason to believe

17      you did not create the document entitled

18      "Talking points for Frank"?

19           A.    I'm unsure.

20           Q.    I'm going to show you a document

21      I've marked as Defendants' Exhibit 17B.

22             (Exhibit 17B was so marked for

23      identification.)

24    BY MS. COLE:

25           Q.    And I'll represent to you that this



1                          Huet

2       is the metadata for Defendants' Exhibit 17 for

3       the attachment asset list -- Valued, Inc. asset

4       list 2/20.  And the same thing, if you see

5       there, the fourth topic down "Document Author,"

6       what does it say?

7              A.    "Alex Merle."

8              Q.    Did you create the document

9       entitled "Valued, Inc. Asset List 2.20"?

10             A.    I don't recall.

11             Q.    Do you have any reason to believe

12      you did not create the asset list?

13             A.    I'm unsure.

14             Q.    I want to show you a document

15      marked as Defendants' Exhibit 18.

16                  (Exhibit 18 was so marked for

17             identification.)

18                  THE WITNESS:  Okay.

19      BY MS. COLE:

20             Q.    And this is an e-mail from Jonathan

21      Gazdak, dated February 14th, 2020 to Frank

22      DiMartini and Alexandra Merle with the e-mail

23      address Alex@FloydsofLeadville.com.

24                  Did you receive this e-mail?

25             A.    I don't recall.



1                              Huet

2          Q.    Do you recognize this document?

3          A.    I do not.

4          Q.    Do you have any reason to believe

5    you did not receive this document, this e-mail?

6          A.    I'm not sure.

7          Q.    Were you employed with Floyd's of

8    Leadville on February 14th, 2020?

9          A.    I don't recall.

10         Q.    Is it possible you were employed

11   with Floyd's of Leadville on February 14th,

12   2020?

13         A.    I don't know.

14         Q.    I'm going to show you a document

15   I've marked as Defendants' Exhibit 19.

16         (Exhibit 19 was so marked for

17   identification.)

18   BY MS. COLE:

19         Q.    Do you recognize the document

20   marked as Defendants' Exhibit 19?

21         A.    I do.

22         Q.    You do?

23         A.    I see -- no, sorry.  I see that it

24   says Defendant 19 on it.

25         Q.    Do you recognize the document?



```
 1                    Huet
 2        A.    No, I do not.
 3        Q.    At the top, it states that it's
 4   from Alexandra Merle with the e-mail address
 5   Alex@FloydsofLeadville.com, that it was sent on
 6   February 20th, 2020 to Jonathan Gazdak and
 7   Chris@FloydsofLeadville.com, and the subject
 8   is, "Follow-up on terms."
 9        A.    Okay.
10        Q.    Do you have any reason to believe
11   you did not receive -- that you did not send
12   this e-mail to Jonathan Gazdak in February of
13   2020?
14        A.    I'm unsure.
15        Q.    As you look down at the e-mail
16   below the one that says that it's from
17   Alexandra Merle, there is an e-mail sent on
18   Thursday, February 20th, 2020, at 11:23 from
19   Jonathan Gazdak.  He wrote, "Alex, I got a call
20   from Pete DiChiara over the weekend.  Is he an
21   authorized contact again for Valued?"
22             Do you know Pete DiChiara?
23        A.    I don't recall.
24        Q.    Do you know if he was an authorized
25   contact for Valued, Inc.?
```



```
 1                      Huet
 2          A.    I don't.
 3          Q.    I'm going to show you a document
 4     I've marked as Defendants' Exhibit 20.
 5               (Exhibit 20 was so marked for
 6     identification.)
 7   BY MS. COLE:
 8          Q.    At the top, there's a phone sent to
 9     and subject.  Below that, I'd like you to look
10     at the one under that, it says "from Jonathan
11     Gazdak," sent Friday, February 21st, 2020 to
12     Chris@FloydsofLeadville and Alexandra Merle.
13               Do you recognize this document?
14          A.    I do not.
15          Q.    Did you receive an e-mail from
16     Jonathan Gazdak on Friday, February 21st, 2020,
17     with the subject, "Follow-up on terms"?
18          A.    I don't remember.
19          Q.    Sitting here today, can you think
20     of any reason why you would not have received
21     this e-mail?
22          A.    I'm unsure.
23          Q.    I'm going to show you a document
24     I've marked as Defendants' Exhibit 21.
25               (Exhibit 21 was so marked for
```



1                          Huet

2       identification.)

3    BY MS. COLE:

4          Q.    Take a look at the document and let

5       me know do you recognize this document that

6       I've marked as Defendants' Exhibit 21?

7          A.    No.  I do not -- I don't know.

8          Q.    Do you recall receiving this e-mail

9       from Floyd Landis on Friday, February 28th,

10      2020?

11         A.    No.

12         Q.    Do you know what Floyd Landis is

13      referring to here as the "OR asset plan"?

14         A.    No, I do not.

15         Q.    Do you have any reason to believe

16      you did not receive this e-mail from Floyd

17      Landis on February 28th, 2020?

18         A.    I'm unsure.

19         Q.    I'm going to show you a document

20      I've marked as Defendants' Exhibit 22.

21          (Exhibit 22 was so marked for

22      identification.)

23    BY MS. COLE:

24         Q.    Do you recognize the document

25      marked as Defendants' Exhibit 22?



```
 1                     Huet
 2          A.    I do not.
 3          Q.    Is this an e-mail from you,
 4   Alexandra Merle-Huet with an e-mail address of
 5   -- @FloydsofLeadville.com, sent on April 5th,
 6   2020 to JonathanGazdak@AlexanderCapitalLP,
 7   copying Floyd Landis, the subject line,
 8   "Valued, Inc. diligence materials"?
 9          A.    I'm unsure.
10          Q.    Is there a reason you're unsure
11   whether this is an e-mail that you sent on that
12   date?
13          A.    It's just -- it's writing on a
14   piece of paper, I don't know where it came
15   from.  I can't verify it.
16          Q.    Do you have any reason to believe
17   you did not send an e-mail to Jonathan Gazdak
18   on April 5th, 2020?
19          A.    I don't know.
20          Q.    You've never seen this e-mail, its
21   writing on the page with the blank ink followed
22   by the red text, you've never seen this
23   document in this form before?
24          A.    I don't recall.
25          Q.    I'm going to show you a document
```



```
 1                    Huet

 2    I've marked as Defendants' Exhibit 23.

 3              (Exhibit 23 was so marked for

 4        identification.)

 5  BY MS. COLE:

 6        Q.    This will be the last one we'll go

 7    over today.

 8          Do you recognize this document?

 9        A.    No.

10        Q.    Do you recall sending an e-mail

11    from an e-mail address

12    Alex@FloydsofLeadville.com on Monday, May 11th,

13    2020, to Jonathan Gazdak, with the subject,

14    "Barber/PA -- agreement."

15        A.    No, I do not.

16        Q.    Do you have any idea what this

17    e-mail is referring to Barber/PA head

18    agreement?

19        A.    No, I don't recall.

20        Q.    And you don't have any reason to

21    believe -- do you have any reason to believe

22    that you did not send this e-mail?

23        A.    I'm unsure.

24          MS. COLE:  Before we go off the

25        record, Mr. Vedra, could you just confirm
```



1                         Huet

2     whether you have anyone present with you

3     during today's deposition.

4           MR. VEDRA:  Yeah, Bob Bell is

5     sitting here with me, as he has been.

6           MS. COLE:  Thank you.  Those are all

7     the questions we have at this time.

8     However, we do reserve our right to

9     recall this witness.

10          MR. VEDRA:  On what basis do you

11    have the right to recall?

12          MS. COLE:  We can talk about it at

13    another time, but we're reserving our

14    right on the record now.

15          MR. VEDRA:  I'd like to know the

16    basis for the reservation on the record,

17    please.

18          MS. COLE:  She was unable to provide

19    answers.  She was unable to recall

20    details.  She's having a hard stop at

21    5:00 p.m., it's 4:59.  We have the right

22    to take her deposition for a total of

23    seven hours.

24          MR. VEDRA:  Well, among the reasons

25    is if somebody doesn't recall, who



```
 1                    Huet
 2   doesn't know detail --
 3        MS. COLE:  No reason to have a
 4   colloquy.  I've stated that we're
 5   reserving our right, we have seven hours,
 6   we have not reached seven hours.
 7        MR. VEDRA:  I just want to make sure
 8   I'm clear on your reasons, though.
 9        MS. COLE:  I don't know whether
10   you're clear or not, but I've clearly
11   stated them.  So, we're ready to go off
12   the record.
13        MR. RACHMUTH:  I will also be
14   requiring time to ask follow-up
15   questions.
16        MR. VEDRA:  That makes sense.
17        MR. WARD:  And we just to make sure
18   that Ms. Merle-Huet saves any of the
19   recordings and any text that you have and
20   to turn over to your counsel for
21   potential production.
22        MR. VEDRA:  I think those are all
23   already been produced, but we'll review
24   them and produce any that have not been,
25   so.
```



1                    Huet

2          MR. WARD:  Thank you.

3          THE VIDEOGRAPHER:  Counsel, would

4   you like me to conclude the deposition at

5   this time?

6          MS. COLE:  Yes.

7          THE VIDEOGRAPHER:  Before I do, I

8   just need to ask if anyone needs a copy

9   of the video.

10         MS. COLE:  We would like a copy of

11  the video, please.

12         MR. WARD:  Transcript only.

13         THE VIDEOGRAPHER:  Anyone else?

14         MR. VEDRA:  Yeah.  I'm not quite

15  sure why we're doing separate orders for

16  the same deposition that just occurred

17  during the same day.  I'm just getting

18  confused by that.

19         THE VIDEOGRAPHER:  I'm sorry,

20  Counsel, I wasn't at the first

21  deposition.

22         MR. VEDRA:  Okay.  Yeah, we will

23  read and sign for Ms. Merle-Huet.

24         THE VIDEOGRAPHER:  Thank you very

25  much.



1                         Huet

2            This concludes today's deposition of

3        Alexandra Merle-Huet.  We're off the

4        video record at 5:00 p.m., Eastern Time,

5        on September 4th, 2024.

6                (Whereupon, at 5:00 p.m. the matter

7        was concluded.)

8

9

10                    _____

11                    Alexandra Merle-Huet

12

13   Subscribed and sworn to before me
     this _____ day of _____, 20___.
14   _____
            NOTARY PUBLIC
15

16

17

18

19

20

21

22

23

24

25



```
 1                       I N D E X
 2
 3   WITNESS                  EXAMINATION BY        PAGE
 4   MS. MERLE-HUET           COLE / DIRECT         6
 5
 6                           EXHIBITS
 7   DEFENDANT'S     DESCRIPTION                    PAGE
 8   Exhibit 10      10/11/19 e-mail               34
 9   Exhibit 12      3/11/19 e-mail                37
10   Exhibit 13      3/4/19 e-mail                 40
11   Exhibit 14      3/5/19 e-mail                 42
12   Exhibit 15      3/15/19 e-mail                43
13   Exhibit 16      Cash Flow Update e-mail       56
14   Exhibit 17      2/13/20 e-mail                58
15   Exhibit 17A     Metadata for Exhibit 17       60
16   Exhibit 17B     Metadata for attachment       61
17   Exhibit 18      2/14/20 e-mail                62
18   Exhibit 19      2/20/20 e-mail                63
19   Exhibit 20      2/21/20                       65
20   Exhibit 21      2/28/20 e-mail                65
21   Exhibit 23      5/11/20 e-mail                68
22   Exhibit 26      Floyd's website printout      11
23   Exhibit 22      4/5/20 e-mail                 66
24   Exhibit 27      LinkedIn page                 17
25   Exhibit 28      Bates FOL-SDNY11034           25
```



```
 1  DEFENDANT'S      DESCRIPTION                PAGE

 2  Exhibit 29      Bates FOLSDNY01549         28

 3  Exhibit 30      Bates FOLSDNY01781         30

 4  (The exhibits were retained by Attorney Cole.)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



C E R T I F I C A T I O N

I, Jeffrey Shapiro, a Stenographic Reporter and Notary Public, within and for the State of New York, do hereby certify:

That ALEXANDRA MERLE-HUET, the witness whose examination is hereinbefore set forth, was first duly sworn by me, and that transcript of said testimony is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 13th day of September, 2024.

JEFFREY SHAPIRO



1      DEPOSITION ERRATA SHEET

2

3    Our Assignment No. J11701173

4    Case Caption:  Floyd's of Leadville vs.

5    Alexander Capital

6

7     DECLARATION UNDER PENALTY OF PERJURY

8              I declare under penalty of perjury

9         that I have read the entire transcript of

10        my Deposition taken in the captioned

11        matter or the same has been read to me,

12        and the same is true and accurate, save

13        and except for changes and/or

14        corrections, if any, as indicated by me

15        on the DEPOSITION ERRATA SHEET hereof,

16        with the understanding that I offer these

17        changes as if still under oath.

18

19        _____

20        Alexandra Merle-Huet

21

22   Subscribed and sworn to on the _____ day of
     _____, 20_____ before me,
23   _____

24   Notary Public,
     In and for the State of _____
25



1          DEPOSITION ERRATA SHEET

2

3    Page No._____Line No._____Change to: _____

4    _____

5    Reason for change: _____

6    Page No._____Line No._____Change to: _____

7    _____

8    Reason for change: _____

9    Page No._____Line No._____Change to: _____

10   _____

11   Reason for change: _____

12   Page No._____Line No._____Change to: _____

13   _____

14   Reason for change: _____

15   Page No._____Line No._____Change to: _____

16   _____

17   Reason for change: _____

18   Page No._____Line No._____Change to: _____

19   _____

20   Reason for change: _____

21   Page No._____Line No._____Change to: _____

22   _____

23   Reason for change: _____

24   SIGNATURE:_____DATE:_____

25          Alexandra Merle-Huet



```
 1       DEPOSITION ERRATA SHEET

 2

 3   Page No._____Line No._____Change to: _____

 4   _____

 5   Reason for change: _____

 6   Page No._____Line No._____Change to: _____

 7   _____

 8   Reason for change: _____

 9   Page No._____Line No._____Change to: _____

10   _____

11   Reason for change: _____

12   Page No._____Line No._____Change to: _____

13   _____

14   Reason for change: _____

15   Page No._____Line No._____Change to: _____

16   _____

17   Reason for change: _____

18   Page No._____Line No._____Change to: _____

19   _____

20   Reason for change: _____

21   Page No._____Line No._____Change to: _____

22   _____

23   Reason for change: _____

24   SIGNATURE:_____DATE:_____

25          Alexandra Merle-Huet
```

