# Exhibit H

1

2          UNITED STATES DISTRICT COURT

3        SOUTHERN DISTRICT OF NEW YORK

4  -------------------------------------------X

5  FLOYD'S OF LEADVILLE, INC., N/K/A VALUED,

6  INC.

7                    Plaintiff,

8  Vs.            Case No.: 1:22-cv-03318-DEH

9  ALEXANDER CAPITAL, L.P., NESA

10  MANAGEMENT, LLC, JOSEPH ANTHONY

11  AMATO, ROCCO GERARD GUIDICIPIETRO,

12  JONATHAN GAZDAK, RONALD BARRIE

13  CLAPHAM, MARK LEONARD, PROVISION

14  HOLDING, INC., TIMOTHY KELLY, and

15  THREE DDD, LLC,

16                    Defendants.

17  -------------------------------------------x

18      VIDEOTELECONFERENCED DEPOSITION OF:

19            CHRISTOPHER L. RYAN

20            New York, New York

21        Friday, September 6, 2024

22

23

24  Reported by:
    Aydil M. Torres, CSR
25  JOB NO. J11629378



1

2

3

4              September 6, 2024

5              11:18 a.m.

6

7

8        VTC deposition of

9   CHRISTOPHER L. RYAN, held at 169

10  Mercer Street, New York, New York,

11  pursuant to Notice, before Aydil M.

12  Torres, a Notary Public of the

13  State of New York.

14

15

16

17

18

19

20

21

22

23

24

25



```
 1

 2   A P P E A R A N C E S:

 3

 4      VEDRA LAW, LLC
        Attorneys for Plaintiff
 5          1444 Blake Street
            Denver, Colorado 80202
 6          Dan@vedralaw.com
        BY:  DANIEL VEDRA, ESQ.
 7

 8      HOLCOMB & WARD, LLP
        Counsel for Defendants
 9      Alexander Capital LP, Joseph Amato, Rocco
        Guidicipietro, Jonathan Gazdak, and NESA
10      Management, LLC
            3455 Peachtree Road NE, Suite 500
11          Atlanta, Georgia 30326
            AaronWright@holcombward.com
12      BY:  AARON WRIGHT, ESQ.

13

14      LAW OFFICE OF PAUL RACHMUTH, ESQ.
        Attorneys for Defendants
15      RONALD BARRIE CLAPHAM and MARK LEONARD
            265 Sunrise Highway, Suite 62
16          Rockville Centre, New York 11570
            Paul@paresq.com
17      BY:  PAUL RACHMUTH, ESQ.

18

        ALSO PRESENT:
19          HOLLY COLE, ESQ.
            BRYAN WARD, ESQ.
20          FLOYD LANDIS
            ROBERT BELL
21

22

23

24

25
```



1

2          THE VIDEOGRAPHER:  We are

3   now on the record.  The time is

4   11:18 a.m., Eastern time, on

5   September 6, 2024.

6          This begins the video

7   conference deposition of

8   Christopher Ryan, taken in the

9   matter of Floyd's of Leadville,

10  Incorporated versus Alexander

11  Capital, L.P., et al. the case

12  number is 1:22-CV-03318-DEH, and it

13  is filed in the United States

14  District Court, Southern District

15  of New York.

16         My name is George Ellis.  I

17  am your remote videographer.  Our

18  court reporter today is

19  Aydil Torres, and we are

20  representing Esquire Deposition

21  Solutions.

22         Counsel, if you would please

23  state your name and who you

24  represent, after which the court

25  reporter will swear in the witness.



1

2          MR. WRIGHT:  My name is

3     Aaron Wright.  I am with Holcomb

4     and Ward, and we represent

5     Alexander Capital, L.P., Nesa

6     Management, Joseph Amato, Rocco

7     Guidicipietro, and Jonathan Gazdak.

8          I am also joined by Holly

9     Cole and Bryan Ward, remotely.

10          MR. VEDRA:  Dan Vedra, on

11     behalf of the Plaintiff, Floyd's of

12     Leadville, and the witness, Chris

13     Ryan.

14          MR. RACHMUTH:  Paul

15     Rachmuth, Paul Rachmuth, PLLC, for

16     the defendant -- for the Defendants

17     Barrie Clapham and Mark Leonard.

18          MR. WRIGHT:  And just to

19     have it on the record, Mr. Vedra,

20     you are joined by Mr. Bell, and

21     Mr. Landis, joining us remotely?

22          MR. VEDRA:  Yes.

23          MR. WRIGHT:  Thank you.

24          Aydil, you are muted.

25          THE REPORTER:  My name is



1

2          Aydil M. Torres, a New York State

3          notary public and certified

4          shorthand reporter.  This

5          deposition is being held via

6          videoconferencing equipment.  The

7          witness and reporter are not in the

8          same room.  The witness will be

9          sworn in remotely pursuant to

10         agreement of all parties.  The

11         parties stipulate that the

12         testimony is being given as if the

13         witness was sworn in person.

14  C H R I S T O P H E R   L.   R Y A N,

15            called as a witness, having been

16            duly sworn by a Notary Public, was

17            examined and testified as follows:

18              THE REPORTER:  Will you

19         please state your name for the

20         record.

21              THE WITNESS:  Christopher

22         Laws Ryan.

23              THE REPORTER:  Can you spell

24         the middle name.

25              THE WITNESS:  L-A-W-S.



 1

 2                THE REPORTER:  Will you

 3           please state the address where you

 4           are currently located.

 5                THE WITNESS:  169 Mercer

 6           Street, Floor Three, New York, New

 7           York 10012.

 8                THE REPORTER:  Thank you.

 9                I will have the first two on

10           the record.  Counsel, you may

11           proceed.

12    EXAMINATION BY

13    MR. WRIGHT:

14        Q.  Good morning, Mr. Ryan.  Thank you

15    for joining us here today.

16                Before we get started, I just want

17    to go through a couple of ground rules.

18                THE VIDEOGRAPHER:  I'm

19           sorry, I'm sorry to interrupt.

20                Was the witness sworn.

21                MR. WRIGHT:  I believe so.

22                THE VIDEOGRAPHER:  Okay, I

23           just missed.  It went right over my

24           head.  I apologize.

25    BY MR. WRIGHT:



1              Christopher L. Ryan

2       Q.   So just a couple of ground rules to

3   make sure we have a good clean reporting.

4            If would you please wait for me to

5   finish my question, before responding, just

6   so the court reporter can get both my

7   question and your answer, and then I will

8   need verbal responses so we can get an

9   answer; is that okay?

10      A.   Yes.

11      Q.   And if you don't understand any of

12  my questions, please let me know.  We will

13  fix it so you can, all right?

14      A.   Yes.

15      Q.   And, likewise, if anything I say

16  doesn't come through, if we are having any

17  audio difficulties, please let me know.  We

18  want you to answer the whole question, not --

19  not have it come through unclear, all right?

20      A.   Understood.

21      Q.   And then last but not least, if you

22  need a break, just let me know.  We will

23  finish whatever question is pending and we

24  will go off the record.  Don't want you to be

25  uncomfortable or anything like that, all



1              Christopher L. Ryan

2    right?

3         A.    Thank you.

4         Q.    Is there any reason that you are

5    aware of, that you can't testify fully and

6    truthfully today?

7                   MR. VEDRA:   Objection; form.

8    BY MR. WRIGHT:

9         Q.    Go ahead and answer.

10        A.    No.  Not that I'm aware of.

11        Q.    Do you have any health issues that

12   would impede your ability to recollect

13   events?

14        A.    No.

15        Q.    Are you on any medications that

16   would impede your ability to recollect

17   events?

18        A.    No.

19        Q.    Are you on any medications that

20   would impede your ability to testify

21   truthfully?

22        A.    No.

23        Q.    And then just as an initial matter,

24   if I say "Floyd's", will you understand that

25   I mean the company that was formally known as



1              Christopher L. Ryan

2    Floyd's of Leadville and is now known as

3    Valued, Inc.?

4         A.   Yes.

5         Q.   Are you represented by counsel with

6    regard to this deposition?

7         A.   Yes.

8         Q.   Who is your counsel?

9         A.   Dan Vedra.

10        Q.   And is there anyone else?

11        A.   No.

12        Q.   When did you engage Mr. Vedra?

13        A.   I don't recall.

14        Q.   Did you engage him since receiving

15   notice of the deposition?

16        A.   I don't recall.

17        Q.   Do you know if you engaged him

18   before or after you received the deposition?

19        A.   I don't recall.

20        Q.   Did you speak with Mr. Vedra about

21   your deposition today?

22        A.   I don't recall.

23        Q.   Have you spoken with Mr. Vedra in

24   the past week?

25        A.   I don't recall.



1              Christopher L. Ryan

2      Q.   Have you spoken with Mr. Vedra in

3  the past day?

4      A.   I don't recall that, no.

5      Q.   Have you spoken with Mr. Vedra in

6  the past hour?

7      A.   No.

8      Q.   Have you spoken to Mr. Vedra today?

9      A.   No.

10     Q.   You don't recall whether or not you

11  spoke with Mr. Vedra about this deposition?

12              MR. VEDRA:   Objection; asked

13          and answered.

14  BY MR. WRIGHT:

15     Q.   You can go ahead and answer,

16  please.

17     A.   I don't recall.

18     Q.   Did you communicate with Mr. Vedra

19  in any way, shape or form about this

20  deposition?

21     A.   I don't recall.

22     Q.   Have you e-mailed Mr. Vedra about

23  this deposition?

24     A.   I don't recall.

25     Q.   Have you texted him about this



```
 1              Christopher L. Ryan
 2    deposition?
 3         A.   I don't recall.
 4         Q.   In getting ready to do this
 5    deposition today, did you review any
 6    documents?
 7         A.   I don't recall.
 8                   MR. VEDRA:  Objection;
 9              foundation.
10    BY MR. WRIGHT:
11         Q.   Did you do anything to get ready
12    for this deposition today?
13         A.   No.
14         Q.   You didn't ask for a link to the
15    deposition?
16         A.   Well, yes, I did ask for a link.
17    Yes.  I did not know when it was scheduled.
18         Q.   And who did you ask for that link?
19         A.   I don't recall.
20         Q.   How did you ask for that link?
21         A.   I don't recall.
22         Q.   How did you receive that link?
23         A.   I don't recall.
24         Q.   Did you click on a link to join
25    this meeting?
```



```
 1                 Christopher L. Ryan
 2        A.   I did.
 3        Q.   Where was the link when you clicked
 4   on it?
 5        A.   I don't recall.
 6        Q.   Was it in a text?
 7        A.   I don't recall.
 8        Q.   Was it in an e-mail?
 9        A.   I don't recall.
10        Q.   So other than asking for the link,
11   did you do anything else to prepare for this
12   deposition?
13        A.   I don't recall.
14        Q.   Did you receive notice of this
15   deposition?
16        A.   I don't understand.
17        Q.   Did you receive a document telling
18   you that this deposition was being taken?
19        A.   I don't recall.
20        Q.   Did you tell Mr. -- well --
21             MR. WRIGHT:  Strike that.
22        Q.   Did you tell anyone that you would
23   appear at this deposition?
24        A.   I don't understand.
25        Q.   Okay.  So you are taking this
```



```
 1              Christopher L. Ryan
 2   deposition today, correct?
 3                   MR. VEDRA:  Objection; form.
 4   BY MR. WRIGHT:
 5        Q.   Are you currently being deposed?
 6        A.   Yes.
 7        Q.   Prior to this moment, have you
 8   spoken to any human being about the fact that
 9   you were going to be deposed today?
10        A.   I don't recall.
11        Q.   Did you speak to Mr. Landis?
12        A.   I don't recall.
13        Q.   Have you sent any e-mails
14   concerning this deposition?
15        A.   I don't recall.
16        Q.   Have you sent any texts concerning
17   this deposition?
18        A.   I don't recall.
19        Q.   Are you familiar with the
20   allegations in this case?
21        A.   I don't recall.
22        Q.   Well, either you are or you are
23   not.  If you don't know what they are, then
24   you are not familiar with them, right?
25                   MR. VEDRA:  Objection; form;
```



1              Christopher L. Ryan

2         argumentative; foundation.

3  BY MR. WRIGHT:

4      Q.   Go ahead and answer the question,

5  please, Mr. Ryan.

6      A.   I don't understand the question.

7      Q.   Okay.  I am asking you if you,

8  sitting here today, are familiar with the

9  allegations in this case?

10              MR. VEDRA:  Objection; form

11          and foundation.

12              THE WITNESS:  I am not

13          familiar with the allegations.

14  BY MR. WRIGHT:

15      Q.   Thank you.

16          Do you recall ever reading any

17  pleadings in this case?

18      A.   I don't recall.

19      Q.   Do you recall ever reading any

20  documents, related to this case?

21              MR. VEDRA:  Objection; form.

22              THE WITNESS:  I don't

23          recall.

24  BY MR. WRIGHT:

25      Q.   Is there anyone present in the room



1              Christopher L. Ryan

2    with you?

3         A.   No.

4         Q.   Is there anyone present in the

5    house with you?

6                   MR. VEDRA:  Objection;

7              foundation; misstates the witness'

8              testimony.

9                   MR. WRIGHT:  Mr. Vedra, we

10             agreed previously that we wouldn't

11             state the basis, just form or

12             foundation.  Would you please

13             refrain from stating the basis?

14                  MR. VEDRA:  Yes.

15                  Would you please refrain

16             from misstating his testimony?

17   BY MR. WRIGHT:

18        Q.   Mr. Ryan, would you answer the

19   question?

20        A.   Please repeat the question.

21        Q.   Is there anyone in the same

22   building as you are?

23        A.   I don't know.  It's a big building.

24        Q.   Are you in an apartment?

25        A.   Yes.



1              Christopher L. Ryan

2       Q.   Is there anyone in the same

3   apartment as you?

4       A.   Yes.

5       Q.   Who?

6       A.   An electrician.

7       Q.   Is that electrician able to hear

8   this testimony?

9       A.   No.

10      Q.   Do you have any notes with you?

11      A.   No.

12      Q.   Do you have any documents with you?

13      A.   No.

14      Q.   Prior to today, have you ever been

15  deposed before?

16      A.   Yes.

17      Q.   Could you recall when?

18      A.   I don't recall.

19      Q.   Can you recall how many times?

20      A.   I don't recall.

21      Q.   Is it more than once?

22      A.   I don't recall.

23      Q.   But it's at least once?

24      A.   Correct.

25      Q.   Do you recall in what matter you



1              Christopher L. Ryan

2  were called -- were deposed?

3       A.   I don't recall.

4       Q.   Do you recall if you were a

5  defendant in that case?

6       A.   I don't recall.

7       Q.   Have you ever been a defendant in a

8  legal case?

9       A.   I don't recall.

10      Q.   Have you ever been a plaintiff in a

11 legal case?

12      A.   Yes.

13      Q.   What was that case?

14      A.   I don't recall.

15      Q.   Do you recall who the defendant

16 was?

17      A.   No.

18      Q.   Do you know if there was one

19 defendant or more than one defendant?

20      A.   I don't -- I don't recall.

21      Q.   Do you remember what the nature of

22 the case was?

23      A.   I don't recall.

24      Q.   Okay.  Do you recall if the case

25 was more than five years ago or less than



1              Christopher L. Ryan

2  five years ago?

3       A.   I don't recall.

4       Q.   Is the case currently ongoing?

5       A.   Let me clarify.  I have some

6  personal -- I don't know if this counts, but

7  marital cases.  So I have been involved in

8  those.  So that -- let me clarify that I was

9  thinking business.

10       Q.   Putting aside your marital cases,

11  have you been a plaintiff in a business suit

12  before?

13                 MR. VEDRA:  Objection; form.

14                 THE WITNESS:  No.

15  BY MR. WRIGHT:

16       Q.   So when you said you were a

17  plaintiff in a suit, that was a marital case?

18       A.   Yes.

19       Q.   Were you deposed?

20       A.   And, technically, a defendant as

21  well.

22       Q.   Okay.  Thank you.

23            And if at any point you remember

24  something else or need to go back and clarify

25  an answer like that, please do.  I appreciate



1           Christopher L. Ryan

2    that.

3           I think, and please correct me if I

4    am wrong, I think I heard you say "marital

5    cases."  Have there been more than one?

6         A.   One marriage.

7         Q.   Were there multiple litigations

8    related to that or just one litigation

9    related to that?

10        A.   I don't recall.

11        Q.   Okay.  Do you recall if you were

12   deposed in a case related to your marriage?

13        A.   I was not.

14        Q.   So you were deposed in a case,

15   other than the one in which you were a

16   plaintiff; is that correct?

17        A.   Yes.

18        Q.   Were you deposed in a case where

19   you were the defendant?

20        A.   I don't recall.

21        Q.   And other than your marital case,

22   you don't recall ever being a defendant; is

23   that correct?

24        A.   Correct.

25        Q.   Have you ever testified before at a



1              Christopher L. Ryan

2   trial or a hearing?

3        A.   I don't recall.

4        Q.   Are you aware of the Exemption

5   Holdings case against Floyd's, that was filed

6   in Colorado?

7        A.   Not specifically.

8        Q.   Are you aware of it, generally?

9        A.   Generally, yes.

10       Q.   What are you generally aware of

11  about it?

12       A.   That it exists.

13       Q.   Do you have any knowledge of the

14  claims?

15       A.   No.

16       Q.   Do you have any knowledge of the

17  resolution?

18       A.   No.

19       Q.   Did you testify in that matter?

20       A.   No.

21       Q.   Were you deposed in that matter?

22       A.   No.

23       Q.   Did you have any involvement in

24  helping Floyd's prepare document responses in

25  that matter?



1              Christopher L. Ryan

2        A.   I don't recall.

3        Q.   What about this case, did you help

4    Floyd's respond to any document requests in

5    this case?

6        A.   I don't recall doing that.

7        Q.   Do you recall ever helping someone

8    respond to a document request?

9        A.   Please clarify.  I mean, in

10   business?

11       Q.   Correct, ever.

12       A.   Possibly, but not in a long time.

13       Q.   Okay.  Were you asked to search

14   your records, in relation to this case?

15       A.   I don't recall.

16       Q.   Did you search your records, in

17   relation to this case?

18       A.   I did not.

19       Q.   Did you help Floyd's respond to any

20   interrogatories in this case?

21       A.   I don't recall.

22       Q.   Do you recall ever helping anyone

23   respond to any interrogatories?

24       A.   I don't recall.

25       Q.   Do you recall ever speaking with



1              Christopher L. Ryan

2  any of Floyd's lawyers about this case?

3       A.   Not specifically.  Anytime...I...I

4  don't recall, specifically.

5       Q.   What do you recall, generally?

6       A.   That there's litigation.

7       Q.   And what do you recall about

8  talking to people about that litigation?

9       A.   Only that it exists.

10       Q.   Do you recall if you were asked any

11  questions about it?

12       A.   I don't recall.

13       Q.   Do you recall if you were asked

14  about any of the underlying facts?

15       A.   I don't recall being asked.

16       Q.   Do you recall if you were asked

17  anything at all, before the case was filed?

18       A.   I don't recall.

19       Q.   All right, let's move on to your

20  background.

21            Can you tell me where you did your

22  undergraduate degree?

23       A.   Yes.

24            MR. VEDRA:  Objection;

25            foundation.



               Christopher L. Ryan

1

2    BY MR. WRIGHT:

3         Q.   Do you have an undergraduate

4    degree?

5         A.   Yes.

6         Q.   Where did you get that degree from?

7         A.   A college.

8         Q.   What college?

9         A.   University of Pennsylvania.

10        Q.   What was that degree in?

11        A.   Economics.

12        Q.   Was it a B.A.?

13        A.   Yes.

14        Q.   When did you graduate?

15        A.   From?

16        Q.   The University of Pennsylvania,

17   with your B.A. in economics.

18        A.   1984.

19        Q.   Since 1984, have you received any

20   other degrees?

21        A.   No.

22        Q.   Are you currently employed?

23        A.   Yes.

24        Q.   Where are you currently employed?

25        A.   With an energy company.



1              Christopher L. Ryan

2      Q.   What's the name of that energy

3   company?

4      A.   Solvent.

5      Q.   Solvent.

6           How long have you been at Solvent?

7      A.   Two months.

8      Q.   And before Solvent, who was your

9   previous employer?

10     A.   I don't recall.

11     Q.   So you joined Solvent two months

12   ago?

13     A.   Yes.

14     Q.   When you joined Solvent, were you

15   employed with someone else?

16     A.   No.

17     Q.   Were you retired?

18     A.   No.

19     Q.   Were you unemployed?

20     A.   Yes.

21     Q.   How long were you unemployed?

22     A.   I don't recall.

23     Q.   Prior to becoming unemployed, do

24   you recall who your employer was?

25     A.   I don't recall.



1                Christopher L. Ryan

2        Q.   Was that employer Floyd's?

3        A.   I don't recall.

4        Q.   Do you recall ever being employed

5   at Floyd's?

6        A.   Yes.

7        Q.   When do you recall being employed

8   at Floyd's?

9        A.   I don't recall.

10       Q.   Was it more than two months ago?

11       A.   Yes.

12       Q.   Was it more than a year ago?

13       A.   Yes.

14       Q.   Was it more than two years ago?

15       A.   I don't recall.

16       Q.   Was it more than twenty years ago?

17       A.   I don't recall.

18       Q.   Was it more than fifty years ago?

19       A.   I don't recall.

20       Q.   So you were -- was it more than 100

21   years ago?

22       A.   It was not more than 100 years ago.

23       Q.   Okay.  So sometime between 100 and

24   two years ago, you were employed at Floyd's?

25       A.   Yes.



1              Christopher L. Ryan

2       Q.   How long were you employed at

3    Floyd's?

4       A.   I don't recall.

5       Q.   Was it more than a day?

6       A.   I don't recall.

7       Q.   You don't recall if it was more

8    than a day that you were employed at Floyd's?

9       A.   I do not.

10      Q.   And just to be sure we're on the

11   same page, we discussed earlier, when I say

12   "Floyd's", I mean Floyd's of Leadville, or

13   the company now known as Valued, Inc.

14           Are we still on the same page

15   there?

16      A.   Yes.

17      Q.   When you were employed at Floyd's

18   what was your job title?

19      A.   I don't recall.

20      Q.   What's your current job title?

21      A.   I don't recall.

22      Q.   When someone asks you what you do,

23   what do you say to them?

24      A.   It depends.

25      Q.   Give me an example.



```
 1              Christopher L. Ryan
 2       A.   I work in electricity.
 3       Q.   What kind of work do you do in
 4  electricity?
 5       A.   I don't -- I don't recall.
 6       Q.   Do you install power lines?
 7       A.   No.
 8       Q.   Do you do financial work?
 9       A.   I don't recall.
10       Q.   You were late for this deposition
11  because you were in a meeting; is that
12  correct?
13       A.   No.
14       Q.   Why were you late for this
15  deposition?
16       A.   I was parking my car.
17       Q.   Mr. Vedra informed us that you were
18  running late because you had a meeting until
19  eleven; was that untrue?
20       A.   Well, my -- I had to sit in my car
21  before it would be towed by eleven.  So it
22  not technically "a meeting."  I was busy
23  between 9:30 and eleven.
24       Q.   Were you doing any work between
25  9:30 and eleven?
```



1              Christopher L. Ryan

2        A.   No.

3        Q.   Have you done any work today?

4        A.   Only personal work.

5        Q.   Have you done any business work

6   today?

7        A.   No.

8        Q.   Did you do any business work

9   yesterday?

10       A.   I don't recall.

11       Q.   When was the last time you recall

12  doing business work?

13       A.   I don't recall.

14       Q.   Have you ever done business work?

15             MR. VEDRA:  Objection;

16        foundation.

17  BY MR. WRIGHT:

18       Q.   Please go ahead and answer that

19  question.

20       A.   Yes.

21       Q.   When you did business work, what

22  was it?

23       A.   I don't recall.

24       Q.   You're currently employed by

25  Solvent; is that correct?



1              Christopher L. Ryan

2        A.   Yes.

3        Q.   You have been employed there for

4   about two months; is that correct?

5        A.   Yes.

6        Q.   In the two months you have worked

7   for Solvent, do you recall doing any work?

8        A.   Yes.

9        Q.   What was that work that you did?

10              MR. VEDRA:   Going to caution

11          the witness, to the extent that

12          divulging what his business deals

13          are presently, which are in no way

14          relevant to this lawsuit, if they

15          are confidential and proprietary in

16          nature, it would endanger his

17          employment with his current

18          employer, not to answer the

19          question.

20              THE WITNESS:   They are

21          confidential, in fact.

22   BY MR. WRIGHT:

23        Q.   Mr. Ryan, can you describe the

24   nature of your work, without disclosing any

25   confidential details?



1              Christopher L. Ryan

2        A.   Developing battery storage

3   projects.

4        Q.   Is your role in developing batter

5   storage projects scientific?

6        A.   No.

7        Q.   Is it economic?

8        A.   Please clarify.

9        Q.   Does it involve the finances of

10  those projects?

11       A.   No.

12       Q.   Does it involve managing the team?

13       A.   No.

14       Q.   What does it involve?

15       A.   It's development.

16       Q.   What are you doing, in terms of

17  development?

18            MR. VEDRA:   Again, if this

19            would cause the witness to divulge

20            any confidential or proprietary

21            information that would endanger his

22            employment -- again, this is not

23            relevant to any fact or consequence

24            to this case, but I would caution

25            Mr. Ryan not to disclose anything



1        Christopher L. Ryan

2    that could jeopardize his

3    employment with Solvent.

4            MR. WRIGHT:  Mr. Vedra,

5    relevance is not a proper objection

6    for a deposition --

7            MR. VEDRA:  But harassing my

8    client -- harassing my client about

9    his current business affairs, which

10   are not relevant to this case -- if

11   you want to ask questions about

12   this case, please do.  If you want

13   to ask him questions about --

14           MR. WRIGHT:  Let's go off

15   the record to have this colloquy.

16           MR. VEDRA:  No, no, we will

17   do this on the record.

18           MR. WRIGHT:  Please go off

19   the record.

20           THE VIDEOGRAPHER:  One

21   moment, please.

22           Going off the record.

23           The time is 11:53.  One

24   second.

25           (Whereupon, a discussion was



```
 1            Christopher L. Ryan
 2         held off the record.)
 3              THE VIDEOGRAPHER:  We are
 4         back on the record.  The time is
 5         12:03.
 6  BY MR. WRIGHT:
 7     Q.   Mr. Ryan, are you familiar with the
 8  term "CFO"?
 9     A.   Yes.
10     Q.   What do you understand that term to
11  mean?
12     A.   I don't recall.
13     Q.   Have you ever heard of a "chief
14  financial officer"?
15     A.   Yes.
16     Q.   Have you ever heard of a "chief
17  financial officer" called a "CFO"?
18     A.   I don't recall.
19     Q.   Have you ever been a chief
20  financial officer?
21     A.   I don't recall.
22     Q.   Have you ever been a CFO?
23     A.   I don't recall.
24     Q.   Have you served as an officer of a
25  company?
```



1              Christopher L. Ryan

2      A.    I don't recall.

3      Q.    What was your first job out of

4  college?

5      A.    I don't -- I don't recall.

6      Q.    Do you recall any of your jobs

7  between when you graduated college and when

8  you began working at Floyd's?

9      A.    I don't recall.

10      Q.    Did you work any jobs between

11  graduating college and working at Floyd's?

12      A.    I don't recall.

13      Q.    Do you recall what you did after

14  college?

15      A.    Yes.

16      Q.    What was that?

17      A.    I went home.

18      Q.    How long did you stay at home?

19      A.    I don't recall.

20      Q.    Did you start to work at some point

21  after that?

22      A.    I don't recall.

23      Q.    Have you ever worked?

24      A.    Yes.

25      Q.    Okay.  When was that?



1               Christopher L. Ryan

2       A.   I don't recall.

3       Q.   I am going to share with you what I

4  have marked as Exhibit 127.  We're going out

5  of order because things were previously

6  stamped in preparation for this.

7            Can you see that document?

8       A.   I can.

9       Q.   We've discussed off the record, but

10  so it's on the record, you have the ability

11  to zoom in on it, you can move up and down

12  the pages, you should be able to see it

13  freely, look at the parts that are of

14  interest to you.

15           Can you review this document for me

16  and then you when you have done, tell me if

17  you recognize it.

18      A.   I can read it.

19      Q.   Do you recognize it?

20      A.   Not specifically.

21      Q.   Do you recognize it, generally?

22      A.   That's a picture of me.

23      Q.   Do you have a LinkedIn profile?

24      A.   I don't recall.

25      Q.   Have you ever seen a LinkedIn



1              Christopher L. Ryan

2   profile before?

3        A.   I don't recall.

4        Q.   Under the picture of you, it says

5   "Christopher Ryan, renewable energy finance";

6   is that correct?

7        A.   I don't recall.  I can't tell.

8        Q.   Okay.  If you can't look at the

9   documents, we're going to have a really

10  difficult time here.

11       A.   Sorry, could you please put the

12  document -- I was -- can you please put the

13  document up again?  I only had documents --

14  maybe -- now I just got a bunch of pictures

15  of people.  I don't know if that's the

16  intent.

17       Q.   You can scroll through the

18  document.  You are looking probably near the

19  bottom of the document.

20       A.   Okay, now I am back.

21       Q.   Okay.

22       A.   Okay.

23       Q.   So under your picture, does it say

24  "Christopher Ryan"?

25       A.   It does.



1              Christopher L. Ryan

2        Q.   Okay.  And is that your name?

3        A.   It is.

4        Q.   And under that it says, "renewable

5   energy finance", and then it shows "Solvent

6   Energy."

7        A.   Yes.

8        Q.   And you currently work for Solvent

9   Energy?

10       A.   Yes.

11       Q.   It says "University of

12   Pennsylvania"?

13       A.   Yes, it does.

14       Q.   And you graduated from University

15   of Pennsylvania?

16       A.   I did.

17       Q.   If you scroll down to "experience",

18   do you see the first job on there is "Solvent

19   Energy"?

20       A.   Yes.

21       Q.   It lists you as the "chief

22   financial officer"; do you see that?

23       A.   That's what it says.

24       Q.   Are you the chief financial officer

25   of Solvent Energy?



1              Christopher L. Ryan

2       A.   I don't recall.

3       Q.   Sitting here today, do you believe

4  you are the chief financial officer of

5  Solvent Energy?

6       A.   Do I "believe"?

7       Q.   Yes.

8       A.   I am not sure.  I don't -- I don't

9  recall.

10       Q.   I am asking what you think in this

11  particular moment.  Not asking for you to

12  remember what happened yesterday.  I am

13  asking you:  Sitting here today, do you

14  currently have a belief that you are the

15  chief financial officer of Solvent Energy?

16       A.   Yes.

17       Q.   What is the basis of that belief?

18       A.   I don't understand the question.

19       Q.   You believe that you are the chief

20  financial officer of Solvent Energy; why is

21  it that you believe that?

22       A.   Well, I am reading it right here.

23       Q.   Do you believe this document is

24  accurate?

25       A.   I can't speak to that.



1              Christopher L. Ryan

2       Q.    It shows that you have been working

3   at Solvent Energy since "July of 2024"; is

4   that accurate?

5       A.    I don't recall that.

6       Q.    Prior to that, going down the list,

7   it shows you were the "principal of Mercer

8   Street Capital Management, LLC."

9              Do you see that?

10      A.    Yes, I do.

11      Q.    It shows that you were in that role

12  from "January 2015 to July 2024"; do you see

13  that?

14      A.    I do.

15      Q.    Is that accurate?

16      A.    I don't recall.

17      Q.    Were you ever employed at Mercer

18  Street Capital Management, LLC?

19      A.    This -- this says that I was.

20      Q.    And now I am asking you if you

21  were?

22      A.    I don't recall.

23      Q.    Underneath that it shows that you

24  were "head of North America for Mainstream

25  Renewable Capital."



1              Christopher L. Ryan

2         Do you see that?

3    A.   Yes, it does.  I do see that.

4    Q.   Have you ever worked for Mainstream

5    Renewable Capital?

6    A.   I don't recall.

7    Q.   It shows you were a "board member

8    for AELA Energia SPA." Butchering the

9    pronunciation, I apologize.

10        But do you see that?

11   A.   Yes, I can see that.

12   Q.   Were you?

13   A.   I don't recall.

14   Q.   Have you ever been a member of a

15   board?

16   A.   I don't recall.

17   Q.   Underneath that it shows you were

18   "chief financial officer of Beowulf Energy,

19   LLC."

20   A.   Yes, I see that.

21   Q.   Do you recall ever working for

22   Beowulf Energy, LLC?

23   A.   I don't.

24   Q.   It says you worked there from

25   "February 2002 to December 2014."



1              Christopher L. Ryan

2         Do you see that?

3    A.   Yes, I see that.

4    Q.   Do you recall working anywhere

5  between 2002 and 2014?

6    A.   I don't.

7    Q.   All right.  You do recall that you

8  worked for Floyd's; is that correct?

9              MR. VEDRA:  Objection; asked

10          and answered.

11             MR. WRIGHT:  Mr. Vedra,

12          please refrain from stating the

13          basis and stick to "form" and

14          "foundation."

15             MR. VEDRA:  Objection to the

16          form of the question.

17  BY MR. WRIGHT:

18    Q.   Do you currently remember that you

19  worked at Floyd's?

20    A.   Yes.

21    Q.   Do you currently remember how long

22  that was?

23    A.   No.

24    Q.   Do you remember if it was for a

25  single day?



1              Christopher L. Ryan

2       A.   I don't recall.

3       Q.   Do you remember if it was for more

4  than a day?

5       A.   I don't recall.

6       Q.   Do you remember if it was for more

7  than a month?

8       A.   I don't recall.

9       Q.   Do you remember if it was for more

10  than a year?

11      A.   I don't recall.

12      Q.   When did you first hear of Floyd's?

13      A.   I don't recall.

14      Q.   Do you recall how you learned of

15  Floyd's?

16      A.   No.

17      Q.   Do you recall how you came to work

18  at Floyd's?

19      A.   I don't recall.

20      Q.   Were you hired to work at Floyd's?

21      A.   I don't recall.

22      Q.   Did you interview to work at

23  Floyd's?

24      A.   I don't recall.

25      Q.   Were you recruited to work at



1              Christopher L. Ryan

2    Floyd's?

3         A.   I don't recall.

4         Q.   Do you recall what your job was

5    when you joined the company?

6         A.   I don't recall.

7         Q.   Were you the chief financial

8    officer?

9         A.   I don't recall.

10        Q.   Do you presently have any belief

11   about what your job was while you were there?

12        A.   I -- I -- I don't know.

13        Q.   I am asking what you believe in

14   this exact moment.

15             Do you have a belief that you did

16   any particular job?

17        A.   Not specifically.

18        Q.   Generally?

19        A.   I don't know.

20        Q.   Again, I am asking for what you

21   know in this exact moment.

22             Do you think you did a particular

23   job or do you think you didn't do a

24   particular job?

25        A.   I just don't know.



1              Christopher L. Ryan

2         Q.   Again, I am not asking you to

3    remember.  I am just asking in this moment,

4    do you have any beliefs at all about what you

5    did at Floyd's?

6                   MR. VEDRA:  Objection to

7              form.

8                   THE WITNESS:  I don't know.

9              It was a long time ago.

10   BY MR. WRIGHT:

11        Q.   How long ago?

12        A.   I don't recall.

13        Q.   Was it more than a year ago?

14        A.   I don't recall.

15        Q.   Was it more than a month ago?

16        A.   I don't recall.

17        Q.   But you do recall it was a long

18   time ago?

19        A.   Yes.

20        Q.   What do you mean by "a long time"?

21        A.   I -- I -- it was in the past.

22        Q.   Is a day "a long time", to you?

23        A.   Can be.

24        Q.   So when you said "it was a long

25   time ago", did you mean it was yesterday?



1              Christopher L. Ryan

2       A.   I don't recall.

3       Q.   You don't recall if it was

4  yesterday or you don't recall what you meant?

5       A.   I don't understand the question.

6       Q.   So you said you worked a long time

7  ago at Floyd's.  When you said, "I worked a

8  long time ago" -- I'm sorry, you said

9  something to the effect of you worked a long

10  time ago at Floyd's.  I don't want to

11  misquote you.

12            When you said that it was "a long

13  time ago", when you used those words, what

14  did you mean by those words?

15       A.   I meant it was a long time ago.

16       Q.   Okay, how long ago?

17       A.   I don't recall.

18       Q.   Did you mean it was more than a day

19  ago?

20       A.   I just don't know.

21       Q.   You don't know what you meant when

22  you said "a long time ago"?

23       A.   I meant it was a long time ago.

24       Q.   Did you have any sense of how long

25  that time was?



1                 Christopher L. Ryan

2        A.   No.

3        Q.   So it could have been a day, it

4   could have been a decade?

5        A.   That's your opinion.  I don't know.

6        Q.   Well, I am asking you what your --

7   what your meaning was.  So I don't want you

8   to tell me what you understand my opinion to

9   be.  I want to know, when you said "a long

10  time ago", did you mean it was a day ago, a

11  decade ago, a century ago?

12       A.   I just don't know.

13       Q.   You just don't know what you meant,

14  okay.

15       A.   It's just a long time ago.

16       Q.   What do you understand Floyd's

17  business model was?

18                 MR. VEDRA:  Objection;

19            foundation.

20  BY MR. WRIGHT:

21       Q.   Okay.  Did Floyd's, to your

22  understanding, have a business model?

23       A.   I don't understand the question.

24       Q.   Your current job is in batteries;

25  is that correct?



```
1              Christopher L. Ryan

2      A.   Yes.

3      Q.   When you worked at Floyd's, what

4   field was Floyd's in?

5      A.   I don't know.

6      Q.   Was it in the CBD business?

7      A.   I am not sure.

8      Q.   Was it in the marijuana business?

9      A.   I don't know.

10     Q.   Was it in the cannabis business?

11     A.   I don't know.

12     Q.   Was it in the commercial real

13  estate business?

14     A.   I don't know.

15     Q.   Was it in the battery business?

16     A.   I don't know.

17     Q.   Was it in energy?

18     A.   I don't know.

19     Q.   To your knowledge, have you ever

20  worked in the cannabis business?

21     A.   I don't recall.

22     Q.   Have you ever sold marijuana?

23     A.   I don't recall.

24     Q.   Have you ever sold cannabis?

25     A.   I don't recall.
```



1                    Christopher L. Ryan

2          Q.   Have you ever sold CBD?

3          A.   I don't recall.

4          Q.   Have you ever been to Colorado?

5          A.   I don't recall.

6          Q.   When you worked at Floyd's, do you

7     know where you worked?

8          A.   I don't recall.

9          Q.   Have you ever worked in a business

10    that was violating federal law?

11         A.   I don't recall.

12         Q.   If you were offered a job violating

13    federal law today, would you take it?

14         A.   I don't understand the question.

15         Q.   If I offered you a job selling

16    methamphetamine, would you take it?

17         A.   What's "methamphetamine"?

18         Q.   Okay.  If I offered you a job

19    selling marijuana, in a state where marijuana

20    was illegal, would you take it?

21         A.   I don't -- I don't understand the

22    question.

23         Q.   Do you understand what "marijuana"

24    is?

25         A.   Yes.



1              Christopher L. Ryan

2       Q.   Do you understand that it's illegal

3   to sell marijuana in some states?

4       A.   I don't know the law.

5       Q.   Are you aware of anything that

6   would be illegal to do?

7              MR. VEDRA:  Objection.

8              THE WITNESS:  I don't

9          understand the question.  I don't

10          understand the question.

11   BY MR. WRIGHT:

12       Q.   You're currently listed as the CFO

13   of Solvent; is that correct?

14       A.   Can you put the exhibit back up,

15   please?

16       Q.   Certainly.

17       A.   I can read that, yes.

18       Q.   Are you aware if there are any laws

19   that you must comply with, as a chief

20   financial officer?

21       A.   I don't understand the question.

22       Q.   Does a chief financial officer have

23   any legal obligations, to your knowledge?

24       A.   Again, I don't understand the

25   question.



```
 1              Christopher L. Ryan
 2      Q.   What about it is confusing?
 3      A.   It's too broad.
 4      Q.   Okay.  I am asking very broadly.
 5           So very, very broadly speaking, are
 6  there any laws that you know that a chief
 7  financial officer must follow?
 8      A.   Not specifically.
 9      Q.   What about generally?
10      A.   I don't understand "generally",
11  what that means in this context.
12      Q.   Well, you said "not specifically."
13  So I am asking if there's a general sense of
14  what laws you understand?
15      A.   Again, too broad.
16      Q.   Would it be, to your understanding,
17  legal for a chief financial officer to report
18  false numbers to the FCC?
19      A.   I don't know.
20      Q.   To your understanding, is a chief
21  financial officer required to report numbers
22  accurately?
23      A.   I don't know.
24      Q.   Have you ever created a
25  spreadsheet?
```



1               Christopher L. Ryan

2        A.   I don't recall.

3        Q.   Have you ever used a spreadsheet?

4        A.   I don't recall.

5        Q.   Have you ever put numbers into a

6   spreadsheet?

7        A.   I don't recall.

8        Q.   Do you know what a "spreadsheet"

9   is?

10       A.   Yes.

11       Q.   What is it?

12       A.   It's a computer program.

13       Q.   Is it -- have you ever used a

14  computer program that you would describe as a

15  "spreadsheet"?

16       A.   I don't recall.

17       Q.   Have you ever --

18                MR. WRIGHT:  Strike that.

19       Q.   Do you recall if you used a

20  computer when you worked at Floyd's?

21       A.   I don't.

22       Q.   Do you recall if you used a phone

23  to communicate with people, while you were at

24  Floyd's?

25       A.   It's possible but I don't recall,



```
 1              Christopher L. Ryan
 2   specifically.
 3        Q.   Is it possible you used a computer
 4   while you were at Floyd's?
 5        A.   I don't recall.
 6        Q.   But it's definitely possible you
 7   used a phone, correct?
 8        A.   It's possible.
 9        Q.   Is it possible you texted, as part
10   of your work with Floyd's?
11        A.   I don't recall.
12        Q.   Have you reviewed your text
13   messages to see if you did?
14        A.   I don't recall.
15        Q.   Have you ever texted?
16        A.   Yes.
17        Q.   Have you ever deleted your texts?
18        A.   I don't recall.
19        Q.   Have you ever used a personal
20   computer for work?
21        A.   I don't recall.
22        Q.   Have you ever owned a personal
23   computer?
24        A.   Yes.
25        Q.   Do you currently own a personal
```



1              Christopher L. Ryan

2    computer?

3         A.   Yes.

4         Q.   Did you check that computer for

5    documents related to this case?

6         A.   I don't recall.

7         Q.   Were you ever asked to do so?

8         A.   I don't recall.

9         Q.   Do you have an e-mail account?

10        A.   Yes.

11        Q.   Do you know what your e-mail

12   account is?

13        A.   According to this schedule, it's

14   "MercerStreetCM@gmail.com."

15        Q.   And putting aside -- I should close

16   the exhibit.  I apologize.

17             Without reference to the exhibit,

18   do you know if you have an e-mail address?

19        A.   I just saw it on my -- on the

20   exhibit.

21        Q.   And that's accurate, that Mercer

22   Street e-mail address is accurate?

23        A.   It is.

24        Q.   Do you have any other e-mail

25   addresses?



1                Christopher L. Ryan

2        A.   I don't recall.

3        Q.   Have you ever had any other e-mail

4   address?

5        A.   I don't recall.

6        Q.   Prior to working at Mercer

7   Street -- sorry.

8             You said your e-mail is the Mercer

9   Street e-mail address?

10       A.   I said that's what this -- oops, I

11  lost it.

12       Q.   I closed it because I don't want to

13  focus on what the document says because you

14  don't recall if it's accurate or not.  I am

15  asking --

16       A.   I said it was accurate.  And it

17  said it was there, and I said it was

18  accurate.

19       Q.   Okay.  And that's your current

20  e-mail address?

21       A.   It's a current address, yes.

22       Q.   Do you work for Mercer Street

23  Capital?

24       A.   I don't recall.

25       Q.   Do you know if you're currently



1          Christopher L. Ryan

2   employed by Mercer Street Capital?

3        A.   I don't recall.

4        Q.   Do you know if you are a partner in

5   Mercer Street Capital?

6        A.   I don't recall.

7        Q.   Do you know if you own Mercer

8   Street Capital?

9        A.   I don't.  I don't recall.

10       Q.   You don't recall, not you don't own

11   it?

12       A.   I said I don't recall my ownership

13   of that.

14       Q.   Okay.  Do you have a work e-mail

15   address for your current job at Solvent?

16       A.   I don't recall.

17       Q.   When you need to communicate with

18   people at Solvent -- without revealing the

19   details of those communications or anything

20   confidential -- do you do so by e-mail?

21       A.   I don't recall.

22       Q.   Have you ever communicated with

23   anyone at Solvent about anything at all using

24   e-mail?

25       A.   Very broad question.  I don't



1                Christopher L. Ryan
2    recall.
3         Q.   Within the past week, have you used
4    e-mail to contact anyone at Solvent?
5         A.   I don't recall.
6         Q.   Within the past three months, have
7    you used e-mail to contact anyone at Solvent?
8         A.   I don't recall.
9         Q.   Have you ever texted anyone at
10   Solvent?
11        A.   I don't recall.
12        Q.   Have you ever had any phone call
13   with anyone at Solvent?
14        A.   Yes.
15        Q.   Did you ever have a phone call with
16   anyone at Floyd's?
17        A.   I don't recall.
18        Q.   And I'm hearing texts sounds going
19   off in the background.  Are you getting texts
20   that you need to deal with?
21        A.   No.
22        Q.   Just a reminder, if you need a
23   break, just let me know.
24        A.   No, that's okay.  I am fine.
25        Q.   Have you ever met a person named



1                  Christopher L. Ryan

2  Floyd Landis?

3        A.   Yes.

4        Q.   What can you tell me about the

5  person named Floyd Landis that you met?

6        A.   I don't recall.

7        Q.   If I just say "Floyd Landis", you

8  understand that I mean the person named

9  Floyd Landis that you met?

10       A.   I do.

11       Q.   Do you remember when you met Floyd

12  Landis?

13       A.   I don't.

14       Q.   Do you remember how you met Floyd

15  Landis?

16       A.   I don't.

17       Q.   Do you remember if Floyd Landis

18  worked at Floyd's?

19       A.   I don't recall.

20       Q.   Do you remember if he owned

21  Floyd's?

22       A.   I don't recall.

23       Q.   Do you remember anything about him?

24       A.   No.

25       Q.   Do you remember if he was a man?



1              Christopher L. Ryan

2       A.   Yes.

3       Q.   Was he a man?

4       A.   Yes, he was a man.  He is a man.

5       Q.   So you, currently, know that he is

6  a man?

7       A.   Yes.

8       Q.   When was the last time you spoke to

9  Mr. Landis?

10      A.   I don't recall.

11      Q.   Was it today?

12      A.   I don't recall.

13      Q.   Was it within the past week?

14      A.   I don't recall.

15      Q.   Was it within the past year?

16      A.   I don't recall.

17      Q.   Do you know what Mr. Landis did for

18  a living?

19      A.   I don't.

20      Q.   Do you know if Mr. Landis was ever

21  a professional cyclist?

22      A.   I don't.

23      Q.   Do you know if Mr. Landis ever

24  owned a company?

25      A.   I don't.



```
 1              Christopher L. Ryan
 2      Q.   Do you know if Mr. Landis ever sold
 3  cannabis?
 4      A.   I don't.
 5      Q.   Do you know if Mr. Landis ever sold
 6  CBD?
 7      A.   I don't.
 8      Q.   Before you met Mr. Landis, had you
 9  ever heard of him?
10      A.   I don't recall.
11      Q.   Are you a sports fan?
12      A.   I don't understand the question.
13      Q.   Do you pay attention to any sports?
14      A.   I don't.
15      Q.   You don't?
16           There isn't a team you root for or
17  anything like that?
18      A.   No.
19      Q.   Where did you grow up?
20      A.   East Coast.
21      Q.   Where on the East Coast?
22      A.   Different towns.
23      Q.   What towns, if any, did you go to
24  high school in?
25      A.   Wallingford, Connecticut.
```



```
 1              Christopher L. Ryan

 2       Q.   Any others?

 3       A.   Fairfield, Connecticut.

 4       Q.   Any others?

 5       A.   No.

 6       Q.   When did you graduate, if you

 7  graduate -- did you graduate high school?

 8       A.   I did.

 9       Q.   Do you know when you graduated high

10  school?

11       A.   I do.

12       Q.   When was that?

13       A.   1980.

14       Q.   Did you go straight to college,

15  after you graduated high school?

16       A.   I don't recall.

17       Q.   When you worked at Floyd's, do you

18  know who your supervisor was?

19       A.   I don't recall.

20       Q.   Have you ever met a person named

21  Alexandra Merle-Hewitt?

22       A.   I don't recall.

23       Q.   Have you ever met a person named

24  Alexandra Merle?

25       A.   I don't recall.
```



1              Christopher L. Ryan

2        Q.    Have you ever met a person named

3   Alex Merle?

4        A.    I don't recall.

5        Q.    Have you ever met a person named

6   Alex Merle-Hewitt?

7        A.    I don't recall.

8        Q.    When you worked at Floyd's, do you

9   know who owned the company?

10       A.    No.

11       Q.    When you worked at Floyd's, do you

12   know who the president was?

13       A.    No.

14       Q.    When you worked at Floyd's, do you

15   know who the CEO was?

16       A.    No.

17       Q.    When you worked at Floyd's, do you

18   know who the COO was?

19       A.    I don't recall.

20       Q.    When you worked at Floyd's, do you

21   know who the CFO was?

22       A.    I don't recall.

23       Q.    Were you the chief financial

24   officer at Floyd's?

25       A.    I don't recall.



1          Christopher L. Ryan

2     Q.   Do you know a person by the name of

3  Robert Bell?

4     A.   I don't recall.

5     Q.   Do you know a person by the name of

6  Bob Bell?

7     A.   I don't recall.

8     Q.   Do you know a person by the name of

9  Tim Kelly?

10     A.   I don't recall.

11     Q.   Have you ever met anyone named Tim

12  Kelly?

13     A.   I don't recall.

14     Q.   Have you ever met anyone named Pete

15  Dipiaro?

16     A.   I don't recall.

17     Q.   Have you ever met anyone named

18  Frank DiMartini?

19     A.   I don't recall.

20     Q.   Have you ever met anyone named

21  Daniel Vedra?

22     A.   Yes.

23     Q.   And he is your lawyer today?

24     A.   Correct.

25     Q.   Do you remember when you last spoke



1                  Christopher L. Ryan

2   with him?

3          A.    I don't recall.

4          Q.    Do you recall what your job duties

5   were while you were at Floyd's?

6          A.    I don't.

7          Q.    Were you ever responsible for

8   creating balance sheets?

9          A.    I don't recall.

10         Q.    Do you know what a "balance sheet"

11  is?

12         A.    Not specifically.

13         Q.    Do you know, generally, what a

14  balance sheet is?

15         A.    It's an accounting term.

16         Q.    Okay.  What do you understand that

17  accounting term to mean?

18         A.    I am not an accountant.

19         Q.    What do you understand the term to

20  mean?

21         A.    I am not an accountant.

22         Q.    I understand that.  I am asking for

23  your understanding, not a technical

24  definition.

25         A.    I don't know.



1              Christopher L. Ryan

2      Q.   You know it's an accounting term?

3      A.   I do.

4      Q.   Have you ever used a balance sheet

5  while performing a job?

6      A.   I don't recall.

7      Q.   Have you ever seen a balance sheet?

8      A.   I don't recall.

9      Q.   I will show you what we have marked

10  -- what I have marked today as exhibit --

11  Defense Exhibit 100.

12          Is that popping up on your screen?

13      A.   It is not.  I just have a -- I have

14  blank -- I can't see faces or anything.  I

15  just have blank gray -- gray color.

16      Q.   What about now?

17      A.   Now, yes, I can.

18      Q.   Have you ever seen a document that

19  looks like this before?

20      A.   Yes.

21      Q.   Do you recall when?

22      A.   Yes.

23      Q.   When?

24      A.   At about an hour ago.

25      Q.   Okay.  Other than today, have you



1              Christopher L. Ryan

2   ever seen a document like this before?

3        A.   I don't recall.

4        Q.   At the top it says "Floyd's of

5   Leadville, Inc."; is that correct?

6        A.   I can read that, yes.

7        Q.   Does it also say "balance sheet"?

8        A.   Yes.

9        Q.   Have you ever seen a balance sheet

10  before?

11       A.   Yes.

12       Q.   Did it look something like this?

13       A.   It did.

14       Q.   Does this look like a balance sheet

15  to you?

16       A.   Well, you showed it to me an hour

17  ago.

18       Q.   I am asking you:  Does this look

19  like a balance sheet to you?

20       A.   It says it's a "balance sheet."

21       Q.   I understand that.

22            I am asking, based on whatever

23  previous experience you have had with balance

24  sheets, does this look like one?

25       A.   I just don't know.



1                Christopher L. Ryan

2      Q.    Other than today, have you ever

3   seen a balance sheet?

4      A.    I don't recall.

5      Q.    Have you ever created a balance

6   sheet?

7      A.    I don't recall.

8      Q.    Have you ever used a balance sheet

9   for work?

10      A.    I don't recall.

11      Q.    While you worked at Floyd's, did

12   you have any responsibility for tracking

13   income?

14      A.    I don't recall.

15      Q.    Have you ever had a job where you

16   were responsible for tracking income?

17      A.    I don't recall.

18      Q.    Have you ever tracked income?

19      A.    I am not sure I understand the

20   term.

21      Q.    Which "term" is confusing you?

22      A.    "Tracking income."

23      Q.    Okay.

24           What do you understand "tracking"

25   to mean?



```
 1              Christopher L. Ryan
 2        A.   I don't know.
 3        Q.   Have you ever heard the word
 4   "tracking", before today?
 5        A.   Yes, I have.
 6        Q.   When you hard it before today, did
 7   you have an understanding of what it meant?
 8        A.   Sorry.
 9        Q.   It's all right.
10        A.   It has many meanings.  I don't know
11   all of them.
12        Q.   When I asked you earlier if you've
13   ever tracked income, what did you understand
14   me to mean?
15        A.   I didn't understand the context.
16   Sorry.
17        Q.   Okay.
18             MR. WRIGHT:  Let's go off
19        the record.
20             THE VIDEOGRAPHER:  One
21        moment.
22             MR. WRIGHT:  Never mind.
23             THE VIDEOGRAPHER:  Okay.
24             MR. WRIGHT:  He is back.  I
25        didn't know how long that was going
```



1              Christopher L. Ryan

2         to take.

3    By MR. WRIGHT:

4         Q.    So do you remember earlier at the

5    beginning of the deposition today, I asked

6    you, please if you don't understand what I am

7    asking, please ask me to clarify?

8              Do you recall that discussion?

9         A.    I do.

10        Q.    Okay.  So if you didn't understand

11   what I meant by "tracking income", I would

12   ask you, just going forward, please do ask

13   for clarification because I want to have a

14   clear record, okay?

15        A.    Okay.

16        Q.    So I previously asked you, have you

17   ever tracked income for work, and you said

18   you didn't recall.

19              Is it now your answer that you

20   don't understand the question?

21        A.    I don't understand the term.

22        Q.    You don't understand the term

23   "tracking income"?

24        A.    Yeah.

25        Q.    Okay.  Do you understand the term



1              Christopher L. Ryan

2    "income"?

3         A.   Yes.

4         Q.   Have you ever, as part of a job,

5    been responsible for keeping track of how

6    much income a company received?

7         A.   I don't recall.

8         Q.   And if I were to tell you that by

9    "tracking income", I mean keeping track of

10   how much income a company received, would you

11   then understand what I mean by tracking

12   income?

13        A.   Possibly.

14        Q.   Okay.  I will tell you, when I say

15   tracking income, I mean keeping track of how

16   much income a company has received.

17        A.   Okay.

18        Q.   Okay?

19        A.   Yes.

20        Q.   So for work, have you ever tracked

21   income?

22        A.   I don't recall doing so.

23        Q.   Do you currently track income as

24   part of your job?

25        A.   I don't recall doing so.



1              Christopher L. Ryan

2      Q.   Have you ever tracked income?

3      A.   I don't recall doing so.

4      Q.   Are you responsible for your own

5   household finances?

6      A.   I don't understand the question.

7      Q.   Do you pay the bills for your

8   household?

9      A.   I have, sometimes.

10      Q.   Does anyone else, currently, pay

11   the bills for your household?

12      A.   I don't recall.

13      Q.   Do you currently live with anyone

14   else?

15      A.   I am not aware of that.

16      Q.   To the best of your knowledge, you

17   do not currently live with anyone else?

18      A.   I don't believe I do.

19      Q.   Are you currently married?

20      A.   No.

21      Q.   Do you have any caretakers?

22      A.   I don't understand the question.

23      Q.   Is there a person who is

24   responsible for helping you shower, feed

25   yourself, bathe yourself, anything like that?



1              Christopher L. Ryan

2        A.   No.

3        Q.   Is there a person who is

4   responsible for making sure that you don't

5   spend too much money on frivolous things?

6        A.   I don't believe there is.

7        Q.   Is there a person, other than you,

8   that has control over your bank accounts, if

9   you have any?

10       A.   I don't know.

11       Q.   Do you have any bank account?

12       A.   I don't recall.

13       Q.   Do you have a bank account?

14       A.   I don't know.

15       Q.   Have you paid bills in the last

16  month?

17       A.   I don't recall.

18       Q.   Do you own your apartment?

19       A.   I don't recall.

20       Q.   Do you rent your apartment?

21       A.   I don't recall.

22       Q.   Do you pay rent?

23       A.   I don't recall.

24       Q.   Do you pay a mortgage?

25       A.   I don't know.



1              Christopher L. Ryan

2        Q.   Do you understand the term

3    "liability"?

4        A.   I am not sure.

5        Q.   Do you understand the term

6    "liability", in the context of finances?

7        A.   I am not sure.

8        Q.   Have you ever hard the term

9    liability before?

10       A.   I believe so.

11       Q.   Have you ever heard it in a context

12   of finance?

13       A.   I don't recall.

14       Q.   Have you ever heard it in the

15   context of economics?

16       A.   I don't recall.

17       Q.   Have you ever heard the term

18   "loan"?

19       A.   Yes.

20       Q.   Do you know what a "loan" is?

21       A.   Not specifically.

22       Q.   Do you know, generally, what a loan

23   is?

24       A.   No.

25       Q.   What is your understanding of the



1              Christopher L. Ryan

2   term loan?

3        A.   I don't -- I just don't know.  But

4   I have heard of the term.

5        Q.   Do you understand the term

6   "borrow"?

7        A.   No.

8        Q.   Have you ever heard the term

9   "borrow"?

10        A.   Yes.

11        Q.   Have you ever heard the term

12   "contract"?

13        A.   I don't recall.

14        Q.   Do you have any understanding of

15   what the term "contract" means?

16        A.   No.

17        Q.   Do you have any understanding of

18   what a "contract" is?

19        A.   No.

20        Q.   Have you ever reviewed a contract?

21        A.   I don't recall doing so.

22        Q.   Have you ever signed a contract?

23        A.   I don't recall.

24        Q.   Do you understand the term

25   "investor"?



1              Christopher L. Ryan

2        A.    "Understand"?

3        Q.    Uh-huh.

4        A.    I have heard the term.  I don't --

5    I don't know what it necessarily is.

6        Q.    Do you have any understanding of

7    what the term "investor" means?

8        A.    No.

9        Q.    Not generally?

10       A.    No.

11       Q.    Have you ever reviewed investors?

12       A.    I don't understand the question.

13       Q.    Have you ever been at a company

14   where someone was investing?

15       A.    I wouldn't know for sure.

16       Q.    Have you ever been responsible for

17   determining whether or not to accept an

18   investment?

19       A.    I don't recall.

20       Q.    Have you ever been responsible for

21   keeping track of who invested in a company?

22       A.    I don't recall.

23       Q.    While you were at Floyd's, do you

24   remember whether or not anyone ever invested

25   in the company?



1             Christopher L. Ryan

2        A.   I don't.

3        Q.   Have you heard reference to

4   something called a "12 percent senior note"?

5        A.   I don't recall.

6        Q.   Have you ever heard of "senior

7   promissory notes"?

8        A.   I don't recall.

9        Q.   Have you ever heard of "notes"?

10       A.   I understand the word.

11       Q.   What do you understand the word to

12   mean?

13       A.   You asked me if I had any notes.

14       Q.   Uh-huh, I did.

15            What did you understand the word to

16   mean?

17       A.   And I said I did not.

18       Q.   I recall.

19            What did you understand the word to

20   mean?

21       A.   Had I -- was I writing stuff down.

22       Q.   Have you ever heard the term

23   "note", in the context of finances?

24       A.   I don't recall.

25       Q.   Have you ever heard the term



1                    Christopher L. Ryan

2    "note", in the context of economics?

3         A.   I don't.

4         Q.   When you got your B.A. in

5    economics, did you specialize in any field?

6         A.   I don't recall.

7         Q.   Do you recall any classes you took?

8         A.   No.

9         Q.   Do you recall any classes you took

10   while you were at college?

11        A.   No.

12        Q.   Do you recall if you did any

13   extracurricular activities while you were at

14   college?

15        A.   Not specifically.

16        Q.   Generally?

17        A.   No.

18        Q.   Are you aware of -- are you

19   familiar --

20                    MR. WRIGHT:  Strike that.

21        Q.   Do you understand the term "profit

22   and loss"?

23        A.   Not specifically.

24        Q.   Do you understand it generally?

25        A.   Not really.



```
 1              Christopher L. Ryan
 2       Q.   Do you understand the term
 3   "profit"?
 4       A.   No.
 5       Q.   Have you ever seen a profit and
 6   loss statement?
 7       A.   I don't recall.
 8       Q.   Do you understand the term "P&L"?
 9       A.   I don't.
10       Q.   Have you ever seen a P&L statement?
11       A.   I don't recall.
12       Q.   While you were at Floyd's, did you
13   have a Floyd's e-mail address?
14       A.   I don't recall.
15       Q.   I will show you what I have marked
16   as Exhibit 101.  You should be seeing a
17   seven-page document with a stamp at the
18   bottom that says "Exhibit 101."
19            Can you see that?
20       A.   I believe I can.  I see the word
21   that says "Exhibit Number."
22       Q.   Again, you can scroll through it,
23   you can --
24       A.   I can scroll, okay.  I don't see
25   the exhibit number, though.
```



1            Christopher L. Ryan

2       Q.   It's at the bottom right-hand side

3   of the first page.

4       A.   Oh, yes, I see it now.  Yeah.

5       Q.   And if you look at the top, the

6   first page, does this look like an e-mail to

7   you?

8       A.   It does.

9       Q.   And you have seen e-mails before

10  today?

11      A.   I have.

12      Q.   Next to the "from" line, the sender

13  is shown as "Chris@FloydsofLeadville.com."

14           Do you see that?

15      A.   I can read that, yes.

16      Q.   Do you know if

17  Chris@FloydsofLeadville.com was your e-mail

18  address?

19      A.   I don't recall.

20      Q.   Looking at this today, do you have

21  any memory at all of ever using that e-mail

22  address?

23      A.   I don't.

24      Q.   Looking at this today, do you have

25  any reason to doubt that that was your e-mail



```
 1              Christopher L. Ryan
 2    address?
 3         A.   I -- I just I don't know.
 4         Q.   You see this e-mail was sent to
 5    Floyd Landis?
 6         A.   Let me find it.  Yes, I can see
 7    that.
 8         Q.   Did you ever work with Floyd
 9    Landis?
10         A.   I don't recall.
11         Q.   It says cc'ing "Jonathan Gazdak"
12    and "Alex Merle Huet."
13         A.   Yes.
14         Q.   Do you see that?
15         A.   I do.
16         Q.   Do you know anyone named Jonathan
17    Gazdak?
18         A.   I don't recall.
19         Q.   Do you know anyone named John
20    Gazdak?
21         A.   I don't recall.
22         Q.   You see this is attaching several
23    documents?
24         A.   I can't tell.
25         Q.   Do you see next to attachment it
```



1              Christopher L. Ryan

2   says, "Third quarter 2019 interest V32.XLSX"?

3        A.   Hold on a second.  Where is that?

4        Q.   Next to "attachments."  Right

5   underneath "subject", which is underneath

6   "cc", which is the line you were just looking

7   at.

8        A.   Oh, okay.  At the top.  Wait.

9             Oh, yes, I do, yeah.

10       Q.   Do you know if you sent this

11  e-mail?

12       A.   I don't recall.

13       Q.   Do you have any reason to doubt

14  that you sent this e-mail?

15       A.   Again, I don't recall.

16       Q.   Going to scroll down to page 5.  I

17  will move you there.  Just give me one

18  second.

19       A.   Okay.

20       Q.   You should, if the program is

21  working correctly, now you will see a page at

22  the top that says "Valued, Inc. profit and

23  loss by month" --

24       A.   Yes.

25       Q.   -- "January to October 2019."



1              Christopher L. Ryan

2       A.   Yes, I can see that.

3       Q.   So you are seeing the same page I

4  am.

5       A.   I am.

6       Q.   Have you ever seen a document that

7  looked like this?

8       A.   I don't recall.

9       Q.   Looking at this document today, do

10  you have any understanding of what

11  information it's communicating?

12      A.   No.

13      Q.   Do you know what "revenues" is?

14      A.   I am not sure.

15      Q.   Have you ever heard the term

16  "revenues" before?

17      A.   I have.

18      Q.   Did you have any understanding of

19  what it meant?

20      A.   I am not sure.

21      Q.   Sitting here today, do you have any

22  understanding of the meaning of the word

23  "revenues"?

24      A.   Not really.

25      Q.   "Not really" or "not at all"?



1              Christopher L. Ryan

2      A.   I -- I don't understand.  I don't

3  understand the term.

4      Q.   The word "revenue" has no meaning

5  to you?

6      A.   Not specifically, no.

7      Q.   What does it mean to you,

8  generally?

9      A.   I am not sure.

10     Q.   Sitting here today, when I say the

11 word "revenue", what do you think it means?

12     A.   I just don't know.

13     Q.   You ever heard the word "cost"

14 before?

15     A.   Yes.

16     Q.   Do you know what the word "cost"

17 means?

18     A.   Yes.

19     Q.   What does the word cost mean?

20     A.   It means I don't know how to I

21 don't know how to explain it.

22     Q.   Do you know what "goods sold"

23 means?

24     A.   I don't understand that term.

25     Q.   Do you understand what "cost of



1              Christopher L. Ryan

2    goods sold" means?

3         A.   No.

4         Q.   Do you understand what "gross

5    profit" means?

6         A.   No.

7         Q.   Do you understand what "percent

8    revenues" means?

9         A.   I am not sure.

10        Q.   Do you have any understanding of

11   what "percent revenues" means?

12        A.   No.

13        Q.   Do you know what "total expenses"

14   means?

15        A.   No.

16        Q.   Do you know what "percent" -- oh,

17   same question.  I apologize.

18             Do you know what E-B-I-T-D-A means?

19        A.   No.

20        Q.   Do you know what "interest" means?

21        A.   Not sure.

22        Q.   Do you have any idea?

23        A.   No, I am just not sure.

24        Q.   Do you know what "commissions"

25   means?



1                    Christopher L. Ryan

2          A.   No.

3          Q.   Have you ever heard of the word

4     "commissions" before?

5          A.   I have.

6          Q.   In what context?

7          A.   I don't recall.

8          Q.   Do you have any understanding, in

9     any context, of what the word "commissions"

10    means?

11         A.   No.

12         Q.   Do you understand the term "net

13    income"?

14         A.   Not specifically.

15         Q.   Generally?

16         A.   I am not sure.

17         Q.   Do you have any understanding what

18    the term "income" means?

19         A.   I have seen the word.

20         Q.   Do you have any understanding of

21    the word?

22         A.   Not -- not specifically.

23         Q.   Do you have any general

24    understanding of the word?

25         A.   Again, I just don't know.



1              Christopher L. Ryan

2      Q.   I am asking, sitting here today, do

3  you have any understanding of the word?

4      A.   Not -- I don't understand the

5  context of the question.

6      Q.   Is there any context in which you

7  would understand the word "income"?

8      A.   I am not sure.

9      Q.   If I asked you about how much money

10  you made and I said, "Do you know what your

11  income was last year?", would you understand

12  that question?

13      A.   I don't know.

14      Q.   Would you understand what it means

15  to "earn an income"?

16      A.   Not specifically.

17      Q.   All right.  I am going to have you

18  scroll down to the last page of this

19  document.

20      A.   Okay.

21      Q.   You should see something that says

22  "native document placeholder."

23      A.   One second.  "Native document" --

24  is that page 7?

25      Q.   Uh-huh.



1              Christopher L. Ryan

2        A.   Yeah, yeah, okay, I see it.

3        Q.   Okay.  I will represent to you that

4   this reflects that a document was produced to

5   -- produced in the course of this litigation

6   in it's native format, and so we don't have

7   it in pdf.  I am going to now show you the

8   document that was produced at Bates number

9   FOL, dash, SDNY 05073, underscore,

10  confidential.  I am showing what I have

11  labeled as Exhibit 101-A, which is the native

12  that was produced at that previously read

13  Bates number.

14            Can you see the document that has

15  at the -- going across the top, the word

16  "note, closing subscriber address, amount

17  received, third quarter 2020 or 2019"?

18       A.   I see a document.  I can't...

19       Q.   Again, you can scroll in, zoom in.

20       A.   My screen is a little frozen for

21  some reason.  I just see a lot of words and

22  letters.

23       Q.   So if you can look at the top of it

24  and make it large enough for you to be able

25  to read.



1              Christopher L. Ryan

2        A.   Oh, okay, I can.  Yeah, see "note."

3        Q.   "Note number", then "closing date",

4   and then "subscriber"?

5        A.   Yes.

6        Q.   Then running down the side in that

7   green column, do you see the numbers 1, 2, 3,

8   4, et. cetera?

9        A.   I do.

10       Q.   Have you ever seen this document

11  before today?

12       A.   I don't recall.

13       Q.   Have you ever seen a document that

14  looks like this before today?

15       A.   Not that I know of.

16       Q.   Do you know what the term

17  "subscriber" means?

18       A.   I don't.

19       Q.   Do you know what the term "address"

20  means?

21       A.   Yes.

22       Q.   What is an "address"?

23       A.   It's -- it's -- my address is where

24  I live.

25       Q.   And do you see under the -- the



1              Christopher L. Ryan

2    word "address", do you see a list of things

3    that are formatted, similar to the way your

4    address is formatted?

5         A.   I do.

6                   MR. WRIGHT:  We have been

7              going about an hour since our last

8              break.  Let's take a ten-minute

9              break.  Unless you want to break

10             for lunch now.

11                  MR. VEDRA:  No, thank you.

12                  THE VIDEOGRAPHER:  Let me

13             take us off the record.  One

14             moment.  Going off the record.

15                  The time is 1:05.

16                  (Whereupon, a recess was

17             taken at this time.)

18                  THE VIDEOGRAPHER:  We are

19             back on record.  The time is 1:16.

20   BY MR. WRIGHT:

21        Q.   I am now going to show you what I

22   have marked as Defense Exhibit 102.

23             Are you seeing on your screen what

24   appears to be an e-mail?

25        A.   Yes.



1                   Christopher L. Ryan

2                        MR. VEDRA:  Aaron, before we

3               go any further, so it's not marked

4               as "Defense Exhibit 102."  It's

5               just marked as "102."

6                        MR. WRIGHT:  Sorry, you are

7               right.  The stamps will not apply

8               with the word "defense."

9                        MR. VEDRA:  Well, I am just

10              worried that we're going to start

11              crossing over to numbers.  Since I

12              was doing numbers, now you are

13              doing numbers, and they are not

14              listed as "defendants" --

15                       MS. COLE:  I can fix the

16              stamps.

17                       MR. VEDRA:  Thank you.

18                       MR. WRIGHT:  Thank you,

19              Holly.

20                       Thank you for the

21              correction, Mr. Vedra.  I

22              appreciate it.

23      BY MR. WRIGHT:

24          Q.   While Holly is making those

25      modifications, are you familiar with the



1              Christopher L. Ryan

2    concept of "income projection"?

3         A.   I am not sure.

4         Q.   Are you familiar with the concept

5    of "looking to the future and trying to

6    accurately estimate how much money a company

7    will make"?

8         A.   No.

9         Q.   No.

10             Is that anything you have ever done

11   for work?

12        A.   I don't recall.

13        Q.   Have you ever done anything

14   similar?

15        A.   Not sure I understand the question.

16        Q.   Have you ever, for work, done

17   anything that might resemble trying to

18   estimate how much a company will earn?

19        A.   I don't recall doing so.

20        Q.   Let me see if the -- it's still

21   showing up.  Sorry, I'm -- we will come back

22   to it.  We will come back to the exhibit.

23             Are you familiar with the concept

24   of "payroll"?

25        A.   Not specifically.



```
 1              Christopher L. Ryan
 2      Q.   Are you generally?
 3      A.   I am not sure.
 4              MS. COLE:  Which exhibit do
 5         you need first?
 6              MR. WRIGHT:  102.
 7              Thank you, Holly.
 8   BY MR. WRIGHT:
 9      Q.   Are you generally familiar with the
10   concept of "payroll"?
11      A.   Again, I am not sure.
12      Q.   When you have worked, have you been
13   paid for working?
14      A.   I am not sure.
15      Q.   Are you being paid for your work at
16   Solvent?
17      A.   I am not sure.
18      Q.   Are you being paid for any work,
19   currently?
20      A.   I don't know.
21      Q.   Have you ever received a W-2?
22      A.   I don't recall.
23      Q.   Have you ever received a 1099?
24      A.   I don't know.
25      Q.   Have you ever been responsible for
```



1              Christopher L. Ryan

2    ensuring that a company paid anyone?

3         A.   I don't recall.

4         Q.   Do you know if you were paid for

5    working at Floyd's?

6         A.   I don't recall.

7         Q.   Do you know if anyone was paid for

8    working at Floyd's?

9         A.   I am not sure.

10        Q.   Do you know if Floyd's had anyone

11   working in human resources?

12        A.   I don't remember.

13        Q.   Do you know if anyone at Floyd's

14   had the authority to sign checks?

15        A.   I don't remember.

16        Q.   Let me just see if the exhibit is

17   fixed.  It is.

18             I will now show you what's been

19   mark as D-102.

20             MR. WRIGHT:  And, again,

21        thank you for that, Mr. Vedra.  I

22        appreciate it.

23             No, it went away.  Let me

24        try one more time.

25             Are you seeing what now has



1          Christopher L. Ryan

2          a stamp at the bottom that says

3          D-102?

4                    MR. VEDRA:  Yes.

5     BY MR. WRIGHT:

6          Q.   And does this appear to be an

7     e-mail?

8          A.   Let me see.  I can't see the top.

9          Q.   Scroll up and take a look at it.

10         A.   It's very small.  Okay, there it

11    is.  Yes, it appears to be an e-mail.

12         Q.   Do you recognize this document?

13         A.   I don't.

14         Q.   The "subject" line is listed as

15    "FOL revenues."  Do you see that?

16         A.   I see that.

17         Q.   Do you know what "FOL" means?

18         A.   I am not sure.

19         Q.   Does "FOL" mean "Floyd's of

20    Leadville"?

21         A.   I don't know.

22         Q.   Have you ever heard Floyd's of

23    Leadville referred to as "FOL"?

24         A.   I don't recall.

25         Q.   Have you ever seen Floyd's of



1              Christopher L. Ryan

2    Leadville listed as "FOL"?

3         A.   I don't remember.

4         Q.   Do you know what the term

5    "revenues" means?

6         A.   I've seen that word.

7         Q.   Do you know what it means?

8         A.   Not specifically.

9         Q.   Do you know what it means

10   generally?

11        A.   Again, I am not sure.

12        Q.   Sitting here today, does the word

13   "revenue" have any meaning to you?

14        A.   Again, I am not sure.

15        Q.   I will ask you to scroll down to

16   page 4.  Actually, you know what, I will just

17   direct you there.

18        A.   Okay.

19        Q.   You should be seeing page 4, which

20   at the top is labeled "unaudited plus pro

21   forma Lloyd's of Leadville, Inc. CBD product

22   lines."  Do you see that?

23        A.   I do.

24        Q.   Do you know what the term

25   "unaudited" means?



1              Christopher L. Ryan

2         A.   I am not sure.

3         Q.   Do you know what the term "pro

4    forma" means?

5         A.   I don't know.

6         Q.   Do you know what the term "product

7    lines" means?

8         A.   Not specifically.

9         Q.   Do you know what it means

10   generally?

11        A.   Not really.

12        Q.   Does the phrase "CBD product lines"

13   have any meaning to you?

14        A.   No, I don't understand.

15        Q.   The next line reads "revenues plus

16   gross margins by CBD product lines."

17        A.   I see it.

18        Q.   Do you know what the term "gross

19   margins" means?

20        A.   Not sure.

21        Q.   Do you know what the term "margin"

22   means?

23        A.   Not sure.

24        Q.   Have you ever seen a document that

25   looks like this before?



1           Christopher L. Ryan

2      A.   I don't recall.

3      Q.   Looking across the top of the chart
4  -- so we read the label at the top, but now
5  underneath it there's a chart.

6           Do you see a chart that says
7  "actual 2018", and then a line that says
8  "projected" with "2019, 2020", and "2021"
9  under it?

10     A.   Yes, I see that.

11     Q.   Have you ever seen a document that
12 shows "actual income"?

13     A.   I am not sure.

14     Q.   Have you ever seen a document that
15 shows "projected" in it?

16     A.   I am not sure.

17     Q.   When you say "not sure", what do
18 you mean by that?

19     A.   It means that I am not sure.

20     Q.   So by "sure", do you mean
21 absolutely certain?

22     A.   It means I -- I -- I don't know how
23 to explain it any better than just saying, "I
24 am not sure."

25     Q.   Do you have any understanding, at



1              Christopher L. Ryan

2   all, of what "margins" means?

3       A.   I don't know.

4       Q.   Sitting here today, can you tell me

5   what a "margin" is?

6       A.   I don't believe I can.

7       Q.   Sitting here today, could you --

8              MR. WRIGHT:  Strike that.

9       Q.   Do you know what the term "stock"

10  means?

11      A.   I am not sure.

12      Q.   In the context of business, do you

13  know what the term "stock" means?

14      A.   I don't know.

15      Q.   Have you ever purchased stock in a

16  company?

17      A.   I don't recall.

18      Q.   Have you ever owned stock in a

19  company?

20      A.   I don't recall.

21           Sorry about the noise.

22      Q.   It's all right.  It's all right.

23              MR. WRIGHT:  Holly, the

24           exhibit I have written out as

25           "Exhibit 103", you have labeled as



1            Christopher L. Ryan

2            "102."  Can you correct that?  We

3            will come back to it.

4                    MS. COLE:  What's the Bates

5            number?

6                    MR. WRIGHT:  Bates number is

7            FOL-SDNY 06427.

8    BY MR. WRIGHT:

9         Q.   Have you ever heard the phrase "due

10   diligence"?

11        A.   I am not sure.

12        Q.   Do you understand what the phrase

13   "due diligence" means?

14        A.   Not really.

15        Q.   Do you have any understanding of

16   what the phrase "due diligence" means?

17        A.   Not really.

18        Q.   Have you ever conducted due

19   diligence?

20        A.   Not -- not to my recollection.

21        Q.   Have you ever been involved in due

22   diligence?

23        A.   Don't recall doing so.

24        Q.   Do you ever provide due diligence

25   materials to anyone?



1              Christopher L. Ryan

2        A.   I don't remember.

3        Q.   Have you ever reviewed documents in

4   the course of your work?

5        A.   I don't recall doing so.

6        Q.   Have you ever received documents

7   from a company?

8        A.   Possibly, but I don't remember,

9   specifically.

10       Q.   In the course of your work, have

11  you ever received documents from a company,

12  other than your own?

13       A.   Possibly, but I just don't

14  remember, specifically.

15       Q.   Generally?

16       A.   Again, I don't -- I don't I don't

17  recall.

18       Q.   Okay.

19       A.   It's possible, but I don't recall.

20       Q.   In the course of your job, do you

21  ever review documents?

22       A.   I don't remember doing so.

23       Q.   In the course of your job, do you

24  ever look at documents?

25       A.   I am not sure.



1                    Christopher L. Ryan

2         Q.   In the course of your job, do you

3    ever ask questions?

4         A.   I don't understand the question.

5         Q.   As part of your work, do you ever

6    ask anyone for information?

7         A.   I don't remember.

8         Q.   You ever ask anyone for facts?

9         A.   Not -- not sure I understand the

10   question.

11        Q.   Do you ever ask anyone for specific

12   factual data points?

13        A.   I am not sure.

14        Q.   You ever ask anyone to provide you

15   with specific numbers, in the course of your

16   work?

17        A.   Not that I can remember.

18        Q.   Can you remember ever asking anyone

19   how much money a product made?

20        A.   Not -- not to my recollection, no.

21        Q.   Or how much something costs?

22        A.   I don't remember.

23        Q.   Or how many units of a product the

24   company had on hand?

25        A.   Don't -- don't remember.



1              Christopher L. Ryan

2        Q.   Have you ever asked anyone about,

3   like, where a business is located?

4        A.   I don't remember.

5        Q.   Do you know what the term "audited"

6   means?

7        A.   I don't.

8        Q.   Have you ever participated in an

9   audit?

10       A.   I don't recall doing so.

11       Q.   Do you recall if any company you

12  have ever worked for has been audited?

13       A.   I don't.

14       Q.   I am going to show you what is

15  labeled as Exhibit D-3.  You should be seeing

16  an exhibit that has "D-103" at the bottom and

17  then underneath that, the letters "FOL-SDNY

18  06427."  Are you seeing that?

19       A.   Yes.

20       Q.   Does this appear to be an e-mail to

21  you?

22       A.   It does.

23       Q.   Do you recall ever seeing this

24  document before?

25       A.   I don't.



1              Christopher L. Ryan

2        Q.   Do you see at the top, this e-mail

3   is sent from Chris@FloydsofLeadville.com?

4        A.   I do.

5        Q.   Do you see that it's sent "to

6   Jonathan Gazdak, Shawn Weadock, Floyd

7   Landis", and "Alexandra Merle Huet"?

8        A.   I do.

9        Q.   Do you know anyone named Shawn

10  Weadock?

11       A.   I don't recall.

12       Q.   Do you see the "subject" line is

13  "Valued, Inc. diligence materials"?

14       A.   Yes, I can read that.

15       Q.   Do you see there's a number of

16  documents attached as "diligence materials"?

17       A.   D-O-C-X?

18       Q.   Some of them do, yes.

19       A.   Okay.  Yes, I see that.

20       Q.   You see the body of the e-mail

21  reads "Attached is the following

22  information", and then there's a list of

23  documents?

24       A.   Yes.

25       Q.   Do you know what an "asset



1              Christopher L. Ryan

2  liability summary" is?

3       A.   I don't.

4       Q.   Do you know what a "summary" is?

5       A.   Yes.

6       Q.   What is a "summary"?

7       A.   Hard to explain, for me.

8       Q.   Just do your best.

9       A.   It means future versus more.

10      Q.   I think I have already asked this,

11  but just so I am sure, do you know what an

12  "asset" is?

13                MR. VEDRA:  Objection to

14           form.

15                THE WITNESS:  I don't

16           remember.

17  BY MR. WRIGHT:

18      Q.   You see item number two is "Tru

19  Cannabis note."  Do you see that?

20      A.   I do.

21      Q.   Have you ever heard of Tru Cannabis

22  before?

23      A.   I don't remember.

24      Q.   You see number three is "Tru

25  Cannabis e-mail agreement"?



1              Christopher L. Ryan

2       A.   I see that, yes.

3       Q.   Do you know what an "agreement" is?

4       A.   I do.

5       Q.   What is an "agreement"?

6       A.   Hard to explain.

7       Q.   Okay, do your best.

8       A.   Again, it's hard for me to explain.

9       Q.   I understand it's difficult.  I am

10   just trying to get an understanding of what

11   you do and don't understand.

12       A.   Yeah.

13       Q.   So if you can, just give me your

14   best understanding of what an "agreement" is.

15       A.   It would be an understanding.

16       Q.   Is it in -- is your understanding

17   of an agreement that it's an understanding

18   between multiple people or entities?

19       A.   It could be.

20       Q.   If it's just one person, would you

21   -- would it be an agreement?

22       A.   I am not sure.

23       Q.   Item number four is "series B

24   promissory note."  Do you see that?

25       A.   I do.



1           Christopher L. Ryan

2       Q.   Do you know what a "promissory

3   note" is?

4       A.   I am not sure.

5       Q.   Have you ever had a promissory

6   note?

7       A.   I don't recall.

8       Q.   You see item five is "Chris Ryan

9   promissory note"?

10      A.   I do.

11      Q.   You see it?

12      A.   Yes.

13      Q.   Do you recall ever having a

14  promissory note with Floyd's of Leadville?

15      A.   I don't.

16      Q.   Do you recall ever loaning money to

17  Floyd's of Leadville?

18      A.   I don't.

19      Q.   Do you recall ever giving money to

20  Floyd's of Leadville?

21      A.   I don't recall.

22      Q.   Do you recall Floyd's of Leadville

23  ever giving you money?

24      A.   I don't remember.

25      Q.   Do you recall them ever repaying a



1              Christopher L. Ryan

2    loan you gave them?

3         A.   I don't remember.

4         Q.   Do you recall ever giving them a

5    loan?

6         A.   I don't.  I don't remember.

7         Q.   Item number six is "hemp purchase

8    agreement, parentheses, farmers."

9              Do you see that?

10        A.   I do.

11        Q.   Do you understand what a "hemp

12   purchasing agreement" is?

13        A.   I don't understand that term.

14        Q.   You see item number seven is

15   "Broadhaven Hemp financing agreement."

16        A.   I do.

17        Q.   Have you ever heard of "Broadhaven

18   Hemp" before?

19        A.   I am not sure.

20        Q.   Does it ring a bell?

21        A.   I -- I -- I don't -- I can't place

22   it.  I don't know.

23        Q.   Did you interact with Broadhaven

24   Hemp, while you were at Floyd's of Leadville?

25        A.   I don't recall.



1             Christopher L. Ryan

2        Q.   See item number eight is

3    "Broadhaven Hemp subscription e-mail, August

4    2019"?

5        A.   I see that.

6        Q.   Do you know what a "subscription

7    e-mail" is?

8        A.   I don't.

9        Q.   Item number ten is "Broadhaven Hemp

10   use of funds, August 2019."  Do you see that?

11       A.   That's item number nine?

12       Q.   Yes, I'm sorry.  I must have

13   misspoke.

14            Item number nine is Broadhaven Hemp

15   use of funds, August 2019"?

16       A.   Yes, I see that.

17       Q.   Do you know what "use of funds"

18   means?

19       A.   I don't.

20       Q.   Item number ten, "Broadhaven Hemp

21   commercial agreement e-mail"; do you know

22   that -- is that correct?

23       A.   I see that, yes.

24       Q.   Do you know what a "commercial

25   agreement" is?



1                  Christopher L. Ryan

2        A.   No.

3        Q.   I will take you to page 17 of the

4   e-mail, which is one of the attachments, and

5   you should see a page now that says "native

6   document placeholder."

7        A.   I see that.

8        Q.   And it directs -- it says, "Please

9   review the native document

10  FOL-SDNY06433_confidential.XLSX."

11            Do you see that?

12       A.   I see -- yes, I do.  Yeah.

13       Q.   I am now going to show you Exhibit

14  D-103.  I will represent to you that this is

15  the document that was produced at that Bates

16  label.  Have you seen --

17       A.   Okay.

18       Q.   -- this document before today?

19       A.   I don't recall this document.

20       Q.   Just to be clear, you should be

21  seeing a document that at the top says

22  "Valued, Inc. asset and liability summary,

23  parentheses, excludes 12 percent senior

24  notes."

25       A.   I am having trouble -- oh, there it



1            Christopher L. Ryan

2   is.  Yes, I can see that.

3        Q.   You understand that "Valued, Inc."

4   was "Floyd's of Leadville"?

5        A.   I am not sure.

6        Q.   Do you know if you created this

7   document?

8        A.   I don't recall.

9        Q.   Do you know who created this

10  document?

11       A.   I don't.

12       Q.   And scrolling down to page 2, have

13  you ever seen a document that looks like this

14  before?

15       A.   Not specifically.

16       Q.   Have you seen one that looks like

17  it, generally?

18       A.   Yes.

19       Q.   Other than today, have you seen a

20  document that looks like this, generally?

21       A.   I am not.  I am not sure.

22       Q.   Do you know what any of your job

23  duties at Floyd's of Leadville were?

24       A.   I don't recall.

25       Q.   Do you know if you had any job



1              Christopher L. Ryan

2    duties?

3         A.   I don't recall.

4         Q.   Do you remember doing anything for

5    Floyd's of Leadville at all?

6         A.   I don't recall.

7         Q.   Do you know if anyone reviewed your

8    work?

9         A.   I don't recall.

10        Q.   Are you familiar with the term

11   "generally accepted accounting principles"?

12        A.   Not specifically, no.

13        Q.   Are you generally familiar with it?

14        A.   I understand the words, but I am

15   not specifically familiar with the term.

16        Q.   Have you ever heard of "GAAP"?

17        A.   I am not sure.

18        Q.   Sometimes pronounced GAAP?

19        A.   Yeah, I am not sure.

20        Q.   Have you ever had to work with any

21   generally accepted accounting -- generally

22   accepted accounting principles?

23        A.   I am not sure.

24        Q.   Have you ever heard of "Alexander

25   Capital"?



1                Christopher L. Ryan

2       A.   Yes.

3       Q.   In what context?

4       A.   I am not sure.

5       Q.   Did you ever work Alexander

6  Capital?

7       A.   I don't recall.

8       Q.   Did Alexander Capital ever do any

9  work for a company you were involved with?

10      A.   I am not sure.

11      Q.   Do you recall ever being involved

12  in a discussion about whether or not to hire

13  Alexander Capital?

14      A.   I don't recall.

15      Q.   Do you ever -- do you recall ever

16  hiring Alexander Capital?

17      A.   I don't recall.

18      Q.   Are you familiar with the term

19  "investment bank"?

20      A.   Not specifically.

21      Q.   Are you generally familiar with it?

22      A.   I understand the words.

23      Q.   What do you understand the words to

24  mean?

25      A.   I am not sure.



1                  Christopher L. Ryan

2        Q.   What do you think you understand

3   the words to mean?

4        A.   I am not sure.

5        Q.   Do you understand the word

6   "investment bank"?

7        A.   Not specifically.

8        Q.   Do you understand them, generally?

9        A.   I am not sure.

10       Q.   Do you know if Floyd's of Leadville

11  ever took out a senior promissory note?

12       A.   I don't recall.

13       Q.   Do you know if Floyd's of Leadville

14  didn't take out a promissory note?

15       A.   I don't recall.

16       Q.   Do you have any memory at all of

17  promissory notes while you were at Floyd's of

18  Leadville?

19       A.   Not to my recollection.

20       Q.   I will go back to exhibit -- which

21  was previously 101A.  It's now marked as

22  D-101A.

23            Do you recall looking at this

24  earlier today?

25       A.   I do.  I do.



1              Christopher L. Ryan

2        Q.   Do you see down the side it says

3   "note number", and then it's got a numerical

4   list?

5        A.   Is that the green column?

6        Q.   The green column.

7        A.   Yes, I see that.

8        Q.   Then it's got a list of

9   subscribers, two columns over.  Starts with

10  "Paul Yurfest", then it goes to "Scott D.

11  Thompson" --

12       A.   Yes.

13       Q.   -- and so on.

14       A.   Yeah, I see that.

15       Q.   Looking at that list of note

16  numbers and names, does that help refresh

17  your recollection about being involved with

18  promissory notes while at Floyd's?

19       A.   It doesn't.

20       Q.   Looking at the column labeled

21  "third quarter 2019", does that help your

22  recollection of whether or not you tracked

23  interest payments on notes?

24       A.   It doesn't.

25       Q.   Do you recall whether or not CBD



1              Christopher L. Ryan

2   was legal at the time you began working for

3   Floyd's?

4        A.   I don't.

5        Q.   Do you recall if there was a time

6   when it was legalized?

7        A.   I don't.

8        Q.   While you were working at Floyd's,

9   did Floyd's change its business model?

10       A.   I -- I don't remember.

11       Q.   Was there a time when Floyd's was

12  primarily focused on the cannabis industry?

13       A.   I don't recall.

14       Q.   Was there a time when Floyd's was

15  primarily focused on CBD products?

16       A.   Not sure.

17       Q.   Have you ever heard the name

18  Floyd's Fine Cannabis?

19       A.   I don't remember.

20       Q.   While you were working at Floyd's,

21  did Floyd's operate a cannabis company?

22       A.   I don't recall.

23       Q.   Do you recall if it operated any

24  cannabis dispensaries?

25       A.   I don't remember.



1              Christopher L. Ryan

2        Q.    Do you remember if it operated any

3   farms?

4        A.    I don't remember.

5        Q.    Do you remember if it operated any

6   grow operations?

7        A.    I don't remember.

8        Q.    I will show you what's been marked

9   as Exhibit D-104.

10             Does this appear to be an e-mail?

11       A.    Let me click that.  Yes, it does.

12       Q.    Do you see at the top it's sent

13  from -- it says "from, Jonathan Gazdak, to

14  Floyd Landis", cc'ing, "Alex Merle-Huet", and

15  "Chris Ryan"?

16       A.    I see that, yes, I do.

17       Q.    And the "subject" line is Valued,

18  slash, Floyd's, parentheses, updated

19  corporate info, close parentheses."

20             Do you see that?

21       A.    I see that, I do.

22       Q.    Do you recognize this e-mail?

23       A.    I don't.

24       Q.    Do you recall receiving this

25  e-mail?



1              Christopher L. Ryan

2      A.   I don't.

3      Q.   Do you have any reason to doubt

4  that you received this e-mail?

5      A.   I don't.

6      Q.   And do you see that in this e-mail

7  the sender is asking for corporate

8  information about Floyd's?

9      A.   Yes, I see that.

10     Q.   Do you see this e-mail was sent at

11  "1:44, Central time", on "November 12, 2019"?

12     A.   I do.

13     Q.   I am going to show you --

14     A.   I've to get a cord.  My phone is

15  running low.  Just give me a second.

16     Q.   Okay.  Will you re -- yeah, thank

17  you.

18     A.   Okay, good.

19     Q.   So I am showing you now what we

20  have labeled as D-105.

21     A.   I see that.

22     Q.   Does this appear to be an e-mail?

23     A.   It does.

24     Q.   Does this e-mail appear to be "from

25  Floyd Landis, to Jonathan Gazdak, Mark



1                Christopher L. Ryan

2    Leonard, Barrie Clapham, and Frank

3    DiMartini", cc'ing "Alex Merle Huet" and

4    "Chris Ryan"?

5         A.   I see that, yes.

6         Q.   If you look down at the bottom of

7    the first page, do you see the e-mail that we

8    were just looking at in Exhibit D-104?

9         A.   I see that, yes.

10        Q.   So does this appear to be sent in

11   response to that e-mail?

12        A.   I can't tell.

13        Q.   Have you ever seen this document

14   before?

15        A.   Not to my recollection.

16        Q.   Do you know if you received this

17   e-mail?

18        A.   I don't recall.

19        Q.   Do you have any reason to doubt

20   that you received this e-mail?

21        A.   I don't.

22        Q.   Do you see in this e-mail the

23   sender is asking for the same information

24   that the sender of the e-mail that we looked

25   at in D-104 was?



1                    Christopher L. Ryan

2        A.   I'm sorry, repeat that.

3        Q.   Sorry, sure.  That was poorly

4    phrased and I apologize.

5              The e-mail that we looked at in

6    D-104, was asking for an "updated cap table."

7        A.   Yes.

8        Q.   Do you see this e-mail is asking

9    for the same thing?

10       A.   Yes.

11       Q.   The e-mail 104 was asking for

12   "current financials, P&L statements to date",

13   and so on.

14             Do you see this e-mail is asking

15   for the same thing?

16       A.   It appears to be doing the same

17   thing.

18       Q.   The e-mail in 104 is asking for

19   current licenses and then it's also asking

20   for "updated asset schedules" for the

21   company; do you see that?

22       A.   I see that.

23       Q.   And this e-mail is asking for the

24   same thing?

25       A.   I do, I see that.



1                  Christopher L. Ryan

2          Q.   And the e-mail from 104 was asking

3    for that information about "Valued, slash,

4    Floyd's."  Do you see that?

5          A.   I can't see that.

6          Q.   It's in the first sentence of that

7    bottom e-mail.

8          A.   Oh, I see that, yes.  I see that.

9          Q.   And looking in the same place on

10   the top e-mail, do you see that this e-mail

11   is asking for that information about

12   "Provision"?

13         A.   I see that.

14         Q.   Have you ever heard the name

15   "Provision"?

16         A.   Not to my recollection.

17         Q.   Have you ever hard the name Mark

18   Leonard, before today?

19         A.   I don't recall.

20         Q.   Have you ever hard the name Barrie

21   Clapham, before today?

22         A.   I am not sure.

23         Q.   Do you have any idea what Provision

24   was?

25         A.   No.



1                Christopher L. Ryan

2      Q.   And this e-mail, this top e-mail is

3   sent "November 12, 2019", at 1:52 Eastern

4   time -- "Central time", I'm sorry.

5      A.   I see that.

6      Q.   I will now show you what is been

7   marked as Exhibit D-106.  Are you seeing what

8   is appearing to be an e-mail?

9      A.   I see that, yes.

10     Q.   This e-mail is sent "from

11  Chris@FloydsofLeadville.com, to Barrie

12  Clapham, Floyd Landis", and "Alexandra

13  Merle."

14          Do you see that?

15     A.   I do.

16     Q.   Do you recall ever seeing this

17  e-mail before?

18     A.   I don't.

19     Q.   Do you recall sending this e-mail?

20     A.   I don't.

21     Q.   Do you have any reason to doubt

22  that you sent this e-mail?

23     A.   I don't.

24     Q.   Do you see anyone from Alexander

25  Capital on this e-mail?



1              Christopher L. Ryan

2      A.   I am not sure.

3      Q.   Next to Mr. Clapham's name is a

4   parentheses that reads "L&S."

5           Do you see that?

6      A.   I do.

7      Q.   Do you know what "L&S" is?

8      A.   I don't.

9      Q.   I will ask you to -- looking at the

10   top, do you see that it lists two

11   attachments, "Valued, Inc. profit and loss,

12   year-to-date, October 2019 versus 2018, dot,

13   pdf", and then "Valued, Inc., underscore,

14   balance sheet, 2019 plus 2018, year-to-date."

15           Do you see that?

16      A.   I do see that.

17      Q.   And I will show you page 3 of 4.

18      A.   Okay.

19      Q.   Do you see a document that is

20   labeled at the top "Valued, Inc. balance

21   sheet, as of October 31, 2019"?

22      A.   Okay.  Yes, I see that.

23      Q.   Do you recognize this document?

24      A.   I don't.

25      Q.   Did you create this document?



```
 1              Christopher L. Ryan
 2       A.   Not to my recollection.
 3       Q.   Do you know who created this
 4  document?
 5       A.   I don't.
 6       Q.   Under "assets", do you see the line
 7  that says "bank accounts"?
 8       A.   I do.
 9       Q.   Do you understand what "bank
10  accounts" are?
11       A.   I am not sure.
12       Q.   Under that it says, "accounts
13  receivable"?
14       A.   Yes.
15       Q.   Do you know what "accounts
16  receivable" are?
17       A.   I am not sure.
18       Q.   Under that it says, "other current
19  assets."  Do you see that?
20       A.   I do.
21       Q.   Do you know what other "current
22  assets" are?
23       A.   I don't.  I am not sure.
24       Q.   Do you know what the phrase "other
25  current assets" means?
```



1              Christopher L. Ryan

2      A.   Not specifically.

3      Q.   Do you know what it means,

4   generally?

5      A.   I am not sure.

6      Q.   Do you know what the phrase

7   "accounts receivable" means?

8      A.   Not specifically.

9      Q.   Do you know, generally?

10      A.   I am not sure.

11      Q.   Do you know what the phrase "bank

12   accounts" means?

13      A.   Not specifically.

14      Q.   Do you know, generally?

15      A.   I am not sure.

16      Q.   Under that, do you see where it

17   says "fixed assets"?

18      A.   I do.

19      Q.   Have you ever hard the term "fixed

20   assets" before?

21      A.   I have.

22      Q.   Did you understood -- do you

23   understand what it meant when you heard that

24   phrase?

25      A.   I am not sure.



1                    Christopher L. Ryan

2          Q.   Do you, sitting here today, have

3     any understanding of what a "fixed asset" is?

4          A.   Not specifically.

5          Q.   Do you have any general

6     understanding of what a "fixed asset" is,

7     sitting here today?

8          A.   I am not sure.

9          Q.   Under that it says, "other assets."

10              Do you see that?

11         A.   I do.

12         Q.   Do you know what the phrase "other

13    assets" means?

14         A.   No.

15         Q.   And then under that is "total

16    assets", and another -- "total assets is the

17    line, liabilities and equity."

18              Do you know what the phrase

19    "liabilities and equities" means?

20         A.   Not specifically.

21         Q.   Do you know what it means,

22    generally?

23         A.   I am not sure.

24         Q.   Sitting here today, do you have any

25    understanding of what "liabilities and



1             Christopher L. Ryan

2  equity" might mean?

3       A.   Again, not specifically.

4       Q.   Do you have any general

5  understanding of what it might mean, sitting

6  here today?

7       A.   Not really.

8       Q.   Under that is "accounts payable."

9       A.   Yes.

10      Q.   Do you know what "accounts payable"

11 means?

12      A.   Not really.

13      Q.   Have you ever heard the phrase

14 "accounts payable" before?

15      A.   Yes.

16      Q.   Do you know in what context?

17      A.   No.

18      Q.   Does it have any meaning to you?

19      A.   Not specifically.

20      Q.   Does it have any general meaning to

21 you?

22      A.   It doesn't.

23      Q.   Under that is "credit cards."

24      A.   Yes.

25      Q.   Do you know what "credit cards"



1              Christopher L. Ryan

2   are?

3        A.   Yes.

4        Q.   What are "credit cards"?

5        A.   They are plastic cards.

6        Q.   And when a person uses a credit

7   card, do you understand that they, then, have

8   to -- let me ask you this.  Let me start

9   over.

10            Do you know how credit cards are

11  used?

12       A.   Not really.

13       Q.   Have you ever used a credit card?

14       A.   Not to my recollection.

15       Q.   Under that is "other current

16  liabilities."  Do you see that?

17       A.   I do.

18       Q.   Do you know what "other current

19  liabilities" means?

20       A.   Not specifically.

21       Q.   Do you know what it means,

22  generally?

23       A.   No.

24       Q.   Have you ever heard the phrase

25  "other current liabilities" before?



1              Christopher L. Ryan

2        A.   Yes.

3        Q.   Sitting here today, does the phrase

4   "other current liabilities" have any meaning

5   to you?

6        A.   No.

7        Q.   Then under that, you see "long-term

8   liabilities"?

9        A.   I see that.

10       Q.   Do you know what the phrase

11  "long-term liabilities" means?

12       A.   No.

13       Q.   Does it have any meaning to you,

14  sitting here today?

15       A.   Not specifically.

16       Q.   Does it have any meaning to you,

17  sitting here today, generally?

18       A.   I am not sure.

19       Q.   Sitting here today, does it ring a

20  bell?

21       A.   It doesn't.

22       Q.   Under that, you see "total

23  liabilities"?

24       A.   Yes.

25       Q.   Do you know what "total



800.211.DEPO (3376)
EsquireSolutions.com

1              Christopher L. Ryan

2    liabilities" means?

3         A.   Not really, no.

4         Q.   Have you ever heard the phrase

5    "total liabilities" before?

6         A.   I have.

7         Q.   Does the phrase "total liabilities"

8    have any meaning to you, sitting here today?

9         A.   Not specifically.

10        Q.   Does it have any meaning to you,

11   sitting here today, generally?

12        A.   Not really.

13        Q.   Under that you see "shareholders

14   equity net"?

15        A.   Yes, I see that.

16        Q.   Do you know what "shareholders"

17   are?

18        A.   Not really.

19        Q.   Do you have any idea?

20        A.   No.

21        Q.   Do you know what "equity" is?

22        A.   Not really.

23        Q.   Do you have any idea?

24        A.   No.

25        Q.   Do you understand the concept of



1              Christopher L. Ryan

2    "netting" something?

3        A.   Not really.

4        Q.   Have you ever had to net out a

5    profit or a loss?

6        A.   I don't recall doing so.

7        Q.   Under that you see "total

8    liabilities and equity"?

9        A.   Yes.

10       Q.   Do you know what "total liabilities

11   and equities" means?

12       A.   Not sure.

13       Q.   Do you understand the term "total"?

14       A.   Yes.

15       Q.   What do you understand the term

16   "total" to mean?

17       A.   It what has many meanings.

18       Q.   Have you ever had to total

19   something up?

20       A.   I am sure that I have, but I don't

21   recall.

22       Q.   When you did that -- sorry, please

23   go ahead.  I spoke --

24       A.   No, I don't recall, specifically.

25       Q.   If you scroll -- I will direct you



1              Christopher L. Ryan

2    to the next page.  This is page 4 of 4.

3          I believe we've looked at a profit

4    and loss statement already.  Does this look

5    like another iteration of a profit and loss

6    statement?

7        A.   I could be wrong, but it looks like

8    the statement we looked at a few minutes ago.

9        Q.   Similar.

10          All right, I am going to show you

11    what has been marked as Exhibit D-107.

12          Does this appear to be an e-mail to

13    you?

14        A.   It does.

15        Q.   And the sender is

16    "Chris@FloydsofLeadville.com."

17        A.   I see that.

18        Q.   It's sent on "November 18, 2019."

19        A.   Yes.

20        Q.   "To, Barrie Clapham, parentheses,

21    L&S, close parentheses", cc'ing, "Floyd

22    Landis and Alexandra Merle. "

23        A.   Yes.

24        Q.   "Subject, re, Floyd's of Leadville

25    update."



1                    Christopher L. Ryan

2         A.    Yes.

3         Q.    "Attachment, Valued, Inc.,

4    underscore, balance, plus sheet, plus 2019,

5    plus 2018, YTD, plus detailed pdf."

6         A.    I see that.

7         Q.    Do you recognize this e-mail?

8         A.    I don't.

9         Q.    Do you remember sending this

10   e-mail?

11        A.    I don't.

12        Q.    Do you have any reason to doubt you

13   sent this e-mail?

14        A.    I don't.

15        Q.    And looking at the body of the

16   e-mail, the first sentence reads -- the first

17   paragraph reads, "Barrie, attached is more

18   detail on other assets and long term

19   liabilities.  Please note month end

20   reconciliation is still to be done so these

21   are not final numbers."

22             Do you see that?

23        A.    I do.

24        Q.    Does that refresh your recollection

25   at all about calculating assets and long-term



1              Christopher L. Ryan

2    liabilities?

3         A.   Not really.

4         Q.   Does it refresh it at all?

5         A.   Not really.

6         Q.   "Not really" or "not at all"?

7         A.   Not -- not really.

8         Q.   Then does it refresh your

9    recollection about "month end

10   reconciliation"?

11        A.   It doesn't.  I just don't know.

12        Q.   Next sentence says, "The hemp crop

13   is on the books at cost of seeds and misc

14   equipment equaling 255K. "

15        A.   Yes.

16        Q.   Do you see that?

17        A.   Yes.

18        Q.   Does this refresh your recollection

19   about whether or not Floyd's was in the hemp

20   business?

21        A.   It doesn't.

22        Q.   Does this refresh your recollection

23   about calculating assets and liabilities?

24        A.   It does not.

25        Q.   Next sentence is, "The extraction



1              Christopher L. Ryan

2    facility is owned separately and is subject

3    to a purchase option that Floyd can explain."

4              Do you see that?

5         A.   I do.

6         Q.   Does this refresh your recollection

7    about whether or not Floyd's operated

8    extraction facilities?

9         A.   It does not.

10        Q.   Does this refresh your recollection

11   as to whether or not you worked with Floyd

12   Landis?

13        A.   It does not.

14        Q.   Next sentence is, "long-term

15   liabilities includes the loan notes at $4.9

16   million."  Do you see that?

17        A.   I do.

18        Q.   Does this refresh your recollection

19   about whether or not Floyd's took out loans?

20        A.   It does not.

21        Q.   Does it refresh your recollection

22   about calculating long-term liabilities?

23        A.   It does not.

24        Q.   I will show you what I have marked

25   as Exhibit D-108.



1                  Christopher L. Ryan

2        A.    I do see that.

3        Q.    Okay.   Does this appear to be an

4   e-mail from you to Mr. Clapham?

5        A.    Yes.

6        Q.    Okay.   And it's also being sent to

7   Alexandra Merle and Floyd Landis?

8        A.    Yes.

9        Q.    And the attachment is titled

10  "Floyd's of Leadville, plus forecast, plus

11  11/20/2019."   Do you see that?

12       A.    Yes.

13       Q.    E-mail reads, "Barrie, attached is

14  a copy of the current FOL P&L summary.

15  Please note that I am in the process of

16  revising the model to more accurately reflect

17  what were previously initiatives,

18  parentheses, C stores extraction, close

19  parentheses, that are now up and running."

20             Do you see that?

21       A.    I do.

22       Q.    The next sentence -- next paragraph

23  reads, "Give me a call on WhatsApp once you

24  have received.   Best regards, Chris."

25       A.    Yes.



1              Christopher L. Ryan

2        Q.   Do you know what "WhatsApp" is?

3        A.   I am not sure.

4        Q.   Have you ever used WhatsApp?

5        A.   Not to my recollection.

6        Q.   Is WhatsApp a communication

7    application?

8        A.   I don't know.

9        Q.   Do you currently have a copy of

10   WhatsApp on your phone?

11       A.   I don't recall.

12       Q.   You don't recall if you ever used

13   it to communicate; is that correct?

14       A.   Yeah, I don't.

15       Q.   Okay.  Does this refresh your

16   recollection about doing profit and loss

17   modeling?

18       A.   It -- it doesn't.

19       Q.   Do you know what "C stores" means?

20       A.   I don't.

21       Q.   Going to direct you to page 6 of

22   this document.

23       A.   Okay.

24       Q.   You should see at the top, "Floyd's

25   of Leadville, Inc., CBD pro forma P&L."



1                Christopher L. Ryan

2        A.    Yes.

3        Q.    It's "2018 to 2021, parentheses,

4   unaudited."  Do you see that?

5        A.    I do.

6        Q.    Do you know what it means for a

7   profit and loss statement to be "unaudited"?

8        A.    I don't.

9        Q.    Do you know what it means for a

10  profit and loss statement to be "pro forma"?

11       A.    No.

12       Q.    Have you seen a document like this

13  before today?

14       A.    I am not sure.

15       Q.    Does seeing this refresh your

16  recollection of doing profit and loss work

17  while at Floyd's?

18       A.    No, it doesn't.

19       Q.    Does it refresh your recollection

20  of doing projections of income while at

21  Floyd's?

22       A.    It doesn't.

23       Q.    Have you ever heard of "London and

24  Scottish Investment"?

25       A.    I don't recall that name.



1          Christopher L. Ryan

2     Q.   Going to show you what's been

3  marked as Exhibit D-109.

4          Are you seeing what appears to be

5  an e-mail?

6     A.   Yes.

7     Q.   Does this e-mail appear to be from

8  Floyd Landis, to Jonathan Gazdak and Chris

9  Ryan, copying Alex Merle-Huet?

10     A.   It does.

11     Q.   Please excuse me.  One moment.  My

12  dog is barking.  I have to let her out.  I

13  apologize.

14          I apologize for that.  Thank you

15  for bearing with me.

16          Have you seen this e-mail before?

17     A.   I don't recall this e-mail.

18     Q.   This e-mail is dated "November 21,

19  2019"; is that correct?

20     A.   Yes.

21     Q.   It reads, "Hey Jonathan, we're

22  putting this together for you and will have

23  it shortly."

24     A.   Yes, I see that.

25     Q.   Underneath that, do you see it says



1          Christopher L. Ryan

2     on, "Tuesday, November 19, 2019", at "10:26

3     a.m., Jonathan Gazdak, Gazdak" --

4     "JGazdak@AlexanderCapitalLP.com" wrote,

5     "Chris, any updates on the below"?

6          A.   I see that, yes.

7          Q.   Do you remember receiving an e-mail

8     to that effect?

9          A.   I don't.

10         Q.   If you look down at the bottom of

11    the page, do you see the e-mail that we

12    previously reviewed as Exhibit D-104?

13         A.   Yes, it looks familiar.

14         Q.   And the exhibit we looked at,

15    D-104, is November 12, 2019?

16         A.   Yes, I don't -- I don't know if

17    this is the same but, yes, I see that date

18    here.

19         Q.   And the one at the top is November

20    21st, 2019?

21         A.   Yes.

22         Q.   Do you have any memory for why

23    there was such a delay in providing that

24    information?

25              MR. VEDRA:  Objection;



1          Christopher L. Ryan

2          foundation.

3                    MR. WRIGHT:  Fair enough.

4                    Let me rephrase.

5     Q.   Do you have any memory for why

6  there was a nine-day gap between the request

7  and this response e-mail?

8     A.   I don't.

9                    MR. VEDRA:  Object to form.

10  BY MR. WRIGHT:

11     Q.   I will show you what we have marked

12  as Exhibit D-110.  Does this appear to be an

13  e-mail to you?

14     A.   It does.

15     Q.   And does this -- sorry, I am having

16  trouble with my zoom.

17          Does this e-mail reflect that it is

18  "from Chris@FloydsofLeadville.com", being

19  "sent" to "Barrie Clapham, parentheses,

20  L&S" --

21     A.   Yes.

22     Q.   -- "Floyd Landis and Alexandra

23  Merle"?

24     A.   Yes.

25     Q.   This is sent on "November 21,



1          Christopher L. Ryan

2   2019", at "6:54 p.m."?

3       A.   Yes.

4       Q.   It reads, "Barrie, good to catch up

5   to you today.  Recapping deliverables, slash,

6   next steps."  And then it's got a list of

7   requested items and a list of next steps.

8          Do you see that?

9       A.   I do.

10      Q.   Then it says "Please let me know if

11  I missed anything.  Best regards, Chris."

12         Do you see that?

13      A.   I do.

14      Q.   Do you remember sending this

15  e-mail?

16      A.   I don't.

17      Q.   Do you remember seeing this e-mail

18  before?

19      A.   I don't.

20      Q.   Do you have any reason to doubt

21  that you sent this e-mail?

22      A.   I don't.

23      Q.   Do you recall ever speaking with

24  Mr. Clapham?

25      A.   I don't recall.



1              Christopher L. Ryan

2       Q.   Under the list of "next steps", do

3  you see the bullet point "Barrie to review

4  materials and develop view on FOL capital

5  requirements"?

6       A.   I do.

7       Q.   Do you have any recollection of

8  that next step?

9       A.   I don't.

10      Q.   Does this refresh your memory at

11  all about the conversation that this

12  reflects?

13      A.   It does not.

14      Q.   Next bullet point, "FOL and Barrie

15  to discuss potential strategies for blending,

16  slash, extending Alexander Capital note."

17           Do you see that?

18      A.   I do.

19      Q.   Does that have any meaning to you?

20      A.   It doesn't.

21      Q.   Do you recall ever working to

22  extend a loan?

23      A.   I don't recall doing so.

24      Q.   Do you recall ever working to

25  extend a note?



1              Christopher L. Ryan

2      A.   I don't recall doing so.

3      Q.   Do you recall ever trying to blend,

4  slash, extend a note?

5      A.   I am not sure.

6      Q.   Does that bullet -- I already asked

7  that.  I apologize.

8           The third bullet point says,

9  "Barrie to engage with sources of capital and

10  develop financial" -- "financing proposal for

11  FOL, understanding that valuation needs to

12  reflect significant progress made executing

13  2019 objectives."  And then it's got a

14  parenthetical.  Do you see that?

15      A.   I do.

16      Q.   And do you understand what it means

17  to "engage in sources of capital"?

18      A.   Not really.

19      Q.   Do you have any understanding at

20  all?

21      A.   No.

22      Q.   Do you know what it means to

23  "develop a financing proposal"?

24      A.   I am not sure.

25      Q.   Have you ever developed a financing



1              Christopher L. Ryan
2    proposal?
3         A.   I don't recall doing so.
4         Q.   Have you ever helped anyone develop
5    a financing proposal?
6         A.   I don't recall.
7         Q.   Do you understand what the term
8    "valuation" means?
9         A.   Not really.
10        Q.   Do you have any general
11   understanding of the term?
12        A.   Not a specific understanding.
13        Q.   Do you have a general
14   understanding?
15        A.   Not really.
16        Q.   Sitting here today, does the word
17   "valuation" have any meaning to you?
18        A.   No, not -- not really.
19        Q.   No meaning at all?
20        A.   I just don't know.
21        Q.   Have you ever heard it before?
22        A.   I have heard that word.
23        Q.   Do you recall ever knowing what it
24   meant?
25        A.   I am not sure.



```
 1                Christopher L. Ryan

 2        Q.    I am showing you what we have

 3   marked as Exhibit 111.  D-111, I'm sorry.

 4              Does this appear to be an e-mail to

 5   you?

 6        A.    It does.

 7        Q.    Does this appear to be an e-mail

 8   chain, dated "November 26, 2019", and it's

 9   between Jonathan Gazdak, Alexandra Merle,

10   Floyd Landis, and Chris Ryan?

11        A.    Yes.

12        Q.    You ever seen this e-mail before?

13        A.    Not to my recollection.

14        Q.    Do you recall receiving this

15   e-mail?

16        A.    I don't.

17        Q.    Do you have any reason to doubt

18   that you received this e-mail?

19        A.    I don't.

20        Q.    And if you look down to the middle

21   of the page, do you see the e-mail from

22   Mr. Gazdak that reads, "Alex, as we start to

23   receive the information that Chris will be

24   sending us, I thought it would be good to put

25   a date on the calendar."
```



1              Christopher L. Ryan

2         Do you see that?

3    A.   I do.

4    Q.   Does this refresh your recollection

5  about sending information to Alexander

6  Capital?

7    A.   It does not.

8    Q.   Do you ever recall sending

9  information to Mr. Gazdak?

10   A.   Not to my recollection.

11   Q.   Do you ever recall sending

12 information to Shawn Weadock?

13   A.   I don't recall that.

14   Q.   Do you ever recall sending

15 information to Frank DiMartini?

16   A.   I don't remember.

17   Q.   Do you recall ever sending an

18 e-mail to anyone with an

19 @AlexanderCapitalLP.com e-mail address?

20   A.   I don't -- I don't recall.

21   Q.   Going to put up now what I have

22 marked as Exhibit D-112.

23        Do you recognize this as an e-mail?

24   A.   I do.

25   Q.   Does this appear to be an e-mail



1              Christopher L. Ryan

2   from Floyd Landis, to Jonathan Gazdak and

3   Frank DiMartini, copying Alex Merle-Huet and

4   Chris Ryan?

5        A.   It does.

6        Q.   The "subject" is "Provision note"?

7        A.   Yes.  Hold on a second.

8             Yes.

9        Q.   Will you just take a moment and

10  read this e-mail to yourself.  I want to ask

11  you a couple of questions about it.

12       A.   Okay.

13       Q.   But I want to make sure you have

14  got it in your head.

15       A.   Okay.  I think I've read it.  Yes.

16            Okay.

17       Q.   You know what, this is -- this is

18  mislabeled and we've been going, not quite an

19  hour, and I need a lunch break.  Let me just

20  take a break here so I can get this labeling

21  corrected and let's take a thirty-minute

22  lunch break while we're at it.  I am starting

23  to lose focus.  So if we can go off the

24  record and come back in half-hour.

25            THE VIDEOGRAPHER:  Going off



1       Christopher L. Ryan

2    the record.

3          The time is 2:18.

4          (Whereupon, a lunch recess

5    was taken at this time.)

6          THE VIDEOGRAPHER:  We are

7    now back on the record.

8          Time is 2:57.

9          MR. WRIGHT:  Welcome back.

10          Just -- I apologize for the

11    confusion before the break.  We you

12    should see on your screen the

13    exhibit that's now labeled as

14    D-122.  I had that mislabeled as

15    12- - 112.  I apologize for the

16    confusion.  I have corrected that

17    labeling.  We will come back to

18    this exhibit now.  We will come

19    back to this exhibit later.  Any

20    confusion around that.

21          MR. VEDRA:  Is that directed

22    just to the witness or to

23    everybody?

24          MR. WRIGHT:  Anyone.  I was

25    asking the witness, but, Mr. Vedra,



1              Christopher L. Ryan

2          if you have any confusion about it,

3          please let me know.

4                  MR. VEDRA:  Yeah, I am not

5          entirely clear.

6                  MR. WRIGHT:  Okay, we had

7          inadvertently labeled this as

8          D-112.  It was intended to be

9          labeled as D-122.  I have corrected

10          the labeling.  You should be able

11          to see that at the bottom.

12                  So I will put this exhibit

13          away and we will come back to it.

14  BY MR. WRIGHT:

15      Q.  Clear enough, Mr. Ryan?

16      A.  Yes, I see "D-122."

17      Q.  Okay.  I am now showing you what

18  has been marked as D-112.  Again, apologies

19  for the confusion.

20          Does this document appear to be an

21  e-mail to you?

22      A.  You mean from the top on down?

23      Q.  Uh-huh.

24      A.  Yes, it does.

25      Q.  This is from



```
 1                  Christopher L. Ryan
 2   Chris@FloydsofLeadville.com to Barrie --
 3        A.   I see something different.   Maybe
 4   I'm -- do I need to be further down?
 5        Q.   Should be at the very top.
 6        A.   I see from Floyd to Jonathan Gazdak
 7   and Frank DiMartini.
 8        Q.   Let me -- that's why we do this
 9   this way.  Let me try this again.  D-112.
10        A.   Okay.
11        Q.   Are you now seeing an e-mail that
12   is from Chris@FloydsofLeadville?
13        A.   I am, yes.
14        Q.   And this e-mail is sent, "Monday,
15   December 2nd", and is "sent" to "Barrie
16   Clapham, parentheses, L&S"?
17        A.   Yes.
18        Q.   "Cc'ing Floyd Landis and Alexandra
19   Merle"?
20        A.   Yes.
21        Q.   Just making sure we've got the
22   right exhibit up.
23             Do you recognize this exhibit as an
24   e-mail?
25        A.   It appears to be an e-mail.
```



1              Christopher L. Ryan

2        Q.   Do you remember sending this

3    e-mail?

4        A.   I don't.

5        Q.   Do you remember reading this

6    e-mail?

7        A.   I don't.

8        Q.   Do you have any reason to doubt

9    that you sent this e-mail?

10       A.   I don't.

11       Q.   The e-mail is attaching two

12   documents.  The body describes them as number

13   one, "YTD cannabis revenues plus GM", and

14   number two, "revised FOL CBD financial

15   model."  Do you see that?

16       A.   Yes.  Yeah.

17       Q.   Do you know what "YTD cannabis

18   revenues, plus GM" means?

19       A.   I am not sure.

20       Q.   Or "revised FOL CBD financial

21   model", do you know what that means?

22       A.   I'm not sure.

23       Q.   Going to take you to page 2 of 3.

24   You should see that there's a "native

25   document placeholder."



1              Christopher L. Ryan

2        A.    I see that.

3        Q.    And it's for the native document

4   FOL-SDNY 05059.XLS --

5        A.    Yes.

6        Q.    -- X.

7        A.    I see that, yes.

8        Q.    I will take you to page 3 of 3.

9              Do you see a "native document

10   placeholder"?

11       A.    I do.

12       Q.    And this one is for FOL-SDNY

13   05060.XLSX.

14       A.    Yes.

15       Q.    I am going to show you what we have

16   labeled as Exhibit D-112-A.  I will represent

17   to you that this is the document that was

18   produced at the first of those Bates labels

19   that we were looking at, and, again, it's

20   small because this was a spreadsheet.  But

21   please feel free to zoom in, as needed, so

22   you can read it.

23       A.    I can read it, yeah.

24       Q.    Does this document -- is this

25   labeled "Floyd's monthly financials"?



1              Christopher L. Ryan

2        A.   Yes.

3        Q.   Do you recognize this document?

4        A.   I don't.

5        Q.   Have you ever seen a document like

6   this before?

7        A.   Not exactly.

8        Q.   Other than what we've looked at

9   today, have you ever seen a document like

10  this before?

11       A.   I am not sure.

12       Q.   Have you ever seen anything similar

13  to it, before today?

14       A.   I am not sure.

15       Q.   On this document, do you see

16  running across the top, "January '19,

17  February '19, March 2019", and so on?

18       A.   I do.

19       Q.   And then underneath that is a line

20  labeled "dispensaries."

21            Do you see that?

22       A.   I do.

23       Q.   And for each of those columns, do

24  you see a number running through September

25  2019?



1              Christopher L. Ryan

2        A.   Yes.

3        Q.   Then there's a blue line underneath

4   that, that says "dispensary percent GM."

5        A.   Yes.

6        Q.   Do you know what "dispensary

7   percent GM" means?

8        A.   I don't.

9        Q.   Do you know what "gross monthly"

10  means?

11       A.   No.

12       Q.   I am now going to show you what we

13  have marked as D-112-B.  Again, small sprint

14  because it is an Excel spreadsheet.  I will

15  represent to you, this is the second

16  attachment to the e-mail we looked at as

17  D-112.

18            Do you recognize this document?

19       A.   I don't.

20       Q.   At the top, are you seeing "Valued,

21  Inc., d/b/a Floyd's of Leadville, Inc."?

22       A.   Yes.

23       Q.   Do you know what "d/b/a" means?

24       A.   I'm not sure.

25       Q.   Have you ever heard the phrase



1              Christopher L. Ryan

2    "doing business as"?

3         A.   Yes.

4         Q.   Do you know what that means?

5         A.   Not sure.

6         Q.   Do you have any understanding of

7    what it means?

8         A.   Not really.

9         Q.   Sitting here today, do you have any

10   understanding at all?

11        A.   Not really, no.

12        Q.   You see the top of the sheet has

13   some columns labeled -- the first column is

14   labeled "actual 2018"?

15        A.   Yes.

16        Q.   And then next to that is "estimated

17   2019"?

18        A.   Yes.

19        Q.   Followed by "2020 through 2022",

20   and then it's "projected 2023 through 2028."

21             Do you see that?

22        A.   I do.

23        Q.   Do you know what "actual revenues"

24   means?

25        A.   I'm not sure.



1              Christopher L. Ryan

2        Q.   Do you have any idea what

3   "revenues" means?

4        A.   I'm not sure.  I have heard the

5   word.  I have heard the word.

6        Q.   Do you have any understanding of

7   what the word means?

8        A.   Not sure.

9        Q.   Sitting here today, any

10  understanding at all?

11       A.   Not really.

12       Q.   All right.  "Not really", does that

13  mean "a little" or "not at all"?

14       A.   I -- I -- I -- I -- "not really"

15  means "not really."

16       Q.   Okay.  Do you have a sense of what

17  it means?

18       A.   Not really.

19       Q.   Does it have anything to do with

20  money, in your head?

21       A.   It could, but I'm not sure.

22       Q.   Okay.  Do you know what "actual"

23  means?

24       A.   Yes, I do.

25       Q.   What does "actual" mean?



1                  Christopher L. Ryan

2        A.   It means -- it means "actual."

3    It's hard to define.  I know what it means.

4        Q.   "Actual", as opposed to

5    "estimated", for example.

6        A.   Yes.

7        Q.   Do you understand what estimate --

8        A.   They're not the same.

9        Q.   Right.

10            Do you understand what "estimated"

11   means?

12       A.   I'm pretty sure.

13       Q.   What about "projected"?

14       A.   Not sure.

15       Q.   Do you know if you created this

16   document?

17       A.   I don't recall doing so.

18       Q.   Do you have any memory of who might

19   have made this document?

20       A.   I don't.

21       Q.   Going to show you what we have

22   labeled as Defense Exhibit 11- -- D-113.

23            Do you see what appears to be an

24   e-mail on your screen?

25       A.   Yes.



1               Christopher L. Ryan

2        Q.   Does this appear to be an e-mail

3   sent "from, Chris@FloydsofLeadville.com, to

4   Barrie Clapham, parentheses, L&S, Floyd

5   Landis", and "Alexandra Merle-Huet"?

6        A.   It does.

7        Q.   And the "subject" is "FOL, plus

8   CWEB valuation thoughts"?

9        A.   Yes.

10       Q.   Do you recall sending this e-mail

11   to Mr. Clapham?

12       A.   I don't.

13       Q.   Have you ever seen this e-mail

14   before?

15       A.   Not to my recollection.

16       Q.   Do you have any reason to believe

17   you didn't send this e-mail?

18       A.   I don't.

19       Q.   If you look into the first

20   paragraph, you will see a place where it

21   says, "I thought you might be interested in

22   some recent research evaluation data on

23   Floyd" -- "FOL's closest publicly traded

24   competitor, Charlotte's Web, parentheses,

25   CWEB, close parentheses."



1                Christopher L. Ryan

2            Do you see that?

3       A.   I don't.

4       Q.   The first full paragraph --

5       A.   Oh, okay.  I see it.  First full

6  paragraph, yes.  Second clause, I do.

7       Q.   Do you know what "valuation" means?

8       A.   I've heard the word.

9       Q.   Okay.  Do you know what it means?

10       A.   I'm not sure.

11       Q.   Have you ever done a valuation of

12  anything?

13       A.   I'm not sure.

14       Q.   Do you recall doing a valuation of

15  Floyd's of Leadville?

16       A.   I don't recall doing so.

17       Q.   Do you recall doing a valuation of

18  Valued, Inc.?

19       A.   I don't recall doing so.

20       Q.   And Charlotte's Web, parentheses,

21  CWEB, do you know --

22       A.   Yes.

23       Q.   -- that name?

24       A.   I have heard that name.

25       Q.   What do you know about that name?



1            Christopher L. Ryan

2        A.   I'm not sure.

3        Q.   Was it a competitor of Floyd's?

4        A.   Not sure.

5        Q.   I am going to ask you to read the

6    last paragraph of this e-mail to yourself,

7    the one that starts "in terms of Alexander."

8        A.   Yes, okay.

9        Q.   Do you recall writing that

10   paragraph?

11       A.   I don't.

12       Q.   Do you have any reason to doubt

13   that you wrote that paragraph?

14       A.   I don't.

15       Q.   Reading this, does this refresh

16   your recollection about Alexander Capital?

17       A.   It doesn't.

18       Q.   Does it refresh your recollection

19   about whether or not you created a balance

20   sheet?

21       A.   It doesn't.

22       Q.   Does it refresh your recollection

23   about 12 percent debt?

24       A.   No.

25       Q.   12 percent senior note?



1              Christopher L. Ryan

2         A.    It doesn't.

3         Q.    Does it refresh your recollection

4    about trying to restructure debt while you

5    were at Floyd's?

6         A.    It doesn't.

7         Q.    I am now going to take you to page

8    63 of this document, which is one of the

9    attachments.  Sorry, that was incorrect.  I

10   apologize.  I have put the wrong page in my

11   notes.  Give me one moment.

12              I am going to take you to page 67

13   of that document.  Again, I apologize.

14              Do you see now a document that says

15   "valuation comparables CBD" at the top?

16        A.    Hold on one second.

17        Q.    Of course.

18        A.    Yes, I see that.

19        Q.    And then the date "12/3/19"?

20        A.    Yes.

21        Q.    Do you recognize this document?

22        A.    I don't.

23        Q.    Have you ever seen a valuation

24   comparison before?

25        A.    Not to my recollection.



1              Christopher L. Ryan

2         Q.   Do you know if you created this

3    document?

4         A.   I don't recall doing so.

5         Q.   Do you have any reason to doubt you

6    created it?

7         A.   I don't.

8         Q.   The bottom -- very bottom, do you

9    see the asterisk that then reads, "Adjusted

10   to include $7 million debt, less" -- "less

11   estimated dispensary value of", and then

12   there's a space, and then "$20 million"?

13        A.   I see that line, yes.

14        Q.   Does this refresh your recollection

15   as to whether or not Floyd's of Leadville had

16   taken on any debt?

17        A.   It does not.

18        Q.   Does it refresh your recollection

19   as to whether or not Floyd's of Leadville

20   owned any dispensaries?

21        A.   No.

22        Q.   Does it refresh your recollection

23   about whether or not you estimated the value

24   of dispensaries?

25        A.   It does not.



1              Christopher L. Ryan

2        Q.   Do you recall ever estimating the

3    value of dispensaries?

4        A.   I don't.

5        Q.   Do you recall if Floyd's of

6    Leadville ever owned any dispensaries?

7        A.   I don't recall.

8        Q.   I am going to show you what we have

9    marked as Exhibit D-114.

10       A.   Okay.

11       Q.   Do you recognize this to be an

12   e-mail?

13       A.   Yes.

14       Q.   Okay, and it appears to be "from

15   Chris@FloydsofLeadville.com, to Jonathan

16   Gazdak, Frank DiMartini, Barrie Clapham,

17   parentheses L&S, close parentheses, Floyd

18   Landis", and "Alexandra Merle-Huet"?

19       A.   Yes.

20       Q.   And the "subject" is "Floyd's of

21   Leadville draft investor proposal and

22   supporting materials."

23       A.   I see that.

24       Q.   Do you recall sending this e-mail?

25       A.   I don't.



1                    Christopher L. Ryan

2       Q.   Do you recall writing this e-mail?

3       A.   I don't.

4       Q.   Do you have any reason to doubt

5  that you wrote this e-mail?

6       A.   I don't.

7       Q.   Do you have any reason to doubt

8  that you sent this e-mail?

9       A.   I don't.

10       Q.   The body of the e-mail reads,

11  "Jonathan, slash, Frank, please find attached

12  the following information as discussed in our

13  meeting last Wednesday", and then it's got a

14  list of items and then it says, "Please let

15  us know when you have had a chance to review

16  and ready to discuss.  Best regards, Chris."

17            Do you see that?

18       A.   I do.

19       Q.   Does this refresh your recollection

20  about having discussions with Alexander

21  Capital?

22       A.   It does not.

23       Q.   The first item is "draft proposal

24  to holders of 12 percent senior notes."

25            Do you see that?



1                Christopher L. Ryan

2       A.   I do.

3       Q.   Does this refresh your recollection

4  about whether or not there were 12 percent

5  senior notes?

6       A.   It does not.

7       Q.   Sitting here today, do you have any

8  memory at all of Floyd's of Leadville taking

9  out 12 percent senior notes?

10       A.   I don't.

11       Q.   Item number three is "financial

12  model."  Do you see that?

13       A.   I do.

14       Q.   Do you -- does this refresh your

15  recollection as to whether or not you did any

16  financial modeling for Floyd's of Leadville?

17       A.   It does not.

18       Q.   I will ask you to look at pages 2

19  through 3 of this document.  If you will just

20  take a minute to review those pages, read

21  them to yourself, and let me know when you

22  have done so.

23       A.   The long pages?  The long -- lot of

24  writing?

25       Q.   A lot of writing.



1              Christopher L. Ryan

2        A.    Okay.

3              Okay, I have read it.

4        Q.    I appreciate it.  Thank you for

5    taking the time to do so.

6              Just to make sure, I should have

7    asked this beforehand, this is the document

8    at the top that begins "Draft 12/15/19"?

9        A.    Yes.

10       Q.    At the bottom of that first page,

11   bottom right-hand side, do you see the

12   letters "FOL-SDNY", followed by "05200"?

13       A.    "201."

14       Q.    "201" at the bottom of the third

15   page and "200" --

16       A.    Oh, yes, yes.

17       Q.    -- underneath the second?

18       A.    Yes, correct.

19       Q.    Perfect; thank you.

20             Do you recall ever seeing this

21   document before?

22       A.    I don't.

23       Q.    Does reading this help refresh your

24   recollection about negotiating with regard to

25   the 12 percent senior notes?



1              Christopher L. Ryan

2      A.   I -- I -- it does not.

3      Q.   Does this help refresh your

4  recollection as to what Floyd's of

5  Leadville's business model was?

6      A.   It does not.

7      Q.   The first paragraph says, "The

8  company has undergone a significant and

9  positive transformation since your investment

10  of 12 percent senior notes from a niche

11  cannabis focused company, to a national

12  branded hybrid CBD company."

13         Do you see that paragraph?

14      A.   I do see that paragraph.

15      Q.   Do you have any memory of Floyd's

16  transitioning from a cannabis focused company

17  to a CBD company?

18      A.   I don't.

19      Q.   And then "At the time of your

20  investment, the company was raising Capital,

21  primarily from two initiatives:  One, to

22  purchase and build out cannabis growing

23  facility in Palisade, Colorado."

24         Do you see that?

25      A.   I do.



1                  Christopher L. Ryan

2        Q.   Does that refresh your recollection

3    about whether or not Floyd's ever purchased a

4    cannabis growing facility?

5        A.   It does not.

6        Q.   Does it refresh your recollection

7    about whether it operated a cannabis growing

8    facility?

9        A.   It does not.

10       Q.   And bullet point two, "To fund the

11   purchase of four cannabis dispensaries, three

12   in Portland, Oregon and one in Leadville,

13   Colorado, and rebrand them as 'Floyd's Fine

14   Cannabis'."  Do you see that?

15       A.   I do see that.

16       Q.   Does that refresh your recollection

17   as to whether or not Floyd's purchased

18   cannabis dispensaries?

19       A.   It does not.

20       Q.   Does it refresh your recollection

21   as to whether or not Floyd's Fine Cannabis

22   was associated with Floyd's of Leadville?

23       A.   It does not.

24       Q.   Does it refresh your recollection

25   in any way with regard to Floyd's Fine



1            Christopher L. Ryan

2    Cannabis?

3        A.   It does not.

4        Q.   Does it refresh your recollection

5    as to whether or not Floyd's ever operated a

6    dispensary?

7        A.   It does not.

8        Q.   On page 3, there's a paragraph

9    underneath the bullet point, that begins,

10   "However, financing the growth of the CBD

11   business remains a challenge."

12            Do you see that paragraph?

13       A.   I do see that paragraph.

14       Q.   Are you aware --

15               MR. WRIGHT:  Strike that.

16               Let me rephrase that.

17       Q.   Do you recall being aware of there

18   being difficulty receiving financing for CBD

19   businesses?

20       A.   No, I don't recall that.

21       Q.   Do you recall being aware of

22   federally chartered banks refusing to do

23   business with CBD companies?

24       A.   I don't recall that.

25       Q.   Do you have any experience with a



1              Christopher L. Ryan

2   business that could not bank with a federally

3   chartered bank?

4        A.   Not -- not to my recollection.

5        Q.   Do you recall ever working for a

6   company that had difficulty accessing

7   financial markets?

8        A.   I don't recall.

9        Q.   Do you know if --

10                  MR. WRIGHT:  Strike that.

11       Q.   I will ask you to just, sort of,

12   skim through -- you know what, we will skip

13   that too.

14       A.   Okay.

15       Q.   I am going to send you directly to

16   page 20 of this document.  This is a slide

17   labeled "Floyd's Fine Cannabis."  The bottom

18   right-hand side bears the label "FOL-SDNY

19   05218."  Do you see that?

20       A.   I do see that slide.

21       Q.   Okay.  Do you remember ever

22   creating an investor deck for Floyd's?

23       A.   I don't recall doing so.

24       Q.   Do you recall ever participating in

25   the creation of an investor deck?



1              Christopher L. Ryan

2        A.    I don't.

3        Q.    Do you know what an "investor deck"

4    is?

5        A.    I am not sure.

6        Q.    Have you ever seen a presentation

7    made by a company to potential investors?

8        A.    I am not sure.

9        Q.    Have you ever seen a PowerPoint

10   slide made -- PowerPoint presentation, made

11   by a company?

12       A.    I am not sure.

13       Q.    And this slide about Floyd's Fine

14   Cannabis, does this refresh your

15   recollection?

16       A.    It does not.

17       Q.    Not with regard to marijuana

18   dispensaries?

19       A.    Correct.

20       Q.    Not with regard to whether or not

21   Floyd's Fine Cannabis operated separately

22   from the CBD business?

23       A.    Correct.

24       Q.    I will direct you to page 25.

25             Are you seeing a slide that has a



1              Christopher L. Ryan

2    picture of a woman, and next to it, it says

3    "Alexandra Merle, President and chief

4    operating officer"?

5         A.    I do.

6         Q.    Looking at this picture, does this

7    refresh your recollection as to whether or

8    not you know Alexandra Merle?

9         A.    I'm not sure.

10        Q.    Have you ever seen this woman

11   before?

12        A.    I'm not sure.

13        Q.    If I told you she also went by Alex

14   Merle, would that refresh your recollection?

15        A.    It would not.

16        Q.    What if I told you that she also

17   went by Alexandra Merle-Huet, would that

18   refresh your recollection?

19        A.    It would not.

20        Q.    What if I told you she also went by

21   Alex Merle-Huet, does that refresh your

22   recollection?

23        A.    It would not.

24        Q.    We will look at the next page.

25              Are you seeing a picture of, what I



1              Christopher L. Ryan

2    assume, is you?

3            Is that a picture of you?

4        A.    I believe it is.

5        Q.    Is that a picture of you standing

6    in front of a "Floyd's of Leadville" logo?

7        A.    It appears to be, but I am not sure

8    of the logo.

9        Q.    And it shows "Christopher L. Ryan,

10   Chief Financial Officer"?

11       A.    Yes, I see that.

12       Q.    Does this refresh your recollection

13   as to whether or not you were the chief

14   financial officer of Floyd's of Leadville?

15       A.    It does not.

16       Q.    Okay.   It says, "Chris is a senior

17   level financial executive with thirty years

18   experience as an investment banker, private

19   equity investor, and chief financial

20   officer."  Do you see that?

21       A.    Yes, I do see that.

22       Q.    Is that a true statement?

23       A.    I'm not sure.

24       Q.    Do you have over thirty years

25   experience as an investment banker, private



1              Christopher L. Ryan

2    equity investor, and chief financial officer?

3         A.    I don't know.

4         Q.    Have you ever been an investment

5    banker?

6         A.    I'm not sure.

7         Q.    Do you know what an "investment

8    banker" is?

9         A.    Not -- not entirely, no.

10        Q.    Do you know at all?

11        A.    No, I'm not sure.

12        Q.    Have you ever been a private equity

13   investor?

14        A.    I'm not sure.

15        Q.    Do you know what a "private equity

16   investor" is?

17        A.    Not really, no.

18        Q.    Sitting here today, do you have any

19   understanding of the phrase "private equity

20   investor"?

21        A.    Not really, no.

22        Q.    Do you have any understanding of

23   what it means to be a "private equity

24   investor"?

25        A.    I don't.



1                 Christopher L. Ryan

2      Q.   Have you ever been a chief

3   financial officer?

4      A.   I am not sure.

5      Q.   Next sentence reads, "Chris was CFO

6   of Beowulf Energy, LLC for twelve years, a

7   senior managing director at Evercore Partners

8   and a principal at Morgan Stanley in M&A

9   department."  Do you see that?

10      A.   I do.

11      Q.   Okay.  Is that a true sentence?

12      A.   I'm not sure.

13      Q.   Do you know if you were ever a CFO

14   of Beowulf Energy, LLC?

15      A.   I don't recall.

16      Q.   Do you know if you worked at

17   Beowulf Energy, ever?

18      A.   I don't remember.

19      Q.   Do you know if you worked there for

20   twelve years?

21      A.   I don't recall.

22      Q.   Do you recall ever being a senior

23   managing director, anywhere?

24      A.   I don't remember.

25      Q.   Have you ever worked at Evercore



1              Christopher L. Ryan

2    Partners?

3         A.   I don't recall.

4         Q.   Have you ever worked at Morgan

5    Stanley?

6         A.   I'm not sure.

7         Q.   Were you ever a principal anywhere?

8         A.   I -- I don't remember.

9         Q.   Do you know what it means to be a

10   "principal", in this context?

11        A.   No.

12        Q.   Do you know what "M&A" means, in

13   this context?

14        A.   I don't.

15        Q.   Do you know what an "M&A

16   department" is?

17        A.   I'm not sure.

18        Q.   Do you have any understanding of

19   what that means?

20        A.   No, I don't.

21        Q.   Do you know what "mergers and

22   acquisitions" means?

23        A.   Not really, no.

24        Q.   Do you have a general

25   understanding?



1              Christopher L. Ryan

2      A.   No.

3      Q.   Do you know what a "mergers and

4   acquisitions department" is?

5      A.   Not sure.

6      Q.   Do you have any understanding?

7      A.   Not really.

8      Q.   Even a general one?

9      A.   I just don't know.

10     Q.   Then it says, "He holds a B.A. in

11  economics from the University of

12  Pennsylvania."  Do you see that?

13     A.   I do.

14     Q.   And is that a true statement?

15     A.   I believe it is.

16     Q.   We will look just -- at the last

17  page, you should see a "native placeholder."

18          Are you seeing that native

19  placeholder?

20     A.   I do.

21     Q.   That says the native document is

22  "FOL-SDNY05227_confidential.XLXS."

23     A.   Yes, I see that.

24     Q.   Going to show you what we've marked

25  as Defendant's Exhibit D-114A.  I will



1              Christopher L. Ryan

2    represent to you this is the native document

3    that was produced at that Bates number.

4         A.   Okay.

5         Q.   Do you recognize this document?

6         A.   I don't.

7         Q.   Excuse me.

8         A.   Other than it looks similar to the

9    document you showed me half-hour ago.

10        Q.   Yeah.

11             At the top it reads, "Valued, Inc.

12   d/b/a Floyd's of Leadville, Inc. CBD

13   summary."

14        A.   Yes.

15        Q.   Looking at this, does this refresh

16   your recollection about this document at all?

17        A.   It does not.

18        Q.   I will show you what we have marked

19   as D-115.  Does this appear to be an e-mail?

20        A.   It does appear to be an e-mail.

21        Q.   Does it appear to be "from Jonathan

22   Gazdak, to Chris@FloydsofLeadville.com",

23   cc'ing "Frank DiMartini,

24   pdichiara@CMDLLP.com, Floyd Landis" and "Alex

25   Merle Huet"?



1              Christopher L. Ryan

2        A.   I see that.

3        Q.   Do you know who

4    pdichiara@CMDLLP.com is?

5        A.   I don't.

6        Q.   Do you recognize this e-mail?

7        A.   I don't.

8        Q.   Do you remember receiving this

9    e-mail?

10       A.   I don't recall receiving it.

11       Q.   Do you have any reason to doubt you

12   received it?

13       A.   I don't.

14       Q.   Do you see the paragraph that

15   begins "We are available"?

16            The second sentence of that

17   paragraph begins, "Please note that if the

18   fourth quarter 2019 interest isn't paid by

19   this Friday, parentheses, one, slash,

20   twenty-four, slash, twenty, close

21   parentheses, we will have to give Valued,

22   slash, Floyd's a notice of default."

23            Do you see that?

24       A.   I do.

25       Q.   Does this refresh your recollection



1              Christopher L. Ryan

2   about Floyd's taking out 12 percent senior

3   notes?

4        A.   It does not.

5        Q.   Does it refresh your recollection

6   about borrowing money through Alexander

7   Capital?

8        A.   It does not.

9        Q.   Does it refresh your recollection

10  about whether or not Alexander Capital worked

11  with Floyd's investment bank?

12       A.   No, it does not.

13       Q.   Seeing this, do you remember there

14  ever being a time when Floyd's didn't pay

15  required interest on a note?

16       A.   I -- I don't remember.

17       Q.   Do you recall ever being told that

18  Floyd's might become in default?

19       A.   I don't recall.

20       Q.   Do you have any memory of working

21  at a company that was ever in default?

22       A.   I don't recall doing so.

23       Q.   Do you know what "default" means?

24       A.   Not really, no.

25       Q.   Do you have a general sense of the



1              Christopher L. Ryan

2  word?

3       A.   Not really, no.

4       Q.   Have you ever seen a contract

5  before?

6       A.   I am not sure.

7       Q.   I will go back to what we -- let me

8  just fix this.  Sorry, we will go back to the

9  document that was previously labeled 103.  It

10 is now labeled D-103, to correct that issue.

11            Do you recall looking at this

12 document earlier today?

13      A.   I think so, yeah.

14      Q.   I am going to direct you to page 7

15 of this document, and have you just look at

16 page 7 through 11.

17      A.    Okay.  I see there are a lot -- a

18 lot -- a lot of stuff here.

19      Q.   Sure, sure, and I don't -- I don't

20 need you to read the whole thing, unless you

21 think reading the whole thing will help you

22 recall if you have seen it before.

23      A.   I don't believe that it will.

24      Q.   Okay.  Have you ever seen a

25 document that looks like this before?



1              Christopher L. Ryan

2      A.   Not really.

3      Q.   Anything similar?

4      A.   Not really, no.

5      Q.   This is labeled "unsecured

6    promissory note, effective date, July, blank,

7    2019."

8      A.   Yes, I see that.

9      Q.   And then if we look down to page

10   11, there are no signatures on that page,

11   correct?

12              MR. VEDRA:   Sorry, are we

13         just asking the witness questions

14         about documents he doesn't

15         recognize?

16              MR. WRIGHT:   I am trying to

17         help refresh his recollection.

18              THE WITNESS:   I see -- I see

19         the signature page, yes.

20   BY MR. WRIGHT:

21      Q.   Does this refresh your recollection

22   about this document?

23      A.   It does not.

24      Q.   I am now directing you to page 25

25   of this document.  At the bottom you should



1           Christopher L. Ryan

2    see the label "FOL-SDNY06451."

3          A.    Okay.

4          Q.    And this is labeled "promissory

5    note."

6          A.    I see that.

7          Q.    And do you see the paragraph that

8    begins "for value received"?

9          A.    Yes.

10          Q.    In that paragraph, do you see the

11    name "Chris Ryan"?

12          A.    Yes, I see that.

13          Q.    Looking at this document, does this

14    refresh your recollection as to whether or

15    not you ever had a promissory note between

16    you and Floyd's of Leadville?

17          A.    It does not.

18          Q.    Have you ever seen this document

19    before today?

20          A.    Not to my recollection.

21          Q.    Do you have any reason to believe

22    you didn't see this document before today?

23          A.    I don't.

24          Q.    Do you know if you ever entered

25    into a contract with Floyd's of Leadville?



1              Christopher L. Ryan

2        A.    I don't recall doing so.

3        Q.    Looking at this document, do you

4   recall if you were ever -- does this refresh

5   your recollection as to whether or not

6   Floyd's of Leadville ever repaid a loan you

7   made to them?

8        A.    It does not.

9        Q.    The last page of the document, the

10  signature line for "holder Chris Ryan", is

11  not signed in but it says next to it, "Chris

12  Ryan, CFO."  Do you see that?

13       A.    Yes, I do see that.

14       Q.    Does that refresh your recollection

15  as to whether or not you were ever CFO of

16  Floyd's of Leadville?

17       A.    It does not.

18       Q.    I think I know the answer to this,

19  but would you do me a favor and just scroll

20  through the rest of the document and see if

21  you recognize any of the other attachments to

22  this.

23       A.    So this is page 28?

24       Q.    Yeah, so just go back to the top.

25  There were several attachments and I just



1              Christopher L. Ryan

2   want to see if any of these refresh your

3   recollection or look like something you have

4   seen before.

5        A.   These don't look familiar.

6        Q.   Do you have any memory of seeing

7   any of those documents, before today?

8        A.   I don't.

9        Q.   I will show you what I have marked

10  as Exhibit D-116.  Does this appear to be an

11  e-mail?

12       A.   It does.

13       Q.   It appears to be "from

14  Chris@FloydsofLeadville.com", being sent "to

15  Jonathan Gazdak, cc'ing Alexandra Merle-Huet,

16  Floyd Landis" and "Shawn Weadock."

17            Do you see that?

18       A.   Yes, I see that.

19       Q.   Do you remember sending this

20  e-mail?

21       A.   I don't.

22       Q.   Have you ever seen this e-mail

23  before?

24       A.   Not to my recollection.

25       Q.   Do you have any reason to doubt



1              Christopher L. Ryan

2    that you sent this e-mail?

3          A.   I don't.

4          Q.   The body of the e-mail says,

5    "Jonathan, slash, Shawn, attached are CBD

6    revenues through March 31."

7              Do you see that?

8          A.   I do.

9          Q.   I will have you scroll down to the

10   last -- I will direct you to the last page.

11             So you are now seeing a spreadsheet

12   that's entitled -- or a sheet that's entitled

13   "Floyd's monthly revenue"?

14         A.   Yes.

15         Q.   Other than today, have you ever

16   seen a document that looks like this before?

17         A.   Not to my recollection.

18         Q.   Does this refresh your recollection

19   as to whether or not Floyd's was involved in

20   the CBD business?

21         A.   It does not.

22         Q.   You see there are separate lines

23   under each month.  The rows are labeled

24   "direct to consumer, distributors, retailers,

25   slash, medical, C-store, Odessa's and



1                    Christopher L. Ryan

2    dispensary"?

3         A.   Yes, I see those -- those -- those

4    categories.

5         Q.   Does seeing this refresh your

6    recollection as to whether or not Floyd's of

7    Leadville ever operated a dispensary?

8         A.   It does not.

9         Q.   Does it refresh your recollection

10   as to whether or not it was in the cannabis

11   business?

12        A.   It does not.

13        Q.   And the line "retailer, slash,

14   medical", does that refresh your recollection

15   as to whether or not Floyd's was in the

16   medical marijuana business?

17        A.   It does not.

18        Q.   I will go back to the top of the

19   document.  You can see this is an e-mail

20   chain.

21        A.   Yes.

22        Q.   You see responses from Mr. Gazdak

23   and Ms. Merle-Huet to Mr. Gazdak and then on

24   page 2, an e-mail from Ms. Merle-Huet.

25             This e-mail has numbers, followed



 1                Christopher L. Ryan
 2    by letters in black, followed by letters in
 3    red.  Are you seeing that?
 4         A.   Yes, I can see that.
 5         Q.   And Chris@FloydsofLeadville was
 6    cc'd on this e-mail?
 7         A.   Yes.
 8         Q.   Focusing now just on this
 9    particular e-mail, do you recall seeing this
10    document before?
11         A.   I don't.
12         Q.   Do you have any reason to doubt
13    that you received this document?
14         A.   I don't.
15         Q.   Looking at item number two, in
16    black it reads "signed agreement on the 50
17    percent, parentheses, grow and dispensary",
18    and then in red it reads, "We cannot afford
19    legal fees for drawing up a new agreement,
20    parentheses, not trying to be difficulty.  We
21    know the e-mail" -- sorry -- "we know that
22    this e-mail is legally enforceable and we
23    already owe Pete over 40-K in legal fees,
24    close parentheses."
25                Do you see that?



1              Christopher L. Ryan

2        A.   I do.

3        Q.   Does this refresh your recollection

4   as to whether or not Floyd's of Leadville

5   owned any dispensaries?

6        A.   It doesn't, no.

7        Q.   Does it refresh your recollection

8   as to whether or not Floyd's of Leadville

9   owned any grow operations?

10       A.   It does not.

11       Q.   Does it refresh your recollection

12  as to whether or not you know Mr. Pete

13  Dipiaro?

14       A.   It does not.

15       Q.   Does it -- do you know any lawyers

16  named Pete?

17       A.   Not to my recollection, no.

18       Q.   Does it refresh your recollection

19  as to whether or not you were ever involved

20  in drawing up contracts?

21       A.   No, it does not refresh my memory

22  on that.

23       Q.   All right.  I am going to move on

24  to what was previously marked as Defense

25  Exhibit 16.  Are you seeing this document?



1              Christopher L. Ryan

2        A.   I can see it, yes.

3        Q.   Does this appear to be an e-mail

4   "from Alexandra Merle, to

5   FDimartini@AlexanderCapitallp.com, cc'ing

6   Chris@FloydsofLeadville.com"?

7        A.   It does.

8        Q.   Have you ever seen this document

9   before today?

10        A.   I don't recall seeing this

11   document.

12        Q.   Do you remember receiving this

13   e-mail?

14        A.   I don't.

15        Q.   Do you have any reason to doubt you

16   received this e-mail?

17        A.   I don't.

18        Q.   I am just going to direct you to

19   the next to last paragraph that starts,

20   "Also, interesting to note."

21            Do you see that paragraph?

22        A.   I see that, yes.

23        Q.   Would you read that paragraph to

24   yourself and let me know when you have done

25   so.



1              Christopher L. Ryan

2        A.    I see that, yes.  I read that.

3        Q.    Do you know what Tru Cannabis is?

4        A.    I don't recall.

5        Q.    Reading this doesn't refresh your

6   recollection?

7        A.    It does not.

8        Q.    Does it refresh your recollection

9   as to whether or not Floyd's of Leadville

10  purchased any dispensaries?

11       A.    It does not.

12       Q.    Does it refresh your recollection

13  as to whether or not Floyd's of Leadville

14  ever owned any dispensaries?

15       A.    It does not.

16       Q.    Seeing this, does this refresh your

17  recollection as to anything at all?

18       A.    It doesn't, no.

19       Q.    We've been going about an hour at

20  this point since our last break.  I can use a

21  ten-minute break and I think, hopefully, we

22  will -- we will be able to power through to

23  the end after that.

24            Is that okay with everyone else?

25                 MR. VEDRA:  That's fine.  I



```
 1                   Christopher L. Ryan
 2            have a stop at 5:20, your guys
 3            time, so --
 4                   MR. WRIGHT:  Okay, I think
 5            we should be done.
 6                   THE VIDEOGRAPHER:  Would you
 7            like to go off the record?
 8                   MR. WRIGHT:  Yeah, please.
 9                   THE VIDEOGRAPHER:  One
10            moment.
11                   Going off the record.  The
12            time is 3:49.
13                   (Whereupon, a recess was
14            taken at this time.)
15                   THE VIDEOGRAPHER:  We are
16            back on record.  The time is 4:02.
17     BY MR. WRIGHT:
18         Q.   I am showing you what has been
19     labeled as Exhibit D-117.
20            Are you seeing a document that
21     appears to be an e-mail.
22         A.   I do see this document, yes.
23         Q.   This is "from Alexandra Merel, to
24     Jonathan Gazdak" and "Frank DiMartini",
25     copying, "Bob Bell,
```



1              Christopher L. Ryan

2    Chris@FloydsofLeadville.com", and "Barrie

3    Clapham, parentheses, L&S."

4              Do you see that?

5         A.   I do.

6         Q.   Looking at this e-mail, do you

7    recall receiving this document?

8         A.   I don't.

9         Q.   Do you recall seeing this e-mail

10   before?

11        A.   I don't.

12        Q.   Do you have any reason to doubt

13   that you received this e-mail?

14        A.   I don't.

15        Q.   You will see that the first

16   attachment to this document is titled

17   "Valued, Inc. asset list 2.22.DOCX."

18              Do you see that?

19        A.   I see that.

20        Q.   I will take you down to page 5 of

21   5.  Do you see the document that is entitled

22   Valued, Inc. asset list at -- sorry, we have

23   lost -- looks like we've lost the witness.

24        A.   I lost you for a second.

25        Q.   Okay.  Are you back?



1              Christopher L. Ryan

2      A.   I'm back but I don't the document.

3      Q.   Okay, let me try that.

4           Are you seeing that now?

5      A.   No.

6      Q.   Let me try it again.

7      A.   I touched the screen --

8      Q.   Yeah.

9      A.   Now I got it.  Yeah, now I can see

10  it.

11      Q.   Okay.  I direct you to page 5 of 5.

12  Are you seeing a document that at the top

13  reads "Valued, Inc. asset list at 2/5/2020"?

14      A.   I see "4 of 5."  I can't get to 5

15  for some weird reason.

16      Q.   Let me try --

17      A.   Now -- yeah, that's better.

18      Q.   Okay.

19      A.   Okay, now I am there.  Yeah, I see

20  it.

21      Q.   Have you seen this document before?

22      A.   I don't recall seeing this.

23      Q.   Do you know if you created it?

24      A.   I don't recall.

25      Q.   Do you know who did make it?



1              Christopher L. Ryan

2         A.    I don't.

3         Q.    The first asset listed is "4

4    Portland retail marijuana dispensaries."

5              Do you see that?

6         A.    Yes.

7         Q.    Does this refresh your recollection

8    as to whether or not Valued, Inc., also known

9    as Floyd's of Leadville, ever operated or

10   owned medical or -- excuse me -- ever

11   operated or owned dispensaries?

12        A.    It does not.

13        Q.    The next asset is listed as

14   "Leadville dispensary."  Do you see that?

15        A.    I do, yes.

16        Q.    Do you know what the Leadville

17   dispensary was?

18        A.    I am not sure.

19        Q.    Have you ever been to Leadville,

20   Colorado?

21        A.    I don't recall going there.

22        Q.    Does this refresh your recollection

23   as to whether or not Floyd's of Leadville

24   operated a dispensary?

25        A.    It does not.



1              Christopher L. Ryan

2       Q.   The next item is "Pennsylvania

3  extraction facility."  Do you see that?

4       A.   I do.

5       Q.   Does this refresh your recollection

6  as to whether or not Floyd's of Leadville

7  operated an extraction facility?

8       A.   It does not.

9       Q.   I will take you now to what's been

10  labeled as Exhibit D-118.  Do you see what

11  appears to be an e-mail sent "from Alexandra

12  Merle, to Barrie Clapham, parentheses, LSIL,

13  close parentheses", copying "Jonathan Gazdak,

14  Frank DiMartini, Bob bell, and

15  Chris@FloydsofLeadville.com"?

16       A.   I do see this.

17       Q.   Have you seen this document before?

18       A.   I don't recall seeing this.

19       Q.   Do you recall receiving it?

20       A.   I don't.

21       Q.   Do you have any reason to doubt you

22  received it?

23       A.   I don't.

24       Q.   In the body, the e-mail reads,

25  "Thank you, Barrie.  I am also attaching a



1              Christopher L. Ryan

2    more detailed breakdown of our monthly

3    revenues, per Frank's request, and the

4    address of the dispensaries" -- "addresses of

5    the dispensaries."  Do you see that?

6         A.   I see that, yes.

7         Q.   Does seeing this help you recall

8    whether or not you have ever done monthly

9    revenues?

10        A.   No, it doesn't.

11        Q.   I will direct you to page 2.  You

12   probably have to size this smaller.  I

13   apologize.

14             Are you seeing what appears to be a

15   screenshot of a search for "Floyd's Fine

16   Cannabis Oregon"?

17        A.   Yes.

18        Q.   Do you see underneath it, a list of

19   four locations?

20        A.   Yes.

21        Q.   "Floyd's Fine Cannabis on Broadway,

22   Floyd's Fine Cannabis on 28th, Floyd's Fine

23   Cannabis on Sandy", and "Floyd's Fine

24   Cannabis on Whitaker"?

25        A.   Yes.



1              Christopher L. Ryan

2        Q.   And those are all identified as

3   "cannabis store", correct?

4        A.   They appear to be, yes.

5        Q.   Does seeing this help refresh your

6   recollection as to whether or not Floyd's

7   Fine Cannabis was associated with Valued,

8   Inc.?

9        A.   It does not.

10       Q.   Does it help refresh recollection

11   as to what Floyd's Fine Cannabis was?

12       A.   No.

13       Q.   Does it help refresh your

14   recollection as to whether or not Valued,

15   Inc. ever owned any cannabis dispensaries?

16       A.   It does not.

17       Q.   Or whether or not Valued, Inc. ever

18   owned any cannabis stores?

19       A.   No, it does not.

20       Q.   Seeing this today, do you have any

21   reason to dispute that Valued, Inc. owned

22   these stores?

23       A.   I don't.

24       Q.   Then I will have you look at page 3

25   which now you will have to enlarge and I



1              Christopher L. Ryan

2   apologize.

3       A.   I see it.

4       Q.   Okay.  You should be seeing

5   something labeled "Floyd's monthly revenue",

6   with only the column for "January 2020"

7   filled in.  Is that what you are seeing?

8       A.   Yes, I see that.

9       Q.   And we've looked at similar

10  documents to this today, but not this one.

11           Have you seen this particular

12  document before today?

13      A.   I don't recall.

14      Q.   Does seeing this help refresh your

15  recollection as to whether or not you ever

16  created documents like this one?

17      A.   No, it does not.

18      Q.   And seeing next to "dispensaries",

19  a total of "$833,443.04", does that help

20  refresh your recollection as to whether or

21  not Floyd's or Valued, Inc. operated

22  dispensaries?

23      A.   It does not.

24      Q.   And does that appear to you to be

25  the majority of the total number in that



1              Christopher L. Ryan

2    column?

3         A.   I can't say for sure.  I don't

4    understand the relationship between the two

5    bottom two numbers.

6         Q.   Okay.  I will show you what we have

7    labeled as Exhibit D-119.  It's missing a

8    stamp.  Hang on.  I will label this D-119.

9              Are you now seeing a document that

10   has the label "D-119" on it?

11        A.   Yes.

12        Q.   And that's right above the label

13   "FOL-SDNY 06316"?

14        A.   Yes.  Yes.

15        Q.   Does this appear to be an e-mail

16   "from Floyd Landis, to Jonathan Gazdak" and

17   "Alexandra Merle", copying "Frank DiMartini"

18   and "Chris@FloydsofLeadville.com"?

19        A.   It does.

20        Q.   Have you ever seen this document

21   before today?

22        A.   I don't recall seeing it.

23        Q.   Do you recall receiving this

24   e-mail?

25        A.   I don't.



1                    Christopher L. Ryan

2         Q.    Do you have any reason to doubt

3   that you received this e-mail?

4         A.    I don't.

5         Q.    This e-mail reads, "The body of the

6   e-mail from me to them, and the response from

7   them to me in the affirmative represents the

8   entirety of the agreement.  The attachment is

9   not applicable or relevant.  Hopefully, that

10  clears that up."  "That clears it up", excuse

11  me.  Do you see that?

12        A.    I do see that.

13        Q.    Reading this, does that refresh

14  your recollection as to whether or not you

15  were involved in any way with contracts while

16  you were at Floyd's of Leadville?

17        A.    It does not, no.

18        Q.    Or agreements of any sort?

19        A.    No.

20        Q.    In your work-life, can you ever

21  recall a time when the entirety of an

22  agreement was contained in an e-mail?

23        A.    I don't recall that, no.

24        Q.    Sitting here today, would that seem

25  unusual to you or normal or --



1             Christopher L. Ryan

2      A.   Can't really say.  I don't know.

3      Q.   I am showing now what we have

4  labeled as Exhibit D-120.

5           Does this appear to be an e-mail

6  "from Floyd Landis, to Barrie Clapham,

7  parentheses, IS" --  sorry, "parentheses,

8  LSIL", copying "Kirt@provision.tv, Mark

9  Leonard, Alex@FloydsofLeadville.com" and

10 "Chris Ryan"?

11     A.   I see that, yes.

12     Q.   Have you ever seen this e-mail

13 before?

14     A.   I don't recall seeing it.

15     Q.   Do you recall receiving this

16 e-mail?

17     A.   I don't.

18     Q.   Does -- I'll ask that in a minute.

19          Do you see the opening paragraph

20 is, "Attached is what I believe to be the

21 Provision agreement that I signed.  However,

22 this one has only Mark's signature."

23          Do you see that sentence in the

24 first paragraph?

25     A.    "This one only has Mark's



1           Christopher L. Ryan

2    signature."  Yeah, I see that, I see that

3    line.

4        Q.   I am going to now direct you to

5    page 5 of 25.  You should be seeing a

6    document which at the top reads "securities

7    purchase agreement", and which has at the

8    bottom the label "FOL-SDNY 05498."

9        A.   I see that.

10       Q.   Do you see that document?

11       A.   I do, yes.

12       Q.   Have you ever seen a securities

13   purchase agreement before today?

14       A.   I'm not sure.

15       Q.   Do you have any memory of seeing

16   something that looks like this?

17       A.   Not specifically, no.

18       Q.   Do you have any general memory of

19   seeing something like this?

20       A.   Not really, no.

21       Q.   Do you know what a "securities" is

22   -- what "securities" are?

23       A.   Not sure.

24       Q.   Have you ever heard of the

25   "Securities and Exchange Commission"?



1              Christopher L. Ryan

2        A.   Yes.

3        Q.   Do you have an understanding of

4   what they do?

5        A.   Not really, no.

6        Q.   Have you ever held a license from

7   FINRA?

8        A.   I don't recall if I did or didn't.

9        Q.   Have you ever held a license from

10  the National Association of Securities

11  Dealers, NASD?

12       A.   I don't remember.

13       Q.   If you will just take a minute,

14  scroll through this document and see if

15  there's anything in there that refreshes your

16  recollection about having seen this before.

17  And please take as much time as you need.

18       A.   I skimmed it but I didn't really

19  read it.  There's a lot to read.

20       Q.   Sure, sure.

21            Does anything in there refresh your

22  recollection about what Provision was?

23       A.   No.

24       Q.   Does anything in there refresh your

25  recollection about who Mark Leonard is?



1              Christopher L. Ryan

2         A.   No.

3         Q.   Does anything in there refresh your

4    recollection about whether Floyd Landis

5    worked at Floyd's of Leadville while you were

6    there?

7         A.   No.

8         Q.   I am looking, just, for example,

9    page 14 of 25.  Do you see there's a space

10   for a signature by "Floyd Landis", under

11   "Floyd's of Leadville, Inc.", and it lists

12   his title as "president"?

13        A.   Yes.

14        Q.   Do you see that?

15        A.   Yes.

16        Q.   Does that help you remember whether

17   or not Floyd Landis was ever the president of

18   Floyd's of Leadville?

19        A.   It does not.

20        Q.   Sitting here today, do you know if

21   Floyd Landis was associated with Floyd's of

22   Leadville at all?

23        A.   I don't.

24        Q.   I will show you what we have

25   labeled as Exhibit D-121.  Does this appear



1          Christopher L. Ryan

2   to be an e-mail "from Barrie Clapham,

3   parentheses, LSIL, close parentheses, to

4   Floyd Landis", copying "Kirt@provision.TV,

5   Mark Leonard, Alex@FloydsofLeadville.com",

6   and "Chris Ryan"?

7          A.   I see that, yes.

8          Q.   Do you recall receiving this

9   e-mail?

10         A.   I don't.

11         Q.   Do you recall ever seeing this

12  e-mail before?

13         A.   I don't.

14         Q.   Do you have any reason to dispute

15  that you received this e-mail?

16         A.   I don't.

17         Q.   Paragraph -- the paragraph numbered

18  two, begins, "Thanks.  I don't understand the

19  role of Tim Kelly.  You told me one more

20  than" -- you told me more than once that he

21  was employed or commissioned by FOL to take

22  you public.  In return for which, he would

23  receive shares which were never issued as he

24  failed to complete his task.  That would

25  certainly fit with how he represented himself



1              Christopher L. Ryan

2    to me, both when we were all together in

3    Colorado and elsewhere, and when I

4    subsequently talked to him one-on-one."

5          Do you see that?

6       A.   I do.

7       Q.   Does reading that help refresh your

8    recollection as to who Tim Kelly was?

9       A.   I just -- my only recollection is

10   he did something bad, but I don't remember

11   what that was.

12      Q.   Okay, so let's -- no, that's

13   wonderful because you -- I understood earlier

14   you had no recollection, but now you are

15   recalling "he did something bad."

16          Is this driving anything else

17   loose?

18      A.   Not really, no.

19      Q.   No.  Does he -- do you know if he

20   was an employee of Floyd's?

21      A.   No, I don't believe he was, but I

22   am not sure.

23      Q.   You "don't believe he was", but you

24   are "not sure"?

25      A.   I just remember -- I remember him



1              Christopher L. Ryan

2   going to jail.

3        Q.   Okay.

4        A.   That's all I remember.

5        Q.   Okay.  Do you remember in what

6   context you learned he went to jail?

7        A.   I don't, no.

8        Q.   Do you remember what you understood

9   he went to jail for?

10       A.   No.

11       Q.   Do you remember who told you he

12  went to jail?

13       A.   No.

14       Q.   You remember he went to jail, but

15  nothing else about it?

16       A.   I don't know anyone that's been to

17  jail, so that's why it stuck out.

18       Q.   Okay.  I am going to show you --

19  hopefully, I will show you what we have --

20  what I am now labeling as Exhibit D-122.  I

21  apologize for the confusion on this.

22            We started to look at this earlier,

23  when it was mislabeled, just before our break

24  earlier.  Do you recall -- do you recall

25  that?



1                Christopher L. Ryan

2        A.   I don't.  Did we see this e-mail

3    earlier?  It doesn't look familiar.

4        Q.   Okay, that's fine.  Let's just --

5    let's start from the beginning, then.

6             Does this appear to be an e-mail

7    "from Floyd Landis, to Alex Merle-Huet"

8    and --

9        A.   Yes.

10       Q.   I'm sorry.  "Floyd Landis, to

11   Jonathan Gazdak, Frank DiMartini", copying

12   "Alex Merle" and "Chris Ryan"?

13       A.   Yes.

14       Q.   Do you recall ever seeing this

15   e-mail before?

16       A.   It looks familiar to me.  I saw it

17   earlier today, but I don't know if it's the

18   same one.

19       Q.   Other than earlier today, do you

20   have any memory of seeing this e-mail?

21       A.   No.

22       Q.   Do you have any reason to doubt you

23   received this e-mail?

24       A.   I don't.

25       Q.   And you see there's an attachment



1              Christopher L. Ryan

2    entitled "FOLPROVagreement.pdf"?

3         A.   I'm sorry, I -- that's the

4    attachment at the top?

5         Q.   Yeah.

6         A.   Yeah, I do see that.  Yeah.

7         Q.   I direct you to page 2 of 2 -- or 2

8    of 22.

9         A.   Okay.

10        Q.   Are you seeing a document labeled

11   "securities purchase agreement"?

12        A.   I am.

13        Q.   The stamp at the bottom is FOL-SDNY

14   04849.

15        A.   Yes.

16        Q.   Looking at this document, does this

17   look similar to the security purchase

18   agreement we looked at a moment ago?

19        A.   It looks similar, yes.

20        Q.   I will just take you to page 11.

21   This is the signature page we looked at

22   earlier.  I asked you if it refreshed your

23   recollection as to whether or not Floyd was

24   involved at Floyd's of Leadville?

25        A.   Yes.  This looks the same as I saw



1              Christopher L. Ryan

2    before.

3        Q.   But seeing this again, is it

4    refreshing your recollection?

5        A.   No, no.

6        Q.   I will now show you what we have

7    labeled Exhibit D-123.  This is "from

8    Chris@FloydsofLeadville.com, to Jonathan

9    Gazdak."  Do you see that?

10       A.   Yes.

11       Q.   The "subject" is "re: Valued, Inc.

12   diligence materials."

13       A.   Yes.

14       Q.   And in -- have you seen this e-mail

15   before?

16       A.   Not to my recollection.

17       Q.   Do you have any reason to doubt you

18   sent this e-mail?

19       A.   I don't.

20       Q.   In this e-mail, the second sentence

21   is, "the DDD is Tim Kelly."

22       A.   Yes, I see that.

23       Q.   Do you know what "DDD" is?

24       A.   I don't.

25       Q.   Do you have any recollection of



1                    Christopher L. Ryan

2    seeing this "DDD" before?

3         A.    No.

4         Q.    I have seen this entity in other

5    places referred to as "Three DDD."

6              Have you ever heard of that?

7         A.    Not -- not to my recollection, no.

8         Q.    Do you have any memory of ever

9    seeing this Three DDD before?

10        A.    No, not specifically, no.

11        Q.    Do you have any general memory of

12   it?

13        A.    I don't believe so, no.

14        Q.    Does seeing this refresh your

15   recollection as to who Tim Kelly is?

16        A.    Not other than the jail thing, no.

17        Q.    Okay.  But nothing new comes to

18   mind?

19        A.    No, no.

20        Q.    I'm going to show you what we have

21   labeled as Exhibit D-124.  Does this appear

22   to be an e-mail sent "from Floyd Landis, to

23   Frank DiMartini", and "Jonathan Gazdak",

24   cc'ing, "Chris@FloydsofLeadville.com", and

25   "Alex@FloydsofLeadville.com"?



```
 1                Christopher L. Ryan
 2       A.   Yes, I see that.  Yeah.
 3       Q.   And in the "from" line, you see
 4  next to "Floyd Landis", it says,
 5  "Floyd@FloydsofLeadville.com"?
 6       A.   Yes.  That's what it reads.
 7            Yes, I see that.
 8       Q.   That's the same e-mail domain as in
 9  Chris@FloydsofLeadville.com?
10       A.   Yeah, yes.
11       Q.   Does seeing that refresh your
12  memory as to whether or not you worked at the
13  same place as Floyd Landis?
14       A.   It doesn't, no.
15       Q.   This e-mail is dated "December 28,
16  2019"; is that correct?
17       A.   Yes, that is what is written.
18       Q.   And it's got a couple of -- it's
19  got three attachments, the last of which is
20  "copy of FOL share transfer ledger
21  062419.XLSX."
22       A.   I'm sorry, is that at the top.
23       Q.   Next to "attachments", there are
24  three attachments, the last of which, "copy
25  of FOL share transfer ledger."
```



1                Christopher L. Ryan

2        A.    I see that, yes.

3        Q.    Okay.  And directing you to page 15

4   of this document, are you seeing something

5   that says at the top, "all shares are post

6   split"?

7        A.    Yes, I see that, that document.

8        Q.    And at the bottom, you see the

9   number -- the -- the stamp "ACLP063181"?

10       A.    Hold on a second.

11       Q.    Sure.

12       A.    "063181"?

13       Q.    I believe so.

14       A.    Yeah, I see that.

15       Q.    Have you ever seen this document

16  before?

17       A.    I don't recall seeing this.

18       Q.    Is this the sort of document you

19  would have created?

20       A.    I am not sure.

21       Q.    Have you ever seen a share ledger

22  before?

23       A.    I am not sure that I have.

24       Q.    Do you see the second row says,

25  "Chris Ryan printed" -- "printed 8/25/22"?



1            Christopher L. Ryan

2      A.   Yes.

3      Q.   And next to it we have got

4  "certificate number", "number of shares",

5  "certificate number D2, number of shares,

6  3,500,000"?

7      A.   Yes.

8      Q.   Do you know if you were ever issued

9  shares of Floyd's of Leadville?

10      A.   I don't recall if I was.

11      Q.   Do you know what "shares" are?

12      A.   I have heard of the term, yes.

13      Q.   What do you understand that term to

14  be?

15      A.   I am not really sure.

16      Q.   Have you owned shares in any

17  company?

18      A.   I am not sure.

19      Q.   Do you remember ever purchasing

20  stock?

21      A.   I am not sure.

22      Q.   Do you know if you have ever

23  purchased stock?

24      A.   I am not sure.

25      Q.   Do you know if you have ever owned



1                    Christopher L. Ryan

2    stock?

3         A.   I -- I am not sure.

4         Q.   Do you know if you ever owned

5    shares of any company?

6         A.   I -- I don't know.  I am not sure.

7         Q.   Going to show you what's been

8    marked as Exhibit D-125.  Does this appear to

9    be an e-mail "from Floyd Landis, Floyd@

10   FloydsofLeadville.com, to Jonathan Gazdak,

11   Mr. Frank DiMartini", copying

12   "Chris@FloydsofLeadville.com", and

13   Alex@FloydsofLeadville.com?

14        A.   Yes, I see that.

15        Q.   Have you seen this document before

16   today?

17        A.   I don't recall seeing this before.

18        Q.   Do you recall ever seeing an e-mail

19   like this before today?

20        A.   Not sure I understand the question.

21        Q.   It was a bad question.  Let me just

22   ignore that question and say:  Do you have

23   any reason to doubt that you received this

24   e-mail?

25        A.   I don't.



1              Christopher L. Ryan

2        Q.   And if you look at page 2, do you

3   see the e-mail from Floyd Landis that we were

4   just looking at in Exhibit D-124?

5        A.   See an e-mail from Floyd Landis,

6   yes.

7        Q.   That's the one we were just looking

8   at.

9        A.   Okay.

10       Q.   I will direct you back to the top

11  of the document.  Second sentence in that

12  full paragraph reads, "The problem with the

13  shares that Mark sold is that I authorized

14  the shares to be sold by Mark while I was

15  still uninformed that the money I loaned to

16  Provision went directly to Mark Leonard, who

17  then used our own capital to buy shares of

18  our company from Tim."

19            Do you see that?

20       A.   I see that, yes.

21       Q.   Does reading that refresh your

22  recollection as to who Provision was?

23       A.   No.

24       Q.   Does it refresh your recollection

25  as to who Mark Leonard was?



1              Christopher L. Ryan

2       A.   No.

3       Q.   Does it refresh your recollection

4  as to who Tim Kelly was?

5       A.   Not other than I have already

6  stated, no.

7       Q.   Okay.  The next sentence reads, "I

8  have retained Gibson Dunn, who I have spent

9  millions of dollars with over the years to

10  sue Provision, Mark Leonard, parentheses,

11  personally, and Tim Kelly for this fraud."

12           Do you see that sentence?

13       A.   I see that sentence, yes.

14       Q.   Does that refresh your recollection

15  as to who Provision is?

16       A.   It does not, no.

17       Q.   Well, I should say, does it refresh

18  your recollection as to what Provision is?

19       A.   No.

20       Q.   Does it refresh your recollection

21  as to who Mark Leonard is?

22       A.   No.

23       Q.   And other than you have already

24  stated, does it refresh your recollection as

25  to who Tim Kelly is?



1              Christopher L. Ryan

2        A.   No.

3        Q.   While you were at Floyd's of

4   Leadville, do you recall Floyd's of Leadville

5   ever suing any person or entity?

6        A.   I don't recall.

7        Q.   Do you recall Floyd's of Leadville

8   ever being involved in any litigation?

9        A.   Not to my recollection.

10       Q.   I will show you what we have marked

11  as Exhibit D-126.  The top of this page

12  should be an e-mail from Floyd Landis to

13  Barrie Clapham, parentheses, LSIL, close

14  parentheses", copying Alexander -- "Alexandra

15  Merel, Frank DiMartini, August 2018, Chris

16  Ryan", and "Bob Bell."  Do you see that?

17       A.   I do.

18       Q.   And the "subject" is "re: Moving

19  forward."

20       A.   I see that, yes.

21       Q.   The bottom is stamped "FOL-SDNY

22  06026."

23       A.   I see that, yes.

24       Q.   Looking at this document, do you

25  remember receiving this e-mail?



1              Christopher L. Ryan

2        A.   I don't.

3        Q.   Do you remember ever seeing this

4   e-mail before today?

5        A.   No, I don't.

6        Q.   And then just looking down

7   underneath the initial e-mail, there's an

8   e-mail "from Barrie Clapham", from

9   "Wednesday, February 12, 2020."

10             Do you see that?

11        A.   Sorry, this is --

12        Q.   It's in the middle of the reply.

13   This is from --

14        A.   From Barrie to Floyd?  Barrie

15   Clapham to Floyd?

16        Q.   It doesn't have a "to" line.  It

17   just says, "On Wednesday, February 12, 2022."

18        A.   Okay, yes, I see that.

19        Q.   And then on page 2, the line with

20   the carrot -- the arrows, begins, On 12,

21   February 2022, at 9:28, Floyd Landis wrote"

22   -- do you see that?

23        A.   Further down, yes, I do.

24        Q.   Further down.

25             Just looking at that e-mail now, do



1              Christopher L. Ryan

2    you recall ever seeing that e-mail before?

3         A.   I don't.

4         Q.   It starts, "I just want to give you

5    a heads up that we're going to start to

6    unwind things here."

7              Do you see that?

8         A.   I do see that, yes.

9         Q.   Do you know what it means for a

10   company to "unwind things"?

11        A.   Not really, no.

12        Q.   Did you have any understanding of

13   it?

14        A.   No.

15        Q.   Next sentence is, "Alex is going to

16   an interview at the N.Y. Federal Reserve

17   today and I'm going to let Bob know to try to

18   find a school admin job so he can support his

19   family."  Do you see that?

20        A.   I do see that, yes.

21        Q.   Does that refresh your recollection

22   as to who Alex Merel is?

23        A.   No, no.

24        Q.   Or who Bob Bell is?

25        A.   No.



1                Christopher L. Ryan

2        Q.   Do you remember being at Floyd's of

3   Leadville, at a time when the company was

4   being unwound?

5        A.   No.

6        Q.   Do you know if the company was shut

7   down while you were there?

8        A.   I don't recall it being shut down.

9        Q.   Do you know if that's why you left?

10       A.   I don't recall.

11       Q.   Do you know why you no longer work

12   at Floyd's of Leadville?

13       A.   Not sure.

14       Q.   Do you recall if you resigned?

15       A.   I don't recall.

16       Q.   Do you recall if you retired?

17       A.   I don't recall.

18       Q.   Do you recall if you were fired?

19       A.   I don't recall.

20       Q.   Have you ever been fired from a job

21   before?

22       A.   I don't remember.

23       Q.   So we have looked at a number of

24   documents today relating to Floyd's of

25   Leadville, having looked at all those



1              Christopher L. Ryan

2    documents, do you have any refreshed

3    recollection as to what you did at Floyd's of

4    Leadville?

5         A.   No.

6         Q.   So sitting here today, you do not

7    know what your job duties were at Floyd's of

8    Leadville?

9         A.   No, not specifically.

10        Q.   Do you know generally?

11        A.   No.

12        Q.   Do you have any recollection at all

13   of what you did for the company?

14        A.   No.

15        Q.   Sitting here today, having reviewed

16   those documents, do you have a refreshed

17   recollection as to when you worked for the

18   company?

19        A.   No.

20        Q.   Do you have a refreshed

21   recollection as to how long you worked for

22   the company?

23        A.   No.

24        Q.   Do you remember anything about

25   Floyd's of Leadville, other than what you



1         Christopher L. Ryan

2   have testified here to today?

3                   MR. VEDRA:  Objection; form.

4         MR. WRIGHT:

5                   THE WITNESS:  I don't

6         understand the question.

7   BY MR. WRIGHT:

8      Q.   Sure.  Let me rephrase the

9   question.  Is there anything about -- let me

10  try that one more time.

11         Other than what you already told us

12  today, do you remember anything about Floyd's

13  of Leadville?

14                   MR. VEDRA:  Objection; form.

15                   THE WITNESS:  That's too

16         broad.  I can't answer that

17         question.

18  BY MR. WRIGHT:

19      Q.   Okay.  Sitting here today, have you

20  had your recollection refreshed as to what

21  kind of business Floyd's of Leadville was

22  operating?

23                   MR. VEDRA:  Objection; to

24         form.

25                   THE WITNESS:  Yeah, I don't



1              Christopher L. Ryan

2         know.

3    BY MR. WRIGHT:

4         Q.   Looking at all the documents we've

5    looked at today, has your -- have you had

6    your reflection refreshed as to whether or

7    not Floyd's of Leadville was involved in

8    cannabis?

9                   MR. VEDRA:  Objection to

10             form.

11                  THE WITNESS:  I can't say.

12                  MR. WRIGHT:  What's the

13             basis, Mr. Vedra?

14                  MR. VEDRA:  I think you have

15             asked this, at least, three or four

16             dozen times.

17                  MR. WRIGHT:  Okay.

18   BY MR. WRIGHT:

19        Q.   Please answer the question,

20   Mr. Ryan.

21        A.   Could you repeat the question,

22   please?

23        Q.   Sure.

24             Having looked at all the documents

25   we looked at today, have you had your memory



1              Christopher L. Ryan

2   refreshed as to whether or not Floyd's of

3   Leadville was involved in the cannabis

4   business?

5        A.   No.

6                 MR. VEDRA:  Same objections.

7   BY MR. WRIGHT:

8        Q.   Looking at all the documents we've

9   looked at here today, have you had your

10  memory refreshed as to whether or not Floyd's

11  of Leadville was in the CBD business?

12                MR. VEDRA:  Objection to

13           form.

14                THE WITNESS:  No.

15  BY MR. WRIGHT:

16       Q.   Sorry, Mr. Ryan, will you please

17  answer for the record.

18       A.   It has not refreshed my memory.

19       Q.   Let's take a break.  I think I am

20  done but I want to consult with my colleagues

21  to make sure I haven't missed anything.

22           Five-minute break?

23       A.   Sure.

24                THE VIDEOGRAPHER:  One

25           moment.  Going off the record.  The



1           Christopher L. Ryan

2           time is 4:42.

3                (Whereupon, a recess was

4           taken at this time.)

5                THE VIDEOGRAPHER:  We are

6           back on the record.  The time is

7           4:44.

8                MR. WRIGHT:  Mr. Ryan, thank

9           you for your time today.  I have no

10          further questions.

11               THE WITNESS:  Thank you.

12               MR. RACHMUTH:  This is Paul

13          Rachmuth, representing Barrie

14          Clapham, Mark Leonard in -- and

15          Mark Leonard in this case.  I have

16          a couple of minor follow-up

17          questions for you.

18               THE WITNESS:  Sure.

19  EXAMINATION BY

20  MR. RACHMUTH:

21       Q.  Aside from the business

22  transactions that we discussed at today's

23  deposition so far, do you have any

24  recollection of any business transactions

25  between Mark Leonard and Floyd's of



1              Christopher L. Ryan

2   Leadville?

3                  MR. VEDRA:  Objection to

4         form and foundation.

5   BY MR. RACHMUTH:

6       Q.   You can answer.

7       A.   I don't recall any.

8       Q.   Do you recall any business

9   transactions between Floyd's of Leadville,

10  also known as Valued, Inc., and Mark Leonard?

11      A.   I don't recall any.

12      Q.   Do you recall any business

13  transactions between Floyd's of Leadville,

14  also known as Valued, Inc., and Provision?

15      A.   I -- I -- I don't recall any.

16      Q.   Do you recall any business

17  transactions between Floyd's of Leadville,

18  also known as Valued, Inc. and Barrie

19  Clapham?

20                  MR. VEDRA:  Objection.

21                  THE WITNESS:  I don't

22        recall, no.

23  BY MR. RACHMUTH:

24      Q.   And by Barrie Clapham, I am

25  referring to the gentleman referred to in the



1              Christopher L. Ryan

2   e-mails known as Barrie Clapham or R. Barrie

3   Clapham or Ronald Barrie Clapham.

4         Do you know of any business

5   transactions between Floyd's of Leadville and

6   Barrie Clapham?

7        A.   I am not aware of any.

8        Q.   I have no further questions.

9               MR. VEDRA:  No questions

10              from the plaintiff.

11              THE VIDEOGRAPHER:  Okay, if

12              we are done --

13              MR. WRIGHT:  We are.

14              THE VIDEOGRAPHER:  This now

15              concludes the videoconferenced

16              deposition of Christopher Ryan.

17              At this time we do ask all

18              counsel to stay connected briefly

19              to provide transcript and video

20              orders for the court report.

21              Mr. Wright, did you need a

22              copy of today's transcript and/or

23              video?

24              MR. WRIGHT:  Yes, to both

25              please.



1      Christopher L. Ryan

2          THE VIDEOGRAPHER:  Copy of

3    the video synced?

4          MR. WRIGHT:  Synced.

5          THE VIDEOGRAPHER:  Any other

6    orders at this time?

7          MR. RACHMUTH:  Transcript

8    only order.

9          THE VIDEOGRAPHER:  Okay,

10   Mr. Vedra?

11         MR. VEDRA:  We will read and

12   sign and we will make our decision

13   after we do that, if we can recall

14   to.

15         THE VIDEOGRAPHER:  Okay,

16   thank you.  We are now going off

17   the record on September 6, 2024, at

18   4:47 p.m. Eastern time.

19         -oOo-

20         (Whereupon, the examination

21   of CHRISTOPHER L. RYAN was

22   adjourned at 4:47 p.m.)

23

24

25



1           Christopher L. Ryan

2

3               CHRISTOPHER L. RYAN

4

5

6  Subscribed and sworn to

7  before me this       day

8  of                 , 2024.

9

10

11  NOTARY PUBLIC

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1

2        ---------------- I N D E X ----------------

3    WITNESS              EXAMINATION BY           PAGE

4    CHRISTOPHER L. RYAN

5                        MR. WRIGHT                7

6                        MR. RACHMUTH              226

7        ---------------- EXHIBITS ------------------

8    DEFENSE                               FOR ID.

9    EXHIBIT 100    Balance Sheet          premarked

10   EXHIBIT 101    E-mail                 premarked

11   EXHIBIT 101A   Spreadsheet            premarked

12   EXHIBIT 102       E-mail              premarked

13   EXHIBIT 103A      Summary             premarked

14   EXHIBIT 104       E-mail              premarked

15   EXHIBIT 105       E-mail              premarked

16   EXHIBIT 106       E-mail              premarked

17   EXHIBIT 107       E-mail              premarked

18   EXHIBIT 108       E-mail              premarked

19   EXHIBIT 109       E-mail              premarked

20   EXHIBIT 110       E-mail              premarked

21   EXHIBIT 111       E-mail              premarked

22   EXHIBIT 112       E-mail              premarked

23   EXHIBIT 112A      Spreadsheet         premarked

24   (Exhibits continued.)

25



1

2     ----------------- EXHIBITS ------------------

3     DEFENSE                              FOR ID.

4     EXHIBIT 112B       Spreadsheet     premarked

5     EXHIBIT 113        E-mail          premarked

6     EXHIBIT 114        Investor Draft  premarked

7     EXHIBIT 114A       Spreadsheet     premarked

8     EXHIBIT 115        E-mail          premarked

9     EXHIBIT 116        Spreadsheet     premarked

10    EXHIBIT 117        E-mail          premarked

11    EXHIBIT 118        E-mail          premarked

12    EXHIBIT 119        E-mail          premarked

13    EXHIBIT 120        E-mail          premarked

14    EXHIBIT 121        E-mail          premarked

15    EXHIBIT 122        E-mail          premarked

16    EXHIBIT 123        E-mail          premarked

17    EXHIBIT 124        E-mail          premarked

18    EXHIBIT 125        E-mail          premarked

19    EXHIBIT 126        E-mail          premarked

20    EXHIBIT 127        LinkedIn        premarked

21         (Exhibits retained by attorney.)

22    ---------------------------------------------

23

24

25



1

2                    C E R T I F I C A T E

3

4   STATE OF NEW YORK      )
                           : ss.
5   COUNTY OF NEW YORK     )

6

7          I, AYDIL M. TORRES, a Notary Public

8   within and for the State of New York, do

9   hereby certify:

10         That CHRISTOPHER L. RYAN, the witness

11  whose deposition is hereinbefore set forth,

12  was duly sworn by me and that such deposition

13  is a true record of the testimony given by

14  the witness.

15         I further certify that I am not

16  related to any of the parties to this action

17  by blood or marriage, and that I am in no way

18  interested in the outcome of this matter.

19         IN WITNESS WHEREOF, I have hereunto

20  set my hand this 6th day of September, 2024.

21

22

23

24                    AYDIL M. TORRES

25



```
 1
 2              DEPOSITION ERRATA SHEET
 3
 4  Our Assignment No. J11629378
 5  Case Caption:  FLOYD'S OF LEADVILLE, INC. ET.
 6  AL vs.  ALEXANDER CAPITAL, L.P., ET. AL
 7     DECLARATION UNDER PENALTY OF PERJURY
 8        I declare under penalty of perjury
 9  That I have read the entire transcript of
10  My Deposition taken in the captioned matter
11  Or the same has been read to me, and
12  The same is true and accurate, save and
13  Except for changes and/or corrections, if
14  Any, as indicated by me on the DEPOSITION
15  ERRATA SHEET hereof, with the understanding
16  That I offer these changes as if still under
17  Oath.
18  _____
19                CHRISTOPHER L. RYAN
20  Subscribed and sworn to on the _____ day of
21  _____, 20____ before me,
22
23  _____
24  Notary Public,
25  In and for the State of _____
```



1
2                DEPOSITION ERRATA SHEET
3    Page No._____Line No._____Change
4    to:_____
5    _____
6    Reason for
7    change:_____
8    Page No._____Line No._____Change
9    to:_____
10   _____
11   Reason for
12   change:_____
13   Page No._____Line No._____Change
14   to:_____
15   _____
16   Reason for
17   change:_____
18   Page No._____Line No._____Change
19   to:_____
20   _____
21   Reason for
22   change:_____
23   Page No._____Line No._____Change
24   SIGNATURE:_____DATE:_____
25            CHRISTOPHER L. RYAN



1

2                    DEPOSITION ERRATA SHEET

3    Page No._____Line No._____Change

4    to:_____

5    _____

6    Reason for

7    change:_____

8    Page No._____Line No._____Change

9    to:_____

10   _____

11   Reason for

12   change:_____

13   Page No._____Line No._____Change

14   to:_____

15   _____

16   Reason for

17   change:_____

18   Page No._____Line No._____Change

19   to:_____

20   _____

21   Reason for

22   change:_____

23   Page No._____Line No._____Change

24   SIGNATURE:_____DATE:_____

25              CHRISTOPHER L. RYAN

