# Exhibit A



**Bryan Ward**
Direct Line: 404.892.5695
bryan.ward@holcombward.com

October 2, 2024

**VIA EMAIL**

Daniel J. Vedra, Esq.
Vedra Law, LLC
1444 Blake Street
Denver, CO 80202
dan@vedralaw.com

    Re:    *Floyd's of Leadville, Inc., n/k/a Valued, Inc. v. Alexander Capital, L.P., et al.;* Civil Action No. 1:22-cv-03318-DEH

Dear Dan:

    As I noted at the end of the Rule 30(b)(6) deposition of Floyd's of Leadville, Inc. n/k/a Valued, Inc. ("Floyd's"), Alexander Capital, L.P.; NESA Management LLC, Rocco Guidicipietro, Joseph Amato, and Jonathan Gazdak (the "Alexander Capital Defendants") reserved their right to continue that deposition. You noted your objection to continuing the deposition on the record.

    The Alexander Capital Defendants believe that, notwithstanding your objection, they are further entitled to question Floyd's corporate representative based on his non-responsive answers, his improper assertion of objections, and his failure to be prepared to answer questions pertaining to the noticed topics.

    During the course of the deposition, I was forced to ask Mr. Bell repeatedly to limit his responses to the questions asked and to refrain from engaging in non-responsive colloquies. I was further forced to ask you to so instruct your client on several occasions. While, on some of those occasions, you did so instruct your client, on others, you declined to do so and, in fact, responded that you did not believe Mr. Bell was giving non-responsive answers. In the end, we were subjected to numerous non-responsive, rambling answers, as well as colloquies offered spontaneously while no question was pending. I understand that depositions often involve tension between examiner and witness and that no witness is going to be willing and able to answer every question exactly as posed, but Mr. Bell's testimony went well beyond these issues, failing to meet the minimal standards for a Rule 30(b)(6) witness.

Daniel J. Vedra, Esq.
October 2, 2024
Page 2

The transcript[1] is replete with examples of these non-responsive answers and colloquies. A large enough number that I cannot list them all here, but, by way of example, the following instances are particularly egregious. Asked if Mr. Clapham was the chairman and chief investor for London and Scottish Investments, Mr. Bell responded "I don't know." This would have been a full and complete answer, but rather than stopping there Mr. Bell added that he wanted Ms. Cole to pull Mr. Clapham's LinkedIn profile[2] and then proceeded to share unrelated facts about Mr. Clapham. I attempted to move on, placing a new exhibit on the screen, but Mr, Bell continued to hold forth on Mr. Clapham, culminating in proffering, unprompted, that Mr. Bell had been told a story wherein Mr. Clapham made a phone call while drunk and in a bathtub with prostitutes. There was no question to which this information was plausibly related and there was no question pending at all when Mr. Bell proffered much of it. Rather, it served no purpose other than to muddy the record and to serve as a sort of filibuster.

A second example can be found in response to being asked if Mr. Bell saw a particular sentence in exhibit D-217. Mr. Bell affirmed that he did see the sentence, which was a full and complete answer to the question. However, rather than pausing to allow the next question to be asked, Mr. Bell gave a long rambling answer about Alexander Capital's alleged fraud, the moral character of Mr. Landis, various allegations about individuals running Redemption Holdings[3], and Mr. DiMartini's childhood. When asked to confine his answers to the questions asked, Mr. Bell responded "I thought -- I mean I thought that was a perfect answer to your question, but if you want another round at it, I'll answer it perfectly again."

---

[1] Alexander Capital Defendants received a rough version of the transcript on Monday, September 30, 2024. All references to the transcript reflect this rough transcript.

[2] This was one of several references Mr. Bell made to Ms. Cole during his deposition testimony, despite no questions pertaining to her. Mr. Bell's repeated references to Ms. Cole were, at best, improper.

[3] On at least four occasions, Mr. Bell, unprompted, and in response to questions having nothing to do with Mr. Hurley accused Mr. Hurley of being a pedophile or made reference to Mr. Hurley's alleged arrest for possession of child pornography. Mr. Bell peppered his testimony with derogatory comments about various individuals involved in this case, often when those comments had no bearing on the question. For example, he referred to the Alexander Capital Defendants as "mobsters," he accused Mr. Clapham of being a "thief" and a "crook" and implied he was lying about holding vigil at his father's hospice, he called Howard DaSilva a "sneaky piece of shit kind of guy," and so on. These derogatory asides, which were not responsive to the questions asked, served no purpose other than to muddy the record and to further delay the deposition. Further, they were inappropriate and indicative of the fact that Mr. Bell did not approach his deposition with the level of respect, professionalism, and seriousness that one would expect from a Rule 30(b)(6) deponent.

Daniel J. Vedra, Esq.
October 2, 2024
Page 3

A third example can be found when Mr. Bell was asked if a statement concerning the intent to sell the Oregon dispensaries was true. Mr. Bell answered, responsively and completely, "absolutely." He followed that with some plausibly responsive elaboration on the market for the sale of dispensaries but then gave a long statement about Floyd's theory of the case, the intentions of parties other than Floyd's, the various investors into Floyd's, and other unrelated topics.

In each of these instances Mr. Bell went on at length on topics that were totally unrelated to the question at hand, offering his own theories or opinions on the case and asserting various facts – many of which are totally unsupported by the record. This testimony, aside from being improper, wasted the Alexander Capital Defendants' time. Because of this extreme, and apparently intentional, time-wasting on the part of Floyd's 30(b)(6) designee, the Alexander Capital Defendants believe they are entitled to further question Floyd's 30(b)(6) designee.

In addition to giving lengthy and non-responsive answers to questions, Mr. Bell also regularly objected to questions. In many instances he did so absent an objection from Floyd's counsel, though in some cases he simply elaborated on the objections made by counsel. In either case, Mr. Bell, as the witness, is not empowered to make objections and he is not empowered to refuse to answer based on those objections. Nonetheless, this is exactly what he did.

This issue is exacerbated by the fact that Mr. Bell repeatedly tied his objections to Alexander Capital's objections to Floyd's 30(b)(6) notice of Alexander Capital. Mr. Bell repeatedly objected to items on the grounds that Alexander Capital might call something overly broad or burdensome. Mr. Bell, who has no standing to object in the first place, appears to have tied his refusal to answer various questions to the fact that Alexander Capital had informed counsel for Floyd's that it would be seeking a protective order. Floyd's could have sought a protective order if it felt the 30(b)(6) notice was overly broad or unduly burdensome. It did not do so. And, as you know, that is because, when Floyd's raised concerns of that nature, Alexander Capital amended the Notice to address those concerns. The time to raise those objections had passed when the deposition began, and they formed no proper basis for refusing to answer questions.

Mr. Bell's improper objections, which extended the deposition needlessly and which caused him to avoid answering questions put to him, form a second, separate, basis for a second 30(b)(6) deposition of Floyd's.

Finally, Mr. Bell repeatedly demonstrated that he was unprepared or unwilling to answer the questions put to him. For instance, on no fewer than twenty-eight occasions, Mr. Bell stated he would not or could not answer questions put to him and that Alexander Capital Defendants would have to ask Floyd Landis that question. These insistences that Mr. Bell could not answer a question put to him as a corporate representative, but that Mr. Landis could, are particularly disturbing as Mr. Bell testified that, in preparing for his testimony, he did not speak to Mr. Landis. In fact, Mr. Bell testified that, while he spoke to several investors who could not have knowledge that would be attributable to Floyd's,

Daniel J. Vedra, Esq.
October 2, 2024
Page 4

he spoke to no other current or former corporate officers of Floyd's who would have such information.

 Mr. Bell asserted Alexander Capital Defendants would have to ask Floyd Landis to get information related to Notice topics 1, 2, 3, 4, 5, 8, 9, 13, and 14. For example, Topic 1 called on Floyd's corporate witness to be prepared to speak to "The locations and sources of Your efforts to preserve and Your efforts to search for and produce documents and information responsive to the Alexander Capital Defendants' First and Second Requests for Production of Documents." Mr. Bell informed Alexander Capital Defendants that they would have to talk to Mr. Landis about document preservation, how Floyd's stores records, whether Floyd's has any paper records, and how Floyd's archives emails. All of these questions fall squarely into Topic 1, yet Mr. Bell could or would not answer them.

 As a second example, Topic 2 called on Floyd's corporate witness to be prepared to speak to "The allegations against ACLP in your First Amended Complaint." Topic 14 specifically called on Floyd's corporate witness to be prepared to testify about "Your communications with ACLP, Jonathan Gazdak, and/or Frank DiMartini relating to the allegations in Paragraphs 33 through 35 of Your First Amended Complaint." Mr. Bell, when asked about specific allegations, repeatedly referred the Alexander Capital Defendants to Mr. Landis. By way of example, when asked about the biweekly, in person meetings described in paragraph 35 – responsive to both Topics 2 and 14 – Mr. Bell repeatedly asserted that Alexander Capital Defendants would have to ask Mr. Landis.

 Mr. Bell's repeated insistence that questions posed to him as the corporate representative of Floyd's – questions that fell squarely within the noticed topics – should be directed to Mr. Landis indicate that Mr. Bell was not properly prepared to answer those questions or that he was refusing to do so. In either case, this refusal would justify a second deposition of Floyd's corporate representative.

 In addition to refusing to answer questions by referring them to Mr. Landis, Mr. Bell demonstrated his inability or unwillingness to answer questions by refusing to answer the question put to him and choosing, instead, to answer some other question. As but one such example, when asked if particular representations were ever made in writing, Mr. Bell answered hyperbolically that "Alexander Capital doesn't do anything in writing,"[4] Mr. Bell repeated this answer several times even after I explained to him that it was not responsive to the specific question being asked.

 Mr. Bell's repeated reliance on non-responsive answers in general and his reliance on such answers in the face of clear explanations as to why those answers were non-

---

[4] Of course, taken literally, this answer is demonstrably false. Mr. Bell, nonetheless, repeatedly asserted it as if it were an honest answer to various questions and repeatedly refused to clarify those answers. Alexander Capital Defendants therefore assume that these responses were hyperbolic rather than simply untrue. Assuming this is, in fact the case, Mr. Bell's hyperbolic responses, including but not limited to this one, would form an additional basis for a second Rule 30(b)(6) deposition.

Daniel J. Vedra, Esq.
October 2, 2024
Page 5

responsive in particular, further shows that he was not willing to answer questions posed to him as a 30(b)(6) witness.

      For all of these reasons, Alexander Capital Defendants request that Floyd's consent to a second day of 30(b)(6) questioning and that it commit to preparing its corporate representative to speak to the noticed topics, to limit his or her answers to the questions asked, to answer the questions asked, and to refrain from offering his or her own objections. If it is preferrable to Floyd's, Alexander Capital Defendants are willing to discuss limiting further oral deposition questioning by using written questions designed to address the defects in the initial testimony.

      If Floyd's is unwilling to consent to this request, please advise us of a time in the next two days when you can meet and confer on Alexander Capital Defendants' intent to request the Court's leave to notice a second 30(b)(6) deposition.

Sincerely,

Bryan Ward

cc:    Paul Rachmuth, Esq.
        Aaron Wright, Esq.
        Holly Cole, Esq.