FLOYD'S OF LEADVILLE, INC.,
N/K/A VALUED, INC.,

        Plaintiff,

v.                            CASE NO.: 1:22-cv-3318-DEH

ALEXANDER CAPITAL, L.P.; NESA
MANAGEMENT, LLC; JOSEPH ANTHONY AMATO;
ROCCO GERARD GUIDICIPIETRO; JONATHAN GAZDAK;
RONALD BARRIE CLAPHAM; MARK LEONARD;
PROVISION HOLDING, INC.;
TIMOTHY KELLY; AND THREE DDD LLC,

        Defendants.

## STIPULATION OF MATERIAL FACTS

Plaintiff Floyd's of Leadville, Inc., n/k/a Valued, Inc. ("FOL"), and Defendants Alexander Capital, L.P. ("Alexander Capital"); NESA Management, LLC; Joseph Anthony Amato; Rocco Gerard Guidicipietro; Jonathan Gazdak; Ronald Barrie Clapham; and Mark Leonard, stipulate to the following material facts:

**Parties – Floyd's of Leadville Inc. n/k/a Valued Inc.**

1.      FOL is a Colorado corporation with its principal place of business located at 1101 Poplar Street, Leadville, CO 80461 formed in 2016, FOL was a start-up company, that sells CBD-branded products over the internet and in retail locations.

2.      Floyd Landis, at all relevant times hereto, was FOL's Chief Executive Officer.

3.      For a period of time, beginning in 2018 or 2019, Bob Bell was FOL's Director of Operations.  Mr. Bell is not an attorney and has never been an attorney.

**Parties - Gazdak**

4.      Jonathan Gazdak is a named defendant in this lawsuit.

5.      He is employed by Alexander Capital L.P..

6. He holds the position of managing director of the investment banking division at Alexander Capital.

7. He holds multiple FINRA licenses, specifically the Series 24, Series 63, and Series 79 licenses.

8. He worked alongside Stephen Walsh, and in 2017, the two of them were the only individuals in Alexander Capital's investment banking division.

**Parties - ACLP**

9. Alexander Capital, L.P. is a limited partnership that operates in the financial industry as a broker-dealer.

10. Alexander Capital, L.P. ("ACLP"), is a FINRA-regulated broker-dealer firm with an investment banking department, which, among other things, helps corporations raise capital in the private and public markets.

11. The firm includes an investment banking division that provides financial advisory services and assists client companies in raising capital.

12. The firm also features a capital markets division and a retail division composed of registered representatives who service customer accounts and facilitate the sale of securities.

13. Joseph Amato serves as the firm's Chief Executive Officer.

14. Rocco Guidicipietro serves as the firm's Chief Operating Officer.

15. Michele Misiti serves as the firm's Chief Compliance Officer.

16. Tom Sullivan serves as the firm's Chief Financial Officer.

**Parties – Ronald Barrie Clapham**

17. Ronald Barrie Clapham is a citizen of the United Kingdom who was located in Gibraltar at the time of his deposition.

18. Defendant Ronald Barrie Clapham ("Clapham") is an adult domiciled in and a citizen of the United Kingdom.

19. He is an entrepreneur whose career has spanned several industries, including property, agriculture, satellite tracking, and environmental automotive waste.

20. Clapham has run agricultural businesses in the United Kingdom in the past, and has invested in 7-8 CBD businesses.

21. He is not a trained attorney and has never practiced law, although he did study law for two years in Scotland.

22. He serves as the chairman of an entity called London and Scottish Investments Limited.

23. He invested $2,000,000 to purchase equity in Floyd's of Leadville, making him a shareholder rather than a noteholder or creditor of the company.

24. Frank DiMartini solicited Clapham's investment in Floyd's of Leadville.

25. Frank DiMartini offered Clapham the opportunity to invest in the promissory note offering but Clapham declined.

26. He participated in an informal advisory board (which he personally referred to as a "credit committee") that was formed to address the maturity of the Promissory Notes owed by Floyd's of Leadville.

27. He drew on his prior financial experience from the 2008 financial crisis, during which he had helped major banks in the United Kingdom renegotiate and extend client debts.

28. Frank Dimartini introduced Clapham to Landis, as well as to Alexandra Merle, and Robert "Bob" Bell of FOL.

29. In 2018, Clapham traveled to Colorado to investigate FOL to see if it was a worthwhile company to invest in.

30. Clapham subsequently purchased 4 million shares in FOL for $2 million.

31. A group of individuals who had different levels of interest and concern created an "Advisory Board" to help identify a solution to the financial difficulties that FOL faced.

32. Various representatives of FOL attended advisory board meetings from time to time.

33. While serving on the Advisory Board, Clapham learned FOL did not own any dispensaries outright.

34. Clapham lent $120,000 to Redemption Holdings, Inc. to support the application for an appointment of a receiver over FOL.

35. In February 2020, Clapham and Leonard, amongst others, were considering opening and/or investing in a business called Above CBD LLC a/k/a Above Holding LLC to sell CBD products in vending machines.

36. Above CBD LLC a/k/a Above Holding LLC is the alleged rival CBD company referred to in the FAC.

37. Above CBD LLC a/k/a Above Holding LLC never made any sales.

38. Clapham believed that in June of 2020 Alexander Capital represented note holders who FOL was indebted to.

39. Clapham thought Alexander Captial's fees towards FOL were hefty but not illegal or fraudulent.

**Parties – Mark Leonard**

40. Mark Leonard is a named defendant.

41. Mark Leonard is an adult domiciled in and a citizen of the State of California.

42. He served as the President and Chief Executive Officer of a company called Provision Holding, Inc., beginning around September 2017.

43. He acquired approximately 2.7 million shares of common stock in FOL by paying Tim Kelly or Kelly's consulting business.

44. He subsequently sold a portion of his shares in FOL to other buyers.

45. He received $540,000 in exchange for the shares he sold.

46. His stock sales were facilitated by Alexander Capital L.P. (specifically through Frank DiMartini), and Leonard agreed to pay the firm an 11 percent commission for the sale of his shares.

47. He explored a potential business venture with Barrie Clapham (sometimes referred to as Above CBD) that aimed to sell CBD products through retail kiosks and vending machines.

48. He explored this potential business venture with Clapham while Clapham was serving on the advisory board.

49. FOL's principal, Floyd Landis ("Landis"), testified that when he first met Leonard, Landis did not know Leonard's relationship to the other individuals present and that the relationship "wasn't really made clear."

50. Landis testified that the meeting led him to believe that Leonard had "great contacts in the convenience store industry."

51. Landis testified that FOL did not enter into any agreement with Coil Distribution LLC ("Coil") for product distribution.

52. Landis further testified that it would have been unlikely for FOL to have entered into any Coil contract without his knowledge.

53. Leonard had discussions and business arrangements with Coil members Frank DiMartini and Tim Kelly concerning Coil Distribution LLC as a possible vehicle to sell FOL's products, but Coil never consummated a binding business arrangement or did business with FOL.

54. No binding Coil agreement with FOL was ever consummated.

55. Leonard did not receive money, inventory, intellectual property, or contractual rights from FOL through Coil.

56. Rainmaker Retail Group, LLC had a relationship with FOL through Leonard.

57. Leonard had a dispute with Rainmaker concerning commissions due to Leonard and was involved with litigation and arbitration against it.

58. Landis testified that his understanding of the Rainmaker dispute was that it concerned a disagreement between Leonard and Rainmaker over ownership or revenue sharing.

59. Landis further testified that FOL was not a party to that litigation, to his knowledge.

60. Leonard acquired approximately 2.7 million shares of common stock in FOL.

61. Leonard subsequently sold a portion of his shares in FOL to other buyers for $540,000.

62. Bari Latterman, a former employee of Alexander Capital, testified that she understood the transaction reflected in the stock purchase materials involved investors buying shares of FOL "owned by Mark Leonard."

63. Latterman testified that her understanding was that the investors would be buying Leonard's shares directly from him.

64. Latterman testified that she did not know who was responsible for determining whether Leonard owned the shares.

65. Latterman testified that she did not know whether that ownership determination was something on which she would have relied on Jonathan Gazdak or FOL.

66. Latterman testified that she did not know who Peter DiChiara, an attorney at Carmel, Milazzo & DiChiara was representing in connection with the stock purchase agreements.

67. Latterman further testified that she did not know whether DiChiara was representing Leonard in connection with those transactions.

68. Martorano testified that the transaction he understood involved stock purchase agreements prepared for the sale of FOL shares "owned by Mark Leonard" to investors, facilitated by Alexander Capital.

69. Martorano testified that Leonard did sell shares in FOL.

70. Martorano testified that he did not recall whether Alexander Capital ever notified FOL that Leonard was selling shares in FOL.

71. Leonard states that he sold shares through Alexander Capital and that his understanding was that those transactions were handled through Alexander Capital and that stock certificates were provided through FOL.

72. Leonard states that he once visited a manufacturer that FOL had used for one of its products.

73. Jonathan Gazdak testified that he did not recall whether Leonard sold shares of Floyd's of Leadville.

74. Gazdak testified that he did not know whether Alexander Capital received any payment for the sale of Leonard's shares.

75. Even after being shown documents, Gazdak testified that the documents did not refresh his recollection as to whether Leonard sold shares in Floyd's of Leadville to any person.

76. Gazdak testified that he did not know whether Leonard was an officer or employee of FOL.

77. Rocco Guidicipietro of Alexander Capital testified that Leonard's name did not sound familiar to him.

**Witness – Frank DiMartini**

78. Frank DiMartini worked as a registered representative at Alexander Capital L.P. from 6/14/16 through 3/18/20, where he was part of the retail department rather than the capital markets or investment banking divisions.

79. He was supervised by the compliance department and branch managers at Alexander Capital, which included Pat Giglia and, later, Carl Martorano.

80. He originally brought the Floyd's of Leadville deal to Alexander Capital and subsequently raised funds for the company by selling its promissory notes and equity to retail clients.

81. He has known several of the investors personally for decades, having grown up in the same neighborhood as Gregory Hurley and having known Gary Grella since high school.

82. He sold one of the promissory notes to his brother.

83. He introduced multiple individuals to the Floyd's of Leadville investment opportunity, including Gary Grella, Gregory Hurley, and Ronald Barrie Clapham.

84. He had previously introduced his clients and contacts to other business investments prior to and separate from Floyd's of Leadville, including opportunities with Draft Kings, DISABOOM, and Provision Holding, Inc..

85.     He was involved in forming a distribution company called Coil—which placed the ownership in his and Tim Kelly's wives' names—alongside Mark Leonard and Tim Kelly to sell Floyd's of Leadville products.

86.     He also explored a potential business venture called Above CBD with Mark Leonard, Barrie Clapham, and Frank Squilla to sell CBD products through retail kiosks.

**Witness – Gary Grella**

87.     Gary Grella was 60 years old as of his 2024 deposition and has personally known Frank DiMartini since high school in the late 1970s.

88.     He had previously invested in Draft Kings through Frank DiMartini before being introduced to the Floyd's of Leadville opportunity.

89.     He invested $50,000 in Floyd's of Leadville by purchasing a promissory note on October 15, 2018.

90.     He maintained his investment records by saving relevant emails and paperwork in a computer folder labeled "Dimar".

91.     He communicated with other individuals involved in the Floyd's of Leadville matter, including participating in a few phone calls and email exchanges with Greg Hurley.

92.     He was familiar with the creation of Redemption Holdings and understood its purpose was to sell assets to pay off the loan holders of Floyd's of Leadville.

**Witness – Greg Hurley**

93.     He acted as an investor and capital provider for Floyd's of Leadville, where he purchased both promissory notes and equity investments.

94.     He purchased both promissory notes and equity investments through ACLP.

95.     He participated as a member of an informal advisory board alongside other investors to address the maturity of the Promissory Notes.

96.     He was and currently is the president, a board member, and a shareholder of a company called Redemption Holdings.

**Witness – Tim Kelly**

97. FOL issued Tim Kelly a "Floyds of Leadville" email address.

98. Tim Kelly also had an e-mail address of tkelly@lyndencap.com.

**The Promissory Note Offering**

99. On October 20, 2017, Alexander Capital L.P. and Floyd's of Leadville entered into an engagement agreement for a private placement of up to $2,000,000 in senior secured debt (the "Engagement Agreement").

100. A true and correct copy of the Engagement Agreement is attached as Joint Exhibit 1.

101. Jonathan Gazdak signed the Engagement Agreement on behalf of Alexander Capital.

102. Under the Engagement Agreement, Alexander Capital was engaged as Floyd's of Leadville's "exclusive placement agent and financial advisor."

103. In exchange, FOL agreed to pay ACLP a placement fee of 10% of net proceeds raised by ACLP.

104. FOL subsequently agreed to increase the amount of capital raised through both debt and equity.

105. Ultimately, ACLP raised $4,338,565 in senior secured debt from investors between December 2017 and October 2018.

106. FOL paid ACLP $433,856.50 pursuant to § 3(a) of the Engagement Agreement.

107. The securities sold as part of this offering were 12 percent senior secured promissory notes.

108. The notes entered into by the Noteholders had two-year repayment terms.

109. Alexander Capital acted as the placement agent, utilizing its registered representatives to sell the promissory notes to investors and customers.

110. Although the initial engagement targeted up to $2,000,000, Alexander Capital ultimately raised $4,338,570.50 through the sale of these notes.

111. Alexander Capital raised this capital through fifty-six (56) different investors and sixty-nine (69) individual promissory notes.

112. DiChiara/CMD served as escrow agent in connection with the private placement.

113. Under the promissory notes, Alexander Capital was appointed as "Agent" for the Noteholders to exercise their rights collectively.

114. Investors participating in the offering completed offering documents, which included a subscription agreement, a promissory note, and a security agreement.

115. The funds raised from the sale of the promissory notes were initially placed into an escrow account before being disbursed to Floyd's of Leadville and other parties through authorized escrow release notices.

116. Alexander Capital earned a fee for its services in the offering, which was agreed to be a 10 percent commission from the proceeds of the transactions.

117. Landis testified that DiChiara, not ACLP, told him that the escrow disbursements to Three DDD were a commission for Tim Kelly.

118. FOL defaulted on the notes after failing to pay the interest due and principal due and negotiations for restructuring the debt were unsuccessful.

**The Advisory Board**

119. The advisory board ("Advisory Board") was an informal group formed around early to mid-2020 after the promissory notes issued by Floyd's of Leadville started to mature.

120. The stated purpose of the board was to attempt a workout to refinance the Promissory Notes.

121. The members participating in the Advisory Board's communications included former registered representative Frank DiMartini, and investors Gregory Hurley, Howard DaSilva, and Ronald Barrie Clapham.

122. Frank DiMartini was no longer an employee or contractor with Alexander Capital at the time the Advisory Board existed.

123. Frank DiMartini did not have a financial interest in the repayment or workout of the promissory notes.

123. The Advisory Board sought and gathered various pieces of information from Floyd's of Leadville, primarily focusing on financial projections, loan documentation, and details regarding the roles of the company's employees.

124. The Advisory Board formulated and proposed potential solutions to the company, such as an "eight-point plan" that was intended to provide a pathway for successful refinancing and to cure defaults.

125. The "eight-point plan" had nine points.

126. One of the points of the "eight-point plan" was that Floyd's of Leadville must establish a lien on the Leadville Dispensary for the benefit of the Lenders.

127. The Advisory Board ultimately did not successfully facilitate a resolution between the noteholders and Floyd's of Leadville, and it ceased to exist around the time Redemption Holdings was formed in August 2020

128. The Advisory Board did not reach a resolution for renegotiation of the Promissory Notes.

129. Alexander Capital, acting as agent for the Lenders, called a default on the Promissory Notes.

130. After calling a default, Alexander Capital resigned as agent.

**Redemption**

131. Redemption Holdings is a Colorado corporation formed in August 2020 to collect and assert client debt claims against Floyd's of Leadville.

132. Redemption Holdings was appointed as successor agent to Alexander Capital.

133. Gregory Hurley serves as the president, a board member, and a shareholder of the company.

135.134. The company's primary purpose was to litigate and exert claims under the existing promissory notes and loan documentation involving Floyd's of Leadville.

136.135. The creation of the company involved multiple individuals, including Gregory Hurley, Barrie Clapham, Frank DiMartini, and Howard DaSilva.

137.136. Barrie Clapham received an approximate five percent shareholding in Redemption Holdings and loaned the company $120,000 to fund its litigation efforts.

138.137. Mark Leonard understood the company was formed to represent the noteholders and potentially take over the operations of Floyd's of Leadville if it failed, though he ultimately relinquished any potential stock or interest he might have had in Redemption.

139.138. Gary Grella understood that the company was working to sell assets in order to pay back the Lenders.

**The Redemption Lawsuit**

140.139. Redemption Holdings filed a civil lawsuit against Floyd's of Leadville in the District Court for the City and County of Denver, Colorado, on behalf of the lenders asserting claims for appointment of a receiver, breach of contract, fraudulent misrepresentation, fraudulent transfer, injunctive relief, specific performance, and declaratory relief. In its pleadings, Redemption alleged that the Leadville Dispensary, located at 113 E. 7th Avenue in Leadville, Colorado, was part of the initial assets pledged as collateral to secure the noteholders' investments.

141.140. Redemption Holdings, LLC, an entity formed by the majority of the investors, filed suit against FOL in Colorado for appointment of a receiver, breach of contract, fraudulent misrepresentation, fraudulent transfer, injunctive relief, specific performance, and declaratory relief.

142.141. Redemption further claimed that the defendants attempted to separate the Leadville Dispensary from the noteholders' collateral by repainting the building and changing the name on its sign from "Floyd's of Leadville" to "Floyd's Fine Cannabis".

143.142. A true and correct copy of Redemption's operative complaint is attached hereto as Joint Exhibit 2.

144.143.    As part of the litigation, Redemption Holdings requested the appointment of a receiver to manage Floyd's of Leadville and take immediate possession of the collateral, explicitly including the Leadville Dispensary.

145.144.    The Redemption Lawsuit was settled and as part of the settlement, Redemption Holdings formally withdrew all accusations that any Floyd's of Leadville parties had engaged in fraud or deceptive conduct.

146.145.    A true and correct copy of the Redemption Settlement Agreement is attached hereto as Joint Exhibit 3.

147.146.    Attached hereto as Joint Exhibit 4 is an example of a Promissory Note, Security Agreement, Subscription Agreement, and Investor Questionnaire executed by an investor.

148.147.    Attached hereto as Joint Exhibit 5 is the form Promissory Note, Security Agreement, Subscription Agreement, and Investor Questionnaire noting a total investment up to $3 million.

149.148.    Attached hereto as Joint Exhibit 6 is the form Promissory Note, Security Agreement, Subscription Agreement, and Investor Questionnaire noting a total investment up to $4 million.

DATED: May 29, 2026

**Vedra Law LLC**
Attorney for Plaintiff Floyd's of Leadville Inc.

Attorneys for Defendants Alexander Capital, L.P., NESA Management, LLC, Joseph A. Amato, Rocco G. Guidicipietro, Jonathan Gazdak

By:    ——————/s/ Daniel J. Vedra
——————
    Daniel Vedra
    1444 Blake St.
    Denver, CO 80202
    303-937-6540
    dan@vedralaw.com

By:    ——————————/s/ Bryan Ward——————
    Bryan Myerson Ward
    Marvin Lim
    Holcomb & Ward, LLP
    3455 Peachtree Rd., Suite 500
    Atlanta, GA 30326

404-601-2803
bryan.ward@holcombward.com

Holly Cole
Lewis Brisbois
600 Peachtree Street NE, Suite 4700
Atlanta, GA 30308
404.476.2027
Holly.Cole@lewisbrisbois.com

Aaron Wright
Alexander Capital, L.P.
10 Drs. James Parker Blvd.
Red Bank, NJ 07701
(732) 256-8106 (office)
(212) 687-5649 (fax)
aaron@alexandercapitallp.com

**Paul A. Rachmuth, Esq.**
**Bochner PLLC**
Attorneys for Defendants Ronald Barrie
Clapham and Mark D. Leonard

By:  _____/s/
Isaac Alony
      Isaac Alony
      Serge Krimnus
      1040 Avenue of the Americas
      15th Fl.
      New York, NY 10018
      ialony@bochner.law