**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

FLOYD'S OF LEADVILLE, INC.,
N/K/A VALUED, INC.,

               Plaintiff,

v.                                CASE NO.: 1:22-cv-3318-DEH

ALEXANDER CAPITAL, L.P.; NESA
MANAGEMENT, LLC; JOSEPH ANTHONY AMATO;
ROCCO GERARD GUIDICIPIETRO; JONATHAN GAZDAK;
RONALD BARRIE CLAPHAM; MARK LEONARD;
PROVISION HOLDING, INC.;
TIMOTHY KELLY; AND THREE DDD LLC,

               Defendants.

## PLAINTIFF'S RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff Floyd's of Leadville, Inc., n/k/a Valued, Inc. ("FOL"), by and through its undersigned counsel, hereby submits this Statement of Material Facts in support of its Motion for Summary Judgment:

## I.    THE PARTIES AND RELEVANT ACTORS

1.     Plaintiff Floyd's of Leadville, Inc., n/k/a Valued, Inc. ("FOL") is a Colorado corporation with its primary place of business located in Leadville, Colorado. (Landis Decl. ¶ 3).

2.     In the fall of 2017, FOL was a startup company seeking to raise capital to participate in the legal cannabis business.  (Landis Decl. ¶ 4).

3.     Defendant Alexander Capital, L.P. ("ACLP"), is a FINRA-regulated broker-dealer firm with an  investment banking department.  (Joint Stipulated Fact 10).

4.     Timothy Kelly was an associate of Defendant ACLP who introduced FOL's founder, Landis, to Frank DiMartini in the fall of 2017.  (Landis Decl. ¶ 5).

5.     Defendant Frank DiMartini ("DiMartini") is an individual who was employed by ACLP as a FINRA-registered broker.  (Joint Stipulated Fact 78).

6.      DiMartini was FOL's primary contact at ACLP during the Placement and the primary broker responsible for selling the Promissory Notes to investors.  (Landis Decl. ¶ 6).

7.      Defendant Jonathan Gazdak ("Gazdak") is an employee of ACLP.  (Joint Stipulated Fact 4).

8.      Gazdak was the Managing Director of ACLP's Investment Banking division.  (Joint Stipulated Fact 6).

9.      Gazdak signed the Engagement Agreement on behalf of ACLP.  (Joint Exhibit 1).

10.     Neither DiChiara nor ACLP disclosed to FOL that DiChiara had previously represented ACLP.  (Landis Decl. ¶ 7).

11.     Ronald Barrie Clapham ("Clapham") is an individual.  (Landis Decl. ¶ 8).

12.     Clapham is a shareholder and minority owner of FOL.  (Landis Decl. ¶ 9.

13.     Defendant Mark Leonard ("Leonard") is an individual.  (Landis Decl. ¶ 10).

14.     Mark Leonard was represented to be the CEO of Provision Holding, Inc.  (Landis Decl. ¶ 11).

15.     Gregory Hurley ("Hurley") is an individual.  (Landis Decl. ¶ 12).

16.     Hurley was an ACLP customer.  (Landis Decl. ¶ 13).

17.     Hurley was a Lender under the Placement.  (Landis Decl. ¶ 14).

18.     Hurley was one of the founders and president of Redemption Holdings, Inc. (Landis Decl. ¶ 15.

19.     Howard DaSilva ("DaSilva") is an individual.  (Landis Decl. ¶ 16).

20.     DaSilva was an ACLP customer.  (Landis Decl. ¶ 17).

21.     DaSilva was a Lender under the Placement.  (Landis Decl. ¶ 18.

## II.     THE CONTRACT

22.     On October 20, 2017, FOL and ACLP entered into an engagement agreement (the "Engagement Agreement"), which Gazdak signed on behalf of ACLP.  (Joint Ex. 1).

23.     Under the Engagement Agreement, FOL retained ACLP as "exclusive placement agent and financial advisor to [FOL] in connection with a private placement of up to $2,000,000

(the "Placement") in senior secured debt (the "Securities")." (Joint Ex. 1 at 2)[1].

24.    FOL retained ACLP "to consult with and advise [FOL] with respect to the Placement, and anything incidental thereto, as directed by the Company." (Id.).

25.    Under the Engagement Agreement, ACLP agreed to the following indemnity:

> Alexander agrees to indemnify and hold harmless the Company . . . against any and all loss, charge, claim, damage, expense and liability whatsoever, including, but not limited to, all attorneys' fees and expenses (hereinafter a "Claim" or "Claims"), related to or arising in any manner out of, based upon, or in connection with any untrue statement or alleged untrue statement of a material fact made by Alexander or any omission or alleged omission of Alexander to state a material fact required to be stated therein or necessary to make the statements therein not misleading and will promptly reimburse the Company for all expenses (including reasonable fees and expenses of legal counsel) as incurred in connection with the investigation of, preparation for or defense of any pending or threatened Claim related to or arising from such misstatement.

(Joint Ex.1 at 8 of 12).

## III.    INTRODUCTION OF ISSUER'S COUNSEL AND PETE DICHIARA'S ROLE

26.    ACLP introduced FOL to attorney Pete DiChiara to represent FOL as issuer's counsel for the Offering. (Landis Decl. ¶ 19).

27.    DiChiara had a longstanding relationship with ACLP. (Landis Decl. ¶ 20).

28.    DiChiara had previously represented ACLP. (Landis Decl. ¶ 21).

29.    DiChiara had previously represented Provision or ACLP on a restructuring of Provision's debt prior to FOL being introduced to DiChiara. (PX 1)[2].

30.    Prior to FOL engaging DiChiara, neither ACLP nor DiChiara disclosed to FOL that DiChiara had a longstanding relationship with ACLP and had previously represented ACLP and other Defendants in similar transactions. (Landis Decl. ¶ 22).

31.    Before Landis had signed an engagement agreement with DiChiara's law firm,

---

[1] Page references are made to the page number of the PDF and not the marked page on the document.

[2] Plaintiff has labelled its Exhibits as PX _____.

DiChiara drafted documents to be used in the Offering.  (PX 2) (Landis Decl. ¶ 23).

32.    DiChiara backdated his firm's engagement agreement with FOL.  (Landis Decl. ¶ 24).

33.    During the due diligence process, Gazdak frequently communicated with DiChiara to complete due diligence, and did not copy Landis or anyone from FOL on those communications.  (Landis Decl. ¶ 25).

## IV.    DUE DILIGENCE

34.    Under the Engagement Agreement, completing due diligence was a condition precedent to ACLP commencing the Offering.  (Joint Ex. 1 at 2).

35.    Prior to commencing the Placement, ACLP conducted due diligence on FOL. Gazdak was responsible for conducting this due diligence, which included reviewing FOL's documents and asset ownership.  (Gazdak Depo at 101:4-109:12).

36.    PBVille, LLC is the owner of a marijuana dispensary in Leadville, Colorado (the "Leadville Dispensary").  (Landis Decl. ¶ 26).

37.    Landis is the sole owner of PBVille, LLC.  He has been the sole owner of PBVille, LLC since it acquired the Leadville Dispensary.  (Landis Decl. ¶ 27).

38.    Gazdak asked for an organization chart showing what companies FOL owned.  (PX 3).

39.    There is no record that Gazdak received such an organization chart including subsidiaries of FOL.  (Bell. Decl. ¶ 3-8).

40.    During due diligence, Gazdak specifically asked for "documentation that shows that FOL, Inc. will lend the money to PBville, LLC... basically, how do the lenders get secured by the land." (PX 4).

41.    There is no record that Gazdak received such documentation.  (Bell. Decl. ¶ 3-8).

42.    Gazdak followed up to request how the funds get to PBVille.  (PX 41).

43.    There is no record that Gazdak received such documentation.  (Bell. Decl. ¶ 3-8).

44.    Gazdak was aware that Landis, not FOL, owned PBVille.  (PX 5).

45.    During due diligence, Gazdak received a letter from Landis stating that Landis owned PBVille, LLC, which was the company that was purchasing the Leadville Dispensary. (PX 6).

46.    In meetings with ACLP, Landis explained to Gazdak and DiMartini that FOL did not own the Leadville Dispensary.  (Landis Decl. ¶ 28).

47.    In meetings with ACLP, Landis explained to ACLP that the Leadville Dispensary could not be pledged as collateral due to Colorado state law restrictions on the ownership and financing of marijuana related businesses.  (Landis Decl. ¶ 29).

48.    Gazdak's due diligence included reviewing Colorado regulations on the marijuana industry.  (Gazdak Depo. at 111:6-13).

49.    Based on his due diligence, Gazdak believed that FOL was going "to acquire real estate to develop a cycling centric community" or "an RV kind of destination, where cyclists would come . . . to congregate and be near and around a – a dispensary or whatever it was called back then."  (Gazdak Depo. 108:5-16).

50.    FOL has never had such plans.  (Landis Decl. ¶ 30).

51.    To establish an escrow arrangement for the Placement, Gazdak represented to Signature Bank that FOL was a "commercial real estate company" and not a CBD or marijuana company.  (PX 7).

52.    Following his due diligence review, Gazdak did not reach any conclusions about the quality of FOL's assets or its future prospects.  (Gazdak Dep. at 126:1-7).

53.    ACLP failed to prepare standard offering materials, including a private placement memorandum, that would have clearly stated the actual terms of the loans.  (Gazdak Dep. at 177:6-12).

54.    Misiti is responsible for ensuring that Gazdak completes due diligence for private placements, like the Placement, including the preparation of a due diligence checklist.  (Misiti Dep. 42:3-13).

55.    ACLP has not produced a copy of the due diligence checklist for the Placement,

and no checklist was completed.  (Bell. Decl. ¶ 3-8).

## V.    THE PLACEMENT AND SOLICITATION MISREPRESENTATIONS

56.    While conducting due diligence, ACLP could begin placing the Promissory Notes but not "break escrow" (i.e. release funds to FOL) until it was complete.  (Gazdak Depo. 102:16-103:7).

57.    There are 69 sets of lending documents at issue in this dispute.  (Stipulated Fact 11).

58.    Each set of lending documents requires at least three sets of physical signatures by all the contractual counterparties: (1) on the note ("Promissory Note"); (2) on the subscription agreement ("Subscription Agreement"); and (3) on the security agreement ("Security Agreement").  (These documents are referred to collectively as the "Lending Documents"). (Joint. Exs. 3-6).

59.    The Leadville Dispensary was not included on a schedule of assets sent to the Lenders to solicit their investments.  (Joint. Exs. 3-6).

60.    The Leadville Dispensary was not included on the form lending documents.  (Joint. Exs. 5-6).

61.    The Placement was originally intended to be limited to $2 million in senior secured promissory notes.  (Joint Ex. 1 at 2).

62.    On the advice of ACLP, the Placement was increased to $3 million.  (Landis Decl. ¶ 31).

63.    Ultimately, the Placement totaled $4,338,565.  (Stipulated Fact 105).

64.    ACLP proceeded with multiple closings once a lender had funded their commitment, rather than a single closing for the total amount of the Offering.  (Landis Decl. ¶ 32).

65.    The lending documents included a representation that $3 million was the maximum aggregate amount of the Promissory Notes.  (Joint Ex. 5).

66.    After increasing the Offering to $4 million, ACLP did not notify earlier Lenders

6

that the Offering had exceeded the $3 million limit reflected in their documents.  (Joint Ex. 6; (Landis Decl. ¶ 33).

67.   Referring to the offering documents, DiMartini admitted that ACLP took "one document with his [Landis's] signature on it, and then I used that as a template to send out to all the clients."  (Ex. Recording 4).

68.   He stated that: "I'm not saying it was done the proper way, and I don't need to challenge that, and I don't want to use that as leverage, 'cause that's not leveraging, but this is what I sent to my clients."  (Ex. Recording 4).

## VI.   DIMARTINI SOLD THE PROMISSORY NOTES TO INVESTORS BY PROMISING TERMS AND RIGHTS THAT WERE NOT PART OF THE NOTES, AND DID NOT INFORM FOL OF THESE PROMISED TERMS.

69.   DiMartini represented to some of the Lenders that they were entitled to a thirty percent (30%) premium upon repayment of the Promissory Note.  (PX 8).

70.   DiMartini told the Lenders that they were entitled to convert their debt to equity at a $10 million valuation.  (Ex. Recording 2).

71.   For example, Hurley believed that he was entitled to the thirty percent (30%) premium upon repayment of the Promissory Note because DiMartini had sent him a copy of the amendment that applied to DaSilva's Promissory Note.  (PX 9).

72.   Hurley firmly believed that the 30% repayment premium was part of the deal.  (PX 10 at 2).

73.   Hurley stated: "But what I understood was is that either it's either the 30% or half of the deal gets converted at a 10 million, half of your debt can get converted on a 10 million valuation."  (Ex. Recording 1; Bell Decl.).

74.   Hurley further stated that DiMartini could not have raised over $4 million without the debt to equity conversion and 30% premium.   (Ex. Recording 3).

75.   Hurley also stated that he would not have done the deal without the debt-to-equity conversion.  (Ex. Recording 5).

7

76.     DaSilva was the only investor who was entitled to a thirty percent (30%) premium upon repayment of the Promissory Note.  (Landis Decl. ¶ 34).

77.     Aside from DaSilva, investors were only entitled to a thirty percent (30%) premium if FOL "redeemed" the Promissory Note.  (Joint Exs. 4-6).

78.     FOL did not redeem any of the Promissory Notes.  (Landis Decl. ¶ 35).

79.     DiMartini represented to some of the Lenders that the collateral under the Security Agreement included the Leadville Dispensary.  (PX 11).

80.     Hurley believed that the Leadville Dispensary was owned by FOL.  (PX 12).

81.     The Leadville Dispensary was not part of the collateral. (PX 5; PX 6).

82.     DiMartini represented to some of the Lenders that they were entitled to convert their debt into equity at a low valuation (e.g., $5 million to $10 million). (PX 8).

83.     FOL had not agreed to these terms, and DiMartini did not inform FOL that he had promised these terms to the Lenders.  (Landis Decl. ¶ 36).

84.     It was not standard practice for DiMartini to send out offering documents. (Latterman Depo. at 116:11-14).

85.     Bari Latterman, an ACLP employee, was responsible for sending placement documents to investors and receiving them back.  (Latterman Dep. at 80:13-22; 116:11-16).

86.     Latterman was unwilling to take signature pages from one document and add them to another document.  (Latterman Dep. at 80:9-12, 83:9-23, 86:9-87:8).

87.     DiMartini repeatedly sent partial, abbreviated copies of the Lending Documents to Lenders that omitted material terms of the Placement (omitting everything except the first page and signature pages).  (Bell Decl. ¶ 9); (Joint Ex. 4).

88.     DiMartini would send out the first and last pages of a document, obtain the Lender's signature, and then someone at ACLP (not Latterman) would insert the missing pages after obtaining the executed document.  (Joint Ex. 4).

89.     For example, DiMartini sent signature pages to Hurley, who signed them and stated his understanding of the deal including the 30% repayment premium (stated as a 154% return).

(PX 13).

90.     DiMartini did not send a security agreement to a prospective Lender that included a list of assets or schedule of subsidiaries pledging assets to secure the notes.  (Bell. Decl. ¶ 3-8).

91.     After assembling the document with the missing pages, ACLP sent the documents to DiChiara for his acceptance on behalf of FOL. (PX 14).

92.     Latterman did not copy anyone from FOL when requesting DiChiara to accept the investor on behalf of FOL.  (Id.) (Landis Decl. ¶ 37).

93.     After assembling the document with the missing pages, ACLP did not send the documents to Landis.  (Landis Decl. ¶ 38).

94.     Notably, some of the documents already had Landis's signature on them before Latterman asked DiChiara to accept the investor. (PX 15 at 6 ). (Latterman Depo. 98:15-106:19).

95.     Floyd Landis did not authorize ACLP, DiMartini, or Latterman to distribute documents with his signature on them to potential investors.  (Landis Decl. ¶ 39).

96.     FOL was never asked to and never physically signed the 69 sets of Lending Documents to the Lenders, and was never presented with a single complete set of Lending Documents to approve and sign.  (Landis Decl. ¶ 40).

97.     ACLP became the agent for the Lenders who loaned money to FOL under the Placement, and Gazdak was personally appointed as agent for the Lenders.  (Joint Ex. 4 at 13); (Gazdak Depo at 193:3-25).

98.     Despite being FOL's financial advisor and agent for the Lenders, ACLP did not have a complete set of documents, including a list of assets that were collateral for the loans.  (PX 16).

99.     Gazdak did not know if ACLP, as agent for the Lenders, was responsible for maintaining a full set of the Lending Documents. (Gazdak Dep. 190:10-193:16).

## VII.    THE PROMISSORY NOTES COME DUE AND THE CREATION OF THE ADVISORY BOARD

100.     The Promissory Notes each had a two-year maturity, beginning to come due in 2019

and 2020.  (Joint Exs. 5-6).

101.    The Promissory Notes were never registered under state or federal securities laws. (Landis Decl. ¶ 41).

102.    DiMartini had represented to FOL that the Promissory Notes would be refinanced or renegotiated when they came due.  (Landis Decl. ¶ 42).

103.    DiMartini had represented to FOL that he would assist in refinancing or renegotiating the Promissory Notes when they came due.  (Landis Decl. ¶ 43).

104.    As the notes began coming due, ACLP created an informal advisory board consisting of Frank DiMartini, Jonathan Gazdak, Barrie Clapham, Greg Hurley, and Howard DaSilva (the "Advisory Board").  (Landis Decl. ¶ 44).

105.    On May 6, 2020, Hurley suggested that a small group of individuals form to discuss the workout with FOL and to discuss, among other things, the 30% repayment premium.  (PX 17).

106.    Hurley was one of the Lenders who believed FOL (rather than ACLP) had misled him.  (Landis Decl. ¶ 45).

107.    Clapham was a minority owner of FOL.  (Landis Decl. ¶ 46).

108.    In 2020, Clapham was working with Mark Leonard and others to set up a rival CBD company.  (Clapham Request for Admission 38; Leonard Request for Admission 43).

109.    The Advisory Board gathered financial information from FOL to restructure the Promissory Notes.  (Landis Decl. ¶ 46).

110.    Gazdak sent an eight-point plan consisting of nine demands for restructuring the Promissory Notes (the "Eight Point Plan").  (Ex. 18).

111.    The Eight Point Plan required, among other things, that FOL grant the Noteholders a lien on the Leadville Dispensary and address the 30% repayment premium that some Lenders believed they were entitled to.  (PX 18, PX 19).

112.    Though ACLP was agent for the Noteholders, and Gazdak was participating in the Advisory Board, Gazdak did not know whether the Lenders wanted to be repaid.  (Gazdak Dep.

10

233-235:1).

113.    Beginning on July 1, 2020, while the Advisory Board was still meeting, FOL asked Gazdak to provide email contact information for the Lenders so that FOL could contact and make payments directly to them.  (PX 20).

114.    FOL did not have email addresses for all of the Lenders.  (Landis Decl. ¶ 48).

115.    The Lenders were located across the United States and in more than a dozen different countries.  (Landis Decl. ¶ 49).

116.    All of the Lenders were ACLP's customers.  (Landis Decl. ¶ 50).

117.    After receiving multiple requests for email contact information, Gazdak conferred with Gregory Hurley and Ronald Barrie Clapham.  (PX 21)

118.    Based on their response, Gazdak refused to provide the email contact information to FOL, confirming with Hurley that he would not provide this information.  (PX 21)

119.    Clapham encouraged Gazdak to withhold the Lenders' contact information.  (PX 21).

120.    This withholding of information was contrary to ACLP policy; Bari Latterman testified that she, as the person who tracked this information, would have provided it to FOL. (Latterman Dep. 129:7-16).

121.    Because Gazdak withheld this contact information, FOL was unable to reach all of the Lenders to arrange to pay off or refinance the notes.  (Landis Decl. ¶ 51).

122.    DiChiara responded to one of Landis's requests for Lender contact information, but did not provide email addresses because he did not have all of them.  (PX 22).

123.    Fearing that Landis would start communicating directly with the Lenders, DaSilva suggested that the Advisory Board prepare their own email to the Lenders.  (PX 23).

124.    DaSilva suggested to the Advisory Board that they "draw out" Landis to reject or fail to respond to the 8 Point Plan and then immediately contact the Lenders to stay "in control" of the situation.  (PX 24).

125.    FOL attempted to reach as many Lenders as possible but was limited by a lack of

email contact information.  (Landis Decl. ¶ 52).

126.    FOL began this process in July of 2020 but had very little response and was unable to contact all Lenders to establish trust and negotiate directly with the Lenders.  (Landis Decl. ¶ 53).

## VIII.    THE CONSPIRACY AND THE TRANSFER TO REDEMPTION HOLDINGS

127.    On July 3, 2020, while the Advisory Board was meeting, Clapham created a strategy to seize all of FOL's assets if FOL did not voluntarily submit to the Eight Point Plan (including a lien on the Leadville Dispensary and other terms promised by DiMartini).  (PX 25).

128.    Clapham wrote a presentation ("FOL Solution") to convince Lenders to assign their notes to Redemption to sue FOL, containing misrepresentations about FOL's leadership and solvency.  (PX 25).

129.    The FOL Solution stated that FOL had no plan to repay Lenders.  (PX 25).

130.    FOL did, in fact, have a plan to repay Lenders.  (PX 26).

131.    Gazdak received FOL's plan to repay Lenders.  (PX 26).

132.    Clapham circulated this presentation to Gazdak beforehand, and Gazdak did not correct any false statements. (PX 25).

133.    Despite being an FOL shareholder, Clapham personally funded up to $500,000 of Redemption's litigation against FOL to seize FOL's assets.  (Clapham Request for Admission 48).

134.    Clapham vetted this litigation strategy with Gazdak, Hurley, and others.  (PX 25).

135.    The Lenders, believing FOL had engaged in wrongdoing, aligned themselves with ACLP and Hurley to attempt to force the acquisition of the Leadville Dispensary, which did not belong to FOL and had not been pledged as collateral.  (PX 27)

136.    On June 16, 2020, ACLP called a default on the Promissory Notes.  (PX 28).

137.    Around the same time, Clapham, with input from Leonard, created a new CBD company called "Above Holdings" to sell CBD products similar to FOL's.  (PX 29).

138.    On August 5, 2020, FOL began making payments to those Lenders who responded

to FOL's email.  (PX 30).

139.    Hurley formed Redemption Holdings to sue FOL and its principals, alleging fraud. (PX 31).

140.    On August 11, 2020, DiMartini solicited all Lenders to assign their Promissory Notes to Redemption to facilitate suing FOL and foreclosing on the purported collateral.  (PX 32).

141.    On August 12, 2020, Hurley assigned his note to Redemption.  (PX 33).

142.    The Lenders could not transfer the Promissory Notes absent either registration under applicable securities laws or delivery of an opinion of counsel acceptable to FOL. (Joint Ex. 5 at 12).

143.    To accomplish the transfer, on August 12, 2020, Redemption's counsel dispatched a letter and opinion to Gazdak (the "Wysocki Opinion Letter") asserting that the notes were exempt from registration. (PX 27).  (PX 34).

144.    In his email dated August 12, 2020, Redemption's attorney demands that Gazdak, acting on behalf of ACLP as "attorney-in-fact" for FOL, accept the opinion letter as sufficient for permitting the Lenders to transfer their notes to Redemption.  (PX 27)

145.    This email contains multiple misrepresentations.  First, ACLP was not "attorney-in-fact" for FOL.  ACLP was agent and attorney-in-fact for the Noteholders as agent.  Second, an attorney-in-fact is not "counsel" or an attorney at law.  Third, the opinion letter has to be satisfactory to FOL's counsel, not the Noteholders.  Fourth, this email purports to appoint Redemption as agent with immediate effect despite the thirty (30) day notice period required under the Promissory Notes.  (PX 27)

146.    Gazdak, after enlisting counsel, did not correct these misrepresentations.  (PX 27)

147.    The Wysocki Opinion Letter contained similar misrepresentations.  (PX 34).

148.    The Wysocki Opinion Letter was addressed to Gazdak as Attorney-in-Fact for FOL. (Id.).

149.    Gazdak is not an attorney and not an attorney for FOL. (Landis Decl. ¶ 54).

150. The Wysocki Opinion Letter was addressed to Bob Bell as General Counsel for FOL.  (PX 34).

151. Bob Bell was FOL's director of operations, not an attorney.  (Landis Decl. ¶ 55).

152. Gazdak knew that Bob Bell was not an attorney.  (Landis Decl. ¶ 56).

153. The Wysocki Opinion Letter was not accepted by FOL.  (Landis Decl. ¶ 57).

154. Redemption's counsel directed a letter to Aaron Wright, attorney for ACLP (and counsel of record in this case), stating that "over 97% of all outstanding holders of the Notes have assigned the Notes to [Redemption]."  (PX 35)

155. The letter asks ACLP for its "resignation as Agent pursuant to Section 8(f)(i) of the Notes" and to "re-confirm that  [the Assignment of over 97% of the Notes] and all further actions taken by [Redemption] as Successor Agent, shall be covered by the indemnification described in Section 8(e) of the Notes."  (Id.).

156. The letter concludes "By signing below, You hereby agree to resign as Agent pursuant to Section 8(f)(i) of the Notes and You hereby acknowledge that RHI is duly appointed Successor Agent under the Notes."  (Id.).

157. Rather than correct the misrepresentations that the Promissory Notes (1) were permitted to be transferred and (2) were transferred, Gazdak adopted those misrepresentations and agreed to the transfer.  (Id.).

158. Gazdak signed the agreement on behalf of ACLP.  (Id.).

159. Gazdak also agreed to ACLP's resignation as agent with immediate effect, (Id.), contrary to the 30-day notice requirement in the Promissory Notes.  (Joint Ex. 5 at 15-16).

160. On August 19, 2020, Redemption filed its complaint against FOL commencing the "Redemption Litigation".  (PX 36).

161. Redemption sued FOL for breach of contract and fraud, attempting to seize collateral that was not part of the offering, including the Leadville Dispensary.  (PX 31).

162. On October 15, 2020, Redemption filed its First Amended Complaint against FOL. (PX 31).

163. Redemption sought to appoint a receiver to, among other things, take control of the Leadville Dispensary, enjoin FOL from operating the Leadville Dispensary, and order it transferred to Redemption to prevent its dissipation; and an order requiring FOL to transfer the Leadville Dispensary to Redemption.  (PX 36 ¶¶ 51, 91, 97-100, 155-64, 194-204, 232); (Ex. 37).

164. Redemption claimed that FOL had improperly transferred its rights to the Leadville Dispensary.  (PX 37 at 7-8).

165. Redemption filed a Second Amended Complaint against FOL.  (Joint Ex. 2).

166. On February 17-21, 2023, Redemption and FOL settled all claims raised in the Redemption Litigation.  (Joint Ex. 3 at 18-24).

167. After years of protracted litigation, Hurley formally retracted the fraud allegations against FOL, Landis, and Alexandra Merle-Huet, and he admitted under oath that ACLP was the source of the misrepresentations.  (Joint Ex. 3 at 122-23) (Hurley Depo. at 30:18-32:10).

168. The Redemption Litigation cost FOL $2,244,942.37 in attorney fees and costs. (Landis Decl. ¶ 58).

169. FOL had access to capital sufficient to refinance the Promissory Notes.  (Landis Decl. ¶ 60).

170. FOL could not borrow to refinance the Promissory Notes because the Lenders, with ACLP acting as their agent, believed they were entitled to a payoff that was 30% greater than was required.  (Landis Decl. ¶ 61).

171. On July 6, 2020, Hurley specifically stated that he wanted the "original deal" including the 30% premium and conversion rights at a low valuation.  (PX 38).

172. FOL could not obtain a loan without an accurate payoff amount.  (Landis Decl. ¶ 62).

173. After Redemption accused FOL of fraud, no reasonable lender would lend to FOL while it was embroiled in heated litigation.  (Landis Decl. ¶ 63).

174. Because FOL participated in good-faith negotiations with the Advisory Board to repay the Lenders, and the Advisory Board quickly acted to sue FOL once FOL began pursuing

15

direct repayment with the Lenders, FOL missed the opportunity to refinance the Promissory Notes with a third party.  (Landis Decl. ¶ 64).

## IX.    THE PROVISION TRANSACTION, PHANTOM STOCK, AND CONVERSION SCHEME

175.    Under the Engagement Agreement, ACLP was engaged to act as financial advisor to FOL. (Joint Ex. 1 at 2).

176.    Before FOL engaged ACLP, ACLP had advised ProVision on restructuring its existing debts that ProVision was unable to repay.  (PX 1)

177.    FOL loaned $200,000.00 to ProVision and paid $100,000.00 for advertising services from Provision.  (Landis Decl. ¶ 65).

178.    ProVision did not repay the $200,000.00 owed to FOL, nor did it provide the $100,000.00 in promised advertising services.  (Landis Decl. ¶ 66).

179.    Curt Thornton of Provision stated on September 17, 2019, that Provision would not timely repay its loan from FOL.  (PX 39 at 2).

180.    Leonard used the $300,000.00 received from FOL to direct a $50,000 kickback to ACLP/DiMartini and to pay $250,000 to Timothy Kelly to acquire "phantom" shares of FOL. (Leonard Request for Admission 25-27).

181.    Kelly did not own any stock in FOL at the time of the transaction.  (Leonard Request for Admission 28).

182.    Using ACLP as a broker, Leonard immediately sold those shares to third-party investors for $540,000.00.  (Stipulated Fact 45-46).

183.    This occurred while ACLP was actively selling shares in FOL and could have sold FOL treasury shares for FOL's benefit.  (Landis Decl. ¶ 67).

184.    Leonard paid ACLP a higher commission (11%) than FOL was paying ACLP (10%) to sell FOL shares.  (Joint Ex. 1 at 2;  Stipulated Fact 46).

185.    When Landis questioned Leonard's stock sales, DiMartini threatened to cut funding to FOL and cause ACLP to liquidate the company.  (Landis Decl. ¶ 68).

186.    Any approval by FOL of the sale of FOL stock to or from Leonard was done under duress.  (Leonard Request for Admission 39).

187.    Leonard sued FOL's most valuable distribution partner and salesman (Rainmaker), causing him to terminate his relationship with FOL. (Landis Decl. ¶ 69).

## X.    FOL's Indemnity Demand

188.    On May 21, 2021, FOL demanded that ACLP indemnify it under the Engagement Agreement.  (PX 40).

189.    ACLP did not indemnify FOL in accordance with the demand.  (Landis Decl. ¶ 69).

190.    FOL has damages in the form of attorney fees and costs from the Redemption Litigation in the amount of $2,244,942.37.  (Landis Decl. ¶ 72).

## XI.    Facts Admitted by Leonard and Clapham

191.    On March 15, 2024, FOL served requests for admission on Leonard and Clapham. (PX 41).  Pursuant to Fed. R. Civ. P. 36(a)(3), responses were due on or before April 14, 2024. As of May 29, 2026, it has been 775 days since responses were due.  Despite multiple notices, in writing and by phone, to Leonard and Clapham's counsel, past and present, no responses have been received.  Therefore, the following matters are deemed admitted:

*Leonard's Admissions*

192.     Leonard owned, directly or indirectly, Coil.

193.    Kelly owned, directly or indirectly, Coil.

194.    DiMartini owned, directly or indirectly, Coil.

195.    Leonard controlled Coil.

196.    Leonard was a manager, officer, or director of Coil.

197.    Kelly controlled Coil.

198.    DiMartini controlled Coil.

199.    Coil had no business operations.

200.    Coil was designed to take money from FOL and provide nothing in return.

201.    CMD helped draft the documents that created Coil.

17

202. Leonard told FOL that Coil was a longstanding distribution company that could help distribute FOL's products to thousands of stores.

203. Coil was just a shell company that had no assets (not even a warehouse in which to distribute and ship FOL's products).

204. In exchange for Coil's "services," Leonard proposed that Coil receive a significant percentage of FOL's equity and a lucrative commission on all sales.

205. CMD helped Leonard and Kelly draft the proposed distribution agreement.

206. Neither Leonard, Kelly, DiMartini, DiChiara, nor CMD ever disclosed that Coil could not distribute FOL's products, that Kelly and DiMartini were owners of Coil, or that making a deal with Coil would be making Kelly and DiMartini de facto shareholders of FOL and lining their pockets at FOL's expense.

207. As a result of Leonard's lawsuit against Rainmaker, Rainmaker terminated its relationship with FOL, leaving FOL without a partner to manage distribution of FOL's products and merchandising in stores.

208. As a result of Leonard's lawsuit against Rainmaker, FOL was also forced to buy back more than a million dollars' worth of product.

209. As a result of Leonard's lawsuit against Rainmaker, FOL lost the ability to distribute its products on a going-forward basis through the industry's largest distributors.

210. Leonard controlled Provision in 2018.

211. Leonard met with FOL and told FOL that Provision badly needed funds as a bridge loan to facilitate a $3 million investment in Provision by Coinstar.

212. Leonard told FOL that a loan to Provision was very low-risk, because Coinstar's $3 million investment was assured and would soon occur.

213. Leonard promised that if FOL were willing to loan $200,000 to Provision under a two-year promissory note, Provision would provide substantial advertising services to FOL at the deeply discounted price of $100,000.

214. CMD secretly negotiated terms of the Provision contract without informing FOL

that CMD was working with Provision directly and involved in the deal.

215. FOL paid $300,000.00 to Provision.

216. Of the $300,000.00 paid to Provision, Provision paid DiMartini and/or Alexander Capital $50,000.

217. Of the $300,000.00 paid to Provision, Leonard directed the remaining $250,000 to Kelly.

218. The payment of $250,000.00 to Kelly was to buy Kelly's stock in FOL.

219. Kelly did not own any stock in FOL.

220. Leonard received stock in FOL allegedly owned by Kelly.

221. Leonard sold some or all of the stock Leonard allegedly acquired from Kelly to others for $540,000.00.

222. Alexander Capital advised Leonard in the acquisition of the FOL stock.

223. CMD advised Leonard in the acquisition of the FOL stock.

224. Alexander Capital advised Leonard in the disposition of the FOL stock.

225. CMD advised Leonard in the disposition of the FOL stock.

226. CMD was paid from the proceeds of the FOL stock.

227. Alexander Capital was paid from the proceeds of the FOL stock.

228. Gazdak, on behalf of Alexander Capital, approved the payment of commissions to Alexander Capital for the sale of FOL stock.

229. DiMartini threatened to liquidate FOL if FOL would not sign the FOL stock over to Leonard.

230. Any approval by FOL of the sale of FOL stock to or from Leonard was done under duress.

231. Leonard met with Mark Ward to obtain information about FOL's products.

232. Leonard met with Mark Ward to copy FOL's creams.

233. Leonard met with Mark Ward.

234. Leonard met with Mark Ward to establish a CBD business to compete with FOL.

*Clapham's Admissions*

235.   Clapham served on the Advisory Board.

236.   Clapham was a shareholder of FOL at the time Clapham served on the Advisory Board.

237.   Clapham recommended that the Advisory Board prevent FOL from communicating directly with the Lenders.

238.   Clapham recommended that the Lenders work together to collect the funds allegedly owed to the Lenders.

239.   Clapham recommended that Redemption be formed.

240.   The purpose of forming Redemption was to sue FOL.

241.   The purpose of forming Redemption was to acquire all of the assets of FOL.

242.   The purpose of forming Redemption was not to protect all of the shareholders of FOL.

243.   The purpose of forming Redemption was to acquire all of the assets of FOL and transfer them to Redemption.

244.   The purpose of forming Redemption was to effect the Secret Side Deal described in the Complaint and Amended Complaint.

245.   All information Clapham received from FOL while serving on the Advisory Board was required to be treated as confidential.

246.   Clapham did not treat all information Clapham received from FOL while serving on the Advisory Board as confidential.

247.   Clapham disclosed to unauthorized third-parties information received from FOL while serving on the Advisory Board.

248.   The purpose of disclosing confidential information about FOL to unauthorized third-parties was to harm FOL.

249.   Other members of the Advisory Board were required to treat all information received from FOL while serving on the Advisory Board as confidential.

250. Other members of the Advisory Board, including DiMartini, disclosed to unauthorized third-parties information received from FOL while serving on the Advisory Board.

251. Other members of the Advisory Board, including DiMartini, disclosed to Leonard information received from FOL while serving on the Advisory Board.

252. Clapham approved of the disclosure of confidential information by Advisory Board members to unauthorized third parties.

253. Clapham approved of the disclosure of confidential information by Advisory Board members to Leonard.

254. The Advisory Board demanded that control of FOL be turned over to the Lenders.

255. The reason the Advisory Board demanded that control of FOL be turned over to the Lenders was to fulfill the terms of the Loans as promised to the Lenders.

256. The reason the Advisory Board demanded that control of FOL be turned over to the Lenders was to effect the Secret Side Deal described in the Complaint and Amended Complaint.

257. The Advisory Board prevented FOL from repaying the loans on the terms that FOL believed were those accepted by FOL.

258. One of the purposes of the Advisory Board was to learn enough about FOL's business operations to permit Redemption or another entity to acquire all of FOL's assets and perform FOL's business operations for the benefit of Redemption's owners.

259. The Advisory Board prevented FOL from renegotiating the loans with the Lenders.

260. The Advisory Board prevented FOL from refinancing the loans.

261. When Clapham served on the Advisory Board, Clapham believed that FOL was worth at least $10 million.

262. When Clapham served on the Advisory Board, Clapham believed that FOL was worth at least $25 million.

263. When Clapham served on the Advisory Board, Clapham believed that FOL was worth at least $50 million.

264. While serving on the Advisory Board, Clapham planned to complete a hostile

takeover of FOL.

265. Clapham invested $2 million in FOL.

266. The terms of the loans promised to the Lenders were different than the terms presented to FOL.

267. Clapham aligned Clapham's interests with the Lenders.

268. Clapham had a larger percentage ownership of Redemption than Clapham had in FOL.

269. Clapham expected to make more money if Redemption owned all of FOL's assets than Clapham would make if FOL repaid the loans.

270. Clapham was aware of the Secret Side-Deal as described in the Complaint and Amended Complaint in this matter.

271. Before Clapham invested in FOL, Clapham was aware of the Secret Side-Deal as described in the Complaint and Amended Complaint in this matter.

272. Clapham intended to run a rival CBD company to FOL after Redemption had acquired FOL's assets.

273. Clapham agreed to join the Lenders to acquire the assets of FOL through Redemption.

274. The purpose of joining the Lenders to acquire the assets of FOL through Redemption was to effect the Secret Side-Deal as described in the Complaint and Amended Complaint in this matter.

275. Clapham participated in recruiting and compensating a sales team to run the rival CBD company to FOL after Redemption had wrongfully acquired FOL's assets.

276. Clapham accepted confidential and proprietary FOL information gathered while serving on the Advisory Board and used it to injure FOL.

277. Clapham made false and misleading statements to the Investors to solicit them to assign their lending documents to Redemption.

278. Clapham funded at least $50,000.00 of Redemption's legal fees and costs in the

Colorado Litigation.

279. Clapham funded at least $100,000.00 of Redemption's legal fees and costs in the Colorado Litigation.

280. Clapham funded at least $200,000.00 of Redemption's legal fees and costs in the Colorado Litigation.

281. Clapham funded at least $250,000.00 of Redemption's legal fees and costs in the Colorado Litigation.

282. Clapham funded at least $500,000.00 of Redemption's legal fees and costs in the Colorado Litigation.

283. Prior to the inception of the Colorado Litigation, Clapham believed FOL or the assets of FOL were worth at least $5 million.

284. Prior to the inception of the Colorado Litigation, Clapham believed FOL or the assets of FOL were worth at least $10 million.

285. Prior to the inception of the Colorado Litigation, Clapham believed FOL or the assets of FOL were worth at least $25 million.

286. Prior to the inception of the Colorado Litigation, Clapham believed FOL or the assets of FOL were worth at least $50 million.

287. Prior to the inception of the Colorado Litigation, Clapham believed FOL or the assets of FOL were worth at least $75 million.

288. Prior to the inception of the Colorado Litigation, Clapham believed FOL or the assets of FOL were worth at least $100 million.

289. Prior to the inception of the Colorado Litigation, Clapham believed FOL or the assets of FOL were worth at least $150 million.

290. Clapham prevented or assisted in preventing FOL from negotiating with the Lenders.

291. Clapham advised the Advisory Board to prevent FOL from negotiating with the Lenders.

292.    Clapham advised or assisted in advising the Lenders that FOL had no plan to repay the Lenders.

293.    Clapham advised or assisted in advising the Lenders that assigning the investments to Redemption was the only way that the Investors would be paid back.

294.    Clapham advised or assisted in advising the Lenders that their ability to be repaid would be further reduced if they did not immediately assign their investments to Redemption.

295.    Clapham falsely advised or assisted in advising the Lenders that assigning their investments to Redemption was the best option to recover all principal and interest owed.

296.    Clapham represented or assisted in representing that FOL and its management had engaged in fraud.

297.    Neither FOL nor its management engaged in fraud.

298.    Clapham contributed to stirring up vexatious litigation against FOL and its officers.

299.    Clapham's actions through the advisory board prevented FOL from refinancing the loans.

300.    After Clapham's investment in FOL, Clapham has continued to make investments through DiMartini.

301.    Clapham's investment strategy is to acquire an equity ownership in overleveraged companies and then cause those companies to distribute their assets to a successor company in which Clapham has a greater ownership percentage.

302.    Clapham directed Clapham's counsel to contact the FBI and notify the FBI that FOL and/or Landis were engaged in fraud.

303.    Clapham's counsel contacted the FBI and notified the FBI that FOL and/or Landis were engaged in fraud.

24