**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FLOYD'S OF LEADVILLE INC., N/K/A VALUED, INC, <br><br> Plaintiff, <br><br> v. <br><br> ALEXANDER CAPITAL, L.P., et al., <br><br> Defendants. | Civil Action No.: 1:22-cv-03318-DEH |

**PLAINTIFF FLOYD'S OF LEADVILLE INC., n/k/a VALUED, INC'S**
**RESPONSE TO DEFENDANTS' JOINT STATEMENT OF UNDISPUTED MATERIAL**
**FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1, Plaintiff Floyd's of Leadville, Inc. n/k/a Valued Inc., by and through its attorney, respectfully submits this Response to Defendants' Joint Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment.

## ACLP DEFENDANTS

1. In October 2017, when FOL entered into the Engagement Agreement with ACLP, Floyd Landis, CEO of FOL, was residing in Larchmont, New York. (Defs' Ex. ACLP-1; Deposition of Floyd Landis (6/13/22) at 182:19-184:24; Defs' Ex. D-224.)

**RESPONSE:** Admitted.

2. FOL's business involved cannabis and hemp products (including THC products), retail stores and dispensaries, extraction facilities, and related operations. (Landis Dep. (6/13/22) at 5:15, 10:25, 11:25, 15:20, 58:25-59:3, 110:10-14, 111:23, 122:16, 124:4, 161-163, 168:9,19, 170:2,13 171:4,10 176:19 273:20, 363; Deposition of Chris Ryan (Vol. 2) at 34-37.)

**RESPONSE:** Admitted.

3. Since 2018, FOL has sold sells gummies and a "tonic" containing CBD. (Deposition of Bob Bell (FOL 30b6 Representative) (SDNY 9/25/24) at 78:8-80:12.) FOL's CBD-infused gummies, which it markets as "gems" are, as of the date of this memo, offered for sale on its website and available to be shipped across the US. (https://floydsofleadville.com/collections/gems, last accessed 5/27/26.) FOL's CBD-infused tonics are also offered for sale on its website. (https://floydsofleadville.com/collections/drinks-tonics, last accessed 5/27/26.) FOL also sells tinctures containing CBD, which also likely violates the FD&C Act, on its website. (https://floydsofleadville.com/collections/tinctures, last accessed 5/27/26.) The FDA approved the sale of a drug containing CBD, Epidiolex, on or about June 25, 2018, before the 2018 Farm Bill was enacted. (https://www.uclahealth.org/news/article/after-fda-approves-first-drug-made-from-marijuana-what-happens-next, last accessed 5/29/26.)

**RESPONSE:** Disputed.

1

The materials cited do not support the alleged facts. Bob Bell testified in his deposition that FOL did not begin selling gummies or tonics until "2018, 2019." (Bell Dep. at 78:8-80:12). FOL did not sell "gems" or "tonics" until 2019. (Supplemental Declaration of Floyd Landis ¶ 5).

4. The Oregon dispensaries held marijuana licenses and sold, at all times relevant to this case, products containing THC. (FOL 30b6 Dep. (9/25/24) at 272:13-15; Landis Dep. (9/26/24) at 262:13-15.)

**RESPONSE:** Admitted in part, disputed in part.

FOL admits that the Oregon dispensaries referenced in this paragraph held state-issued marijuana dispensary licenses and sold products containing THC. Defendants do not define what is meant by "at all times relevant to this case", and the cited materials do not reference a time frame for the proposition that the Oregon dispensaries "sold, at all times relevant to this case, products containing THC."

FOL and ACLP entered into the Engagement Agreement in October of 2017, (ACLP SUMF ¶ 1), and FOL did not acquire an economic interest in the Oregon Dispensaries until 2018. (Landis Supp. Decl. ¶ 53).

5. FOL, not ACLP, prepared investor pitch decks for use by ACLP to solicit investors and asked ACLP to share them with potential investors and noteholders. (Deposition of Jonathan Gazdak (ACLP 30b6 Representative) (Colorado 9/18/22) at 206:1-211:9; Gazdak Decl. ¶ 9; Defs' Ex. ACLP-2.)

**RESPONSE:** Admitted in part, disputed in part.

FOL denies that it provided investor pitch decks for use by ACLP to solicit investors and asked ACLP to share them with potential investors and noteholders. The Deposition of Jonathan Gazdak, as Rule 30(b)(6) designee of ACLP, does not stand for the proposition that "FOL . . asked

ACLP to share [investor pitch decks] with potential investors and noteholders." The cited material does not mention that FOL asked ACLP to share the investor pitch decks with potential investors and noteholders.

Similarly, Exhibit ACLP-2 does not support the facts as alleged. Exhibit ACLP-2 is an email from Tim Kelly to Floyd Landis referencing an unidentified "PPT" that is not attached to the email, nor is there any return email from Landis to Kelly with the unidentified PPT. This exhibit does not show that FOL asked ACLP to share the unidentified PPT with potential investors and noteholders.

FOL admits that it shared information with Tim Kelly, who FOL believed was representing ACLP's interests. (Landis Supp. Decl. ¶ 10). In his deposition as ACLP's Rule 30(b)(6) designee, Gazdak, in his deposition as Rule 30(b)(6) designee, identifies management as Floyd, Chris Ryan, and Alex, and not Tim Kelly. (Gazdak Dep. 9/19/2022 at 202:19-203:6). To the extent that Exhibit ACLP-2 shows Landis sharing information about FOL with ACLP, this confirms FOL's understanding that Kelly was working on behalf of ACLP to obtain information about FOL for ACLP. (Landis Supp. Decl. ¶ 11).

ACLP participated in altering a PowerPoint presentation created by FOL that ACLP then used to solicit investors. (PX 43). Gazdak, with the assistance of ACLP employee Stephen Walsh, did the same with a PowerPoint presentation in 2018. (ACLP Ex. A-2 at 22 of 43).

ACLP distributed an Investor Presentation marked "Confidential" and "Not for Distribution." (ACLP Exhibit A-2 at 3 of 43). Alexandra Merle-Huet expressly instructed ACLP to limit distribution. (PX 44).

6. The investor pitch decks contained information regarding FOL and its need for capital including an overview of the business, industry, and management, assets, and internal financial projections. (*Id.*)

**RESPONSE:** FOL is unable to admit or dispute this alleged fact because there is no "investor pitch deck" referenced in the materials. FOL cannot admit or dispute the content of materials that are not attached.

The referenced materials are a deposition transcript, a declaration, and an email that does not contain a pitch deck.

To the extent that this alleged fact references PowerPoint presentations created by FOL, the PowerPoint presentations created by FOL were marked Confidential and Not for Distribution, then altered by ACLP and distributed by ACLP. (Ex. A-2, A-4, at bottom of pages)

7. Although the Engagement Agreement provided that ACLP was engaged as financial adviser to FOL, ACLP did not and was not asked to provide financial advice to FOL, including advice on amount of debt or terms. (Gazdak Dep. (9/18/22) at 85-87, 96-97; Gazdak Decl. ¶ 6.)

**RESPONSE:** Disputed.

FOL disputes this fact as not supported by the cited materials, inconsistent with Gazdak's deposition testimony, and inconsistent with the facts. Pages 85-87 and 96-97 of Gazdak's 9/18/2022 Deposition as Rule 30(b)(6) Designee do not show that ACLP did not and was not asked to provide financial advice to FOL. On Pages 85-87, Gazdak, as ACLP 30(b)(6) Designee, testifies about trust and escrow accounts. (Gazdak Dep. (9/18/22) at 85-87). On pages 96-97, Gazdak discusses customer accounts, not financial advice to ACLP clients. (Gazdak Dep. (9/18/22) at 96-97.

In his 2024 deposition, Gazdak testified that he did not recall if ACLP was asked to provide financial advice to FOL. When asked in his August 13, 2024, deposition whether anyone at ACLP provided financial advice to FOL, Gazdak's testimony was that he could not recall. (Gazdak 8/13/2024 Depo. 85-90).

In his 2022 deposition as ACLP 30(b)(6) Designee, Gazdak admitted that ACLP would advise FOL on "whatever the company would ask and discuss." (Gazdak Dep. (9/18/22) at 54:19-24). He further admitted that ACLP would and could advise on terms. (Gazdak Dep. (9/18/22) at 55:23-57:11). FOL asked about and was advised about the terms and amount of debt. (Landis Supp. Decl. ¶ 32).

8. ACLP's role was to obtain funding, not to advise FOL about its business, whether a private placement was in FOL's interest, or what terms it could expect to meet. (Gazdak Decl. ¶ 7.)

**RESPONSE:** Disputed.

FOL disputes this fact for the same reasons stated in its response to ACLP SUMF ¶ 7. Additionally, Gazdak's declaration contradicts the terms of the Engagement Agreement, which provides that ACLP is obligated "to consult with and advise the Company with respect to the Placement and anything incidental thereto, as directed by the Company." (Joint Ex. 1 at 2 of 12, ¶ 2). ACLP advised FOL on the private placement and its terms. (Landis Supp. Decl. ¶ 32).

FOL cannot admit or dispute what is meant by "advise FOL about its business" because this statement is vague.

9. No one in ACLP's investment banking department was ever asked by FOL regarding the advisability of the terms of the 12% Senior Secured two-year notes or the amount of the capital raise. (Gazdak Decl. ¶ 8.)

**RESPONSE:** Disputed.

FOL disputes this fact based on Gazdak's contradictory deposition.  Gazdak was asked this question in his deposition and he "did not recall." (Gazdak 8/13/2024 Depo. At 89-93).  FOL further disputes this fact for the same reasons set forth in its response to ACLP SUMF ¶ 7-8.

10. FOL, not ACLP, chose the terms for the private placement, including the decision to initially opt for a debt raise rather than an equity raise. (Gazdak Decl. ¶ 14; Rule 26 Report of Patrick A. O'Shea at 3, 5-6.)

**RESPONSE:** Disputed.

FOL disputes this fact based on the express terms of the Engagement Agreement  and Gazdak's contradictory testimony.  The express terms of the Engagement Agreement provide that the terms are set by the mutual agreement of FOL and ACLP's client, the Lenders.  (Joint Ex. 1 at 2 of 12) ("The terms of the Placement shall be subject to mutual agreement of the Company and each investor in the Placement.").  Gazdak testified that the terms were set based upon ACLP's experience in the industry, ACLP's knowledge, the company's business, the company's business cycle, the company's management, and the company's current obligations and assets." (Gazdak Dep. (9/18/22) at 55:23-57:11).  ACLP further advised FOL that the placement would have to be senior secured debt because "the investors were going to require that it needed to be senior secured." (Id. at 57:12-59:4).

11. FOL is alone ultimately responsible for the decision to pursue a certain deal structure and weighing the risks of a senior secured note structure, considering the funds necessary to launch and operate the business, the expectations for revenue generation and growth, and the expenses of operations. (O'Shea Report at 6.)

**RESPONSE:** Disputed.

FOL disputes this fact as contradicted by Gazdak's testimony. Gazdak testified that the terms were set based upon ACLP's experience in the industry, ACLP's knowledge, the company's business, the company's business cycle, the company's management, and the company's current obligations and assets." (Gazdak Dep. (9/18/22) at 55:23-57:11). ACLP further advised FOL that the placement would have to be senior secured debt because "the investors were going to require that it needed to be senior secured." (Id. at 57:12-59:4).

12. FOL was overly optimistic about its business prospects, shared those optimistic projections with ACLP, and failed to assess the risks associated with not being able to meet its financial obligations. (O'Shea Report at 6-7.)

**RESPONSE:** Disputed.

FOL disputes this fact as contradicted by the record evidence. FOL met or exceeded its financial expectations and was prevented from refinancing the Promissory Notes by ACLP and Defendants. (Landis Supp. Decl. ¶ 45).

13. FOL engaged attorneys Peter DiChiara and Kirill Nikonov of the law firm Carmel, Milazzo & DiChiara ("CMD") to represent FOL in connection with the private placement. (Defs' Ex. ACLP-3; Deposition of Peter DiChiara Vol. I (7/6/22) at 42, 79; Deposition of Peter DiChiara Vol. II (12/9/22) at 197-198; Deposition of Chris Milazzo (CMD 30b6 Representative) at 17-21; Landis Dep. (6/13/22) at 187; Landis Dep. (9/26/24) at 28; Gazdak Dep. (8/13/24) at 48-50.)

**RESPONSE:** Admitted in part, disputed in part.

FOL admits that it engaged CMD.

FOL denies that Landis signed the Engagement Agreement in October of 2017, as indicated in the document. Landis had not met DiChiara until weeks after the date on the document and the

engagement agreement was not signed until December of 2017. (Landis Dep. (6/13/2022) at 27:16-228:231:2).

14. ACLP had no knowledge of and was not involved in the alleged "backdating" of CMD's retainer agreement with FOL. (Gazdak Decl. ¶ 15.)

**RESPONSE:** Admitted.

15. DiChiara/CMD did not represent Alexander Capital in any capacity in connection with the FOL capital raise. (DiChiara Dep. Vol. I at 79; Gazdak Decl. ¶ 16.)

**RESPONSE:** Disputed.

FOL disputes this fact based on the statements made by Frank DiMartini that DiChiara/CMD represented both FOL and ACLP on the placement. (Transcription of PX. Recording 6 attached to Bell Supplemental Declaration).

16. ACLP acknowledges it had engaged DiChiara/CMD in a handful of prior transactions, but DiChiara was not engaged by ACLP in this case and exclusively represented FOL. (Gazdak Decl. ¶ 16; O'Shea Report at 3-4.)

**RESPONSE:** Admitted in part, disputed in part.

FOL admits that DiChiara and CMD represented ACLP.

FOL disputes this fact based on the statements made by Frank DiMartini that DiChiara/CMD represented both FOL and ACLP on the placement. (Transcription of PX. Recording 6 attached to Bell Supplemental Declaration).

17. Law firms engaged on behalf of the issuer in one transaction and the broker-dealer in another transaction is common practice in the industry. (O'Shea Report at 4.)

**RESPONSE:** Admitted for the purposes of this motion only. This opinion is not relevant to what happened in this case.

18. Floyd Landis, CEO of FOL, recalls meetings at DiChiara's office during which DiChiara described the terms of the private placement near the start of fundraising. (Landis Dep. (9/26/24) at 43.)

**RESPONSE:** Admitted.

19. FOL understood the terms of the private placement capital raise as explained by its attorney DiChiara prior to the execution of the lending documents and the receipt of any investor funds. (Landis Dep. (9/26/24) at 43, 168-171.)

**RESPONSE:** Admitted.

20. FOL decided upon the increase in size from $2mm to $3mm and from $3mm to $4mm, and Tim Kelly distributed an updated investor deck and subscription agreement to reflect the changes adopted by FOL. These documents were circulated to ACLP from FOL's agent Tim Kelly through FOL's counsel DiChiara. (O'Shea Report at 9; Gazdak Decl. ¶ 12.)

**RESPONSE:** FOL admits that FOL agreed to increase the maximum size of the Placement from $2 million to $3 million to $4 million. FOL disputes the characterization of Tim Kelly as FOL's "agent." Neither the O'Shea Report nor the Gazdak Declaration stand for this proposition. The O'Shea report does not rely on any facts for the opinion that Tim Kelly was FOL's "agent."

The Gazdak Declaration states that "ACLP understood Tim Kelly to be acting as FOL's agent due to the fact that Tim Kelly brought FOL to DiMartini and ACLP." FOL admits that Kelly brought FOL to DiMartini and ACLP, but making a referral does not make a person an agent and there are no other facts alleged in Gazdak's Declaration to support this legal conclusion.

Tim Kelly was not FOL's agent. (Landis Supp. Decl. ¶ 8). Frank DiMartini represented Tim Kelly to be his business partner. (Landis Supp. Decl. ¶ 9). Tim Kelly, Mark Leonard, and Frank DiMartini were all listed as part owner of Three DDD, LLC in an operating agreement

drafted by Pete DiChiara and sent to Mark Leonard via Tim Kelly. (PX 45). Tim Kelly helped raise money for Provision, (Leonard Dep. 10/29/2024 at 65:5-22, Leonard Dep. 10/11/2024 at 48:5-20), and Provision was one of ACLP's clients. (Leonard Dep. 10/29/2024 at 67:4-7). Tim Kelly continued to work with Frank DiMartini on deals involving ACLP after DiMartini was no longer an employee of ACLP. In the screen shots of text messages between Frank DiMartini and Tim Kelly, Frank DiMartini (in gray) says to Kelly (in blue) that Rocco (owner of ACLP) will let DiMartini work on a deal for Stewart's if he can "wipe out" Floyd's equity. (PX 46). Tim Kelly also maintained an office in CMD, which was the only place that Landis met with Kelly for approximately one year after being introduced to DiChiara. (Landis Supp. Decl. ¶ 7).

21. DiChiara/CMD was responsible for deciding the terms of the notes, drafting the lending documents, and arranging for FOL's execution of those documents. (DiChiara Dep. Vol. I at 42, 62-63, 73, 147-148, 150-157; DiChiara Dep. Vol II. at 197-198, 202-204; CMD 30b6 Dep. at 17-21, 29-32, 34-36, 44; Gazkdak Decl. ¶ 14.)

**RESPONSE:** FOL admits that DiChiara was responsible for drafting the lending documents and arranging for FOL's execution of those documents.

FOL disputes that DiChiara/CMD "was responsible for deciding the terms of the notes . . . ." FOL disputes this fact based on the contradictory allegation in ACLP SUMF ¶ 7, the express terms of the Engagement Agreement, and Gazdak's contradictory testimony.

In ACLP SUMF ¶ 7, ACLP states that FOL set the terms of the Placement. Now, ACLP Claims DiChiara set the terms. These are contradictory statements.

The express terms of the Engagement Agreement provide that the terms are set by the mutual agreement of FOL and ACLP's client, the Lenders. (Joint Ex. 1 at 2 of 12) ("The terms of the Placement shall be subject to mutual agreement of the Company and each investor in the

Placement."). Gazdak testified that the terms were set based upon ACLP's experience in the industry, ACLP's knowledge, the company's business, the company's business cycle, the company's management, and the company's current obligations and assets." (Gazdak Dep. (9/18/22) at 55:23-57:11). ACLP further advised FOL that the placement would have to be senior secured debt because "the investors were going to require that it needed to be senior secured." (Id. at 57:12-59:4).

22. Alexander Capital acted as underwriter/placement agent, sourcing lenders and relaying them to CMD and FOL for document drafting. (CMD 30b6 Dep. at 22.)

**RESPONSE:** FOL disputes this fact based on the express terms of the Engagement Agreement where FOL engaged ACLP to be its "exclusive placement agent and financial advisor" for the Placement. (Joint Ex. 1 at 2 of 12 ¶ 1). This fact is also misleading as it makes it appear as though CMD drafted documents for each individual investor. DiMartini would send signature pages from template documents to investors, obtain their signatures, and then compile the document. (FOL SUMF ¶ 88). CMD, who was representing ACLP without FOL's knowledge, drafted template documents but did not draft individualized documents for each investor. [Frank Both], (Landis. Supp. Decl. ¶ 6).

23. Private placements are purchased by the investor directly from the issuer. A private placement agent's brokers market the transaction to investors using the form of Notes, Security and other documents for signature, as well as support materials such as investor decks authored by the company with the assistance from counsel and the agent's investment banking team. Often, the placement agent, with the knowledge of the issuer, distributes the documentation to investors for review and signature, and the legal team representing the company collects and processes

the executed documentation, ultimately assembling completed documents. (O'Shea Report at 5.)

**RESPONSE:** Admits for the purposes of this motion only. This opinion is not relevant to what happened in this case.

24. The 10% placement fee FOL agreed to pay ACLP on capital raised is reasonable and within industry standards given FOL's early stage and the risk associated with the investment. (O'Shea Report at 4.)

**RESPONSE:** Admitted.

25. Landis admitted he only assumed the lending documents were prepared by Gazdak/ACLP using ACLP templates but that he does not know who prepared them or when and has no way of knowing that. (Landis Dep. (9/26/24) at 64-66.)

**RESPONSE:** Admitted.

26. DiChiara/CMD, as escrow agent, was in control of the escrow account where the investor funds were originally deposited before being distributed. (DiChiara Vol. I Dep. at 42; CMD 30b6 Dep. at 34-36; Landis Dep. (9/26/24) at 74-75.)

**RESPONSE:** FOL disputes this fact as it contradicts the express terms of the escrow agreement, which is a tripartite agreement where all three parties (ACLP, FOL, and CMD) have to consent to a distribution form the escrow account. (PX 47, Ex. A).

27. Landis has no basis to support the allegation that ACLP and CMD placed Tim Kelly in control of the escrow account as alleged in the First Amended Complaint. (Landis Dep. (9/26/24) at 74-75.)

**RESPONSE:** Admitted.

28. DiChiara/CMD prepared the escrow agreement and the escrow release/break forms for each investor. (DiChiara Vol. I Dep. at 51-52; CMD 30b6 Dep. at 34-36; Gazdak Decl. ¶ 18.)

**RESPONSE:** Admitted.

29. It was CMD's practice to obtain signatures from both Floyd Landis (FOL) and Jonathan Gazdak (ACLP) on the escrow breaks. (DiChiara Vol. I Dep. at 62-63, 73; CMD 30b6 Dep. at 29-30, 44, 52; Defs' Ex. ACLP-4.)

**RESPONSE:** Admitted.

30. Landis, on behalf of FOL, authorized and executed each escrow release/break. (Landis Dep. (9/26/24) at 64; Defs' Ex. ACLP-5.)

**RESPONSE:** Admitted.

31. Landis acquiesced to DiChiara's acceptance of the investors on FOL's behalf. (FOL 30b6 (9/28/22) Dep. at 215:5-216:12.)

**RESPONSE:** Admitted.

32. A release signed by both Alexander Capital and FOL exists for each disbursement from CMD's escrow account (CMD 30b6 Dep. at 52.)

**RESPONSE:** Admitted.

33. DiChiara/CMD did not make any unauthorized disbursements from the escrow account. (DiChiara Vol. I Dep. at 59; CMD 30b6 Dep. at 29.)

**RESPONSE:** FOL disputes this allegation. On multiple occasions, ACLP agreed to disburse funds to Three DDD, LLC and FOL agreed. (PX 47 at ¶ 1.4, Ex. A, PX 48). FOL understood these payments to be for commissions to Kelly, who was represented to be the sole owner of Three DDD, LLC. (Landis Supp. Decl. ¶ 15). FOL learned only in discovery in this case that Mark

Leonard and Frank DiMartini likely had an ownership interest in Three DDD, LLC. (Landis Supp. Decl. ¶ 16).

34. Jonathan Gazdak signed the escrow breaks on behalf of ACLP and confirmed the amounts and authorization language on the form, but neither Gazdak nor ACLP had any control over where the issuer's (FOL) portion of the funds were distributed after received in escrow. (Gazdak (8/13/24) Dep. at 213-215.)

**RESPONSE:** Admit that ACLP had no control over the funds *after* they were disbursed to FOL. Prior to disbursement, ACLP, FOL, and CMD were required to agree to the disbursement. (PX 47).

35. ACLP typically received 10 percent of the funds from each escrow release and the remainder was distributed as directed by FOL and CMD as ACLP did not control the issuer's disbursements. (Gazdak (8/13/24) Dep. at 218-220; Gazdak Decl. ¶ 19.)

**RESPONSE:** FOL disputes this fact. FOL disputes this fact as it contradicts the express terms of the escrow agreement, which is a tripartite agreement where all three parties (ACLP, FOL, and CMD) have to consent to a distribution form the escrow account. (PX 47 at ¶ 1.4, Ex. A). After the disbursement, ACLP did not have any control over the funds. (Landis Supp. Decl. ¶ 43).

On multiple occasions, ACLP agreed to disburse funds to Three DDD, LLC and FOL agreed. (PX 48). FOL understood these payments to be for commissions to Kelly, who was represented to be the sole owner of Three DDD, LLC. (Landis Supp. Decl. ¶ 54). FOL learned only in discovery in this case that Mark Leonard and Frank DiMartini likely had an ownership interest in Three DDD, LLC. (Landis Supp. Decl. ¶ 16).

36. Industry practice dictates that ACLP's responsibility was to ensure the funds arrived in escrow from the investors, and to ensure its own interests were appropriately served upon any break

from escrow. ACLP had no duty to monitor or affect other FOL distributions. (O'Shea Report at 8.)

**RESPONSE**: FOL disputes that ACLP's responsibility was solely as its expert describes as industry practice. In the Engagement Agreement, ACLP agreed to conduct the Placement in accordance with all applicable laws and FINRA Rules. (Joint Ex. 1 at FINRA at 7 of 12 ¶ 12). FINRA Rule 2040(a) provides: "No member or associated person shall, directly or indirectly, pay any compensation, fees, concessions, discounts, commissions or other allowances to: (1) any person that is not registered as a broker-dealer under Section 15(a) of the Exchange Act but, by reason of receipt of any such payments and the activities related thereto, is required to be so registered under applicable federal securities laws and SEC rules and regulations . . . ." Tim Kelly was previously a registered representative. (Landis Supp. Decl. ¶ 55). He had his license revoked. (Landis Supp. Decl. ¶ 55). ACLP agreed to disburse funds from escrow to Kelly's entity Three DDD, LLC, in violation of Rule 2040(a). (PX 48; PX 47 at ¶ 1.4, Ex. A, Landis Supp. Decl. ¶ 15).

37. ACLP obtained lending documents completed and executed by the individual investors and provided copies of those documents to FOL and/or its attorney DiChiara. (Gazdak Decl. ¶20.)

**RESPONSE:** FOL disputes this fact as not supported by the cited materials. In his declaration, Gazdak references Exhibit D. Exhibit D is twenty-five separate PDF's of approximately one hundred pages each and more than two thousand pages in total. (ACLP Ex. D.). It does not appear that there is more than a handful of emails to FOL attaching executed lending documents in this Exhibit. (Ex. D-3 at 13). Moreover, it does not appear to be transmitting all executed lending documents to CMD. For example, the first page of this Exhibit is not an email from ACLP to FOL or CMD. It's from Bari Latterman of ACLP to Jonathan Gazdak of ACLP. (D-1 at 2 of 101). The next email is *not* Gazdak forwarding that email to CMD/FOL. (D-2 at 29 of 101). This document

does not demonstrate that ACLP transmitted *all* documents directly to FOL or CMD, who was also acting as ACLP's attorney. To the extent it shows ACLP transmitting documents to CMD, it is unclear whether those transmissions were to ACLP's attorney or FOL's, because CMD represented both (without FOL's knowledge). [Frank Both]. Moreover, Gazdak stated that he has was not able to locate a complete set of documents. (PX 16). Last, this set of lending documents does not contain any asset schedules. (Ex. D). A set of documents missing asset schedules is not complete.

38. Email communications between Alexander, CMD, and FOL show that FOL approved and accepted each of the investors, was provided copies of the lending documents, and was provided with the identity and contact information of the investors. (FOL 30b6 (9/28/22) Dep. at 212:5-214:15; Landis Dep. (9/26/24) at 44-55, 65, 75; CMD 30b6 Dep. at 24, 29, 31-32; Ex. 270 to FOL 30b6 Dep.)

**RESPONSE:** FOL admits that it approved and accepted each of the investors.

FOL disputes that it was provided with copies of all of the lending documents. The deposition testimony does not establish that ACLP transmitted copies of all of the lending documents to FOL.

- The first citation of Landis's deposition testimony shows only three sets of investor documents, not 69. (FOL 30b6 (9/28/22) Dep. at 212:5-214:15).

- The second citation of Landis's deposition testimony shows only shows only three sets of investor documents, not 69. (Landis Dep. (9/26/24) at 44-55, 65, 75).

- The citation to CMD's testimony shows zero sets of lending documents. (CMD 30b6 Dep. at 24, 29, 31-32)

- "Exhibit 270 to FOL 30b6 Dep" shows four sets of lending documents, not 69.

- None of the cited materials included asset schedules, which were intended to be part of the Lending Documents.

- None of the cited materials contain lender phone numbers.

- None of the cited materials contain lender bank account information for payment.

The cited materials also demonstrate that the information contained in them was illegible or impossible to decipher. (Ex. 270 at 7 of 84).

39. Landis acknowledged receipt of lending packages for specific investors via email in January and March 2018 but does not recall reviewing the documents. (Landis Dep. (9/26/24) at 44-45, 52.)

**RESPONSE:** Admitted.

40. Landis acknowledged receiving a January 2018 email asking him to review and approve investor documents and confirm his acceptance of the investor(s) but does not recall responding to the email. (Landis Dep. (9/26/24) at 48, 51-52.)

**RESPONSE:** Admitted.

41. Landis, on behalf of FOL, testified that when he received an email providing him with copies of the loan documents and asking him to review and approve them, Landis ignored the request because he thought his agents, Pete DiChiara or Tim Kelly, would take care of it. (FOL 30b6 (9/28/22) Dep. at 214:3-15.)

**RESPONSE:** FOL admits that it believed that when Landis, on behalf of FOL, received an email providing him with copies of the loan documents and asking him to review and approve them, he did not review the documents because he relied on ACLP, its agents, and CMD, who were being paid for their services. (Landis Supp. Decl. ¶ 27).

FOL disputes that Tim Kelly was FOL's agent. The citation to the deposition testimony does not call Tim Kelly FOL's "agent". (FOL 30b6 (9/28/22) Dep. at 214:3-15.). Tim Kelly was not FOL's agent. (Landis Supp. Decl. ¶ 8).

42. Landis admits he received the lending documents but did not review them prior to accepting the investor funds, though nothing prevented him from doing so. (Landis Dep. (9/26/24) at 58-59; FOL 30b6 (9/28/22) Dep. at 214:3-15.)

**RESPONSE:** The cited materials do not stand for the proposition that FOL received *all* lending documents and only vaguely reference documents without any specific reference to which documents the interrogator was inquiring after.

43. CMD attorney Kirill Nikonov transmitted signature pages of the Subscription Agreement, Promissory Note and Security Agreement to FOL for execution by Mr. Landis. (Ex. E to Gazdak Decl.; CMD 30b6 Dep. at 29-30, 44.)

**RESPONSE:** The cited materials do not stand for the proposition that Kiril Nikinov transmitted all signature pages to Mr. Landis. Ex. E is a single email from Kiril Kikinov transmitting a single set of only signature pages to Mr. Landis on May 30, 2018, more than six months after the offering commenced. There is no return email to Kiril Nikinov returning the signature pages.

44. According to DiChiara, none of the promissory notes were signed manually by FOL. DiChiara tasked attorney Kirill Nikonov with facilitating FOL's execution of the lending documents. (DiChiara Vol. II Dep. at 202-204.)

**RESPONSE:** FOL admits that Landis did not sign any of the promissory notes. FOL admits that DiChiara tasked attorney Kirill Nikonov with facilitating FOL's execution of the lending documents.

45. Signature pages bearing Mr. Landis' signature were maintained and used as form signature pages for notes and security agreements. (DiChiara Vol. I Dep. at 151-153.)

**RESPONSE:** Admitted.

46. CMD affixed Landis's electronic signature to the lending documents. (DiChiara Vol. I Dep. at 151-153, DiChiara Vol. II Dep. at 202-204.)

**RESPONSE:** FOL disputes this allegation as being misleading. CMD did not affix Landis's electronic signature to *all* of the lending documents, as this allegation suggests. DiMartini and Latterman sent out pre-signed documents to investors as well. (FOL SUMF ¶ 67, Latterman Dep. at 97:22-25).

47. CMD would not indicate acceptance of loan documents without FOL's direction. (CMD 30b6 Dep. at 29.)

**RESPONSE:** Admitted.

48. ACLP would email CMD and FOL requesting approval/acceptance of investors and documents. (CMD 30b6 Dep. at 24; Gazdak Decl. ¶ 20; Ex. D to Gazdak Decl.)

**RESPONSE:** FOL admits that it approved or accepted all investors.

FOL disputes this allegation because the referenced documents do not support the allegation that ACLP sent *all documents* to FOL for approval. Ex. D is thousands of pages of documents with no reference to which pages that purportedly show ACLP emailing CMD and FOL requesting approval/acceptance of investors and documents. The first email in the document is not an email from ACLP to CMD and FOL but an email within ACLP asking Gazdak to forward documents to CMD or FOL. The second email does not appear until Exhibit D-2 at Page 29 of 101. This is a reply email solely from DiChiara, with no documents attached. The documents that appear to be attached are from a non-sequential Bates range and were not attached by DiChiara as

the document makes it appear. The document has many discrepancies. To the extent it shows ACLP transmitting documents to CMD, it is unclear whether those transmissions were to ACLP's attorney or FOL's, because CMD represented both (without FOL's knowledge). [Frank Both].

49. CMD was not aware of any instance where FOL did not approve an investor under the offering. (CMD 30b6 Dep. at 29.)

**RESPONSE:** Admitted.

50. As described by DiChiara, CMD's process was to prepare typed documents with names, dates, and note numbers, insert borrower and holder signature pages into PDFs, save them, and provide them to the noteholders and Alexander Capital. (DiChiara Vol. I Dep. at 148, 150-151, 155-157.)

**RESPONSE:** Disputed.

Defendants' description of the DiChiara testimony is misleading. The process was not to provide the documents to the noteholders and Alexander Capital. The process was only to provide them to the noteholders and Alexander Capital *if requested.* (DiChiara Vol. I Dep. at 151:1-15).

51. The assemblage of executed subscription documents from multiple sources, including by scanning signature pages, is common accepted practice. (O'Shea Report at 9.)

**RESPONSE:** Admitted.

52. ACLP, upon request, was provided with fully executed copies of the lending documents by attorney Kirill Nikonov of CMD. (Gazdak Decl. ¶ 27; Ex. G to Gazdak Decl.)

**RESPONSE:** Admitted in part, disputed in part.

FOL admits that, on occasion, CMD provided fully executed copies of the lending documents to its client ACLP.

FOL disputes that a complete copy of all executed documents was requested and obtained by ACLP and Gazdak. Gazdak stated that he was unable to locate a full set of fully executed documents. (PX 16). Exhibit G does not show the request and transmission of a full set of documents. Moreover, it shows communications exclusively between CMD and ACLP without including anyone from FOL, confirming CMD and ACLP's attorney-client relationship. Further, no set of documents included asset schedules listing the collateral securing the Promissory Notes. (PX 16).

53. Completed notes were sent to Alexander Capital; as placement agent, it would want fully executed copies for its investor clients. (CMD 30b6 Dep. at 31-32.)

**RESPONSE:** Admitted in part, disputed in part.

FOL admits that ACLP, as placement agent, it would want fully executed copies for its investor clients.

FOL disputes that a complete copy of executed documents was requested and obtained by Gazdak. The cited materials do not state that "completed notes were sent to Alexander Capital." (CMD 30b6 Dep. at 31-32). Gazdak stated that he was unable to locate a full set of fully executed documents. (PX 16). Further, no set of documents included asset schedules listing the collateral securing the Promissory Notes. (PX 16).

54. CMD maintained a shared drive repository for fully executed loan packets. (DiChiara Vol. I Dep. at 147, 157.)

**RESPONSE:** Admitted in part, denied in part.

FOL admits that CMD maintained a shared drive repository for fully executed loan packets.

FOL denies that the shared drive repository for fully executed loan packets was shared with FOL. (Landis Suppl. Decl. ¶ 52).

55. The responsibility for maintaining complete executed subscription documents was that of FOL and its counsel, CMD, not ACLP. (O'Shea Report at 7.)

**RESPONSE:** Disputed.

FOL disputes that FOL and its counsel were responsible for maintaining complete executed subscription documents was that of FOL and its counsel. According to Alexander Capital's Written Supervisory Procedures, the "designated principal" is required to keep copies of documents—such as securities purchase or subscription agreements—for its records, showing the date of approval and initials or signature. (PX 57 29, ACLP236132)

Chief Compliance Officer Michele Misiti testified that she delegated this responsibility to the investment banking department. She stated that investment banking was "tasked with keeping track of them and keeping -- and keeping them on file." (Misiti Dep. at 99:13-20)..

As the managing director of the investment banking division, Jonathan Gazdak testified that his department definitely kept copies of some documents, but when asked if he was personally responsible for ensuring they were maintained, he stated, "I don't think so. I think that's our technology department". (Gazdak Depo. (8/13/2024) at 152:16-154:20). He also suggested that maintaining copies of purchase agreements was the responsibility of the "back office" and that he did not know who kept copies of the documents. (Id.).

If CMD was responsible for maintaining a complete set of documents, that was at the direction of ACLP on behalf of its client ACLP to discharge ACLP's duties under applicable FINRA rules. (Frank Both)

56. ACLP did not modify or manipulate the lending documents in any way after obtaining completed and executed copies from the individual investors. (Gazdak Decl. ¶ 22.)

**RESPONSE:** Disputed.

FOL disputes this allegation based on ACLP's assemblage of the documents. On October 15, 2018, contrary to ACLP's allegations that CMD assembled completed documents, ACLP sent allegedly complete documents to CMD for approval for investor John Burgess. (PX 14). As can be clearly seen from the contents of the documents, the first and signature pages of each are scanned documents with handwritten names and signatures, and the intervening pages are from an electronic PDF. (Id.).

57. ACLP had no involvement in the manner in which DiChiara directed FOL to execute the documents and would have no knowledge as to whether DiChiara asked FOL to sign or had authority to insert Floyd Landis's electronic signature on the lending documents. (Gazdak Decl. ¶ 23.)

**RESPONSE:** Admitted.

58. ACLP did not insert Floyd's electronic signature on any of the lending documents. (Gazdak Decl. ¶ 24.)

**RESPONSE:** Disputed.

FOL disputes this allegation as contradicted by Gazdak's testimony and documentary evidence. ACLP relies on Gazdak for this statement, but Gazdak testified as Rule 30(b)(6) representative of ACLP that he did not have any knowledge of how Floyd Landis's signature came to be on the lending documents. (ACLP 30(b)(6) at 154:12-15). Frank DiMartini sent out lending documents with Landis's signature pre-applied. (FOL SUMF 94).

59. ACLP was not involved in the creation of the schedules listing FOL's assets that were appended to the Security Agreements. Those schedules were provided by Tim Kelly and DiChiara. (Gazdak Decl. ¶ 25.)

**RESPONSE:** Disputed.

FOL disputes this allegation as contradicted by Gazdak's testimony and the facts. Despite stating in his declaration that ACLP was not involved in creating the asset schedules, Gazdak testified as Rule 30(b)(6) designee that he did not have any knowledge as to how the asset schedules were created. (ACLP 30(b)(6) at 171:8-10).

Frank DiMartini created the asset schedules. (Transcription of PX Recording 7 attached to Supplemental Declaration of Bob Bell).

60. ACLP was not responsible for obtaining or maintaining fully executed copies of the lending documents. That was the responsibility of FOL's attorney, Peter DiChiara. (Gazdak Decl. ¶ 26.)

**RESPONSE:** Disputed.

FOL disputes that FOL and its counsel were responsible for maintaining complete executed subscription documents was that of FOL and its counsel   According to Alexander Capital's Written Supervisory Procedures, the "designated principal" is required to keep copies of documents—such as securities purchase or subscription agreements—for its records, showing the date of approval and initials or signature. (PX 57 at 29 ACLP236132)

Chief Compliance Officer Michele Misiti testified that she delegated this responsibility to the investment banking department. She stated that investment banking was "tasked with keeping track of them and keeping -- and keeping them on file." (Misiti Dep. at 99:13-20)..

As the managing director of the investment banking division, Jonathan Gazdak testified that his department definitely kept copies of some documents, but when asked if he was personally responsible for ensuring they were maintained, he stated, "I don't think so. I think that's our technology department". (Gazdak Depo. (8/13/2024) at 152:16-154:20). He also suggested that maintaining copies of purchase agreements was the responsibility of the "back office" and that he did not know who kept copies of the documents. (Id.).

If CMD was responsible for maintaining a complete set of documents, that was at the direction of ACLP on behalf of its client ACLP to discharge ACLP's duties under applicable FINRA rules. (Frank Both)

61. With the exception of the DaSilva Note, which was amended and approved by Landis to allow for a redemption premium to be expanded to a premium payment upon maturity (a change initiated by Tim Kelly acting on behalf of FOL) the executed investor documents are materially identical. (O'Shea Report at 7.)

**RESPONSE:** Admitted in part, disputed in part.

FOL admits that "[w]ith the exception of the DaSilva Note, which was amended and approved by Landis to allow for a redemption premium to be expanded to a premium payment upon maturity the executed investor documents are materially identical."

FOL disputes that Tim Kelly, acting on behalf of FOL, initiated a change to the DaSilva note. The statement "(a change initiated by Tim Kelly acting on behalf of FOL" is not supported by the cited material. Moreover, the statement that Tim Kelly initiated this change contradicts ACLP's 30(b)(6) testimony. ACLP's Rule 30(b)(6) designee was asked: "why did Howard have this premium when other note holders did not?" He testified: "I believe because he asked for it." (Martarano Depo at 176:8-10).

62. The Note terms and conditions were in line with industry standards. (O'Shea Report at 7.)

**RESPONSE:** Admits for the purposes of this motion only. This opinion is not relevant to what happened in this case.

63. CMD also prepared and maintained a spreadsheet listing each note by number, closing date, subscriber, address, amount received, and interest due that were sent to FOL. (DiChiara Vol. I Dep. at 96-98, 123-124; Ex. 317 to DiChiara Dep.; Landis (9/26/24) Dep. at 117-119.)

**RESPONSE:** Admitted.

64. The subscription documents executed by the investors were provided by ACLP to FOL and CMD and contained mailing addresses and email addresses of each investors. (Gazdak Decl. ¶ 29; Ex. D to Gazdak Decl.)

**RESPONSE:** Disputed.

FOL disputes this fact as not supported by the cited materials. In his declaration, Gazdak references Exhibit D. Exhibit D is twenty-five separate PDF's of approximately one hundred pages each and more than two thousand pages in total. (ACLP Ex. D.). It does not appear that there is more than a handful of emails to FOL attaching executed lending documents in this Exhibit. (Ex. D-3 at 13). Moreover, it does not appear to be transmitting all executed lending documents to CMD. For example, the first page of this Exhibit is not an email from ACLP to FOL or CMD. It's from Bari Latterman of ACLP to Jonathan Gazdak of ACLP. (D-1 at 2 of 101). The next email is *not* Gazdak forwarding that email to CMD/FOL. (D-2 at 29 of 101). This document does not demonstrate that ACLP transmitted *all* documents to FOL or CMD. Moreover, Gazdak stated that he has was not able to locate a complete set of documents. (PX 16). Last, this set of lending documents does not contain any asset schedules. (Ex. D). A set of documents missing

asset schedules is not complete.  It contains multiple illegible documents.  (Ex. D-2 at 34, 75).  It does not contain any banking information.  (Ex. D).

If CMD was responsible for maintaining a complete set of documents, that was at the direction of ACLP on behalf of its client ACLP to discharge ACLP's duties under applicable FINRA rules. (Frank Both).

66. DiChiara testified that borrower signature pages typically came from Alexander Capital, and CMD compiled final PDFs inserting those pages, and funds were placed into CMD's escrow account. (DiChiara Vol. I Dep. at 147-148.)

**RESPONSE:**  Admitted.

66. Landis saw that his signature had been placed on lending documents contemporaneous with their execution and never objected, assuming the terms matched what he had been told. (Landis Dep. (9/26/24) at 98.)

**RESPONSE:**  Admitted.

67. Landis believed at the time that the notes created enforceable obligations pledging all FOL assets but later believed the notes were not enforceable because of alleged issues with the documents, including his belief that the loan documents were manufactured after the fact. (Landis Dep. (9/26/24) at 37-38, 73-74.)

**RESPONSE:**  Admitted in part, disputed in part.

FOL admits that the promissory notes contained an obligation for FOL to repay the Lenders based on the terms contained in the promissory notes agreed to by FOL.

FOL disputed that the promissory notes and other lending documents obligated FOL to comply with the terms that Redemption attempted to enforce through the Redemption Litigation, including the enforcement of a security interest on collateral that was not owned by FOL or pledged

as collateral. (Landis Supp. Decl. ¶ 46). None of the lending documents contained asset schedules. (PX 16).

68. Section 2 of the 12% Series A Senior Secured Promissory Note set the payment amounts and maturity dates for each investment. (Joint Exhibit 5 at 12; Joint Exhibit 6 at 12.)

**RESPONSE:** Admitted.

69. Section 7(b) of the Note stated that FOL "has the requisite power to execute, deliver and perform this Note, and to consummate the transactions contemplated hereby." (Joint Exhibit 5 at 13; Joint Exhibit 6 at 13.)

**RESPONSE:** Admitted.

70. Section 9 of the Promissory Note defined "Events of Defaults" as including "(i) the failure by the Company to pay any install of interest … when due and payable" and "(ii) the failure by the Company to pay all or any part of the principal" when it becomes "due and payable," "at maturity, by acceleration or otherwise." (Joint Exhibit 5 at 17; Joint Exhibit 6 at 17.)

**RESPONSE:** Admitted.

71. In Section 8 of the Promissory Notes, the investors "designate[d] and appoint[ed] ACLP (the "Agent") as their agent under the Series A Notes" to act on their behalf under the provisions of the notes and to "exercise such powers set forth therein," including declaring default under the notes, exercising all rights with respect to the Collateral upon default. Section 8 further provides, "In performing its functions and duties under the Series A Notes, the Agent shall act solely as an administrative representative of the Series A Holders and does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with or for the Series A Holders and does not assume and shall not be deemed to have assumed

any obligation toward or relationship of agency or trust with or for the Series A Holders, the Company or any person." (Joint Exhibit 5 at 14; Joint Exhibit 6 at 14; Gazdak Decl. ¶ 37.)

**RESPONSE:** Admitted.

72. The appointment of the ACLP as administrative agent for the noteholders as provided for under Section 8 of the Promissory Notes does not pose a conflict and is common procedure among broker-dealers processing private placement documentation for their issuing clients. (O'Shea Report at 9.)

**RESPONSE:** Disputed.

FOL disputes this opinion. ACLP promised more favorable terms to the Lenders than FOL had agreed to. (FOL SUMF ¶¶ 69-83). When the promissory notes came due, ACLP was obligated to enforce the Promissory Notes as agent for the Lenders. (Joint Ex. 5 at 14 of 44, § 8(b)(6). It did not have a full set of notes incorporating the asset schedules. (PX 16). At the same time, it owed FOL fiduciary duties as its financial adviser of loyalty, perfect candor, full disclosure, utmost good faith, and strict honesty. When FOL disputed the terms that the Lenders sought to enforce, including the repayment premium, conversion rights, and collateral rights, ACLP could not simultaneously deliver the terms promised to the lenders—but not agreed to by FOL—and adhere to its duties of loyalty, candor, full disclosure, good faith, and strict honesty. Moreover, the collection of any amount is a zero-sum game. The debtor wants to pay at most the amount it agreed to pay, and the creditor wants to be paid the most it can collect. A person owing a duty to collect the maximum amount possible for the creditor cannot accomplish that goal without violating a duty of loyalty to the debtor, particularly when the amount is disputed. (Landis Supp. Decl. ¶ 47).

73. ACLP did not prohibit FOL from contacting investors or communicating directly with them. In fact, FOL communicated directly via email, by phone, and in person with several investors

including Howard DaSilva, Greg Hurley, John Burgess, and Barrie Clapham. (Gazdak Decl. ¶ 28.)

**RESPONSE:** Disputed.

FOL disputes this allegation as inconsistent with Gazdak's prior testimony and the facts. Gazdak testified as Rule 30(b)(6) designee that he could not speak to whether there were conversations between FOL and the Lenders. (ACLP 30(b)(6) at 118:7-10). Except for John Burgess, who ACLP directed FOL to repay, DaSilva, Hurley, and Clapham were all on the advisory board. (Landis Supp. Decl. ¶ 20). Any other lenders that FOL contacted refused to speak to FOL or had very little to say.. (Landis Supp. Decl. ¶ 21).

74. ACLP did not withhold contact information for the investors from FOL. In fact, the lending documents sent to FOL and its counsel contained mailing addresses and email addresses of each of the investors. (Gazdak Decl. ¶ 29.)

**RESPONSE:** Disputed.

FOL disputes this allegation as inconsistent with the facts. ACLP never provided FOL with a complete set of the lending documents. (Landis Supp. Decl. ¶ 48). Gazdak expressly withheld contact information. (PX 21). Like ACLP expects the Court to comb through thousands of pages of documents to confirm that the subscription agreements actually contained legible contact information for each lender, ACLP refused to provide it to FOL in summary format. (Landis Supp. Decl. ¶ 49). ACLP did not provide phone numbers or bank account information for any of the investors. (Landis Supp. Decl. ¶ 49).

This statement also contradicts Gazdak's prior testimony. In his deposition, Gazdak was asked whether he ever provided lender contact information to FOL. Contrary to his sworn

declaration, he stated that he did not recall and did not know why he did not send it. (Gazdak Depo. at 233:23-234:18).

75. FOL was introduced to ACLP and Frank DiMartini by Tim Kelly. (Gazdak Decl. ¶ 12; Deposition of Floyd Landis (6/13/22) at 182:19-184:24; Defs' Ex. D-224.)

**RESPONSE:** Admitted.

76. Tim Kelly had no relationship with Alexander Capital and Alexander Capital never held Tim Kelly out as its agent. ACLP understood Tim Kelly to be acting as FOL's agent due to the fact that Tim Kelly brought FOL to DiMartini and ACLP. (Gazdak Decl. ¶ 12.)

**RESPONSE:** Admitted in part, disputed in part.

FOL disputes this allegation based on the facts and as being inconsistent with prior testimony. Like ACLP believes that Tim Kelly was FOL's management, Gazdak testified as Rule 30(b)(6) designee testified that he had met Tim Kelly as a "management consultant" for ACLP client Logicworks, prior to ACLP's engagement with FOL. (ACLP 30(b)(6) at 119:3-120:14). Carl Martorano confirmed that ACLP had prior contact with Kelly through Logicworks. (ACLP 30(b)(6) 2024 at 24:11-23). Tim Kelly also raised funds for Provision around the same time that ACLP was restructuring Provision's senior secured debt that was similar in terms to FOL's senior secured debt. (Leonard Dep. at 47:23-48:20); PX 58). Three DDD, LLC was also paid out of that restructuring. PX 58 at Schedule B, Page 9 of 9)

This statement is also inconsistent with Gazdak's deposition testimony. Gazdak said he did not know what capacity Tim Kelly was acting in. (Gazdak ACLP 30(b)(6) Deposition 135:14-22). Gazdak also testified that the management of FOL did not include Tim Kelly. (Gazdak Dep. 9/19/2022 at 202:19-203:6).

FOL admits that ACLP never held Tim Kelly out to be its agent.

77. Tim Kelly was a primary contact for FOL and provided ACLP with investor pitch decks and other requested information about FOL's business for use as part of ACLP's due diligence. (Gazdak's Decl. ¶ 10.)

**RESPONSE:** Disputed.

FOL disputes this allegation as contradictory to sworn testimony and contrary to the facts. Gazdak's declaration contradicts his prior testimony. Floyd Landis was the primary contact for FOL. (Landis Supp. Decl. ¶ 12). FOL believed that Kelly was ACLP's contact for FOL i.e., the person FOL would contact to provide information to ACLP. (Landis Supp. Decl. ¶ 14). This statement is also inconsistent with Gazdak's prior testimony. Gazdak testified he did not know what capacity Tim Kelly was acting in. (Gazdak ACLP 30(b)(6) Deposition 135:14-22).

78. Tim Kelly provided ACLP with an investor pitch deck entitled "Deck 9.19.18" on September 24, 2018, for use in connection with the solicitation of investors in the private placement. (Gazdak's Decl. ¶ 10; Ex. A to Gazdak Decl. at 122-143.) While the deck contained a footer stating "Confidential | Not for Distribution," it was understood that the purpose of this language was to warn the potential investors – not ACLP – to refrain from distributing the decks outside of the fundraising process. (*Id.*)

**RESPONSE:** Disputed.

FOL disputes this allegation based on the facts and that it contradicts Gazdak's prior testimony. Gazdak's understanding that a document marked "Confidential" and "Not for Distribution" is not based on any facts and directly contradicts the commonly understanding of what something that is "Confidential" and "Not For Distribution" is. When asked whether he reviewed the document, Gazdak stated he "did not recall." (Gazdak Depo. at 137:1-138:6). When asked whether he approved sending the pitch deck, Gazdak testified that he "did not know."

(Gazdak Dep. at 183:22-24).  He also testified that he did not know whether it was his job to approve communications to be sent to investors.  (Gazdak Dep. at 142:1-12).  Now he declares that the purpose of the language was to warn investors, not warn ACLP not to distribute confidential information.

Chief Compliance Officer Michelle Misiti contradicted this testimony, stating that she would have preferred to see a version that was not marked "Confidential" and "Not for Distribution."  (Misiti Dep. at 93:3-94:1).

79. Tim Kelly and CMD, not ACLP, prepared the collateral schedules that were appended to the lending documents. (Gazdak Decl. ¶ 25; Ex. F to Gazdak Decl.; Defs' Ex. ACLP-6.)

**RESPONSE:**  Disputed.

FOL disputes this allegation as unsupported by the cited material, contrary to the facts, and contrary to Gazdak's testimony.

First, Defendant's Ex. ACLP-6 does not show any asset schedules.

Second, Gazdak was asked "Do you have any knowledge as to how these schedules were created?"  He answered: "No."  (Gazdak 30(b)(6) at 171:8-10).  Now he asserts that Tim Kelly and CMD created the schedules.

Third, Frank DiMartini created the schedules. (Transcription of PX Recording 7 attached to Supplemental Declaration of Bob Bell).

Fourth, according to Jonathan Gazdak, the schedules were never located and appended to the lending documents.  (PX 16).

80. FOL had an agreement with Tim Kelly, dated November 27, 2017, described as a "Senior Secured Loan" whereby Kelly agreed to lend senior secured debt to FOL for the purpose of

purchasing a Palisade Greenhouse in exchange for cashless warrants of shares in FOL. (Defs' Ex. ACLP-7.)

**RESPONSE:** Admitted.

81. Landis/FOL agreed to pay Tim Kelly disbursements from investor funds out of the escrow account. (Defs' Ex. ACLP-8.)

**RESPONSE:** Admitted in part, disputed in part.

The cited materials do not support the alleged facts. Exhibit ACLP-8 does not show an agreement to disburse funds from the Escrow Account. Exhibit ACLP-8 is an email for a proposed real estate closing that never happened. (Landis Supp. Decl. ¶ 18).

FOL admits that FOL *and* ACLP agreed to pay Kelly pursuant to the Escrow Agreement. FOL agreed to pay Tim Kelly, a person FOL later learned was not permitted to collect commissions, because FOL was told that he was entitled to commissions. (Landis Supp. Decl. ¶ 15).

82. The allegation in the First Amended Complaint that Alexander Capital and CMD arranged for unauthorized kickbacks to be paid to Three DDD, an entity owned by Tim Kelly, is based only on an assumption by Landis. (Landis Dep. (9/26/24) at 75-77, 171-72.)

**RESPONSE:** Admitted in part, disputed in part.

FOL admits that it assumed that ACLP had an agreement to compensate Kelly with commission after being directed to pay them. (Landis Supp. Decl. ¶ 15). FOL learned after Landis's referenced deposition that Mark Leonard and Frank DiMartini were also likely owners in Three DDD, LLC. (Landis Supp. Decl. ¶ 16.). FOL also learned that ACLP had compensated Three DDD, LLC in restructuring the Provision Senior Secured Debt. (Landis Supp. Decl. ¶ 17).

34

ACLP, as a party to the Escrow Agreement, agreed to pay Three DDD, LLC through the escrow disbursements. (PX 47 at ¶ 1.4, Ex. A).

83. Landis assumed that Tim Kelly had a deal with ACLP to earn commissions on the funds raised in the private placement. (Landis Dep. (9/26/24) at 171-72.)

**RESPONSE:** Admitted in part, disputed in part.

FOL admits that it assumed that ACLP had an agreement to compensate Kelly with commission after being directed to pay them. (Landis Supp. Decl. ¶ 15). FOL learned after Landis's referenced deposition that Mark Leonard and Frank DiMartini were also likely owners in Three DDD, LLC. (Landis Supp. Decl. ¶ 16). FOL also learned that ACLP had compensated Three DDD, LLC in restructuring the Provision Senior Secured Debt. (Landis Supp. Decl. ¶ 17).

84. ACLP did not utilize Kelly's services in connection with the FOL investment raise. Whatever the arrangement was between FOL, DiMartini, and Kelly regarding Kelly's compensation for any work he performed on FOL's behalf was not part of ACLP's engagement agreement with FOL. ACLP had no knowledge of alleged kickbacks being paid to DDD, LLC, and in fact had no knowledge that DDD was Tim Kelly's company until after FOL approved those disbursements. (Gazdak Decl. ¶ 13.)

**RESPONSE:** Admitted in part, disputed in part.

This allegation of fact is self-contradictory. The statement "[w]hatever the arrangement was between FOL, *DiMartini*, and Kelly regarding Kelly's compensation . . ." glances past the fact that DiMartini was an agent for ACLP. As a party to the Escrow Agreement, ACLP also approved of disbursements to Three DDD, LLC. (PX 47 at ¶ 1.4, Ex. A). These approvals effectuated the agreement between DiMartini, as agent for ACLP, and Kelly.

FOL disputes this allegation as contrary to the facts and misleading. FOL learned after Landis's referenced deposition that Mark Leonard and Frank DiMartini were also likely owners in Three DDD, LLC. (Landis Supp. Decl. ¶ 16). FOL also learned that ACLP had compensated Three DDD, LLC in restructuring the Provision Senior Secured Debt. (Landis Supp. Decl. ¶ 17).

85. Landis admits that he has no direct knowledge of a deal between ACLP and Kelly or that Kelly would receive commissions in connection with the private placement. (Landis Dep. (9/26/24) at 172.)

**RESPONSE:** Disputed.

FOL agreed to pay Tim Kelly, a person FOL later learned was not permitted to collect commissions, because FOL was told that he was entitled to commissions. (Landis Supp. Decl. ¶ 15).

86. Landis approved disbursements from escrow to DDD/Tim Kelly and characterized them as "interest" payments. (Landis Dep. (9/26/24) at 82-91; Defs' Ex. ACLP-9.)

**RESPONSE:** Admitted in part, disputed in part.

FOL admits Landis approved disbursements from escrow to DDD/Tim Kelly and characterized them as "interest" payments. FOL adds that ACLP also approved the disbursements to Three DDD, LLC based on its approval of the escrow breaks, as required under the Escrow Agreement. (PX 47 at ¶ 1.4, Ex. A).

87. The 30% premium to be paid to investors on their principal balance was only called for upon an early redemption by the company and not at maturity. Notes often have such early redemption language. (O'Shea Report at 10.)

**RESPONSE:** Admitted.

88. FOL made no principal payments on any of the senior secured notes. (FOL 30b6 (9/28/22) Dep. at 138:5-8.)

**RESPONSE:** Disputed.

FOL disputes this allegation as contradicted by the facts. FOL repaid John Burgess in full at the direction of Jonathan Gazdak because Burgess was not an accredited investor who desperately needed to be repaid, and FOL was later sued for doing so. (Landis Supp. Decl. ¶ 20).

89. Although FOL did, for a time, make the requisite interest payments on the notes, FOL did not pay the full amount of interest owed. (Landis Dep. (6/13/22) at 219:7-221:12; 304:3-23.)

**RESPONSE:** Admitted.

90. Based on its revenue projections, FOL should have had more than enough cash to repay the notes. (FOL 30b6 (9/28/22) Dep. at 169-179.)

**RESPONSE:** Admitted.

91. Landis testified that FOL had "easy access" to the funds to repay the notes in full and that Landis could have raised the money to repay the debts on his own. (Landis Dep. (9/26/24) at 309:24, 313:23-314:10.)

**RESPONSE:** Admitted.

92. Landis testified that FOL held enough assets of value – in this case, the interest in various cannabis dispensaries – that the sale of those assets could have paid off the debt in full. (Landis Dep. (9/26/24) at 313:18-22.)

**RESPONSE:** Admitted.

93. After FOL failed to timely pay the quarterly interest when it became due, ACLP attempted to work with FOL to comply with its obligations to the lenders, including discussing a variety of potential repayment or restructuring options. (Gazdak Decl. ¶ 30.)

**RESPONSE:** Disputed.

FOL disputes this allegation as inconsistent with Gazdak's prior testimony and inconsistent with the facts. Gazdak testified that he did not know if he or ACLP wanted Lenders to be repaid. (Gazdak Dep. at 234:19-235:12). As reflected in the 8 Point Plan, ACLP and the Advisory Board put forth a refinancing proposal that was intended to deliver to the Lenders the terms that ACLP and DiMartini had promised but not delivered. (PX 18). ACLP did not discuss a variety of potential repayment plans or restructuring options. (Landis Supp. Decl. ¶ 22). ACLP only discussed repayment plans or restructuring options that would effectuate the terms of the Secret Side Deal. (Landis Supp. Decl. ¶ 22).

94. From November 2019 through June 2020, ACLP engaged in lengthy and protracted negotiations with FOL to aid FOL in attempting to satisfy its obligations to the investors under the notes and facilitate the success of the company. (Gazdak Decl. ¶ 31-32.)

**RESPONSE:** Admitted in part, disputed in part.

FOL admits that the Admit from November 2019 through June 2020, ACLP engaged in lengthy and protracted negotiations with FOL. This was the pretense of these discussions, but as Gazdak testified, he did not know if ACLP wanted the lenders to be repaid. (Gazdak Dep. at 234:19-236:15). As reflected in the 8 Point Plan, ACLP and the Advisory Board put forth a refinancing proposal that was intended to deliver to the Lenders the terms that ACLP and DiMartini had promised but not delivered. (PX 18). ACLP was attempting to satisfy its promises to the Lenders under the Secret Side Deal. (Landis Supp. Decl. ¶ 24). ACLP only discussed repayment plans or restructuring options that would effectuate the terms of the Secret Side Deal. (Landis Supp. Decl. ¶ 22).

95. In response to a June 6, 2020 proposal from ACLP and the investors with a "framework to move forward, which should allow [FOL] to agree [to] a refinancing deal acceptable to the Noteholders, while not compromising the future success of the business to progress along a growth path," Floyd Landis stated "I'd rather walk away and start over than ever pay this much for Capital again." Five days later, at the request of the investors, ACLP sent FOL a notice of default and demand for full payment of all principal and interest. (Gazdak Decl. ¶ 33; Exhibit H to Gazdak Decl. at ACLP 037902-031905.)

**RESPONSE:** Disputed.

FOL disputes this allegation because it is not supported by the cited materials. Gazdak's declaration cites Exhibit H, and Exhibit H does not state this.

96. Although ACLP was copied on an email outlining Barrie Clapham's alternative plan to form a new company with new management with the goal of filing suit against FOL, and acquiring FOL's assets, ACLP was not involved in the creation or execution of the proposed plan. (Gazdak Decl. ¶ 34.)

**RESPONSE:** Disputed.

FOL disputes this allegation because it is inconsistent with ACLP's binding Rule 30(b)(6) testimony. Clapham circulated an email proposing this plan and then requested that Gazdak organize a phone call to discuss it. (PX 25). FOL asked ACLP 30(b)(6) designee Carl Martarano whether this phone call occurred, and he testified that he did not know and did not discuss this with Gazdak in preparation for his binding 30(b)(6) testimony. (ACLP Depo. at 212:19-213:7). Now, ACLP contends that nothing further happened despite putting forward an unprepared Rule 30(b)(6) designee who was not able to answer questions on this precise issue.

ACLP was involved in the execution of the proposed plan. ACLP transferred the Promissory Notes to Redemption in violation of the Promissory Notes' transfer restrictions. (FOL SUMF ¶¶ 140-159).

97. ACLP was replaced as Agent for the noteholders on August 12, 2020 by Redemption Holdings, Inc., a company made up of certain of the investors for purposes of taking action to collect on the defaulted notes. Alexander Capital was not involved with the creation of Redemption Holdings, Inc. and had no relationship with Redemption. (Gazdak Decl. ¶ 35.)

**RESPONSE:** Disputed.

FOL disputes this allegation as contrary to the facts. ACLP agreed to resign as agent for the Lenders and transferred the Promissory Notes to Redemption in violation of the express terms prohibiting their transfer. (FOL SUMF ¶¶ 140-159).

98. Redemption alleged that FOL made fraudulent misrepresentations in marketing materials to induce the investments. (Joint Exhibit 2 ¶¶ 40-45, 71-100, 258-264.)

**RESPONSE:** Admitted.

99. Redemption's Second Amended Complaint alleged that FOL represented that: (a) it had already received a dispensary license in Palisade; (b) it was under contract to purchase a Tier 2 licensed cannabis farm in Moffat, Colorado and an existing marijuana dispensary in Leadville, Colorado; and (c) that FOL brand was sold in over 30 dispensaries. (*Id.* ¶ 41.)

**RESPONSE:** Admitted.

100. Redemption's Second Amended Complaint further alleged that marketing materials produced by FOL showed that the Palisade greenhouse and the Moffat farm are listed as assets to be secured by the funds raised. (*Id.* ¶ 42.)

**RESPONSE:** Admitted.

101. Redemption's Second Amended Complaint further alleged that in pre-investment talks with FOL in 2018, Chris Ryan, FOL's chief financial officer, represented to at least one Noteholder that FOL was undergoing an audit and the balance sheet was positive. (*Id.* ¶ 43.)

**RESPONSE:** Admitted.

102. Redemption's Second Amended Complaint further alleged that according to FOL the funds raised were to be used to acquire dispensaries selling THC and CBD products. (*Id.* ¶ 44.)

**RESPONSE:** Admitted.

103. Redemption's Second Amended Complaint further alleged that the Noteholders ultimately discovered that no audit was ever accomplished, and that FOL was not being managed as represented. (*Id.* ¶ 45.)

**RESPONSE:** Admitted.

104. FOL settled the default on the notes in litigation with the lenders without having to repay the principal or remaining interest. (Joint Exhibit. 3.)

**RESPONSE:** Admitted in part, disputed in part.

FOL admits that it settled the default on the Promissory Notes.

FOL disputes this allegation because it is inconsistent with the cited material. As reflected in Joint Exhibit 3, FOL gave valuable consideration in exchange for satisfaction of the Promissory Notes being satisfied in full.

105. The noteholders did not foreclose on FOL's collateral or attempt to take over the company. (*Id.*)

**RESPONSE:** Admitted in part, disputed in part.

FOL admits that Redemption was not successful in foreclosing on any collateral.

FOL disputes this allegation as inconsistent with the facts. Redemption attempted to seize all of the company's assets through a restraining order, injunction, receivership, and request to foreclose all assets of the company, including assets that did not belong to the company. (PX 31). Redemption obtained the option to acquire the Oregon Dispensaries and FOL terminated its interest in those dispensaries. (ACLP SUMF ¶ 106).

106. The noteholders, through Redemption Holdings, agreed to settle their claims against FOL and the terms of the settlement of that litigation allowed Floyd Landis to retain control of FOL and did not result in the seizure of FOL's assets. (*Id.*)

**RESPONSE:** Admitted.

107. As part of the settlement of the Redemption litigation, the noteholders released FOL from any obligation to repay those loans in exchange for $1 and certain Oregon cannabis dispensaries. (Landis Dep. (9/26/24) at 200:2-25.)

**RESPONSE:** Admitted.

108. Bob Bell, sitting as FOL's 30b6 designee, testified that FOL did not own the dispensaries and that "there are other entities and stuff that owned those dispensaries and stuff." (FOL 30b6 Dep. (9/25/24) at 301:23-302:14.)

**RESPONSE:** Admitted.

109. The dispensaries, which were operated under the name Floyd's Fine Cannabis, were not operated by FOL and that FOL did not own the brand name Floyd's Fine Cannabis and was never involved in the cannabis business in any way. (FOL 30b6 Dep. (9/25/24) at 8:21 – 10:5.)

**RESPONSE:** This allegation contradicts ACLP's principal argument that FOL was involved in the sale of cannabis in ACLP SUMF ¶ 2.

110. ACLP did not have any interest or direct rights to the collateral securing the FOL notes. (Gazdak Decl. ¶ 36.)

**RESPONSE:** Disputed.

FOL disputes this allegation as contrary to the facts. ACLP was the agent for the lenders and had an interest in seizing that collateral to collect on obligations owed to the lenders.

111. If FOL defaulted, the noteholders could seek to foreclose on the collateral. (Gazdak Decl. ¶ 38; Joint Exhibits 5 & 6 at 17.)

**RESPONSE:** Admitted.

112. ACLP stood to gain nothing from FOL's potential default, and, in fact, did not gain anything from FOL's default. (Gazdak Decl. ¶ 38.)

**RESPONSE:** Admitted.

113. After the noteholders directed ACLP to issue the notice of default, they replaced ACLP as their agent and sued FOL, without ACLP's involvement. (Gazdak Decl. ¶ 35; Ex. J to Gazdak Decl.)

**RESPONSE:** Disputed.

FOL disputes this allegation as inconsistent with the facts. ACLP agreed to resign as agent for the lenders and transfer the Promissory Notes in violation of the Promissory Notes' transfer restrictions. (FOL SUMF ¶¶ 140-159).

114. John Burgess signed documentation affirming he was an accredited investor when he executed his loan documents on March 31, 2018 and September 9, 2018. (Defs' Ex. ACLP-10 at 7-9, 47-50.)

**RESPONSE:** Disputed.

FOL disputes this allegation as the documentation that DiMartini and ACLP sent to Mr. Burgess was pre-filled and he was not an accredited investor. (PX 59; Landis Supp. Decl. ¶ 44).

115. Landis authorized the sale of Tim Kelly's shares in FOL to Mark Leonard and signed a certificate for 2,700,000 shares to Mark Leonard. (Landis (10/16/24) Dep. at 22:23-23:24.)

**RESPONSE:** Disputed.

FOL disputes this allegation as not supported by the referenced materials. As Landis made clear in his deposition testimony, there were events that led to issuing the share certificates that cast doubt on their validity. (Landis (10/16/24) Dep. at 22:23-23:24.). As Leonard admitted, the shares were issued under duress. (FOL SUMF ¶ 186). Landis did not authorize the sale but acquiesced to it under duress. (FOL SUMF ¶ 186).

116. Although a Securities Purchase Agreement dated September 16, 2018 between FOL and Provision Holding, Inc. contains a reference to certain notes placed by ACLP, ACLP had no involvement in this agreement, did not prepare the document, and did not receive any compensation associated with the agreement. (Gazdak Decl. ¶ 39.)

**RESPONSE:** Disputed.

FOL disputes this allegation as inconsistent with the facts. ACLP did not receive any direct compensation from FOL, but Leonard has admitted that the shares were issued under duress and then Leonard sold some of this shares to others and paid ACLP a higher commission than FOL was paying to raise capital. (FOL SUMF ¶ 186, 184).

117. ACLP was never involved in any discussions with FOL regarding a reverse IPO. Such discussions would have necessitated a new Engagement Agreement, and no such agreement exists (or was ever even discussed). Any discussions between FOL and DiMartini (along with Tim Kelly) about a reverse IPO would have been outside the scope of DiMartini's

employment with ACLP and his role in raising funds under the Engagement Agreement for the private placement. (Gazdak Decl. ¶ 40.)

**RESPONSE:** Disputed.

FOL disputes this allegation as inconsistent with the facts. Just because it was outside of DiMartini's employment with ACLP does not mean the discussions did not occur. FOL discussed a reverse IPO with DiMartini. (Landis Supp. Decl. ¶ 13).

118. Joseph Amato and Rocco Guidicipietro are not and have never been partners of ACLP. (Declaration of Joseph Amato ¶¶ 2-10; Declaration of Rocco Guidicipietro ¶¶ 2-10.)

**RESPONSE:** Disputed.

FOL disputes this allegation as inconsistent with the facts. In ACLP's Rule 30(b)(6) deposition, ACLP's Chief Compliance Officer Michelle Misiti called Amato and Guidicipietro the owners of ACLP. (Misiti Dep. 9/19/2022 at 7:11-16). ACLP's current general counsel (and counsel of record in this matter) Aaron Wright responded to a FINRA enforcement action by stating that Amato and Guidicipietro are "active owners and partners in the Firm." (Ex. 45 at 5 of 18). Mr. Wright elaborated that it would be "absolutely unfair" for FINRA to bring an enforcement action against ACLP for ACLP's wrongdoing that occurred before "December of 2013" before "active control of the Firm was sold to Messrs. Amato and Guidicipietro." (Id. at 9 of 18). In its Continuing Member Application FINRA, prepared by ACLP's counsel, ACLP listed both Amato and Guidicipietro as "direct owners" of ACLP. (Ex. 47 at 5-6 of 18) also (Ex. 51 at 10 of 15) (FINRA registration statement listing Amato as "partner" of ACLP). At a minimum, this is a disputed material fact.

119. John DiMartini's invested in FOL via a promissory note dated April 27, 2018. (Defs' Ex. ACLP-11.)

**RESPONSE:** Admitted.

120. Coil Distribution LLC was not a registered LLC until June 2018 and the purported distribution agreement drafted by CMD was not contemplated until September 2018. (Defs' Ex. ACLP-12; Defs' Ex. ACLP-13.)

**RESPONSE:** Admitted.

<div align="center"><strong>CLAPHAM AND LEONARD "INVESTOR" DEFENDANTS</strong></div>

**Mark D. Leonard**

1. Defendant Mark D. Leonard ("Leonard") was never an officer, director, employee, or fiduciary of Floyd's of Leadville n/k/a Valued Inc. ("FOL") and was not an agent of FOL with respect to investor communications, lending transactions, or control of company assets. Leonard Dec. ¶ 4.

**RESPONSE:** Admitted in part, disputed in part.

FOL disputes this allegation based on the facts. Leonard was a sales agent. (Landis Decl. ¶ 50). "In the principal-agent context, it is the agent who owes a fiduciary duty to the principal as a matter of law. 'An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship.'" *MDM Grp. Assocs. v. CX Reinsurance Co. Ltd.*, 165 P.3d 882, 889 (Colo. App. 2007); Restatement (Third) of Agency § 8.01 (2006).

2. Leonard's interactions with FOL concerned ordinary commercial opportunities, including possible retail or distribution contacts. *Id.* at ¶ 5.

**RESPONSE:** Disputed.

FOL disputes this allegation based on the facts. Leonard's characterizations of his interactions with FOL are contrary to the facts he has admitted in this case. Based on the RFAs, Leonard's interactions that deviate from ordinary, arm's-length commercial business include:

- **The "Coil" Shell Company Scheme:** Leonard admitted that he owned and controlled Coil, a shell company with no assets or business operations. (FOL SUMF ¶¶ 192-199). Leonard admitted that he misrepresented Coil to FOL as a "longstanding distribution company" capable of distributing their products to thousands of stores. (FOL SUMF ¶ 202). He admitted this arrangement was designed to extract a significant percentage of FOL's equity and lucrative sales commissions without providing anything in return, and without disclosing that Coil was actually owned by Alexander Capital associates (Tim Kelly and Frank DiMartini) who were attempting to extract money from FOL. (FOL SUMF ¶¶ 192-204).

- **The "Provision" Loan and Extorted Stock Scheme:** Leonard, who controlled an entity called Provision, admitted that he convinced FOL to lend to Provision under the false pretenses of an impending $3 million investment by Coinstar and promises of discounted advertising services. (FOL SUMF ¶ 210-213) Instead of being used for Provision's operations, Leonard admitted that $50,000 of FOL's loaned funds were paid to DiMartini/Alexander Capital, and the remaining $250,000 was directed to Kelly to purchase FOL stock (even though Kelly did not actually own any FOL stock). (FOL SUMF ¶¶ 217-219). Leonard acquired this stock under duress—with DiMartini threatening to liquidate FOL if they did not sign the stock over to Leonard—and ultimately sold it for $540,000, subsequently paying out commissions to Alexander Capital and their law firm, CMD, from the proceeds. (FOL SUMF ¶ 221-230).

- **Stealing Product Information to Compete:** Leonard admitted that he met with Mark Ward specifically to obtain information about FOL's products, copy FOL's creams, and establish a rival CBD business to directly compete with FOL. (FOL SUMF ¶ 231-234).

3. Tim Kelly contacted Leonard on Floyd Landis's ("Landis") behalf to get FOL's products into the retail sector, and Leonard and his colleagues placed FOL's brand in multiple retail stores. *Id.* at ¶ 6.

**RESPONSE:** Admitted.

4. FOL never compensated Leonard for his services. *Id.* at ¶ 7.

**RESPONSE:** Admitted.

5. At the request of Landis and Tim Kelly (who Leonard understood to be working for FOL), Leonard introduced certain people to Landis and Tim Kelly, who later invested in FOL, but he did not collect investor monies, act as an agent for debt holders, or act on behalf of investors in enforcing notes against FOL. *Id.* at ¶ 8.

**RESPONSE:** Admitted.

6. Landis repeatedly asked Leonard to introduce him to investors who would infuse capital into FOL, and Leonard did so. *Id.* at ¶ 9.

**RESPONSE:** Admitted.

7. Leonard acquired approximately 2.7 million shares of common stock in FOL. *Id.* at ¶

**RESPONSE:** Admitted.

8. Leonard received a signed stock certificate evidencing his ownership of the shares in FOL. *Id.* at ¶ 11.

**RESPONSE:** Admitted.

9. Leonard subsequently sold a portion of his shares in FOL to other buyers for $540,000. *Id.* at ¶ 12.

**RESPONSE:** Admitted.

10. These buyers also received signed stock certificates. *Id.* at ¶ 13.

**RESPONSE:** Admitted.

11. Leonard offered some of his shares to Landis and Alexandra Merle of FOL to raise money for FOL but they declined. *Id.* at ¶ 14.

**RESPONSE:** It is unclear what the meaning of this allegation is. Leonard offering his shares of FOL to the existing owners of FOL to raise money for FOL does not make sense.

12. Leonard never prepared, drafted, revised, approved, or directed the preparation of any FOL lending documents, subscription agreements, promissory notes, or investor communications relating to the notes at issue in this case. *Id.* at ¶ 15.

**RESPONSE:** Admitted.

13. Leonard never directed Alexander Capital or anyone else to make any false statement to FOL investors concerning repayment, conversion rights, premiums, or any alleged "secret side deal." *Id.* at ¶ 16.

**RESPONSE:** Admitted.

14. Leonard never communicated false information to investors to induce them not to negotiate with FOL, not to refinance their loans or to assign their claims, and never made false statements that FOL had no plan to repay them. *Id.* at ¶ 17.

**RESPONSE:** Admitted.

15. Leonard never communicated false information to FOL investors, never stated that FOL management had committed fraud, and never said that investors were entitled to terms different from those reflected in the operative documents. *Id.* at ¶ 18.

**RESPONSE:** Admitted.

16. Leonard never participated in any effort to pressure FOL's investors to refuse negotiations with FOL. *Id.* at ¶ 19.

**RESPONSE:** Disputed.

FOL disputes this allegation as contradicted by the facts. Leonard participated in an effort to create a rival CBD company with Clapham, who funded litigation efforts to seize FOLs assets through receivership, which Clapham admits. (PX 54; FOL SUMF ¶¶ 133, 234, 239-243, 258).

17.     Any shares of FOL Leonard discussed selling were shares he understood he personally owned or had the right to sell and that, during the period when FOL was raising money, he offered on multiple occasions to allow some of his shares to be sold, understanding that any shares sold in those transactions were existing shares that he owned or had the right to sell. *Id.* at ¶ 20.

**RESPONSE:** Admitted.

18.     Leonard did not ask anyone to issue him treasury shares or newly issued company shares from FOL that he did not own and did not knowingly sell shares of FOL that he did not own, nor did he ever take, posses, or exercise dominion over money or property belonging to FOL without authorization. *Id.* at ¶ 21.

**RESPONSE:** Disputed.

FOL disputes this allegation based on the facts. Leonard alleges that the share certificates that he received for his shares were issued directly by FOL to Leonard and not from Kelly, from whom he allegedly acquired them. [Leonard Undisputed Material Fact ¶ 8; FOL SUMF ¶¶ 177-186). Shares issued by a company to an investor are treasury shares.

19.     Leonard did not instruct Alexander Capital, Bari Latterman, Peter DiChiara, or anyone else to misrepresent to any investor that shares were newly issued by FOL if they were not, and that his understanding was that the shares at issue were existing FOL shares, not newly issued company shares. *Id.* at ¶ 22.

**RESPONSE:** Disputed.

FOL disputes this allegation based on the facts. Leonard testified that the share certificates that he received for his shares were issued directly by FOL to Leonard and not from Kelly, from whom he allegedly acquired them. (Leonard Undisputed Material Fact ¶ 8; FOL SOMF ¶¶ 210-230). Shares issued by a company to an investor are treasury shares.

20. Leonard did not direct Alexander Capital or any other person to conceal from FOL any sale of shares that he believed he had the right to sell and that his understanding was that FOL and Alexander Capital were aware that he was offering his shares to be sold. *Id.* at ¶ 23.

**RESPONSE**: Disputed.

FOL disputes this allegation based on the facts. Leonard contacted Gazdak and DiChiara himself without FOL's knowledge. (PX 52). He concealed his acquisition of the shares from FOL. (Id.)

21. Leonard did not receive any company funds from FOL in connection with any stock transaction. *Id.* at ¶ 24.

**RESPONSE:** Admitted.

22. Leonard did not agree to participate in any unlawful plan to acquire FOL's assets, did not communicate inducements to investors to assign claims or refuse negotiations, and later withdrew from Redemption altogether before this lawsuit. *Id.* at ¶ 25.

**RESPONSE:** Disputed.

FOL disputes this allegation based on the facts. Leonard obtained confidential information from ACLP concerning FOL's vendors, then visited at least one of those vendors to attempt to create an identical product. (SUMF ¶ 251, 231-234). He researched FOL's vendors and used this information in conjunction with his plan to establish a rival CBD company with Clapham. (Leonard Dep. 10/29/2024 at 119:7-123:16, PX 53).

23.     Leonard never agreed to participate in a plan to run a rival cannabidiol ("CBD") company using assets belonging to FOL and, although he later explored unrelated business opportunities, he did not use FOL's assets in doing so. *Id.* at ¶ 26.

**RESPONSE:**  Disputed.

FOL disputes this allegation based on the facts.  Leonard obtained confidential information from ACLP concerning FOL's vendors, then visited at least one of those vendors to attempt to create an identical product.  (Leonard Dep. 10/11/2024 at 149:18-21).  He used this information in conjunction with his plan to establish a rival CBD company with Clapham.  (Leonard Dep. 10/11/2024 at 149:18-21; FOL SUMF ¶¶ 231-234)

24.     Leonard states that he never knowingly joined any conspiracy to harm FOL, never knowingly participated in any breach of fiduciary duty owed to FOL, and never acted as an assignee, collection vehicle, or enforcement agent for investors for the purpose of wrongfully acquiring FOL assets. *Id.* at ¶ 27.

**RESPONSE:**  Disputed.

FOL disputes these allegations as inconsistent with the facts.  Leonard obtained confidential information from ACLP concerning FOL's vendors, then visited at least one of those vendors to attempt to create an identical product.  (Leonard Dep. 10/11/2024 at 149:18-21; FOL SUMF ¶¶ 231-234).  He used this information in conjunction with his plan to establish a rival CBD company with Clapham.  (Id.).  Leonard contacted Gazdak and DiChiara himself without FOL's knowledge.  PX 52).  He concealed his acquisition of the shares and subsequent sale from FOL. (Id.).

25.     Leonard did not use confidential information belonging to FOL to compete against FOL or to help anyone else do so. *Id.* at ¶ 28.

**RESPONSE:** Disputed.

FOL disputes this allegation based on the facts. Leonard obtained information about FOL's manufacturers and visiting them to create a competing product and company. (FOL SUMF ¶ 231-234). He admits that he visited one of FOL's manufacturers, but denies that he succeeded in competing.

26. Leonard states he once visited a manufacturer that FOL had used for one of its products, but did not use that manufacturer to take or exploit FOL's assets, never did any business with that company, and understood that the manufacturer offered a broad range of products unrelated to CBD. *Id.* at ¶ 29.

**RESPONSE:** Admitted in part, disputed in part.

FOL admits that Leonard once visited a manufacturer that FOL had used for one of its products, but did not use that manufacturer to take or exploit FOL's assets, never did any business with that company.

FOL disputes that Leonard "understood that the manufacturer offered a broad range of products unrelated to CBD." As Leonard testified in his deposition, he went to that manufacturer "because [he] knew they did CBD products" and "they did Floyd's as well." (Leonard Depo. 10/11/2024 at 149:8-21).

27. Leonard never took, possessed, or exercised dominion over money or property belonging to FOL without authorization and never received funds that he understood belonged to FOL and were improperly withheld from the company. *Id.* at ¶ 30.

**RESPONSE:** Disputed.

FOL disputes this allegation based on Leonard's admitted facts. Leonard obtained the funds to acquire shares in FOL through a fraudulent scheme was using a $300,000.00 payment

made by FOL to Provision Holding, Inc., which was ostensibly intended for business operations and marketing services. Once Provision received these funds, Mark Leonard directed a series of highly suspect transfers. First, a $50,000.00 kickback was carved out of FOL's $300,000.00 payment and routed directly to Frank DiMartini and/or FOL's broker-dealer, Alexander Capital, L.P. (FOL SUMF 215). Leonard directed the remaining $250,000.00 to Kelly (FOL SUMF 216). This payment was explicitly designated to purchase Kelly's stock in FOL (FOL SUMF 217). In reality, Kelly did not own any stock in FOL (FOL SUMF ¶ 218). Despite this absolute lack of ownership, Leonard "received" FOL stock that was falsely alleged to belong to Kelly (FOL SUMF ¶ 219). This established a completely fraudulent, "phantom" stock transfer designed to siphon equity out of FOL.

Having acquired these unauthorized "phantom" shares of FOL, Leonard and ACLP immediately moved to liquidate them for substantial private profit. Leonard sold the converted FOL stock to third-party investors for $540,000.00, securing a profit on a transaction funded entirely by FOL's original $300,000.00 capital outlay (FOL SUMF 220). This conversion and resale were not executed in isolation. Both Alexander Capital and its advisory associates, CMD, actively advised Leonard on both the acquisition (FOL SUMF ¶¶ 221, 222) and the disposition of this unauthorized stock (FOL SUMF ¶¶ 223, 224).

Both CMD and Alexander Capital were paid directly out of the cash proceeds generated from the sale of this converted FOL stock (FOL SUMF ¶ 225, 226).

To complete the self-dealing, Gazdak—acting on behalf of Alexander Capital—personally approved the payment of these transaction commissions back to his own firm. (FOL SUMF ¶ 227). Frank DiMartini threatened to liquidate FOL if the company refused to sign the FOL stock over to Leonard (FOL SUMF ¶ 228). Because of this threat to the startup's survival, any formal

approval or sign-off by FOL regarding the sale or transfer of FOL stock to or from Leonard was executed under duress, rendering those approvals invalid. (FOL SUMF ¶ 229).

28. Any business dealings Leonard had that involved FOL were legitimate commercial dealings undertaken in good faith and that he did not engage in any conspiracy, aiding and abetting, tortious interference, conversion, or other wrongful conduct toward FOL. *Id.* at ¶ 31.

**RESPONSE:** This purported undisputed material fact is a series of legal conclusions that contains no facts. For the reasons set out in FOL's motion for summary judgment and its response to Defendants' motion, FOL disputes that Leonard's characterizations are correct.

29. Leonard was a member of a company called Coil Distribution LLC ("Coil.") *Id.* at ¶ 32.

**RESPONSE:** Admitted.

30. Leonard had discussions and business arrangements with Coil members Frank DiMartini and Tim Kelly concerning Coil Distribution LLC as a possible vehicle to sell FOL's products, but Coil never consummated a binding business arrangement or did business with FOL. *Id.* at ¶ 33.

**RESPONSE:** Admitted in part, disputed in part.

FOL admits that Leonard was a member of Coil and that he had discussions with Frank DiMartini and Tim Kelly concerning Coil Distribution LLC as a possible vehicle to sell FOL's products.

31. Coil was never used to obtain FOL's assets. *Id.* at ¶ 34.

**RESPONSE:** Admitted.

FOL admits that Coil was unsuccessful in obtaining FOL's assets.

**Leonard and Rainmaker Retail Group, LLC**

32.     Leonard introduced FOL to Rainmaker Retail Group, LLC ("Rainmaker") at the request of Landis. *Id.* at ¶ 35.

**RESPONSE:**  Admitted.

33.     Leonard initiated litigation and arbitration against Rainmaker to recover commissions due to him pursuant to agreement. *Id.* at ¶ 36.

**RESPONSE:**  Admitted.

34.     Leonard never harassed or threatened Rainmaker to dissuade it from doing business with FOL. *Id.* at ¶ 37.

**RESPONSE:**  Disputed.

FOL disputes this allegation based on Leonard's admitted facts.  Leonard admitted that he sued Rainmaker and caused Rainmaker to discontinue its relationship with FOL, lose its ability to distribute its products, and buy-back more than a million dollars worth of FOL product.  (FOL SUMF ¶¶ 187, 207-209).

35.     Leonard did not initiate or pursue any litigation or arbitration against Rainmaker for the purpose of harming FOL, and he did not direct any litigation strategy at FOL or its investor relationships. *Id.* at ¶ 38.

**RESPONSE:**  Disputed.

FOL disputes this allegation based on Leonard's admitted facts.  Leonard admitted that he sued Rainmaker and caused Rainmaker to discontinue its relationship with FOL, lose its ability to distribute its products, and buy-back more than a million dollars worth of FOL product.  (FOL SUMF ¶¶ 187, 207-209).

36.     Leonard and Rainmaker settled their dispute in arbitration. *Id.* at ¶ 39.

**RESPONSE:**  Admitted.

**Ronald Barrie Clapham**

37.   In 2018, Defendant Ronald Barrie Clapham ("Clapham") traveled to Colorado to investigate FOL to see if it was a worthwhile company to invest in. Clapham Dec. at ¶ 4 .

**RESPONSE:**  Admitted.

**Landis's misrepresentations and admissions concerning FOL**

38.   During his trip to Colorado, Landis and Alexandra Merle of FOL made representations to Clapham concerning FOL which he later discovered were false. *Id.* at ¶ 5.

**RESPONSE:**  FOL cannot properly respond to this alleged fact because it does not reference any particular statement that is alleged to be false, when it was made, what context it was made in, who in particular made it, why it was made, or when Clapham allegedly discovered it was false.  Neither Landis nor Alexandra Merle-Huet made any false statements to Clapham.  (Landis Supp. Decl. ¶ 30).

It appears also that Clapham may be experiencing the same problem that Hurley and Redemption experienced.  In the Redemption Litigation, Redemption accused FOL, Landis, and Merle-Huet of fraud, and Hurley later retracted those allegations and testified under oath that Alexander Capital was responsible for creating these false impressions of dishonesty.  (PX 31).

Clapham admitted that neither FOL nor its management engaged in fraud.  (FOL SUMF ¶ 297).

39.   Shortly after his investment in FOL, Landis told Clapham that if Clapham didn't invest more money in FOL then FOL would go bankrupt. *Id.* at ¶ 6.

**RESPONSE:**  Disputed.

FOL disputes this allegation as contradicted by the material facts and divorced from context.  At the time that Clapham invested in FOL, FOL expected Provision to repay its loan.

(Landis Supp. Decl. ¶ 29). Clapham's business partner Leonard caused Provision not to repay the loan, and caused a liquidity issue at FOL. (Landis Supp. Decl. ¶ 31). Thereafter, FOL engaged in the Advisory Board process to reach a resolution with the existing stakeholders rather than liquidating assets or borrowing from a third-party to repay the Promissory Notes. (Landis Supp. Decl. ¶ 23). When Gazdak refused to provide current and accurate contact information for the Lenders, FOL attempted to reach the Lenders independently from ACLP and had little success. (Landis Supp. Decl. ¶ 37). When FOL reached out to the Lenders, ACLP transferred the Promissory Notes and other lending documents in violation of the transfer restrictions in the Promissory Notes. (FOL SUMF ¶¶ 142-159. Redemption then unsuccessfully attempted to seize all of FOL's assets through a restraining order, preliminary injunction, and receivership. (FOL SUMF ¶ 160-167). Redemption also accused FOL, Landis, and Merle-Huet of fraud and prevented FOL from refinancing with a third-party. (FOL SUMF ¶¶ 160-173). After spending more than $2 million on litigation, FOL has not sought bankruptcy protection. (Landis Supp. Decl. ¶ 38).

40. In late 2018, Floyd promised Clapham that he would involve him in the management of FOL and to make an IPO of FOL, only to renege on the promise. *Id.* at ¶ 7.

**RESPONSE:** Admitted in part, disputed in part.

FOL admits that Landis promised to involve Clapham in the management of FOL and to take FOL public through an IPO.

FOL disputes that Lanids "reneged" on his promise. Landis did not "renege" on that promise—ACLP had fraudulently promised to take FOL public to induce it to borrow and did not follow through on its promise. (Landis Supp. Decl. ¶ 57).

Clapham admitted that neither FOL nor its management engaged in fraud. (FOL SUMF ¶ 297).

41. Landis admitted to Clapham that he had removed assets from FOL. *Id.* at ¶ 8.

**RESPONSE:** FOL cannot properly respond to this alleged fact because it does not reference any particular asset that is alleged to have been removed.

FOL denies that Landis removed assets from FOL, and the ownership of the Leadville Dispensary was fully disclosed. (Landis Supp. Decl. ¶ 40). It appears also that Clapham may be experiencing the same problem that Hurley and Redemption experienced. ACLP informed the Lenders that FOL owned the Leadville Dispensary and it was pledged as collateral to secure the Promissory Notes. (FOL SUMF ¶ 79-80). The Leadville Dispensary did not belong to FOL, was not collateral to secure the loans, could not be pledged as collateral, and was always wholly-owned by PBVille, LLC, an LLC owned solely by Landis. (FOL SUMF ¶ 37, 47, 59, 60).

It appears also that Clapham may be experiencing the same problem that Hurley and Redemption experienced. In the Redemption Litigation, Redemption accused FOL, Landis, and Merle-Huet of fraud, and Hurley later retracted those allegations and testified under oath that Alexander Capital was responsible for creating these false impressions of dishonesty. (FOL SUMF ¶¶ 167).

Clapham admitted that neither FOL nor its management engaged in fraud. (FOL SUMF ¶ 297).

42. Landis explained to Clapham that he should back Landis to keep assets out of FOL because that way FOL's lenders can't get their hold in any value. *Id.* at ¶ 9.

**RESPONSE:** FOL cannot properly respond to this alleged fact because it does not reference any particular asset that is alleged to have been kept out of FOL.

FOL denies that Landis kept assets out of FOL. (Landis Supp. Decl. ¶ 40). It appears also that Clapham may be experiencing the same problem that Hurley and Redemption experienced.

ACLP informed the Lenders that FOL owned the Leadville Dispensary and it was pledged as collateral to secure the Promissory Notes. (FOL SUMF ¶ 79-80). The Leadville Dispensary did not belong to FOL, was not collateral to secure the loans, could not be pledged as collateral, and was always wholly-owned by PBVille, LLC, an LLC owned solely by Landis. (FOL SUMF ¶ 37, 47, 59, 60). FOL considered a structure with the Advisory Board where the Leadville Dispensary could be pledged to secure the loans, but never agreed to that due to the Lenders' attempts to enforce the other terms—30% repayment premium and conversion rights—that DiMartini and ACLP had promised but FOL did not agree to. (Landis Supp. Decl. ¶ 58).

It appears also that Clapham may be experiencing the same problem that Hurley and Redemption experienced. In the Redemption Litigation, Redemption accused FOL and Landis of fraud and removing assets, and Hurley later retracted those allegations and testified under oath that Alexander Capital was responsible for creating these false impressions of dishonesty. (FOL SUMF ¶¶ 167).

Clapham admitted that neither FOL nor its management engaged in fraud. (FOL SUMF ¶ 297).

43. Clapham discovered the financial information of FOL he had been given by Landis and Alexandra Merle of FOL was inaccurate. *Id.* at ¶ 10.

**RESPONSE:** FOL cannot properly respond to this alleged fact because it does not reference any particular "financial information" that either Landis or Merle-Huet had given, how it was given, when it was given, or why it was inaccurate.

FOL disputes that Landis and Merle-Huet gave inaccurate financial information. Neither Landis nor Merle-Huet gave financial information that was known to be inaccurate at the time given. (Landis Supp. Decl. ¶ 42).

It appears also that Clapham may be experiencing the same problem that Hurley and Redemption experienced. In the Redemption Litigation, Redemption accused FOL, Landis, and Merle-Huet of fraud, and Hurley later retracted those allegations and testified under oath that Alexander Capital was responsible for creating these false impressions of dishonesty. (FOL SUMF ¶¶ 167).

Clapham admitted that neither FOL nor its management engaged in fraud. (FOL SUMF ¶ 297).

44. It appeared to Clapham that Landis was manipulating the income and the assets of FOL for his own personal benefit, or certainly to the detriment of the business. *Id.* at ¶ 11.

**RESPONSE:** FOL cannot properly respond to this alleged fact because it does not reference any particular "income or assets" that Landis was alleged to be manipulating to his own personal benefit or to the detriment of the business.

Generally, it appears also that Clapham may be experiencing the same problem that Hurley and Redemption experienced. In the Redemption Litigation, Redemption accused FOL, Landis, and Merle-Huet of fraud, and Hurley later retracted those allegations and testified under oath that Alexander Capital was responsible for creating these false impressions of dishonesty. (FOL SUMF ¶¶ 167).

Clapham admitted that neither FOL nor its management engaged in fraud. (FOL SUMF ¶ 297).

45. Clapham discovered there was $100,000 to $1.5 million in debt from Landis's family and friends that hadn't been declared by FOL. *Id.* at ¶ 12.

**RESPONSE:** FOL cannot properly respond to this alleged fact because it does not reference any particular timeframe for when Clapham "discovered" the liquidity that Landis's family and friends provided to FOL.

Generally, it appears also that Clapham may be experiencing the same problem that Hurley and Redemption experienced. In the Redemption Litigation, Redemption accused FOL, Landis, and Merle-Huet of concealing this debt, and Hurley later retracted those allegations and testified under oath that Alexander Capital was responsible for creating these false impressions of dishonesty. (FOL SUMF ¶¶ 167).

Clapham admitted that neither FOL nor its management engaged in fraud. (FOL SUMF ¶ 297).

46. Clapham's impression was that FOL's revenue was being wasted on unnecessary expenditures. *Id.* at ¶ 13.

**RESPONSE:** Disputed.

Clapham's impression as to what was an unnecessary expenditure is not relevant to any claim or defense in this action. It appears also that Clapham may be experiencing the same problem that Hurley and Redemption experienced. In the Redemption Litigation, Redemption accused FOL, Landis, and Merle-Huet of wasting company assets on personal expenditures, and Hurley later retracted those allegations and testified under oath that Alexander Capital was responsible for creating these false impressions of dishonesty. (FOL SUMF ¶¶ 167).

Clapham admitted that neither FOL nor its management engaged in fraud. (FOL SUMF ¶ 297).

47. In 2019 or 2020, Clapham discovered that FOL was unable to repay its debts to noteholders. *Id.* at ¶ 14.

**RESPONSE:** Disputed.

FOL disputes the allegation that in 2019 or 2020, Clapham "discovered" that FOL was unable to repay its debts to noteholders. In his alleged fact 39, Clapham states that Landis told him that FOL was facing bankruptcy. Now, he claims he discovered it. FOL disputes the allegation in Clapham's SUMF 47 for the same reasons as FOL disputes the allegations in Paragraph 39.

48. Specifically, FOL owed approximately $4.3 million of 12 percent senior secured debt. *Id.* at ¶ 15.

**RESPONSE:** Admit that FOL owed approximately $4.3 million of 12 percent senior secured debt.

49. Clapham believed that the noteholders owed money from FOL were prepared to take action against FOL, which would cause the shareholders of FOL to suffer. *Id.* at ¶ 16.

**RESPONSE:** Admitted.

50. Clapham initially believed Alexander Capital simply represented note holders who FOL was indebted to. *Id.* at ¶ 17.

**RESPONSE:**

Admit that Clapham believed that ACLP represented the Lenders.

FOL disputes that Clapham "simply" believed this. Clapham testified that DiMartini offered to sell Promissory Notes to Clapham, indicating that ACLP was acting as FOL's investment banker, financial advisor, and underwriter. (Clapham Dep. 10/13/2024 at 15:10-25). Clapham then invested in FOL through an equity purchase handled through DiMartini of ACLP. (Clapham Dep. 10/13/2024 at 19:1-12).

**The Informal Advisory Board**

51. The advisory board ("Advisory Board") was an informal group formed around early to mid-2020 after the promissory notes issued by FOL started to mature. *Id.* at ¶ 18.

**RESPONSE:** Admitted.

52. The stated purpose of the Advisory Board was to attempt a workout to refinance the Promissory Notes payable by FOL. *Id.* at ¶ 19.

**RESPONSE:** Admitted in part, disputed in part.

Admit that the *stated* purpose of was to attempt a workout to refinance the Promissory Notes payable by FOL.

FOL disputes this fact because that was the stated purpose, but the Advisory Board and Clapham had ulterior motives. Clapham admitted that one of the primary purposes of the Advisory Board was to "learn enough about FOL's business operations to permit Redemption or another entity to acquire all of FOL's assets and perform FOL's business operations for the benefit of Redemption's owners." (FOL SUMF ¶ 258). Clapham admitted that the Advisory Board demanded that control of FOL be turned over to the Lenders specifically to fulfill the false loan terms promised to them and to effect the "Secret Side-Deal." (FOL SUMF ¶ 256). He admitted that the Advisory Board intentionally prevented FOL from refinancing its loans, renegotiating with the Lenders, or repaying the loans on the terms FOL believed it had accepted. (FOL SUMF ¶ 259-260).

53. Clapham believed the purpose of the informal advisory board was to obtain true information about the state of FOL and to identify a solution that would enable the business to become solvent. *Id.* at ¶ 20.

**RESPONSE:** Disputed.

FOL disputes this fact based on Clapham's admissions. Clapham admitted that one of the purposes of the Advisory Board was to learn enough about FOL's business operations to permit Redemption or another entity to acquire all of FOL's assets and perform FOL's business operations for the benefit of Redemption's owners. (FOL SUMF ¶ 258). Clapham admitted that when he served on the Advisory Board, he planned a complete hostile takeover of FOL. (FOL SUMF ¶ 264). Clapham admitted that the Advisory Board demanded that control of FOL be turned over to the Lenders specifically to fulfill the false loan terms promised to them and to effect the "Secret Side-Deal." (FOL SUMF ¶ 256). He admitted that the Advisory Board intentionally prevented FOL from refinancing its loans, renegotiating with the Lenders, or repaying the loans on the terms FOL believed it had accepted. (FOL SUMF ¶ 259-260).

54. While serving on the Advisory Board, Clapham learned that, contrary to the representations made to him by FOL, FOL did not own any dispensaries outright. *Id.* at ¶ 21.

**RESPONSE:** Disputed.

FOL disputes this fact based on Clapham's representations to others. He claims in this disputed fact that he learned that "FOL did not own any dispensaries outright," but in his "FOL Solution" presented to the Advisory Board, his plan states that FOL owned the dispensaries. (PX 25 at 4 of 12). He also funded litigation with the stated purpose of taking those dispensaries through court process, which would have been impossible had FOL not owned them. (Clapham Undisputed Material Fact 60; FOL SUMF ¶ 241, 243).

55. While Clapham was on the Advisory Board, he had no knowledge of material misrepresentations of a false fact asserted by anyone. *Id.* at ¶ 22.

**RESPONSE:** Disputed.

FOL disputes this fact based on Clapham's admissions. Clapham admitted he knew that the terms promised to the Lender's were different than the terms agreed to by FOL. (FOL SUMF ¶ 266).

56. The Advisory Board existed from roughly January 2020 to August 2020. *Id.* at ¶ 23.

**RESPONSE:** Admitted.

57. FOL was given the opportunity to action a financial plan suggested by the Advisory Board, but FOL vacillated and then declined. *Id.* at ¶ 24.

**RESPONSE:** Admitted in part.

Admit that the 8 Point Plan was proposed and declined.

58. Clapham wanted a receiver appointed over FOL to, inter alia, deal with the excessive number of employees at the company and due to the belief that the Company was being mismanaged, evidenced by the fact that, amongst other things, it couldn't pay its noteholders. *Id.* at ¶ 25.

**RESPONSE:** FOL disputes this allegation based on the facts. Clapham has admitted that he sought a receiver for ulterior motives: First, he has admitted that he was planning a targeted acquisition:

- He admitted that "while serving on the Advisory Board, [he] planned to complete a hostile takeover of FOL". (FOL SUMF ¶ 264).

- He admitted that his "investment strategy is to acquire an equity ownership in overleveraged companies and then cause those companies to distribute their assets to a successor company in which [he has] a greater ownership percentage". (FOL SUMF ¶ 301).

- He admitted that he "expected to make more money if Redemption owned all of FOL's assets than [he] would make if FOL repaid the loans". (FOL SUMF ¶ 269).

- Clapham admitted the goal of litigation was asset acquisition for a rival company, not managing employees. (FOL SUMF ¶¶ 272-275)

- He admitted that "the purpose of forming Redemption was to sue FOL". (FOL SUMF ¶ 240).

- He admitted that "the purpose of forming Redemption was to acquire all of the assets of FOL and transfer them to Redemption". (FOL SUMF ¶ 241).

- He admitted that "one of the purposes of the Advisory Board was to learn enough about FOL's business operations to permit Redemption or another entity to acquire all of FOL's assets and perform FOL's business operations for the benefit of Redemption's owners". (FOL SUMF ¶ 258).

- He admitted that he "intended to run a rival CBD company to FOL after Redemption had acquired FOL's assets". (FOL SUMF ¶ 272).

- Clapham admitted that he and the Advisory Board intentionally blocked FOL from paying or restructuring its debt, rather than FOL failing to do so due to mismanagement. (FOL SUMF ¶ 257, 259-260).

- He admitted that the "Advisory Board prevented FOL from repaying the loans on the terms that FOL believed were those accepted by FOL". (Id.)

- He admitted that his "actions through the advisory board prevented FOL from refinancing the loans". (FOL SUMF ¶ 260).

- He admitted that the "Advisory Board prevented FOL from renegotiating the loans with the Lenders". (FOL SUMF ¶ 259).

- He admitted that he "prevented or assisted in preventing FOL from negotiating with the Lenders". (FOL SUMF ¶ 290).

Despite claiming he believed the company was mismanaged, Clapham admitted to believing the company had massive value and committed no wrongdoing.

- He admitted that "neither FOL nor its management engaged in fraud". (FOL SUMF ¶ 297).

- He admitted that "prior to the inception of the Colorado Litigation, You believed FOL or the assets of FOL were worth at least $150 million" (FOL SUMF ¶ 289).

59.     Clapham believed that if Landis didn't return FOL's misappropriated assets or create a lien against FOL assets, the noteholder's only way of protecting themselves would be to see a receiver taking control of the assets and the income of FOL. *Id.* at ¶ 26.

**RESPONSE:** FOL disputes this fact on the same basis FOL disputed Clapham's SUMF ¶ 58.

**Clapham and Redemption**

60.     Clapham lent $120,000 to Redemption Holdings, Inc. ("Redemption") to support the application for an appointment of a receiver over FOL. *Id.* at ¶ 27.

**RESPONSE:** Admitted in part, disputed in part.

Clapham did not lend $120,000 to Redemption solely to support an application for appointment of a receiver. He admitted that the purpose of forming Redemption was to acquire all of the assets of FOL and transfer them to Redemption. (FOL SUMF ¶ 243). He further admitted that the purpose of forming Redemption was to effect the Secret Side Deal described in the Complaint and Amended Complaint." (FOL SUMF ¶ 244).

61.     Clapham did not believe that the purpose of Redemption was to take over FOL's assets. *Id.* at ¶ 28.

**RESPONSE:** Disputed.

FOL disputes this fact on the same basis FOL disputed Clapham's SUMF ¶ 58.

62. Clapham only made contact with Landis and FOL at least 6 months after FOL completed its loan deal with Alexander Capital. *Id.* at ¶ 29.

**RESPONSE:** Disputed.

FOL disputes this allegation based on documentary evidence and Clapham's testimony. DiMartini contacted Clapham at the beginning of the Promissory Note offer. (Clapham Oct. 13, 2024 Depo. at 15:10-12). On May 23, 2018, Frank DiMartini sent Clapham documents to participate in the Promissory Note Offering. (PX 55).

Moreover, the promissory note offering was ongoing when Clapham met Landis. Clapham testified that he met Landis in September or October of 2018. (Clapham Dep. 10/13/2024 at 15:1-9). He made his investment in FOL on or before November 6, 2018. (PX 56 at 2). This was just seven days after the last Lender made its investment in FOL. (PX 56 at 1).

63. Clapham did not know of the existence of either entity before that time. *Id.* at ¶ 30.

**RESPONSE:** Disputed.

FOL disputes this allegation because Clapham testified, under oath, contrarily to this. Clapham has known Frank DiMartini since 2006 or 2007, and DiMartini has contacted him "dozens" of times. (Clapham Dep. 10/29/2024 at 35:5-36:2). On May 23, 2018, Frank DiMartini sent Clapham documents to participate in the Promissory Note Offering. (PX 55).

Moreover, the promissory note offering was ongoing when Clapham met Landis. Clapham testified that he met Landis in September or October of 2018. (Clapham Dep. 10/13/2024 at 15:1-9). He made his investment in FOL on or before November 6, 2018. (PX 56 at 2). This was just seven days after the last Lender made its investment in FOL. (PX 56 at 1).

64. Clapham never told investors that FOL had no plan to pay them back. *Id.* at ¶ 31.

**RESPONSE:** Disputed.

FOL disputes this allegation as contrary to the facts based on Clapham's admissions and documents. Clapham admitted that he "advised or assisted in advising the Lenders that FOL had no plan to repay the Lenders." (FOL SUMF ¶ 292). Clapham circulated a presentation that said the same thing. (PX 25.

65. Clapham was never involved in a business that tried to take over FOL or actually competed with FOL. *Id.* at ¶ 32.

**RESPONSE:** Admitted in part, disputed in part.

FOL disputes this allegation on the same basis FOL has disputed Clapham's SUMF ¶ 58.

FOL admits that Clapham was unsuccessful in his attempts to compete with FOL.

66. Clapham did not use confidential information belonging to FOL to compete against it or to help anyone else do so. *Id.* at ¶ 33.

**RESPONSE:** Disputed.

FOL disputes this allegation as contrary to the facts. Clapham admitted that all information he received from FOL while serving on the Advisory Board was required to be treated as confidential. (FOL SUMF ¶ 245). He admitted that he accepted confidential and proprietary FOL information gathered while serving on the Advisory Board and used it to injure FOL. (FOL SUMF ¶ 276). He admitted that he did not treat all information he received from FOL while serving on the Advisory Board as confidential. (FOL SUMF ¶ 246). He admitted that he disclosed to unauthorized third-parties information received from FOL while serving on the Advisory Board. (FOL SUMF ¶ 246-247). He admitted that he approved of the disclosure of confidential information by Advisory Board members to unauthorized third parties. (FOL SUMF ¶ 252). He

70

admitted he approved of the disclosure of confidential information by Advisory Board members to Leonard. (FOL SUMF ¶ 253). He admitted that the purpose of disclosing confidential information about FOL to unauthorized third-parties was to harm FOL. (FOL SUMF ¶ 248).

67. Clapham was never an officer, director, employee, or fiduciary of FOL, and was not an agent of FOL with respect to investor communications, lending transactions, or control of company assets. *Id.* at ¶ 34.

**RESPONSE:** Admitted.

68. Clapham never knowingly joined any conspiracy to harm FOL, never knowingly participated in any breach of fiduciary duty owed to FOL, and never acted as an assignee, collection vehicle, or enforcement agent for investors for the purpose of wrongfully acquiring FOL assets. *Id.* at ¶ 35.

**RESPONSE:** Disputed.

FOL disputes this fact on the same basis FOL disputed Clapham's SUMF ¶ 58. Additionally, Clapham's emails to Gazdak and others show that he was actively attempting to conceal his tracks including by contacting the principals for the Oregon Dispensaries, when he stated to Gazdak that he was "happy to agree a cover story" for contacting them. [ACLP224560]

**Above CBD**

69. In February 2020, Clapham and Leonard, amongst others, were considering opening and/or investing in a business called Above CBD LLC a/k/a Above Holding LLC to sell CBD products in vending machines. *Id.* at ¶ 36.

**RESPONSE:** Admitted.

70. Above CBD LLC a/k/a Above Holding LLC is the alleged rival CBD company referred to in the First Amended Complaint. *Id.* at ¶ 37.

**RESPONSE:** Admitted. Clapham also started a second company of similar nature called "Purafyll." (PX 54).

71. Above CBD LLC a/k/a Above Holding LLC never made any sales or competed with FOL. *Id.* at ¶ 38.

**RESPONSE:** Admitted.

<u>**ADDITIONAL STATEMENT OF UNDISPUTED MATERIAL FACTS**</u>

Pursuant to the Court's Individual Rules and Practices in Civil Cases, Section 4(g)(iii), FOL submits the following Statement of Undisputed Material Facts. FOL notes that Defendants did not consecutively number their Statement of Undisputed Material Facts. The ACLP Defendants submitted 120 Undisputed Material Facts, and Defendants Leonard and Clapham submitted 71 Undisputed Material Facts. Because these overlap, and to avoid confusion and comply with the Court's practice standard to begin numbering each entry where the moving party left off, FOL starts its Additional Statement of Undisputed Material Facts at 121, where ACLP left off.

120. A true and correct copy of FOL's Initial and Supplemental Rule 26(a)(1) is attached as PX 49.

121. Frank DiMartini admitted that DiChiara represented ACLP on the Offering. (Transcription of PX Recording 6 attached to Supplemental Declaration of Bob Bell).

122. To sell his phantom shares in FOL, Leonard sent a share purchase agreement, which he drafted, to DiChiara, and then asked him to issue regulatory compliance opinions under SEC Section 4(a)(7), bypassing FOL's corporate authorization. (PX 50-52).

123. Leonard and Clapham discussed using Frank DiMartini to extend the loan notes as they discussed setting up a new CBD company, and then discussed taking over the loans to achieve their purposes. (PX 54).

124. ACLP's current general counsel (and counsel of record in this matter) Aaron Wright responded to a FINRA enforcement action by stating that Amato and Guidicipietro are "active owners and partners in the Firm." (PX 62 at 5 of 18)

125. Mr. Wright elaborated that it would be "absolutely unfair" for FINRA to bring an enforcement action against ACLP for ACLP's wrongdoing that occurred before "December of 2013" and before "active control of the Firm was sold to Messrs. Amato and Guidicipietro." (Id. at 9 of 18).

126. In its Continuing Member Application to FINRA, prepared by ACLP's counsel, ACLP listed both Amato and Guidicipietro as "direct owners" of ACLP. (PX 63 at 5-6 of 34) also (Ex. 64 at 10 of 15) (marked as Exhibit 51 from a deposition) (FINRA registration statement listing Amato as "partner" of ACLP).

127. FOL engaged ACLP to sell up to $50,000,000.00 in its equity and that number was not just made up. (Gazdak Depo. at 225:9-25).

128. Clapham understood that DiMartini was securing loans and investment in FOL. [Clapham Depo. 10/29/2024 at 38:16-22).

129. Clapham knew that Gazdak worked for ACLP and supervised the salespeople, including DiMartini. (Clapham Depo. 10/7/2024 at 49:6-25)

130. Clapham understood that Hurley considered him to be the "Trojan Horse" to take control of FOL. (Clapham Depo. 10/29/2024 at 6:19-11:19); (PX 60).

131. Leonard learned about FOL's Utah manufacturer through Frank DiMartini. (Leonard Dep. 10/11/2024 at 149:18-21).

132. ACLP did not prepare a private placement memorandum to be filed with FINRA. (Gazdak Depo. 8/13/2024 at 158:23-159:7).

133. Leonard learned about FOL's Utah manufacturer through Frank DiMartini. (Leonard Dep. 10/11/2024 at 149:18-21).

134. Michelle Misiti, as ACLP Rule 30(b)(6) designee, testified that the owners of ACLP are Joseph Amato and Rocco Guidicipietro. (Misiti Dep. 9/19/2022 at 7:14-16).

135. FOL has reviewed all of the discovery documents in this case. FOL has not located a submission to FINRA of private placement memoranda, term sheets or other offering documents, or any retail communications (as defined in Rule 2210) that promoted or recommended the Placement, including any materially amended versions thereof, used in connection with such sale within fifteen calendar days of the date of first sale. (Bell Supp. Decl. ¶ 3-8).

136. FOL has reviewed Timothy Kelly's registration statements with FINRA. Kelly was formerly a FINRA licensed securities broker but that license was revoked due to Kelly's misfeasance. (Landis Supp. Decl. ¶ 55).

137. Gazdak valued FOL at $50 million and believed that ACLP could sell at least that much equity. Defendants' actions prevent FOL from achieving that value. (Landis Supp. Decl. ¶ 59)

138. FOL's primary business was selling hemp-derived CBD products. (Landis Supp. Decl. ¶ 60)

139. ACLP had sole responsibility for communicating with the Lenders during the Placement. FOL did not communicate with the Lenders. (Landis Supp. Decl. ¶ 61).

74

140. FOL would not have engaged DiChiara had FOL known that he represented ACLP presently or previously. (Landis Supp. Decl. ¶ 62).

141. Clapham had access to the lending documents that were stored in the data room accessible to the Advisory Board, and those documents did not have asset schedules attached. (Landis Supp. Decl. ¶ 63).

142. ACLP was asked to advise FOL on investing in Provision and failed to disclose that Provision had just defaulted on its debt and did not advise FOL on the risks and rewards of investing in a near-insolvent company. ACLP also failed to disclose they had placed Leonard as Provision's CEO and had financed the 5 million it was about to default on. (Landis Supp. Decl. ¶ 33-35).

143. Clapham was FOL's largest equity investor outside of the founders. (Landis Supp. Decl. ¶ 64)

144. FOL worked with and trusted Clapham on the Advisory Board because he appeared aligned with FOL's interests and to be an ally on the Advisory Board. (Landis Supp. Decl. ¶ 65).

145. Leonard knew that DiMartini was working for ACLP. (Leonard Dep. 10/11/2024 at 56:2-6)

DATED: July 17, 2026

<div style="margin-left: 50%;">

Respectfully submitted,

/s/ Daniel J. Vedra
Daniel J. Vedra
Vedra Law LLC
1444 Blake Street
Denver, CO 80202
Phone: (303) 937-6540
Fax: (303) 937-6547
Email: dan@vedralaw.com

</div>